IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT SANDERS, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:22-CV-01523 |
| | § | |
| REGIONS BANK, | § | JURY DEMANDED |
| Defendant. | § | |

---

**DEFENDANT REGIONS BANK'S MOTION FOR SUMMARY JUDGMENT**

---

Jamila M. Brinson
ATTORNEY-IN-CHARGE
State Bar. No. 24074867
S.D. Texas ID. No. 1127492
JACKSON WALKER LLP
1401 McKinney Street, Suite 1900
Houston, TX | 77010
Voice: (713) 752-4356
Facsimile: (713) 308-4112
Email: jbrinson@jw.com

OF COUNSEL:

Jaclyn C. Staple
State Bar No. 24114890
S.D. Texas ID. No. 3241341
JACKSON WALKER LLP
1401 McKinney Street, Suite 1900
Houston, TX | 77010
Voice: (713) 752-4415
Facsimile: (713) 754-6715
Email: jstaple@jw.com


ATTORNEYS FOR DEFENDANT
REGIONS BANK

## <u>TABLE OF CONTENTS</u>

I.  NATURE AND STAGE OF PROCEEDING ............................................................1

II.  ISSUES AND STANDARD OF REVIEW .............................................................2

III.  SUMMARY OF THE ARGUMENT .....................................................................3

      A.    Regions values equal employment opportunity and diversity. ...............................3
      B.    Regions hired Sanders as a Branch Manager........................................................4
      C.    Sanders failed to apply to or was not selected for lateral openings. ......................5
      D.    Regions received and investigated an internal complaint about Sanders. ..............6
      E.    An issue arose with Sanders' expense report.........................................................7
      F.    Regions interviewed Sanders concerning Miranda's complaint.............................8
      G.    Days after his interview, Sanders first reported discrimination and
           retaliation. ..........................................................................................................10
      H.    Sanders made contradictory statements during Regions' investigation. ..............11
      I.    Regions terminated Sanders' employment. ..........................................................12

IV.  LAW AND ARGUMENT........................................................................................14

      A.    Sanders has not received a TCHRA right to sue...................................................14
      B.    Sanders cannot show race discrimination under the TCHRA. .............................14

           1.    Sanders' claim related to lateral transfers is not actionable......................15
                 a. Sanders' failure to "promote" claims are time-barred ...........................16
                 b. Sanders cannot show he applied to and was clearly more qualified
                 for the lateral positions................................................................................16
           2.    Sanders cannot show a prima facie race discrimination case based
                on his termination. .....................................................................................17
           3.    Regions' honest belief in the results of its investigation was a
                legitimate, non-discriminatory reason for Sanders's termination..............19
           4.    Sanders cannot show Regions' reason was pretextual...............................19
           5.    Sanders cannot show race discrimination was Regions' real reason
                 for terminating his employment..................................................................20
      C.    Sanders cannot show retaliation under the TCHRA. .............................................21

           1.    Certain actions Sanders claims were retaliatory were not adverse
                 actions. .......................................................................................................21
            2.    Sanders cannot show that Regions' reason for termination was
                 pretextual....................................................................................................24
V.  CONCLUSION......................................................................................................25

## **TABLE OF AUTHORITIES**

**Cases** **Page(s)**

*Alamo Hts. Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755 (Tex. 2018) ...............................13, 21, 25

*Ameen v. Merck & Co, Inc.*, 226 F. App'x 363 (5th Cir. 2007) ....................................................23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................................2

*Autry v. Fort Bend Indep. Sch. Dist.*, 704 F.3d 344 (5th Cir. 2013)............................................16

*Baker v. Exxon Chemical Americas*, 68 F.3d 467, 1995 WL 581611 (5th Cir. Aug.
  29, 1995) ..................................................................................................................................20

*Burger v. Central Apt. Mgmt., Inc.*, 168 F.3d 875 (5th Cir. 1999) ..............................................16

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..............................................................................2

*Cephus v. Tex. Health and Human Servs. Comm'n*, 146 F. Supp.3d 818 (S.D. Tex.
  2015) ........................................................................................................................................23

*Chaney v. New Orleans Pub. Facility Mgmt.*, 179 F.3d 164 (5th Cir. 1999) ...............................23

*Cooper v. Wal-Mart Transp., LLC*, 662 F. Supp. 2d 757 (S.D. Tex. 2009) .................................22

*Eaglin v. Texas Children's Hosp.*, 801 F. App'x 250 (5th Cir. 2020)...............................14, 15, 19

*Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572 (Tex. 2017) ....................................................15

*Gorman v. Verizon Wireless Tex., LLC*, 753 F.3d 165 (5th Cir. 2014) ............................21, 23, 24

*Grice v. FMC Techs. Inc.*, 216 F. App'x 401 (5th Cir. 2007) .......................................................15

*Harris Cty. Hosp. Dist. v. Parker*, 484 S.W.3d 182 (Tex. Ct. App. 2015)...................................16

*Harris-Childs v. Medco Health Solutions, Inc.*, 169 F. App'x 913 (5th Cir. 2006) .....................22

*Jassen v. O'Reilly Auto. Servs., Inc.*,
  No. 7:12-cv-00097-O, 2013 WL 12124102 (N.D. Tex. Aug. 23, 2013) ................................16

*Jefferies v. Harris Cty. Comm'y Action Ass'n*, 615 F.2d 1025 (5th Cir. 1980) ...........................19

*Johnson v. Select Energy Servs., LLC*, No. H-11-3486, 2013 WL 5425115 (S.D.
  Tex. Sept. 24, 2013)................................................................................................................14

*Laxton v. Gap Inc.*, 333 F.3d 572 (5th Cir. 2003).......................................................................15

*Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253 (5th Cir. 2009).........................................................19

*Maestas v. Apple, Inc.*, 546 F. App'x 422 (5th Cir. 2013) ............................................................16

*McCoy v. City of Shreveport*, 492 F.3d 551 (5th Cir. 2007) ........................................................18

*McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973) ..........................................................15

*Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629 (Tex. 2012) ................................15

*Moss v. BMC Software, Inc.*, 610 F.3d 917 (5th Cir. 2010) .........................................................17

*Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527 (5th Cir. 2015) ............................2

*Owens v. Circassia Pharms., Inc.*, 33 F.4th 814 (5th Cir. 2022) .................................................20

*Patton v. United Parcel Serv., Inc.*, 910 F. Supp. 1250 (S.D. Tex. 1995) ....................................21

*Pegram v. Honeywell, Inc.*, 361 F.3d 272 (5th Cir. 2004) .....................................................15, 16

*Perkins v. Promoworks, LLC*, No. H-11-442, 2012 WL 6530137 (S.D. Tex. Nov. 26, 2012) ...................................................................................................................................16

*Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483 (5th Cir. 2004).........................................21, 25

*Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500 (Tex. 2012) ..............................................13

*Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473 (Tex. 2001) .................................................15

*Quintana v. Fujifilm N. Am. Corp.*, 96 F. Supp.3d 601 (N.D. Tex. 2015) ...................................25

*Raggs v. Miss. Power & Light Co.*, 278 F.3d 463 (5th Cir. 2002) ................................................20

*Ross v. Judson Indep. Sch. Dist.*, 993 F.3d 315 (5th Cir. 2021) ..................................................18

*Sacchetti v. Optiv Security, Inc.*, 819 F. App'x 251 (5th Cir. 2020)............................................19

*Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398 (5th Cir. 1999)..........................13, 17, 19

*Swenson v. Schwan's Consumer Brands N.A., Inc.*, 500 F. App'x 343 (5th Cir. 2012) ...................................................................................................................................20

*Trent v. Wade*, 776 F.3d 368 (5th Cir. 2015)..................................................................................2

*Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887 (5th Cir. 2012) .....................................................19

*Vielma v. Eureka Co.*, 218 F.3d 458 (5th Cir. 2000) ...................................................................14

*West v. Nabors Drilling USA, Inc.*, 330 F.3d 379 (5th Cir. 2003) ...............................................15

**Statutes**

Civil Rights Act ........................................................................................................1

Civil Rights Act Title VII .......................................................................................13

Code p. 15 ...............................................................................................................13

Code p. 21 ...............................................................................................................12

TCHRA ............................................................................................................ *passim*

TCHRA: (1) ..............................................................................................................1

Tex. Lab. Code § 21.001(1) ....................................................................................13

Tex. Lab. Code § 21.055 ...................................................................................21, 22

Tex. Lab. Code § 21.202(a) ....................................................................................16

Tex. Lab. Code § 21.254 .........................................................................................13

Texas Commission on Human Rights Act ................................................................1

Texas Commission on Human Rights Act ..............................................................14

Title VII .............................................................................................................13, 14

**Other Authorities**

Federal Rule of Civil Procedure 56 ..........................................................................2

Defendant Regions Bank ("Regions") moves for summary judgment on statute of limitations and on the merits of Plaintiff Robert Sanders' ("Sanders") claims for race discrimination and retaliation under the Texas Commission on Human Rights Act ("TCHRA").

## I.  NATURE AND STAGE OF PROCEEDING

This is an employment dispute brought by Sanders against his former employer, Regions. On May 28, 2021, Sanders filed a race discrimination and retaliation Charge of Discrimination ("Charge") under Title VII of the Civil Rights Act ("Title VII") with the Equal Employment Opportunity Commission ("EEOC") and Texas Workforce Commission ("TWC").[1] On June 17, 2021, Sanders amended his Charge to reference his termination.[2] On January 26, 2022, the EEOC issued Sanders a Notice of Right to Sue.[3] Sanders has not presented a TWC notice of right to sue.

On April 18, 2022, Sanders filed his Original Petition in the Fort Bend County District Court alleging two claims under the TCHRA: (1) race discrimination; and (2) retaliation.[4] On May 12, 2022, Regions removed Sanders' case to this Court on the basis of diversity of citizenship.[5] Regions answered Sanders' Complaint on May 19, 2022.[6]

The parties conducted discovery, which closed on May 30, 2023.[7] The parties exchanged and responded to written discovery. Regions deposed Sanders' wife, Lida Thomas, on April 25, 2023,[8] and deposed Sanders on May 26, 2023.[9] Docket call is March 11, 2024.[10]

---

[1] Exh. D, Staple Decl. ¶ 3, Exhibit D-1, p. 10. The Declaration of Attorney Jaclyn Staple is attached as **Exhibit D** and cited as "Exh. D, Staple Decl. ¶ __."
[2] Exh. D, Staple Decl. ¶ 3, Exhibit D-1, p. 18.
[3] Exh. D, Staple Decl. ¶ 3, Exhibit D-1, p. 2.
[4] Dkt. at 1-3.
[5] Dkt. at 1.
[6] Dkt. at 3.
[7] Dkt. at 12.
[8] Relevant portions of Lida Thomas' deposition transcript are attached as **Exhibit B** and referenced as "Exh. B, Thomas Dep. ___:___."
[9] Relevant portions of Robert Sanders' deposition transcript are attached as **Exhibit A** and referenced as "Exh. A, Sanders Dep. __:__."
[10] Dkt. at 12.

## II.  ISSUES AND STANDARD OF REVIEW

1.      Whether Sanders can show a genuine issue of material fact on his TCHRA race discrimination claim when he failed to timely apply to two positions, was not clearly more qualified for a lateral transfer, and is time-barred from pursuing a failure to promote claim; Regions replaced Sanders with an African-American associate, and there is no comparator evidence; and Regions terminated Sanders based on its honest belief in its internal investigation in which Sanders provided contradictory explanations and that showed Sanders violated multiple Regions policies; and

2.      Whether Sanders can show a genuine issue of material fact on his TCHRA retaliation claim when he filed an internal complaint alleging race discrimination after Regions had already interviewed him in connection with a complaint against him; the decision-maker in Sanders' termination was unaware of his complaint; and Regions received his Charge after he was terminated.

The legal standard for all issues presented is the well-established summary judgment framework under Federal Rule of Civil Procedure 56. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Summary judgment is required when 'the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)). A genuine issue of material fact arises where "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The moving party must either show portions of the record demonstrating the absence of a genuine issue of material fact or point to the absence of evidence. *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015). Then, the burden shifts to the non-moving party to point to evidence and articulate how it shows there is a genuine issue of material fact on each element of his claim. *Id.* (citation omitted).

2

## III.  SUMMARY OF THE ARGUMENT

Sanders lacks evidence of a genuine issue of material fact on his race discrimination claim. His failure to "promote" claim arose in 2018 and 2019 and is time-barred; Sanders failed to timely apply to two positions, one of which was a lateral position; and he cannot show he was clearly more qualified for the other lateral position. Following his termination, a Black/African American Regions associate replaced Sanders, and Sanders has no comparator evidence.

Sanders lacks evidence of a genuine issue of material fact on his retaliation claim. Regions' Human Resources department received a complaint about Sanders and began investigating before Sanders complained of discrimination and retaliation to Regions. Sanders then threatened legal action, so Regions' Legal Department separately handled Sanders' complaint. Sanders' supervisor was unaware that Sanders had complained at the time he decided to terminate Sanders' employment with Regions. Finally, Regions received notice of Sanders' Charge days after his termination, so it cannot be the basis for a retaliation claim.

Rather, Regions investigated an internal complaint about Sanders and honestly believed the investigation's results that Sanders violated multiple Regions' policies, including by providing inconsistent, conflicting information during the investigation. Regions thus terminated Sanders for legitimate, non-pretextual, non-discriminatory, and non-retaliatory reasons, not due to race or alleged protected activity. Sanders' claims should therefore be dismissed.

## IV.     STATEMENT OF FACTS

### A.    Regions values equal employment opportunity and diversity.

Regions promotes an equal employment opportunity policy that prohibits discrimination and retaliation.[11] All Regions employees (known as associates) are required to follow its Code of

---

[11] See Exh. C, Mummert Decl. ¶ 3, Exhibit C-1. The declaration of Erin Mummert is attached as **Exhibit C** and referenced as "Mummert Decl. ¶ __."

Conduct ("Code") and *You and Regions Guidelines* ("Guidelines") which outline prohibited conduct.[12] Regions' Code reflects its commitment to equal employment practices and against retaliation.[13] Sanders received the Code and Guidelines and completed annual training on them.[14]

If an associate violates the Code or Guidelines, he is subject to discipline, up to and including termination.[15] Although Regions has a progressive discipline policy where discipline for similar infractions may increase in severity over time, the policy is clear that Regions, in its sole discretion, may move directly to immediate termination.[16]

**B.      Regions hired Sanders as a Branch Manager.**

Regions hired Sanders (who is Black/African American)[17] on July 2, 2012, as Branch Manager IV at its Sugar Land, Texas branch.[18] A branch manager is responsible for maintaining an operationally sound and high performing team that provides a high level of customer service.[19]

At Regions, Consumer Banking Managers ("CBM") supervise Branch Managers.[20] CBM Mary McDonnell (who is White/Caucasian) supervised Sanders from time of hire through approximately August 2018.[21] Then, Sanders started reporting to CBM Dave Leonard ("Leonard") (who is White/Caucasian).[22] Year after year, McDonnell and then Leonard consistently assessed Sanders' overall performance as average.[23]

In early 2021, Sanders' direct reports were: (1) Lakesha Crawford ("Crawford") (who is Black/African American), a Financial Relationship Specialist ("FRS"), *i.e.*, a banker position; (2)

---

[12] Exh. C. Mummert Decl. ¶ 3, Exhibit C-2.
[13] Exh. A, Sanders Dep. 62:25–63:9; Exh. C, Mummert Decl. ¶ 3, Exhibit C-1.
[14] Exh. A, Sanders Dep. 63:15-17, 63:24-25, 64:1.
[15] Exh. C. Mummert Decl. ¶ 3, Exhibit C-2, Progressive Discipline Guideline.
[16] Exh. C. Mummert Decl. ¶ 3, Exhibit C-2, Progressive Discipline Guideline.
[17] Exh. A, Sanders Dep. 40:25–41:2; Exh. C, Mummert Decl. ¶ 5.
[18] Exh. A, Sanders Dep. 51:15-18, 52:15-17, 54:16-18.
[19] Exh. A, Sanders Dep. 52:18-24; 53:11-13, Exhibit A (job description); Exh. C, Mummert Decl. ¶ 5.
[20] Exh. C. Mummert Decl. ¶ 5.
[21] Exh. A, Sanders Dep. 54:22-24; Exh. C. Mummert Decl. ¶ 5.
[22] Exh. A, Sanders Dep. 54:25–55:5; Exh. C. Mummert Decl. ¶ 5.
[23] Exh. A, Sanders Dep. 55:23–56:3; Exh. C. Mummert Decl. ¶ 5.

Karen Mendez Rivadenayra ("Rivadenayra") (who is Hispanic), a Financial Relationship Consultant ("FRC"), *i.e.*, a teller position; (3) Melissa Miranda ("Miranda") (who is Hispanic), a FRC; and (4) Raven Porter ("Porter") (who is Black/African American), a FRC.[24]

**C.    Sanders failed to apply to or was not selected for lateral openings.**

Regions has different branch models, including traditional, and "de novo" or "nexus" branches. [25] De novo or nexus branches are those opened in a  new market in which Regions does not have an established business base.[26]

Regions maintains an internal, electronic job board of available positions that an associate can browse at any time.[27] Occasionally, a manager may reach out to an associate they believe could be a good candidate and encourage them to apply, but it is not Regions' policy to do so.[28] If an associate is interested in an open position, they must apply via Regions' applicant tracking software system.[29]

Per Sanders, in about December 2018, he verbally expressed interest in an open branch manager position at the Sienna Plantation de novo branch.[30] The position had been posted for months, but Sanders had not applied.[31] Per Sanders, Leonard told him that Regions already provided a conditional offer of employment to its selected candidate, Melissa Ybarra ("Ybarra") (who is Hispanic), who applied for the position in August 2018 and started in December 2018.[32] Ybarra had over twenty years of banking experience at large institutions.[33]

---

[24] Exh. A, Sanders Dep. 64:18-22, 65:10–66:9, 67:11–68:9; Exh. C, Mummert Decl. ¶ 5.
[25] Exh. A, Sanders Dep. 86:12-14.
[26] Exh. A, Sanders Dep. 45:17–46:2, 46:22-24.
[27] Exh. A, Sanders Dep. 84:4-11; Exh. C, Mummert Decl. ¶ 6.
[28] Exh. C, Mummert Decl. ¶ 6.
[29] Exh. C, Mummert Decl. ¶ 6.
[30] Exh. A, Sanders Dep. 85:12-14.
[31] Exh. A, Sanders Dep. 87:17–88:2.
[32] Exh. A, Sanders Dep. 88:11-20.
[33] Exh. C, Mummert Decl. ¶ 15.

Next, Sanders believes in 2019, he went into Regions' system to "enter his interest" in a CBM position.[34] Sanders learned, however, that the position had already been taken down.[35]

In 2019, Sanders applied for a Branch Manager position at Regions' Lake Riverstone nexus branch.[36] Leonard interviewed him and, per Sanders, failed to ask him more details about his business development ideas and offended Sanders by asking, "Have you ever hired an employee who did great in the interview then did not perform?"[37] Regions selected internal candidate Myra Sanchez ("Sanchez") who had worked in banking since about 2007 and was a proven top performer.[38] Regions closed Sanders' application on or about May 22, 2019.[39] After Sanchez transferred to a branch closer to her home, the position re-opened in 2020, and Sanders did not apply; Regions hired internal candidate Matthew Batuuka (who is Black/African American) for the position, who had worked in banking since about 2003.[40]

## D.   Regions received and investigated an internal complaint about Sanders.

On January 7, 2021, Regions received an anonymous complaint about Sanders.[41] The complaint included a slew of issues: Sanders made certain associates work unfavorable times; referred Regions' customers to his wife's mortgage business; came into work late, left early, and took long lunches; and did personal business with a Regions IT support associate, Eric Johnson ("Johnson"), who had a side construction business.[42] Regions' Office of Associate Conduct

---

[34] Exh. A, Sanders Dep. 85:19-22; 96:8-16, 173:1-5 (noting CBM position was in 2018 or 2019).

[35] Exh. A, Sanders Dep. 97:8-11. Sanders believes Lee Harris ("Harris") was selected for this position. Exh. A, Sanders Dep. 97:24–98:4, 98:16-17. Harris was the Branch Manager at Regions' Cypress Branch in the Houston market and was selected for and transferred to a CBM position in Regions' Austin market in September/October 2018. *See* Exh. C, Mummert Decl. ¶ 16.

[36] Exh. A, Sanders Dep. 85:19-21, 91:17-22; Exh. C, Mummert Decl. ¶ 17, Exhibit C-15.

[37] Exh. A, Sanders Dep. 92:4-8, 93:19–94:2, 107:14-19; Exh. C, Mummert Decl. ¶ 17.

[38] Exh. C, Mummert Decl. ¶ 17.

[39] Exh. C, Mummert Decl. ¶ 17.

[40] Exh. C, Mummert Decl. ¶ 17.

[41] Exh. C, Mummert Decl. ¶ 7, Exhibit C-5. Regions had received at least one other complaint about Sanders around the same time period, *see* Exh. C, Mummert Decl. ¶ 7; however, the referenced complaint's allegations and Sanders' conduct related to the referenced complaint's investigation lead to his termination.

[42] Exh. C, Mummert Decl. ¶ 7.

("OAC"), the investigative arm of Regions' Human Resources, assigned the complaint to Associate Relations Business Partner Melody Bodine ("Bodine") to investigate.[43] The complainant self-disclosed herself as Miranda, and spoke with Leonard, then spoke with Bodine on January 21, 2021.[44]

On January 26, 2021, Bodine interviewed Rivadenayra.[45] She revealed that about once a month for about a year, Sanders had brought his personal money into the branch, exchanged it for new bills, asked his associates to keep his bills in their cashboxes, and bought back the original bills on payday.[46] Associates had to record his bills on their cashbox balance sheets as "miscellaneous."[47] In effect, Sanders was treating Regions' cashboxes like a pawn shop.[48]

Bodine asked Leonard to gather certain information to assist with the investigation.[49] For instance, Bodine provided a list of customer names related to Sanders allegedly referring customers to his wife's mortgage business.[50] Leonard reviewed websites and other sources but could not determine the nature of Sanders' wife's business.[51]

### E.    An issue arose with Sanders' expense report.

Meanwhile, Sanders submitted his January 2021 expense report.[52] The expense report seemed odd to Leonard in comparison with the amount of expenses other branch managers were submitting.[53] Sanders sought mileage reimbursement for performing Enhanced Due Diligence ("EDD") on five businesses.[54] EDD is something Regions' compliance department may request

---

[43] Exh. A, Sanders Dep. 123:9-21, 125:4-8; Exh. C, Mummert Decl. ¶¶ 2, 7.
[44] Exh. C, Mummert Decl. ¶ 7, Exhibit C-7.
[45] Exh. C, Mummert Decl. ¶ 7, Exhibit C-7.
[46] Exh. C, Mummert Decl. ¶ 7, Exhibit C-7.
[47] Exh. C, Mummert Decl. ¶ 7, Exhibit C-7.
[48] Exh. C, Mummert Decl. ¶ 7, Exhibit C-7.
[49] Exh. C, Mummert Decl. ¶ 7, Exhibit C-7.
[50] Exh. C, Mummert Decl. ¶ 7, Exhibit C-7.
[51] Exh. C, Mummert Decl. ¶ 7.
[52] Exh. C, Mummert Decl. ¶ 7.
[53] Exh. C, Mummert Decl. ¶ 18.
[54] Exh. C, Mummert Decl. ¶ 18.

that associates perform to verify select customer accounts are associated with real businesses, and may consist of taking photographs, performing site surveys, conducting questionnaires, or other steps.[55] It is not something associates decide to initiate on their own—they must receive a formal EDD request.[56]

When Leonard reviewed Sanders' expense report, he questioned why Sanders was conducting EDDs considering Regions' then COVID-19 protocol, which limited in-person EDD visits in order to limit virus exposure.[57] Leonard asked Sanders to confirm the names and addresses of the businesses for which he conducted EDD, and Sanders provided five business names, most located at significant distances from Sanders' Sugar Land branch.[58]

## F.   Regions interviewed Sanders concerning Miranda's complaint.

On February 11, 2021, Bodine and Leonard interviewed Sanders in connection with Regions' investigation into Miranda's complaint, and his interview revealed the following:[59]

- In response to Miranda's allegations, Sanders described Miranda negatively.[60]

- Sanders admitted his wife had a mortgage business but denied referring Regions customers to her business.[61]

- In response to the cashbox allegations, Sanders described himself as a "numismatist"—one who collects and studies rare currency.[62] Sanders explained he would

---

[55] Exh. A, Sanders Dep. 141:7-10, 141:23–142:9 (describing the EDD process), 143:14-16; Mummert Decl. ¶ 18.
[56] Mummert Decl. ¶ 18.
[57] Exh. A, Sanders Dep. 142:25–143:1-4 (admitting Regions' COVID-19 protocols limited face-to-face EDD); Exh. C, Mummert Decl. ¶ 7, Exhibit C-6 (Leonard January 29, 2021 email).
[58] Exh. C, Mummert Decl. ¶ 18.
[59] Exh. A, Sanders Dep. 128:8-14; Exh. C, Mummert Decl. Exhibit C-7. Regions attempted to interview Sanders sooner, on February 9, 2021, but he canceled. *See* Exh. C, Mummert Decl. ¶ 7, Exhibit C-6 (Sanders' February 8, 2021 email to D. Leonard).
[60] Exh. C, Mummert Decl. Exhibit C-7
[61] Exh. C, Mummert Decl. Exhibit C-7.
[62] Exh. A, Sanders Dep. 132:20-22; Exh. C, Mummert Decl. Exhibit C-7.

purchase a rare coin or old bill when he saw them come into the branch.[63] He also mentioned his family member was financially struggling, so he brought in $300 from his personal money collection and exchanged it for $100 bills; asked an associate to hold his original bills; then exchanged other bills he had for his original bills on payday.[64] When asked why he did not help his family member with the money he had, Sanders did not answer and deflected, stating he was not experiencing personal gain and, to him, it was no different than when a bank's vault retains new bills.[65]

- Regarding his expense report, Sanders stated he had acquired five new business relationships and performed "EDD" to ensure they were legitimate.[66] Sanders stated the EDD requests came directly to him from Regions' compliance department, and upon request, he later provided the names of those five businesses to Leonard.[67]

- Sanders admitted he (and his wife) owned rental properties.[68] He had "consulted" with Johnson on at least one of the properties.[69] He would not answer how many rental properties

---

[63] Exh. C, Mummert Decl. Exhibit C-7.

[64] Exh. A, Sanders Dep. 133:3-16; Exh. C, Mummert Decl. Exhibit C-7. Although he now claims his remark about helping a family member was a misunderstanding, he readily admits he was swapping bills: "So, it wasn't like I was doing anything like getting a loan from the bank. I just brought the new money in; and if they still had it, I would buy it back from them." Exh. A, Sanders Dep. 131:13-16, 131:19-22.

[65] Exh. C, Mummert Decl. Exhibit C-7. Afterward, Regions confirmed Sanders had $4,000 recorded "miscellaneous" in his cash box, and his drawer was about $7,000 over Regions' limit.

[66] Exh. C, Mummert Decl. Exhibit C-7.

[67] Exh. A, Sanders Dep. 154:11-17, Exhibit K; Exh. C, Mummert Decl. Exhibit C-7. The businesses were: (1) SK International LLC; (2) La Porte Shell, LLC; (3) Amlanis, LLC; (4) Wilson Discount Lumber Inc.; and (5) Sunlight I Holdings. Sanders now denies all of these expenses were for official "EDD" and claims some were for his own diligence. Exh. A, Sanders Dep. 156:4-10, 157:19-21, 158:5-15. Despite being familiar with what "EDD" meant, during Regions' investigation, he consistently referred to "EDD." *See* Exh. C, Mummert Decl. ¶ 7, Exhibit C-7, pp. 23, 28.

[68] Exh. C, Mummert Decl. Exhibit C-7.

[69] Exh. A, Sanders Dep. 136:3-10; Exh. C, Mummert Decl. Exhibit C-7 (listing the five businesses as (1) SK International LLC in Cypress; (2) La Porte Shell, LLC in Dickinson; (3) Amlanis, LLC in Houston (Sharpstown/Gulfport area); (4) Wilson Discount Lumber Inc. in Stafford; and (5) Sunlight I Holdings in Wallis). Sanders and his wife had at least three rental properties during Sanders' Regions employment. Exh. A, Sanders Dep. 32:20–33-6; 34:11-16; Exh. B, Thomas Dep. 11:12–13:25. And although Sanders now denies consulting with Johnson on the rental properties, *see* Sanders Dep. 37:12-21, at the time of the investigation, he communicated to the OAC that he consulted with Johnson on a remodel and admitted he discussed Johnson doing work on some of the properties with Johnson. Exh. A, Sanders Dep. 37:19-21; Exh. C, Mummert Decl. ¶ 8, Exhibit C-7, p. 24 (Q: "Have you used

he had and instead stated the properties had nothing to do with Regions.[70] He admitted he had not completed Regions' outside activities form to report the rental properties.[71]

## G. Days after his interview, Sanders first reported discrimination and retaliation.

On February 18, 2021, just one week after Regions interviewed Sanders in connection with Miranda's complaint, he reported discrimination by Leonard and retaliation by Miranda.[72] Sanders reported Leonard discriminated against him based on Sanders' age, race, or health status in 2019 when Leonard failed to select Sanders for the Sienna Plantation or Lake Riverstone lateral positions.[73] Sanders reported Miranda filed a complaint against him in retaliation for him giving her a bad performance review.[74] Sanders said he would follow up his concerns in writing.[75]

Regions attempted to interview Sanders on February 20, 2021, in connection with his report.[76] Sanders indicated he planned to submit his concerns in writing.[77] On February 26, 2021, Sanders was interviewed and provided some details on the concerns he raised and said he would follow up in writing; and on March 9, 2021, Sanders' attorney sent Bodine and two other OAC associates a "cease and desist" letter demanding that Regions stop all harassment, retaliation, and discrimination.[78] The letter provided no details about the specific actions or conduct Sanders

---

him for outside business?" A: "Yes."). Further, although Sanders claims he did not own or manage the rental properties, he admits he performed maintenance at the properties, Exh. A, Sanders Dep. 36:10-23. Regions' Outside Activities policy encompassed the rental properties, *see* Exh. C, Mummert Decl. ¶ 3, Exhibit C-1 (Code, Outside Activities).

[70] Exh. C, Mummert Decl. Exhibit C-7.

[71] Exh. C, Mummert Decl. Exhibit C-1, Exhibit C-7.

[72] Exh. A, Sanders Dep. 100:15-18, 172:1-11; Exh. C, Mummert Decl. ¶ 10, Exhibit C-11.

[73] Exh. A, Sanders Dep. 101:3-7; Exh. C, Mummert Decl. ¶ 10, Exhibit C-11. Sanders himself is unsure as to the basis of his discrimination claim concerning the lateral transfers, namely whether Regions' alleged failure to select him was because of his race, age, or medical conditions. Exh. A, Sanders Dep. 180:4-8 ("I was never given an opportunity, even a lateral position with the company I've been with for nine years that I'm overqualified for. If it's not my race, maybe it's my age or maybe it's my medical conditions.").

[74] Mummert Decl. ¶ 10, Exhibit C-11.

[75] Exh. C, Mummert Decl. ¶ 11, Exhibit C-7.

[76] Exh. C, Mummert Decl. ¶ 11, Exhibit C-7. OAC investigator Nicole Cooper ("Cooper") (who is Black/African American) interviewed Sanders, with Bodine in attendance, *see* Exh. C, Mummert Decl. ¶ 7, Exh. C-7 & Exh. C-8.

[77] Exh. C, Mummert Decl. ¶ 11, Exhibit C-7.

[78] Exh. C, Mummert Decl. ¶ 20, Exhibit C-18.

believed were harassing, retaliatory, or discriminatory, nor was it sent to Leonard or any other decision-maker.[79] Because Sanders threatened legal action against Regions, his report was sent to Regions' Legal Department for handling under attorney-client privilege.[80]

**H.   Sanders made contradictory statements during Regions' investigation.**

On March 2, 2021, Bodine interviewed Sanders along with Erin Mummert ("Mummert"), another Associate Relations Business Partner, to follow up on the cashbox and expense report issues.[81] Sanders changed his story from his February 11, 2021 interview:[82]

- Sanders stated sometimes customers request new bills, such as a customer who services ATMs, so he kept new currency for them.[83] Sanders said the branch's Asian customers requested new currency for Chinese New Year (which was February 11 – 26, 2021) because it was in bad taste to gift worn bills.[84] When Bodine brought up Sanders' prior statement about helping a family member, Sanders accused Bodine of misquoting him.[85] Still, it made no sense why Sanders needed to bring in personal money when the bank receives new bills for customers.[86]

- Leonard had contacted Regions' compliance department to verify whether Regions had requested EDD on the five business names Sanders provided.[87] Only one had an EDD request for January 2021,[88] despite Sanders clearly marking "EDD" on his expense report entries.[89] Bodine

---

[79] Exh. C, Mummert Decl. ¶ 20, Exhibit C-18.
[80] Exh. C, Mummert Decl. ¶ 20, Exhibit C-18.
[81] Exh. A, Sanders Dep. 125:15-18, 137:9–138:2; Exh. C, Mummert Decl. ¶¶ 7, 9, Exhibit C-7.
[82] Exh. C, Mummert Decl. ¶¶ 7, 9, Exhibit C-7.
[83] Exh. C, Mummert Decl. ¶¶ 7, 9, Exhibit C-7
[84] Exh. C, Mummert Decl. ¶¶ 7, 9, Exhibit C-7.
[85] Exh. C, Mummert Decl. ¶¶ 7, 9, Exhibit C-7.
[86] Exh. C, Mummert Decl. ¶¶ 7, 9, Exhibit C-7.
[87] Exh. C, Mummert Decl. ¶ 7, 9, Exhibit C-6 (Leonard February 2, 2021 and February 10, 2021 emails).
[88] Exh. C, Mummert Decl. ¶ 7, Exhibit C-6 (Nicole Garner January 12, 2021 email regarding La Porte Shell LLC).
[89] Exh. A, Sanders Dep. 153:11-22, Exhibit J; Exh. C, Mummert Decl. ¶¶ 7, 8, 9, Exhibit C-7, Exhibit C-9. In January 2021, Sanders submitted interim onsite visit documentation for a customer, *see* Exh. A, Sanders Dep. 153:11-22, Exhibit J, but it was not "EDD." One EDD request Sanders received for the Cypress business (SK International) was not issued by Regions until March 12, 2021, and was completed in April 2021. *See* Exh. C, Mummert Decl. ¶ 7, Exhibit C-6, (Leonard April 22, 2021 email).

and Mummert asked Sanders to confirm which businesses the five expense report entries pertained to, and Sanders listed visits to a Dickinson business and a Houston business but failed to identify the other three businesses in Cypress, Stafford, and Wallis that he initially reported to Leonard.[90] Sanders then changed his story and said he was not told to conduct "EDD," but that the expenses were for his own diligence practice.[91]

On March 24, 2021, Bodine and Mummert again interviewed Sanders related to a new discrimination complaint raised by Miranda.[92] Sanders had approved bereavement leave for the death of Porter's aunt but denied bereavement leave for the death of Miranda's aunt.[93] Regions' bereavement leave does not include aunts.[94] When Sanders entered Porter's bereavement leave, he selected "parent-in-law" from Regions' system menu and added "mother's sister" in the comments, showing he had information sufficient to know Regions' bereavement leave would not apply.[95] Sanders said he made a mistake with Porter and did not realize he could not correct it after the fact.[96] However, when asked if he thought he should give Miranda one day of bereavement so she would be treated the same as Porter, Sanders said that would be discriminatory.[97]

## I.   Regions terminated Sanders' employment.

Regions' investigation determined the following complaints about Sanders were substantiated: (1) poor performance/management for inconsistently applying Regions'

---

[90] Exh. A, Sanders Dep. 159:4-13, Exhibit L; Exh. C, Mummert Decl. ¶¶ 7, 8, 9, Exhibit C-7, Exhibit C-9. On April 5, 2021, Sanders emailed Mummert and Bodine a list of the businesses on his January 2021 expense report with additional details. He listed Richmond Food Mart as "EDD," but Regions did not issue an EDD request for Richmond Mart until June 14, 2021, weeks after Sanders' termination. Exh. C, Mummert Decl. ¶ 7, Exhibit C-6.
[91] Exh. C, Mummert Decl. ¶¶ 7, 8, 9, Exhibit C-7, Exhibit C-9.
[92] Exh. C, Mummert Decl. ¶¶ 7, 10, Exhibit C-7.
[93] Exh. A, Sanders Dep. 161:7-19, 162:13-24, 164:6–165:7, Exhibit M; Exh. C, Mummert Decl. ¶¶ 7, 10, Exhibit C-7, Exhibit C-10.
[94] Exh. C, Mummert Decl. ¶¶ 3, 7, 10, Exhibit C-2, Exhibit C-6 (Leonard March 10, 2021 email), Exhibit C-10.
[95] Exh. C, Mummert Decl. ¶¶ 7, 10, Exhibit C-7, Exhibit C-10.
[96] Exh. C, Mummert Decl. ¶¶ 7, 10, Exhibit C-7, Exhibit C-10
[97] Exh. C, Mummert Decl. ¶¶ 7, 10, Exhibit C-7, Exhibit C-10.

bereavement policy;[98] (2) violating Regions' Transaction Processing Manual – Branch Current & Coin – Coin and Currency Collection related to pawning bills in cashboxes;[99] (3) misapplying the Associate Expense Reimbursement Policy related to EDD;[100] and (4) violating Regions' Code by failing to disclose an outside activity, his rental properties.[101] But most significantly, Sanders also violated Regions' Code by presenting shifting explanations and untruthful communications to Regions during the investigation, particularly related to bill swapping and EDD.[102] This called his credibility and trustworthiness as a Branch Manager into question, resulting in Leonard deciding on or about March 25, 2021 to terminate Sanders' employment.[103] After Regions completed its investigations into other complaints involving Sanders and had all internal approvals, his termination was communicated to him on June 3, 2021.[104]

Regions associate Beverly Ero (who is Black/African American) was selected to fill Sanders' Sugar Land Branch Manager position.[105]

---

[98] Exh. C, Mummert Decl. ¶ 3, Exhibit C-2 (Guidelines on Bereavement Leave).

[99] The relevant portion of the Manual states: "The collection of coin and currency is prohibited unless prior authorization is received from management. Associates should not ask an associate to collect coin or currency and hold it in a cashbox as part of the cash total with the intent of purchasing the coin/currency later."

[100] Relevant portions of the Associate Expense Reimbursement Policy state: "All associates . . . are expected to become acquainted with, and live within, the spirit of this policy."

[101] Exh. A, Sanders Dep. 183:2-13; Exh. C, Mummert Decl. ¶ 3, Exhibit C-1 (Code excerpts at p. 21, Outside Activities ("You must receive express approval from your manager and the Associate Conduct Officer prior to engaging in any activity that may present a conflict of interest . . . To request approval, complete and submit the Outside Activities Approval Request Form . . . ")).

[102] Exh. A, Sanders Dep. 54:12-15; 183:3-4; Exh. C, Mummert Decl. ¶ 3, Exhibit C-1, (Code excerpts at p. 15 (Internal and External Communications: ". . . What we say, write and do should reflect a clear understanding of Regions' ethical values . . . . That means being clear, truthful, accurate and respectful . . . . These requirements apply to communications of all kinds . . . .")); ¶ 7, Exhibit C-8 at ¶ 9, Exhibit C-9 at ¶ 14, Exhibit C-13.

[103] Exh. C, Mummert Decl. ¶ 12, Exhibit C-12.

[104] Exh. C, Mummert Decl. ¶ 12, Exhibit C-12.

[105] Exh. A, Sanders Dep. 234:11-18, 235:12-17 (Q: "Do you know how Ms. Ero would self-identify in terms of her race?" A: ". . . I think she classifies as an African American female.").

## IV.  LAW AND ARGUMENT

Sanders brings race discrimination and retaliation claims under the TCHRA.[106] One of the TCHRA's purposes is to execute the policies of Title VII of the Civil Rights Act ("Title VII"). Tex. Lab. Code § 21.001(1). Federal cases interpreting Title VII are used to interpret the TCHRA. *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n. 2 (5th Cir. 1999); *Alamo Hts. Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 781-82 (Tex. 2018).

### A.    Sanders has not received a TCHRA right to sue.

Under the TCHRA, a complainant must bring a civil action within sixty (60) days from the date of the notice of the right to file a civil action from the TWC. Tex. Lab. Code § 21.254; *Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500, 508 (Tex. 2012) ("the TCHRA is not identical to Title VII and the Legislature has not indicated an intent to make it so. For example … the TCHRA requires a plaintiff to file suit within sixty days of receiving a right-to-sue letter whereas Title VII imposes a deadline of ninety days."); *Johnson v. Select Energy Servs., LLC*, No. H-11-3486, 2013 WL 5425115 (S.D. Tex. Sept. 24, 2013) (dismissing TCHRA claims filed over 60 days past TWC's notice of right to sue, as EEOC's notice does not trigger the time clock for TCHRA claims).

Here, Sanders has not presented a TWC right to sue letter.[107] Doing so is a condition precedent to suit. *See Gorman v. Verizon Wireless Tex., LLC*, 753 F.3d 165, 170 (5th Cir. 2014). Sanders' EEOC Notice is not interchangeable. For this reason, his claims should be dismissed.

### B.    Sanders cannot show race discrimination under the TCHRA.

Sanders' race discrimination claims are based on disparate treatment theories. An employee may prove a disparate treatment claim with direct evidence—*i.e.*, statements  proving

---

[106] In his deposition, Sanders testified that he believes Regions also discriminated against him on the basis of age and medical condition (cancer, which he had in 2015). Exh. A, Sanders Dep. 180:2-11. Sanders failed to raise age or disability in his Amended Charge and therefore has failed to exhaust his administrative remedies on those claims. Exh. D, Staple Decl. ¶ 3, Exhibit D-1, p. 18. Further, he only plead race discrimination in his Petition. *See* Dkt. at 3-1.
[107] Exh. D, Staple Decl. ¶3, Exhibit D-1, p. 2.

the fact of discrimination without inference or presumption. *See Eaglin v. Texas Children's Hosp.*, 801 F. App'x 250, 255 (5th Cir. 2020); *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012). Direct evidence is rare, and Sanders has none here.

Without direct evidence, courts employ the *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden-shifting framework. *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 583 (Tex. 2017) (explaining TCHRA claims follow *McDonnell-Douglas*). Under *McDonnell-Douglas*, the employee must first establish a prima facie discrimination case. *Eaglin*, 801 F.3d at 802; *Mission Consol. Indep. Sch. Dist.*, 372 S.W.3d at 638–39. Then, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Eaglin*, 801 F.3d at 802; *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 477 (Tex. 2001). This is a burden of production, not persuasion, and does not involve an assessment of the employer's credibility. *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (5th Cir. 2003). The final burden rests with the employee to show: (1) each of the articulated reasons is pretextual, *i.e.*, false or unworthy of credence; and (2) discrimination was the real reason. *McDonnell-Douglas*, 411 U.S. at 804; *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003); *Quantum Chem.*, 47 S.W.3d at 477.

### 1.    Sanders' claim related to lateral transfers is not actionable.

#### a.    *Sanders' failure to "promote" claims are time-barred.* [108]

Failure to promote is a discrete act that starts "a new clock for filing charges alleging that act." *Grice v. FMC Techs. Inc.*, 216 F. App'x 401, 407 (5th Cir. 2007) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-14 (2002)); *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 280 (5th Cir. 2004) ("a one-time employment event, including the  failure to hire, promote … is a

---

[108] As discussed in the next section, neither Branch Manager position Sanders mentions was a "promotion" – they were lateral transfers.

discrete action that constitutes a separate actionable unlawful employment practice" (internal quotation omitted)).

Sanders had to file his Charge alleging these claims within 180 days or, at most, 300 days of Regions not selecting him for each position. Tex. Lab. Code § 21.202(a); *Pegram*, 361 F.3d at 278-79; *Harris Cty. Hosp. Dist. v. Parker*, 484 S.W.3d 182, 193 (Tex. Ct. App. 2015) ("Because the evidence conclusively establishes that Parker filed his EEOC charge more than 180 days after he was denied promotions, the trial court erred in denying the District's plea to the jurisdiction"). Regions closed Sanders' last application on or about May 22, 2019.[109] Sanders filed his Charge on May 28, 2021. Sanders was over a year late in bringing a failure to hire or promote charge.

      b.    *Sanders cannot show he applied to and was clearly more qualified for the lateral positions.*

Even if Sanders' claim was not time-barred, he cannot establish a failure to "promote" claim. Sanders must show a prima facie case: (1) he was not promoted; (2) he was qualified for the position; (3) he fell within a protected class; and (4) Regions either gave the position to someone outside of that protected class or failed to select him because of his race. *See Autry v. Fort Bend Indep. Sch. Dist.*, 704 F.3d 344, 346–47 (5th Cir. 2013).

Sanders cannot show a prima facie case because the Branch Manager positions were lateral transfers, not promotions. *Burger v. Central Apt. Mgmt., Inc.*, 168 F.3d 875, 879 (5th Cir. 1999) ("a purely lateral transfer is not an adverse employment action" (citation omitted)). Sanders himself admits they were lateral transfers.[110] Therefore, Sanders did not experience an adverse employment action and cannot show the first element of a prima facie case.

---

[109] Exh. A, Sanders Dep. 174:23–175:5 (noting his nearly two-year delay in complaining about the various positions was because he "didn't want it to be a perception").

[110] Exh. A, Sanders Dep. 181:5-10 (Q: "… when we talked earlier about the Riverstone and Sienna Plantation branch manager roles, would those have been lateral transfers for you? A: "Yes.").

Further, Regions had legitimate, non-discriminatory reasons for not selecting Sanders for the positions to which he claims he applied. Sanders did not timely apply to the Sienna Plantation position, and he did not apply to the CBM position because Regions had already closed it. Failure to apply for a position generally bars a claim. *Shackelford*, 190 F.3d at 406.

Sanders cannot show Regions' reasons were pretextual. Sanders must show Regions' explanations were false or he was "clearly more qualified" than the selected candidate, meaning "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Moss v. BMC Software, Inc.,* 610 F.3d 917, 923 (5th Cir. 2010). For the Sienna Plantation position, Ybarra had years of experience at large banks and more recent experience in de novo branches.[111] For Lake Riverstone, Sanchez was a top performer, and Sanders failed to re-apply when Regions selected internal candidate Batuuka (who is also Black/African American).[112] Finally, as noted above, Sanders' performance was average, demonstrating he lacked skills Regions looks for in a de novo branch manager. Regions' reasons were not false, and Sanders cannot show he was clearly more qualified than Ybarra, Sanchez, or Batuuka. Sanders has no failure to promote claim.

## 2.   Sanders cannot show a prima facie race discrimination case based on his termination.

Sanders must establish a prima facie case by showing: (1) he is in a protected class; (2) he was qualified for his job; (3) he experienced an adverse employment action, meaning  "ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating;" and (4) he was either (i) replaced by someone outside the protected class, or (ii) treated less

---

[111] *Compare* Melissa Ybarra's resume to Sanders' resume (Exh. A, Sanders Dep. 204:23–205:3, Exhibit R) Sanders' experience at de novo branches was dated. Exh. A, Sanders Dep. 45:4-6, 48:19-22, 49:21-23, 216:7-13 (Capital One from 2004-2008 was de novo branches). Sanders admitted he did not review Melissa Ybarra's resume, but he believes he "had more experience for that position" based on his "success in the business industry." Exh. A, Sanders Dep. 88:24–89:9, 89:17-19.
[112] Exh. C, Mummert Decl. ¶¶ 15, 17.

favorably than other similarly-situated employees outside the protected class. *Ross v. Judson Indep. Sch. Dist.*, 993 F.3d 315, 321 (5th Cir. 2021); *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007). First, Sanders cannot show an adverse action other than his termination. Second, Sanders cannot show the fourth element of a prima facie case.

With respect to adverse employment actions, Sanders may argue that Leonard's interview of him for the Lake Riverstone position was an adverse employment action because he conducted it by telephone and asked him questions Sanders deemed offensive.[113] But Leonard had met Sanders in person before, and he listened to Sanders' thoughts about building business.[114] And Sanders has no evidence whether or not Leonard asked the same questions of all candidates.[115]

Sanders may also argue that Leonard asking him to hire a FRC, Jared Ogburn ("Ogburn"), was an adverse employment action. Per Sanders, Leonard asked Sanders to hire Ogburn as a favor to Ogburn's father, who was Leonard's neighbor and friend, despite Ogburn lacking banking experience.[116] Sanders believes Leonard and Ogburn conspired against Sanders to "get him out of [his] office."[117] But Sanders characterizes Ogburn's hire as "nepotism" and cannot explain how any of this is connected to Sanders' race.[118] Further, Sanders had the ability to terminate Ogburn but never did.[119] This did not rise to an "ultimate employment decision" for Sanders.

Regarding his termination, Sanders was replaced with a Black/African American associate and lacks any similarly-situated comparator evidence.[120] "Similarly situated" means employees "held the same job or responsibilities, shared the same supervisor or had their employment status

---

[113] Exh. A, Sanders Dep. 103:5–104:2.
[114] Exh. A, Sanders Dep. 108:3-17.
[115] Exh. A, Sanders Dep. 108:18–109:7.
[116] Exh. A, Sanders Dep. 116:13-16.
[117] Exh. A, Sanders Dep. 116:11-13, 117:24–118:4.
[118] Exh. A, Sanders Dep. 117:14-18.
[119] Exh. A, Sanders Dep. 112:1-9; 119:16-19; 184:20-25, 186:7-18.
[120] Exh. A, Sanders Dep. 235:7-17.

determined by the same person, and ha[d] essentially comparable violation histories." *Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 892 (5th Cir. 2012); *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) ("the conduct that drew the adverse employment decision must have been nearly identical to that of the proffered comparator . . . ."). Sanders cannot show a prima facie case, his race discrimination claim should be dismissed.

### 3.      Regions' honest belief in the results of its investigation was a legitimate, non-discriminatory reason for Sanders's termination.

An employer's good faith belief in an investigation showing an employee violated company policy is a legitimate, non-discriminatory reason for termination. *Eaglin v. Tex. Children's Hosp.*, 801 F. App'x 250, 256 (5th Cir. 2020) (citing *Wallace v. The Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)); *Jefferies v. Harris Cty. Comm'y Action Ass'n*, 615 F.2d 1025, 1036 (5th Cir. 1980) ("[A]n employer's honest belief in the existence of factors which are nondiscriminatory constitutes a legitimate reason for the employer's acting on that belief."); *Shackelford*, 190 F.3d at 408. Regions honestly believed the results of its investigation into an internal complaint that revealed Sanders violated Regions' Code and policies.[121]

### 4.      Sanders cannot show Regions' reason was pretextual.

The employee must show the employer's legitimate, non-discriminatory reason presented is pretextual, meaning false or unworthy of belief. *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002). An employer's honest belief in its reason for an adverse employment action, even if ultimately found to be mistaken, is not evidence of pretext. *Swenson v. Schwan's Consumer Brands N.A., Inc.*, 500 F. App'x 343, 346 (5th Cir. 2012) (citing *Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1166 (5th Cir. 1993)); *Baker v. Exxon Chemical Americas*, 68 F.3d 467, 1995 WL 581611, at *3 (5th Cir. Aug. 29, 1995) (unpublished) (citing *Dickerson v.*

---

[121] *See, e.g.*, Exh. C, Mummert Decl. ¶ 13.

*Metropolitan Dade County,* 659 F.2d 574, 581 (5th Cir. 1981)) ("Even if the termination were wrongful, however, the decision is not discriminatory if the employer had a sincere and honest belief, based on lawful reasons, that its actions were justified.").

Sanders cannot show pretext in Regions' reliance on its investigation. Sanders confirmed the accuracy of his statements contained in Regions' Case Resolution Form, which summarized the investigation.[122] Sanders has no evidence Regions did not honestly believe the investigation's results.

### 5. Sanders cannot show race discrimination was Regions' real reason for terminating his employment.

The real, final question is the "motive" of the employer's decision, not the "merit," which courts do not second-guess. *See id.* (citing *Wilson v. Belmont Homes, Inc.*, 970 F.2d 53, 57 (5th Cir. 1992)). In fact, "[e]mployers are 'entitled to be unreasonable' in terminating their employees 'so long as [they] do[ ] not act with discriminatory animus.'" *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 826 (5th Cir. 2022). Even if an employee believes his employer could have handled the situation differently, "it is not the court's place to second-guess management's business decisions or to serve as a self-appointed, corporate personnel manager." *Patton v. United Parcel Serv., Inc.*, 910 F. Supp. 1250, 1267 (S.D. Tex. 1995) (citing *Waggoner*, 987 F.2d at 1165).

Assuming *arguendo* Sanders could show pretext (he cannot), he still cannot show discrimination. Sanders has no evidence the investigation would have resolved differently had it involved a non-Black/African American Branch Manager IV. Sanders has no evidence Regions relied on anything but its investigation in its decision.[123] Even if Sanders now claims he was not untruthful during Regions' investigation and Regions mistook his representations, that still does

---

[122] Exh. A, Sanders Dep. 191:2-9, Exhibit O.
[123] *See, e.g.*, Exh. C, Mummert Decl. ¶ 13.

not show race discrimination was the reason for his termination (which it was not). For these reasons, there is no genuine issue of material fact on Sanders' race discrimination claim.

**C.**      **Sanders cannot show retaliation under the TCHRA.**

To establish this claim, Sanders must show: (1) he engaged in protected activity; (2) he experienced an adverse action; and (3) a "but for" causal link existed between the protected activity and the adverse action. *Gorman*, 753 F.3d at 170 (citing *Shackelford*, 190 F.3d at 403 n. 2); *Alamo Hts. Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 782 (Tex. 2018). Protected activity includes filing an internal complaint or an external charge of discrimination. Tex. Lab. Code § 21.055. A causal link requires showing the employment decision was based in part on knowledge of the employee's protected activity, and if temporal proximity alone is relied upon, it must be very close in time. *Cooper v. Wal-Mart Transp., LLC*, 662 F. Supp. 2d 757, 777 (S.D. Tex. 2009) (citations omitted).

**1.**      **Certain actions Sanders claims were retaliatory were not adverse actions.**

In his deposition, Sanders noted actions by Regions associates he claims were retaliatory: (i) Miranda's filing of her complaint against Sanders[124] and keeping of a list of information about Sanders that she provided to Leonard;[125] and (ii) Leonard accusing Sanders of things Sanders claims he did not do.[126] Even if these occurred, none constitute adverse actions, and Miranda's complaint about Sanders was protected conduct. *See* Tex. Lab. Code § 21.055.

**2.**      **Any protected conduct was not causally linked to Sanders' termination.**

Sanders alleges he engaged in protected activity by filing internal reports of discrimination and filing his Charge. Specifically, Sanders claims he (1) reported (i) Ogburn and Leonard

---

[124] Exh. A, Sanders Dep. 175:11-18.
[125] Exh. A, Sanders Dep. 175:19-21.
[126] Exh. A, Sanders Dep. 178:20–180:14.

conspired against him[127] and (ii) discrimination by Leonard and retaliation by Miranda to Regions on February 18, 2021; and (2) filed his Charge on May 28, 2021.[128]

Sanders' termination was not causally connected to any alleged protected conduct based on timing. Regions' investigation into Sanders began in early January 2021.[129] At the time of Sanders' February 18, 2021 report—a mere six days after Regions interviewed him—Regions had already received complaints calling Sanders' conduct into question; Leonard had investigated issues with Sanders' mortgage referrals and expense report; and Sanders admitted to conduct violating Regions' policies (*e.g.*, cash box issues, failure to disclose an outside activity).[130] *Gorman*, 753 F.3d at 172 ("An independent investigation fairly conducted usually prohibits the ultimate decisionmaker from being a 'rubber stamp' because it acts as a superseding cause to the termination decision"). If every employee could pursue a retaliation claim to trial simply by issuing their own report after learning their employer was investigating them, then every workplace investigation resulting in a termination would result in a jury trial. That is not the law.

Further, Leonard independently investigated Sanders' conduct in the course of reaching his termination decision.[131] When the decision-maker "conducts an independent investigation in the course of reaching his or her decision," the causal link is broken. *See Ameen v. Merck & Co, Inc.*, 226 F. App'x 363, 377 (5th Cir. 2007). Leonard's independent investigation of Sanders' conduct[132]—coupled with the fact Sanders was terminated before Leonard ever knew about his report of discrimination and retaliation and before Regions knew

---

[127] Sanders' alleged complaint about Leonard and Ogburn did not relate to race or a protected class, *see* Exh. A, Sanders Dep. 219:6-10, and thus was not protected conduct. Tex. Labor Code § 21.055; *Harris-Childs v. Medco Health Solutions, Inc.*, 169 F. App'x 913, 916 (5th Cir. 2006) (holding complaint has to place employer on notice that it is based on discrimination in order to be protected activity).
[128] Exh. A, Sanders Dep. 219:6-11; Dkt. at 3-1, Petition ¶ 61.
[129] Exh. C, Mummert Decl. ¶ 7, Exhibit C-7, Exhibit C-8.
[130] Exh. C, Mummert Decl. ¶ 7, Exhibit C-7, C-16.
[131] Exh. C, Mummert Decl. ¶ 18, Exh. C-16, emails reflecting Leonard reviewing EDD, expenses, wife's business.
[132] Exh. C, Mummert Decl. ¶ 18, Exh. C-16, emails reflecting Leonard reviewing EDD and expenses.

about his Charge—shows there was no causal connection between any alleged protected conduct and the termination decision. *Cephus v. Tex. Health and Human Servs. Comm'n*, 146 F. Supp.3d 818, 835 (S.D. Tex. 2015) (noting the decision-maker had no knowledge of any lawsuit); *Chaney v. New Orleans Pub. Facility Mgmt.*, 179 F.3d 164, 168 (5th Cir. 1999) ("If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct").

Importantly, Sanders' report and "cease and desist" letter were not considered in Regions' investigation into the complaint against Sanders or the termination decision. Regions' documentation of its investigation shows as much.[133] The complaints about and by Sanders involved different investigators (Bodine and Mummert versus Cooper and Regions' Legal Department) and entirely different decision makers (Leonard versus Regions' Legal Department).[134] Leonard had no knowledge that Sanders filed his internal report with Regions prior to deciding Sanders had to be terminated for his untrustworthy conduct.[135]

Further, Regions' Legal Department received Sanders' Charge after Sanders' termination, so it was not considered in any decision.[136] Leonard decided to terminate Sanders' employment on or March 25, 2021;[137] the EEOC received Sanders' Charge on Friday, May 28, 2021;[138] the investigation completed well before Monday, June 1, 2021;[139] the termination decision was finalized, at the latest, on Tuesday, June 2, 2021;[140] and Sanders was terminated on Thursday, June

---

[133] Exh. C, Mummert Decl. ¶ 7, Exhibit C-8 (reflecting no mention of Sanders' complaint in its summary of violations found).
[134] See Exh. C, Mummert Decl. ¶ 7.
[135] Exh. C, Mummert Decl. ¶ 13.
[136] Exh. C, Mummert Decl. ¶ 13.
[137] Exh. C, Mummert Decl. ¶ 13.
[138] Exh. D, Staple Decl. ¶ 3, Exhibit D-1.
[139] Exh. C, Mummert Decl. ¶ 7, Exhibit C-8, p. 1 (Case Resolution Form).
[140] Exh. C, Mummert Decl. ¶ 14, Exhibit C-13 (termination email script).

3, 2021. Regions received Sanders' Charge on June 7, 2021.[141] *Gorman*, 753 F.3d at 171  ("if the decisionmakers were completely unaware of the plaintiff's protected activity, then it could not be said … that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity"). For all of these reasons, Sanders cannot show a prima facie retaliation case.

### 2.   Sanders cannot show that Regions' reason for termination was pretextual.

Regions had legitimate, non-retaliatory, and non-pretextual reasons for terminating Sanders' employment. As discussed, Regions honestly believed the results of its investigation that found Sanders violated the Code and other Regions policies. *Pineda*, 360 F.3d at 488.

Sanders finally must show his termination would not have resulted "but for" his report or Charge, and close temporal proximity is not enough. *Id.* at  487; *Alamo Hts. Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 790 (Tex. 2018) ("In evaluating but-for causation evidence in retaliation cases, we examine all of the circumstances, including temporal proximity … knowledge of the protected activity, expression of a negative attitude toward the employee's protected activity, failure to adhere to relevant established company policies, discriminatory treatment in comparison to similarly situated employees, and evidence the employer's stated reason is false."). Sanders' termination would have resulted regardless of his report or Charge. It was based on his policy violations and untrustworthiness demonstrated during Regions' investigation—which was well under way when Sanders made his report—and was implemented before Regions knew about Sanders' Charge. *See Quintana v. Fujifilm N. Am. Corp.*, 96 F. Supp. 3d 601, 620 (N.D. Tex. 2015) ("Adverse employment actions that occurred prior to the protected activity cannot serve as the basis for a claim of retaliation"). For these reasons, Sanders has no retaliation claim.

---

[141] Exh. A, Sanders Dep. 219:20-25 (Q: "And do you have any evidence that Dave Leonard knew that you filed an EEOC Charge?" A: "I don't know what Dave Leonard has. I can't say that I have evidence that he knows that I filed for these charges . . . . I have no way of knowing that.").

## V.  CONCLUSION

For the reasons outlined above, Regions requests this Court enter summary judgment in its favor and against Sanders on each of his TCHRA claims and dismiss this case with prejudice.

Respectfully submitted,

By: _____
     Jamila M. Brinson
     ATTORNEY-IN-CHARGE
     State Bar. No. 24074867
     S.D. Texas ID. No. 1127492
     JACKSON WALKER LLP
     1401 McKinney Street, Suite 1900
     Houston, TX | 77010
     Voice: (713) 752-4356
     Facsimile: (713) 308-4112
     Email: jbrinson@jw.com

OF COUNSEL:

Jaclyn C. Staple
State Bar No. 24114890
S.D. Texas ID. No. 3241341
JACKSON WALKER LLP
1401 McKinney Street, Suite 1900
Houston, TX | 77010
Voice: (713) 752-4415
Facsimile: (713) 754-6715
Email: jstaple@jw.com

ATTORNEYS FOR DEFENDANT
REGIONS BANK

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document will be accomplished through the notice of electronic filing in accordance with the Federal Rules of Civil Procedure on July 31, 2023, to the following:

      Mr. Eddie Hodges, Jr.
      Kennard Law P.C.
      5120 Woodway Drive, Suite 10010
      Houston, Texas 77056
      Email: eddie.hodges@kennardlaw.com

Jamila M. Brinson

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT SANDERS, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:22-CV-01523 |
| | § | |
| REGIONS BANK, | § | JURY DEMANDED |
|     Defendant. | § | |

**APPENDIX TO DEFENDANT REGIONS BANK'S
MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

By: _____
Jamila M. Brinson
ATTORNEY-IN-CHARGE
State Bar. No. 24074867
S.D. Texas ID. No. 1127492
JACKSON WALKER LLP
1401 McKinney Street, Suite 1900
Houston, TX | 77010
Voice: (713) 752-4356
Facsimile: (713) 308-4112
Email: jbrinson@jw.com

OF COUNSEL:

Jaclyn C. Staple
State Bar No. 24114890
S.D. Texas ID. No. 3241341
JACKSON WALKER LLP
1401 McKinney Street, Suite 1900
Houston, TX | 77010
Voice: (713) 752-4415
Facsimile: (713) 754-6715
Email: jstaple@jw.com

ATTORNEYS FOR DEFENDANT
REGIONS BANK

## <u>INDEX TO APPENDICES</u>

TAB 1    Excerpts and Exhibits from the May 26, 2023   EXHIBIT A
        Deposition of Robert Sanders

TAB 2    Excerpts from the April 25, 2023      EXHIBIT B
        Deposition of Lida Thomas

TAB 3    Declaration of Erin Mummert     EXHIBIT C

TAB 4    Declaration of Jaclyn Staple      EXHIBIT D

TAB 5    Appendix of Unreported Cases     EXHIBIT E

36038910v.12