# EXHIBIT A

Robert Anthony Sanders

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ROBERT SANDERS,          )
        Plaintiff,       )
                         )
VS.                      )CIVIL ACTION NO. 4:22-cv-01523
                         )   JURY DEMANDED
REGIONS BANK,            )
        Defendant.       )

*************************************************
ORAL VIDEOTAPED DEPOSITION
ROBERT ANTHONY SANDERS
May 26, 2023
*************************************************

ORAL VIDEOTAPED DEPOSITION OF ROBERT ANTHONY
SANDERS, produced as a witness at the instance of the
Defendant and duly sworn, was taken in the above-styled
and numbered cause on the 26th day of May, 2023, from
10:33 a.m. to 5:57 p.m., before Jennefer Franklin,
Certified Shorthand Reporter in and for the State of
Texas, reported by computerized stenotype machine at the
offices of Jackson Walker, LLP, located at 1401 McKinney
Street, Suite 1900, Houston, Texas 77010, pursuant to
the Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

Ross Reporting Services, Inc.                 281-484-0770

---

Robert Anthony Sanders

2

1            APPEARANCES
2
3   FOR THE PLAINTIFF:
      Mr. Eddie Hodges, Jr.
      KENNARD LAW, PC
4     5120 Woodway Drive, Suite 10010
      Houston, Texas 77056
5     Telephone:  (713)742-0900
      Fax:  (832)558-9412
6     E-mail:  eddie.hodges@kennardlaw.com
7
8   FOR THE DEFENDANT:
      Ms. Jaclyn C. Staple
      Mr. Tayte Doddy (Partial)
9     JACKSON WALKER, LLP
      1401 McKinney, Suite 1900
10    Houston, Texas 77010
      Telephone:  (713)752-4415
11    Fax:  (713)754-6715
      E-mail:  jstaple@jw.com
12
13  ALSO PRESENT:
      Mr. Jesus Garcia - Videographer
14
15
16
17
18
19
20
21
22
23
24
25

Ross Reporting Services, Inc.                 281-484-0770

---

Robert Anthony Sanders

3

1
2                    INDEX
3                                    PAGE
4   ROBERT ANTHONY SANDERS
5   Examination by Ms. Staple .......................5
    Examination by Mr. Hodges ..............242
6   Further Examination by Ms. Staple .......257
    Further Examination by Mr. Hodges .......260
7   Signature Page  ..................262
    Court Reporter's Certificate ...................264
8
9                 EXHIBITS
10
11  EXHIBIT          DESCRIPTION          PAGE
12  Exhibit A     Regions Branch Manager Job     52
                  Description
13                (REGIONS 000045-000051)
14  Exhibit B     Final Written Warning          57
                  (REGIONS 000134)
15
16  Exhibit C     Progressive Discipline Form,   57
                  Verbal Warning Memorandum
17                (REGIONS 000132-000133)
18  Exhibit D     Regions Acknowledgement Form   63
                  (REGIONS 000057)
19  Exhibit E     Enterprise Associate          100
                  Investigation Tool - 42415
20                (REGIONS 000164-000167)
21  Exhibit F     Enterprise Associate          122
                  Investigation Tool - 42278
22                (REGIONS 000160-000163)
23  Exhibit G     Regions Office of Associate   125
                  Conduct Investigation/Interview
24                Quick Reference Guide
                  (REGIONS 000168-000206)
25

Ross Reporting Services, Inc.                 281-484-0770

---

Robert Anthony Sanders

4

1               EXHIBITS (cont.)
2   EXHIBIT          DESCRIPTION          PAGE
3   Exhibit H     Expense Reports        148
4   Exhibit I     Onsite Visit, Interim COVID-19  151
                  for La Porte Shell, LLC
5                 (REGIONS 001829-001833)
6   Exhibit J     E-mails (REGIONS 001923-001928)  153
7   Exhibit K     E-mails (REGIONS 001775-001777)  153
8   Exhibit L     E-mails (REGIONS 001816-001818)  158
9   Exhibit M     Time Off Request:  Lakesha    164
                  Crawford (REGIONS 001869 and
10                REGIONS 001904)
11  Exhibit N     E-mails (REGIONS 001778-001780)  168
12  Exhibit O     OAC Case Resolution Form      186
                  (REGIONS 000207-000223)
13
14  Exhibit P     E-mail (REGIONS 000224)        191
15  Exhibit Q     Texas Citizens Bank -         200
                  Employment Application
16                (REGIONS 002227-002228)
17  Exhibit R     Résumé of Robert A. Sanders    204
                  (REGIONS 002229-002231)
18  Exhibit S     E-mails (REGIONS 002207-002210)  205
19  Exhibit T     Texas Citizens Bank Termination  206
                  Agreement
20                (REGIONS 002240-002247)
21  Exhibit U     Petitioner's Original Petition   214
22  Exhibit V     Plaintiff's Response to       220
                  Defendant's First Set of
23                Interrogatories
24
25

Ross Reporting Services, Inc.                 281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

5

1          P R O C E E D I N G S
2          (All Parties present have hereby waived
3          the necessity of the reading of the
4          statements by the deposition officer as
5          required by Rule 30(b)(5).)
6          THE VIDEOGRAPHER:  Going on the record at
7    10:33 a.m.
8          ROBERT ANTHONY SANDERS,
9    having been first duly sworn, testified as follows:
10          EXAMINATION
11   BY MS. STAPLE:
12   Q.  Good morning, Mr. Sanders.
13   A.  Good morning.
14   Q.  My name is Jackie Staple.  I'm an attorney who
15   is representing Regions Bank in a lawsuit that you filed
16   against Regions Bank.
17   A.  Okay.
18   Q.  I'm here this morning to take your deposition.
19   Do you understand that you're here today to have your
20   deposition taken in a case you've brought against
21   Regions Bank?
22   A.  Yes.
23   Q.  Have you had your deposition taken before?
24   A.  No.
25   Q.  Since you haven't had your deposition taken

Robert Anthony Sanders

7

1    not a sprint and so, I'm fine with taking breaks and I
2    do like to take periodic breaks for the restroom or to
3    grab some food, but at any time, if you need a break,
4    please just let us know.  The only thing I would ask is
5    if I have asked a question, if you could, answer the
6    question before we go on the break.  Is that okay?
7    A.  Yes, that's fine.
8    Q.  Mr. Sanders, are you taking any medications or
9    substances that would impair your ability to give
10   truthful testimony today?
11   A.  No, no.
12   Q.  Did you prepare for your deposition today?
13   A.  No, I did not.
14   Q.  Did you meet with your attorney to talk about
15   the deposition process?
16   A.  I spoke with my attorney regarding today's
17   meeting, yes, because I didn't understand what it was
18   regarding as far as the deposition.
19   Q.  How long did you spend with your attorney
20   speaking about today's deposition?
21   A.  Make 15 minutes, 10 minutes.
22   Q.  Did you review any documents with your attorney
23   when you met to prepare for this deposition?
24   A.  No, I did not.
25   Q.  Mr. Sanders, do you have any video or audio

Robert Anthony Sanders

6

1    before, your attorney may have gone over some ground
2    rules of the deposition process with you; but I want to
3    just go over those with you today.
4          Do you understand that today you'll be
5    testifying under oath as if you were testifying at a
6    trial?
7    A.  Okay.  Yes.
8    Q.  So that it's easier for the court reporter to
9    take down my questions and your answers, it's really
10   important that we answer audibly and in conversation
11   it's very common for us to start to nod our heads or
12   shake our heads or shrug, but can you promise that today
13   you'll do your best to answer all questions audibly?
14   A.  Yes.
15   Q.  And if I ask a question, I will presume that
16   you understood the question.  Is that okay?
17   A.  Yeah, I mean, that's fine; and if I don't
18   understand, I'll -- I'll ask for you to repeat it.
19   Q.  Thank you.  Please do.  I will try my best not
20   to talk over you when you give your answers, and I would
21   just ask that you try your best not to talk over my
22   questions and wait until the question is completely
23   finished.  Is that okay?
24   A.  Yes.
25   Q.  And then, to me, a deposition is a marathon,

Robert Anthony Sanders

8

1    recordings of any Regions employee that relate to the
2    allegations in your lawsuit?
3    A.  I don't know -- any information I've had
4    regarding Regions has been given to my attorneys, any
5    information that I have.
6    Q.  Okay.  So, my question is a little different.
7    Do you have any audio or video recordings of any Regions
8    employee that relates to the allegations in your
9    lawsuit?
10   A.  I do.  I have an audio that I've given to my
11   attorney regarding the filing of the racial
12   discrimination, but that information has been given to
13   my attorney.
14   Q.  So, when you say you have an audio recording
15   related to race discrimination, is that an audio
16   recording that you made or that someone else made?
17   A.  It was an audio that I made with my phone.
18   Q.  And was it your voice on that audio?
19   A.  Yes.
20   Q.  When did you make that audio recording?
21   A.  I don't recall the exact date.
22   Q.  Was it after you filed your lawsuit?
23   A.  It was actually Regions' call to me
24   investigating the case of race discrimination.  It was
25   where I was being interviewed.  I don't recall the names

Robert Anthony Sanders

9

1    of the Regions associates and -- and legal and HR that
2    contacted me that day; but I did record -- for my
3    protection, I did record that conversation.
4        Q.  And you said that on that audio recording, it
5    was Regions legal team or HR; or was it both?
6        A.  It was possibly just -- just HR, if I'm
7    correct.  It was just HR.
8        Q.  What was the name of the HR representative?
9        A.  I'd have to re -- review my records.  I don't
10   know -- remember the names.
11       Q.  Okay.  I would ask that if you have any other
12   copies of that recording, that you do not destroy them;
13   and we would request that from your attorney as well.
14       A.  That's fine.
15       Q.  Did you speak with anyone else besides your
16   attorney to prepare for your deposition today?
17       A.  No, I did not.  No.
18       Q.  Besides your attorney, who else have you
19   discussed your lawsuit against Regions with?
20       A.  My family.
21       Q.  And who are your family members who you've
22   discussed your lawsuit with?
23       A.  My current wife, Lida Thomas; my daughter,
24   Alexa Thomas; my son, Aaron Sanders.  I'd have to recall
25   the list of associates that worked at Regions at the

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

11

1        Q.  Did that include Raven Porter?
2        A.  That is correct.
3        Q.  Did that include Karen Rivadeneyra?
4        A.  That is correct.
5        Q.  Did that include Melissa Miranda?
6        A.  No, it did not.
7        Q.  Besides telling your team at Regions about the
8    cease and desist, did you discuss any of your other
9    allegations with the team that you've brought against
10   Regions?
11       A.  No, we never discussed anything in detail.  My
12   team was very understanding to the nature of what was
13   happening.  They -- my team was constantly interviewed.
14   Basically, HR was calling every other week interviewing
15   the staff and employees on that list.
16       Q.  Did you ever discuss with Ms. Crawford or
17   Ms. Porter or Ms. Rivadeneyra what they told to HR
18   during those interviews?
19       A.  What they told to HR --
20       Q.  Yes.
21       A.  -- their conversations?  It was a brief
22   communication about it, but I don't recall the exact
23   details of it.  They can provide statements as to what
24   the content was.
25       Q.  Did you ever discuss Melissa Miranda's

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

10

1    time that were in my office that were aware of the
2    situation that was going on.
3        Q.  Would that have included Melissa Miranda?
4        A.  No, it did not.
5        Q.  Did that include Karen Rivadeneyra?
6        A.  Yes, it was.  She was included.
7        Q.  Did you speak about your lawsuit with Raven
8    Porter?
9        A.  Let me clarify also, too.  It wasn't speaking
10   about the lawsuit.  They knew that -- my team knew that
11   I had to file a cease and desist on Regions Bank for
12   retaliation.  So, they were aware of that.  They were
13   not privileged to the details of the lawsuit or any --
14   any of that content.  They knew about the incident.
15       Q.  So, to clarify --
16       A.  Sure.
17       Q.  -- you told your team at Regions that you had
18   to file a cease and desist against Regions, but you did
19   not discuss the particular --
20       A.  No.
21       Q.  -- specifics with them?
22       A.  That is correct.  I did not.
23       Q.  And the team members who knew that you filed a
24   cease and desist, did that include Lakesha Crawford?
25       A.  That is correct.

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

12

1    complaint about you to Regions with Melissa?
2        A.  No, I did not.  Not to her directly, no, I did
3    not.
4        Q.  And when you said you did not discuss Melissa
5    Miranda's complaint about you to Regions with her
6    directly, did you discuss it with anyone?
7        A.  My staff, yes, because they informed me of the
8    activity that Melissa Miranda was conducting with Dave
9    Leonard.
10       Q.  And when you said Melissa was conducting
11   activity with Dave Leonard, what do you mean by that?
12       A.  My staff informed me that Melissa Miranda was
13   going to create a list of false information and provide
14   it to Dave Leonard.  I don't know the exact time frame
15   when that was communicated to me, but it was
16   communicated.
17       Q.  Who communicated that to you?
18       A.  The staff members that I recall that -- that
19   were privileged to the conversation -- Lakesha Crawford,
20   Raven Porter, and I'm thinking also Karen Mirandez [sic]
21   was also part of that dialogue.  It was my understanding
22   that she was bragging about the list that she was going
23   to create.
24       Q.  Do you know if Melissa Miranda ever produced a
25   list to Dave Leonard with complaints about you?

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

13

1    A.  She did.
2    Q.  Did you ever see a copy of that list?
3    A.  I did not.
4    Q.  And what is the basis of your knowledge for
5  knowing that Melissa produced that list to Dave Leonard?
6  How do you know?
7    A.  I don't recall exactly how it was presented to
8  me; but I guess all the details that I was made aware of
9  that she was trying to create were presented to me, I
10  guess, in a conversation with HR when they were calling,
11  inquiring about activities related to coaching and
12  development of Melissa Miranda.
13       I can't remember exactly the details of
14  that conversation, but they were -- they were related to
15  what she was trying to fabricate about my activity as a
16  manager.
17    Q.  So, to clarify your testimony:  Is it that the
18  details you were asked about by human resources
19  reflected some of the things that your team told you
20  Melissa Miranda had on her list?
21    A.  That is correct.
22    Q.  You mentioned that you've talked about your
23  lawsuit against Regions with your current wife, Lida
24  Thomas.
25    A.  Correct.

Ross Reporting Services, Inc.                     281-484-0770

Robert Anthony Sanders

14

1    Q.  What point in time did you separate from
2  Ms. Thomas?
3    A.  We are still in the midst of a divorce right
4  now.
5    Q.  Was there a point in time that you were legally
6  separated?
7    A.  I really don't know how to address that,
8  meaning that I'm still married to her.  We are in
9  separate dwellings at this time, and that started at the
10  end of January of this year.
11    Q.  So, to clarify:  You stopped co-habiting as
12  husband and wife January of 2023?
13    A.  The end of January, roughly.
14    Q.  After the time that you stopped living in the
15  same marital dwelling with Ms. Thomas, have you spoken
16  with her about your lawsuit?
17    A.  No, we have not had a conversation regarding
18  it.
19    Q.  Did Ms. Thomas pay any of your legal fees in
20  this lawsuit?
21    A.  She did on the initial retainer.  We were
22  married.  We were not in the process of a divorce.  We
23  had money in a -- she had a separate account that had a
24  majority of our assets.  She took 7500 of that so that I
25  could retain Alfonso Kennard's law firm.

Ross Reporting Services, Inc.                     281-484-0770

Robert Anthony Sanders

15

1    Q.  How did you learn of Kennard Law?
2    A.  I did some research.  I can't recall exactly
3  how the name came across as far as my information, but I
4  did some research.  I researched Kennard Law Firm.  I
5  researched another law firm regarding this case, and I
6  chose to go with Kennard Law Firm.
7    Q.  Were you referred to Kennard Law by a Regions
8  employee?
9    A.  No, I was not.
10    Q.  Were you referred to Kennard Law by an employee
11  of Kennard Law?
12    A.  No, I was not.
13    Q.  You mentioned you've also spoken about your
14  lawsuit against Regions with your daughter, Alexa
15  Thomas?
16    A.  Right.
17    Q.  What have you spoken with her about pertaining
18  to your lawsuit?
19    A.  My family has been aware of my experience and
20  what I've been subjected to; and so, they knew what was
21  in process and what was being done in terms of the
22  filing and just -- some just basic information.
23       My daughter, Alexa Thomas, was living in
24  DC at the time.  So, it wasn't like it was a daily
25  communication.  I couldn't really recall exactly when my

Ross Reporting Services, Inc.                     281-484-0770

Robert Anthony Sanders

16

1  family and I spoke about the matter.  It wasn't a
2  subject matter that we always talked about.  So --
3    Q.  And to clarify:  Alexa Thomas, is she 18 or
4  older?
5    A.  Yes, she is.
6    Q.  And your son, Aaron Sanders, is he 18 or older?
7    A.  He is.
8    Q.  What have you spoken about pertaining to your
9  lawsuit against Regions with Aaron Sanders?
10    A.  Not very much.  As a -- again, any dialogue
11  with my family regarding what the matters of Regions and
12  the lawsuit and the discrimination that I've
13  experienced, I don't go into a lengthy conversation
14  about it.  It's a reality that I'm experiencing right
15  now.  So, it's not a daily conversation.  So --
16    Q.  You told Ms. Thomas, Alexa Thomas, or Aaron
17  Sanders that Regions conducted an investigation into you
18  based on an internal complaint that it received?
19    A.  My family was aware of it.  Anytime that I left
20  my office for vacation or time off, I would find out
21  through the team that they were being interviewed by HR.
22  So, my family knew incidents that were transpiring with
23  the bank after I had filed the case of discrimination.
24       And, again, it was almost every other week
25  HR was doing some type of investigation on me with the

Ross Reporting Services, Inc.                     281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

17

1  staff with the employees.  So, anytime that something
2  happened, my family probably -- we probably
3  communicated.
4      MS. STAPLE:  Objection, nonresponsive.
5      Q.  (By Ms. Staple) I appreciate the explanation;
6  but my question was just a "yes" or "no" if you had told
7  your family -- meaning Ms. Thomas, Alexa Thomas, and
8  Aaron Sanders -- that Regions had conducted an
9  investigation into you based on an internal complaint?
10     A.  I guess if I -- and let me see if I can
11 understand -- if I can paraphrase your question.  I
12 didn't explain to my family that I'm -- I guess -- well,
13 could you repeat the question again?  I'm sorry.
14     Q.  Sure, Mr. Sanders.  No problem.  The question
15 was:  Did you inform or tell your family -- meaning
16 Ms. Thomas, Aaron Sanders, and Alexa Thomas -- that
17 Regions had conducted an investigation into you based on
18 an internal complaint that Regions had received?
19     A.  No, I was not aware that they were
20 investigating me.
21     Q.  When Regions representatives interviewed you,
22 did you believe that they were investigating someone
23 else other than you?
24     A.  Okay.  I'm not -- to understand the question,
25 when you say they were investigating me -- when HR

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

18

1  called me regarding the information from Melissa
2  Miranda, it was just an HR call.  It wasn't -- it wasn't
3  presented as an investigation.  I was told that we have
4  an employee come into information that was mentioned to
5  me and they just wanted to address those details.
6  That's what I understood, if I remember correctly.
7      Q.  So, when you spoke with HR regarding Melissa
8  Miranda's complaints against you, is it correct that you
9  did not understand at that time that Melissa Miranda had
10 filed a formal complaint against you?
11     A.  I don't recall if it was presented that way.
12 That's not what I recall.  If -- if I recall correctly,
13 Dave Leonard had already moved Melissa Miranda from the
14 Sugar Land Branch.  HR contacted me regarding the
15 information that was shared; and they just said -- my
16 understanding was they were calling to address the
17 information that was presented, nothing in regards to an
18 investigation that I recall.
19     Q.  Mr. Sanders, I understand you have a brother;
20 is that correct?
21     A.  I have three brothers.
22     Q.  I understand that one of your brothers had
23 COVID-19 in the summer of 2022; is that correct?
24     A.  I thought it was 2021; but it could have been
25 around the same time, yes.

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

19

1      Q.  Okay.  What was your brother's -- or is your
2  brother's name who had COVID in summer of 2021?
3      A.  I guess I'm trying to understand the relevance,
4  meaning that I've had other families that have COVID.
5      Q.  Yes.  And so, your job today in the deposition
6  is to answer my questions --
7      A.  Okay.
8      Q.  -- unless your attorney objects.  He's not
9  objected based on relevance --
10     A.  Okay.
11     Q.  -- and this is relevant, and so --
12     A.  Okay.  So, my brother that had COVID at the
13 time, his name is Reginald Sanders.
14     Q.  And my understanding is that Reginald Sanders
15 may have been hospitalized --
16     A.  He was.
17     Q.  -- with COVID-19; is that correct?
18     A.  That is correct.
19     Q.  Did Reginald Sanders live in a property that
20 you and Ms. Thomas owned at that time?
21     A.  The property is community property.  The
22 property is titled in my wife's name.  My brother was
23 renting the property at the time, yes.
24     Q.  What's the address of that property that
25 Reginald Sanders was renting?

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

20

1      A.  I don't know the exact address off the top of
2  my head.  It's -- I'll have to research that information
3  on the address.  I don't know it off the top of my head
4  exactly.
5      Q.  What city is it in?
6      A.  I think it's Fresno.
7      Q.  When Reginald Sanders contracted COVID-19, did
8  you assist him financially?
9      A.  I did.
10     Q.  What financial assistance did you provide to
11 Reginald Sanders?
12     A.  I used my 401(k).
13     Q.  How much of your 401(k) did you use to assist
14 Reginald Sanders when he had contracted COVID?
15     A.  It could have been -- if I recall correctly, it
16 was close to $10,000.
17     Q.  Did you also assist him by abating or forgoing
18 rent on the property that he was renting from you and
19 Lida?
20     A.  Say that one more time, please.
21     Q.  Did you assist Reginald Sanders by either
22 reducing or forgoing collecting rent on the property
23 that Reginald Sanders was living in that you and Lida
24 owned?
25     A.  No, I did not.  The reason I took the money

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

21

1    from my 401(k) is so that my wife would not complain
2    anymore about his inability to pay the rent; and I used
3    the funds, also, to assist my nephew who was caring for
4    the property at the time his dad was in the hospital to
5    help pay other household debt, his car note, utilities.
6        Q.   And paying the household debt and car note and
7    utilities that you've just mentioned, was that all
8    within the $10,000 that you used from your 401(k)?
9        A.   It was.
10       Q.   Besides the $10,000, did you provide Reginald
11   Sanders or your nephew who was living with him any
12   additional funds that you had pulled out of your 401(k)?
13       A.   That would have been the 10,000 that I can
14   recall.
15       Q.   How many months of rent did you provide to
16   Reginald Sanders for the house he was living in that you
17   and Lida owned?
18       A.   If my memory serves me correctly, it was three
19   months' worth of rent.
20       Q.   Are you currently providing Reginald Sanders
21   any financial assistance?
22       A.   I am not, no.
23       Q.   After providing the $10,000 of financial
24   assistance to Reginald Sanders through today's date,
25   have you provided him any other financial assistance?

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

22

1        A.   I have not, no.
2        Q.   Is Reginald Sanders currently living in the
3    rental home that you --
4        A.   He is not --
5        Q.   -- and Lida own?
6        A.   -- no.
7        Q.   When did he move out of that home?
8        A.   December of 2022.
9        Q.   Is your nephew still living at that home?
10       A.   He is not.
11       Q.   When did he move out?
12       A.   Prior to my brother moving out.  I don't know
13   the exact month or time.
14       Q.   Is anyone currently renting the home that
15   Reginald Sanders formerly rented from you and Lida?
16       A.   Yes; and the best way I can explain this
17   information is that through the divorce, the temporary
18   orders were for me to either keep the property, live in
19   the property, or sell the property.
20            Unfortunately, my wife decided to do a
21   wraparound mortgage with an investor which took the
22   proceeds away from me.  So, she has the property under
23   an owner finance wraparound mortgage which she still --
24   she's -- technically, she's sold the property; but she
25   still owns the property.  She still has the mortgage

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

23

1    note.
2        Q.   Is anyone currently living there and paying
3    rent?
4        A.   My understanding is there is someone renting
5    the property at this time.  I do not have the details of
6    that information.
7        Q.   With respect to your lawsuit against Regions,
8    do you have any notes or calendars or diaries containing
9    any sorts of descriptions of events or facts that relate
10   to your alligations in your lawsuit?
11       A.   Any information that I have for dates,
12   calendars, and details have been given to my attorney.
13       Q.   Mr. Sanders, I understand that you have several
14   briefcases that you keep various notes and documents in;
15   is that correct?
16       A.   That is not correct.
17       Q.   Have you ever had the habit of keeping
18   briefcases with notes and documents and files?
19       A.   I have my -- I keep an office briefcase that
20   has my office keys to the branch, important
21   documentation pertaining to the office -- or not the
22   office, but my personal stuff -- my personal
23   information; but no bank information has ever been kept
24   in any one of my briefcases.
25       Q.   How many briefcases do you own?

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

24

1        A.   I don't recall.  I have several that I have
2    coin collections for, but I don't recall.  I've never
3    taken inventory.
4        Q.   More than one, though?
5        A.   More than one.
6        Q.   Ten or fewer?
7        A.   Less than ten.
8        Q.   Mr. Sanders, let's get some basic background
9    information on you.  Your -- what is your full name?
10       A.   I'm sorry.  Robert Anthony Sanders.
11       Q.   And have you ever gone by any other nicknames
12   or aliases?
13       A.   No, I have not.
14       Q.   What's your date of birth?
15       A.   March 4th, 1964.
16       Q.   What's your current address?
17       A.   Right now, 8585 Sienna Springs Boulevard,
18   Apartment 1123.  That's Missouri City, Texas 77459.
19       Q.   Prior to the Sienna Springs Boulevard address,
20   did you live at 26 Lake Como Drive in Missouri City?
21       A.   That is correct.  That is my residence.
22       Q.   And that is the marital home that you shared
23   with Lida Thomas?
24       A.   That is correct.
25       Q.   When you moved out of 26 Lake Como, which you

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

25

1    testified was January of 2023, did you take all of your
2    personal items with you?
3        A.  I did not.
4        Q.  And what did you not take with you?
5        A.  I had personal assets and property within the
6    home.  I don't have a list of the inventory.
7        Q.  What sort of property do you still have within
8    the 26 Lake Como Drive home?
9        A.  Every asset in the property is mine -- I mean,
10   meaning that it's our -- it's our property -- the
11   furniture, the fixtures, the electronic -- everything in
12   the property is mine.  I don't have a list of it, but --
13       Q.  I understand there's community marital
14   property, and my question is getting more to:  Do you
15   have any property in the home that was property that you
16   exclusively used or property that was personal in nature
17   to you?
18       A.  I can't --
19       Q.  Pers --
20       A.  -- no, I don't have any property that was just
21   for my personal use.  It was my family.  So --
22       Q.  Okay.  And my question is --
23       A.  Clothing.  I mean, I have clothing from my --
24   my home; but that's -- I still have other things.  I
25   still have clothing that's still there.

Robert Anthony Sanders

26

1        Q.  Are there any other personal effects that you
2    have there?
3        A.  Quite a few.
4        Q.  What personal effects are still in the marital
5    home?
6        A.  I don't have a list of it.  I mean, there -- I
7    didn't take all of my property.  I only had clothes that
8    I was able to get out, clothes and shoes.  That was all
9    I was able to get out of the property.
10       Q.  Do you have any electronic devices there that
11   were used by you --
12       A.  Yes.
13       Q.  -- exclusively?
14       A.  The media room.  We have the family room.  We
15   have -- I have electronics.  I have stereo equipment
16   that's in the attic, in the garage.  I mean, yes, I have
17   tons of electronics that are still in the house.
18       Q.  Do you have a laptop that you used personally
19   and exclusively?
20       A.  I have that with me, yes.
21       Q.  So, that -- the laptop is no longer in the
22   marital home?
23       A.  Right.  The home PC is still there, but the
24   laptop is with me.
25       Q.  Do you have any personal notes or journals or

Robert Anthony Sanders

27

1    diaries still in the marital home?
2        A.  Yes, I do.
3        Q.  Do any of those contain information or facts
4    relevant to your lawsuit against Regions?
5        A.  I don't really know -- meaning that I have all
6    my medical records.  I have all of my Texas Workforce
7    Commission records there that are still in the -- in the
8    dwelling.  I have a lot of personal family records for
9    my daughter that has a disability that I care for.
10           So, yeah, I have a ton of records that are
11   there.  I can't say that any of the records there are
12   pertaining to this lawsuit or how much of it is there.
13       Q.  And with respect to the Texas Workforce
14   Commission records that you stated were still in the
15   marital home, what efforts have you made to retrieve
16   those records?
17       A.  I have several efforts.  I've tried to be
18   cordial with my wife as far as entering the property.
19   She's prohibiting me from even coming inside my home.
20   That is not part of the temporary orders.  That is part
21   of her position.
22           So, I've -- I've made -- every time that
23   I'm spending time with my daughter, who is 22 -- she has
24   Down syndrome.  Her name is Asha Sanders.  When I'm
25   spending time with her, picking her up, and taking her

Robert Anthony Sanders

28

1    back home, I'm constantly inquiring as, "Can I come into
2    the home?  There are things that I need to acquire"; and
3    she would not let me enter the home.
4            My attorney currently is working to try to
5    get some type of agreement with her opposing counsel so
6    that I can enter the home and at least even get
7    furniture and property of which I still do not have.
8        Q.  And with respect to the medical records you
9    testified were still in the marital home, are those
10   medical records related to any of the damages that
11   you're alleging in your lawsuit against Regions?
12       A.  Yes, there are.
13       Q.  What efforts have you made to obtain the
14   medical records --
15       A.  Cons --
16       Q.  -- from the marital home?
17       A.  I'm sorry.  Constantly, I'm inquiring with her,
18   "I just need to get into the home to get those records";
19   and she will not let me enter the home.
20       Q.  Have you filed anything with the court in your
21   divorce case that would allow you to enter the home to
22   get those records?
23       A.  My attorney has informed me that all she can do
24   is -- is --
25       Q.  I don't want to know anything that you spoke

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

29

1   about with your attorney.
2      A.   That's the efforts, meaning that with my
3   attorney, I'm constantly inquiring as to what can be
4   done so that I can enter the property to gather these
5   documentation; and all I'm told is that she can write a
6   letter to the opposing counsel and see if they're
7   willing to allow me to come in.
8      Q.   So, to answer my question -- my question was:
9   Have you filed anything with the court to allow you to
10  enter to get those records?
11     A.   My understanding is there is nothing I can file
12  with the court to get those records.
13     Q.   Okay.  My question was just a "yes" or "no."
14     A.   Yeah, no -- well, I -- I guess it's -- it's not
15  as simple as "yes" or "no" because I've contacted Fort
16  Bend and I've been instructed that I can get a constable
17  to come out so that I can enter the property, but,
18  again, it takes a court order.
19          My attorney is telling me that there's
20  nothing they can do with a court order for me to enter
21  the property to get the records.  So, all they can do is
22  write a letter to opposing counsel and see if they will
23  be willing to consider me entering the property.  We're
24  still trying.
25     Q.   Mr. Sanders, have you ever lived at an address

Robert Anthony Sanders

30

1   13409 Garden Spring Court in Rosharon?
2      A.   That is the address, yes.
3      Q.   When did you live there?
4      A.   When we first moved here from Dallas to Houston
5   in 2012.
6      Q.   When you said "we," was that you and Lida
7   Thomas?
8      A.   And my children, also.
9      Q.   When did you marry Lida Thomas?
10     A.   20 -- 2000.
11     Q.   How long did you live at the Garden Spring
12  Court address?
13     A.   Two years.
14     Q.   And where did you move after that?
15     A.   50 Fort Arbor Lane, Missouri City, Texas 77459.
16     Q.   And does your family live there as well?
17     A.   Yes.
18     Q.   How long did you live at the Fort Arbor Lane
19  address?
20     A.   2014 to 2017.  The address that you referenced
21  earlier, Garden Springs, was the address of Lida Thomas'
22  parents.
23     Q.   Do Lida Thomas' parents still own the Garden
24  Spring Court house?
25     A.   They do, yes.

Robert Anthony Sanders

31

1      Q.   And the Fort Arbor Lane house, do you and
2   Ms. Thomas still own that property?
3      A.   We sold that property.
4      Q.   Did you ever use it as a rental property before
5   you sold it?
6      A.   We did not.
7      Q.   Have you ever lived at a 1201 Homer Johnson
8   Lane, Garland, Texas address?
9      A.   We did.
10     Q.   And when did you live there?
11     A.   Prior to moving here in 2012.  We acquired that
12  property, goodness, 2000 and -- no, I'm sorry -- 2004.
13  1201 Homer Johnson, that was our second home.
14     Q.   Did you ever rent the Homer Johnson Lane
15  property?
16     A.   We did not, no.
17     Q.   Have you ever lived at an address 905 Sagebrush
18  Trail in Garland, Texas?
19     A.   Yes.
20     Q.   When did you live there?
21     A.   We purchased that home in 2000 when we first
22  got married.
23     Q.   Did you sell the home?
24     A.   We sold it.
25     Q.   Did you ever rent the property at Sagebrush

Robert Anthony Sanders

32

1   Trail?
2      A.   We did not, no.
3      Q.   And have you ever lived at 4306 Rainier Street
4   in Irving, Texas?
5      A.   Yeah, that was an apartment that I moved into.
6   I don't remember the exact timeline when I moved here
7   from Dallas -- no, from -- I'm sorry -- from St. Louis,
8   Missouri.
9      Q.   So, Rainier Street, that was not a property
10  that you owned?
11     A.   No, that was an apartment.
12     Q.   My understanding is that you and/or Ms. Thomas
13  own other properties besides your 26 Lake Como address,
14  which was your marital home.  Where are those
15  properties' other addresses?
16     A.   I'd have to pull that data and information.  I
17  don't know the exact addresses for each one.  The
18  properties that were acquired, my wife put every
19  property in her name.  So --
20     Q.   Is 627 Harvest Bluff in Rosharon one of the
21  properties that Lida Thomas --
22     A.   Yes, she --
23     Q.   -- has in her name?
24     A.   Yes, yes.
25     Q.   Is that a rental property?

Robert Anthony Sanders

33

1    A.  Yes.
2    Q.  When did Ms. Thomas first acquire that
3  property?
4    A.  I don't recall the exact timeline.
5    Q.  Was it while you were working at Regions?
6    A.  Yes.
7    Q.  Did you or Ms. Thomas ever life in the Harvest
8  Bluff property?
9    A.  No.
10    Q.  Have you and Ms. Thomas rented the Harvest
11  Bluff property the entire time that you have owned it?
12    A.  It was rented, yes.
13    Q.  How much is the current monthly rent for the
14  Harvest Bluff property?
15    A.  If I recall correctly, the rent was about 1850
16  a month for that property.
17    Q.  And in terms of the rental income from the
18  Harvest Bluff or any of the other properties, was that
19  held in any particular bank account?
20    A.  That was directly to Lida Thomas.  I never saw
21  any of the proceeds from any of the rent.
22    Q.  Did Ms. Thomas use any of the rental proceeds
23  that were in her bank account for household expenses?
24    A.  No.
25    Q.  Did Ms. Thomas ever use any of the rent

Ross Reporting Services, Inc.                      281-484-0770

---

Robert Anthony Sanders

35

1  Lane property, like painting or flooring or lining up
2  vendors?
3    A.  At the time I was unemployed when she acquired
4  the property, yes, I did work to the property.  I helped
5  clean the property.  I didn't do any painting.  They
6  hired contractors for that; but, again, she did the
7  investment property with her brother.  She excluded me
8  from all the details.  I wasn't working at the time, but
9  I would go by and help.
10    Q.  When was the 227 Kestrel Lane property acquired
11  by Lida?
12    A.  It would have been in February of 2022, last
13  year.  My understanding was it was sold.  I found that
14  from my first attorney for the divorce that she sold it
15  with her brother in June of 2022.
16    Q.  When you did some work to the 227 Kestrel Lane
17  property, did you ever do any of that work during
18  regular banking business hours?
19    A.  I wasn't employed at the time.
20    Q.  Besides the addresses that we've talked about,
21  are there any other rental property addresses or homes
22  that Lida Thomas owns?
23    A.  I'd have to recall the exact address.  There
24  was another property in Rosharon that she did, again,
25  with her brother and another family member on her side

Ross Reporting Services, Inc.                      281-484-0770

---

Robert Anthony Sanders

34

1  proceeds in that bank account for purchasing other types
2  of investments?
3    A.  I don't know because I never saw the accounts.
4  The money she would get for the rental property, she
5  would sweep it into another account.  I never saw it.  I
6  never -- I could never have access to it.
7    Q.  What bank or financial institution was the bank
8  account with that held all the rent money?
9    A.  The rent money would go into Bank of America;
10  and, again, I had no access to those accounts.
11    Q.  Was another one of the rental properties
12  1126 Noble Glenn Drive in Fresno?
13    A.  Yes.  Noble Glenn was the property address that
14  my brother was renting.
15    Q.  And is that currently rented?
16    A.  My understanding, it is.
17    Q.  What is the monthly rental on the Noble Glenn
18  property?
19    A.  I don't recall exactly.  Estimated roughly
20  about 1600 a month.
21    Q.  And then the address 227 Kestrel Lane in
22  Rosharon, is that a rental property as well?
23    A.  That was a property that my wife did with her
24  brother as a flip for which I was excluded from.
25    Q.  So, did you ever do any work on the Kestrel

Ross Reporting Services, Inc.                      281-484-0770

---

Robert Anthony Sanders

36

1  that was a rental property.  She had it for several
2  years before they sold it, and I want to say the
3  property was sold in 2021.  She had it probably with her
4  brother four years -- maybe three years, four years
5  prior to selling it.
6    Q.  Did Ms. Thomas have any business entity that
7  held her rental properties, or were they all in her name
8  personally?
9    A.  They were all in her name.
10    Q.  Did you help in any other way with the rental
11  properties such as collecting rent, checking on the
12  properties, doing a driveby of the properties, anything
13  else where you were involved in maintaining the rental
14  properties?
15    A.  Before the divorce, I could see some of the
16  rental income coming in, made sure that the mortgage
17  payments were paid, and anytime that -- outside of
18  working at Regions or when I was unemployed, I would do
19  things that were needed if another family member
20  couldn't go to the property and help.
21    Q.  What sort of things were -- were those that you
22  would do?
23    A.  Maintenance work, anything that needed to be
24  done.  I can't recall exactly.  It wasn't like it was a
25  great deal of work.  It was just maybe following up,

Ross Reporting Services, Inc.                      281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

37

```
 1    picking up mail, something like that.
 2         Q.   My understanding is that when you worked at
 3    Regions Sugar Land Branch, there was an employee Eric
 4    Johnson.  Do you recall Mr. Johnson?
 5         A.   I do, yes.
 6         Q.   And my understanding is he was an IT associate
 7    at Regions; is that correct?
 8         A.   That is correct.
 9         Q.   And I understand that he had an outside
10    construction business; is that correct?
11         A.   That is correct.
12         Q.   And did you ever solicit Mr. Johnson to do any
13    work on yours and Lida's rental -- rental properties?
14         A.   No.
15         Q.   Did you ever have Eric Johnson do any
16    construction or remodeling work on any of your
17    properties?
18         A.   No.
19         Q.   Did you ever discuss with Mr. Johnson him doing
20    work on any of your properties?
21         A.   Yes, and to clarify:  Mr. Eric Johnson came --
22    would frequently come by our office to do IT services
23    and at the time I recall Melissa Miranda had expressed
24    work needing to be done to their home so that they
25    can -- I think it was her mom's home she wanted to sell.
```

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

38

```
 1         I mentioned to the entire staff and
 2    team -- I said, "I have never used Eric Johnson," I
 3    said, "but he showed me some photos of some amazing work
 4    that he's done on properties that he's flipped."
 5         I reluctantly -- I chose not to mention
 6    that to Melissa Miranda, but my whole team was aware
 7    that he had a construction company outside of Regions
 8    and they did -- he showed me photos that he did very
 9    good work that I could see from the photos.
10         Q.   So, did you ever personally discuss with
11    Mr. Johnson the potential of him doing any work on your
12    properties?
13         A.   No.  I did inquire as to his knowledge in the
14    field of construction as to the degree of his
15    workmanship and just getting feedback from him.
16         Q.   And was that feedback for purposes so then you
17    could go and potentially improve your properties or do
18    other projects on your properties?
19         A.   I just wanted to better understand the industry
20    that he -- that he does, construction.  I felt that it
21    was very interesting just to see the improvements that
22    he could do.
23         Q.   Mr. Sanders, what are all the phone numbers
24    that you have used for your personal phone numbers in
25    the past five years?
```

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

39

```
 1         A.   Past five years, just one cell phone number;
 2    and that's (469)744-0923.  That's the only number I've
 3    had.
 4         Q.   How long have you had that phone number?
 5         A.   Since Dallas and probably the last -- I've been
 6    here for ten years plus -- no, 11 years, I've been here
 7    in Houston.  Prior to that, we'll probably say in the
 8    last 15, 16 years.
 9         Q.   And same question for e-mails:  What are all
10    the e-mails that you've had personally since about
11    January 2018, the last five years or so?
12         A.   Personal e-mail, robert-sanders@hotmail.com.
13         Q.   Any others?
14         A.   None that I can recall.
15         Q.   What are all the electronic devices, meaning
16    laptops and cell phones and any storage devices, that
17    you've used in the past five years?
18         A.   Just my personal laptop and my cell phone.
19         Q.   What brand is your personal laptop?
20         A.   I don't know.  I don't know the name of it.
21    I'm sorry.
22         Q.   Is it a PC?
23         A.   It's a -- it's a small -- it's not a Dell, but
24    it's -- it looks very similar to that (indicating).
25    It's just a small laptop.
```

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

40

```
 1         Q.   Okay.  So, an Apple or --
 2         A.   It's not an Apple.
 3         Q.   Okay.  And how about your cell phone?  What
 4    type of phone?
 5         A.   It's an iPhone.  I think it's an older one,
 6    too.
 7         Q.   What are all your social medial accounts?
 8         A.   I really only have Facebook -- oh, I'm sorry.
 9    LinkedIn, Facebook.
10         Q.   Do you use Twitter?
11         A.   I don't use Twitter, no.
12         Q.   Do you use Instagram?
13         A.   No.
14         Q.   Do you use TikTok?
15         A.   No, I do not.
16         Q.   Besides the lawsuit that you've brought against
17    Regions, have you been involved in any other lawsuits in
18    the past?
19         A.   I'm learning now the, divorce.
20         Q.   Besides the divorce and the lawsuit against
21    Regions, have you been involved in any other lawsuits?
22         A.   The guardianship for my daughter Asha Sanders.
23         Q.   Any others?
24         A.   That's it.
25         Q.   Mr. Sanders, how do you self-identify in terms
```

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

41

1  of your race?
2      A.  A very proud African-American male.
3      Q.  In terms of your educational background, I
4  understand that you went to Jesse H. Jones Senior High
5  School; is that correct?
6      A.  That is correct.
7      Q.  Did you graduate?
8      A.  I did.
9      Q.  When was that?
10     A.  1982.
11     Q.  And did you attend college?
12     A.  I went to the military.
13     Q.  Is that a "no," then, to attending college?
14     A.  I did not.  I'm sorry.  No, I did not attend
15  college.
16     Q.  Did you attend any vocational schools?
17     A.  While in the military, I did take courses, yes.
18     Q.  What were those courses in?
19     A.  Communication was one.  Computer science was
20  another.
21     Q.  And I understand you were in the United States
22  Army; is that correct?
23     A.  That is correct, yes.
24     Q.  What were your years of service?
25     A.  Years of service was 1982 to 1986.

Ross Reporting Services, Inc.                281-484-0770

Robert Anthony Sanders

42

1      Q.  Where were your tours?
2      A.  Stuttgart, Germany; and Fort Carson, Colorado,
3  Colorado Springs.
4      Q.  Besides your employment at Regions, have you
5  ever been terminated from another employer?
6      A.  I'd have to recall -- I have in the past, many
7  years ago.  I'd have to recall which companies.
8      Q.  Besides Regions, have you been terminated from
9  a job in banking before?
10     A.  Yes.
11     Q.  Where was that?
12     A.  One, BB&T Bank.  I don't recall the year but I
13  was only employed with them a year prior to moving here
14  and it was more of a mutual agreement because my family
15  and I were already planning to move to Houston when I
16  started with them.  I want to say I started with them in
17  2011.  Part of the hiring, they agreed that they would
18  have Houston locations in the market that I could apply
19  for for transfers.
20         Within the year's time, they indicated
21  that the merger that they were anticipating did not go
22  through.  So, therefore, there was nothing for me to
23  apply for in Houston.  It was a mutual understanding and
24  I decided to basically exit the company but I still
25  consider that as a termination, but --

Ross Reporting Services, Inc.                281-484-0770

Robert Anthony Sanders

43

1      Q.  What made you and your family want to move to
2  Houston?
3      A.  It was my wife's desire to be with her -- near
4  her family here.  I'm a native, born and raised in
5  Houston.  I supported her recommendations to move here.
6  It was -- but it was my wife's decision to move here.
7      Q.  Besides BB&T and what you've explained there,
8  have you ever been asked to resign in lieu of
9  termination from an employer?
10     A.  I don't recall ever being asked to resign, no.
11     Q.  Have you ever resigned your employment
12  believing that if you did not, you would be terminated?
13     A.  No, I don't -- no.
14     Q.  Have you ever been demoted at a job?
15     A.  No.
16     Q.  Have you ever had your pay cut at a job?
17     A.  No, I have not.
18     Q.  Have you ever applied for unemployment
19  benefits?
20     A.  Yes, I have.
21     Q.  When was that?
22     A.  Most recently after the wrongful termination in
23  June of 2021, I had to apply for unemployment benefits.
24  I then reapplied in February of 2022.  Prior to that,
25  when I lived in Dallas, I think for four or five months,

Ross Reporting Services, Inc.                281-484-0770

Robert Anthony Sanders

44

1  I applied for unemployment benefits from April of 2012
2  to June, if I'm correct.
3      Q.  And was that as a result of BB&T Bank --
4      A.  Correct --
5      Q.  -- or something else?
6      A.  -- leaving it, yes.  That's correct.
7      Q.  Have you ever applied for Social Security
8  benefits for yourself?
9      A.  No.
10     Q.  And disability benefits?
11     A.  No, I have not.
12     Q.  Mr. Sanders, I'd like to talk about your prior
13  employment in banking before you were employed at
14  Regions.  I understand that you worked at BB&T Branch
15  Banking and Trust.  Is that now Truist Financial
16  Corporation, to your knowledge?
17     A.  Not sure if they changed, but that was Branch
18  Banking and Trust who I was with for one year.
19     Q.  And that was in the Dallas area?
20     A.  That's correct, yes.
21     Q.  What was your title there?
22     A.  Branch Manager IV.
23     Q.  What were your duties as Branch Manager IV?
24     A.  Leadership development, market -- well, not
25  market manager, but building relationships with existing

Ross Reporting Services, Inc.                281-484-0770

Robert Anthony Sanders

45

1   portfolios, acquiring new relationships for both
2   commercial and consumer, lending specialist for the
3   branch.
4       Q.   When you worked at B&T [sic], was that more of
5   a traditional branch?
6       A.   It was a traditional, yes, it was.
7       Q.   Who was your supervisor there?
8       A.   I'd have to remember.  Matt -- I can't remember
9   his last name.  It was a district manager.  Diane Perez
10  was the branch -- the -- no, I'm sorry.  Area manager
11  was Matt.  Diane Perez was the, like, district manager.
12      Q.   When you were at -- excuse me.  When you were
13  at BB&T, were you ever leading any de novo branches?
14      A.   The location, if I'm correct, that I was
15  managing at the time was considered a de novo, was kind
16  of a newer location for them.
17      Q.   And when we talk about de novo branches --
18      A.   Yes.
19      Q.   -- in banking, what does that mean to you?
20      A.   That's a new ground build location.  That's in
21  a new market.  That is a brand-new branch.  Some -- some
22  companies and banks call them Nexus or de novos, but
23  they're new locations to new markets.
24      Q.   And so, is it fair to say that the branch is in
25  a new market; and so, a focus is business development

Robert Anthony Sanders

46

1   because there's no existing business?
2       A.   Absolutely.
3       Q.   Would it be fair to say, too, that sometimes a
4   de novo branch might have newer technology, new ways of
5   doing things?
6       A.   Newer technology in some cases, but existing
7   pro forma in terms of the expectations.  I'm very proud
8   to say with the Hibernia Bank/Capital One organization
9   that I was a manager for and market manager, considered
10  a bank president.  I opened up five new de novo/Nexus
11  branches, or new de novo branches in the Dallas area.
12           MS. STAPLE:  Okay.  Objection,
13  nonresponsive.
14      Q.   (By Ms. Staple) I appreciate that
15  explanation --
16      A.   Okay.
17      Q.   -- but my question was just about the new
18  technology --
19      A.   Absolutely.
20      Q.   -- of a de novo branch.
21      A.   Yes.
22      Q.   And then, is it fair to say that at a de novo
23  branch, you would be building a staff from scratch?
24      A.   Absolutely, yes.
25      Q.   And so, to clarify:  BB&T, I think you had

Robert Anthony Sanders

47

1   testified that was a traditional but that the location
2   was newer.  Can you clarify:  Was that a de novo branch
3   or a traditional branch?
4       A.   It was a traditional branch; but if I recall
5   correctly, the branch had just been built maybe a year
6   prior to me getting there.  It was still considered new.
7       Q.   So, is it fair to say when you arrived at BB&T,
8   the branch had been there for about a year -- so, there
9   was some existing business -- but that you still had a
10  focus on business development?
11      A.   That is correct.
12      Q.   And then afterwards, I understand you worked at
13  ViewPoint Bank; is that correct?
14      A.   That is correct.
15      Q.   When did you work at ViewPoint Bank?
16      A.   I don't recall the exact timeline.  I was with
17  ViewPoint for three, possibly four years.
18      Q.   Would 2008 to 2011 sound correct?
19      A.   That's correct.  Yes, that would be correct.
20      Q.   What was your title at ViewPoint Bank?
21      A.   Bank president.
22      Q.   Is that the same as a branch manager?
23      A.   Branch manager, yes.
24      Q.   Who is your supervisor at ViewPoint Bank?
25      A.   At the time, Yvette Taft was the -- like, the

Robert Anthony Sanders

48

1   district manager.  Paul Craig was the senior manager.
2       Q.   Why did you leave ViewPoint Bank?
3       A.   It was more for the opportunity.  Again, my
4   family was considering transferring to Dallas.
5   ViewPoint had no locations in Dallas.
6       Q.   Where was the ViewPoint location where you
7   worked?
8       A.   I don't recall the exact street address; but it
9   was in Plano, Texas.
10      Q.   Was the ViewPoint branch where you worked a de
11  novo branch or traditional?
12      A.   Traditional.
13      Q.   And then I understand prior to that, you worked
14  at Capital One; is that correct?
15      A.   That is correct.
16      Q.   What years did you work at Capital One?
17      A.   I'm sorry.  I apologize.  I don't know the
18  exact time frame; but it -- again, it was roughly about
19  four years at Capital One.
20      Q.   Since it was prior to ViewPoint, would it be
21  about 2004 to 2008?
22      A.   That is correct, yes.
23      Q.   And what was your title at Capital One?
24      A.   Multi -- the -- it was multiple titles.  Branch
25  Manager IV, vice president.  We were also considered

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

49

1  market managers.
2      Q.  What does a market manager do that's different
3  than a branch manager?
4      A.  The classification identifies that if you're a
5  market manager, you own the market for which you
6  represent in that area, that location.
7      Q.  And were you over one branch or multiple
8  branches?
9      A.  One branch.
10     Q.  Was that in Plano?
11     A.  Yes.
12     Q.  Who was your supervisor?
13     A.  A lot of changes.  Mark Welch and at the time,
14  also, too, Paul Craig was there as a senior manager.
15     Q.  Did Paul Craig help recruit you to ViewPoint?
16     A.  He actually was the one that recruited me for
17  ViewPoint, yes.
18     Q.  Why did you leave Capital One?  Was that
19  because Paul recruited you?
20     A.  He did, yes.
21     Q.  And at Capital One, were you managing
22  traditional or de novo branch or branches?
23     A.  Primarily, all de novos, all new branches.
24     Q.  When you say "primarily," how many de novo
25  versus traditional did you have at Capital One?

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

50

1      A.  To clarify, all the branches that I manage and
2  for Capital One/Hibernia were all new de novo branches.
3      Q.  And besides the banking institutions we've
4  talked about, are there any others that you've worked
5  for in your career?
6      A.  I started my career in 1998 or -- I think
7  roughly 1998 with Bank One before it became Chase Bank.
8  I was with them for over four years.  I was recruited by
9  a friend of mine from Bank One to go to Compass Bank,
10  and I was with them about four years before I went to
11  Hibernia/Capital One.
12     Q.  When you worked at Bank One, what was your role
13  there?
14     A.  I started with the organization as a -- in the
15  branch -- the management training program.  I started
16  out as a branch manager.
17     Q.  And at Compass Bank, what was your role there?
18     A.  I was branch manager, also, too.
19     Q.  In your career in banking, have you ever worked
20  a role other than branch manager or its equivalent?
21     A.  Yes.  More recently, I was relationship
22  manager, a commercial officer for Texas Citizens Bank;
23  but that was from roughly October of 2021 to the end of
24  January or beginning February of 2022.
25     Q.  Have you ever worked in, like, a teller or a

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

51

1  banker role?
2      A.  Unfortunately, I have not had the opportunity
3  to do that but in my job description, I do all of it,
4  but, no, I didn't start out as a teller or banker.
5      Q.  Understood.  I think now would be a good time
6  to just take a quick five-minute bathroom break --
7      A.  Sure.
8      Q.  -- and come back at 11:45.
9      A.  Thank you.
10        THE VIDEOGRAPHER:  Going off the record at
11  11:39 a.m.
12        (Recess from 11:39 a.m. to 11:45 a.m.)
13        THE VIDEOGRAPHER:  Going on the record at
14  11:45 a.m.
15     Q.  (By Ms. Staple) All right, Mr. Sanders.  Let's
16  talk about your employment at Regions.  Is July 2nd,
17  2012 the date you were hired at Regions?
18     A.  Yes, that's correct.
19     Q.  How did you learn about a job opening at
20  Regions Bank?
21     A.  I was applying with other banks here in the
22  market because we were transitioning to Houston.  I
23  don't recall the name.  There was a colleague of mine, a
24  friend of mine that I found out that was working for
25  Regions and I just happened to pull up the website and I

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

52

1  noticed that the Sugar Land branch manager position had
2  just posted and I applied for it that day.  I don't know
3  the exact date when it was posted; but I posted, like,
4  two weeks prior to that day.
5      Q.  When you saw the Sugar Land position open up,
6  were you living in the Sugar Land area at that time?
7      A.  I was living in Dallas at the time, no.
8      Q.  And was it your intention to live in the Sugar
9  Land area when you relocated?
10     A.  No.  We didn't know where we were going to live
11  at the time, but I did understand that my wife wanted us
12  to move in with her parents which lived in Rosharon.
13  So, Sugar Land would have been a perfect location for
14  us.
15     Q.  And my understanding is your title at Regions
16  was Branch Manager IV; is that correct?
17     A.  That is correct.
18     Q.  What were your duties generally as Branch
19  Manager IV at Regions?
20     A.  Business development; leadership development of
21  associates, bankers, team; operational; sales;
22  compliance; the day-to-day responsibilities; personal
23  consumer development; building relationships within the
24  market.
25        (Regions Exhibit A marked)

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

53

1    Q.  (By Ms. Staple)  Okay.  Mr. Sanders, I'm going
2  to hand you what's being marked as Regions Exhibit A.
3  If you could, just review the document; and let me know
4  when you've had sufficient time to review it and are
5  able to answer questions.
6    A.  You want me to review all pages of this or --
7    Q.  Take as much time as you need to review the
8  whole document, and let me know when you're ready to
9  answer questions.
10    A.  Okay.
11    Q.  Mr. Sanders, is Regions Exhibit A an accurate
12  description of the branch manager role?
13    A.  Yes.
14    Q.  You can go ahead and set that aside.  That was
15  my only question for that document.
16    Q.  Who interviewed you for the branch manager
17  role at Regions?
18    A.  Mary McDonnell and -- oh, my goodness -- Bagley
19  was the last -- Alan -- I think Alan Bagley.  He was
20  considered the market manager.  Mary McDonnell was
21  considered -- was the CBM, consumer banking manager, for
22  that area which is equivalent to district manager.
23    Q.  Who decided to extend you an offer of
24  employment for Regions?
25    A.  Both.

Ross Reporting Services, Inc.                     281-484-0770

Robert Anthony Sanders

54

1    Q.  With Mary and Alan?
2    A.  Alan and Mary, both.
3    Q.  And I'm sorry.  Did you say Alan with an "A" or
4  Ellen with a "E"?
5    A.  Alan with an "A."
6    Q.  Okay.
7    A.  Alan Bagley was his last name.
8    Q.  Did you have the same title of Branch
9  Manager IV for your whole duration of employment at
10  Regions?
11    A.  Yes.
12    Q.  And I understand that you were terminated from
13  Regions on June 3rd, 2021; is that correct?
14    A.  I would say, yes.  Roughly, yes.  Terminate --
15  yes.
16    Q.  What branch did you work at when you were at
17  Regions?
18    A.  The Sugar Land office.
19    Q.  What was the address of the Sugar Land Branch?
20    A.  I can't even remember.  Highway 6 -- I'm sorry.
21  I can't remember the exact street address.  I apologize.
22    Q.  That's okay.  And was Mary McDonnell your
23  immediate supervisor when you started?
24    A.  Yes.
25    Q.  My understanding is at some point, you began

Ross Reporting Services, Inc.                     281-484-0770

Robert Anthony Sanders

55

1  reporting instead to Dave Leonard; is that correct?
2    A.  That is correct.
3    Q.  When did that supervisor change happen?
4    A.  I don't remember the exact timeline.  It could
5  have been in 2019.
6    Q.  And is your understanding that your supervisor
7  change from Mary McDonnell to Dave Leonard was because
8  Regions was restructuring some of its Houston market and
9  reporting structures within the market?
10    A.  I'm trying to recall at the time.  It -- the
11  new Nexus locations were coming in.  They were adding
12  more locations, and I don't recall exactly why Mary
13  was -- was transitioning and Dave came in.  I don't
14  recall.
15    Q.  My understanding is that for the duration of
16  your employment with Regions, your annual evaluations
17  were rated as a "met expectations," which was the
18  average rating on the evaluations with the exception of
19  the first quarter of 2021 --
20    A.  Say that again.
21    Q.  -- is that correct?
22    A.  I'm sorry?  You said "unmet" or --
23    Q.  My understanding is that for your annual
24  performance evaluations, that through the duration of
25  your Regions employment, they were "met expectations,"

Ross Reporting Services, Inc.                     281-484-0770

Robert Anthony Sanders

56

1  which is the middle-of-the-road, average rating; is that
2  right?
3    A.  The overall, I would probably say, yes; but the
4  different areas of performance, I do recall that none of
5  my performance has ever been unmet.  It has always been
6  "advanced," "a role model," or "met expectations"; but
7  the overall summary has always been "met expectations."
8    Q.  Have you ever received any disciplinary actions
9  or warnings at Regions prior to your termination?
10    A.  The only two disciplinary actions -- yes, two.
11  When I first started with the company, if you did not
12  complete a mandatory training course prior to the due
13  date, the first occurrence is a write-up.
14    The second write-up that I received -- I
15  cannot pronounce her last name.  She was a branch
16  operations manager.  I forgot her name already.  I'm
17  sorry.  She worked with Dave Leonard and I was
18  disciplined for -- I was on vacation and there was an
19  audit of safe deposit boxes that was not properly done
20  by my staff and my team and because the due date of the
21  audit on the safe deposit boxes date had expired and
22  there was a finding, I was cited saying that it should
23  have been done before I went on vacation.
24    That's the only two write-ups I've ever
25  received in nine years.

Ross Reporting Services, Inc.                     281-484-0770

Robert Anthony Sanders

57

1            (Regions Exhibit B marked)
2        A.  Meghan was her first name.  I apologize.
3        Q.  (By Ms. Staple) Mr. Sanders, I'm handing you
4    what's being marked as Regions Exhibit B.
5        A.  Okay.
6        Q.  Just go ahead and review the document, and let
7    me know --
8        A.  Sure.
9        Q.  -- when you're ready to answer questions.
10       A.  Okay.  No questions.  This is the first one I
11   mentioned.
12       Q.  Okay.  So, Regions Exhibit B, is this an
13   accurate copy of the final written warning that you had
14   received that was related to the compliance training --
15       A.  Right.
16       Q.  -- deadline that was missed?
17       A.  That is correct.
18       Q.  Okay.  You can go ahead and put that to the
19   side.
20            (Regions Exhibit C marked)
21       Q.  (By Ms. Staple) Mr. Sanders, I'm passing you
22   what's being marked as Regions Exhibit C.  Please go
23   ahead and review the document, and let me know when
24   you're ready to answer questions.
25       A.  Okay.  This is the second occurrence that I had

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

58

1    mentioned, also.
2        Q.  Okay.  So, Regions Exhibit C, is that the
3    verbal warning that you received related to, I believe
4    it's a safe deposit --
5        A.  Escheatment, yes.
6        Q.  -- escheatment process?
7        A.  Yes.  And this is where I went on vacation
8    during the time that the expectation was required to be
9    completed.  They found a finding my team -- through my
10   team's audit of the escheatment.  It was -- in other
11   words, my team did something incorrectly; but I was
12   cited.
13       Q.  Prior to going on vacation when you said this
14   audit was due, while you were on vacation, did you --
15       A.  No, it was prior to.  I'm sorry.  The audit was
16   due prior to me going on vacation.  It was in -- it was
17   already being completed, and there was a finding.  In
18   other words, they did something incorrectly while I was
19   on vacation.
20       Q.  Prior to you going on vacation, did you leave
21   instructions with your staff or train them of how they
22   were to complete this escheatment process?
23       A.  That is correct.  Yes, I did.
24       Q.  And did you appoint anyone on your staff to --
25   to be in charge of the process while you were out of the

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

59

1    office?
2        A.  If I recall correctly during this time, Nita
3    Shah was one of my bankers.  I don't recall who was
4    working with her.  I can't remember who was finishing
5    this up; but for some reason, I'm just thinking that
6    that was around the same time that she was still in the
7    branch as an employee.
8        Q.  Was there a protocol that Regions had where if
9    you were out of the office as branch manager, that
10   someone else would be stepping into your duties while
11   you were on vacation?
12       A.  Normally, it's always -- I don't recall which
13   branch was our buddy branch but they do -- we all -- as
14   a best practice, we always reach out to a buddy branch,
15   another manager or the team will reach out to Dave
16   Leonard or the branch operations manager, which is
17   Meghan.
18       Q.  And when you went on vacation, was Dave Leonard
19   aware that you were gone on vacation --
20       A.  Yes.
21       Q.  -- and that someone would need to be overseeing
22   the process who was not you?
23       A.  Yes.  I mean, I think that the details -- Dave
24   was aware of my vacation, yes.  Any expectations needed
25   support from upper management, my team knew to reach out

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

60

1    to him, yes, or to Meghan.
2        Q.  And before you went on vacation, did you reach
3    out to your buddy branch and communicate that you would
4    be out and that this escheatment process was going on
5    and your team might need assistance?
6        A.  Yes, I do recall.  I always give very clear
7    details on what the office is working on when I go on
8    vacation as to what they might need support with.  So,
9    it was communicated, yes.
10       Q.  And who would that have been communicated to?
11       A.  I don't recall who the other buddy branch was
12   at the time.
13       Q.  Okay.  You can go ahead and place that document
14   to the side.
15            At the time you were terminated from
16   Regions, what was your salary?
17       A.  I think the base salary was right about
18   ninety-five eight, if I remember correctly.
19       Q.  Were you able to participate in any type of
20   bonus program --
21       A.  Yes --
22       Q.  -- at the time of your termination?
23       A.  -- we were; but at the time of termination, I
24   don't think we had any incentives coming up that I would
25   have been entitled to.

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Q. Had you ever received incentive payments under a bonus plan while you were at Regions?
A. Yes.
Q. What was the structure of that bonus plan?
A. It was more like a quarterly bonus that, on average, I would receive anywhere from about -- I would to say more -- well, if I recall correctly, on an average, it could be anywhere from about 1100 to $2,000 quarterly.
Q. Under that bonus plan, did you have to be employed on the day the bonus was paid to receive it?
A. You did.
Q. And was that bonus merit based? Was it discretionary? Was it based on criteria or performance indicators?
A. Performance -- performance, loan -- percentage of loan increase in terms of growth, deposit growth, new relationship growth. There was -- I'm just trying to recall compared to what I've seen before or after. Primarily, it was rated on deposit, lending, and customer service score pro forma.
Q. Did you have a 401(k) at Regions?
A. I did at the time.
Q. Did Regions match any portion of that?
A. Regions, I think they capped -- I'm trying to

remember. 6 percent was their -- was their max; but every year, I would increase my 401(k) by whatever annual merit increase that I would receive. So, year over year, if I received a 3 percent increase, I would increase my 401(k) by another 3 percent.
Q. So, to clarify: You personally would increase your individual contribution to your 401(k) each year; and then, separate and apart from that, Regions had a match program that was capped at 6 percent?
A. Correct.
Q. Okay. What employee benefits did you receive at Regions in terms of insurances or other benefits?
A. Health insurance that I can recall is probably the only other standard benefit -- 401(k), health insurance, and dental -- vision and dental.
Q. Did you receive any sort of life insurance benefits?
A. Yes, there is. While you're employed, you do get a life insurance coverage. I would always try to extend the coverage of life insurance, yeah, through the company.
Q. Did you receive short-term or long-term disability benefits?
A. I want to say, yes, we did -- yeah, I did.
Q. Mr. Sanders, when you started at Regions and

you were onboarded, did you receive a copy of Regions' code of conduct?
A. Yes, I did. I don't recall what the document is; but I do recall going over the code of conduct, yes.
Q. And were you aware at that time that Regions had an anti-discrimination and anti-harassment, anti-retaliation policy?
A. I would say, yes. If I review the code of conduct, then, yes.
(Regions Exhibit D marked)
Q. (By Ms. Staple) I'm handing you what's being marked as Regions Exhibit D. Just go ahead and review the document, and let me know when you're ready.
A. Yes, this is correct.
Q. Mr. Sanders, do you recall digitally signing this acknowledgement form?
A. I did, yes.
Q. Okay. You can go ahead and place that to the side.
My understanding is that Regions conducts trainings each year on its code of conduct; is that correct?
A. That is correct.
Q. And did you, in fact, do a training each year on Regions' code of conduct?

A. Yes.
Q. Does Regions call its employees "associates"? Is that the common term that they use?
A. I'd say, yes. I mean, we say "associates," "team members." We used to also say, too, "having a best friend at work." So -- but we do say "associates" or "team members."
Q. It's interesting. So, the best friend at work, was that a term used for everyone on the team; or was that to --
A. That was a Regions terminology, yes.
Q. So, you could call your -- your colleague at work your best friend at work?
A. Best friend at work.
Q. Who was on your team at Sugar Land that directly reported to you?
A. My -- at the time prior to?
Q. At the time you were terminated, who was on your team? Like, who were your direct reports?
A. Okay. My direct reports consisted of Lakesha Crawford, Raven Porter, Karen Mendez -- Mendez. Melissa Miranda was at the office at the time. I feel like I'm forgetting someone. We had some short-term employment for one of the employees. I cannot remember everyone's name, but this is right around the time of the pandemic.

Robert Anthony Sanders

65

1    So, I know our staffing went down; but, primarily, I'm
2    trying to think if I missed anyone.
3            Prior to me being terminated by Regions --
4    I guess, you don't want to go back to 2019, do you?
5    You're just talking about directly?
6        Q.  Yeah, toward the end of your employment.
7        A.  '21, '22 -- I can't remember exactly the time
8    frame when everything took place.  That's all I can
9    recall at this time.
10       Q.  Let's talk about Lakesha Crawford.
11       A.  Sure.
12       Q.  What was her title?
13       A.  For that -- financial relationship specialist.
14       Q.  And what would a financial relationship
15   specialist do at Regions?
16       A.  It's personal bank relationship building.  I
17   could go over the job description for management, but
18   it's just more of the sale service relationship of
19   clients, lending needs, operational, making sure we're
20   doing the right thing for each client, opening new
21   accounts, conducting lending opportunities for clients,
22   needs-based assessments, having a needs-based sales
23   conversation as to how we can better identify financial
24   guidance to our -- our clients.
25       Q.  Are you aware of how Ms. Crawford

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

66

1    self-identified in terms of her race?
2        A.  She would self -- self-identify as
3    African-American female.
4        Q.  And then Raven Porter, what was her title, her
5    role?
6        A.  We went through a transition of title changes.
7    She was no longer a teller.  Financial relationship -- I
8    don't want to say it incorrectly -- FRC consultant, but
9    it's more of a teller/personal banker.
10       Q.  So, between an FRS and an FRC --
11       A.  Right.
12       Q.  -- would an FRC be -- kind of be a more entry
13   level; and then an FRS would be a step up from entry
14   level?
15       A.  I would say an FRC would be more of
16   operational, transactional for day-to-day deposits and
17   still expected to deliver on needs-based sales
18   conversations, opening accounts, things of that nature.
19   So, it was just a cross between two positions.
20       Q.  Okay.  So, the FRC and FRS would have been, I
21   guess, in a hierarchy roughly equivalent; but they would
22   be doing different things?
23       A.  Right.  So, from an entry level, Regions
24   changed the format.  So, I guess if you want to say an
25   FRC is entry level, it's more of the teller operational

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

67

1    side and then the sales side, also, combined whereas an
2    FRS is primarily conducting more of the lending account
3    activity/teller activity, also.
4        Q.  From your experience at Regions, could an
5    employee be hired in as either an FRC or an FRS in an
6    entry-level role; or would someone have to start, say,
7    as an FRC and then work their way up to an FRS?
8        A.  I would probably say, depending on their
9    experience, they could come in as an FRC as an entry
10   level and go to an FRS.
11       Q.  And going back to Ms. Raven Porter, do you know
12   how she self-identified in terms of her race?
13       A.  She would probably say African-American female,
14   also.
15       Q.  And then let's talk about Karen Mendez.  Was
16   she an FRC or FRS or something else?
17       A.  At the time I was there, I think Karen
18   transitioned from an FRC to FRS.  I just can't recall
19   the exact classification they did, but she was more of
20   an FRC.  She was our vault custodian.
21       Q.  What does a vault custodian do?
22       A.  More operational, but she managed the balancing
23   shipments of deposit activity on our vault for the
24   branch.
25       Q.  And do you know how Ms. Mendez would have

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

68

1    self-identified in terms of her race?
2        A.  She would probably say a Hispanic female.
3        Q.  And then finally you mentioned Melissa Miranda.
4    What was her role?
5        A.  She was hired as an FRS banker with the same
6    duties and responsibilities as Lakesha Crawford.
7        Q.  And do you know how Ms. Miranda would
8    self-identify in terms of her race?
9        A.  She would probably say Hispanic female.
10       Q.  When did Ms. Miranda start at Regions?
11       A.  I don't recall the exact time frame.  She was
12   actually referred by Lakesha Crawford.  They worked
13   together at Wells Fargo.
14       Q.  And prior to the four team members we just
15   talked about joining Regions, were you acquainted with
16   any of them, for example, from working at previous
17   banks; or did you know of them in the industry prior to
18   them coming to Regions?
19       A.  I did not.
20       Q.  Did you decide to hire Melissa Miranda?
21       A.  I did at the -- yes.
22       Q.  Did you interview her before you hired her?
23       A.  I did.
24       Q.  Did anyone else interview her?
25       A.  I don't recall at the time if another branch

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

69

1    interviewed her before me.
2        Q.  What was your working relationship like with
3    Melissa Miranda?
4        A.  Initially, my assessment of our working
5    relationship was as consistent with the rest of the
6    team; but there appeared to be a challenge with her
7    coaching and development.  She seemed to resist any
8    coaching opportunities that I would do one-on-one with
9    her or as a group, as a team; but she became more
10   resistent to just any type of communication and
11   coaching.
12       Q.  You said she became more resistent to the
13   communication and coaching.  Were -- was there anything
14   in particular that she said or did that gave you that
15   impression that she was --
16       A.  Yes.
17       Q.  -- resistent?
18       A.  Yes.  I don't know the exact date and time.  It
19   was customary that we do what we call -- is coaching
20   observations; and so, most of our observations from our
21   team can be done where we were observing the transaction
22   with the -- that the employees do with the client or we
23   do it as a group.  It was a best practice for our team.
24   We would talk about interactions that one team member
25   would have with a client and the successes of what came

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

71

1    don't appreciate that you called me out in front of
2    everyone else."
3            And I said, "Well, we do this all the
4    time."  I said, "I wasn't calling you out.  I was just
5    complimenting you on the interaction with the client,
6    identifying the lending opportunity; and I just wanted
7    to hear some of the key things that you picked up on."
8            She said, "Well, I'd appreciate it if you
9    do that in private instead of in front of everyone
10   else."
11           And I said, "Well, my apologies."  I said,
12   "I will -- now understanding that, I will step -- me and
13   you sit one-on-one and we can do the observation and the
14   coaching."
15           That was probably, like, my first of two
16   indicators that anything that I did in communication
17   with her, she was more resistent to any type of
18   performance communication.
19       Q.  If I represented to you that Ms. Miranda
20   started at Regions around the beginning of 2020 --
21       A.  Okay.
22       Q.  -- about how long into her employment was this
23   coaching observation incident where she was not
24   receptive?
25       A.  She started in 2020.  It was probably four or

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

70

1    out of that, opportunities, and follow-up.
2            And on a day that I observed her meeting
3    with one of my existing clients, she did an application
4    and we did our normal open-model coaching and she
5    became, I guess, offended that -- and the only thing I
6    said to her -- I said, "Well, did -- what -- what key
7    clues did you hear that led you to the application for
8    the client?"
9            She's like, "Well, he said he wanted to do
10   a loan application."
11           So, I said, "Well, what did you do for the
12   needs-based sales conversation?"
13           And then she basically kind of shut down
14   and came over to my office after.
15           And so, what -- I guess during this
16   conversation, I said, "Well, great job on -- you know,
17   submitting the application."  I said, "Give us feedback.
18   Let me know what you hear as far as the answer and the
19   decision on the application."  I said, "What's your next
20   step?"
21           And she said, "Well, I'm going to call and
22   give him the answer once I get the -- the decision."
23           Okay.  After that, we kind of parted ways.
24   The team and I went in my office.
25           She came over; and she said to me, "I

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

72

1    five months after she had been with the company, maybe,
2    roughly.  I don't recall exactly.
3        Q.  Prior to that time, had she exhibited any
4    difficulties working with you or with your working
5    relationship?
6        A.  It was primarily related to coaching and
7    performance.  Anytime that I would try to engage in a
8    positive communication with her about the lack of sales
9    performance, her not meeting her goals, completing her
10   assigned tasks, she would get defensive.
11           And I tried many times just to say, "Well,
12   what do you prefer in communication and coaching?"  How
13   would you like to be communicated to?"
14           It was just more of a situation where
15   every approach that I had for coaching and development,
16   she would become confrontational.
17       Q.  And I understand that you had at some point
18   expressed that you believed Ms. Miranda had difficulty
19   retaining information -- is that correct -- and what led
20   you to that conclusion?
21       A.  I'm not really sure.  I guess it would be
22   primarily related to sales and service.  Anytime that I
23   would help her with training and development and
24   coaching as to how to open an account, what documents
25   are needed -- I'm trying to think of what the

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

73

1    opportunities were -- but anytime that I would coach him
2    on things that were required for opening a new account,
3    like a business account, she wouldn't recall the steps,
4    the information.
5            And at times she would actually reach out
6    to Meghan, the ROM, for questions how to do certain
7    things in accounts; and then I would get called in
8    saying, "Well, why is she calling me when you're right
9    there?"
10           And I would have to address that issue,
11   also.
12       Q.  You said Meghan.  Was that -- I believe her
13   name is Meghan Wernecke?
14       A.  That's correct, yes.
15       Q.  And you said ROM.  Does that stand for
16   regional --
17       A.  Yes --
18       Q.  -- operations manager?
19       A.  -- that's correct.  Right.
20       Q.  And would Ms. Miranda reaching out to Meghan be
21   out of protocol for Regions?
22       A.  It would be step -- a step over the manager,
23   meaning that she wouldn't -- she -- if -- I don't recall
24   all the incidents; but I do recall one incident where
25   Meghan called -- reached out to me and said, "Why is she

Ross Reporting Services, Inc.                   281-484-0770

---

Robert Anthony Sanders

74

1    inquiring about this with me?"
2            And I said, "Well, I wasn't aware that she
3    was reaching out to you."
4            So, I didn't know.
5        Q.  Did Ms. Miranda ever express to you that she
6    preferred a different way of coaching or guidance other
7    than you referring her various Regions resources?
8        A.  I don't recall that conversation, no.  I recall
9    most of -- the majority of my coaching with my team and
10   my staff, I'm directly involved with that.  My door is
11   always open.  We sit down, and we discuss things.
12           I lead by example.  I even let my team
13   coach me in observations because when I'm with a client,
14   I want them to listen and hear some of the key
15   conversations what I'm having and see if I missed any
16   opportunities.
17           So, I've always developed my team that
18   way.  I didn't have any reason to think that it would be
19   any different with Melissa.  So --
20       Q.  When you were working with Melissa, do you
21   recall ever referring her to different Regions
22   resources, like some manuals or maybe step-by-step
23   lists of how to do things --
24       A.  Yes.
25       Q.  -- rather than showing her?

Ross Reporting Services, Inc.                   281-484-0770

---

Robert Anthony Sanders

75

1        A.  Yes, I would -- I would do both.  I didn't just
2    direct my team and my staff to go to the policy and
3    procedures in the guidelines.  I would always show them
4    first and then I would have another team member, best
5    friend at work, work with them in development of product
6    knowledge, the system utilization for establishing
7    relationships, but at no time would I just use the
8    policy and procedure as the only method of development
9    and training, no.
10       Q.  So, was there ever a time when you got
11   frustrated with Ms. Miranda and just told her, "Go look
12   at the policy or guideline," and did not show her?
13       A.  I don't recall, no.  No.
14       Q.  My understanding is that in a conversation with
15   Regions Office of Associate Conduct, you described
16   Ms. Miranda as moody.  Do you recall saying that, and --
17   and can you explain?
18       A.  Yes, I can.  I do recall the conversation
19   because, as I indicated to HR during that time -- is
20   that she became confrontational and moody if I had any
21   type of conversation with her.  She didn't appreciate
22   any type of coaching and development.  Whatever approach
23   that I would try to engage with conversation with her,
24   she became more kind of defensive and more
25   argumentative; and it was only just trying to help

Ross Reporting Services, Inc.                   281-484-0770

---

Robert Anthony Sanders

76

1    develop and coach and kind of build the team.
2        Q.  So, with Ms. Miranda being your direct reports,
3    in terms of her being moody and not receptive, did you
4    ever discipline her for any of those things?
5        A.  I do recall there was a coaching document that
6    I had to do on her performance, and it was because of
7    her communication and demeanor.  I don't recall exactly
8    the incident.  I mean, there would be -- I don't know if
9    it was a formal documented coaching.
10           I can't recall all the details but I do
11   recall her conversation with the -- it was the elderly
12   mother with her son and he was trying to assist his mom
13   with the documentation of her account and information on
14   her account.
15           Melissa became challenging to the son
16   basically told him, "I'm talking to her, not you."
17           And when I -- after I -- you know, when
18   she had an opportunity to step away, I said, "Could you
19   explain to me what's happening?"
20           She says, "Well, he keeps talking.  It's
21   his mom's account, and he's not a signer for the
22   account."
23           I said, "Well, is he the executor?"
24           She said, "Well, I don't know yet."
25           I said, "Well, let's be respectful.  He's

Ross Reporting Services, Inc.                   281-484-0770

Robert Anthony Sanders

77

1 still considered a client. He's helping his mom. So,
2 let's be respectful in how we communicate." I said,
3 "That can be taken very offensively. You told him to be
4 quiet -- basically, I'm talking to her"; and I said,
5 "That's" -- I said, "I have a concern with it. That's
6 not the way we communicate with clients."
7        She became, I guess, disappointed that I
8 coached her on it; and I said, "We have to be respectful
9 to all clients. It doesn't matter what the situation
10 is."
11        But anytime that I would try to interject
12 or comment, she became -- and I think at that day, I had
13 to coach her on that. I don't recall exactly. I did
14 communicate with Meghan; and I want to say I
15 communicated with Dave, also, too, as to the nature of
16 the encounter.
17        And they just said, "Document it," and I
18 don't recall the end result of that, but I do recall
19 there were incidents where I had to document coach or I
20 had to coach her on her performance.
21    Q.  So, with respect to that particular
22 situation --
23    A.  Right.
24    Q.  -- with the son and the mother, do you recall
25 if you did, in fact, complete any document where it

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

78

1 would show the coaching?
2    A.  I don't recall at the time. I don't.
3    Q.  Besides that particular incident, are there any
4 other times you recall disciplining her?
5    A.  There were other occasions but I don't recall
6 to the degree of what it was related to, but there were
7 other occasions that I had to coach her. I just can't
8 recall if it was all documented or just -- we would --
9 we would have coaching forms that we would do and I
10 would try to do everything with -- as equally with
11 all -- all my associates and my team as far as
12 documenting and coaching and I would try to kind of key
13 that information in. So, any coaching forms that I
14 created for the team, that would have been included in
15 there.
16    Q.  Did you ever send Ms. Miranda to any trainings?
17    A.  I don't recall exactly, but I know that I have
18 recommended additional training for her on certain areas
19 of her performance. I do recall multiple times that I
20 would partner her with Lakesha in helping her to improve
21 her quality of her, you know, performance in her work.
22    Q.  Ms. Miranda expressed that you would not give
23 her training on cashboxes -- is that correct -- and can
24 you explain why not?
25    A.  That's not correct. Actually, we assigned her

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

79

1 a cashbox and we continued to try to have her do the
2 teller training so that she could be experienced because
3 they -- we started a new requirement where the bankers
4 would have a cash drawer -- I think, a cash drawer at
5 their desk, but she had to complete the training.
6        But we continued -- I don't recall exactly
7 what the challenges were with her desk and the keys but
8 we continued to try to get her in a desk, an area where
9 she could utilize the teller functionality of doing cash
10 transactions and doing activity as a -- on the teller
11 side, but we never refused her access to a cashbox.
12    Q.  Ms. Miranda also said that you did not get her
13 an alarm code -- is that correct -- and --
14    A.  That is incorrect, no. Every -- every
15 associate had to have alarm codes. I'm not sure if it
16 was related to how she entered her codes into the
17 system, but I know there was a challenge initially
18 getting her codes entered into the system. It took a
19 little while but she ended up finally getting codes, but
20 it took a little while. It wasn't -- it wasn't a
21 manager issue. It was -- it was the system issue as far
22 as adding her as a signer.
23        As a matter of speaking, I had to direct
24 the concern to Meghan, as the ROM. We finally got the
25 instructions on how to delete the old signers to add the

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

80

1 new signers and it just, unfortunately, took a while
2 before they could give me the instructions on the right
3 key panel to get that completed but it just took some
4 time, but she had alarm codes.
5    Q.  So, the process of getting alarm codes, which
6 department, I guess, or group within Regions would have
7 ultimately needed to handle the assignment?
8    A.  This -- the better way I can explain that is
9 that this is at a time where Regions changing the
10 positions from -- we used to have an assistant branch
11 manager and we used to have a branch, I think,
12 operations manager and so, the branch operations manager
13 was like the assistant to the branch manager. They were
14 responsible for entering the codes into the system.
15 They eliminated the branch operations manager, then made
16 an assistant branch manager.
17        Through all this transitioning, all the
18 requirements for that kept changing. So, I had to step
19 in as a manager to identify what was needed to get new
20 codes and things assigned to the team members. Again,
21 it was more of a learning process of having instructions
22 for me as a manager to delete the old codes and put the
23 new codes in the system; and she was just right at that
24 time.
25        It was -- actually, it was Lakesha

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

81

1    Crawford.  It was Melissa Miranda, and I want to say it
2    might have been either Karen Mendez -- they all had
3    issues with getting the codes entered into the system.
4    It just -- it just -- and when we finally figured it
5    out, it was just deleting the old codes from the system
6    that was the problem.
7       Q.  Ms. Miranda had expressed that you told her she
8    had to give all her customers in the first quarter of
9    2020 to Lakesha so that Lakesha could get a bonus?
10       A.  That is incorrect, no.  I've never -- I've
11    never encouraged an associate to do anything of that
12    nature, no.
13       Q.  Ms. Miranda also said that you would try to
14    steal other associates' customers?
15       A.  I'm sorry.
16       Q.  Were you --
17       A.  I'm sorry.  Okay.  Go ahead.  I apologize.
18       Q.  Were you ever asked about that during Regions'
19    investigation?
20       A.  No, I was not.  One of the things I am most
21    proud of: I'm a successful branch manager.  I love
22    building new relationships from existing to prospect
23    clients.  I would never with either one of the team
24    members, not even another branch, take a client from a
25    customer -- from another fellow associate.

Ross Reporting Services, Inc.        281-484-0770

Robert Anthony Sanders

82

1          I -- as an example of a great leader, I
2    give my team members relationships.  I put customers in
3    front of them so they could build relationships, and I
4    explain to them how to build the relationship starting
5    from one savings account to multiple relationships.
6          So, I've never encouraged an associate to
7    give another associate business to make their goals; or
8    I've never taken any production away from an associate
9    to make my goal.
10       MS. STAPLE:  Okay.  Objection,
11    nonresponsive to the part that did not answer my
12    question.
13       A.  Okay.
14       Q.  (By Ms. Staple) I appreciate that, Mr. Sanders.
15       A.  Could you rephrase the question again?
16       Q.  Yeah.  My question was simply whether Regions
17    asked you about Melissa Miranda's allegation that you
18    were stealing customers from her?
19       A.  I don't recall them ever asking me that, no.
20       Q.  Do you know that Melissa Miranda transferred to
21    another branch of Regions?
22       A.  I wasn't aware of it until after it happened.
23       Q.  Was that while you were still employed with
24    Regions?
25       A.  Yes, that's correct.

Ross Reporting Services, Inc.        281-484-0770

Robert Anthony Sanders

83

1       Q.  Are you aware that she requested the transfer
2    because of her experience working with you?
3       A.  I was not aware of the reason for the decision,
4    no, but I will say that I -- it was obvious as to --
5    this is at the time that -- when she was trying to
6    create this list and my understanding was at the same
7    time that she had given that list to Dave is when she
8    transferred out.
9       Q.  And did you treat Ms. Miranda differently
10    because she was Hispanic?
11       A.  I did not, no.
12       Q.  Did you treat her differently than other
13    associates on the team?
14       A.  I did not.
15       Q.  Mr. Sanders, I understand that while you were
16    at Regions, there was a process where associates who
17    currently work for the bank could apply to other
18    positions internally through the team.  What was the
19    process of submitting an application for another
20    position at Regions for an internal applicant like
21    yourself?
22       A.  I can't recall exactly when I learned of the
23    process but as we started building new locations, you
24    could internally post for a position that is being
25    post -- that has been posted and since being with

Ross Reporting Services, Inc.        281-484-0770

Robert Anthony Sanders

84

1    Regions, I was always clear on the understanding that
2    you could also communicate a posting that was coming up
3    that had not been presented yet.
4       Q.  So, if a current Regions employee wanted to
5    apply for any other position --
6       A.  Right.
7       Q.  -- within the bank, could they go into, like,
8    an intranet or an applicant tracking system and see all
9    the job postings that were available within Regions?
10       A.  They could go to the career center; and if the
11    position is posted, they can apply for the position.
12       Q.  And was the career center just for Regions
13    associates to see, or was that also something the
14    general public could see?
15       A.  My understanding is if it was -- a position is
16    posted within the organization, external and internal
17    candidates can see the posting for that.
18       Q.  So, when you were working at Regions, if you
19    went on the Regions website, was there a career tab and
20    then you should search all available positions so anyone
21    could see it if they looked on the Regions website?
22       A.  That's correct, yes.  I think so, yes.  That's
23    correct.
24       Q.  And then within just Regions -- so, just for
25    Regions associates, was there also, like, an intranet

Ross Reporting Services, Inc.        281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

85

1  that, you know, maybe have the same thing that had all
2  the job postings that just employees could access?
3      A.  I never spent a lot of time on it.  I can tell
4  you that we do -- they have the ability -- an associate
5  has an ability they can apply for a position.  I just
6  don't recall if it was just the intranet or if it was
7  just on the main website for -- for Regions that they
8  could apply for it.
9      Q.  Okay.  So, through either Regions website or an
10  intranet, if that was available, what other positions
11  did you apply for while you were at Regions?
12      A.  The other positions that I applied for were
13  the -- the Nexus branch for the Sienna Plantation
14  location.  I started that process with Mary McDonnell
15  before the job posting was even listed.  Before Dave
16  Leonard took over, he was aware of my interest and
17  expectation; and it was included on my performance
18  review for the Sienna Nexus location.
19            After that, I applied for the Riverstone
20  Nexus location for Regions Bank and I can't recall her
21  name but I went into the system to enter my interest in
22  the CBM position that was posted and the day I went to
23  go -- and I can't recall the -- the admin that was for
24  Earl Connell.  I contacted her on the Friday of the day
25  that I was going -- I can't remember the exact time

Robert Anthony Sanders

86

1  frame -- but anyway, I contacted her about posting for
2  the position.
3            And she said, "Well, it's already been
4  taken down."
5            And so, I could not post for that
6  position, but --
7      Q.  Okay.  So, let's talk about --
8      A.  Sure.
9      Q.  -- each of those.  So, the Nexus Sienna
10  Plantation Branch.
11      A.  Sure.
12      Q.  So, Nexus, that is another term for de novo; is
13  that right?
14      A.  Correct.
15      Q.  And you said you started the process with Mary
16  McDonnell before the job posted.  What do you mean by
17  starting the process?
18      A.  On my quarterly performance review and even on
19  my annual performance review, there were already rumors
20  and conversations regarding the Sienna Plantation's
21  de novo branch coming into the market.  One of the
22  reasons -- multiple reasons I was excited about this is
23  my experience and achievements over the years with other
24  banks as far as opening new locations.  Mary McDonnell
25  and I would sit and talk during our quarterly

Robert Anthony Sanders

87

1  interviews, performance reviews.
2            And I said -- you know, it was all --
3  always a customary conversation that, "I can't wait for
4  the posting to take place.  I'm looking forward to
5  applying for the position"; and we would always talk
6  about, "You have a great opportunity."
7            But my client base for Sugar Land was
8  clients from Richmond to Missouri City, Sienna
9  Plantation, Fresno.  I had clients all over the market;
10  and I would also communicate with them that, "We have a
11  new branch coming in from the Sienna Plantation.  I
12  don't know exactly where."
13            But I would constantly communicate it to
14  even my existing clients, even new clients.  So, the
15  expectation was that once it posted, I could -- I could
16  apply for the position.
17      Q.  Okay.  And once it did post --
18      A.  Okay.
19      Q.  -- did you apply to that position?
20      A.  I don't recall exactly if -- I'm trying to
21  remember the exact steps that were taken.  I want to say
22  Dave Leonard was already in place and I constantly -- I
23  think I continued to follow with him and at the time --
24  I don't recall the -- exactly how it transpired, but
25  before I could even enter my application, Dave Leonard

Robert Anthony Sanders

88

1  had told me that him and Earl Connell had already made a
2  decision on the management position for Sienna.
3            I directly questioned him.  I said, "Well,
4  why did -- why was it posted?"  And I said, "But we
5  have -- we've been talking about this."
6            He said, "Well, I'll let you know if she
7  accepts the offer or not."
8            I said, "Okay."
9            And I just kind of left the conversation
10  at that.
11      Q.  And, ultimately, was it Melissa Ybarra who was
12  hired?
13      A.  Correct.  That is correct.
14      Q.  Are you aware of anything about her experience
15  in the banking industry?
16      A.  A little because she did her training with her
17  staff and team at my office in Sugar Land.
18      Q.  Are you aware she has several decades of
19  banking experience?
20      A.  Almost equivalent to what I have.  I think I
21  have more.
22      Q.  Are you aware that a large portion of her
23  experience is at large financial institutions?
24      A.  And as equally as mine, absolutely.  Well, I
25  don't know all of her résumé; but I do know that I had

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

89

1    more experience for that position.
2       Q.   When you say you have more experience, are you
3    couching that in terms of your years of experience in
4    the banking industry or some other criteria?
5       A.   My success -- my success in the business
6    industry.  I had already been -- my résumé included all
7    the new de novo locations and things that I have done
8    over the past years for Hibernia Bank, Compass Bank,
9    other locations and branches.
10           Proudly, I used to keep on my wall in the
11   office in Sugar Land -- I was part of the leadership of
12   the Plano Chamber of Commerce, Leadership Class 26
13   and -- but I used to display that in the office, but my
14   years of experience and accomplishments, I was
15   overqualified for the position for the Sienna Plantation
16   location.
17      Q.   But you never actually reviewed Melissa
18   Ybarra's résumé, did you?
19      A.   No, I didn't interview her.  No.
20      Q.   And then you previously testified that
21   Leonard -- Dave Leonard was also aware of your interest
22   in the position.  How did he come to be aware of your
23   interest?
24      A.   It was the ongoing communication that I had
25   with Dave in the transition of Mary McDonnell leaving

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

91

1    Leonard ever tell you, "When this posts, apply for it"?
2       A.   He never said those exact words.  I was the one
3    that initiated the conversation that, "I can't wait for
4    the posting so that I can apply for it."
5       Q.   Mr. Sanders, you're looking at your phone.  Do
6    you need --
7       A.   Sorry.
8       Q.   -- to take a break?
9       A.   No, I'm just -- I'm just trying to turn it off.
10   I'm okay.
11      Q.   And then you mentioned the Riverstone Branch.
12   Where is that located?
13      A.   That's Sienna Ranch and -- not University --
14   University and Sienna Ranch.  Wait a minute.  Hold on.
15   I'm sorry.  I think that is Riverstone.  Okay.  Yeah, it
16   is.  I'm sorry.
17      Q.   And did you submit a formal application for
18   that Riverstone Branch manager position either through
19   Regions --
20      A.   I did.
21      Q.   -- website or the intranet?
22      A.   Yes, ma'am, I did.
23      Q.   What response did you receive for that
24   application?
25      A.   I don't think there was a response, meaning

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

90

1    and Dave taking over.  I would always enter into a
2    conversation with Dave Leonard regarding the interest in
3    the Sienna Plantation location; and I do recall multiple
4    times that, even from Mary McDonnell and Dave Leonard,
5    they appeared to be interested in my -- my interest in
6    the position because of my relationship with my deposit
7    base in Sugar Land in terms of the clients that live in
8    that area.
9       Q.   Did Mary McDonnell ever expressly tell you,
10   "When this job is posted, apply for it"?
11      A.   Yes, we did.
12      Q.   And did Dave Leonard ever tell you that?
13      A.   Dave Leonard never communicated, you know, when
14   it was going to be posted or anything of that nature.
15   We always talked about once the position was posted, I'm
16   looking forward to do -- because my understanding was,
17   even though it's an internal applicant, you still have
18   to interview for the position.
19           So, what I would do as a best practice is
20   communicate that with Dave and Mary -- you know, "I'm
21   excited about having an opportunity to interview for
22   that position."
23           MS. STAPLE:  Okay.  Objection,
24   nonresponsive.
25      Q.   (By Ms. Staple) My question was just:  Did Dave

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

92

1    that the application was submitted; but I do recall I
2    consistently had to communicate with Dave Leonard about
3    having an interview.
4       Q.   Did you, in fact, interview for that Riverstone
5    position?
6       A.   Over the phone.
7       Q.   Who did you interview with?
8       A.   Dave Leonard.
9       Q.   Did you interview with anyone else besides Dave
10   Leonard for the Riverstone position?
11      A.   Dave was the only CBM interviewing for that
12   position --
13      Q.   Do you --
14      A.   -- or conducting interviews for that position.
15      Q.   Did you ever have a screening interview with
16   anyone at Regions for the Riverstone position?
17      A.   I don't recall any screening interview.  What
18   concerned me about applying for that position, Dave
19   Leonard would come to the Sugar Land location to conduct
20   interviews with other applicants for Riverstone.
21           And it -- and it just came to a point
22   where I just -- I kept inquiring as to him, "What do I
23   need to do to interview for that position?"
24           He says, "Well, I'll make -- I'll make
25   time.  I'll get back with you."

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

93

1         MS. STAPLE: Okay. Objection,
2    nonresponsive.
3         A.   Okay.
4         Q.   (By Ms. Staple) My question was just whether
5    you received a screening interview. Did Tatiana
6    Hernandez ever interview you for Riverstone?
7         A.   I don't -- no, I don't recall ever having an
8    interview with Tatiana.
9         Q.   Were you working at all with Tatiana on the
10   application process for Riverstone?
11        A.   I might have. Getting her feedback on applying
12   for the position and trying to schedule the interview
13   with Dave, I might have.
14        Q.   And so, you mentioned that Dave Leonard was
15   conducting interviews at the Sugar Land Branch for the
16   Riverstone position. To clarify: Were these prior to
17   when you received your interview for the position?
18        A.   Correct.
19        Q.   As part of Dave Leonard's interview, did he ask
20   you questions related to building a team?
21        A.   Yes, but I want to make it clear: Dave
22   Leonard -- I prepared for the interview. I anticipated
23   we were going to have an in-person interview. Dave
24   Leonard called me on the phone to have a conference
25   interview; and I was well-prepared for that interview

Robert Anthony Sanders

94

1    conversation with him, how I would develop, build the
2    market, my deposit base, my clientele base.
3         Q.   What made you anticipate an in-person interview
4    with Dave?
5         A.   Because of my prior experience that he had
6    conducted external applicants' personal interviews in
7    person, not over the phone.
8         Q.   Is it fair to say when Dave interviewed you for
9    that position, that you and Dave had met in person on
10   various topics of bank business multiple times prior?
11        A.   I'm not understanding the question. I'm sorry.
12        Q.   Sure. Prior to your interview for the
13   Riverstone position with Dave Leonard, is it fair to say
14   you and Dave had met in person multiple times on Regions
15   Bank business?
16        A.   No. Anytime Dave Leonard came to my office, if
17   he did an interview, Dave Leonard was in and out of the
18   branch.
19        Q.   Apart from the Riverstone interview process, is
20   it fair to say you and Dave had met in person prior to
21   your interview for Riverstone?
22        A.   I do recall him coming to the branch on -- I
23   just can't remember the dates and times as far as the
24   occasions and the conversations; but he's come over a
25   couple of times having conversations about different

Robert Anthony Sanders

95

1    activities in the company, yes, prior to Riverstone.
2         Q.   So, even though your Riverstone interview with
3    Dave was not in person, you had met with him on other
4    things in person before? In other words, that interview
5    would not have been the first time you'd ever met with
6    Dave in person?
7         A.   I'm not -- I guess I'm not understanding. I'm
8    sorry.
9         Q.   That's okay. I'll ask a different way. Had
10   Dave interviewed you for Riverstone in person, that
11   would not have been the first time you'd ever met Dave
12   in person, would it?
13        A.   Correct. No, it would not have been the first
14   time.
15        Q.   What was the result of your Riverstone
16   application?
17        A.   Well, I guess the -- the end result was I
18   didn't get the position.
19        Q.   Do you know who did?
20        A.   I can't recall the person that got the position
21   initially. I can't recall.
22        Q.   Was it Matthew Batuuka?
23        A.   No, he was not the hiring manager for that
24   position. There was another manager that was hired for
25   that office, but the offer was extended to -- I would

Robert Anthony Sanders

96

1    like to address an area of -- of concern when it came to
2    the interview.
3         Q.   Mr. Sanders, I apologize; but that's just not
4    how a deposition works.
5         A.   Okay.
6         Q.   I'll ask the questions; and, if you could, just
7    answer my questions.
8              You had mentioned a third, I believe,
9    position that you went into the system to enter an
10   interest in a consumer banking manager position. When
11   was that?
12        A.   I don't know the timeline.
13        Q.   Was it more toward the beginning of your
14   Regions employment, end?
15        A.   No, it was around probably the time in between
16   Sienna and Riverstone in that -- in that area.
17        Q.   And when you applied to Sienna Plantation,
18   would that have been in 2018?
19        A.   I don't recall.
20        Q.   And how about Riverstone? Would that have been
21   2018?
22        A.   No, I don't recall. It should have been maybe
23   2019, if I'm correct.
24        Q.   And was the CBM position in the Houston market?
25        A.   It's in the Houston area, yes.

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

97

1      Q.   And then you said you contacted an admin for
2   Earl Connell.  Is Earl Connell Dave Leonard's
3   supervisor?
4      A.   That is correct.
5      Q.   What is his title, Earl Connell's?
6      A.   I don't recall exactly.  He's, like, the senior
7   consumer banking manager or --
8      Q.   And your response that you received from
9   Mr. Connell's admin was just that the position was
10  already taken down?
11     A.   They had already taken it down, correct.
12     Q.   Did you ever ask Earl Connell or Dave Leonard
13  about that position?
14     A.   I don't recall exactly.  It might have been
15  mentioned in conversations, yes; but I don't recall
16  when.
17     Q.   And after you learned that it was taken down,
18  did you follow up with Earl or Dave about the status of
19  the position?
20     A.   I did not, no.
21     Q.   And did you get any information on whether
22  Regions ever filled the position or whether they decided
23  to just not have the position?
24     A.   It was -- as, I guess, the best way to explain
25  it, it was very transparent.  Lee Harris was already

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

98

1   promised the position.  He was the one that filled that
2   position and that was the direct hire of -- if I'm
3   correct, that was a direct hire of Earl Connell and I
4   forgot who the other CBM that hired him.
5      Q.   Was he --
6      A.   He was hired as a branch manager prior to
7   getting the position.
8      Q.   So, Regions brought him in as a branch
9   manager --
10     A.   Right.
11     Q.   -- and so, he was an internal candidate for the
12  CBM role?
13     A.   Correct.
14     Q.   Was he in the Houston market or a different
15  market?
16     A.   He was in the Houston market.  I think he
17  managed the Cypress location at the time.
18     Q.   While you were employed at Regions, what is the
19  first time that you ever made a formal complaint about
20  not being selected for Riverstone or Sienna Plantation?
21     A.   I can't necessarily say there was a formal
22  complaint submitted.  I did communicate my concern with
23  Dave Leonard; and, if I recall at the time, one of the
24  conversations I had with him about Sienna -- I think the
25  young lady's name was Miriam -- no, that's not her.  It

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

99

1   was Patty Fish -- Fisher was also there when I spoke to
2   Dave.  I can't remember exactly what the conversation
3   was, but I remember her being there.
4      Q.   Okay.  So, just to clarify:  Patty Fisher was
5   present when you spoke with Dave Leonard about --
6      A.   Sienna.
7      Q.   -- not being selected for Sienna Plantation?
8      A.   That is correct, part of that, yes.  I don't
9   know how much she heard of that; but, yes, she was part
10  of that conversation.
11     Q.   And what did you say to Dave about not being
12  selected?
13     A.   Well, there was no indication that I had not
14  been selected yet.  If I recall correctly, it was right
15  around the time that he had indicated that himself and
16  Earl Connell had went to go talk to Melissa and that
17  they were going to consider -- to extend an offer and
18  they said they will let me know -- he'll let me know if
19  she accepts or not.
20          And then I want to say, if I'm correct,
21  even Patty Fisher had -- was saying that -- I think she
22  was interested in Sienna.
23          And she said, "Well, if that's already
24  filled" -- and I think that's when we started dialoguing
25  about Riverstone and that was mentioned, also.

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

100

1          (Regions Exhibit E marked)
2      Q.   (By Ms. Staple)  All right.  Mr. Sanders, I'm
3   handing you what is being marked as Regions Exhibit E.
4   If you could, take a look at the document; and let me
5   know when you're ready to answer some questions.
6      A.   Okay.
7      Q.   Have you had enough time to review?
8      A.   This is the first time I'm seeing this, but I
9   guess, you can go ahead and I, guess, if you want to
10  explain what this is or --
11     Q.   Sure, Mr. Sanders.  I'll represent to you
12  what's been marked as Regions Exhibit E is a Regions
13  document that's used to track internal complaints.
14     A.   Okay.
15     Q.   And so, my understanding is that you made an
16  internal complaint to Regions on February 18th, 2021; is
17  that correct?
18     A.   That's sounds about right.
19     Q.   And if I can direct you to the second page of
20  the document, you'll see at the bottom, it's got a
21  Bates number.  It says Regions 000165.  Toward the top
22  of the document, there's a box that says Issue
23  Specifics.
24          And if you look under the description, it
25  says that, "Sanders alleges that Leonard has passed over

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

101

1    Sanders for Nexus Branch Manager positions that Sanders
2    has applied for in 2019 and since that time."
3           Is this the first time that you formally
4    complained to Regions about not being selected for
5    Riverstone or Sienna Plantation?
6       A.  This would probably have been the first time,
7    yes, that I formally submitted the -- the complaint --
8       Q.  Okay.
9       A.  -- roughly.
10      Q.  Okay.  You can go ahead and put this document
11   to the side for now.
12          Was there ever a position at Regions you
13   applied to that would have been called Evergreen?
14      A.  Evergreen?
15      Q.  (Moving head up and down).
16      A.  I don't recall.  There's an elite team captain
17   which is Regions At Work, but I don't recall what
18   Evergreen would have been.
19      MS. STAPLE:  I think now is a good time to
20   stop and take a quick meal break.
21      MR. HODGES:  Okay.
22      MS. STAPLE:  So, we can go off the record.
23      THE VIDEOGRAPHER:  Going off the record at
24   1:01 p.m.
25          (Recess from 1:01 p.m. to 1:40 p.m.)

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

102

1       THE VIDEOGRAPHER:  Going on the record at
2    1:40 p.m.
3       Q.  (By Ms. Staple) All right.  Mr. Sanders, before
4    the break, we were talking about three different
5    positions of Regions -- Sienna Plantation, Riverstone,
6    and a CBM role.
7           Besides not being selected for those
8    positions, is there anything else related to those three
9    roles that you contend was discriminatory by Regions?
10      A.  Aside from the positions that I applied for?
11      Q.  Aside from not being selected for the Sienna
12   Plantation, Riverstone, or CBM positions, is there
13   anything else about those three roles and the process in
14   which Regions filled those roles that you contend in
15   your lawsuit was discriminatory?
16      A.  I guess I'm trying to just understand.  Are you
17   asking me:  Is there more information pertaining to
18   those three roles that I feel are discriminatory?
19      Q.  I'll ask the question in a different way.  In
20   your lawsuit that you filed against Regions, my
21   understanding is you are alleging that not being
22   selected for Lake -- Riverstone, Sienna Plantation, and
23   the CBM role was discriminatory against you by Regions.
24          Besides not being selected, is there
25   anything else Regions did with respect to those

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

103

1    positions that you are claiming was discriminatory
2    towards you?
3       A.  Yes, in the method and the way that I was
4    treated.
5       Q.  Describe -- what do you mean by "method" and
6    "way" you were treated?
7       A.  At the time -- or the date and time of the
8    phone interview with Dave Leonard, Dave Leonard did not
9    inquire as to the method and process of building a new
10   market at Riverstone.  I had data, how -- median
11   household income.  I had all the information pertaining
12   to the schools, the community, how I would grow the --
13   the deposit base, the lending base for the mark -- for
14   that branch.  We talked about the different -- it's
15   heavily residential, limited commercial, some commercial
16   retail.  I had all my data and information prepared.  He
17   never discussed one aspect of that during the interview.
18          At -- the very last question of the
19   interview that Dave Leonard presented to me, he said to
20   me, "Have you ever hired someone that did really well in
21   the interview; but when it came to performance, they
22   lacked, they fell short?"
23          I immediately responded with, "Our
24   responsibility -- roles as leaders and as managers is to
25   develop our team and our associates to the best of their

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

104

1    ability, giving them the tools and resources necessary
2    to be successful.  If there's an associate" -- and I
3    said, "I've had many interviews where an associate has
4    done really well; but when it came to performance, they
5    lacked in some capacity.  My responsibility as a leader
6    is to develop them to the best of their ability; and if
7    we -- if there's another area of opportunity within the
8    organization that they find more suitable to their skill
9    set, then we coach and we just improve on that."
10          He replied with, you know, "Good" -- you
11   know, "That's great.  Great -- good comment."
12          And I said, "Can I enter some" -- I said,
13   "Now, off the record between you and I," I said, "I do
14   have a concern with the recommended hire that you
15   requested of me for Jared Ogburn."  I said, "I have
16   concerns with his performance and what he's displaying
17   in our market and in our branch."
18          He inquired as to, "What do you mean?"
19          I said, "Jared Ogburn is telling
20   customers, new clients and existing clients and some of
21   the staff that he's the branch manager."
22          He was hired as a financial
23   relationship specialist by the encouragement of Dave
24   Leonard.
25          And I said -- I said, "I will continue to

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

105

1  observe and give you feedback as to what I'm hearing," I
2  said, "but I do have a concern."  I said, "Just as if
3  you walked into a market and the customer said to you,
4  'Hey, Robert Sanders, the new CBM, just came by to visit
5  with me,'" I said, "there would be an issue with me
6  representing myself in a role that I don't own -- that I
7  have not been hired for that title for."  I said, "I
8  have a concern when he's telling customers and telling
9  people that he's the branch manager."
10        He said, "Just keep me posted."
11    Q.  So --
12    A.  Dave -- well, let me finish.  And Dave ended
13  the phone conversation from that interview for
14  Riverstone.  Jared Ogburn was a banker in my branch at
15  that time.
16        He gets up from his desk, comes over to my
17  office, and says, "Robert, Dave just called me."  I
18  said -- he says, "Do you know what he's calling about?"
19        I said, "I'm not sure."  I said, "He's
20  probably just calling to check and see how you're doing
21  on your performance."  I -- I -- at that point, I
22  said, "Maybe call him back and see, you know, what he's
23  calling in for."
24        I e-mailed Dave Leonard; and I said,
25  "Dave, Jared just came over asking about the call you

Robert Anthony Sanders

106

1  just -- you just called him.  Is everything okay?"
2        Dave didn't reply back to the e-mail.
3        Jared Ogburn walks into the conference
4  room with his personal cell phone, calls Dave Leonard.
5  Five minutes later, he comes out back out, sits at his
6  desk.
7        I walked over; and, again, before I walked
8  over, I sent Dave, you know, a reply.  I said, "Dave," I
9  said, "I'm not sure if you got my last e-mail.  Jared
10  was concerned about your call to him.  Is everything
11  okay?"
12        And I went over to Jared; and I said,
13  "Jared, what happened?"
14        I said -- he said, "No.  He just wanted to
15  see how I was doing."
16        And that was it, but Dave never --
17  never -- never commented or said anything.  So, I took
18  that under advisement.  Dave Leonard shared that
19  critical information as to what I observed in the
20  performance of the associate Jared Ogburn and called him
21  immediately and told him that I had already heard wind
22  that he had been telling customers in our market that he
23  was the new branch manager.
24    Q.  So, going back to your contention that Dave
25  Leonard not asking you about methods of billing [sic]

Robert Anthony Sanders

107

1  for Riverstone was discriminatory towards you, on what
2  basis was that discriminatory?  Was that discriminatory,
3  are you contending, based on your race?
4    A.  It wasn't on performance.
5    Q.  Do you contend that Dave Leonard's failure to
6  ask you about your methods of billing [sic] for
7  Riverstone was race discrimination?
8    A.  For billing?
9    Q.  Your testimony was that Dave did not inquire
10  and ask you during an interview about your billings for
11  Riverstone and that you had information that you wanted
12  to share with him.  Are you contending that his failure
13  to ask you about those topics was race discrimination?
14    A.  I find it offensive that if you're interviewing
15  a manager for a position in a role in a market that's
16  new, you would want to find out what are the steps that
17  they're going to take to build the team, build -- build
18  the deposit base and the lending base for that new -- he
19  never discussed any of the information I provided.  Not
20  the billing, if I heard you correctly; but it's just the
21  building of the new Nexus branch.  So, I apologize if I
22  misstated that.
23    Q.  Okay.  And my question was really just a "yes"
24  or "no":  Are you his contending that his failure to ask
25  you about those things related to Riverstone was race

Robert Anthony Sanders

108

1  discrimination?
2    A.  I feel that it was.
3    Q.  When you mentioned that you had that
4  information that you could have shared, did you offer to
5  share it during the interview?
6    A.  I did.
7    Q.  Did he listen to what you shared?
8    A.  I don't -- he didn't ask me any questions about
9  it.  I told him that I had information prepared for the
10  interview to talk about the area, but he never -- he
11  never elaborated.  He never asked me any questions about
12  it.
13    Q.  But you did, in fact, share it with him during
14  that interview, correct?
15    A.  I told him I had information and data
16  pertaining to that market, but he didn't enter any
17  conversations about it.
18    Q.  Are you aware of the questions that he asked to
19  other candidates for the Riverstone position?
20    A.  Not entirely.
21    Q.  Are you aware whether he asked other candidates
22  about how they would build the Riverstone Branch?
23    A.  I was not privileged to any of those
24  interviews.  I'm not aware of what he said to them.
25    Q.  Related to the -- you said the last question of

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

109

1  your interview with Dave about, "Did you ever hire
2  someone who did great in the interview; but when it came
3  to performance, they lacked" -- do you know if he asked
4  that same question to the other candidates for the
5  Riverstone position?
6      A.  I was not privileged to any of the other
7  interviews.  So, I'm not sure if he did or didn't.
8      Q.  Are you contending that Dave Leonard asking you
9  the question about hiring someone who did great in the
10 interview, but lacking in performance was race
11 discrimination?
12     A.  I really can't say what his agenda was.  I
13 don't know what it was but I found it unique in the
14 context of what was said and I just -- in my years of
15 banking, I've never had that position -- that question
16 presented that way.
17     Q.  Did you at any time think that Dave Leonard was
18 asking you that question in relation to a branch
19 manager's job to build a team?
20     A.  I don't know what his intentions were.
21     Q.  Related to Jared Ogburn, you said that he was
22 hired as a financial relationship consultant; is that
23 correct?
24     A.  At the recommendations of Dave Leonard, yes.
25     Q.  Okay.  And did you hire him as an FRC?

Robert Anthony Sanders

110

1      A.  I was asked to hire him by Dave Leonard.
2      Q.  And did you, in fact, approve that hire?
3      A.  Dave Leonard approved that hire.
4      Q.  Did you -- were you able to make a
5  recommendation of whether Jared Ogburn should or should
6  not be hired?
7      A.  No, because at the time, Jared Ogburn came to
8  the Sugar Land Branch to interview for the Sienna
9  Plantations Branch with Melissa.  So, his interview was
10 scheduled with her.  Dave Leonard was there the day that
11 the interview took place.
12     Q.  So, just so I'm clear:  Jared Ogburn, was he
13 interviewing for a branch manager role?
14     A.  No.
15     Q.  Was he interviewing for an FRC role?
16     A.  He was FRS, financial relation specialist, for
17 the Sienna new build -- for Sienna.  He was scheduled to
18 meet with Melissa and that's where she was conducting
19 her interviews and Dave was there the day that all the
20 interviews were taking place.
21        Dave Leonard -- after the interview with
22 Melissa and Jared Ogburn, Dave Leonard, in my office
23 with Melissa present -- Melissa explained to him that
24 Jared -- Jared had no banking experience and since she's
25 building a new branch and a new team, it would be not a

Robert Anthony Sanders

111

1  good fit for him to start with us.
2         I want to say it was before she left the
3  room, my office, Dave stood in my office and says,
4  "Well, Robert, you have an open position here.  Let's
5  give him a shot here and see how it works out."
6      Q.  Did you participate in any interview of Jared
7  Ogburn?
8      A.  That same day, I sat and talked with him
9  because Dave wanted me to -- to speak with him.  Dave
10 Leonard gave me details of his résumé, saying that he
11 has great experience.  He tested well.  There has to be
12 an assessment for a position.  Jared Ogburn only -- out
13 of four categories only scored above on two, but Dave
14 felt that he had sales and communication to
15 be considered.
16        So, I sat with him for ten minutes.  We
17 did an interview the same day.  Dave -- I went back to
18 my office with Dave; and I said, "It would be a
19 challenge.  He's new to banking."
20        He says, "Well, I know his dad.  Just --
21 let's give him a shot and see how it works out."
22     Q.  So, did Jared Ogburn join your team --
23     A.  Yes.
24     Q.  -- at Sugar Land?
25     A.  Right, with Dave's approval.

Robert Anthony Sanders

112

1      Q.  So, you were Jared's direct supervisor,
2  correct?
3      A.  That's correct.
4      Q.  And when you learned that Jared Ogburn was
5  telling people he was the branch manager, did you
6  discipline him for that?
7      A.  I did not discipline him for that.  I did speak
8  with him in regards to the content of what he
9  communicated.  He denied it.
10     Q.  Did you report -- at the time when you talked
11 with Jared about the content of what he was saying, did
12 you then tell Dave about what he was saying?
13     A.  I don't remember the timeline in terms of when
14 I spoke with Dave about the events that were taking
15 place but I would bring any concerning matter to his
16 attention, but I don't recall the dates and times.
17     Q.  Was Jared Ogburn eventually terminated from
18 Regions?
19     A.  He actually resigned.  I don't remember the
20 exact month or time yet.  I think he had been with the
21 bank for maybe less than a year.  I can't remember the
22 exact time frame.
23     Q.  And are you contending that Jared Ogburn's hire
24 was discriminatory towards you?
25     A.  It was, yes.  I am contending that.

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

113

1    Q.  And are you contending that it was
2 discriminatory based on your race?
3    A.  It is, yes.
4    Q.  And what basis do you have to support the fact
5 that it was discriminatory based on your race?
6    A.  Because -- I'd have to circle back around with
7 the timeline.  We had one white female.  Jared was a
8 white male.  Jared worked with Dave to have -- I can't
9 remember Amanda's last name -- transferred from Sugar
10 Land to a Katy Branch.
11      Tatiana was the HR contact and they --
12 there was a requirement through the Regions
13 organization.  You had to be in your role 12 months
14 before you could apply for a new -- another location or
15 another position.  Melinda was -- Amanda was approaching
16 her 12 months, was not quite there, almost there.  I
17 knew that she lived with her parents in Katy.  She
18 homeschooled her daughter.
19      And I said, you know, "When it comes time
20 for you to -- if there's a position available out there,
21 I'll be more than happy to support you in getting closer
22 to your family as far as the commute."
23      Amanda came into my office one day; and
24 she says, "There is a position open in Katy that I want
25 to post for."

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

114

1      I said, "Well, let me work with Tatiana in
2 HR to see if we can" -- I said, "This -- you're not
3 quite at 12 months yet, but let me see if I can help out
4 in that process."
5      She -- she kind of looked at me
6 upsettingly and asked if I'm not allowing her to post.
7      I said, "Well, let me find out from HR
8 first."
9      When I called Tatiana, Tatiana said to
10 me -- I said, "Well, Amanda wants to post.  She's less
11 than 12 months.  What do we do?"
12      She said, "Oh, we change that."
13      I said, "Well, I didn't see any
14 communication."  I said, "So, I guess she can post for
15 the Katy position?"
16      "Oh, yeah.  It's already been, you know,
17 basically approved."
18      I said, "Well, okay.  I didn't know that."
19      The hiring manager was -- I think his name
20 was Ron Hale.  He called me.  He says, "Robert, I'm
21 doing this as a formality" -- he is a white male.  He
22 called me; and he's, like, "I'm doing this as a
23 formality."
24      I said, "What do you mean?"
25      He says, "I just have to talk to you about

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

115

1 Amanda's performance.  They are forcing me to take her.
2 I don't have a position open here"; and he's, like,
3 "Just between you and I," he says, "Dave is the one.
4 They're forcing me to take her over here."
5      And I'm not sure exactly how I found out,
6 but I found out later it was Jared working with Dave and
7 they wanted to make it seem like there was an
8 environment of reverse -- not reverse discrimination --
9 like I was discriminating against Amanda or Jared
10 because they were white.
11    Q.  So -- so I'm clear:  Amanda was an associate in
12 your branch -- correct -- in Sugar Land?
13    A.  That is correct.
14    Q.  And she wanted to transfer to the Katy Branch
15 at some point because her family was in Katy, correct?
16    A.  She lived in Katy.  That would be the closest
17 location for her if there was a position available.
18    Q.  And so, Amanda was given approval by Regions to
19 transfer to the Katy Branch, correct?
20    A.  For no -- but there was no posting.
21    Q.  Okay.  But she was given approval to transfer
22 to the Katy Branch, correct?
23    A.  My understanding was -- is that Tatiana and HR,
24 they approved her transferring to the Katy Branch.
25    Q.  Okay.  And so, then that left a position open

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

116

1 at your Sugar Land Branch, correct?
2    A.  That is correct.
3    Q.  And then is that the position that Jared Ogburn
4 filled?
5    A.  No.  Jared Ogburn had filled a position for a
6 banker already.  This is prior to -- this is probably in
7 2019, roughly.
8    Q.  Okay.  So, I think my question was more related
9 to Jared Ogburn's hire.
10    A.  Sure.
11    Q.  What about hiring Jared Ogburn was
12 discriminatory towards you based on your race?
13    A.  From my assessment, it was nepotism.  I later
14 found out not only was Jared's father a good friend of
15 Dave Leonard's, they were like neighborhoods; and so,
16 that hire was specific to get him into the branch.
17      I later found out through communication
18 from other team members that Dave Leonard once a month
19 would meet with Jared in the Sugar Land market without
20 my knowledge and this has never been done with any CBM
21 to -- for a banker to meet up undisclosed to the
22 manager.  Basically, my understanding was they were
23 trying to find anything on me as a manager in terms of
24 performance.
25    Q.  So, your testimony, if I can clarify, is that

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

117

1    Jared's hire was nepotism, correct?
2        A.  That's what I feel, yes.
3        Q.  And so, how -- explain how the nepotism relates
4    to your race.
5        A.  Jared Ogburn was hired as -- not even just a
6    recommendation -- at the approval of Dave Leonard,
7    regardless of the fact that he did not get the position
8    at Sienna after the interview.
9            Dave says, "Let's give him a chance here
10   and see how it works out."  He says, "I'll approve it."
11       Q.  And to follow up on your answer, how does that
12   connect to your race which you self-identified earlier
13   as African-American?
14       A.  I am who I am.  I'm African-American.  There
15   would be no other reason why.  This wasn't done for an
16   African-American female or male or a Hispanic female or
17   male.  This was done at the directive of Dave Leonard
18   and what they wanted to do.  So --
19       Q.  So, to clarify your testimony:  Are you
20   testifying that Jared Ogburn's hire because he happened
21   to be white was discriminatory toward you because you
22   are black because, to your knowledge, there was not an
23   associate who was non-white who was hired in this way?
24       A.  My statement is that Dave Leonard hired Jared
25   Ogburn to find an opportunity to get me out of my

Ross Reporting Services, Inc.                   281-484-0770

---

Robert Anthony Sanders

118

1    office, and I feel that that is discriminatory.  There
2    was no reason, my performance, anything of the nature of
3    my performance in that branch that would otherwise
4    explain the behavior that was taking place.  So --
5        Q.  What facts do you have to support that Jared
6    Ogburn's hire was a way to get you out of your office,
7    as you testified?
8        A.  If I recall correctly, Jared Ogburn had not
9    been in his role at Sugar Land as an FRS for probably,
10   maybe three days, maybe a little bit more than that.  I
11   can't remember exactly.  Melissa, the manager for the
12   Sienna location, was acting manager in my office when I
13   had to take a vacation for a week with my wife to
14   travel.
15           During the last two days of my travel,
16   without communicating with Melissa, who was the acting
17   manager for my branch, Jared Ogburn entered a customer
18   complaint and put the information saying that the
19   customer complaint was on me.  He called me while I was
20   on vacation and started explaining the details of it and
21   I questioned him.
22           I said, "If this customer that you're
23   referring to -- this is your client.  That back office
24   put a hold on their account for suspected fraud, but why
25   would you put the customer complaint under my name?"

Ross Reporting Services, Inc.                   281-484-0770

---

Robert Anthony Sanders

119

1            He said, "Well, she wanted to complain
2    that you -- since you were the manager, that you placed
3    the hold on it."
4        I said, "Jared, if you look at the
5    history, that's your account that you opened.  They have
6    indications of fraud.  Back office put the hold on
7    there, but I just don't understand.  If Melissa is the
8    acting manager, why would you list a customer complaint
9    under -- under me as if I was the one that the customer
10   was complaining about?"
11           And he had no explanation of that, and it
12   just took other incidents after that where I started
13   hearing the feedback from clients and employees that
14   he's telling people he's the manager when I'm -- when
15   I'm not there.
16       Q.  Did you discipline Jared for that incident
17   where he put the customer complaint under your name
18   instead of his own name?
19       A.  I coached him on it.  I did coach him on it.  I
20   sat down, and I spoke with him about it.  He indicated
21   he made a mistake in entering that.
22           But I said, "Melissa is right here.  Why
23   would you not reach out to Melissa and go over it with
24   her?"
25           And Melissa actually was there with me and

Ross Reporting Services, Inc.                   281-484-0770

---

Robert Anthony Sanders

120

1    she even said that, you know, Jared never communicated.
2    She even told us -- you know, "All you had to do is talk
3    to me about it and I could have, you know, helped you
4    with the process of it."
5        Q.  Did Jared apologize to you?
6        A.  I don't recall him ever apologizing for it.  I
7    think he just kind of equated it as, "Oh, I made a
8    mistake."  So --
9        Q.  All right.  Besides that one instance, do you
10   have any other facts to support that Jared Ogburn was
11   trying to get you out of your office?
12       A.  I have statements from other associates.
13   Shannon Randle was one of our lead employees.  She had
14   been there longer before I got there.  She actually
15   confided in me because she had already -- and she said
16   she will be more than happy to give a statement on the
17   content and the details that she had already heard that,
18   "Jared was meeting with Dave and they were trying to
19   find anything on you in your position as manager here at
20   Sugar Land."
21       Q.  When did Shannon Randle tell you that?
22       A.  I don't know the exact timeline.  She spoke
23   with them before she -- she -- she resigned or I want to
24   say she just got -- no, she actually started a new
25   job -- I'm sorry -- with MD Anderson in the billing

Ross Reporting Services, Inc.                   281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

121

1  area; but right around the time that she was leaving is
2  when she started kind of explaining to me what she was
3  noticing and the things that she had already heard.
4      Q.  When you were a branch manager at Regions, were
5  you an employee at-will, meaning you could be fired at
6  any time for any reason?
7      A.  Any -- any position or any company within the
8  state of Texas.  Yes, I understand that.
9      Q.  And so, Dave Leonard could have terminated you
10  anytime had he wanted to?
11     A.  Just as any other bank that I've ever worked
12  for, yes, that's true.
13     Q.  All right.  So, besides the items that we've
14  talked about related to your applications or expressions
15  of interest in Riverstone, Sienna Plantation, the CBM
16  role, is there anything we haven't talked about related
17  to those that you are contending was discriminatory
18  towards you based on your race?
19     A.  Right now at this time, I can't think of
20  anything.
21     Q.  Anything else that was discriminatory towards
22  you based on any other characteristic?
23     A.  Related to those three positions, I can't think
24  of anything at this time.
25     Q.  Mr. Sanders, did you become aware at any time

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

122

1  that there was an anonymous complaint made about you to
2  Regions Office of Associate Conduct?
3      A.  I don't know if it was characterized that way.
4  I don't recall the exact verbiage.
5      Q.  Did you become aware that a complaint had been
6  filed against you with Regions?
7      A.  That -- if it came across, it would have been
8  probably at the same time I guess this whole -- the
9  thing that was happening with Melissa Miranda, if I'm
10  correct.
11     Q.  Okay.
12        (Regions Exhibit F marked)
13     Q.  (By Ms. Staple) All right.  Mr. Sanders, I'm
14  handing you what's being marked as Regions Exhibit F.
15  Go ahead and take a look at the document, and let me
16  know when you've had a chance to read through it and are
17  ready to answer questions.
18     A.  I'm not sure -- February 12th.  Okay.
19     Q.  Are you ready to answer questions?
20     A.  Sure.
21     Q.  Have you ever seen this document before?
22     A.  I don't -- I don't recall ever seeing a
23  document on this.
24     Q.  Were you ever made aware that Melissa Miranda
25  filed a complaint against you?

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

123

1      A.  I do recall getting the call initially on this
2  and in terms of the details, I can't remember how it
3  went, but I do remember getting a call, yes.
4      Q.  You can go ahead and put this to the side for
5  the moment.
6          Who called you about this?
7      A.  I can't -- I can't recall the names.  It was
8  someone from HR.  I can't recall.
9      Q.  Just backing up:  With Regions HR generally,
10  the way I understand it, if you can verify for me, is
11  there is an HR department within Regions; and part of
12  that HR department is the Office of Associate Conduct.
13  Is that your understanding?
14     A.  I would probably say, yes.  Yeah.  There's
15  different levels of HR, yes.
16     Q.  And to your understanding, is the Office of
17  Associate Conduct, or OAC -- is that the investigation
18  arm of Regions HR?
19     A.  As to my understanding and what has transpired,
20  I would probably say, yes, that is -- that is the --
21  guess, the standard.  Yeah.
22     Q.  And I'll represent to you that within the OAC,
23  Regions as various investigators.  Were you ever
24  contacted by an OAC investigator named Nicole Cooper
25  related to Melissa Miranda's complaint?

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

124

1      A.  I would probably say, yes, that was the name.
2      Q.  And are you aware geographically where
3  Ms. Cooper is located?
4      A.  Birming -- maybe in the corporate office in
5  Birmingham, Alabama; but not exactly.
6      Q.  Okay.  She was not based in Houston, to your
7  knowledge, was she?
8      A.  I -- wait a minute.  I think Nicole Cooper was
9  out of Houston; but I think the person I spoke with
10  initially was out of Birmingham, Alabama, if I'm
11  correct.
12     Q.  Okay.  And with respect just to Ms. Cooper,
13  whenever you spoke with her during the course of the
14  OAC's investigation into Ms. Miranda's complaint, as
15  well as your complaint, did you ever meet in person; or
16  did you always speak with her on the phone or virtually?
17     A.  And I might have to get a -- a reference to the
18  names because I don't think Nicole Cooper was part of
19  the initial communication about the OAC.  I could be
20  wrong, but I recall someone else calling me about the
21  anonymous complaint.
22        I recall, if I'm right, Nicole Cooper was
23  the HR person that was reaching out to me when I had
24  filed for the discriminatory act; and she called me to
25  interview about that, if I remember the names correctly.

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

125

1    Q.  Okay.  And then when Nicole Cooper spoke with
2  you, was that all by telephone; or was that in person?
3    A.  Over the phone.
4    Q.  And then did Melody Bodine ever speak with you
5  in relation to Melissa Miranda's complaint?
6    A.  I think that was probably the lady that spoke
7  with me initially.  I can't say for a hundred percent
8  sure, but I think so.
9    Q.  And do you know:  Was she based in Birmingham?
10    A.  I can assume that she was.  I can't say for
11  sure.
12    Q.  And whenever Ms. Bodine spoke with you, was
13  that in person; or was that on the phone?
14    A.  Phone.
15    Q.  And then, finally, do you recall speaking with
16  Erin Mummert?
17    A.  I do recall an Erin, but I don't know at what
18  part of the conversation or when I spoke with her.
19    Q.  And when you spoke with Ms. Mummert, was that
20  ever in person; or was that always on the phone?
21    A.  Always over the phone.
22       (Regions Exhibit G marked)
23    Q.  (By Ms. Staple) All right.  Mr. Sanders, I'm
24  handing you what's being marked as Regions Exhibit G and
25  I'll represent to you this is a rather thick document

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

126

1  and this is a Regions internal document of investigation
2  notes.
3       And, if you could, generally take a look
4  through it and then my questions are going to relate to
5  certain pages of it but if you want to generally look
6  through the document and then let me know and then I can
7  direct you to specific parts that I'd like to ask you
8  about.
9    A.  I guess, for the sake of time, we can go
10  straight to your questions --
11    Q.  Okay.
12    A.  -- and I -- if you want to go to there and I
13  can look at that information at that time.
14    Q.  Okay.  That's fine with me.  If you could,
15  turn -- it's about halfway through the document.  At the
16  bottom of the page, it's labeled Regions 000185 and at
17  the top of the page, there's a box and it says, "Name:
18  Robert Sanders," and at the top right, it's labeled
19  page 18 of 39 and the date on this portion is from
20  February 11th, 2021.
21    A.  Got it.
22    Q.  Have you been able to make your way to that
23  page?
24    A.  I have it right now.
25    Q.  Okay.  If you could, review this section of the

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

127

1  investigation notes.  So, it goes from page 18 through
2  page 24 of the investigation notes; and just let me know
3  when you're ready to answer questions.
4    A.  To page what now?  I'm sorry.
5    Q.  It goes from page 18 into page 24; and so,
6  you'll see that section stop when there's the next gray
7  box that says "Name."  So, that would be the last page
8  that you just hit.  If you could, review those pages 18
9  to 24.
10    A.  Okay.  We can start, I guess, your questions.
11    Q.  All right, Mr. Sanders.  As you reviewed
12  pages 18 through 24 marked at the top of the page of
13  Regions Exhibit G, is there anything that are in the
14  investigation notes that you do not recall telling to
15  Melody Bodine or Dave Leonard during this conversation?
16    A.  Before reading this, I probably didn't recall
17  half of the stuff that's in here; but we'd have to go
18  through to see what I recall and what I don't recall.  I
19  can't tell you specifics right now.
20    Q.  Sure.  And as you reviewed pages 18 through 24,
21  was there anything that you read that you believe is
22  inaccurate or that you did not say?
23    A.  I -- I can't attest to that -- things that are
24  in here that I did or did not say.
25    Q.  In pages 18 through 24, is there anything that

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

128

1  you see noted that is different than your recollection
2  of what you communicated to Melody Bodine and Dave
3  Leonard?
4    A.  I can't acknowledge or -- or deny that anything
5  is different.  I -- this is what information is -- that
6  has been provided to me.  I can't tell you that it's
7  accurate or not.
8    Q.  Okay.  So, in these -- I'll represent to you
9  these are investigation notes; and they appear to be
10  from a conversation that Dave Leonard and Melody Bodine
11  had with you on February 11th, 2021.  Do you remember
12  having this conversation?
13    A.  I do recall the day that Dave Leonard showed --
14  came up to the office and, if my recollection is
15  correct, he came in like he was doing a branch visit and
16  I don't recall how I got the communication.  I don't
17  know if I was just logging into my computer.
18       And I said, "Well, Dave, you'll have to
19  wait.  I got a meeting here, a conference call with
20  someone from HR."  I said, "Do you know what that's
21  about?"
22       He said, "No, I don't know what that's
23  about."
24       And then he -- I said, "Well" -- no, I
25  can't remember exactly, but it was something to the

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

129

1  effect when he came in, he said, "Hey, I got a call from
2  so-and-so; but I don't know what it's about."
3         But he showed up for an unscheduled branch
4  visit.  I just can't remember the details, but I do
5  remember a call.
6         I said, "Well, do you know what it's
7  about?"
8         He said, "No, I don't know."
9         And that's when he came in the office,
10  closed the door; and that's when we got on the call.
11     Q.  Okay.  So, you do remember having a
12  conversation on --
13     A.  Right.
14     Q.  -- February 11th, 2021 --
15     A.  Yes.
16     Q.  -- and Dave Leonard was present in the
17  branch --
18     A.  Yes.
19     Q.  -- and Melody Bodine was present on the phone;
20  is that correct?
21     A.  That's correct, yes.
22     Q.  Okay.  And I'll represent to you that pages 18
23  through 24 are investigation notes that were taken by
24  Regions as part of that phone call.  As you read through
25  these here today, hypothetically, assuming that this was

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

131

1  trying to explain to her.  At times I will bring in new
2  currency that I have for the Chinese New Year, different
3  things, when a customer asks for new bills.  If I have
4  it, I'll give it to the branch.  If they don't sell it,
5  they don't use it, I'll normally buy it back to bring in
6  at a different time.
7         And so, in reference, what they were
8  referring to, this $300 to help a family member out, it
9  wasn't specific to that.  It was just new currency that
10  I would buy from the branch and if -- if I needed to
11  bring it back, I'd just bring it back if they needed to
12  sell it to a customer.
13         So, it wasn't like I was doing anything
14  like getting a loan from the bank.  I just brought the
15  new money in; and if they still had it, I would buy it
16  back from them.  So, I think that was just kind of a
17  misstatement on what they were trying to say that I was
18  using the bank's money as my own money or whatever.
19     Q.  And so, when it says you were "helping a family
20  member out," what was meant by that?
21     A.  I think it was just a misunderstanding of the
22  communication of it.  At that same time, I was probably
23  doing something.  I was helping a family member, but
24  that was nothing related to the money I exchanged with
25  them.  I think it was just a misstatement.

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

130

1  everything that was said during the conversation taken
2  down accurately, is there anything, sitting here today,
3  that you would want to correct that you believe was not
4  taken down accurately in these notes?
5     A.  I would have to spend more time to go through
6  this to see what is accurate, what probably is
7  different, what I felt that was said or done.
8     Q.  Okay.  Well, we have some time here today.  So,
9  if you could, please -- if you need some more time to
10  read through pages 18 through 24 in more detail, please
11  go ahead and take all the time that you need and then we
12  can talk about it after you've had time to read through
13  it in detail.
14     A.  (Witness complies).
15         Okay.
16     Q.  All right, Mr. Sanders.  Now that you've had
17  time to review pages 18 to 24 of Regions Exhibit G, is
18  there anything in those pages related to what was
19  recorded about what you told to investigators that you
20  believe you actually stated differently or would like to
21  correct?
22     A.  The statement related to, "Tell us about the
23  process ... you bring in money and switch it out for
24  other money."
25         That was a misunderstanding of what I was

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

132

1     Q.  What family member were you helping out that
2  this would have referred to?
3     A.  I don't recall at the time.
4     Q.  And then in that same section that you pointed
5  out, it has the word "numismatist."  What does that
6  mean?
7     A.  Where is that?  I'm sorry.  Which -- where is
8  that at, and what page?
9     Q.  Sure.  On page 23 under the section that you
10  pointed out that said, "Tell us about the process in
11  which you bring in money and switch it out for other
12  money," there's a sentence and then a second sentence
13  and then there's a third paragraph.
14         And the second sentence of that third
15  paragraph said, "He is a self-proclaimed numismatist."
16     A.  Oh, okay.  I'm sorry.
17     Q.  What does that mean?
18     A.  That -- I -- they probably misunderstood that.
19  Numismatist.
20     Q.  Numismatist.
21     A.  A numismatist is basically someone who does
22  coin collection.  I collect old currency.  I collect
23  coins.  So, one of the -- and I did this way before
24  banking.  I have just been fortunate to come across some
25  very rare and different dollar notes, silver coins; and

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

133

1   so, I just -- you know, I'm a self-proclaimed
2   numismatist.  I collect currency.  That's all it is.
3      Q.  And so, for instance, when you worked at
4   Regions, would you -- if you saw a unique coin, would
5   you take the coin and then put in the equivalent money
6   so that you could have the physical coin that was unique
7   for yourself?
8      A.  Well, it would be with any bank associate.
9   Anytime a bank associate sees a silver coin, they all
10   have someone basically buy it from their drawer; and
11   they'll just give them the currency for it.  So -- but
12   you can only do it for face value.  Customers will bring
13   in coins they don't -- they don't want anymore.  So,
14   instead of it just being mixed with just normal
15   currency, they'll just exchange it out or buy it from
16   the teller that has it.
17      Q.  Was there a Regions policy that told associates
18   that this was okay to do?
19      A.  There was no Regions policy that said that we
20   couldn't.  It's just like exchanging any currency,
21   meaning that if somebody comes in and they want new
22   bills versus old bills, it's just an exchange of
23   currency.  There's -- it just so happens to be that some
24   of these currencies are just different.  That's all it
25   is.

Ross Reporting Services, Inc.        281-484-0770

---

Robert Anthony Sanders

134

1      Q.  And I know you just testified there was no
2   policy saying that you couldn't do it.  Was there
3   anything saying affirmatively, like, "Yes, associates
4   can do this.  They can swap a bill for an equivalent
5   bill"?
6      A.  No, it's a standard of banking.  When a
7   customer comes in with a note -- customers come in all
8   the time:  "I just need -- I need twenties instead of a
9   hundred."
10      It's just exchanging currency.  That's all
11   it -- that's all it's doing.
12      Q.  Okay.  And just to clarify:  I know you are
13   testifying about customers can do it; but with Regions
14   associates who work in the bank, was there any policy or
15   document that said affirmatively that, "Yes, this is
16   fine for associates to do.  You can swap the money.
17   That's approved"?
18      A.  I don't know if there's a set standard that an
19   associate cannot exchange currency or if I need change
20   for a 10-dollar bill, I don't think there's a -- there's
21   a policy that says that you can or cannot do that.
22   That's just a customary way of banking.
23      It doesn't have to be an old dollar bill
24   or a silver coin.  If I have a 10-dollar bill and I need
25   10 ones, I'm exchanging that for that 10 ones.  It just

Ross Reporting Services, Inc.        281-484-0770

---

Robert Anthony Sanders

135

1   so happens if that's new currency versus old, it's just
2   whatever the teller has.
3      Q.  Tell us about your currency collection.  What
4   do you have in it?  How extensive is it?  When did you
5   start?
6      A.  I started way before banking.  I couldn't tell
7   you exactly when.  I was probably in Chicago in 19 --
8   1990's or whatever and just collected over the years.  I
9   don't -- I really haven't assessed to what I have and
10   how much it is.  I haven't even looked at it.  A lot of
11   it is already -- I don't -- a lot of it, I don't even
12   have anymore.
13      Q.  Do you store it in -- well, where do you store
14   your coin and bill collection?
15      A.  There's really nothing to store right now.  I'm
16   going through a divorce.  I mean, pretty much anything I
17   had of a collection has already been liquidated.  It's
18   gone.  I don't have it.
19      Q.  So, you no longer have your coin and bill
20   collection?
21      A.  Nothing, right.
22      Q.  All right.  And then, Mr. Sanders, if you
23   could, turn to page 24 at the top of Exhibit G.  It's
24   Bates numbered Regions 191.  Toward the end of that
25   page, there is a question:  "Have you used him" -- which

Ross Reporting Services, Inc.        281-484-0770

---

Robert Anthony Sanders

136

1   refers to Eric Johnson -- "for outside business?"
2      A.  Right.
3      Q.  And it says -- you said, "Yes"; and it said
4   that you "consulted with Eric."
5      What does that mean by you "consulted"
6   with him?
7      A.  Yes, I've had many conversations with him, as I
8   mentioned earlier, as to the degree of experience that
9   he has in construction of rebuilds, construction work
10   that he does.  Never done any work with him.  Never
11   hired him for any work.  It's just more of an inquiry.
12   He's shown me photos of work that he's completed, which
13   I really was amazed with at the degree of renovations
14   that he's done, but I've never had the opportunity to
15   work with him or refer him in business or anybody else
16   or done anything with him.
17      Q.  And then the next sentence says, "He was going
18   to surprise his wife" -- meaning Lida Thomas -- "with a
19   remodel but decided to hold off."
20      How far along in kind of the process of
21   talking about a remodel did you get with Eric Johnson?
22      A.  A remodel for what?  I don't have any remodels
23   that I would have done.
24      Q.  Do you recall representing to Melody Bodine
25   during this February 11th conversation that you thought

Ross Reporting Services, Inc.        281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

137

1  about surprising Lida Thomas with a remodel of any of
2  the properties that you or she owns?
3      A.  I don't recall anything like that, and I'm not
4  really sure what that was in reference to.
5      Q.  Okay.  All right, Mr. Sanders.  So, the next
6  section of this Exhibit G I'd like you to take a look at
7  starts on page 26 and it goes through page 30 and at the
8  top of page 26, it says, "Robert Sanders."
9          And I'll represent to you this -- these
10 were notes from a conversation that you had with Erin
11 Mummert and Melody Bodine on March 2nd, 2021.  If you
12 can, just take some time and read carefully through
13 pages 26 through 30; and let me know when you're ready
14 to answer questions.
15     A.  (Witness complies).
16         Okay.
17     Q.  All right, Mr. Sanders.  After you've reviewed
18 pages 26 through 30 of Exhibit G, is there anything in
19 these investigation notes that you believe was not
20 correct related to what you said to the investigators?
21     A.  I recall the details in the communication and
22 the responses listed on here.  I can't validate if
23 everything is correct, but I do recall the mentions of
24 the details that are in here.
25     Q.  Okay.  So, to clarify:  You remember stating

Robert Anthony Sanders

138

1  the responses that are in these notes?
2      A.  The responses so far that I've noticed, yes.
3      Q.  All right.  And on page 26 underneath the gray
4  boxes in the first section of the interview notes, it
5  says, "Sanders said he never asked the associates to
6  hold" it -- meaning currency -- "in their drawer."
7          Do you recall Regions looking at your
8  team's cashboxes and identifying that there was money in
9  miscellaneous columns in several of them?
10     A.  Until it was mentioned this day, I was not
11 aware of how they were placing the money for new bills
12 for clients, how they positioned it in their boxes.  I
13 was not made aware until then that some associates had
14 identified putting new currency in miscellaneous.  I
15 didn't know if that was their process or not.
16     Q.  Was that a practice or policy at Regions to do
17 monthly cashbox audits of associates' cashboxes?
18     A.  We always did, right.
19     Q.  And were you in charge as the branch manager of
20 conducting those cashbox audits?
21     A.  I think the audits were, like, I could assign
22 them to someone, if I recall correctly.
23     Q.  And were you responsible for reviewing the
24 results of the cashbox audits?
25     A.  I don't think there was any review unless it

Robert Anthony Sanders

139

1  was an outage, but we made sure that whatever --
2  whenever -- normally, the audits are done where
3  everything is done in one day.  So, it's not just like
4  you do one box this day or -- so, it's like all boxes.
5  So, anytime we had an audit, audits were completed on a
6  timely fashion.  We had no discrepancy issues as far as
7  the report.
8      Q.  Related to the cashbox audits, prior to this
9  interview on March 2nd, 2021, had you ever reviewed the
10 cashbox audit results for your associates?
11     A.  I don't recall which dates I've -- I've
12 reviewed.  I'm pretty sure I reviewed any cash audits
13 that were done.  I just don't recall which ones.
14     Q.  Sure.  And when you reviewed the cashbox audits
15 for your associates prior to this March 2nd, 2021
16 interview, had you ever seen money loaded in a
17 miscellaneous column for any of your associates?
18     A.  I don't recall any of that.  I know they've had
19 mutilated money in certain categories.  I don't recall
20 how they placed that in their box.  I don't recall.
21     Q.  Okay.  So, to clarify:  You don't recall seeing
22 any -- anything recorded in the miscellaneous column?
23     A.  I don't recall looking at their audit sheets
24 questioning what they had in their boxes.  I don't
25 recall anything being identified as miscellaneous,

Robert Anthony Sanders

140

1  whatever that was.  I don't recall that.
2      Q.  Okay.  And then on page 27, the third question
3  down, you were asked, "Do you have a cashbox?"
4          And you said you did not have a cashbox.
5      A.  I was never assigned a cashbox.
6      Q.  And on page 28, it looks like you were asked
7  about your expense report for January; and I'm assuming
8  that's January of 2021.  Do you recall that
9  conversation?
10     A.  I recall the first -- if it was during this
11 conversation here, I recall it first being mentioned;
12 but I've never had a conversation with Dave Leonard
13 regarding my expense report.  It wasn't until this
14 expense report that was filed that was the first expense
15 report in nine years that Dave Leonard questioned me on
16 the entries.
17         MS. STAPLE:  Okay.  Objection,
18 nonresponsive.
19     Q.  (By Ms. Staple)  My question was a little
20 different.
21     A.  Okay.
22     Q.  I was asking specific to this conversation that
23 you had with Erin Mummert and Melody Bodine on
24 March 2nd, 2021, do you recall them asking you about
25 your expense report --

---

Robert Anthony Sanders

141

```
1       A.  Yes.
2       Q.  -- during this conversation?
3       A.  That is correct.
4       Q.  And they were asking you about your
5   January 2021 expense report; is that right?
6       A.  That is correct.
7       Q.  And I guess on that expense report, you had
8   mileage for several businesses that you were conducting
9   some sort of diligence on; is that correct?
10      A.  EDD is Enhanced Due Diligence.  That is a
11  requirement for any -- what they call -- what we call an
12  MSB -- is a money service business.  The locations that
13  I attended to complete the EDD requirements were a
14  directive from back office.  If they were not completed,
15  then that means they would shut the customers' accounts
16  down.  Go ahead.
17      Q.  I don't want to interrupt you.
18      A.  No.  Dave Leonard and Meghan -- I can never
19  pronounce her last name -- were aware of the EDD's that
20  I was required to complete for this expense report.
21      Q.  So, help me understand the EDD process --
22      A.  Sure.
23      Q.  -- at Regions.  So, my understanding is that
24  there are new businesses that come in or there may be
25  requests to check on an existing business and a certain
```

---

Robert Anthony Sanders

143

```
1   time at the heat of the pandemic.  Even with the
2   protocols that we were limited to going outside
3   face-to-face, we were still required to do the EDD's to
4   clear these or these accounts would be closed.
5       So, I would always make sure that my
6   supervisor, Dave Leonard, was communicated that I'm
7   being instructed by back office that I have to get
8   photos or details to confirm the site survey that that
9   location is in existence.  If I need to put pictures, I
10  bring pictures back.  If I don't need pictures, I have
11  to go visit the site, drive by to make sure that it's
12  there, they're operational; but I made them aware when I
13  made my visits.
14      Q.  So, what department or what person or both does
15  an EDD request come at Regions?
16      A.  It's -- it's the compliance department.  It's
17  an EDD.  It's Enhanced Due Diligence.  It's basically
18  AML and BSA department that heads up the Enhanced Due
19  Diligence for Regions.  They -- they monitor the
20  activity of the account; and if there -- if they are a
21  convenience store like this -- some of these customers
22  are in here, if that Google Maps photo is over a year
23  old, they require the branch manager to go and get a
24  picture of that location, if they had an ATM, if they
25  did check cashing -- that it was physically operational
```

---

Robert Anthony Sanders

142

```
1   department within Regions issues an EDD request to, I
2   guess, typically the branch manager or whoever holds
3   that customer account and then you have to go do certain
4   things related to diligence, whether it's taking photos
5   or doing a driveby.  Is that a fair characterization, or
6   am I --
7       A.  That is --
8       Q.  -- missing part of the process?
9       A.  That's a fair characterization of it.  It is
10  entailed to, as you said, new relationships.  Anytime
11  that we onboard a new relationship, we are expected to
12  do a Google search on the location and make sure that
13  the physical address that's related to the business
14  customer is in the -- it's a true and existing location.
15      It just so happened a large portion of the
16  portfolio for that office at that time that I was there
17  was a lot of commercial convenience stores, gas
18  stations.  C-stores have a higher requirement for EDD's,
19  or Enhanced Due Diligence, to where if the site survey
20  on Google Maps is over a year old, the EDD department
21  will not accept that as a compliance standard for
22  clearing the EDD.  So, you have to do a site survey.
23  You drive by the location.  You take pictures, and you
24  send those back in.
25      During this time, this is right around the
```

---

Robert Anthony Sanders

144

```
1   and running.
2       Q.  Is AML that you referenced anti-money
3   laundering?
4       A.  That's correct, right.  It's the BSA/AML
5   department; but most of everything came from Regions and
6   Enhanced -- the EDD department is what --
7       Q.  So, EDD --
8       A.  -- (overlapping conversation) these --
9       Q.  Oh, I'm sorry.
10      A.  -- Enhanced Due Diligence.  So, that's the EDD
11  department that manages things.
12      Q.  Okay.  So, EDD is within compliance --
13      A.  Yes.
14      Q.  -- AML/BSA?
15      A.  Correct.
16      Q.  Okay.  And then going through on page 28 some
17  of these businesses that you'd mentioned, the first one
18  I see is La Porte Shell?
19      A.  Yes.
20      Q.  My understanding is the expense report had
21  mileage to La Porte Shell to conduct EDD.  Would you
22  have been starting from your house or from the branch?
23      A.  From the branch.  Any mileage that's calculated
24  is always from the branch to the location.
25      Q.  Okay.  And for La Porte Shell, was that in
```

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

---

Robert Anthony Sanders

145

1  Dickinson?
2      A.  Yep.  Yes, ma'am, it was.  Dickinson.
3      Q.  About how far would that have been from the
4  branch?
5      A.  I don't want to -- I can't recall off the top
6  of my head; but I know round trip is over 37 miles -- I
7  mean, no.  It was way more than that round trip.  I
8  don't recall exactly.
9      Q.  And then another one of them mentioned is
10 AMLANIS, LLC.  What kind of business is that?
11     A.  I don't recall.  Which paragraph did you see
12 that under?
13     Q.  Sure.  It's on page 28 and it's toward the
14 bottom under the bold heading, "1/25 EDD Site Survey.
15 New business, AMLANIS."
16     A.  I'm trying to remember this company.  This was
17 a new business.  I can't recall all the details related
18 to it but I think that was a new company that we were
19 onboarding and I had -- the location that they had, I
20 think, was a new location.  So, there was nothing with
21 the name of the business; and I had to do a site survey
22 on that one.
23     Q.  And when you said you had to do a site survey,
24 was that part of an EDD request; or was that something
25 different?

---

Robert Anthony Sanders

146

1      A.  That's the onboarding for business
2  relationships.
3      Q.  Okay.
4      A.  Due to the degree of fraud that Regions had
5  taken -- I mean, prior to the pandemic, they required
6  branch managers to do a driveby of the location to make
7  sure that there's a physical location for that business.
8      Q.  And do you recall about how far from the office
9  that would have been?
10     A.  Don't know.  I don't recall.
11     Q.  And turning to Exhibit G, page 29, it looks
12 like there are a couple of other businesses that were
13 discussed during this interview.  Toward the bottom of
14 the page it look like there's a Castor's Quick Car and
15 Lube.  Is that like -- was that an auto body shop?
16         And this is under January 13th, "Next Step
17 Call."
18     A.  So, this is a next step call for a client that
19 was approved for through Regions, the PPP loan; and I
20 had to go and visit that location to get the necessary
21 documents to complete his information.  So, that might
22 have been -- I do recall the business; but I just recall
23 that they were on our list of approval for clients for a
24 PPP loan.
25     Q.  Okay.  And when you would do the PPP check, was

---

Robert Anthony Sanders

147

1  that, for example, to see if there were actually
2  employees working there that were going to receive the
3  loan funds, or was that for something --
4      A.  I don't recall what this visit was about.  I
5  just recall that we had to do this one and it was --
6  actually, this customer here, probably between coming to
7  the branch and us coming to him, he was doing everything
8  he could to get this -- this PPP loan complete.  I just
9  don't remember exactly what we were completing.
10     Q.  Okay.  And then right below that, it says Boss
11 Man Wholesale, LLC.  What kind of business was that?
12     A.  It was an existing client.  I can't recall
13 exactly what -- what product and inventory that he was
14 selling but that was a new business relationship and we
15 were expanding on an existing and he had a warehouse and
16 I can't remember all the details of that one.
17     Q.  Was that located in Houston?
18     A.  I think it was.
19     Q.  And then the next business below that listed
20 Rich -- Richman Food Mart.  Was it Richman or Richmond?
21 Was that a --
22     A.  Richmond Food Mart was a C-store.  It's a
23 convenience store.  That was -- if I'm correct, that was
24 an existing client that -- and I don't recall.  There
25 was an EDD, also, call because it has it listed on

---

Robert Anthony Sanders

148

1  there.
2      Q.  Do you recall where that was located?
3      A.  It's probably in Houston somewhere, if I'm
4  correct.
5      Q.  And then below that, it -- the notes trail off
6  a bit but it says, "Houston area existing client, H" --
7  and then a number of dots -- "Eldridge."
8          Do you recall what that was?  Was that
9  Pecan Eldridge, Incorporated?
10     A.  It could have been.  I really don't know.  I
11 can't tell you.  I'm not looking at the expense report.
12     Q.  Understood.  Are there any other businesses
13 that aren't listed in pages 26 to 30 of this Exhibit G
14 that you recall were on your expense report that aren't
15 noted in here?
16     A.  I'd have to see the expense report; but I had
17 numerous clients that if I had to do some type of visit
18 or dropping off information or whatever it might have
19 been, I'm not really sure what it was, it would have
20 been listed on the report.
21     Q.  Okay.  You can go ahead and place Exhibit G to
22 the side for now.
23         (Regions Exhibit H marked)
24     Q.  (By Ms. Staple) Mr. Sanders, I'm handing you
25 what is being marked as Regions Exhibit H on a larger

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

149

1   11-by-17 paper; and I'll represent to you that this
2   reflects your expense reports at Regions.
3            And you can take a moment to look but the
4   part I would like to talk about is on page 2 of 4 and
5   it's the section toward the bottom of page 2 related to
6   the 2021 January expense report.
7            A.  Okay.
8            Q.  All right.  So, looking at page 2 under
9   January 2021, it lists a number of rows that relate to
10  that expense report.  It lists all of the items for
11  mileage; is that correct?  Would all of these expenses
12  have been for your personal car mileage to conduct these
13  various surveys?
14           A.  If it was entered on there, that's -- that's
15  what I calculated --
16           Q.  Okay.
17           A.  -- for the mileage.
18           Q.  And, to your knowledge, the businesses that we
19  just spoke about that were noted in the investigation
20  notes, would those all be reflected in one of these rows
21  on the January 2021 section?
22           A.  Normally, it's listed on here because I always
23  put details of who I visited with and what the purpose
24  of the information.  So, if it's -- if it's on here,
25  it's related to one of those; and I always put the

Robert Anthony Sanders

150

1   business name that I visited with.  I try to.
2            Q.  How would this expense report have been
3   completed?  Was there an online software where you
4   entered it, or did you enter it just like this in a
5   spreadsheet?
6            A.  No, you enter it into a software.  It's the
7   expense report.  You have to enter in -- it's a -- it's
8   an app, I guess, on Regions' website but you have to
9   enter the -- you can actually label it final -- you
10  know, with your file name, but it's under the expense
11  report.  There is a direct link to it.  You can tie in
12  your -- if you had your corporate card, you can tie in
13  your corporate card with it.
14           But you enter in the date, the time of the
15  event, the place, the location, if it's a prospect, if
16  it's an existing client, even if it's for a manager's
17  meeting -- that's all included on that report.  You
18  just -- you click it.  You get in, and it calculates the
19  total.  It does the mileage automatically, and you also
20  are encouraged to include tolls for toll roads.
21           Q.  Okay.  So, you would just enter the beginning
22  address and the end address; and then the app or
23  Regions' system would calculate the mileage?
24           A.  No, no, no.  I think you -- you don't enter the
25  address.  You enter the place, the location, the city or

Robert Anthony Sanders

151

1   area where it was and, for my record, I tied that into
2   my schedule and my calendar so I know exactly -- I
3   record the mileage from the branch to the location and I
4   put -- I put that as a tab on my calendar so I can go
5   back to my expense report and enter the mileage.
6            And if it's 31 miles to the location, 62
7   is the total mileage; and I enter that, plus if there's
8   any tolls associated with that.
9            Q.  On this report in Exhibit H, besides you
10  mentioning that normally there's a description, is there
11  anything else that you believe is missing from this
12  report?
13           A.  Not to my knowledge.  At this time, no.
14           Q.  Okay.  Go ahead and set Exhibit H to the side
15  for now.
16              (Regions Exhibit I marked)
17           Q.  (By Ms. Staple) All right, Mr. Sanders.  I'm
18  handing you what's being marked as Regions Exhibit I.
19  Please take a moment and look through the document, and
20  let me know when you're ready to answer questions.
21              THE WITNESS:  God bless him.  That didn't
22  sound good.
23           Q.  (By Ms. Staple) I'm sorry, Mr. Sanders.  I
24  didn't hear you.
25           A.  No, there was obviously a car accident; and I

Robert Anthony Sanders

152

1   said that doesn't sound very good.
2            Q.  Oh.  No, it did not.
3            A.  May God bless them.
4            Q.  I agree.
5            A.  Okay.
6            Q.  All right.  Is Exhibit I an example of Enhanced
7   Due Diligence that we were talking about?
8            A.  Yes, it is; but what I'm noticing on this
9   document, there's some areas that are not completed.
10           Q.  Is it fair to say this is at least the start on
11  an Enhanced Due Diligence response?
12           A.  This could have been one of the -- for this
13  location, I know there was more than one that we
14  completed.  So, this looks like one of them.
15           Q.  Okay.  So, this location, it looks like it's
16  for La Porte Shell --
17           A.  Uh-huh --
18           Q.  -- LLC.
19           A.  -- in Dickinson.
20           Q.  Would you have completed the supplemental EDD
21  forms similar to this one for La Porte Shell?
22           A.  What I recall about this one, this is the one
23  that I specifically kept Dave Leonard and Meghan -- I
24  never get her last name right -- but I included both of
25  them on this because I was being instructed by EDD to

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

153

1    get this done.
2            The first set that I sent was incorrect.
3    I had to do it again and then I think there were, like,
4    three entries that I did and these were pictures that I
5    had to take and enter into the database for this to be
6    completed so they didn't shut the account down.  So,
7    this is one of probably the many that I had to do to
8    complete that.
9        Q.  Okay.
10           (Regions Exhibit J marked)
11       Q.  (By Ms. Staple) Mr. Sanders, I'm handing you
12   what's being marked as Regions Exhibit J.  Take a look,
13   and let me know when you're ready.
14       A.  Okay.
15       Q.  I'll represent to you, Mr. Sanders, this
16   appears to be a series of e-mails, some of them that you
17   are on, as well as Nicole Garner, Meghan Wernecke, and
18   Dave Leonard.
19           Are these the communications that you just
20   testified to about keeping Meghan and Dave apprised of
21   the La Porte Shell EDD?
22       A.  That is -- that is correct, yes.
23       Q.  Okay.  You can go ahead and set that exhibit to
24   the side.
25           (Regions Exhibit K marked)

Ross Reporting Services, Inc.                281-484-0770

---

Robert Anthony Sanders

154

1        Q.  (By Ms. Staple) Mr. Sanders, I'm handing you
2    what's being marked as Regions Exhibit K.  Please go
3    ahead and take a look, and let me know when you're
4    ready.
5        A.  Okay.
6        Q.  All right.  And I'll represent to you this
7    appears to be e-mails between you and Dave Leonard
8    regarding your January 2021 expense report; is that
9    correct?
10       A.  That is correct.
11       Q.  And do you recall on the first page of
12   Exhibit K, the January 29, 2021, 5:02 p.m., e-mail -- do
13   you recall if you did the names of these five businesses
14   lists to --
15       A.  Correct.
16       Q.  -- Mr. Leonard?
17       A.  Yes.
18       Q.  And we've talked about a couple of these
19   businesses, but not all of them.  What is
20   SK International, LLC?
21       A.  I'm trying to remember the customer off the top
22   of my head.  I don't recall exactly.  It will take me
23   some time to recall that client.
24       Q.  Do you recall SK International being in
25   Cypress?

Ross Reporting Services, Inc.                281-484-0770

---

Robert Anthony Sanders

155

1        A.  Yes.  I just don't recall what the business
2    was.
3        Q.  Sure.  And do you remember what you had to do
4    in terms of -- in terms of diligence for
5    SK International?  Was it photos or was it speaking to
6    someone or something else?
7        A.  I don't recall.  I don't remember what --
8    exactly what it was for.
9        Q.  And then we haven't talked about Wilson
10   Discount Lumber, Incorporated, yet.  What kind of
11   business is that?
12       A.  That is a lumber company.  They are -- they
13   were an existing client of the bank.  I think we
14   expanded on their relationships; and I don't recall
15   exactly what we went out for, also, to -- to help them
16   for those calls.  I think it was maybe one visit that we
17   probably had to do, but they were on the report.
18       Q.  And then the last business listed in this
19   January 29th e-mail, Sunlight 1 Holdings, what kind of
20   business is that?
21       A.  That is multiple entities.  He has a C-store, a
22   doughnut shop, Subway.  He has multiple business
23   entities.  This is his primary company.  We were
24   visiting with him during that time on -- there was some
25   lending that he needed.  I can't remember exactly what

Ross Reporting Services, Inc.                281-484-0770

---

Robert Anthony Sanders

156

1    we were doing for him at that time.  I know he sold the
2    gas station, but I can't remember at the time we visited
3    with him what we were working on.
4        Q.  With these five businesses listed in Exhibit K,
5    did you receive a formal EDD request for each of them?
6        A.  All these are not EDD's.  They were -- La Porte
7    Shell was an EDD.  I can't remember which other ones
8    were EDD's, but the other ones were -- were calls that
9    required that visit for whatever -- I can't recall the
10   reason, but --
11       Q.  Okay.  So, just out of these five, La Porte
12   Shell was the only one that was officially EDD?
13       A.  I can't say for certain, but I can tell you
14   that Sunlight 1 Holding has a C-store.  I don't think --
15   SK International, I think, is a C-store, also, too.  So,
16   they could have been -- fell under EDD.  I just can't
17   recall exactly what these calls were in January of 2021.
18       Q.  Okay.  But not all five were official EDD
19   requests; is that right?
20       A.  They -- they still could have been in terms of
21   the site photos.  So, if it fell under the EDD, then
22   that means that whatever photos were needed, it needed
23   to be taken.  So, I really can't say for sure exactly.
24       Q.  Is there a difference at Regions between photos
25   being taken for certain reasons and then photos being

Ross Reporting Services, Inc.                281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

157

```
 1   taken for EDD?
 2       A.  So, EDD's can come in different requirements.
 3   It could be photos.  It could be site surveys.  It could
 4   be just whatever the Enhanced Due Diligence is, they
 5   want us to do that part.
 6           If you look at -- there was one document
 7   that you provided that had -- well, it was the actual
 8   EDD form; and it goes over different categories, number
 9   of employees.  It goes over the operation service of the
10   business, business location.
11           So, it doesn't necessarily mean just
12   photos.  It could be any one of these categories; and if
13   they felt -- if they got a request for an EDD
14   resolution, we have to get those completed.
15       Q.  And then would there have ever been an occasion
16   where those items you just mentioned -- site surveys or
17   photos or number of employees -- would have been
18   requested outside of a formal EDD request?
19       A.  I think outside of a formal request would be me
20   doing my due diligence so that they did not get put on a
21   list.  The one thing that I was privileged to have is
22   the book of business that fell into these MSB's that
23   require these EDD reports.  I knew exactly what was
24   expected or anticipated from those entities.  So, I made
25   sure I did my due diligence prior to them being on a
```

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

158

```
 1   list so that it would not impact the customer's
 2   relationship.
 3       Q.  Okay.  And just so I understand, when you say
 4   "the list," is that the EDD list?
 5       A.  There's -- I guess the only way I can probably
 6   summarize it is that an EDD requirement can come in the
 7   form from the EDD department, or it can come in the form
 8   of just you're going to have this coming up soon that --
 9   there are certain things you have to do for money
10   service industries that you have to get those done so
11   that they do not get put on a list where you have to
12   clear them.
13           I used to make it a best practice to try
14   to get these things done prior to that being put on the
15   list so it did not impact the customer.
16       Q.  Okay.
17       A.  If I'm correct, if they didn't change their
18   guidelines, you had less than 90 days to clear certain
19   EDD.  Some EDD's were 30 days.  Some were 90 days, but
20   you -- it was best as a best practice to get the
21   information you needed prior to them being put on a list
22   and getting it cleared.
23       Q.  Okay.
24           (Regions Exhibit L marked)
25       Q.  (By Ms. Staple)  All right, Mr. Sanders.  I'm
```

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

159

```
 1   handing you what's being marked as Regions Exhibit L.
 2   Take a look, and let me know when you're ready.
 3       A.  Okay.
 4       Q.  This, Mr. Sanders, I'll represent, appears to
 5   be e-mails between you and Erin Mummert and Melody
 6   Bodine as part of Regions' investigation.  Is that
 7   accurate, to your knowledge?
 8       A.  That was accurate to my knowledge, yes.
 9       Q.  And it looks like they'd asked for additional
10   detail on items on your expense report.  Do you recall
11   providing this additional information on the businesses
12   listed in your expense report?
13       A.  Yes, that's correct.
14       Q.  And it looks like there are a couple of
15   additional businesses listed in this April 5th e-mail
16   that were not in the January 29th e-mail.  I wanted to
17   ask you about those.
18           The first one that appears to be
19   additional is The Young Journey Foundation and MUSA
20   Enterprise.  What was that business or businesses?
21       A.  Right now, I can't recall.  Yeah, I don't
22   recall exactly all of the details of -- I know all the
23   business names; but I really can't tell you all the
24   details right now as far as what these calls were
25   related to.  If it has EDD business prospect call, say
```

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

160

```
 1   for me -- then that's what I provided as far as why
 2   those calls took place.
 3       Q.  And then Team Builders Construction, what kind
 4   of business is that?
 5       A.  That -- that is -- that, I don't recall.
 6   Construction company, but that was a next step call.
 7       Q.  And so, in your January 29th e-mail in
 8   Exhibit K where you listed five businesses, to prepare
 9   the e-mail where you listed the five businesses, did you
10   go back and look at your expense report?
11       A.  I did not.  I just recall from the top of my
12   head what they were.
13       Q.  And this April 5th, 2021 e-mail, to prepare
14   this e-mail, did you look at your expense report?
15       A.  I might have for this one because if you
16   notice, I put the dates of each one.  So, that means
17   that I included what was -- should have been listed on
18   the other report that has the dates and time.  I think I
19   tried to go from -- the best information I had was from
20   my expense report to see which calls I made and who they
21   were made to.
22       Q.  And was there a reason you initially, back on
23   January 29th, did not refer to your expense report?
24       A.  I don't know why I didn't.
25       Q.  And, to your knowledge, is the April 5th, 2021
```

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

161

1  e-mail listing of these various businesses from your
2  expense report complete and accurate, based on your
3  expense report?
4     A.   It looks to be.
5     Q.   Okay.  You can go ahead and set that exhibit to
6  the side.
7          Do you recall Melody Bodine and Erin
8  Mummert asking you about the allegation that you
9  discriminated against Hispanic associates?
10    A.   I don't recall the specific conversation.  If
11  it's related to -- I don't recall it ever being
12  presented that way.  Like I said, I don't remember; but
13  the only reference to that, Melissa Miranda requested
14  bereavement for her aunt passing.  I consulted with, I
15  think, HR, and I think it was Erin that I spoke with in
16  HR and I went over.
17         She said, "You can go -- here's the
18  guidelines.  Aunts and uncles are not included in
19  bereavement."
20         I -- I expressed my condolences to her and
21  her family for their loss.
22         I said, "My understanding is that aunts do
23  not fall under the category of bereavement -- 3 days'
24  bereavement"; and I expressed that to Melissa.
25         She then, in turn, says that I'm showing

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

162

1  favoritism.
2          And I asked her, "What do you mean by
3  that?"
4          She's, like, "You gave Lakesha
5  bereavement."
6          And I said, "Well, first of all, I've
7  never given an associate bereavement."
8          And so, when -- when I looked at this -- I
9  have -- I always kept a history of the annual calendar
10 when -- when employees would come in late, when they
11 were sick, if there was a family emergency, bereavement.
12 I always kept a history so that I could see patterns.
13         I went back to the time that she
14 referenced that Lakesha Crawford had bereavement for her
15 aunt, and I recalled the incident.  She received family
16 news that her aunt had passed away.  It was on either a
17 Thursday and she was so distraught, I -- we sent her
18 home and payroll was due.  Like, I always do payroll on
19 the weekend instead of waiting till Monday.
20         I inadvertently made the mistake.  Instead
21 of entering vacation time, I hit the bereavement.  I
22 didn't know how to go back and correct it, but Lakesha
23 took Monday and Tuesday off the following week as
24 vacation.
25         I even call -- I think I spoke to someone

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

163

1  in HR.  I -- and I didn't know how to correct that one
2  day; and so, I explained to Lakesha that, "You've got a
3  day of bereavement that was done by mistake as a bank
4  error."
5          So, you know -- don't know how to -- you
6  know, I forgot how we discussed it but when I talked to
7  Erin in HR, I explained to her and we looked at the
8  calendar together.
9          She looked at Lakesha's information; and
10 she says, "Well, Robert, go ahead and give her the
11 bereavement."
12         I said, "Well, send me an e-mail
13 instructing me to give an associate bereavement because
14 I made a mistake on another associate."
15         And, also, too, I did research and found
16 out that Raven Porter lost her aunt that she was really
17 close to maybe a year before.  I can't remember the
18 exact timeline, and she could not take bereavement.  She
19 took vacation.
20         She's African-American.  Lakesha is
21 African-American and, I guess, Melissa is Hispanic.  I
22 wasn't showing favoritism, and I wasn't doing anything.
23 It was just a mistake on Lakesha's part, and I was just
24 going over the guidelines that I did with every
25 associate.

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

164

1          (Regions Exhibit M marked)
2     Q.   (By Ms. Staple) Mr. Sanders, I'm handing you
3  what's being marked as Regions Exhibit M.  Just take a
4  look, and let me know when you're ready.
5     A.   Okay.
6     Q.   Is this, to your knowledge, an image of Lakesha
7  Crawford's bereavement request?
8     A.   That's exactly the one I made the mistake to,
9  yes.
10    Q.   And if you look to the right of the document,
11 there's a block that says "Reason"; and underneath, it
12 says, "Parent-in-law."
13         Would that have been something you would
14 have selected in the system?
15    A.   I don't know how the system equates that
16 information.  I'm not sure.  I don't think that's
17 anything I typed in, but --
18    Q.   Would that have been --
19    A.   It might have been a drop-down box.
20    Q.   Okay.  So, the reason may have been a drop-down
21 box?
22    A.   Uh-huh.
23    Q.   And then next to it, there's a comment.  Would
24 that have been a section you would have had to type in
25 to?

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

165

1    A.  That might have been because I indicated on
2  there that's "mother's sister."  That would have
3  included her being an aunt.
4    Q.  And so, is the reason you typed in the comment
5  as "mother's sister" because there was no aunt or uncle
6  available under the Reason drop-down?
7    A.  I don't know.
8    Q.  Had there been an aunt or uncle option under
9  the Reason drop-down, would you have selected that
10  option for Lakesha Crawford's request?
11    A.  If I entered it as a mistake, I think -- I just
12  normally -- I like to always include comments.  So, I
13  might have entered that note just as my reference of
14  what I was putting in; but, again, when I did the time
15  sheet on that, I made an error.  I should have entered
16  it as vacation, not bereavement.  So, it was a mistake
17  on my part.
18    Q.  All right.  And my -- my question, though, was
19  under the Reason drop-down.  Had it given an option aunt
20  or uncle, would you have selected aunt or uncle for this
21  request?
22    A.  I -- I can't say because there was no drop-down
23  to that degree.  I don't know what I would have done at
24  that point if there was a drop-down.
25    Q.  So, what I'm asking is just a hypothetical

Ross Reporting Services, Inc.                281-484-0770

Robert Anthony Sanders

166

1  question.  Under Exhibit M for the Reason drop-down, you
2  entered "Parent-in-law"; but if on that Reason drop-down
3  menu, there had been an option where you could have
4  selected aunt or uncle, is that what you would have
5  selected?
6        MR. HODGES:  Objection, speculation.
7    A.  Then, again, I don't know if this was a
8  drop-down or if it was -- I don't -- I don't know.  This
9  was a mistake as an entry.  So, I can't say that I would
10  have done anything differently.  I made a mistake.
11    Q.  (By Ms. Staple) Okay.  I'll ask it a little
12  differently.  Under the Reason box, assuming it was
13  either drop-down or type-in, if Lakesha Crawford asked
14  for time off for her aunt, wouldn't it have been
15  accurate to put "aunt" under the Reason, and not
16  "Parent-in-law"?
17    A.  This should have been entered as a vacation,
18  not as a bereavement.  It was a mistake entry.
19    Q.  Okay.  And my question is little different than
20  that, although I appreciate that --
21    A.  Right.
22    Q.  -- answer.  If there had been an availability
23  to put "aunt" under Reason, would that have been the
24  correct label to provide under Reason?
25    A.  I can't say that --

Ross Reporting Services, Inc.                281-484-0770

Robert Anthony Sanders

167

1        MR. HODGES:  Objection, speculation.
2    A.  -- "yes" or "no."  I can't answer that
3  question.
4    Q.  (By Ms. Staple) Did Melissa Miranda ever tell
5  you that she felt you were discriminating against her by
6  denying her bereavement request -- request for her aunt
7  but granting it for Lakesha Crawford?
8    A.  In her e-mail communication, she said that I
9  was showing favoritism.
10    Q.  Did you respond to her remark that you were
11  showing favoritism?
12    A.  I don't know what my response was to her, but I
13  was showing -- I -- I immediately included Erin from HR
14  on the communication to this.  Obviously, Erin from HR
15  refused to send me the e-mail telling me to give
16  Melissa -- because she told me to give her the
17  bereavement time.
18        I said, "Even though I made a mistake?"
19        And she's, like, "Well, you might as well,
20  you know, do it -- if you did it for one, you might as
21  well do it for the other."
22        And I can't recall if she -- she responded
23  with an e-mail to that, but I requested that she give me
24  an e-mail approval that she wanted me to do that.
25    Q.  Okay.

Ross Reporting Services, Inc.                281-484-0770

Robert Anthony Sanders

168

1        (Regions Exhibit N marked)
2    Q.  (By Ms. Staple) Mr. Sanders, I'm handing you
3  what's being marked as Regions Exhibit N.  Go ahead and
4  take a look, and let me know when you're ready.
5    A.  Okay.
6    Q.  If you can, turn to the second page of the
7  Exhibit N.  There's an e-mail from you to Ms. Miranda
8  and it says you will update the WorkDay and the In Time
9  today.  "Regions Policy outlines the following as
10  bereavement," and it gives a bullet-point list of
11  multiple categories of family members.
12        Does this refresh your recollection at all
13  of whether there was a drop-down that you could select,
14  and would these have been the options in the drop-down?
15    A.  This detail here came from HR as to the
16  categories that bereavement falls under, and I sent that
17  to Melissa.  When she requested me to correct her time
18  card, even though she was at another branch, she was
19  still under our time card, our payroll "for last week"
20  and then she mentioned the bereavement time.
21        And I contacted Erin.  Erin gave me the
22  categories of what -- I might have copied and pasted
23  this from our website.
24        I said, "I will update WorkDay ... today.
25  Regions Policy outlines the following as bereavement";

Ross Reporting Services, Inc.                281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

169

1  and I just sent that to her.  I said, "You can contact
2  HR to verify if the time out of the office qualifies as
3  bereavement."
4      Q.  So, to clarify:  The March 8th, 2021 at
5  3:11 p.m. e-mail with the list --
6      A.  Right.
7      Q.  -- Erin Mummert provided you with this
8  bullet-point list?
9      A.  She instructed me where to get the information
10  from, yes.
11      Q.  Okay.  And, then, above that e-mail, it looks
12  like Melissa Miranda responded to you; and part of what
13  she said was, "I feel like this" is "discriminating to
14  me, and you are constantly singling me out and I can't
15  understand why."
16          When she remarked that she felt
17  discriminated against, did you report her complaint of
18  discrimination to anyone?
19      A.  I communicated with Erin, and I might have even
20  sent this e-mail that she sent me to Erin because I
21  wanted her to see what was being communicated.  I did
22  not want to communicate directly with her to cause any
23  other concerns.
24      Q.  And you had mentioned a moment ago, I believe,
25  that at this time, Melissa Miranda's payroll was still

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

170

1  counted with Sugar Land; but was she already working at
2  a different branch?
3      A.  She was.
4      Q.  Okay.  So, she would have transferred to
5  another branch around March of 2021?
6      A.  I'm not sure of the exact time frame but she
7  was still under our payroll, but she was then working at
8  a different office at that time.
9      Q.  Okay.  Can you tell me about the surprise
10  cashbox counts at Regions and how that procedure worked?
11      A.  It's been a while in terms of -- let me think.
12  Okay.  So, Regions -- I don't know if they still do.
13  They used to require that you schedule the surprise cash
14  counts.  It's for every box in the branch.  You schedule
15  it for -- I think it's every other -- it's every month
16  but on a different day.  I'm trying to remember now.
17          You had to do a rotation.  Like, if you
18  scheduled it on a Monday, it could be the first or
19  second week of the month.  The next month, you might
20  want to schedule it the first week of month, the third
21  week of the month.  You don't want to do the same week
22  and you don't want to do the same day.  So, you're
23  supposed to have a calendar that you rotate the surprise
24  cash counts by.
25      Q.  And to your recollection, is it true that you

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

171

1  did not complete the surprise cashbox counts for October
2  through December of 2020?
3      A.  I don't think that's correct.  I think we
4  always did our cash counts.  I think we were just always
5  concerned about being in a pattern, but we always did
6  our surprise cash counts.
7      Q.  Do you ever remember missing a month for the
8  surprise cashbox counts?
9      A.  I don't recall ever missing a month for a
10  surprise cash count.  I don't recall.
11      Q.  Okay.  I think it's a good time if we just take
12  a five-minute restroom break.
13          THE VIDEOGRAPHER:  Going off the record at
14  3:31 p.m.
15          (Recess from 3:31 p.m. to 3:35 p.m.)
16          THE VIDEOGRAPHER:  Going on the record at
17  3:35 p.m.
18      Q.  (By Ms. Staple) All right, Mr. Sanders.
19  Earlier today, we looked at Regions Exhibit E.  If I
20  could trouble you to find that exhibit in your stack,
21  I'd like to ask you a couple questions; and this is the
22  one that is the complaint that you had issued to
23  Regions.  At the top, it says Enterprise Associate
24  Investigation Tool.
25      A.  Okay.

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

172

1      Q.  And earlier, Mr. Sanders, we talked about your
2  conversations with some of Regions OAC investigators
3  related to Melissa Miranda's complaint; and we talked
4  about the conversation you had with Melody Bodine on
5  February 11th, 2021.  Do you remember talking about that
6  conversation?
7      A.  Yes.
8      Q.  And then it looks like in Exhibit E, you filed
9  a complaint on February 18th, 2021, about a week later.
10  Was that correct?
11      A.  Yes, that sounds correct.
12      Q.  And it looks like your complaint had a couple
13  of different allegations; and so, I'm looking at the
14  second page of Exhibit E.
15          And it says that you had stated you're
16  being discriminated against based on your "race, age,
17  and health conditions by CBM Dave Leonard.  Sanders
18  alleges that Leonard" had "passed over Sanders for Nexus
19  Branch Manager positions that Sanders has applied for in
20  2019 and since that time.  Sanders alleges that Leonard
21  has conspired with a previous associate Jared (last name
22  unknown) and current associate Melissa Miranda, who
23  reported the concerns in" -- and then it lists her
24  complaint number -- "to report issues to attack Sanders
25  as a manager."

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

173

1    My first question is:  The branch manager
2 in the CBM position we talked about earlier, you stated
3 that those were in 2018 or 2019, correct?
4    A.  Roughly.  I can't say exactly, but somewhere in
5 that area.
6    Q.  What prompted you, then, to complain about
7 being discriminated against related to those positions
8 in February of 2021?
9    A.  What prompted me?  I don't know.  I really
10 can't say what prompted me.  I guess, it was obviously a
11 feeling that I needed to address; and it appears that
12 there was nothing that -- that I was doing that would
13 attribute to the things that were being done against me.
14    But I will say this, that Melissa Miranda
15 was -- at the time that she started with the Sugar Land
16 location was aware of the behavior and activity that
17 Jared Ogburn -- it's -- I think it's O-G-B-U-R-N -- was
18 the associate that Dave Leonard required that I hire
19 that he had been working with; but she was privileged in
20 knowing that any information that she gave Dave Leonard,
21 he would use it to his benefit -- in other words, making
22 up information.
23    So, when I realized -- I don't know what
24 it was about that time frame; and I want to say -- you
25 know what?  I do realize.  I say -- you know, because

Ross Reporting Services, Inc.                 281-484-0770

---

Robert Anthony Sanders

174

1 this is definitely retaliation.  I had always tried to
2 find out and figure out what I needed to do, and it just
3 so happened that was the day that I decided I needed to
4 go ahead and report this information because I didn't
5 know what to do.  I didn't know -- I had no one else
6 that was -- that I could speak to regarding this.
7    So, I thought it was best that I go ahead
8 and try to find a way to communicate now what my
9 concerns are with HR; and that's why I wanted to file a
10 report.  So, I don't know what else to explain why it
11 was at that day I made the decision to do that.
12    Q.  Was there a reason for the delay in you
13 complaining from 2018 to 2019 about the various
14 positions all the way to February of 2021?
15    A.  It wasn't from '18 to '19.  This all -- if I'm
16 correct, everything started with the new branch and
17 things that were along that line were right about '19.
18 I don't recall it being '18.  I could be wrong, but my
19 timeline -- I don't recall it being from '18.  There
20 might have been other things that occurred, but I
21 don't -- I think the majority of this was impacting me
22 in '19 to '20.
23    Q.  And so, from 2019 when the branch manager and
24 the CBM position we talked about earlier were available
25 until February of 2021, what was the reason for your

Ross Reporting Services, Inc.                 281-484-0770

---

Robert Anthony Sanders

175

1 delay in speaking out about your concerns about being
2 discriminated related to those positions?
3    A.  I wanted to -- I didn't want it to be a
4 perception.  I didn't want -- I wanted to be factual in
5 what I was providing information on.
6    Q.  And then related to your complaint that Melissa
7 Miranda was attacking you or retaliating against you,
8 was that related to the fact that she had made a
9 complaint to the OAC about you?
10    A.  No.  Say your question again.  I'm sorry.
11    Q.  Yeah.  I'm asking about the basis for your
12 complaint that Melissa Miranda was retaliating or
13 conspiring against you; and I'm asking:  Was the basis
14 the fact that she made a complaint about you --
15    A.  No.
16    Q.  -- to the OAC?
17    A.  No.  Well, I'll say that's part of her
18 retaliation.  She retaliated against me for performance
19 reviews that I had conducted on her and she started
20 retaliating about creating a list of false information
21 against me to report to Dave Leonard.
22    So, my understanding is -- is that she --
23 she was being coached and even -- and I want to say in
24 2021 on her annual performance review, her rating was
25 she did not meet expectations and that upset her and

Ross Reporting Services, Inc.                 281-484-0770

---

Robert Anthony Sanders

176

1 that's when everything started with her retaliation
2 against me as a manager.
3    Q.  And so, you said her 2021 annual review.
4    A.  Of 20 --
5    Q.  Would that have been 2020?
6    A.  -- 2020, yeah.  Right.  It probably would have
7 been 2020.
8    Q.  So -- and just so I'm clear:  The acts that you
9 are contending were retaliatory by Melissa Miranda were
10 her creating a list of issues she had with you to give
11 to Dave Leonard, but you are not contending it was
12 retaliatory for her to make a complaint to OAC about
13 you.  Is that accurate?
14    A.  I'm not understanding your question.
15    Q.  Sure.  So, I'm trying to understand all the
16 bases that you believe Melissa Miranda was retaliating
17 against you because of.
18    A.  I don't know what her motivation was.  I don't
19 know what her intentions were, but I knew that they were
20 retaliatory toward me as a manager for -- for coaching
21 her in her performance reviews.  I feel -- and I see
22 that -- everything that I see leads up to that.  She's
23 retaliating against my performance as a manager on her,
24 but that has no basis on the reason I reported the --
25 the discrimination because those were things that were

Ross Reporting Services, Inc.                 281-484-0770

---

Robert Anthony Sanders

177

1  done to me prior to this incident.  That's just a
2  combination of it.  My -- my experience is directly
3  related to Dave Leonard under Earl Connell's leadership
4  in terms of what -- what I experienced.
5      Q.  Okay.  So, I just want to be sure that I'm
6  clear and so, let me ask a little differently and bear
7  with me.
8          I'm trying to understand, first, Melissa
9  Miranda and all the things that she did that you're
10 contending are retaliatory against you; and so, the
11 first thing that you had mentioned was her creating a
12 list to give to Dave Leonard.  Are you contending that
13 her creating that list -- was it out of retaliation?
14     A.  I would say that is retaliation, yes.
15     Q.  And then I understand that you mentioned she
16 was conspiring against you.  Are you contending that
17 that was retaliatory?
18     A.  Any of her behavior I feel is a retaliation
19 against me for whatever reason.  I don't know why.
20     Q.  And so, in Exhibit E where it notes that
21 "Sanders alleges that Leonard has conspired with a
22 previous associate Jared ... and current associate
23 Melissa Miranda," are you contending Melissa Miranda
24 conspired with Leonard out of retaliation against you?
25     A.  I really don't know what Dave Leonard's

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

178

1  intentions were, Melissa Miranda's intentions, and
2  Dave -- I don't know entirely.  I know what I've
3  experienced, and I know what I went through.
4      Q.  I appreciate that.  I'm trying to get at what
5  specific behaviors Melissa engaged in that you are
6  claiming were retaliatory; and so, we talked about the
7  list.  Are you contending that her complaint to OAC was
8  retaliatory towards you?
9      A.  It was a retaliation.  I mean -- I guess, I
10 don't know any other way to say "yes" or "no."  I mean,
11 I feel that it is retaliation.
12     Q.  Do you feel that she was retaliating against
13 you based on your race?
14     A.  I don't know.  I really don't know what her
15 intentions were.
16     Q.  And you're also contending Dave Leonard
17 conspired with her.  Are you contending he was also
18 retaliating against you?
19     A.  Yes.
20     Q.  Are you contending Dave Leonard retaliated
21 against you based on your race?
22     A.  Yes.
23     Q.  Are you contending Dave Leonard retaliated
24 against you because you filed a complaint with the OAC?
25     A.  Yes.

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

179

1      Q.  Is there anything else that you believe Dave
2  Leonard was retaliating against you based on, any action
3  you took or any protected characteristic of yours?
4      A.  I don't know what to add or how to respond to
5  that.
6      Q.  In this lawsuit that you brought against
7  Regions, you've raised a claim for retaliation.  Is
8  there anything we haven't already talked about that you
9  believe is the basis for retaliation against you by
10 Leonard or Miranda?
11     A.  The only way I can answer that in response to
12 my wrongful termination:  In June of 2021 I was told
13 that I showed favoritism to one associate and not the
14 other one, Melissa for the bereavement.  That was a
15 mistake.
16         I was never provided with the termination
17 documentation that Dave Leonard did with Erin over the
18 phone the day he wrongfully terminated me.
19         I was also told that I falsified my
20 expense report, which was a false accusation and a false
21 statement.  I never falsified my expense report.
22         I was told that I mishandled cash or
23 currency, which I had no control over, in the branch,
24 which I did not; nor did I give any direction to my team
25 members as far as how to process and manage currency as

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

180

1  far as new cash and new currency.
2          There might have been one other area that
3  I feel like that I was wrongfully terminated under, but
4  this was unequivocally discrimination.  I was never
5  given an opportunity, even a lateral position with the
6  company I've been with for nine years that I'm
7  overqualified for.  If it's not my race, maybe it's my
8  age or maybe it's my medical conditions.
9          But what's most offensive:  I started with
10 Regions in 2012.  I was diagnosed with cancer in 2013;
11 and because I did not want to affect my payroll, I came
12 into my work against my doctor's wishes while taking
13 chemo because I wanted to support my team.  And this is
14 how I'm treated?
15         MS. STAPLE:  Objection, nonresponsive.
16     Q.  (By Ms. Staple) Mr. Sanders, would you like to
17 take a moment?  We can go off the record a moment if
18 that would be helpful.
19         MS. STAPLE:  Why don't we go off the
20 record for a moment?
21         THE VIDEOGRAPHER:  Going off the record at
22 3:50 p.m.
23         (Recess from 3:50 p.m. to 3:55 p.m.)
24         THE VIDEOGRAPHER:  Going on the record at
25 3:55 p.m.

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

181

1    A.  My apologies.
2    Q.  (By Ms. Staple) No need to apologize,
3  Mr. Sanders.  No need at all.  We can take breaks at any
4  time.
5        Before we took this most recent break, you
6  had mentioned the lateral positions.  So, when we talked
7  earlier about the Riverstone and Sienna Plantation
8  branch manager roles, would those have been lateral
9  transfers for you?
10   A.  Yes.
11   Q.  And then you mentioned medical conditions.  Was
12  that the cancer that you had referenced?
13   A.  Yes.  I'm a cancer survivor.
14   Q.  And then you mentioned that you were told
15  certain reasons of why you were being terminated.  Was
16  there a meeting that you had with Dave Leonard where he
17  communicated to you that you were terminated?
18   A.  Dave Leonard and Meghan Wernecke came into my
19  office earlier that morning, said that they were just
20  doing a surprise visit.  They conducted an audit of all
21  the branch deposit -- I'm sorry, teller drawers, the
22  boxes, the vault -- they -- before they met with me with
23  HR in the conference room, but they did an audit of the
24  branch before they did the termination.
25   Q.  And then when you said "met ... with HR in the

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

182

1  conference room," was someone from HR dialing on the
2  phone for the --
3    A.  I think Dave and Meghan were in the conference
4  room prior to me entering.  They had already contacted
5  Erin from HR.
6    Q.  Okay.  So, Erin attended the meeting by phone?
7    A.  Correct.
8    Q.  And what did they tell you at the termination
9  meeting?
10   A.  When I walked into the room, I -- Dave
11  immediately said, "Erin, Robert's here now; and Meghan
12  is here."
13        And then Erin said hello.  She's, like,
14  "Now, Robert, the reason why we're meeting with you
15  today, we are effective immediately terminate" -- well,
16  no.  Let me see.
17        If I remember correctly, it's -- it was
18  more Erin introduced herself, said good morning.
19        And then Dave started with the
20  documentation he had in front of him and started reading
21  off the documentation and says, "First, Robert, you
22  know, based on the findings of the interview that were
23  conducted by HR regarding the complaint made on you, we
24  don't feel like you've been honest with your responses;
25  and that is one of the reasons why we're" -- I can't

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

183

1  remember exactly how it was said.
2        It was just, like, he read over four
3  different lines.  He says, "We don't feel like you were
4  being truthful and honest in your responses to HR in
5  your interviews.  The fact that you've shown favoritism
6  with -- on -- and treatment of employees, the" -- and if
7  I remember the verbiage correctly -- "the falsifying of
8  expense reports and the -- the violation of company
9  policy on handling cash drawer," or something "cash
10  activity" and the last one, of course, at-will state,
11  threw it in that -- you know, loss of confidence and he
12  said, you know, "We're terminating you, effective
13  immediately."
14        I said, "Can I have a copy of the
15  documentation?"
16        Dave replied to Erin, "Erin, can I give
17  him a copy?"
18        And Erin says, "No, Dave.  That's for your
19  records."
20        I said, "Legally on the information,
21  you -- you are required to give me a copy of the
22  termination documentation."
23        And they refused to.
24        I said, "Okay.  My attorney will get that
25  from you, then."

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

184

1    Q.  Mr. Sanders, do you have knowledge that Regions
2  was already investigating Melissa Miranda's complaint at
3  the time that you made your internal complaint about
4  Dave Leonard and Melissa Miranda?
5    A.  Was I aware that they were investigating her,
6  her complaint?  I did -- I was not aware that they were
7  investigating her complaint, no.  I just knew that they
8  raised concerns or mentioned to me about what she had
9  stated, but I didn't realize it was an investigation.
10   Q.  Okay.  Do you acknowledge you were at least
11  interviewed by HR prior to you filing your complaint?
12   A.  I took the initial information when they --
13  when Dave was there that that was what was said.  I
14  didn't take it as that was an investigation.  It was
15  said that these things were mentioned, knowing that they
16  were not true.  I didn't see that, and it was never
17  communicated that it was an invest -- I don't recall it
18  being said it was an investigation.  That had nothing to
19  do with me filing my complaint of discrimination.
20   Q.  Going back to Jared Ogburn, you were his direct
21  supervisor -- is my understanding.  Did you have the
22  authority to terminate him?
23   A.  I guess as a branch manager, we had the
24  terminated to -- the authority to terminate an
25  associate; but it had to go through HR.  It's not just a

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

185

1  decision based on management.  You have to go through
2  HR; and I have to go through, also, my supervisor, which
3  is Dave Leonard.
4      Q.  So, the answer is, "yes," though?  You could
5  terminate him?
6      A.  I could not terminate an associate without
7  going through HR.  It has to be approved by HR and
8  senior management first.
9      Q.  In your time at Regions, have you terminated
10  any other FRC's or FRS's?
11      A.  With the approval of HR, yes.  If I was told
12  to, based on whatever the decision from HR, based on the
13  findings, yes, I was told to terminate an associate.
14  Yes.
15      Q.  In your time at Regions, have you ever gone to
16  HR and said, "I need to terminate this associate"; and
17  did you seek HR's recommendation or approval?
18      A.  Yeah.  You have to provide the required
19  information pertaining to the reasons for termination;
20  but once it's officially determined by HR, then you can
21  deliver the termination.
22      Q.  Which associate on your team at Regions did you
23  go to HR and say, "I want to terminate this associate"?
24      A.  I really can't think of the names of the
25  associates that I've had to terminate exactly -- meaning

Robert Anthony Sanders

186

1  that it depends on if it's a violation, if it's an audit
2  issue, if it's a compliance issue, if it's a performance
3  issue.
4          But in that office, I probably had several
5  employees that we had to terminate.  Some of the cases,
6  HR would come and do the termination, not just me.
7      Q.  So, if you had wanted to terminate Jared
8  Ogburn, you at least knew of the process of what you
9  would need to do to start that?
10      A.  There was a process that you have to go through
11  HR, based on the incidents, the occurrences, and the
12  activity that determines termination.
13      Q.  So, is that a "yes," you were aware of the
14  process of --
15      A.  Right.
16      Q.  -- what you would need to do if you wanted to
17  terminate Jared Ogburn?
18      A.  Yes.
19          (Regions Exhibit O marked)
20      Q.  (By Ms. Staple) All right, Mr. Sanders.  I'm
21  handing you what's being marked as Regions Exhibit O.
22  I'll represent to you that this is Regions' Case
23  Resolution Form that discusses the investigation that
24  Regions conducted and its conclusions.  Have you seen
25  this document before?

Robert Anthony Sanders

187

1      A.  I don't recall seeing this -- this document
2  before.
3      Q.  Okay.  If you could, take a few minutes and
4  look through the document; and my questions are going to
5  be specific to and similar to what we talked about
6  before.  What I would like to know is if there's
7  anything in this document that you believe is false or a
8  mistake.
9      A.  I'm not understanding -- let me see.  How are
10  they -- the -- it's showing unsatisfactory work
11  performance in 5/3 of 2019.  I don't recall having an
12  unsatisfactory work performance --
13      Q.  Okay.
14      A.  -- but it's saying that here.
15      Q.  Okay.  And I'll represent to you I don't know
16  if this section that you're referring to is related to
17  you or if it's related to Dave Leonard; but you're
18  saying if this is related to you, that this section you
19  don't remember a verbal warning for unsatisfactory
20  performance?
21      A.  I don't.  So, he's citing this as a verbal
22  warning.  I don't recall ever having a conversation of
23  unsatisfactory performance and then the compliance
24  training, of course, is clearly outlined here from 2014,
25  but in this document, he's citing it as from May of 2019

Robert Anthony Sanders

188

1  to May of 2020, unsatisfactory performance and that he
2  gave me a verbal.  I don't recall that.
3      Q.  Okay.
4      A.  And if I recall, from my understanding, that
5  was at the beginning of the pandemic; and I do recall
6  that in 2020, there were certain guidelines for
7  performance that they were no longer measuring
8  associates because of the pandemic.  So, I don't know
9  how I would have been cited for unsatisfactory during a
10  pandemic.
11      Q.  Okay.  So, besides that reference to a verbal
12  warning from May 3rd, '19 to '20, if you could, review
13  the rest of this document; and my question is:  Is there
14  anything in here that you contend is false or
15  inaccurate?
16      A.  Okay.  This Issue Type 1 Description is an
17  untrue statement.  I've never retaliated.  I've never
18  treated customers unfavorably based on hours and days,
19  and I've never had an issue with any of my employees
20  working with our clients -- my clients and my -- my
21  team's clients.
22          This accusation of "smart remarks," I
23  disagree with that statement that's listed here.  I
24  don't know if this is what they are reporting or --
25      Q.  Yeah, and I'll represent to you, you're looking

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

189

1    at the box on page 3 --
2        A.  Okay.
3        Q.  -- called Incident Details and my understanding
4    is these are various things that were alleged or
5    reported.
6        A.  Okay.
7        Q.  And then the report goes through each of those
8    issues and discusses what was found related to that
9    issue in the investigation and then states a conclusion.
10       A.  Okay.
11       Q.  So, I believe you have to read --
12       A.  All right.
13       Q.  -- the narrative along with that.
14       A.  Okay.  And I will; but I can tell you right
15   now, even at the description, this is not a true
16   statement.
17           The second one is not a true statement.  I
18   never referred business to my wife's mortgage company
19   ever.  She would refer clients to come in and open
20   accounts with us and do secured loans to help build
21   their credit, but she never received business from us.
22           "Comes into work late" -- and, first of
23   all, there were times when I don't even get a lunch.
24   So, that's not a true statement.  "Treats" -- so, yeah,
25   anyway, these are all false accusations here.  So, yeah,

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

190

1    that's --
2            Okay.  And I think we went over most of
3    this already.  So, wherever you want to start, you can.
4        Q.  Okay.  So, my question is:  This report goes
5    through various issues that were reported and there are
6    statements in here representing what you had stated or
7    expressed during Regions' investigation.
8            And so, my question is:  Is there anything
9    in the narrative that's in this Exhibit P that you
10   contend was false, meaning that you did not -- you did
11   not say --
12       A.  Is this O or --
13       Q.  -- and that is not what you represented?
14       A.  I'm sorry.  This is O, right?  You said
15   Exhibit O?  You said Exhibit P, but --
16           MS. STAPLE:  Ma'am, are we on P or O?
17           THE REPORTER:  This Case Resolution Form
18   is Exhibit O.
19       Q.  (By Ms. Staple) Okay.  We're on Exhibit O.
20       A.  Okay.  So, all of the information that I've
21   already identified in here, I don't agree with any of
22   this in terms of -- this is -- these statements are not
23   accurate.
24       Q.  Is there a statement representing something
25   that you had told the investigators that is not

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

191

1    accurate?
2        A.  My statements to -- to -- is it Melanie that
3    was on this or -- because the information pertains [sic]
4    comments and accusations made against me, what I see in
5    terms of what's been listed here that I've said -- to
6    the best of my knowledge, what I've entered on here is
7    correct, the best of my knowledge.  The other statements
8    that are made about me alleged by Ms. Melissa Miranda, I
9    don't agree with.
10       Q.  Understood, and that answers my question.  You
11   can go ahead and put Exhibit O to the side.
12           (Regions Exhibit P marked)
13       Q.  (By Ms. Staple) And, Mr. Sanders, I'm handing
14   you what has been marked as Regions Exhibit P.  I will
15   represent to you that this is a script between Erin
16   Mummert and Dave Leonard related to talking points for
17   the meeting that they had with you regarding your
18   termination.  I know we talked about that a moment ago,
19   and you had mentioned that you had asked for a copy of
20   termination documentation.
21           Besides your request for that
22   documentation, is everything else in this e-mail
23   complete with what was discussed during that meeting?
24       A.  No, we didn't go over this much information.
25   The four categories that were mentioned were the expense

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

192

1    report, the fairness in terms of with associates, the
2    currency, and I forgot what the other one was.
3        Q.  Was it the cash --
4        A.  The expense report, the cash, yeah.  That was
5    the four areas that they mentioned at the time.
6        Q.  Did they state specifically that you violated
7    certain Regions policies?
8        A.  They asserted that I violated Regions policy.
9        Q.  Is there anything else that is in this e-mail
10   that was not communicated to you?
11       A.  As I mentioned before, there were only four
12   things mentioned to me at the termination.  There are
13   more than four items here that are outlining -- oh, the
14   other thing that I had mentioned earlier, they said that
15   they felt like I was being untruthful about my responses
16   to HR.  That was the four things that they said to me
17   when they terminated me.
18       Q.  And so I'm clear:  They did communicate to you
19   that you violated Regions policy, but they did not give
20   you specific policies that you had violated?  Is that
21   accurate?
22       A.  They were trying to assert that I violated
23   Regions policy by not showing fairness to treatment of
24   employees, but that was not true.  The currency -- I
25   didn't handle any currency.  That was not true.  The

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

193

1  expense report -- I did not violate expense report
2  policy.  That was not true.  I was open and honest and
3  truthful to my statements and responses to HR, and that
4  was true.  I was truthful to them, and they said that I
5  was not truthful.
6          MS. STAPLE:  Objection, nonresponsive.
7  Q.  (By Ms. Staple) My question was just a little
8  different.  My question is:  At the termination meeting,
9  was it communicated to you that you violated a Regions
10  policy, they just didn't tell you which policy that they
11  believed you had violated?
12      A.  The policy that I understood that day of
13  termination was that I violated the policy of treating
14  employees fairly and that was, I believe -- I guess, the
15  bereavement, but, again, that was a mistake.  That was
16  not a violation.  I didn't treat anyone indifferently.
17  So, that was my understanding at -- as I recall it.
18      Q.  I want to talk a little bit more about your
19  complaint that you made to Regions about Dave Leonard
20  and Melissa Miranda conspiring with Jared Ogburn.  Did
21  anyone from Regions HR department contact you and
22  interview that -- you about your complaint?
23      A.  I thought that was Nicole Cooper that -- when I
24  registered the complaint in February.  I can't remember
25  exactly how long it took them; but I was on the

194

1  conference call with Nicole Cooper, if I'm correct.
2      Q.  What was the contents of that conversation you
3  had with Nicole Cooper?
4      A.  I'll be very honest:  It was very disheartening
5  because it was really turned back on me that it was my
6  fault in terms of the process for applying for
7  positions, even after I gave factual information to her
8  regarding the times, the communications, the performance
9  reviews with Mary McDonnell, the communication with Dave
10  Leonard consistently about my interest in certain
11  positions; and I felt that the conversation was one of
12  saying that, "It was not their fault.  It was your
13  fault."
14          And when I mentioned the information about
15  the treatment of -- about the hiring practice of Jared
16  Ogburn, it was -- I just felt like everything was
17  discounted as to -- it was -- everything was just
18  vaguely addressed; and nothing was ever followed up on.
19      Q.  Did Nicole Cooper ask you about all of the
20  various components of your complaint, meaning she asked
21  you about your position application, she asked you about
22  Jared Ogburn, and she asked you about Melissa Miranda
23  during that conversation?
24      A.  I don't remember the entire conversation.  I
25  recall that we were -- we started out with my complaint

195

1  and it didn't take very long for her to go into the
2  information about the application for the different
3  positions and each time that I would try to explain
4  something related to that filing, I just felt like she
5  turned it back on me, that it was my fault.  It was my
6  fault.
7          I -- well -- even when I explained to her
8  about the interview that I experienced with Dave Leonard
9  where I constantly had to almost every week call him and
10  say, "When are we going to do an interview," and then
11  finally I get a phone interview which would -- lasted
12  maybe 15 or 10 minutes.
13          But there was no feeling of understanding
14  or trying to see the merit of what I was communicating.
15  There was no -- there was no request for additional
16  documentation.  There was no request for information or
17  other people's statements.  There was nothing.  It was
18  just -- it wasn't that lengthy of a call.
19          MS. STAPLE:  Okay.  Objection,
20  nonresponsive.
21      Q.  (By Ms. Staple) I just want to be clear:  Did
22  Ms. Cooper ask you about all the elements of your
23  complaint, meaning the positions, Dave Leonard and Jared
24  Ogburn and Melissa Miranda?
25      A.  I don't recall exactly what Nicole Cooper --

196

1  what she touched on exactly; but I do recall knowing
2  that we talked about the branches, my applications.  So,
3  whether she went into everything, I don't recall that
4  being addressed very clearly.  I don't recall.
5      Q.  Besides that conversation with Nicole Cooper,
6  were you contacted by anyone else in Regions OAC related
7  to your complaint?
8      A.  I don't remember receiving any additional phone
9  calls.
10      Q.  Did you ever receive notification on how your
11  complaint was being resolved?
12      A.  I don't recall receiving any documentation of
13  it.  I don't remember.
14      Q.  After your -- well, let me ask:  Was your
15  termination from Regions June 3rd, 2021?
16      A.  Correct.
17      Q.  Following June 3rd, 2021, did you take any time
18  off before you looked for a new job?
19      A.  Prior to June?  I'm sorry.  Say that again.
20      Q.  Sure.  After your termination from Regions --
21      A.  After.
22      Q.  -- on June 3rd, 2021, did you take any time off
23  before you started your job search?
24      A.  I was -- I mean, I don't -- I can't call it
25  time off.  I was -- I was terminated.  I wasn't working.

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

197

1    Even though my wife wanted me to take time off, that is
2    just not in my nature in who I am.  I immediately
3    started contacting recruiters and other people as far as
4    getting back into the banking industry.  I didn't waste
5    any time.
6        Q.  Which recruiters did you contact?
7        A.  I have -- I have to get her name and
8    information but I have one recruiter that she deals only
9    with small banks and with banking industry and it's more
10   for management and vice president positions but I worked
11   with her plus my LinkedIn and other people that I know
12   in the market as far as banking, but I -- I didn't waste
13   any time as far as applying for other positions.
14       Q.  So, June 4th, 2021, you started your job
15   search?
16       A.  I can't remember the exact date I started.  I
17   know I had to wait a certain time frame before I could
18   start claiming unemployment; but my wife wanted to
19   encourage me to take some time off, you know, just --
20   unfortunately, because of all of this, I have -- I have
21   high blood pressure now.  My doctor has diagnosed me
22   with depression, anxiety.  Even before I was terminated
23   by Regions, I started having panic attacks; and my
24   doctors provided me with medication.
25       So, I didn't want to -- how should I

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

198

1    say -- my wife wanted me to relax and rest; and I just
2    wanted to kind of -- I've always worked.  I've never had
3    an issue with employment but my spouse wanted me to take
4    some time off, but I didn't want to.
5        Q.  How long -- excuse me.  How long after
6    June 3rd, 2021 did you wait before starting your job
7    search?
8        A.  I think my -- my research started pretty much
9    immediately.  I didn't -- I didn't want to waste any
10   time, meaning that I put -- I would reach out to
11   recruiters.  I can't say exactly what my time frame was
12   when I started doing applications, but I know that I
13   didn't waste any time as far as even looking at
14   insurance companies as an insurance agent.  I've talked
15   to Center of Influences about getting into the insurance
16   industry.  So, I didn't waste any time.
17       Q.  Mr. Sanders, I would ask that you provide your
18   attorney the name of the recruiter that you testified
19   about --
20       A.  Sure.
21       Q.  -- who works in the banking industry.
22       A.  I will.
23       Q.  Besides her, did you formally work with any
24   other recruiters, meaning did any other recruiters
25   submit applications or résumés on your behalf?

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

199

1        A.  She was my primary one.
2        Q.  Were you looking for jobs just in the banking
3    industry, or were you looking at other industries as
4    well during your job search?
5        A.  That's my desired industry.  I've always kept
6    my focus on banking management.  I've been a retail
7    merchandising buyer, but banking is where I have a
8    passion and desire for.  So, it was only directly
9    related to banking; and I've also researched
10   opportunities as a commercial relationship manager,
11   commercial banker.  So, I didn't just not limit -- I
12   didn't limit myself just to branch manager.  I looked at
13   all -- all areas of opportunity.
14       Q.  My understanding is that you eventually found a
15   position -- position with Texas Citizens Bank --
16       A.  That is correct.
17       Q.  -- is that correct?
18       A.  That's correct.
19       Q.  How did you apply to Texas Citizens Bank?  Was
20   that a paper application or online?
21       A.  That was through a recruiter.  That was the
22   recruiter that I'll have to get the information on, but
23   she found the position for me.  She actually found two
24   positions for me, and that was the one that I -- I went
25   for.

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

200

1        (Regions Exhibit Q marked)
2        Q.  (By Ms. Staple) All right, Mr. Sanders.  I am
3    handing you what's being marked as Regions Exhibit Q.
4    Just take a look, and let me know when you're ready.
5        A.  Okay.
6        Q.  Is this a copy of an employment application you
7    completed for Texas Citizens Bank?
8        A.  That would look about right.
9        Q.  On the second page of this document, is that
10   your signature at the bottom of the document?
11       A.  It is.
12       Q.  And looking at the front of the document, it
13   looks like you were applying for a loan officer
14   position.  Was that a position that was advertised?
15       A.  If I remember correctly, actually, no, it was
16   not.  The position that they were interviewing me for
17   was a branch manager position.  If I remember correctly,
18   it was a Rosenberg location; and after the interview
19   with Nick Fox -- who was my boss, my hiring manager.
20   He's a senior relationship manager or officer -- they
21   created a position for me because of my experience that
22   they wanted me on board with.  So, they -- they felt
23   that I was overqualified for the branch manager
24   position.
25       Q.  So, was someone else selected for the branch

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

201

1    manager position?
2        A.  No.  They offered me another position as an
3    officer.
4        Q.  So, do you know if anyone has filled the
5    Rosenberg branch manager position?
6        A.  Oh, yeah.  Actually, around the same time when
7    I accepted this position, they hired someone else for
8    the other position.
9        Q.  And what did you do as a loan officer?
10       A.  I was a -- directly in support of Nick Fox, who
11   was the senior lead relationship manager.  I worked with
12   him on his portfolio, building and maintaining existing
13   relationships.  He probably had more than
14   250-million-dollar portfolio of commercial clients that
15   we worked on as far as their accounts, adding new
16   relationships.  So, I was basically a commercial loan
17   officer with him.
18       Q.  And it looks like on the application, you
19   listed your desired salary as $75,000.  Why did you
20   choose that number?
21       A.  That was -- the actual branch manager position
22   was less than this; and so, for them to give me even
23   close to this range, they wanted me in this position as
24   a relationship manager because the branch manager
25   position was much, much less.

Robert Anthony Sanders

203

1    during that time.
2            It might have been due to traveling with
3    my family that I couldn't start until the 20th versus
4    when I did the application on the 8th.  I just needed
5    time to get prepared and I think part of it was
6    attributed to the commute there in Pasadena and I live
7    in Missouri City.  So, I wanted to make sure as far as
8    commute where I would be going as far as training.
9        Q.  And when you said you were on vacation with
10   your family, where did you go and for how long?
11       A.  I couldn't tell you.  I mean, we had several
12   trips we probably took in 2021.  Actually, in November
13   of 2021, we went to -- went to Dubai and I forget what
14   other trips we had prior to that.  I'd have to look at
15   my calendar.  I don't remember.
16       Q.  Yeah.  If you could preserve your calendar for
17   2021 showing all your vacation dates, I would ask you to
18   give that calendar time frame to your attorney.
19       A.  Sure.
20       Q.  Besides Dubai and a trip in September of 2021
21   related to your Texas Citizens start date, did you take
22   any other vacations?
23       A.  We went to San Diego, California.  We went to
24   Lake Tahoe, but I just have to look at the actual
25   timeline.  I think all those trips were in 2021, but I

Robert Anthony Sanders

202

1        Q.  Did you ever have a conversation with Texas
2    Citizens about your former salary at Regions to see if
3    they would get closer to your former salary?
4        A.  Yes, they knew my former salary.
5        Q.  What was the result of that conversation?
6        A.  They were capped.  That's why they created this
7    position here.  They wanted me a part of the company.
8    So, that's why they had me as a relationship manager
9    instead of a branch manager because they could not come
10   close to the salary that I was at Regions Bank.
11       Q.  And it looks like on the front of the
12   application under the Desired Employment section, you
13   indicated date you can start is 9/20/20, which I'm
14   assuming that was 2021; is that right?  So, that was a
15   typo?
16       A.  It should have been 2021.  That's a typo.
17       Q.  Okay.  And then on the back, it looks like you
18   signed the application on 9/8/20.  Is there a reason
19   that you applied on 9/8/20, but indicated you couldn't
20   start until 9/20?
21       A.  I'm not really sure.  Like I said, this must --
22   I don't know why it's showing -- I was with Regions
23   2020.  So, maybe it's how they entered the actual dates
24   with the slashes, but I think at this time since I was
25   already -- I can't remember exactly what was happening

Robert Anthony Sanders

204

1    can't give -- I'll have to get my calendar for the exact
2    dates.
3        Q.  And then on the back of your application,
4    there's a check box asking, "May we contact your
5    supervisor?"
6            And you checked, "Yes."
7            That would have been Dave Leonard,
8    correct?
9        A.  Where is that one?
10       Q.  It's on the second page.  It's about four boxes
11   down under Work Background on the left.
12       A.  Yes.  I guess it would have been.  It would
13   have been Dave Leonard or HR.
14       Q.  Okay.  So, you indicated, yes, they could
15   contact Dave Leonard who you claim discriminated against
16   you?
17       A.  For reference, I had no problem with anyone
18   calling for my background check or information from my
19   previous employer.  I had no reason to hide that.  So,
20   no.  I am going to check, "Yes.  You can call my
21   previous employer, yes."
22           (Regions Exhibit R marked)
23       Q.  (By Ms. Staple) Mr. Sanders, I'm handing you
24   what's being marked as Regions Exhibit R; and as you
25   review this, my question is:  Is this a true and

Robert Anthony Sanders

205

1  accurate copy of the résumé that you provided to Texas
2  Citizens Bank with your application?
3       A.  It looks to be correct.
4       Q.  All right.  And you can go ahead and set that
5  to the side.
6            (Regions Exhibit S marked)
7       Q.  (By Ms. Staple) And I'm handing you what is
8  being marked as Regions Exhibit S.  Please go ahead and
9  review, and let me know when you're ready.
10      A.  Okay.
11      Q.  I'll represent to you this is a series of
12 e-mails we received from Texas Citizens Bank related to
13 your hire.  Do these e-mails accurately characterize the
14 terms of your employment with Texas Citizens?
15      A.  It looks to be correct; and, actually, on the
16 second page, if I'm correct, that's the recruiter that I
17 work with on the second page.
18      Q.  Okay.  You're referring to Tammy Rinaldi?
19      A.  Yes, that's correct.
20      Q.  Okay.  And you testified she was your primary
21 recruiter that you used?
22      A.  She was the one, yeah, my primary contact as a
23 recruiter.
24      Q.  Did she submit your résumé or applications on
25 your behalf to any other employ -- prospective

Robert Anthony Sanders

207

1  Bank?
2       A.  My position was eliminated, yes.
3       Q.  What was your last day of employment with --
4       A.  That would --
5       Q.  -- Texas Citizens Bank?
6       A.  -- that would have been February the 4th.
7       Q.  And in Exhibit T on the first page toward the
8  bottom of the page, there's an "A" and then a "1" and it
9  says Severance Payment and it says the bank will pay you
10 $6,250 as a severance payment, which represents
11 four weeks of your regular pay.  Did you receive that
12 severance payment?
13      A.  I did.
14      Q.  Did you sign a release of claims to receive it?
15      A.  Yes, I did.
16      Q.  And following your termination from Texas
17 Citizens Bank, did you apply for unemployment
18 compensation?
19      A.  I had to wait for the time frame to expire
20 because I received severance, but I had to wait before I
21 could submit the claim.
22      Q.  And did you receive unemployment?
23      A.  I did, after whatever time allowance expired.
24      Q.  Did you also apply for unemployment
25 compensation after your Regions termination?

Robert Anthony Sanders

206

1  employers?
2       A.  I don't know how many she submitted to.
3  Anytime that she found an interest for me, she would get
4  my permission.  I don't know how many she submitted to,
5  though.
6       Q.  Do you have records of giving her permission to
7  submit your materials, such as e-mails or messages or
8  text messages?
9       A.  No, they were conversations.  So, no, I don't
10 have records of that.
11           (Regions Exhibit T marked)
12      Q.  (By Ms. Staple) Mr. Sanders, I'm handing you
13 what's being marked as Regions Exhibit T.  If you can,
14 take a look; and let me know when you're ready.
15      A.  Okay.
16      Q.  Do you recognize this document that's
17 Exhibit T?
18      A.  Uh-huh, yes.
19      Q.  And what is it?
20      A.  This is where Texas Citizens Bank was acquired
21 by b1Bank out of Baton Rouge, Louisiana.  Through that
22 acquisition and merger, there were several positions
23 with Texas Citizens Bank, mine included, basically, that
24 were being eliminated.
25      Q.  And so, were you laid off from Texas Citizens

Robert Anthony Sanders

208

1       A.  I had to wait for a certain time frame before I
2  could apply for unemployment benefits.
3       Q.  Did you eventually apply for unemployment
4  benefits after your Regions termination?
5       A.  I did.
6       Q.  Did you receive them?
7       A.  I did.
8       Q.  How much did you receive in unemployment
9  benefits from the time you were terminated from Regions
10 to the time you started at Texas Citizens Bank?
11      A.  I don't know the exact dollar amount.  I think
12 it was biweekly, but I can't remember the exact
13 amounts -- like, a thousand dollars, roughly.
14      Q.  My understanding is you found employment after
15 Texas Citizens Bank at Cadence Bank; is that correct?
16      A.  That is correct.
17      Q.  How did you apply to Cadence Bank?
18      A.  Through multiple applications that I submitted
19 online.  I found Cadence Bank through LinkedIn, if I'm
20 correct, is when I found their -- their position.
21      Q.  When you say you applied to Cadence Bank
22 through multiple online applications, were those
23 applications that were directly on Cadence Bank's
24 website?  Were those Workday?  Were those LinkedIn
25 applications?

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

209

1    A.  I would go through LinkedIn looking for the
2    desired positions but all banks that I was -- I probably
3    applied to every one that I can recall but when I found
4    the position on LinkedIn for Cadence, I went to Cadence
5    Bank's website and I entered the job request information
6    and I submitted my résumé and applied for the position.
7        Q.  Do you still have access to the account you
8    used on Cadence Bank's website to submit your
9    application?
10       A.  I don't know if I have a copy of that
11   information.
12       Q.  Was this an application for Cadence Bank where
13   you had to create a user name and log-in and then go in
14   and complete an online application?
15       A.  I think I did through that link -- the portal
16   because pretty much every bank now requires that you do
17   a user ID and password when you do applications.  So,
18   I'm sure I had to -- I had to fill one of those out,
19   also.
20       Q.  I would ask that, because we requested your job
21   search documentation, if you could go into your user
22   name and password for Cadence Bank and any other
23   accounts that you had created to submit applications and
24   then download your applications and provide those to
25   your attorney, we would request those.

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

210

1        A.  Okay.  And I don't have a history.  I don't
2    keep that kind of record.  If I apply for a position, if
3    I'm -- I try to keep as much as I can.  Unfortunately
4    with the divorce, there are certain documentation that's
5    in my dwelling that I have -- I cannot get access to.
6        But if I didn't get a position with an
7    entity or a bank, I didn't retain that information; but
8    I applied numerous applications.  I mean -- because I
9    have to complete my -- my log for my Texas Workforce
10   Commission on my entries, but I don't know how much of
11   that information is still retained.
12       Q.  Sure.  And I would just ask that because we
13   requested all your job search info, any documents that
14   you have in print or any log-ins that you have where you
15   can actually still go in and access your application and
16   download it, we would ask that you go through and do
17   that and provide that all to your attorney.  I
18   understand what you're saying about maybe not being able
19   to access documents in the marital home.
20       A.  Yeah.  I -- it's going to be impossible for me
21   to go through all the banks and companies that I've
22   applied for and get the user ID and information what I
23   set up because I don't -- I didn't -- I didn't retain
24   that information.  There was no need for me to retain
25   that if I didn't get the position.  I'm not going to

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

211

1    keep unnecessary information on where I'm applying for
2    applications if I get denied the position or somebody
3    else gets it or I go through two interviews.  I keep as
4    much as I can on record; but if my application was not
5    received or I did not get an interview, I didn't retain
6    that -- all that information.
7        Q.  Okay.  I think we'll let --
8        MS. STAPLE:  Eddie, can you address this
9    afterward with Mr. Sanders where we can talk about it?
10       MR. HODGES:  (Moving head up and down).
11       Q.  (By Ms. Staple) At Cadence Bank, who's your
12   supervisor?
13       A.  My direct supervisor is John Klipka,
14   K-L-I-P-E-K-A [sic].
15       Q.  What is John Klipka's title?
16       A.  He is a senior consumer manager -- senior
17   consumer manager.
18       Q.  What is your title at Cadence Bank?
19       A.  I'm a branch manager for it, vice president.
20       Q.  What is your branch location?
21       A.  I'm at 1333 West Loop South, Houston, Texas
22   77027.
23       Q.  Would that be considered Galleria area or --
24       A.  It's the Galleria area.  It's at Post Oak or --
25   and 610.

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

212

1        Q.  What was your date of hire at Cadence Bank?
2        A.  November 28th, 2022.
3        Q.  Do you receive a salary?
4        A.  I do.
5        Q.  In what amount?
6        A.  My annual salary is 95 -- 95,000.
7        Q.  Do you participate in any bonus plans?
8        A.  They have a 401(k), but I'm just getting
9    started.
10       Q.  In terms of extra compensation that you can
11   receive like incentive pay, is there a bonus plan
12   related to incentives or meeting metrics?
13       A.  There is an incentive plan.  The payout,
14   depending on production -- I think the average payout is
15   about 15 quarterly.
16       Q.  Is that 15,000 quarterly?
17       A.  No, 1500 quarterly.
18       Q.  1500.  Have you received any of those bonuses?
19       A.  I just started with them.  Not yet.
20       Q.  Besides a 401(k), does Cadence Bank offer you
21   any other benefits?
22       A.  Health, medical, vision, dental.
23       Q.  And you are still employed with Cadence Bank
24   today; is that correct?
25       A.  That is correct, yes.

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

213

1    Q.  Since you started at Cadence Bank, have you
2  discontinued your job search?
3    A.  I have, yes.
4    Q.  Other than the vacations that we've talked
5  about, were there any days or time periods from your
6  termination from Regions on June 3rd, 2021 through the
7  time you started at Texas Citizens that you were unable
8  or unwilling or unavailable to work?
9    A.  I was always available to work.  I was always
10  searching for work.
11    Q.  So, there were no periods of illness when you
12  would not have been able to work?
13    A.  I don't recall having a period where I could
14  not work.  I was always available to work.
15    Q.  Were there any time periods between your
16  Regions termination and starting at Texas Citizens when
17  you were unavailable to work because of child care?
18    A.  I would say, no, but my wife would always
19  continue to encourage me to be at our home with our
20  daughter who is now 22 that has Down syndrome and I am
21  pretty much her primary care provider.  She is always
22  with me and I always care for her, but we do have other
23  ways of making sure that she's taken care of when both
24  of us are working.
25    Q.  Okay.  So, had you received a job offer and had

Robert Anthony Sanders

214

1  to report to work, you would have had other child care?
2    A.  Yeah, we would have found other ways.  I would
3  have been available to work.
4    Q.  Mr. Sanders, my understanding is that you filed
5  a charge with the Equal Employment Opportunity
6  Commission and that you initially filed it May 27th of
7  2021 and then amended it after your termination on
8  June 17th, 2021.  Do you have any knowledge of who at
9  Regions received your EEOC charge -- in other words, who
10  was it served to at Regions?
11    A.  I don't know.  That would have been through my
12  attorney.
13    Q.  And then my understanding is that you received
14  a notice of right to sue from the EEOC; is that correct?
15    A.  That would have been -- yes.  That would have
16  been through my attorney.
17       (Regions Exhibit U marked)
18    Q.  (By Ms. Staple) All right, Mr. Sanders.  I'm
19  handing you Regions Exhibit U, and I will represent to
20  you that this is a copy of the petition which is your
21  lawsuit that you have filed in court.  If you'd like,
22  take a few minutes to look through it; and then I have
23  some specific questions about some of the allegations in
24  your petition.
25    A.  Okay.  You can go ahead.  I recall this

Robert Anthony Sanders

215

1  document.
2    Q.  Okay.  On the second page of the document,
3  under paragraph 9, it says throughout your employment
4  with Regions you "suffered disparaging and
5  discriminatory acts, directly from Dave Leonard ... the
6  new Consumer Banking Manager."
7       Other than what we've already talked about
8  today, are there any other disparaging or discriminatory
9  acts by Dave Leonard that we haven't talked about that
10  you are alleging?
11    A.  I can't think of anything else right now at
12  this time.
13    Q.  Okay.  And then paragraph 14 on page 3
14  references the Sienna Plantation position that we talked
15  about; and it says, "Defendant confirmed that they would
16  inform him when the position becomes available."
17       What individual or individuals did you
18  mean by "defendant"?
19    A.  Mary McDonnell and Dave Leonard.
20    Q.  And then in paragraph 16, still talking about
21  the position, it said that you were under the impression
22  you would "receive an invitation to apply."
23       Who gave you that impression that you
24  would receive an invitation?
25    A.  Mary McDonnell and Dave Leonard.

Robert Anthony Sanders

216

1    Q.  And then in paragraph 20 -- this is on
2  page 4 -- it talks about your career in banking and that
3  you've been "successful in opening more than 10 new
4  Denovo locations for other financial entities."
5       Which entity or entities are you referring
6  to there?
7    A.  First bank would have been Hibernia Bank, which
8  became Capital One.  One, two, three, four -- probably
9  five or six locations that I was fortunate to work for
10  as a new de novo.
11       When I first started my career with Bank
12  One -- that was Chase Bank now -- I had a new de novo
13  location in Allen, Texas.  Let's see.  BB&T would have
14  been one that was new.  Prior to that with Viewpoint
15  Bank -- I don't recall which locations they were but I
16  had another location that I worked with there that was a
17  new de novo, but primarily, the majority of it would
18  have been with Capital One and Hibernia Bank.  I worked
19  several branches that were brand-new locations for that
20  organization.
21    Q.  Turning to page 6 and looking at paragraph 31,
22  this represent -- or references a conversation that you
23  had with Nicole Cooper and Melody Bodine and questions
24  from Nicole Cooper, and it says that Ms. Cooper asked
25  you, "'Why was it Leonard's responsibility to remind you

Robert Anthony Sanders

217

1  of the open branch manager position?'  'Why would
2  Leonard need to inform you of meeting with Ogburn for
3  lunch?'"
4         What were your answers to Ms. Cooper to
5  these questions?
6     A.  Her questions to me -- I guess, my questions to
7  her when she first said, "Well, why was it Dave
8  Leonard's responsibility" -- and when I communicated
9  back with her when this all started with Mary McDonnell
10  before Dave Leonard took over, our first meeting with
11  Dave Leonard, I continued to express my interest in when
12  the posting for the Sienna Plantation -- as far as me
13  being a considered for that branch.  I would constantly
14  follow up with him consistently until I knew that, I
15  guess, I would get the opportunity to apply for it.
16         When it came to the interactions between
17  him and Jared Ogburn, I addressed the concern with
18  Nicole Cooper; but there was no response as to the
19  nature of why would my boss CBM Dave Leonard be meeting
20  with Jared Ogburn with -- I guess, without my
21  understanding of the meetings.  I guess
22  we addressed that, but I didn't get any clarification as
23  to why these things took place.
24     Q.  Did you ever complain to Earl Connell about
25  Dave Leonard?

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

218

1     A.  No.  At the time, I had never really heard from
2  Dave -- from Earl Connell.  He never communicated with
3  my branch.  I never received any communication from him
4  and after the complaint was filed, I think a couple of
5  months later, I started getting communication from Earl
6  Connell checking in to see how we were doing and how
7  things were going in the branch and I had never heard
8  that before, but I never complained to him directly.  I
9  never had a relationship with Earl Connell to have a
10  communication with him.
11     Q.  Did you ever complain to Earl Connell about not
12  being selected for the positions we talked about today?
13     A.  I never had the opportunity to talk to Earl
14  Connell.
15     Q.  And if we turn to page 8 in paragraph 44, it
16  references that you never received any disciplinary
17  write-ups.  That's false, correct?  We talked about --
18     A.  Which line again?
19     Q.  Paragraph 44.  At the end of that statement, it
20  says that you never received any disciplinary write-ups.
21  Is that false, based on what we talked about today?
22     A.  Yeah, that would be false, based on the
23  write-up for not completing the course and the one from
24  the Regions operations manager.
25     Q.  And turning to page 10 in paragraph 61, at the

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

219

1  start of paragraph 61, it references a December 4th,
2  2020 internal complaint of discrimination and
3  harassment.  Who was that complaint made to?
4     A.  I'd have to go back and check my records on
5  that one.
6     Q.  Okay.  Do you recall making a complaint to the
7  OAC or HR on December 4th, 2020?
8     A.  It could have been, yes; and I think that was
9  in relations to the Jared Ogburn and Dave Leonard
10  activity.  I don't recall who it was reported to; but,
11  yeah, I do recall making that.
12     Q.  You don't remember to whom, though?
13     A.  I just don't remember all the details.
14     Q.  So, you don't remember if it was to HR or to
15  someone else?
16     A.  I don't remember exactly who it was to or
17  who -- how it was communicated; but, yeah, I do recall
18  that's something I did bring up.  I just don't recall
19  who in HR that I'd spoken about the information.
20     Q.  Okay.  And do you have any evidence that Dave
21  Leonard knew that you filed an EEOC charge?
22     A.  I don't know what Dave Leonard has.  I can't
23  say that I have evidence that he knows that I filed for
24  these charges.  I don't -- I don't -- I have no way of
25  knowing that.

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

220

1         (Regions Exhibit V marked)
2     Q.  (By Ms. Staple) Mr. Sanders, I'm handing you
3  what's being marked as Regions Exhibit V.  I will
4  represent to you these are answers to Regions
5  interrogatories to you and then you provided some
6  supplemental answers as well and those are also included
7  in this document.  Please take a moment and look things
8  over, and I have some specific questions on certain of
9  the interrogatories.  Just let me know when you're
10  ready.
11     A.  You can go ahead.
12     Q.  Okay.  So, toward the back of the document is
13  the supplementation you provided and the
14  second-to-the-last page, it says Interrogatory No. 3 at
15  the top of the page and this interrogatory was asking to
16  identify all the employment or work that you have
17  sought.  Is the list provided here a complete and
18  accurate list of all the job applications you've
19  submitted to all entities?
20     A.  This is what I provided to my attorney.
21  There -- it could be a lot more than this because there
22  are records that I have in my home that I have no access
23  to, but I tried to include everything in its entirety on
24  where I applied and who I applied with.
25     Q.  And for these entities that are listed, most of

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

221

1    them are banks or credit unions. Have you gone into
2    their online portals for those that you applied to
3    online and seen if you could log in and put in your
4    password and still download your application?
5         A.  No.  I have no way -- like I said, I didn't
6    retain information and history on everywhere I applied
7    for, meaning that I didn't keep a running history.
8    There was no need -- for the Texas Workforce Commission,
9    there was no need for me to keep that type of data.  So,
10   there no reason for me to collect that information.
11        So, I applied numerous times, submitting
12   my résumés to everywhere and different banks all over.
13   There are banks on here that are not -- that I've
14   submitted to that I may have a copy of the website.  I
15   probably could clip a copy of that but that information,
16   like I said, I have no access to but, yeah, this is a --
17   a good gauge on what I've submitted, but there is more
18   than this.
19        Q.  Okay.  And I'll just represent to you,
20   Mr. Sanders, that a lot of times a company, when you
21   apply online, will use a software like Workday or
22   another application --
23        A.  I understand that --
24        Q.  -- system --
25        A.  -- correct.

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

222

1         Q.  -- an ATS; and so, for these entities that are
2    listed where you know that you've applied, my question
3    is:  Have you actually gone in and seen if you can still
4    access through your log-in and password all your past
5    applications?  Have you done that?
6         A.  No.  No, I have not.
7         Q.  All right.  Turning the page to the
8    second-to-the-last page, provided a response, a
9    supplemental response to Interrogatory No. 6, and you
10   provided a damages model.
11        And the first component, you list back pay
12   and front pay; and you list attorney's fees, mental
13   anguish.  The fourth one is out-of-pocket 401(k) and
14   you've listed $194,000 and you're stating that you were
15   forced to withdraw it from your 401(k).
16        Earlier, you testified to $10,000 of that
17   that went to support a family member.  What else have
18   you used the remaining $184,000 of your 401(k) for?
19        A.  Okay.  The best way I can probably explain
20   this:  At the time that this wrongful termination takes
21   place, I'm going through a very egregious process of a
22   divorce after 20 years of marriage where all assets, all
23   funds have been taken away from me by my wife.  I have
24   accounted for over $500,000 that she's displaced from
25   our joint accounts that I have no access to.

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

223

1         The only money that I had at the time I
2    was wrongfully terminated by Regions Bank was my 401(k).
3    If I didn't have that, I'd have no other way to pay my
4    mortgage, to pay my bills.  Every month since I was
5    wrongfully terminated, yes, I received unemployment
6    benefits but I still have to pay for my day-to-day
7    expenses.
8         And so, for attorney's fees, I've had to
9    hire two different attorneys for the divorce.  That has
10   cost me over $70,000, not including the funds that I've
11   had to pay in attorney's fees for this matter.  For my
12   doctor's expenses, my credit cards, I just -- I am well
13   in excess of what I had; and my 401(k) has been wiped
14   out and eliminated.  It's taken me two years to get to
15   this day where we are right here.  Everything I've ever
16   had is gone.
17        Q.  So, following up on that, Lida Thomas -- was
18   she the primary breadwinner in your relationship,
19   generally?
20        A.  She was.
21        Q.  And so, if I'm understanding your testimony,
22   she has frozen certain accounts.  Were those accounts
23   that only she was on --
24        A.  She --
25        Q.  -- or that you were both on?

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

224

1         A.  Not frozen.  What my wife has decided to do --
2    I don't know the exact timeline -- she opened up another
3    account at Bank of America where the majority of her
4    assets were directed to that account where I could not
5    see them.
6         Anytime that she had a surplus -- my wife,
7    on an annual basis, would make about 300,000.  I would
8    make about a hundred when I was with Regions.  Of the
9    300 that she received, she splits half of that with her
10   brother who is in business with her.  His name is Lloyd
11   Daniel, and I've already talked to accountants and
12   everyone else.
13        And what's happening is she has been
14   gifting him money for years to split the -- in other
15   words, he makes a hundred thousand on the books as a
16   branch manager.  She's the MLO.  She's the breadwinner
17   for the business.  It's her business.  It's her company.
18   She makes 300.  He makes a hundred.  The four hundred,
19   they combine as W-2 income; and they -- and they split
20   it between each other.
21        In addition to that, she has acquired
22   commercial property that she put in her father's name,
23   Chandy Daniel, to get away from community property.  She
24   told me that she did that because she didn't want her
25   brother's wife, who is a doctor, to go after her

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

225

1  business assets; but it was in protection so that when
2  she filed for divorce, that she thought it would be
3  omitted from this community property of our divorce.
4       That being said, before she filed for
5  divorce and -- I think it was the beginning of 2022,
6  she -- or, actually, it was maybe around the time I left
7  Regions or I separated from Regions -- or terminated
8  from Regions, she started taking the excess funds that
9  she would make every month and putting it in an account
10  that I could not see. So, I had no access to it.
11       Q.  Okay. So, I have a couple of follow-up
12  questions. That's a lot of money. My understanding is
13  you were terminated from Regions at the beginning of
14  June, and you started at Texas Citizens Bank in
15  September --
16       A.  Right.
17       Q.  -- of 2021. So, that's four months. So, what
18  were your living expenses during those four months
19  before you found new employment? You mentioned a
20  mortgage. How much was that per month?
21       A.  My mortgage is $5,035, something like that --
22  40 -- $48 a month.
23       Q.  What were your other living expenses for those
24  four months?
25       A.  Three car notes.

Ross Reporting Services, Inc.                281-484-0770

Robert Anthony Sanders

226

1       Q.  Whose cars are those?
2       A.  Right now, all the cars and vehicles are titled
3  under her name.
4       Q.  How much do the car notes total per month?
5       A.  Fourteen -- we'll say $2,000 between three
6  cars.
7       Q.  What are the cars, the make and models?
8       A.  2018 Tahoe; 2022, I don't remember what class
9  it is, BMW; and 2022 Toyota GR8 that my son -- I guess
10  she gave to my son.
11       Q.  So, your son drives the Toyota?
12       A.  Uh-huh.
13       Q.  Does Lida drive the BMW?
14       A.  Correct.
15       Q.  And do you drive the Tahoe?
16       A.  Yes.
17       Q.  Okay. So, there's mortgage. There are three
18  car notes. What other living expenses did you have in
19  those four months between Regions and Texas Citizens?
20       A.  Credit card debt.
21       Q.  How much credit card debt did you incur?
22       A.  I have over 70,000.
23       Q.  What items or services did you purchase that
24  constitutes that 70,000 in credit card debt?
25       A.  I'd have to give you the entire statements of

Ross Reporting Services, Inc.                281-484-0770

Robert Anthony Sanders

227

1  each one. You can see the activity.
2       Q.  Were those for other living expenses like food,
3  utilities; or were those for --
4       A.  Food, utilities. I'll never do that ever
5  again, using a credit card to pay utility bills.
6       Q.  Anything besides food and utilities?
7       A.  That's pretty much about it.
8       Q.  So, from June to September of 2021, you
9  incurred $70,000 in food and utilities? There's nothing
10  else?
11       A.  I can't think -- I can't think of the activity
12  on each one of the cards, but --
13       Q.  Have you provided all of your itemized credit
14  card statements to your attorney?
15       A.  I think there's more that my attorney is
16  waiting for right now that I have to get.
17       Q.  Besides the mortgage, car notes, and credit
18  card charges, what else did you use your 401(k) money
19  on?
20       A.  Medical expenses.
21       Q.  Were those for you or a family member?
22       A.  That was for me and my family.
23       Q.  Were those for your -- for your children?
24       A.  For me and my children; and that's part of the
25  extra credit card expenses, too. Most of our

Ross Reporting Services, Inc.                281-484-0770

Robert Anthony Sanders

228

1  counseling, most of my doctor's appointments and medical
2  bills went under credit cards, also.
3       Q.  Following your termination from Regions, did
4  you take COBRA continuation for your health plan?
5       A.  I did not, no.
6       Q.  Were you on someone else's health plan after
7  your Regions termination?
8       A.  I think my wife did insurance under her name
9  for me and the kids.
10       Q.  When you worked at Regions, were you on
11  Regions' plan; or were you on Lida's plan?
12       A.  No. When I work at Regions, the entire family
13  was under my plan.
14       Q.  So, after your termination from Regions, Lida
15  then added you to her health plan?
16       A.  Correct.
17       Q.  Are you currently still on Lida's health plan?
18       A.  No.
19       Q.  When you started at Texas Citizens, did you go
20  on Texas Citizens' health plan?
21       A.  Yes, I did.
22       Q.  And then after your termination from Texas
23  Citizens, did you go back on Lida's health plan?
24       A.  I want to say, yes; and then she terminated the
25  insurance policy in October of last year. So, yes, in

Ross Reporting Services, Inc.                281-484-0770

Robert Anthony Sanders

229

1  February to October, I was under her health coverage;
2  and then from October to November, I had no health
3  coverage.
4      Q.  And then in November of 2022, did you get
5  coverage with Cadence Bank?
6      A.  Yes, which include my son Aaron Sanders and
7  daughter Asha Sanders.
8      Q.  Besides mortgage, car notes, credit card debt,
9  and medical expenses and divorce attorney expenses and
10  expenses for Kennard Law, is there anything else you
11  spent your 401(k) money on -- and your family member
12  assistance of $10,000?  Is there anything else?
13      A.  I can't think of anything else, no.
14      Q.  Is there any portion of funds from your 401(k)
15  that you pulled out that you have not yet spent?
16      A.  I wish; but, no, I don't have anything left.
17      Q.  Are you claiming emotional distress damages in
18  your lawsuit against Regions?
19      A.  Yes.
20      Q.  What symptoms of emotional distress do you
21  contend you have?
22      A.  I think at the doctor's or counselor's
23  information, I was diagnosed with PTSD, depression.  My
24  one doctor, Dr. Patel, put me on anxiety medication.
25      Before I was wrongfully terminated by

Ross Reporting Services, Inc.        281-484-0770

Robert Anthony Sanders

230

1  Regions, I had panic attacks.  There were cases where
2  even my staff would come over because I couldn't
3  breathe.  We didn't know if I was having a heart attack
4  or it was just -- it was a lot happening.  It was a lot
5  of stress, a lot of things happening at that time; but,
6  yeah, my doctors have already diagnosed me with high
7  blood pressure and depression.
8      Q.  When were you diagnosed first with depression?
9      A.  It was in 2021.
10      Q.  Which month?
11      A.  I don't know exactly when.
12      Q.  Had you ever previously been diagnosed with
13  depression before 2021?
14      A.  No.
15      Q.  How about PTSD?  Had you ever been diagnosed
16  with -- I'm sorry -- PTSD prior?
17      A.  No, I had not.
18      Q.  And when were you diagnosed with PTSD?
19      A.  I don't remember the exact month or time frame.
20  It was -- I feel like it was last year; but just right
21  now, I can't think clearly.  It might have been 2021.
22      Q.  Forgive me for asking this because I know it
23  may be sensitive, but it is commonly known that many of
24  our veterans suffer with PTSD.  Is your PTSD related in
25  any way to your time serving our country?

Ross Reporting Services, Inc.        281-484-0770

Robert Anthony Sanders

231

1      A.  No.  I actually went to the VA just to make
2  sure, and it was not because of my military service.
3      Q.  And high blood pressure -- when is the first
4  time you've been diagnosed with high blood pressure in
5  your life?
6      A.  2020 -- 2021.
7      Q.  Which month?
8      A.  It was -- it might have been in the beginning
9  of 2021, or maybe at the end of 2020; but it was around
10  that time frame.  I started experiencing severe
11  headaches.  I didn't know it was high blood pressure
12  until we started buying the -- the home blood pressure
13  from Costco and that's when I first identified it and I
14  went to Kelsey-Seybold where my doctor validated, which
15  I'm on four different medications right now for high
16  blood pressure.
17      Q.  And what are those medication?
18      A.  I don't know them all by heart.
19      Q.  Do you recall any of them, the names?
20      A.  Not really, but I have them all.  I should have
21  brought them with me, but I have them all.
22      Q.  And in your interrogatory answers, you provided
23  the name of Dr. Patel at Kelsey-Seybold.
24      A.  That is correct.
25      Q.  What is Dr. Patel's speciality, or why do you

Ross Reporting Services, Inc.        281-484-0770

Robert Anthony Sanders

232

1  see Dr. Patel?
2      A.  He was my oncologist.  I have to go back
3  periodically just to make sure that my tumor markers are
4  within line, and he's referred me to other family
5  medical doctor -- Dr. Doan is who I used to visit with
6  at Kelsey-Seybold for the blood pressure -- for the high
7  blood pressure.
8      Q.  And you said Dr. Patel was the doctor who
9  placed you on anxiety medication; is that correct?
10      A.  I think he prescribed, yes.
11      Q.  And then you also named Dr. Matthew Dollan
12  [sic] at Kelsey-Seybold.  What does -- or, I'm sorry,
13  Doan.
14      A.  Doan, yes.
15      Q.  What is Dr. Doan's speciality, or why do you
16  see Dr. Doan?
17      A.  Family practice.  He was the one that was
18  treating me for the -- or, actually, he's the one that
19  prescribed the medication for the high blood pressure.
20      Q.  And besides Dr. Doan and Dr. Patel, do you have
21  any other doctors that you've seen relating to the
22  symptoms of emotional distress you're claiming as
23  damages in this lawsuit?
24      A.  I'd have to get with the counselors that I have
25  sessions with, but --

Ross Reporting Services, Inc.        281-484-0770

Robert Anthony Sanders

233

1      Q.   Who are your counselors?
2      A.   I went through Thriveworks, had different
3    counselors at -- during the time; but I'd have to get
4    their names and information.
5      Q.   And was that in 2021 when you were counseling
6    through Thriveworks?
7      A.   2021, 2022.
8      Q.   Were you counseling with Thriveworks even after
9    you started employment with Texas Citizens?
10     A.   Yes.
11     Q.   Are you still seeing Thriveworks for
12   counseling?
13     A.   No, I haven't been able -- I've been trying to
14   get back on my feet financially.  I haven't been able to
15   afford it.
16     Q.   When's the last time that you had a counseling
17   session with Thriveworks?
18     A.   Thriveworks has been probably maybe six months,
19   but I'm now reaching out to different counselors through
20   our company program for the employ -- employee
21   assistance program, trying to get new counseling set up.
22     Q.   Are there any other symptoms that you've
23   experienced that you claim were related to emotional
24   distress from your Regions employment or termination?
25     A.   I just -- you know, I guess it's -- I don't

Ross Reporting Services, Inc.                281-484-0770

Robert Anthony Sanders

234

1    know how to even explain it.  It's a lot.  I don't know,
2    just trying to take it day by day.
3           MS. STAPLE:  I think now would be a good
4    time for a five-minute break.  I should be wrapping up
5    soon.
6           THE VIDEOGRAPHER:  Going off the record at
7    5:14 p.m.
8           (Recess from 5:14 p.m. to 5:17 p.m.)
9           THE VIDEOGRAPHER:  Going on the record at
10   5:17 p.m.
11     Q.   (By Ms. Staple) Mr. Sanders, do you know who
12   Regions hired to be the branch manager at Sugar Land
13   following your termination?
14     A.   I was informed that Beverly -- I can't
15   remember -- Barryman -- not Barryman.  I can't think of
16   her last name -- was the new manager.
17     Q.   Would that be Beverly Ero -- Ero?
18     A.   That's correct.  Excuse me one second.  I'm
19   trying -- I was just trying to log out of here.  I
20   apologize.
21     Q.   No, that's fine.  We can wait a moment.
22     A.   Okay.
23     Q.   Do you need to go -- should we go off the
24   record?  Do you need to --
25     A.   If you don't mind, yeah.  It'll take -- take me

Ross Reporting Services, Inc.                281-484-0770

Robert Anthony Sanders

235

1    one second.
2           THE VIDEOGRAPHER:  Going off the record at
3    5:18 p.m.
4           (Recess from 5:18 p.m. to 5:21 p.m.)
5           THE VIDEOGRAPHER:  Going on the record at
6    5:21 p.m.
7      Q.   (By Ms. Staple) Mr. Sanders, before our break,
8    you testified that you learned that Beverly Ero was
9    hired to be branch manager at Sugar Land after your
10   termination; is that correct?
11     A.   Yes.
12     Q.   Do you know how Ms. Ero would self-identify in
13   terms of her race?
14     A.   It was based on the documentation presented, I
15   guess, by Regions through my attorney that I found out
16   about it; but I think she classifies as an
17   African-American female.
18     Q.   Have you ever met Beverly Ero in person?
19     A.   Actually, she trained in my office when Melissa
20   hired her when she first started with Regions.
21     Q.   In this case, your wife was deposed and she
22   testified about an incident involving a screenshot and
23   her testimony simplified was that you had a video on
24   your phone of a sexually explicit nature and you told
25   her that you had taken a customer's phone at Regions and

Ross Reporting Services, Inc.                281-484-0770

Robert Anthony Sanders

236

1    while the customer was away, you had gone through her
2    phone and that you had sent yourself this sexually
3    explicit video and that you were keeping it as evidence
4    or proof or a word to that effect.
5           Do you recall this video or this -- this
6    screenshot?
7      A.   Yes, I recall the video that a customer that
8    was basically trying to -- I don't know, for lack of a
9    better way of putting it -- blackmail me for something
10   that I didn't do but she had sent me an inappropriate
11   video from her phone to my phone and I totally forgot
12   that the image that I had on my phone was still on my
13   phone.
14     Q.   What was the customer's name?
15     A.   Name was Melinda Tate.
16     Q.   T-A-T-E?
17     A.   T-A-T-E.
18     Q.   Was she a Sugar Land Branch customer?
19     A.   No.  She was -- I don't know where she opened
20   her account originally, but she was not a Sugar Land
21   customer.
22     Q.   Did you provide banking services to her at the
23   Sugar Land Branch?
24     A.   She would come to the branch through my
25   employees and other people to do business, but it wasn't

Ross Reporting Services, Inc.                281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

237

1  a lot.
2      Q.  Did you ever work with her directly to provide
3  her banking services?
4      A.  I think I might have helped her with a couple
5  of transactions on her account, but I can't remember
6  what they were.
7      Q.  What was the nature of the reason why she was
8  trying to blackmail you?
9      A.  I had identified that she had did a fraudulent
10 PPP loan, and I had requested that she do the right
11 thing.  She did not have a business to apply for a PPP
12 loan, and I think she diverted the funds from coming to
13 Regions because when I -- I can't remember if they came
14 to Regions or not.
15      But when I found out about it, I said,
16 "The best thing you need -- you need to report that.
17 You need to turn it back in."
18      Q.  So, Regions was holding fraudulent PPP money
19 for her?
20      A.  I don't know if it was Regions or who.  I just
21 recall that she was -- she had qualified for a PPP loan;
22 and when I found out about it, I told her she should
23 turn the money back in because she did not have a
24 legitimate business.  It was a rampant fraud of people
25 doing false or fake PPP loans under the pandemic and

Ross Reporting Services, Inc.                281-484-0770

Robert Anthony Sanders

238

1  they didn't have businesses and I just advised her not
2  to do it.
3      Q.  So, you're not aware --
4      A.  So, she thought I was going to turn her in but
5  I can't recall the -- the exact details of her
6  transaction, but I remember bringing it to her
7  attention.
8      Q.  And you can't know for sure if that money was
9  at Regions or not?  You didn't ask her?
10     A.  I can't remember exactly how I identified it,
11 but I just remember bringing it to her attention when I
12 found out about it.
13     Q.  Did you report that to Dave Leonard or anyone
14 above you in Regions' hierarchy?
15     A.  I think that under -- I don't recall if -- how
16 it was reported or the information was communicated, but
17 I don't recall what took place after that.
18     Q.  So, just to be clear:  Did you report it to
19 anyone else in Regions?
20     A.  If it wasn't with Regions, I had no way to
21 report it to Regions.  So, I just -- I don't remember
22 how I came across the fact that she had a fraudulent PPP
23 loan.  I can't remember the details of that.
24     Q.  Okay.  And just to be clear:  Your answer is,
25 no, that you didn't report that to anyone at Regions?

Ross Reporting Services, Inc.                281-484-0770

Robert Anthony Sanders

239

1      A.  I didn't report it -- if it wasn't with
2  Regions, I didn't report it to Regions.  I don't recall
3  how it came across my desk.
4      Q.  Was this sexually explicit video a reason that
5  led to your divorce --
6      A.  No --
7      Q.  -- from Lida Thomas?
8      A.  -- no.  I think my wife was looking for a
9  reason, but that wasn't the reason.  Actually, my
10 wife -- because that person's number was still on my
11 phone.  She called it.  They had a conversation, and she
12 said that there was no relationship between us.  The
13 video was her -- of her and her husband.  Unfortunately
14 for me, I forgot that it was still on my phone.
15     Q.  We talked about that you drained your 401(k) to
16 the tune of $194,000.  Was you draining your 401(k) a
17 reason for Lida filing divorce?
18     A.  No -- at least, I don't think so.  I don't
19 know.
20     Q.  And then today we talked about a number of
21 things.  Other than what we've already talked about, are
22 there any other events or instances or facts that you
23 are contending support your claim that Regions
24 discriminated against you?
25     A.  In my own assessment, Beverly is a -- I've

Ross Reporting Services, Inc.                281-484-0770

Robert Anthony Sanders

240

1  worked with her before.  She's trained in my office -- a
2  respectable person, but when -- when I found out that
3  she was the manager for Sugar Land, my understanding was
4  no one in the bank wanted that -- that office knowing
5  the expectation, but no else applied for the branch.
6          Dave Leonard, my understanding was, went
7  to Beverly -- not directly to her manager to recruit
8  someone who was African-American to replace my position.
9  My understanding was no one else applied for that branch
10 and I want to say it was probably four months before
11 they hired Beverly to manage that office, and if I'm
12 correct, Beverly has no management experience in
13 banking.
14     Q.  Do you know if she has management experience in
15 other industries?
16     A.  Only what was provided in the documentation by
17 my attorney from Regions when they -- I guess, in the
18 respondent's or something information, I remember seeing
19 her résumé and information out there.
20     Q.  So, were you aware that the Sugar Land branch
21 manager position was posted?  Like, did Regions post it
22 on the website and no one applied?  Is that what you
23 mean?
24     A.  I was aware that, yeah, Regions did post it.  I
25 could see it on -- yeah, it was out there posted on the

Ross Reporting Services, Inc.                281-484-0770

Robert Anthony Sanders

241

1    website.
2         Q.   And how did you learn that no one else had
3    applied besides --
4         A.   Because the position was out there for four
5    months.
6         Q.   But you're unaware if Regions interviewed
7    anyone and just didn't offer them the role?
8         A.   Yeah, I don't know who they interviewed or
9    considered for it, but --
10        Q.   All right.  Any other instances, facts,
11   anything else to support your discrimination claim that
12   we have not talked about already?
13        A.   The only other area of concern that I had is
14   when Jared Ogburn had resigned from -- from Regions
15   Bank, he processed over $5,000 in fake checks that
16   some -- somebody had passed through our drive-through
17   and then his cashbox that he had the last day he was
18   there -- he only worked his box for four hours -- was
19   $2,000 short and I communicated that information to Dave
20   Leonard, to HR, to Meghan Wernecke, and not one person,
21   not even corporate security investigated the information
22   of the matter.
23        Q.   All right.  Anything else?
24        A.   Nothing else that I can think of.
25             MS. STAPLE:  All right.  I'll pass the

Robert Anthony Sanders

242

1    witness.
2             Go ahead, Eddie.
3             EXAMINATION
4    BY MR. HODGES:
5         Q.   Okay, Mr. Sanders.  I just have a couple of
6    follow-up questions.
7             THE VIDEOGRAPHER:  Do you have your mike
8    on?
9         Q.   (By Mr. Hodges) Mr. Sanders, if you could
10   reference what's been labeled Defendant's Exhibit O --
11   no, excuse me.  Sorry, Exhibit G, Exhibit G.  It's the
12   one that says Regions Office of Associate Conduct
13   Investigation/Interview Quick Reference Guide.
14        A.   Okay.
15        Q.   All right.  And if you go to page 24 for me?
16        A.   Okay.
17        Q.   Now, earlier you were questioned as to whether
18   you've gone through this information and whether any of
19   this information was inaccurate and I think you were
20   kind of going through and you said there was some
21   discrepancies.  Do you remember -- do you recall that?
22        A.   I recall that.
23        Q.   All right.  So, I want you to look at the --
24   and, again, just for the record, this is interview notes
25   during the -- when you were questioned -- is that

Robert Anthony Sanders

243

1    correct -- when you were questioned for the
2    investigation?
3         A.   Yes.
4         Q.   And so, do you see the question that says,
5    "What kind of business do you have with Eric Johnson
6    outside of the bank?"
7         A.   Yes.
8         Q.   Did you -- or do you recall having any response
9    to that?
10        A.   No, because I didn't have any business with
11   him.  We didn't do any business outside of the bank.
12        Q.   Okay.  And so, that goes into my question.  So,
13   the line that says, "Have you used him for outside
14   business," and it says, "Yes," do you believe that
15   that's inaccurate?
16        A.   That's not accurate.  I -- we didn't do any
17   business together.
18        Q.   And so, why do you believe that it was notated
19   "yes" in this question?
20             MS. STAPLE:  Objection, speculation.
21        A.   I don't know.  We didn't -- if the question was
22   presented to me, do we do business outside of -- outside
23   of the bank, I wouldn't have responded "yes" because we
24   didn't do any business together.
25        Q.   (By Mr. Hodges) Okay.

Robert Anthony Sanders

244

1         A.   So, it's not speculation.  We didn't -- I
2    didn't -- there's no business conducted with Eric
3    Johnson for his construction company I ever did with
4    him.  We did -- we did no business together.
5         Q.   And were you able to see these interview notes
6    at any time prior to your termination?
7         A.   No, not this, not the details of this.
8         Q.   And are you familiar with Regions outside
9    business activity policy?
10        A.   As far as --
11        Q.   Well, let me --
12        A.   Oh, yes.  Okay.  So, yes.  If I have outside
13   business, yes, relate -- yes, I'm familiar with that.
14        Q.   And do you recall reviewing and understanding
15   that policy and maybe signing to say that you had been
16   trained under that policy?
17        A.   Yes.
18        Q.   And do you recall whether it was asserted that
19   you had violated that policy?
20        A.   It was asserted that I violated the policy
21   because my family has rental property, but --
22        Q.   And --
23        A.   -- I have no business ownership of the
24   property.  It's community property.
25        Q.   And so, based on your personal knowledge, what

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

245

1    does the outside employment policy mean?
2         A.  So, if I have outside employment or business
3    endeavors that I'm doing outside of Regions, I would
4    have to disclose that to them.  We had an associate that
5    had her own restaurant, her and her family, in Southeast
6    Houston and so, that information has to be disclosed,
7    but I had no active entity or business that I receive
8    benefits from as far as any -- I had no business outside
9    of Regions.  Regions was my only employment.
10        Q.  And you mentioned that you had an employee fill
11   out the outside business form.  Do you recall who that
12   employee was?
13        A.  Shannon Randle.
14        Q.  And do you know of any other employees that
15   you -- that were your subordinates that filled out that
16   form or had other outside businesses?
17        A.  I would imagine Eric Johnson would have to fill
18   one because he had -- he -- actually, he had a -- what
19   is it called -- catering company which Regions used
20   multiple times for different events.  The construction
21   company, I'm sure he had to disclose that to the bank;
22   but that's pretty much all I ever have known on that.
23        Q.  Okay.  And so, I'm going ask some specific
24   questions that's taken directly from the policy.  Have
25   you ever prepared, audited, or certified statements or

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

246

1    documents related to Regions' businesses within your
2    out -- alleged outside employment?
3         A.  Say that one more time.  Sorry.
4         Q.  Yes.  Have you ever -- within this alleged
5    outside employment, have you ever prepared, audited, or
6    certified statements or documents related to Regions'
7    businesses?
8         A.  No.
9         Q.  Have you ever been employed at the same time by
10   Regions and by certain security firms, financial firms?
11        A.  No, no one.
12        Q.  Have you ever been employed as a paid or unpaid
13   consultant in the same area of employment that you work
14   for at Regions?
15        A.  No.
16        Q.  Have you ever bought assets from or sold assets
17   to Regions or any account that Regions acts as a
18   fiduciary?
19        A.  No.
20        Q.  Have you ever bought property Regions acquired
21   through foreclosure or repossession?
22        A.  No.
23        Q.  Have you represented another company in its
24   dealings with Regions?
25        A.  No.

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

247

1         Q.  Have you purchased any property, including real
2    estate, knowing that Regions intended to purchase it?
3         A.  No.
4         Q.  Have you ever used Regions property, corporate
5    time, internal systems, or processes or other
6    proprietary confidential information for your personal
7    gain other than in the performance of your job?
8         A.  No.
9         Q.  Okay.  I want to go to -- actually, you don't
10   have to necessarily reference it; but were you ever
11   given a direction from Dave Leonard that branch managers
12   should limit their outside business contact during the
13   pandemic?
14        A.  I wasn't given the information until after the
15   expense report was challenged.
16        Q.  And that's what -- and you said you weren't
17   given -- who gave that information?  Who gave you that
18   information?
19        A.  I can't recall if it was Dave Leonard or
20   Meghan, but I do recall someone challenging the fact
21   that I went and conducted the EDD requirements under the
22   pandemic.
23        Q.  From -- so, the pandemic, we would say, started
24   sometime in March 2020.  Is that fair to say?
25        A.  I think, roughly.

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

248

1         Q.  And so, from March 2020 until January 2021, did
2    you conduct any other EDD's?
3         A.  Yeah, there were other calls that were
4    conducted; and they were also filed on my expense report
5    months prior to this -- this report.
6         Q.  And were you ever questioned as to those EDD's
7    were being done during the pandemic that was in
8    violation or any wrongdoing?
9         A.  No.
10        Q.  And let me see here.  All right.  I want to go
11   to the Exhibit Q.  It was your Texas Citizens Bank
12   application.  You mentioned that you -- actually, first,
13   who's Kimberly Stephens?
14        A.  Kimberly Stephens was a commercial loan
15   officer.  She was a commercial banker for Regions.  She
16   moved to Nevada and she's a senior commercial officer
17   for a bank in Nevada, but she's a good friend of mine.
18   She used to work for Regions.
19        Q.  And when it says under -- the name of
20   supervisor on the back page, it says Kimberly Stephens.
21   Was she one of your supervisors at a certain time?
22        A.  She was.  She was a partner in the business,
23   meaning that she covered my branch at Regions.
24        Q.  So, when you filled out this information and
25   you said name of supervisor, and we may contact your

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

249

1  supervisor, you were specifying that they could contact
2  Kimberly Stephens?
3      A.  Right.
4      Q.  And did you mention Dave Leonard in this --
5      A.  I didn't mention Dave Leonard's name.  No, I
6  didn't.
7      Q.  Okay.
8      A.  I don't recall.  I think Kimberly might have
9  still been with them during this time.  I don't recall.
10     Q.  You said -- so, you -- Kimberly ended up
11  leaving at some point?
12     A.  Eventually.  I can't remember exactly when she
13  left Regions, but I know that now she's in Nevada.
14     Q.  Was she employed when you were terminated,
15  still?
16     A.  I think she was, yeah.  I'm sure of it.  I
17  don't recall.
18     Q.  And based on your personal knowledge of the
19  Regions outside employment policy, do you believe that
20  owning rental property is a direct violation of that
21  policy, based on your knowledge?
22     A.  Do I believe it's a direct violation?
23     Q.  Yes, based on your personal knowledge and
24  understanding of the outside employment policy?
25     A.  I understand the policy and procedure.  I'm not

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

250

1  in violation.  I don't own any property.  I don't manage
2  any property.  I don't -- I don't receive any profits or
3  benefits from any property that my wife has under her
4  name.
5      Q.  And when -- I think it's -- some exhibits in
6  here.  I have to find it.  Just one second.
7          So, Exhibit K.  It's the one -- the top of
8  it says, "Good afternoon Melody"; and -- do you see it?
9      A.  I'm sorry.  You said it says --
10     Q.  Exhibit K.  It's an e-mail.  At the top of the
11  e-mails, it says, "Good afternoon Melody."  It says --
12  on the bottom, it's Bates labeled Regions 001775.
13     A.  Go ahead -- go ahead, and I'll address it until
14  I can find it.  Go ahead.
15     Q.  So, in the -- on 1776, once you pull it up --
16  you don't have it yet?  I just -- I wanted you to see --
17  read what it says.  That may be it.  Is that -- let me
18  see.  I think that one --
19     A.  No.
20     Q.  That's not --
21     A.  I don't think that's the same one.
22     Q.  Regions --
23     A.  Oh, okay.  Okay.  I'm sorry.
24     Q.  Yeah.  So, the second page, Regions 1776.
25     A.  Okay.

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

251

1      Q.  And Dave's e-mail where it says, "I was under
2  the impression we were not doing physical visits due to
3  COVID.  Please advise."
4          And then I you responded, "The only
5  way to clear the EDD is to have current photos of the
6  site surveys."
7          Can you please explain to the jury what
8  that means?
9          MS. STAPLE:  Objection to "the jury."
10         MR. HODGES:  Oh.
11     Q.  (By Mr. Hodges)  Well, can you explain to --
12  your testimony as to what that means?
13     A.  Which -- which part is Dave's statement that
14  you're reading from?
15     Q.  Yeah.  So, I read the first e-mail from Friday,
16  January 29th, 4:30.
17         It says, "Robert, I received your expense
18  report and saw the following (EDD site visits)."
19     A.  Got it.
20     Q.  "Who were these for?"
21         And then you responded, "The only way to
22  clear the EDD is to have current photos of the site
23  surveys."
24     A.  Survey, right.
25     Q.  And I just want to know if you can explain what

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

252

1  that means.
2      A.  Okay.  So, on that expense report that he
3  provided to me -- he has the Katy.  He has the site
4  survey for Houston, and it has the -- that's the
5  La Porte Shell.  I guess the round trip is 91 miles
6  and -- let me see -- the EDD resolution.  Let me see
7  here, the site survey.  So -- okay.
8          So, that's when I was explaining to him
9  again and to Meghan that -- no, actually, this one
10  didn't go to Meghan on this one -- but I started
11  including both of them on the information and the
12  details pertaining to how I was requested on other --
13  there's additional e-mails that I was directed by the
14  EDD department to go and take those photos of those
15  locations and so, that's what I was responding to is
16  that the EDD has to have current photos of the site
17  surveys.
18     Q.  And my question is:  Why?  Why is that?  Why do
19  they have to have current photos?
20     A.  Because if the Google Maps photo of the
21  business location is over one year, the ED -- the EDD
22  department will only clear that exception for that --
23  that business unless there's a current photo.  So, not
24  knowing when Google Maps updates photos on -- on street
25  surveys, we had to go and take the photos to provide

Ross Reporting Services, Inc.                    281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

253

1  them to the EDD department to clear that; or if not,
2  they were going to shut the customer's account down.
3      Q.  Gotcha.  Okay.  And then you -- he responded in
4  that e-mail, "Who were these site ... businesses for?"
5          And then you responded with the list of
6  names that we've kind of already gone through, the five
7  here.
8      A.  And I think for time's sake on that one, if you
9  notice, it's at 5:00 p.m. on a Friday.  I was trying to
10 get him the information.  That's at close of business,
11 and I'm trying to send this over to him so that he can
12 understand what this information was related to and the
13 business names.
14     Q.  And so, we're still on this Exhibit O.  Go back
15 to the Exhibit O.  Go back to that.
16     A.  Okay.
17     Q.  Okay.  My question is:  Prior to January, you
18 have conducted other EDD's, correct?
19     A.  Correct.
20     Q.  And were those other EDD's ever verified or, I
21 guess, audited by Dave Leonard?
22     A.  No.
23     Q.  So, prior to March -- or excuse me -- yeah,
24 prior to this occasion, you were never audited or
25 verified as to whether your expense report locations

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

255

1          So, I'm not sure why I would have not
2  entered all of them that were the EDD requirements, if
3  that's what he's asking for.  I think I just grabbed the
4  first ones that came to mind when I responded to the
5  e-mail.
6      Q.  Okay.  And do all the EDD's that you perform
7  have to be specifically requested by the EDD department,
8  or can you do it on your own due diligence?
9      A.  You can use your own due diligence, also, too.
10     Q.  And previous to this occasion, have you used
11 your own due diligence to conduct EDD's?
12     A.  Yes.
13     Q.  And were those EDD ever verified or audited?
14     A.  They were never questioned or audited.
15     Q.  And, based on your personal knowledge, why do
16 you believe that you were questioned and audited on that
17 specific --
18     A.  Because I feel like that incident was more of a
19 retaliation.  I've done site surveys and EDD
20 requirements initiated because I know what's needed for
21 those business relationships, and I complete them so
22 that it's not an issue.  This one came right at the time
23 that I -- after I had filed.
24     Q.  And are you familiar with Regions reimbursement
25 expense policy --

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

254

1  were accurate?
2      A.  I've never had a question about an expense
3  report or a concern over an expense report.
4      Q.  And you mentioned that you sent the first
5  e-mail here in a -- 5:00 p.m., and are you saying that
6  you were in a rush or --
7      A.  I'm just thinking off the top of my head, if
8  that was on a Friday at 5:00 o'clock, I was trying to
9  respond to Dave in a timely fashion before the weekend.
10     Q.  Okay.
11     A.  I'm just sure that I probably sent it over just
12 to help support what he's inquiring about.  If he would
13 have requested more information other than what I
14 provided, I would have provided that, too.
15     Q.  Okay.  And so, if you go to Exhibit O, the
16 investigator and the interviewer's notes mentioned that
17 when you explained to them, you didn't mention the
18 SK International, Wilson Discount Lumber, or Sunlight
19 Holdings?  And that's going to be on page 12 of 17.
20     A.  So, again, the best of my understanding, if
21 they were not all EDD resolutions, I -- I can tell you
22 that I did outline the ones that were EDD resolutions
23 and if it's on here, this has to be related to either
24 the industry being a C-store, convenience store, that an
25 EDD is required.

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

256

1      A.  The guide --
2      Q.  -- policy?
3      A.  -- yes, I am.  I am.  And that -- at that time,
4  I was, also.
5      Q.  And, based on your understanding of that
6  policy, do you believe that you violated that policy?
7      A.  No.
8      Q.  And why is that?
9      A.  Because I did what was required of me in my
10 role as a branch manager to complete the required --
11 required information that I needed to do.
12     Q.  And after -- and after these EDD -- this
13 expense report was submitted in January, did you conduct
14 any other EDD's after January?
15     A.  I don't recall if I reported any other -- I
16 don't recall.  I think I might have had another expense
17 report right after that.  I just don't recall.
18     Q.  Okay.  And I think -- and is there any other
19 discriminatory acts or examples that you have that have
20 not been mentioned today that -- that has occurred at
21 the time that Regions -- that resulted in your wrongful
22 termination that you would like to disclose?
23         MS. STAPLE:  Objection, asked and
24 answered.
25     Q.  (By Mr. Hodges)  You can answer if there's any

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

257

1    others.
2        A.  I can't think of anything right now.
3        Q.  Okay.  All right.  Just let me double-check
4    here.
5            MR. HODGES:  All right.  I'll pass the
6    witness.  No further questions.
7            FURTHER EXAMINATION
8    BY MS. STAPLE:
9        Q.  Just a couple questions, Mr. Sanders.  What was
10   Kimberly Stephens' title when she worked at Regions?
11       A.  I don't recall exactly.  I know she was a
12   commercial loan officer, vice president.  I don't recall
13   exactly.
14       Q.  Did she have the ability to affect the terms or
15   conditions of your employment?
16       A.  I would say, "yes," meaning that as a
17   commercial loan officer and a partner, if there's
18   anything that I have done in terms of performance for a
19   commercial client, I mean, she could -- I think any
20   officer could, yes.
21       Q.  Did she have the ability to terminate your
22   employment?
23       A.  That, I'm not sure of.  I don't know.
24       Q.  Isn't it true Dave Leonard was your immediate
25   supervisor?

---

Robert Anthony Sanders

258

1        A.  He was.  That's correct.
2        Q.  Is there a reason that you listed Kimberly
3    Stephens rather than Dave Leonard as your supervisor in
4    your Texas Citizens application?
5        A.  As a reference, I worked with her.  I
6    considered her a supervisor, and that's what I put on my
7    application for Texas Citizens Bank.
8        Q.  Isn't it true she was not your immediate
9    supervisor?
10       A.  She was not my immediate supervisor, no.
11       Q.  Is there a reason you listed Kimberly Stephens
12   as opposed to Earl Connell, who supervised Dave Leonard?
13       A.  Because I didn't feel confident in Earl Connell
14   or Dave Leonard's ability to provide any type of
15   reference related to my employment information.
16       Q.  Did the question on the Texas Citizens
17   application ask you simply for your named supervisor or
18   who would provide a reference?
19       A.  I don't recall the reason why I used Kimberly
20   Stephens versus putting Dave Leonard, but I would never
21   put Dave Leonard's information on my application.  As to
22   what I'm going through right now, I --
23       Q.  If you had to answer the question today, who
24   was your supervisor at Regions, who would you answer?
25       A.  I would have to say Dave Leonard.

---

Robert Anthony Sanders

259

1        Q.  To your knowledge, did Texas Citizens ever
2    reach out to Kimberly Stephens?
3        A.  Not to my knowledge.  I'm not sure if they did
4    it.
5        Q.  To your knowledge, did Texas Citizens reach out
6    to Regions for a reference for you?
7        A.  I'm not sure.  No one ever communicated any
8    concerns or interest in that information.  They never
9    asked me for any other person's contact information.
10       Q.  Okay.  My last question:  Mr. Hodges asked you
11   a question and you responded that EDD scrutiny came
12   right after you filed.  When you say you filed, are you
13   referring to your internal complaint to Regions?
14       A.  When I filed for -- with Regions in February of
15   the acts of discrimination and the things that I had
16   concerns with and what was being done to me by Dave
17   Leonard, it wasn't until after that filing I felt like
18   that was a retaliation for the questioning of that
19   expense report.
20           MS. STAPLE:  Okay.  Objection,
21   nonresponsive.
22       Q.  (By Ms. Staple) My question was just a little
23   different.  I was trying to clarify what you meant by
24   "filing"; and, as I understand it, by "filing" when you
25   answered Mr. Hodges' question, you mean that

---

Robert Anthony Sanders

260

1    February 18th, 2021 complaint to Regions; is that
2    correct?
3        A.  Okay.  Yeah, I guess, just to be clear:  If
4    we're talking about when I filed for a discrimination
5    against Regions, that was in February that I felt like,
6    yes, that saying that I violated the expense report
7    policy was a retaliation for me filing.
8        Q.  Understood.
9            MS. STAPLE:  All right.  Those are all my
10   questions.
11           Eddie, did you have any --
12           MR. HODGES:  I did.  I was just looking
13   for this document, but I think I can do it off the top
14   of my head.
15           FURTHER EXAMINATION
16   BY MR. HODGES:
17       Q.  Do you know, by chance, if disciplinary action
18   has a time limit or expires after a certain point in
19   time at Regions?
20       A.  Say that one more time.  I'm sorry.
21       Q.  Do you know if a disciplinary action expires at
22   Regions; or after a certain amount of time, any
23   disciplinary action on your record is erased or
24   anything?
25       A.  I -- I don't know.  I'm not familiar with that.

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

Robert Anthony Sanders

261

1    Q.   Okay.  Let me see if I can find what the
2  document -- well, actually, you don't know.
3         MR. HODGES:  That's my last question.  I
4  pass the witness.
5         And I would like to read and sign, on the
6  record.  Thank you.
7         MS. STAPLE:  I'm all finished.  We can go
8  off the record.  Thank you, everyone.
9         THE VIDEOGRAPHER:  Going off the record
10  5:57 p.m.
11         (Proceedings concluded at 5:57 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

263

1       I, ROBERT ANTHONY SANDERS, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
6
7            _____
8            ROBERT ANTHONY SANDERS
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

262

1              CHANGES AND SIGNATURE
2  PAGE LINE        CHANGE        REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Ross Reporting Services, Inc.                    281-484-0770

---

Robert Anthony Sanders

264

1         IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
2               HOUSTON DIVISION
3  ROBERT SANDERS,          )
       Plaintiff,        )
4                          )
   VS.                    )CIVIL ACTION NO. 4:22-cv-01523
5                          )   JURY DEMANDED
   REGIONS BANK,           )
6       Defendant.         )
7
8
9  *********************************************************
10       REPORTER'S CERTIFICATION
11   ORAL VIDEOTAPED DEPOSITION OF ROBERT ANTHONY SANDERS
12         May 26, 2023
13  *********************************************************
14
15     I, Jennefer Franklin, Certified Shorthand Reporter
16  in and for the State of Texas, certify to the following:
17     That the witness, ROBERT ANTHONY SANDERS, was duly
18  sworn by the officer and that the transcript of the oral
19  deposition is a true record of the testimony given by
20  the witness;
21     I further certify that pursuant to FRCP Rule
22  30(e)(1) that the signature of the deponent:
23     _____ was requested by the deponent or a party
24  before the completion of the deposition and returned
25  within 30 days from date of receipt of the transcript.

Ross Reporting Services, Inc.                    281-484-0770

Robert Anthony Sanders

265

1    If returned, the attached Changes and Signature Page
2    contains any changes and the reasons therefor;
3    _____ was not requested by the deponent or a party
4    before the completion of the deposition.
5      I further certify that I am neither attorney nor
6    counsel for, related to, nor employed by any of the
7    parties to the action in which this testimony was taken.
8      Further, I am not a relative or employee of any
9    attorney of record in this cause, nor do I have a
10   financial interest in the action.
11     SUBSCRIBED AND SWORN TO on this the _____ day of
12   _____, _____.
13
14
15      *Jennefer Franklin* .
       _____
16    Jennefer Franklin, CSR  .
       Texas CSR 9325
17    Expiration:  8/31/24
       Ross Reporting Services, Inc.
18    Firm Registration No. 169
       11706 Playa Court
19    Houston, Texas 77034
       (281)484-0770
20
21
22
23
24
25

Ross Reporting Services, Inc.         281-484-0770

0ac800b4-e5ac-4b2d-95ad-137ce60450c6

**A**

**a.m** 1:19 5:7 51:11
  51:12,12,14
**Aaron** 9:24 16:6,9
  16:16 17:8,16
  229:6
**abating** 20:17
**ability** 7:9 85:4,5
  104:1,6 257:14,21
  258:14
**able** 26:8,9 53:5
  60:19 110:4
  126:22 210:18
  213:12 233:13,14
  244:5
**above-styled** 1:17
**absolutely** 46:2,19
  46:24 88:24
**accept** 142:21
**accepted** 201:7
**accepts** 88:7 99:19
**access** 34:6,10
  79:11 85:2 209:7
  210:5,15,19
  220:22 221:16
  222:4,25 225:10
**accident** 151:25
**accomplishments**
  89:14
**account** 14:23
  33:19,23 34:1,5,8
  67:2 72:24 73:2,3
  76:13,14,21,22
  82:5 118:24 119:5
  142:3 143:20
  153:6 209:7 224:3
  224:4 225:9
  236:20 237:5
  246:17 253:2
**accountants** 224:11
**accounted** 222:24
**accounts** 34:3,10
  40:7 65:21 66:18
  73:7 141:15 143:4
  189:20 201:15
  209:23 222:25
  223:22,22

**accurate** 53:11
  57:13 128:7 130:6
  159:7,8 161:2
  166:15 176:13
  190:23 191:1
  192:21 205:1
  220:18 243:16
  254:1
**accurately** 130:2,4
  205:13
**accusation** 179:20
  188:22
**accusations** 189:25
  191:4
**achievements**
  86:23
**acknowledge** 128:4
  184:10
**acknowledgement**
  3:17 63:16
**acquainted** 68:15
**acquire** 28:2 33:2
**acquired** 31:11
  32:18 35:3,10
  206:20 224:21
  246:20
**acquiring** 45:1
**acquisition** 206:22
**act** 124:24
**acting** 118:12,16
  119:8
**action** 1:4 179:2
  260:17,21,23
  264:4 265:7,10
**actions** 56:8,10
**active** 245:7
**activities** 13:11
  95:1
**activity** 12:8,11
  13:15 67:3,23
  79:10 143:20
  173:16 183:10
  186:12 219:10
  227:1,11 244:9
**activity/teller** 67:3
**acts** 176:8 215:5,9
  246:17 256:19

259:15
**actual** 157:7 201:21
  202:23 203:24
**add** 79:25 179:4
**added** 228:15
**adding** 55:11 79:22
  201:15
**addition** 224:21
**additional** 21:12
  78:18 159:9,11,15
  159:19 195:15
  196:8 252:13
**address** 14:7 18:5
  18:16 19:24 20:1
  20:3 24:16,19
  29:25 30:2,12,19
  30:20,21 31:8,17
  32:13 34:13,21
  35:23 48:8 54:19
  54:21 73:10 96:1
  142:13 150:22,22
  150:25 173:11
  211:8 250:13
**addressed** 194:18
  196:4 217:17,22
**addresses** 32:15,17
  35:20,21
**admin** 85:23 97:1,9
**advanced** 56:6
**advertised** 200:14
**advise** 251:3
**advised** 238:1
**advisement** 106:18
**affect** 180:11
  257:14
**affirmatively** 134:3
  134:15
**affix** 263:2
**afford** 233:15
**African-American**
  41:2 66:3 67:13
  117:13,14,16
  163:20,21 235:17
  240:8
**afternoon** 250:8,11
**afterward** 211:9
**age** 172:16 180:8

**agenda** 109:12
**agent** 198:14
**ago** 42:7 169:24
  191:18
**agree** 152:4 190:21
  191:9
**agreed** 42:17
**agreement** 4:19
  28:5 42:14
**ahead** 53:14 57:6
  57:18,23 60:13
  63:12,18 81:17
  100:9 101:10
  122:15 123:4
  130:11 141:16
  148:21 151:14
  153:23 154:3
  161:5 163:10
  168:3 174:4,7
  191:11 205:4,8
  214:25 220:11
  242:2 250:13,13
  250:14
**Alabama** 124:5,10
**Alan** 53:19,19 54:1
  54:2,3,5,7
**alarm** 79:13,15
  80:4,5
**Alexa** 9:24 15:14
  15:23 16:3,16
  17:7,16
**Alfonso** 14:25
**aliases** 24:12
**allegation** 82:17
  161:8
**allegations** 8:2,8
  11:9 172:13
  214:23
**alleged** 189:4 191:8
  246:2,4
**alleges** 100:25
  172:18,20 177:21
**alleging** 28:11
  102:21 215:10
**Allen** 216:13
**alligations** 23:10
**allow** 28:21 29:7,9

**allowance** 207:23
**allowing** 114:6
**Amanda** 113:15,23
  114:10 115:9,11
  115:18
**Amanda's** 113:9
  115:1
**amazed** 136:13
**amazing** 38:3
**amended** 214:7
**America** 34:9
  224:3
**AML** 143:18 144:2
**AML/BSA** 144:14
**AMLANIS** 145:10
  145:15
**amount** 208:11
  212:5 260:22
**amounts** 208:13
**and/or** 32:12
**Anderson** 120:25
**anguish** 222:13
**annual** 55:16,23
  62:3 86:19 162:9
  175:24 176:3
  212:6 224:7
**anonymous** 122:1
  124:21
**answer** 6:10,13 7:5
  19:6 29:8 53:5,9
  57:9,24 70:18,22
  82:11 96:7 100:5
  117:11 122:17,19
  127:3 137:14
  151:20 166:22
  167:2 179:11
  185:4 238:24
  256:25 258:23,24
**answered** 256:24
  259:25
**answers** 6:9,20
  191:10 217:4
  220:4,6 231:22
**Anthony** 1:11,15
  3:4 5:8 24:10
  263:1,7 264:11,17
**anti-discriminati...**

63:6
**anti-harassment**
63:6
**anti-money** 144:2
**anti-retaliation**
63:7
**anticipate** 94:3
**anticipated** 93:22
157:24
**anticipating** 42:21
**anxiety** 197:22
229:24 232:9
**anybody** 136:15
**anymore** 21:2
133:13 135:12
**anytime** 16:19 17:1
36:17 72:7,22
73:1 77:11 94:16
121:10 133:9
139:5 142:10
206:3 224:6
**anyway** 86:1
189:25
**apart** 62:8 94:19
**apartment** 24:18
32:5,11
**apologies** 71:11
181:1
**apologize** 48:17
54:21 57:2 81:17
96:3 107:21 120:5
181:2 234:20
**apologizing** 120:6
**app** 150:8,22
**appear** 128:9
**APPEARANCES**
2:1
**appeared** 69:6 90:5
**appears** 153:16
154:7 159:4,18
173:11
**Apple** 40:1,2
**applicant** 83:20
84:8 90:17
**applicants** 92:20
**applicants'** 94:6
**application** 4:15

70:3,7,10,17,19
83:19 87:25 91:17
91:24 92:1 93:10
95:16 194:21
195:2 199:20
200:6 201:18
202:12,18 203:4
204:3 205:2 209:9
209:12,14 210:15
211:4 221:4,22
248:12 258:4,7,17
258:21
**applications** 121:14
196:2 198:12,25
205:24 208:18,22
208:23,25 209:17
209:23,24 210:8
211:2 220:18
222:5
**applied** 43:18 44:1
44:7 52:2 85:12
85:19 96:17 101:2
101:13 102:10
172:19 202:19
208:21 209:3,6
210:8,22 220:24
220:24 221:2,6,11
222:2 240:5,9,22
241:3
**apply** 42:18,23
43:23 83:17 84:5
84:11 85:5,8,11
87:16,19 90:10
91:1,4 113:14
199:19 207:17,24
208:2,3,17 210:2
215:22 217:15
221:21 237:11
**applying** 51:21
87:5 92:18 93:11
194:6 197:13
200:13 211:1
**appoint** 58:24
**appointments**
228:1
**appreciate** 17:5
46:14 71:1,8

75:21 82:14
166:20 178:4
**apprised** 153:20
**approach** 72:15
75:22
**approaching**
113:15
**approval** 111:25
115:18,21 117:6
146:23 167:24
185:11,17
**approve** 110:2
117:10
**approved** 110:3
114:17 115:24
134:17 146:19
185:7
**April** 44:1 159:15
160:13,25
**Arbor** 30:15,18
31:1
**area** 44:19 45:10
46:11 49:6 52:6,9
53:22 79:8 90:8
96:1,16,25 104:7
108:10 121:1
148:6 151:1 173:5
180:2 211:23,24
241:13 246:13
**areas** 56:4 78:18
152:9 192:5
199:13
**argumentative**
75:25
**arm** 123:18
**Army** 41:22
**arrived** 47:7
**Asha** 27:24 40:22
229:7
**aside** 53:14 102:10
102:11
**asked** 7:5 13:18
43:8,10 81:18
82:17 108:11,18
108:21 109:3
110:1 114:6 138:5
140:3,6 159:9

162:2 166:13
191:19 194:20,21
194:22 216:24
256:23 259:9,10
**asking** 82:19
102:17 105:25
106:25 109:8,18
140:22,24 141:4
161:8 165:25
175:11,13 204:4
220:15 230:22
255:3
**asks** 131:3
**aspect** 103:17
**assert** 192:22
**asserted** 192:8
244:18,20
**assessed** 135:9
**assessment** 69:4
111:12 116:13
239:25
**assessments** 65:22
**asset** 25:9
**assets** 14:24 25:5
222:22 224:4
225:1 246:16,16
**assign** 138:21
**assigned** 72:10
78:25 80:20 140:5
**assignment** 80:7
**assist** 20:8,13,17,21
21:3 76:12
**assistance** 20:10
21:21,24,25 60:5
229:12 233:21
**assistant** 80:10,13
80:16
**associate** 3:19,21
3:23 37:6 75:15
79:15 81:11,25
82:6,7,8 85:4
104:2,3 106:20
115:11 117:23
122:2 123:12,17
133:8,9 134:19
162:7 163:13,14
163:25 171:23

172:21,22 173:18
177:22,22 179:13
184:25 185:6,13
185:16,22,23
242:12 245:4
**associated** 151:8
**associates** 9:1,25
52:21 64:2,4,6
78:11 83:13,16
84:13,25 103:25
120:12 133:17
134:3,14,16 138:5
138:13 139:10,15
139:17 161:9
185:25 188:8
192:1
**associates'** 81:14
138:17
**assume** 125:10
**assuming** 129:25
140:7 166:12
202:14
**at-will** 121:5
183:10
**ATM** 143:24
**ATS** 222:1
**attached** 1:25
265:1
**attack** 172:24
230:3
**attacking** 175:7
**attacks** 197:23
230:1
**attend** 41:11,14,16
**attended** 141:13
182:6
**attending** 41:13
**attention** 112:16
238:7,11
**attest** 127:23
**attic** 26:16
**attorney** 5:14 6:1
7:14,16,19,22
8:11,13 9:13,16
9:18 19:8 23:12
28:4,23 29:1,3,19
35:14 183:24

Robert Anthony Sanders

268

209:25 210:17
214:12,16 220:20
227:14,15 229:9
235:15 240:17
265:5,9
**attorney's** 222:12
223:8,11
**attorneys** 8:4 223:9
**attribute** 173:13
**attributed** 203:6
**audibly** 6:10,13
**audio** 7:25 8:7,10
8:14,15,17,18,20
9:4
**audit** 56:19,21
58:10,14,15 139:5
139:10,23 181:20
181:23 186:1
**audited** 245:25
246:5 253:21,24
255:13,14,16
**audits** 138:17,20,21
138:24 139:2,5,8
139:12,14
**aunt** 161:14 162:15
162:16 163:16
165:3,5,8,19,20
166:4,14,15,23
167:6
**aunts** 161:18,22
**authority** 184:22
184:24
**auto** 146:15
**automatically**
150:19
**availability** 166:22
**available** 84:9,20
85:10 113:20
115:17 165:6
174:24 213:9,14
214:3 215:16
**average** 55:18 56:1
61:6,8 212:14
**aware** 10:1,12 13:8
15:19 16:19 17:19
38:6 59:19,24
63:5 65:25 74:2

82:22 83:1,3
85:16 88:14,18,22
89:21,22 108:18
108:21,24 121:25
122:5,24 124:2
138:11,13 141:19
143:12 173:16
184:5,6 186:13
238:3 240:20,24

## B

**B** 3:14 57:1,4,12
**B&T** 45:4
**b1Bank** 206:21
**back** 28:1 51:8 65:4
67:11 92:25
105:22 106:2,5,24
111:17 113:6
118:23 119:6
131:5,11,11,16
141:14 142:24
143:7,10 151:5
160:10,22 162:13
162:22 184:20
194:5 195:5 197:4
202:17 204:3
217:9 219:4
220:12 222:11
228:23 232:2
233:14 237:17,23
248:20 253:14,15
**background** 24:8
41:3 204:11,18
**backing** 123:9
**Bagley** 53:18,19
54:7
**balancing** 67:22
**bank** 1:5 4:14,19
5:15,16,21 10:11
16:23 23:23 33:19
33:23 34:1,7,7,9
42:12 44:3 46:10
47:13,15,20,21,24
48:2 50:7,7,9,9,12
50:17,22 51:20
65:16 83:17,18
84:7 85:20 89:8,8

94:10,15 112:21
121:11 131:14
133:8,9 134:14
155:13 163:3
199:15,19 200:7
202:10 205:2,12
206:20,23 207:1,5
207:9,17 208:10
208:15,15,17,19
208:21 209:12,16
209:22 210:7
211:11,18 212:1
212:20,23 213:1
216:7,7,11,12,15
216:18 223:2
224:3 225:14
229:5 240:4
241:15 243:6,11
243:23 245:21
248:11,17 258:7
264:5
**bank's** 131:18
208:23 209:5,8
**Bank/Capital** 46:8
**banker** 51:1,4 66:9
68:5 105:14 116:6
116:21 199:11
248:15
**bankers** 52:21 59:3
79:3
**banking** 35:18 42:9
44:13,15,18 45:19
50:3,19 53:21
88:15,19 89:4
96:10 97:7 109:15
110:24 111:19
132:24 134:6,22
135:6 197:4,9,12
198:21 199:2,6,7
199:9 215:6 216:2
236:22 237:3
240:13
**banks** 45:22 51:21
68:17 86:24 197:9
209:2 210:21
221:1,12,13
**Barryman** 234:15

234:15
**base** 60:17 87:7
90:7 94:2,2
103:13,13 107:18
107:18
**based** 16:18 17:9
17:17 19:9 61:13
61:14 107:3 113:2
113:5 116:12
121:18,22 124:6
125:9 161:2
172:16 178:13,21
179:2 182:22
185:1,12,12
186:11 188:18
218:21,22 235:14
244:25 249:18,21
249:23 255:15
256:5
**bases** 176:16
**basic** 15:22 24:8
**basically** 11:14
42:24 70:13 76:16
77:4 114:17
116:22 132:21
133:10 143:17
201:16 206:23
236:8
**basis** 13:4 107:2
113:4 175:11,13
176:24 179:9
224:7
**Bates** 100:21
135:24 250:12
**bathroom** 51:6
**Baton** 206:21
**Batuuka** 95:22
**BB&T** 42:12 43:7
44:3,14 45:13
46:25 47:7 216:13
**bear** 177:6
**began** 54:25
**beginning** 50:24
71:20 96:13
150:21 188:5
225:5,13 231:8
**behalf** 198:25

205:25
**behavior** 118:4
173:16 177:18
**behaviors** 178:5
**believe** 17:22 58:3
73:12 96:8 127:21
130:3,20 137:19
151:11 169:24
176:16 179:1,9
187:7 189:11
193:14 243:14,18
249:19,22 255:16
256:6
**believed** 72:18
193:11
**believing** 43:12
**Bend** 29:16
**benefit** 62:14
173:21
**benefits** 43:19,23
44:1,8,10 62:11
62:12,17,23 208:2
208:4,9 212:21
223:6 245:8 250:3
**bereavement**
161:14,19,23,24
162:5,7,11,14,21
163:3,11,13,18
164:7 165:16
166:18 167:6,17
168:10,16,20,25
169:3 179:14
193:15
**best** 6:13,19,21
22:16 59:14 64:6
64:8,13,14 69:23
75:4 90:19 97:24
103:25 104:6
158:13,20,20
160:19 174:7
191:6,7 222:19
237:16 254:20
**better** 38:19 65:23
80:8 236:9
**Beverly** 234:14,17
235:8,18 239:25
240:7,11,12

**bill** 134:4,5,20,23
    134:24 135:14,19
**billing** 106:25
    107:6,8,20 120:25
**billings** 107:10
**bills** 131:3 133:22
    133:22 138:11
    223:4 227:5 228:2
**Birming** 124:4
**Birmingham** 124:5
    124:10 125:9
**birth** 24:14
**bit** 118:10 148:6
    193:18
**biweekly** 208:12
**black** 117:22
**blackmail** 236:9
    237:8
**bless** 151:21 152:3
**block** 164:11
**blood** 197:21 230:7
    231:3,4,11,12,16
    232:6,7,19
**Bluff** 32:20 33:8,11
    33:14,18
**BMW** 226:9,13
**board** 200:22
**Bodine** 125:4,12
    127:15 128:2,10
    129:19 136:24
    137:11 140:23
    159:6 161:7 172:4
    216:23
**body** 146:15
**bold** 145:14
**bonus** 60:20 61:2,4
    61:5,10,11,13
    81:9 212:7,11
**bonuses** 212:18
**book** 157:22
**books** 224:15
**born** 43:4
**boss** 147:10 200:19
    217:19
**bottom** 100:20
    126:16 145:14
    146:13 149:5

200:10 207:8
    250:12
**bought** 246:16,20
**Boulevard** 24:17
    24:19
**box** 100:22 126:17
    127:7 139:4,20
    164:19,21 166:12
    170:14 189:1
    204:4 241:18
**boxes** 56:19,21
    138:4,12 139:4,24
    181:22 204:10
**bragging** 12:22
**branch** 3:12 18:14
    23:20 37:3 44:14
    44:17,22,23 45:3
    45:5,10,21,24
    46:4,20,23 47:2,3
    47:4,5,8,22,23
    48:10,11,24 49:3
    49:7,9,22 50:15
    50:16,18,20 52:1
    52:16,18 53:12,16
    54:8,16,19 56:15
    59:7,9,13,13,14
    59:16 60:3,11
    67:24 68:25 80:10
    80:11,12,13,15,16
    81:21,24 82:21
    85:13 86:10,21
    87:11 91:11,18
    93:15 94:18,22
    98:6,8 101:1
    103:14 104:17,21
    105:9,14 106:23
    107:21 108:22
    109:18 110:8,9,13
    110:25 112:5
    113:10 115:12,14
    115:19,22,24
    116:1,16 118:3,17
    121:4 128:15
    129:3,17 131:4,10
    138:19 142:2
    143:23 144:22,23
    144:24 145:4

146:6 147:7 151:3
    168:18 170:2,5,14
    172:19 173:1
    174:16,23 179:23
    181:8,21,24
    184:23 199:12
    200:17,23,25
    201:5,21,24 202:9
    211:19,20 217:1
    217:13 218:3,7
    224:16 234:12
    235:9 236:18,23
    236:24 240:5,9,20
    247:11 248:23
    256:10
**branches** 45:13,17
    46:11,11 49:8,22
    49:23 50:1,2 89:9
    196:2 216:19
**brand** 39:19
**brand-new** 45:21
    216:19
**breadwinner**
    223:18 224:16
**break** 7:3,6 51:6
    91:8 101:20 102:4
    171:12 181:5
    234:4 235:7
**breaks** 7:1,2 181:3
**breathe** 230:3
**brief** 11:21
**briefcase** 23:19
**briefcases** 23:14,18
    23:24,25
**bring** 112:15
    130:23 131:1,5,11
    131:11 132:11
    133:12 143:10
    219:18
**bringing** 238:6,11
**brother** 18:19
    19:12,22 22:12
    34:14,24 35:7,15
    35:25 36:4 224:10
**brother's** 19:1,2
    224:25
**brothers** 18:21,22

**brought** 5:20 11:9
    40:16 98:8 131:14
    179:6 231:21
**BSA** 143:18
**BSA/AML** 144:4
**buddy** 59:13,14
    60:3,11
**build** 45:20 76:1
    82:3,4 94:1
    107:17,17,17
    108:22 109:19
    110:17 189:20
**Builders** 160:3
**building** 44:25
    46:23 52:23 65:16
    81:22 83:23 93:20
    103:9 107:21
    110:25 201:12
**built** 47:5
**bullet-point** 168:10
    169:8
**business** 35:18 36:6
    37:10 45:25 46:1
    47:9,10 52:20
    73:3 82:7 89:5
    94:10,15 136:1,15
    141:12,25 142:13
    145:10,15,17,21
    146:1,7,22 147:11
    147:14,19 150:1
    155:1,11,18,20,22
    157:10,10,22
    159:20,23,25
    160:4 189:18,21
    224:10,17,17
    225:1 236:25
    237:11,24 243:5
    243:10,11,14,17
    243:22,24 244:2,4
    244:9,13,23 245:2
    245:7,8,11 247:12
    248:22 252:21,23
    253:10,13 255:21
**businesses** 141:8,24
    144:17 146:12
    148:12 149:18
    154:13,19 156:4

159:11,15,20
    160:8,9 161:1
    238:1 245:16
    246:1,7 253:4
**buy** 131:5,10,15
    133:10,15
**buyer** 199:7
**buying** 231:12

---

### C

**C** 2:8 3:15 5:1
    57:20,22 58:2
**C-store** 147:22
    155:21 156:14,15
    254:24
**C-stores** 142:18
**Cadence** 208:15,17
    208:19,21,23
    209:4,4,8,12,22
    211:11,18 212:1
    212:20,23 213:1
    229:5
**calculate** 150:23
**calculated** 144:23
    149:15
**calculates** 150:18
**calendar** 151:2,4
    162:9 163:8
    170:23 203:15,16
    203:18 204:1
**calendars** 23:8,12
**California** 203:23
**call** 8:23 18:2 45:22
    64:2,12 69:19
    70:21 105:22,25
    106:10 123:1,3
    128:19 129:1,5,10
    129:24 141:11,11
    146:17,18 147:25
    159:25 160:6
    162:25 194:1
    195:9,18 196:24
    204:20
**called** 18:1 71:1
    73:7,25 93:24
    101:13 105:17
    106:1,20 114:9,20

Robert Anthony Sanders

114:22 118:19
123:6 124:24
189:3 239:11
245:19
**calling** 11:14 13:10
18:16 71:4 73:8
105:18,20,23
124:20 204:18
**calls** 106:4 155:16
156:8,17 159:24
160:2,20 196:9
248:3
**cancer** 180:10
181:12,13
**candidate** 98:11
**candidates** 84:17
108:19,21 109:4
**capacity** 104:5
**Capital** 48:14,16,19
48:23 49:18,21,25
50:2 216:8,18
**capped** 61:25 62:9
202:6
**captain** 101:16
**car** 21:5,6 146:14
149:12 151:25
225:25 226:4,18
227:17 229:8
**card** 150:12,13
168:18,19 226:20
226:21,24 227:5
227:14,18,25
229:8
**cards** 223:12
227:12 228:2
**care** 27:9 213:17,21
213:22,23 214:1
**career** 50:5,6,19
84:10,12,19 216:2
216:11
**carefully** 137:12
**caring** 21:3
**cars** 226:1,2,6,7
**Carson** 42:2
**case** 4:12 5:20 8:24
15:5 16:23 28:21
186:22 190:17

235:21
**cases** 46:6 186:5
230:1
**cash** 79:4,4,9
139:12 170:13,24
171:4,6,10 179:22
180:1 183:9,9
192:3,4
**cashbox** 79:1,11
138:17,20,24
139:8,10,14 140:3
140:4,5 170:10
171:1,8 241:17
**cashboxes** 78:23
138:8,17
**cashing** 143:25
**Castor's** 146:14
**categories** 111:13
139:19 157:8,12
168:11,16,22
191:25
**category** 161:23
**catering** 245:19
**cause** 1:18 169:22
265:9
**CBM** 53:21 85:22
92:11 96:24 98:4
98:12 102:6,12,23
105:4 116:20
121:15 172:17
173:2 174:24
217:19
**cease** 10:11,18,24
11:8
**cell** 39:1,16,18 40:3
106:4
**center** 84:10,12
198:15
**certain** 73:6 78:18
126:5 139:19
141:25 142:3
156:13,25 158:9
158:18 181:15
188:6 192:7
194:10 197:17
208:1 210:4 220:8
223:22 246:10

248:21 260:18,22
**Certificate** 3:7
**CERTIFICATI...**
264:10
**certified** 1:20
245:25 246:6
264:15
**certify** 264:16,21
265:5
**challenge** 69:6
79:17 111:19
**challenged** 247:15
**challenges** 79:7
**challenging** 76:15
247:20
**Chamber** 89:12
**chance** 117:9
122:16 260:17
**Chandy** 224:23
**change** 55:3,7
114:12 134:19
158:17 262:2
**changed** 44:17
66:24
**changes** 49:13 66:6
262:1 265:1,2
**changing** 80:9,18
**characteristic**
121:22 179:3
**characterization**
142:5,9
**characterize**
205:13
**characterized**
122:3
**charge** 58:25
138:19 214:5,9
219:21
**charges** 219:24
227:18
**Chase** 50:7 216:12
**check** 105:20
141:25 143:25
146:25 204:4,18
204:20 219:4
**checked** 204:6
**checking** 36:11

218:6
**checks** 241:15
**chemo** 180:13
**Chicago** 135:7
**child** 213:17 214:1
**children** 30:8
227:23,24
**Chinese** 131:2
**choose** 201:20
**chose** 15:6 38:5
**circle** 113:6
**cited** 56:22 58:12
188:9
**citing** 187:21,25
**Citizens** 4:14,19
50:22 199:15,19
200:7 202:2
203:21 205:2,12
205:14 206:20,23
206:25 207:5,17
208:10,15 213:7
213:16 225:14
226:19 228:19,23
233:9 248:11
258:4,7,16 259:1
259:5
**Citizens'** 228:20
**city** 20:5 24:18,20
30:15 87:8 150:25
203:7
**Civil** 1:4,24 264:4
**claim** 179:7 204:15
207:21 233:23
239:23 241:11
**claiming** 103:1
178:6 197:18
229:17 232:22
**claims** 207:14
**clarification** 217:22
**clarify** 10:9,15
13:17 14:11 16:3
37:21 46:25 47:2
50:1 62:6 93:16
99:4 116:25
117:19 134:12
137:25 139:21
169:4 259:23

**class** 89:12 226:8
**classification** 49:4
67:19
**classifies** 235:16
**clean** 35:5
**clear** 60:6 84:1
93:21 110:12
115:11 143:4
158:12,18 176:8
177:6 192:18
195:21 238:18,24
251:5,22 252:22
253:1 260:3
**cleared** 158:22
**clearing** 142:22
**clearly** 187:24
196:4 230:21
**click** 150:18
**client** 65:20 69:22
69:25 70:8 71:5
74:13 77:1 81:24
87:7 118:23
146:18 147:12,24
148:6 150:16
154:23 155:13
257:19
**clientele** 94:2
**clients** 65:19,21,24
70:3 77:6,9 81:23
87:8,9,14,14 90:7
104:20,20 119:13
138:12 146:23
148:17 188:20,20
188:21 189:19
201:14
**clip** 221:15
**close** 20:16 163:17
201:23 202:10
253:10
**closed** 129:10 143:4
**closer** 113:21 202:3
**closest** 115:16
**clothes** 26:7,8
**clothing** 25:23,23
25:25
**clues** 70:7
**co-habiting** 14:11

Robert Anthony Sanders

271

**coach** 73:1 74:13
76:1 77:13,19,20
78:7 104:9 119:19
**coached** 77:8
119:19 175:23
**coaching** 13:11
69:7,8,11,13,19
70:4 71:14,23
72:6,12,15,24
74:6,9 75:22 76:5
76:9 78:1,9,12,13
176:20
**COBRA** 228:4
**code** 63:2,4,8,21,25
79:13
**codes** 79:15,16,18
79:19 80:4,5,14
80:20,22,23 81:3
81:5
**coin** 24:2 132:22
133:4,5,6,9
134:24 135:14,19
**coins** 132:23,25
133:13
**colleague** 51:23
64:12
**collect** 132:22,22
133:2 221:10
**collected** 135:8
**collecting** 20:22
36:11
**collection** 132:22
135:3,14,17,20
**collections** 24:2
**college** 41:11,13,15
**Colorado** 42:2,3
**column** 139:17,22
**columns** 138:9
**combination** 177:2
**combine** 224:19
**combined** 67:1
**come** 18:4 28:1
29:7,17 37:22
51:8 67:9 89:22
92:19 94:24
132:24 134:7
141:24 143:15

157:2 158:6,7
162:10 186:6
189:19 202:9
230:2 236:24
**comes** 105:16 106:5
113:19 133:21
134:7 189:22
**coming** 27:19 36:16
55:11 60:24 68:18
84:2 86:21 87:11
94:22 147:6,7
158:8 237:12
**comment** 77:12
104:11 164:23
165:4
**commented** 106:17
**comments** 165:12
191:4
**Commerce** 89:12
**commercial** 45:2
50:22 103:15,15
142:17 199:10,11
201:14,16 224:22
248:14,15,16
257:12,17,19
**Commission** 27:7
27:14 210:10
214:6 221:8
**common** 6:11 64:3
**commonly** 230:23
**communicate** 60:3
77:2,6,14 84:2
87:10,13 90:20
92:2 98:22 169:22
174:8 192:18
**communicated**
12:15,16,17 17:3
60:9,10 72:13
77:15 90:13 112:9
120:1 128:2 143:6
169:19,21 181:17
184:17 192:10
193:9 217:8 218:2
219:17 238:16
241:19 259:7
**communicating**
118:16 195:14

**communication**
11:22 15:25 41:19
69:10,13 71:16,18
72:8,12 76:7
89:24 111:14
114:14 116:17
124:19 128:16
131:22 137:21
167:8,14 194:9
218:3,5,10
**communications**
153:19 194:8
**community** 19:21
25:13 103:12
224:23 225:3
244:24
**commute** 113:22
203:6,8
**Como** 24:20,25
25:8 32:13
**companies** 42:7
45:22 198:14
210:21
**company** 38:7
42:24 56:11 62:21
72:1 95:1 121:7
145:16,18 155:12
155:23 160:6
180:6 183:8
189:18 202:7
221:20 224:17
233:20 244:3
245:19,21 246:23
**compared** 61:19
**Compass** 50:9,17
89:8
**compensation**
207:18,25 212:10
**complain** 21:1
119:1 173:6
217:24 218:11
**complained** 101:4
218:8
**complaining**
119:10 174:13
**complaint** 12:1,5
16:18 17:9,18

18:10 98:19,22
100:16 101:7
118:18,19,25
119:8,17 122:1,5
122:25 123:25
124:14,15,21
125:5 169:17
171:22 172:3,9,12
172:24 175:6,9,12
175:14 176:12
178:7,24 182:23
184:2,3,6,7,11,19
193:19,22,24
194:20,25 195:23
196:7,11 218:4
219:2,3,6 259:13
260:1
**complaints** 12:25
18:8 100:13
**complete** 56:12
58:22 77:25 79:5
141:13,20 146:21
147:8 153:8 161:2
171:1 191:23
209:14 210:9
220:17 255:21
256:10
**completed** 58:9,17
80:3 136:12 139:5
141:14 150:3
152:9,14,20 153:6
157:14 200:7
**completely** 6:22
**completing** 72:9
147:9 218:23
**completion** 264:24
265:4
**compliance** 52:22
57:14 142:21
143:16 144:12
186:2 187:23
**complies** 130:14
137:15
**complimenting**
71:5
**component** 222:11
**components** 194:20

**computer** 41:19
128:17
**computerized** 1:21
**concern** 77:5 79:24
96:1 98:22 104:14
105:2,8 217:17
241:13 254:3
**concerned** 92:18
106:10 171:5
**concerning** 112:15
**concerns** 104:16
169:23 172:23
174:9 175:1 184:8
259:8,16
**concluded** 261:11
**conclusion** 72:20
189:9
**conclusions** 186:24
**conditions** 172:17
180:8 181:11
257:15
**condolences** 161:20
**conduct** 3:23 63:2,4
63:9,21,25 75:15
92:19 122:2
123:12,17 144:21
149:12 242:12
248:2 255:11
256:13
**conducted** 16:17
17:8,17 94:6
175:19 181:20
182:23 186:24
244:2 247:21
248:4 253:18
**conducting** 12:8,10
65:21 67:2 92:14
93:15 110:18
138:20 141:8
**conducts** 63:20
**conference** 93:24
106:3 128:19
181:23 182:1,3
194:1
**confided** 120:15
**confidence** 183:11
**confident** 258:13

Robert Anthony Sanders

**confidential** 247:6
**confirm** 143:8
**confirmed** 215:15
**confrontational**
  72:16 75:20
**connect** 117:12
**Connell** 85:24 88:1
  97:2,2,12 98:3
  99:16 217:24
  218:2,6,9,11,14
  258:12,13
**Connell's** 97:5,9
  177:3
**Cons** 28:15
**consider** 29:23
  42:25 99:17
**considered** 45:15
  46:9 47:6 48:25
  53:20,21 77:1
  111:15 211:23
  217:13 241:9
  258:6
**considering** 48:4
**consisted** 64:20
**consistent** 69:5
**consistently** 92:2
  194:10 217:14
**conspired** 172:21
  177:21,24 178:17
**conspiring** 175:13
  177:16 193:20
**constable** 29:16
**constantly** 11:13
  28:1,17 29:3
  87:13,22 169:14
  195:9 217:13
**constitutes** 226:24
**construction** 37:10
  37:16 38:7,14,20
  136:9,9 160:3,6
  244:3 245:20
**consultant** 66:8
  109:22 246:13
**consulted** 136:4,5
  161:14
**consumer** 45:2
  52:23 53:21 96:10

97:7 211:16,17
  215:6
**cont** 4:1
**contact** 113:11
  169:1 193:21
  197:6 204:4,15
  205:22 247:12
  248:25 249:1
  259:9
**contacted** 9:2 18:14
  29:15 85:24 86:1
  97:1 123:24
  168:21 182:4
  196:6
**contacting** 197:3
**contain** 27:3
**containing** 23:8
**contains** 265:2
**contend** 102:9,14
  107:5 188:14
  190:10 229:21
**contending** 107:3
  107:12,24 109:8
  112:23,25 113:1
  121:17 176:9,11
  177:10,12,16,23
  178:7,16,17,20,23
  239:23
**content** 10:14
  11:24 112:8,11
  120:17
**contention** 106:24
**contents** 194:2
**context** 109:14
**continuation** 228:4
**continue** 104:25
  213:19
**continued** 79:1,6,8
  87:23 217:11
**contracted** 20:7,14
**contractors** 35:6
**contribution** 62:7
**control** 179:23
**convenience** 142:17
  143:21 147:23
  254:24
**conversation** 6:10

9:3 12:19 13:10
  13:14 14:17 16:13
  16:15 65:23 70:12
  70:16 74:8 75:14
  75:18,21,23 76:11
  87:3 88:9 90:2
  91:3 94:1 99:2,10
  105:13 125:18
  127:15 128:10,12
  129:12 130:1
  136:25 137:10
  140:9,11,12,22
  141:2 144:8
  161:10 172:4,6
  187:22 194:2,11
  194:23,24 196:5
  202:1,5 216:22
  239:11
**conversations**
  11:21 66:18 74:15
  86:20 94:24,25
  97:15 98:24
  108:17 136:7
  172:2 206:9
**Cooper** 123:24
  124:3,8,12,18,22
  125:1 193:23
  194:1,3,19 195:22
  195:25 196:5
  216:23,24,24
  217:4,18
**copied** 168:22
**copies** 9:12
**copy** 13:2 57:13
  63:1 183:14,17,21
  191:19 200:6
  205:1 209:10
  214:20 221:14,15
**cordial** 27:18
**corporate** 124:4
  150:12,13 241:21
  247:4
**Corporation** 44:16
**correct** 9:7 10:22
  10:25 11:2,4
  13:21,25 18:8,20
  18:23 19:17,18

23:15,16 24:21,24
  37:7,8,10,11 41:5
  41:6,22,23 44:2,4
  44:6,20 45:14
  47:11,13,14,18,19
  47:19 48:14,15,22
  51:18 52:16,17
  54:13 55:1,2,21
  57:17 58:23 62:10
  63:14,22,23 72:19
  73:14,19 78:23,25
  79:13 82:25 84:22
  84:23 86:14 88:13
  88:13 93:18 95:13
  96:23 97:4,11
  98:3,13 99:8,20
  100:17 108:14
  109:23 112:2,3
  115:12,13,15,19
  115:22 116:1,2
  117:1 122:10
  124:11 128:15
  129:20,21 130:3
  130:21 137:20,23
  141:3,6,9 144:4
  144:15 147:23
  148:4 149:11
  153:22 154:9,10
  154:15 158:17
  159:13 162:22
  163:1 166:24
  168:17 171:3
  172:10,11 173:3
  174:16 182:7
  191:7 194:1
  196:16 199:16,17
  199:18 204:8
  205:3,15,16,19
  208:15,16,20
  212:24,25 214:14
  218:17 221:25
  226:14 228:16
  231:24 232:9
  234:18 235:10
  240:12 243:1
  253:18,19 258:1
  260:2 263:3

**correctly** 18:6,12
  20:15 21:18 33:15
  47:5 59:2 60:18
  61:7 99:14 107:20
  118:8 124:25
  138:22 182:17
  183:7 200:15,17
**cost** 223:10
**Costco** 231:13
**couching** 89:3
**counsel** 28:5 29:6
  29:22 265:6
**counseling** 228:1
  233:5,8,12,16,21
**counselor's** 229:22
**counselors** 232:24
  233:1,3,19
**count** 171:10
**counted** 170:1
**country** 230:25
**counts** 170:10,14
  170:24 171:1,4,6
  171:8
**couple** 94:25
  146:12 154:18
  159:14 171:21
  172:12 218:4
  225:11 237:4
  242:5 257:9
**course** 56:12
  124:13 183:10
  187:24 218:23
**courses** 41:17,18
**court** 1:1 3:7 6:8
  28:20 29:9,12,18
  29:20 30:1,12,24
  214:21 264:1
  265:18
**coverage** 62:19,20
  229:1,3,5
**covered** 248:23
**COVID** 19:2,4,12
  20:14 251:3
**COVID-19** 4:4
  18:23 19:17 20:7
**Craig** 48:1 49:14
  49:15

Robert Anthony Sanders

Crawford 4:9
10:24 11:16 12:19
64:21 65:10,25
68:6,12 81:1
162:14 166:13
167:7
Crawford's 164:7
165:10
create 12:13,23
13:9 83:6 209:13
created 78:14
200:21 202:6
209:23
creating 175:20
176:10 177:11,13
credit 189:21 221:1
223:12 226:20,21
226:24 227:5,13
227:17,25 228:2
229:8
criteria 61:14 89:4
critical 106:19
cross 66:19
CSR 265:16,16
currencies 133:24
currency 131:2,9
132:22 133:2,11
133:15,20,23
134:10,19 135:1,3
138:6,14 179:23
179:25 180:1
192:2,24,25
current 9:23 13:23
24:16 33:13 84:4
172:22 177:22
251:5,22 252:16
252:19,23
currently 21:20
22:2,14 23:2 28:4
34:15 83:17
228:17
custodian 67:20,21
customary 69:19
87:3 134:22
customer 61:21
81:25 105:3
118:17,19,22,25

119:8,9,17 131:3
131:12 134:7
142:3,14 147:6
154:21 158:15
236:1,7,18,21
customer's 158:1
235:25 236:14
253:2
customers 81:8,14
82:2,18 104:20
105:8 106:22
133:12 134:7,13
143:21 188:18
customers' 141:15
cut 43:16
Cypress 98:17
154:25

_____

D

D 3:17 5:1 63:10,12
dad 21:4 111:20
daily 15:24 16:15
Dallas 30:4 32:7
39:5 43:25 44:19
46:11 48:4,5 52:7
damages 28:10
222:10 229:17
232:23
Daniel 224:11,23
data 32:16 103:10
103:16 108:15
221:9
database 153:5
date 8:21 21:24
24:14 51:17 52:3
56:13,20,21 69:18
103:7 126:19
150:14 197:16
202:13 203:21
212:1 264:25
dates 23:11 94:23
112:16 139:11
160:16,18 202:23
203:17 204:2
daughter 9:23
15:14,23 27:9,23
40:22 113:18

213:20 229:7
Dave 12:8,11,14,25
13:5 18:13 55:1,7
55:13 56:17 59:15
59:18,23 77:15
83:7 85:15 87:22
87:25 89:21,25
90:1,2,4,12,13,20
90:25 92:2,8,9,11
92:18 93:13,14,19
93:21,23 94:4,8,9
94:13,14,16,17,20
95:3,6,10,11 97:2
97:12,18 98:23
99:2,5,11 103:8,8
103:19 104:23
105:12,12,17,24
105:25 106:2,4,8
106:8,16,18,24
107:5,9 109:1,8
109:17,24 110:1,3
110:10,19,21,22
111:3,9,9,13,17
111:18 112:12,14
113:8 115:3,6
116:15,18 117:6,9
117:17,24 120:18
121:9 127:15
128:2,10,13,18
129:16 140:12,15
141:18 143:6
152:23 153:18,20
154:7 172:17
173:18,20 175:21
176:11 177:3,12
177:25 178:2,16
178:20,23 179:1
179:17 181:16,18
182:3,10,19
183:16,18 184:4
184:13 185:3
187:17 191:16
193:19 194:9
195:8,23 204:7,13
204:15 215:5,9,19
215:25 217:7,10
217:11,19,25

218:2 219:9,20,22
238:13 240:6
241:19 247:11,19
249:4,5 253:21
254:9 257:24
258:3,12,14,20,21
258:25 259:16
Dave's 111:25
251:1,13
day 1:18 9:2 52:2,4
61:11 70:2 77:12
85:22,24 110:10
110:19 111:8,17
113:23 128:13
138:10 139:3,4
163:2,3 170:16,22
174:3,11 179:18
193:12 207:3
223:15 234:2,2
241:17 265:11
day-to-day 52:22
66:16 223:6
days 118:10,15
158:18,19,19
188:18 213:5
264:25
days' 161:23
DC 15:24
de 45:13,15,17,22
46:4,10,11,20,22
47:2 48:10 49:22
49:23,24 50:2
86:12,21 89:7
216:10,12,17
deadline 57:16
deal 36:25
dealings 246:24
deals 197:8
debt 21:5,6 226:20
226:21,24 229:8
decades 88:18
December 22:8
171:2 219:1,7
decide 68:20
decided 22:20
42:24 53:23 97:22
136:19 174:3

224:1
decision 43:6 70:19
70:22 83:3 88:2
174:11 185:1,12
defendant 1:6,17
2:7 215:15,18
264:6
Defendant's 4:22
242:10
defensive 72:10
75:24
definitely 174:1
degree 38:14 78:6
136:8,13 146:4
165:23
delay 174:12 175:1
delete 79:25 80:22
deleting 81:5
deliver 66:17
185:21
Dell 39:23
DEMANDED 1:5
264:5
demeanor 76:7
demoted 43:14
denied 112:9 211:2
Denovo 216:4
dental 62:15,15
212:22
deny 128:4
denying 167:6
department 80:6
123:11,12 142:1
142:20 143:14,16
143:18 144:5,6,11
158:7 193:21
252:14,22 253:1
255:7
depending 67:8
212:14
depends 186:1
deponent 264:22
264:23 265:3
deposed 235:21
deposit 56:19,21
58:4 61:17,20
67:23 90:6 94:2

103:13 107:18
181:21
**deposition** 1:10,15
5:4,18,20,23,25
6:2,25 7:12,15,18
7:20,23 9:16 19:5
96:4 263:2 264:11
264:19,24 265:4
**deposits** 66:16
**depression** 197:22
229:23 230:7,8,13
**Describe** 103:5
**described** 75:15
**description** 3:11,12
4:2 51:3 53:12
65:17 100:24
151:10 188:16
189:15
**descriptions** 23:9
**desire** 43:3 199:8
**desired** 199:5
201:19 202:12
209:2
**desist** 10:11,18,24
11:8
**desk** 79:5,7,8
105:16 106:6
239:3
**destroy** 9:12
**detail** 11:11 130:10
130:13 159:10
168:15
**details** 10:13 11:23
13:8,13,18 18:5
23:5,12 35:8
59:23 60:7 76:10
111:10 118:20
120:17 123:2
129:4 137:21,24
143:8 145:17
147:16 149:23
159:22,24 189:3
219:13 238:5,23
244:7 252:12
**determined** 185:20
**determines** 186:12
**develop** 76:1 94:1

103:25 104:6
**developed** 74:17
**development** 13:12
44:24 45:25 47:10
52:20,20,23 69:7
72:15,23 75:5,8
75:22
**devices** 26:10 39:15
39:16
**diagnosed** 180:10
197:21 229:23
230:6,8,12,15,18
231:4
**dialing** 182:1
**dialogue** 12:21
16:10
**dialoguing** 99:24
**Diane** 45:9,11
**diaries** 23:8 27:1
**Dickinson** 145:1,2
152:19
**Diego** 203:23
**difference** 156:24
**different** 8:6 49:2
56:4 66:22 74:6
74:19,21 94:25
95:9 98:14 102:4
102:19 103:14
123:15 128:1,5
130:7 131:2,6
132:25 133:24
140:20 145:25
157:2,8 166:19
170:2,8,16 172:13
183:3 193:8 195:2
221:12 223:9
231:15 233:2,19
245:20 259:23
**differently** 83:9,12
130:20 166:10,12
177:6
**difficulties** 72:4
**difficulty** 72:18
**digitally** 63:15
**diligence** 141:9,10
142:4,19 143:17
143:19 144:10

152:7,11 155:4
157:4,20,25 255:8
255:9,11
**direct** 64:19,20
75:2 76:2 79:23
98:2,3 100:19
112:1 126:7
150:11 184:20
211:13 249:20,22
**directed** 224:4
252:13
**direction** 179:24
247:11
**directive** 117:17
141:14
**directly** 12:2,6
33:20 64:16 65:5
74:10 88:3 169:22
177:2 199:8
201:10 208:23
215:5 218:8 237:2
240:7 245:24
**disability** 27:9
44:10 62:23
**disagree** 188:23
**disappointed** 77:7
**disciplinary** 56:8
56:10 218:16,20
260:17,21,23
**discipline** 3:15 76:4
112:6,7 119:16
**disciplined** 56:18
**disciplining** 78:4
**disclose** 245:4,21
256:22
**disclosed** 245:6
**discontinued** 213:2
**Discount** 155:10
254:18
**discounted** 194:17
**discrepancies**
242:21
**discrepancy** 139:6
**discretionary** 61:14
**discriminated**
161:9 169:17
172:16 173:7

175:2 204:15
239:24
**discriminating**
115:9 167:5
169:13
**discrimination**
8:12,15,24 16:12
16:23 107:7,13
108:1 109:11
115:8 169:18
176:25 180:4
184:19 219:2
241:11 259:15
260:4
**discriminatory**
102:9,15,18,23
103:1 107:1,2,2
112:24 113:2,5
116:12 117:21
118:1 121:17,21
124:24 215:5,8
256:19
**discuss** 10:19 11:8
11:16,25 12:4,6
37:19 38:10 74:11
**discussed** 9:19,22
11:11 103:17
107:19 146:13
163:6 191:23
**discusses** 186:23
189:8
**disheartening**
194:4
**disparaging** 215:4
215:8
**displaced** 222:24
**display** 89:13
**displaying** 104:16
**distraught** 162:17
**distress** 229:17,20
232:22 233:24
**district** 1:1,1 45:9
45:11 48:1 53:22
264:1,1
**diverted** 237:12
**DIVISION** 1:2
264:2

**divorce** 14:3,22
22:17 28:21 35:14
36:15 40:19,20
135:16 210:4
222:22 223:9
225:2,3,5 229:9
239:5,17
**Doan** 232:5,13,14
232:16,20
**Doan's** 232:15
**doctor** 197:21
224:25 229:24
231:14 232:5,8
**doctor's** 180:12
223:12 228:1
229:22
**doctors** 197:24
230:6 232:21
**document** 53:3,8
53:15 57:6,23
60:13 63:3,13
76:5 77:17,19,25
100:4,13,20,22
101:10 122:15,21
122:23 125:25
126:1,6,15 134:15
151:19 152:9
157:6 164:10
186:25 187:1,4,7
187:25 188:13
200:9,10,12
206:16 215:1,2
220:7,12 260:13
261:2
**documentation**
23:21 29:5 76:13
179:17 182:20,21
183:15,22 191:20
191:22 195:16
196:12 209:21
210:4 235:14
240:16
**documented** 76:9
78:8
**documenting** 78:12
**documents** 7:22
23:14,18 72:24

Robert Anthony Sanders

275

146:21 210:13,19
246:1,6
**Doddy** 2:8
**doing** 16:25 36:12
37:19 38:11 46:5
65:20 66:22 79:9
79:10 105:20
106:15 114:21,22
128:15 131:13,23
134:11 142:5
147:7 156:1
157:20 163:22
173:12 181:20
198:12 218:6
237:25 245:3
251:2
**Dollan** 232:11
**dollar** 132:25
134:23 208:11
**dollars** 208:13
**door** 74:10 129:10
**dots** 148:7
**double-check** 257:3
**doughnut** 155:22
**download** 209:24
210:16 221:4
**Dr** 229:24 231:23
231:25 232:1,5,8
232:11,15,16,20
232:20
**drained** 239:15
**draining** 239:16
**drawer** 79:4,4
133:10 138:6
183:9
**drawers** 181:21
**drive** 2:4 24:20
25:8 34:12 142:23
143:11 226:13,15
**drive-through**
241:16
**driveby** 36:12
142:5 146:6
**drives** 226:11
**drop-down** 164:19
164:20 165:6,9,19
165:22,24 166:1,2

166:8,13 168:13
168:14
**dropping** 148:18
**Dubai** 203:13,20
**due** 56:12,20 58:14
58:16 141:10
142:19 143:17,18
144:10 146:4
152:7,11 157:4,20
157:25 162:18
203:2 251:2 255:8
255:9,11
**duly** 1:17 5:9
264:17
**duration** 54:9
55:15,24
**duties** 44:23 52:18
59:10 68:6
**dwelling** 14:15 27:8
210:5
**dwellings** 14:9

———————
**E**
**E** 3:19 5:1,1 54:4
100:1,3,12 171:19
172:8,14 177:20
**e-mail** 2:6,11 4:13
39:12 106:2,9
154:12 155:19
159:15,16 160:7,9
160:13,14 161:1
163:12 167:8,15
167:23,24 168:7
169:5,11,20
191:22 192:9
250:10 251:1,15
253:4 254:5 255:5
**e-mailed** 105:24
**e-mails** 4:6,7,8,11
4:18 39:9,10
153:16 154:7
159:5 205:12,13
206:7 250:11
252:13
**Earl** 85:24 88:1
97:2,2,5,12,18
98:3 99:16 177:3

217:24 218:2,5,9
218:11,13 258:12
258:13
**earlier** 30:21
117:12 136:8
171:19 172:1
173:2 174:24
181:7,19 192:14
222:16 242:17
**easier** 6:8
**ED** 252:21
**EDD** 141:10,13,21
142:1,20,22
143:15,17 144:6,7
144:10,12,21
145:14,24 147:25
152:20,25 153:21
156:5,7,12,16,18
156:21 157:1,8,13
157:18,23 158:4,6
158:7,19 159:25
247:21 251:5,18
251:22 252:6,14
252:16,21 253:1
254:21,22,25
255:2,7,13,19
256:12 259:11
**EDD's** 141:19
142:18 143:3
156:6,8 157:2
158:19 248:2,6
253:18,20 255:6
255:11 256:14
**Eddie** 2:3 211:8
242:2 260:11
**eddie.hodges@k...**
2:6
**educational** 41:3
**EEOC** 214:9,14
219:21
**effect** 129:1 236:4
**effective** 182:15
183:12
**effects** 26:1,4
**efforts** 27:15,17
28:13 29:2
**egregious** 222:21

**eight** 60:18
**either** 20:21 22:18
67:5 81:2,23 85:9
91:18 162:16
166:13 254:23
**elaborated** 108:11
**elderly** 76:11
**Eldridge** 148:7,9
**electronic** 25:11
26:10 39:15
**electronics** 26:15
26:17
**elements** 195:22
**eliminated** 80:15
206:24 207:2
223:14
**elite** 101:16
**Ellen** 54:4
**else's** 228:6
**emergency** 162:11
**emotional** 229:17
229:20 232:22
233:23
**employ** 205:25
233:20
**employed** 35:19
42:13 44:13 61:11
62:18 82:23 98:18
212:23 246:9,12
249:14 265:6
**employee** 8:1,8
15:8,10 18:4 37:3
59:7 62:11 67:5
84:4 121:5 233:20
245:10,12 265:8
**employees** 11:15
17:1 64:2,24
69:22 85:2 119:13
120:13 147:2
157:9,17 162:10
183:6 186:5
188:19 192:24
193:14 236:25
245:14
**employer** 42:5 43:9
204:19,21
**employers** 206:1

**employment** 4:15
42:4 43:11 44:13
51:16 53:24 54:9
55:16,25 64:23
65:6 71:22 96:14
198:3 200:6
202:12 205:14
207:3 208:14
214:5 215:3
220:16 225:19
233:9,24 245:1,2
245:9 246:2,5,13
249:19,24 257:15
257:22 258:15
**encounter** 77:16
**encourage** 197:19
213:19
**encouraged** 81:11
82:6 150:20
**encouragement**
104:23
**endeavors** 245:3
**ended** 79:19 105:12
249:10
**engage** 72:7 75:23
**engaged** 178:5
**Enhanced** 141:10
142:19 143:17,18
144:6,10 152:6,11
157:4
**entailed** 142:10
**enter** 28:3,6,19,21
29:4,10,17,20
85:21 87:25 90:1
96:9 104:12
108:16 150:4,6,7
150:9,14,21,24,25
151:5,7 153:5
**entered** 79:16,18
81:3 118:17
149:14 150:4
165:11,13,15
166:2,17 191:6
202:23 209:5
255:2
**entering** 27:18
29:23 80:14

119:21 162:21 182:4
**Enterprise** 3:19,21 159:20 171:23
**entire** 33:11 38:1 194:24 226:25 228:12
**entirely** 108:20 178:2
**entirety** 220:23
**entities** 155:21,23 157:24 216:4,5 220:19,25 222:1
**entitled** 60:25
**entity** 36:6 210:7 216:5 245:7
**entries** 140:16 153:4 210:10
**entry** 66:12,13,23 66:25 67:9 166:9 166:18
**entry-level** 67:6
**environment** 115:8
**Equal** 214:5
**equally** 78:10 88:24
**equated** 120:7
**equates** 164:15
**equipment** 26:15
**equivalent** 50:20 53:22 66:21 88:20 133:5 134:4
**erased** 260:23
**Eric** 37:3,15,21 38:2 136:1,4,21 243:5 244:2 245:17
**Erin** 125:16,17 137:10 140:23 159:5 161:7,15 163:7 167:13,14 168:21,21 169:7 169:19,20 179:17 182:5,6,11,13,18 183:16,16,18 191:15
**Ero** 234:17,17 235:8,12,18

**error** 163:4 165:15
**escheatment** 58:5,6 58:10,22 60:4
**establishing** 75:6
**estate** 247:2
**Estimated** 34:19
**evaluations** 55:16 55:18,24
**event** 150:17
**events** 23:9 112:14 239:22 245:20
**eventually** 112:17 199:14 208:3 249:12
**Evergreen** 101:13 101:14,18
**everyone's** 64:24
**evidence** 219:20,23 236:3
**exact** 8:21 11:22 12:14 20:1 22:13 32:6,17 33:4 35:23 47:16 48:8 48:18 52:3 54:21 55:4 67:19 68:11 69:18 85:25 87:21 91:2 112:20,22 120:22 122:4 163:18 170:6 197:16 204:1 208:11,12 224:2 230:19 238:5
**exactly** 13:7,13 15:2,25 20:4 34:19 36:24 55:12 65:7 72:2 76:7 77:13 78:17 79:6 83:22 87:12,20,24 97:6,14 99:2 115:5 118:11 124:5 128:25 135:7 145:8 147:9 147:13 151:2 154:22 155:8,15 155:25 156:17,23 157:23 159:22 164:8 173:4 183:1

185:25 193:25 195:25 196:1 198:11 202:25 219:16 230:11 238:10 249:12 257:11,13
**Examination** 3:5,5 3:6,6 5:10 242:3 257:7 260:15
**example** 68:16 74:12 82:1 147:1 152:6
**examples** 256:19
**exception** 55:18 252:22
**excess** 223:13 225:8
**exchange** 133:15 133:22 134:19
**exchanged** 131:24
**exchanging** 133:20 134:10,25
**excited** 86:22 90:21
**excluded** 34:24 35:7
**exclusively** 25:16 26:13,19
**excuse** 45:12 198:5 234:18 242:11 253:23
**executor** 76:23
**exhibit** 3:11,12,14 3:15,17,19,21,23 4:2,3,4,6,7,8,9,11 4:12,13,14,16,18 4:19,21,22 52:25 53:2,11 57:1,4,12 57:20,22 58:2 63:10,12 100:1,3 100:12 122:12,14 125:22,24 127:13 130:17 135:23 137:6,18 146:11 148:13,21,23,25 151:9,14,16,18 152:6 153:10,12 153:23,25 154:2 154:12 156:4

158:24 159:1 160:8 161:5 164:1 164:3 166:1 168:1 168:3,7 171:19,20 172:8,14 177:20 186:19,21 190:9 190:15,15,18,19 191:11,12,14 200:1,3 204:22,24 205:6,8 206:11,13 206:17 207:7 214:17,19 220:1,3 242:10,11,11 248:11 250:7,10 253:14,15 254:15
**exhibited** 72:3
**exhibits** 3:9 4:1 250:5
**existence** 143:9
**existing** 44:25 46:1 46:6 47:9 70:3 81:22 87:14 104:20 141:25 142:14 147:12,15 147:24 148:6 150:16 155:13 201:12
**exit** 42:24
**expanded** 155:14
**expanding** 147:15
**expectation** 58:8 85:17 87:15 240:5
**expectations** 46:7 55:17,25 56:6,7 59:24 175:25
**expected** 66:17 142:11 157:24
**expense** 4:3 140:7 140:13,14,14,25 141:5,7,20 144:20 148:11,14,16 149:2,6,10 150:2 150:7,10 151:5 154:8 159:10,12 160:10,14,20,23 161:2,3 179:20,21 183:8 191:25

192:4 193:1,1 247:15 248:4 251:17 252:2 253:25 254:2,3 255:25 256:13,16 259:19 260:6
**expenses** 33:23 149:11 223:7,12 225:18,23 226:18 227:2,20,25 229:9 229:9,10
**experience** 15:19 67:4,9 83:2 86:23 88:14,19,23 89:1 89:2,3,14 94:5 110:24 111:11,14 136:8 177:2 200:21 240:12,14
**experienced** 16:13 79:2 177:4 178:3 195:8 233:23
**experiencing** 16:14 231:10
**Expiration** 265:17
**expire** 207:19
**expired** 56:21 207:23
**expires** 260:18,21
**explain** 17:12 22:16 75:17 76:19 78:24 80:8 82:4 97:24 100:10 117:3 118:4 131:1 174:10 195:3 222:19 234:1 251:7,11,25
**explained** 43:7 110:23 163:2,7 195:7 254:17
**explaining** 118:20 121:2 252:8
**explanation** 17:5 46:15 119:11
**explicit** 235:24 236:3 239:4
**express** 74:5 217:11

Robert Anthony Sanders

expressed 37:23
  72:18 78:22 81:7
  161:20,24 190:7
expressions 121:14
expressly 90:9
extend 53:23 62:20
  99:17
extended 95:25
extensive 135:4
external 84:16 94:6
extra 212:10
  227:25

**F**

F 3:21 122:12,14
fabricate 13:15
face 133:12
face-to-face 143:3
Facebook 40:8,9
fact 63:24 77:25
  92:4 108:13 110:2
  113:4 117:7 175:8
  175:14 183:5
  238:22 247:20
facts 23:9 27:3
  118:5 120:10
  239:22 241:10
factual 175:4 194:7
failure 107:5,12,24
fair 45:24 46:3,22
  47:7 94:8,13,20
  142:5,9 152:10
  247:24
fairly 193:14
fairness 192:1,23
fake 237:25 241:15
fall 161:23
falls 168:16
false 12:13 175:20
  179:20,20 187:7
  188:14 189:25
  190:10 218:17,21
  218:22 237:25
falsified 179:19,21
falsifying 183:7
familiar 244:8,13
  255:24 260:25

families 19:4
family 9:20,21
  15:19 16:1,11,19
  16:22 17:2,7,12
  17:15 25:21 26:14
  27:8 30:16 35:25
  36:19 42:14 43:1
  43:4 48:4 113:22
  115:15 131:8,19
  131:23 132:1
  161:21 162:11,15
  168:11 203:3,10
  222:17 227:21,22
  228:12 229:11
  232:4,17 244:21
  245:5
far 7:18 15:3 27:18
  70:18 78:11 79:21
  86:24 94:23
  113:22 136:20
  138:2 139:6 145:3
  146:8 159:24
  160:1 179:25
  180:1 197:3,12,13
  198:13 201:15
  203:7,8 217:12
  244:10 245:8
Fargo 68:13
fashion 139:6 254:9
father 116:14
father's 224:22
fault 194:6,12,13
  195:5,6
favoritism 162:1
  163:22 167:9,11
  179:13 183:5
Fax 2:5,11
February 35:12
  43:24 50:24
  100:16 122:18
  126:20 128:11
  129:14 136:25
  172:5,9 173:8
  174:14,25 193:24
  207:6 229:1
  259:14 260:1,5
Federal 1:24

feedback 38:15,16
  70:17 93:11 105:1
  119:13
feel 64:22 102:18
  108:2 117:2 118:1
  169:13 176:21
  177:18 178:11,12
  180:3 182:24
  183:3 230:20
  255:18 258:13
feeling 173:11
  195:13
fees 14:19 222:12
  223:8,11
feet 233:14
fell 103:22 156:16
  156:21 157:22
fellow 81:25
felt 38:20 111:14
  130:7 157:13
  167:5 169:16
  192:15 194:11,16
  195:4 200:22
  259:17 260:5
female 66:3 67:13
  68:2,9 113:7
  117:16,16 235:17
fewer 24:6
fiduciary 246:18
field 38:14
figure 174:2
figured 81:4
file 10:11,18 29:11
  150:10 174:9
filed 5:15 8:22
  10:23 16:23 18:10
  28:20 29:9 102:20
  122:6,25 124:24
  140:14 172:8
  178:24 214:4,6,21
  218:4 219:21,23
  225:2,4 248:4
  255:23 259:12,12
  259:14 260:4
files 23:18
filing 8:11 15:22
  184:11,19 195:4

239:17 259:17,24
  259:24 260:7
fill 209:18 245:10
  245:17
filled 97:22 98:1
  99:24 102:14
  116:4,5 201:4
  245:15 248:24
final 3:14 57:13
  150:9
finally 68:3 79:19
  79:24 81:4 125:15
  195:11
finance 22:23
financial 20:10
  21:21,23,25 34:7
  44:15 65:13,14,23
  66:7 88:23 104:22
  109:22 110:16
  216:4 246:10
  265:10
financially 20:8
  233:14
find 16:20 104:8
  107:14,16 114:7
  116:23 117:25
  120:19 171:20
  174:2,8 250:6,14
  261:1
finding 56:22 58:9
  58:17
findings 182:22
  185:13
fine 6:17 7:1,7 9:14
  126:14 134:16
  234:21
finish 105:12
finished 6:23 261:7
finishing 59:4
fired 121:5
firm 14:25 15:4,5,6
  265:18
firms 246:10,10
first 4:22 5:9 30:4
  31:21 33:2 35:14
  55:19 56:11,13
  57:2,10 71:15

75:4 81:8 95:5,11
  95:13 98:19 100:8
  101:3,6 114:8
  138:4 140:10,11
  140:14 144:17
  153:2 154:11
  159:18 162:6
  170:18,20 173:1
  177:8,11 182:21
  185:8 189:22
  207:7 216:7,11
  217:7,10 222:11
  230:8 231:3,13
  235:20 248:12
  251:15 254:4
Fish 99:1
Fisher 99:1,4,21
fit 111:1
five 38:25 39:1,11
  39:17 43:25 46:10
  72:1 106:5 154:13
  156:4,11,18 160:8
  160:9 216:9 253:6
five-minute 51:6
  171:12 234:4
fixtures 25:11
flip 34:24
flipped 38:4
flooring 35:1
focus 45:25 47:10
  199:6
follow 87:23 97:18
  117:11 217:14
follow-up 70:1
  225:11 242:6
followed 194:18
following 36:25
  162:23 168:9,25
  196:17 207:16
  223:17 228:3
  234:13 251:18
  264:16
follows 5:9
food 7:3 147:20,22
  227:2,4,6,9
forced 222:15

Robert Anthony Sanders

278

**forcing** 115:1,4
**foreclosure** 246:21
**foregoing** 263:1
**forget** 203:13
**forgetting** 64:23
**Forgive** 230:22
**forgoing** 20:17,22
**forgot** 56:16 98:4
  163:6 192:2
  236:11 239:14
**form** 3:15,17 4:12
  63:16 157:8 158:7
  158:7 186:23
  190:17 245:11,16
**forma** 46:7 61:21
**formal** 18:10 76:9
  91:17 98:19,21
  156:5 157:18,19
**formality** 114:21
  114:23
**formally** 101:3,7
  198:23
**format** 66:24
**former** 202:2,3,4
**formerly** 22:15
**forms** 78:9,13
  152:21
**Fort** 29:15 30:15,18
  31:1 42:2
**fortunate** 132:24
  216:9
**forward** 87:4 90:16
**found** 35:13 51:24
  58:9 109:13 115:5
  115:6 116:14,17
  163:15 189:8
  199:14,23,23
  206:3 208:14,19
  208:20 209:3
  214:2 225:19
  235:15 237:15,22
  238:12 240:2
**Foundation** 159:19
**four** 36:4,4 43:25
  47:17 48:19 50:8
  50:10 68:14 71:25
  111:13 183:2

191:25 192:5,11
  192:13,16 204:10
  207:11 216:8
  224:18 225:17,18
  225:24 226:19
  231:15 240:10
  241:4,18
**Fourteen** 226:5
**fourth** 222:13
**Fox** 200:19 201:10
**frame** 12:14 48:18
  65:8 68:11 86:1
  112:22 170:6
  173:24 197:17
  198:11 203:18
  207:19 208:1
  230:19 231:10
**Franklin** 1:19
  264:15 265:16
**fraud** 118:24 119:6
  146:4 237:24
**fraudulent** 237:9
  237:18 238:22
**FRC** 66:8,10,12,15
  66:20,25 67:5,7,9
  67:16,18,20
  109:25 110:15
**FRC's** 185:10
**FRCP** 264:21
**frequently** 37:22
**Fresno** 20:6 34:12
  87:9
**Friday** 85:24
  251:15 253:9
  254:8
**friend** 50:9 51:24
  64:6,8,13,14 75:5
  116:14 248:17
**front** 71:1,9 82:3
  182:20 200:12
  202:11 222:12
**frozen** 223:22
  224:1
**FRS** 66:10,13,20
  67:2,5,7,10,16,18
  68:5 110:16 118:9
**FRS's** 185:10

**frustrated** 75:11
**full** 24:9
**functionality** 79:9
**funds** 21:3,12 147:3
  222:23 223:10
  225:8 229:14
  237:12
**furniture** 25:11
  28:7
**further** 3:6,6 257:6
  257:7 260:15
  264:21 265:5,8

---

**G**

**G** 3:23 5:1 125:22
  125:24 127:13
  130:17 135:23
  137:6,18 146:11
  148:13,21 242:11
  242:11
**gain** 247:7
**Galleria** 211:23,24
**garage** 26:16
**Garcia** 2:13
**Garden** 30:1,11,21
  30:23
**Garland** 31:8,18
**Garner** 153:17
**gas** 142:17 156:2
**gather** 29:4
**gauge** 221:17
**general** 84:14
**generally** 52:18
  123:9 126:3,5
  223:19
**geographically**
  124:2
**Germany** 42:2
**getting** 25:14 38:15
  47:6 79:18,19
  80:5 81:3 93:11
  98:7 113:21 123:1
  123:3 131:14
  158:22 197:4
  198:15 212:8
  218:5
**gifting** 224:14

**give** 6:20 7:9 60:6
  70:17,22 78:22
  80:2 81:8 82:2,7
  105:1 111:5,21
  117:9 120:16
  131:4 133:11
  163:10,13 167:15
  167:16,23 176:10
  177:12 179:24
  183:16,21 192:19
  201:22 203:18
  204:1 226:25
**given** 8:4,10,12
  23:12 83:7 115:18
  115:21 162:7
  165:19 180:5
  247:11,14,17
  264:19
**gives** 168:10
**giving** 104:1 206:6
**Glenn** 34:12,13,17
**go** 6:3 7:6 15:6
  16:13 34:9 35:9
  36:20 38:17 42:21
  50:9 53:14 57:6
  57:18,22 60:7,13
  63:12,18 65:4,17
  67:10 75:2,11
  81:17 84:7,10
  85:23 99:16 100:9
  101:10,22 119:23
  122:15 123:4
  126:9,12 127:17
  130:5,11 141:16
  142:3 143:11,23
  146:20 148:21
  151:4,14 153:23
  154:2 160:10,19
  161:5,17 162:22
  163:10 168:3
  174:4,7 180:17,19
  184:25 185:1,2,23
  186:10 191:11,24
  195:1 203:10
  205:4,8 209:1,13
  209:21 210:15,16
  210:21 211:3

214:25 219:4
  220:11 224:25
  228:19,23 232:2
  234:23,23 242:2
  242:15 247:9
  248:10 250:13,13
  250:14 252:10,14
  252:25 253:14,15
  254:15 261:7
**goal** 82:9
**goals** 72:9 82:7
**God** 151:21 152:3
**goes** 127:1,5 137:7
  157:8,9 189:7
  190:4 243:12
**going** 5:6 10:2
  12:13,22 51:10,13
  52:10 53:1 58:13
  58:16,20 60:4
  63:4 67:11 70:21
  85:25 90:14 93:23
  99:17 101:23
  102:1 106:24
  107:17 126:4
  135:16 136:17
  143:2 144:16
  147:2 158:8
  163:24 171:13,16
  180:21,24 184:20
  185:7 187:4
  195:10 203:8
  204:20 210:20,25
  218:7 222:21
  234:6,9 235:2,5
  238:4 242:20
  245:23 253:2
  254:19 258:22
  261:9
**good** 5:12,13 38:9
  51:5 101:19
  104:10,11 111:1
  116:14 151:22
  152:1 171:11
  182:18 221:17
  234:3 248:17
  250:8,11
**goodness** 31:12

53:18
**Google** 142:12,20
143:22 252:20,24
**Gotcha** 253:3
**GR8** 226:9
**grab** 7:3
**grabbed** 255:3
**graduate** 41:7
**granting** 167:7
**gray** 127:6 138:3
**great** 36:25 70:16
82:1 87:6 104:11
104:11 109:2,9
111:11
**ground** 6:1 45:20
**group** 69:9,23 80:6
**grow** 103:12
**growth** 61:17,17,18
**guardianship** 40:22
**guess** 13:8,10 17:10
17:12 19:3 29:14
65:4 66:21,24
70:5,15 72:21
77:7 80:6 95:7,17
97:24 100:9,9
102:16 114:14
122:8 123:21
126:9 127:10
141:7 142:2 150:8
158:5 163:21
173:10 178:9
184:23 193:14
204:12 217:6,15
217:20,21 226:9
233:25 235:15
240:17 252:5
253:21 260:3
**guidance** 65:24
74:6
**guide** 3:24 242:13
256:1
**guideline** 75:12
**guidelines** 75:3
158:18 161:18
163:24 188:6

**H**

**H** 4:3 41:4 148:6,23
148:25 151:9,14
**habit** 23:17
**Hale** 114:20
**half** 127:17 224:9
**halfway** 126:15
**hand** 53:2
**handing** 57:3 63:11
100:3 122:14
125:24 148:24
151:18 153:11
154:1 159:1 164:2
168:2 186:21
191:13 200:3
204:23 205:7
206:12 214:19
220:2
**handle** 80:7 192:25
**handling** 183:9
**happen** 55:3
**happened** 17:2
51:25 82:22
106:13 117:20
142:15 174:3
**happening** 11:13
76:19 122:9
202:25 224:13
230:4,5
**happens** 133:23
135:1
**happy** 113:21
120:16
**harassment** 219:3
**Harris** 97:25
**Harvest** 32:20 33:7
33:10,14,18
**he'll** 99:18
**head** 20:2,3 101:15
145:6 154:22
160:12 211:10
254:7 260:14
**headaches** 231:11
**heading** 145:14
**heads** 6:11,12
143:18
**health** 62:13,14
172:17 212:22

228:4,6,15,17,20
228:23 229:1,2
**hear** 70:7,18 71:7
74:14 151:24
**heard** 99:9 106:21
107:20 120:17
121:3 218:1,7
**hearing** 105:1
119:13
**heart** 230:3 231:18
**heat** 143:1
**heavily** 103:15
**held** 33:19 34:8
36:7
**hello** 182:13
**help** 21:5 35:9
36:10,20 49:15
72:23 75:25 114:3
131:8 141:21
155:15 189:20
254:12
**helped** 35:4 120:3
237:4
**helpful** 180:18
**helping** 77:1 78:20
131:19,23 132:1
**hereto** 1:25
**Hernandez** 93:6
**Hey** 105:4 129:1
**Hibernia** 46:8 89:8
216:7,18
**Hibernia/Capital**
50:11
**hide** 204:19
**hierarchy** 66:21
238:14
**high** 41:4 197:21
230:6 231:3,4,11
231:15 232:6,19
**higher** 142:18
**Highway** 54:20
**hire** 68:20 98:2,3
104:14 109:1,25
110:1,2,3 112:23
116:9,16 117:1,20
118:6 173:18
205:13 212:1

223:9
**hired** 35:6 51:17
67:5 68:5,22
88:12 95:24 98:4
98:6 103:20
104:22 105:7
109:22 110:6
117:5,23,24
136:11 201:7
234:12 235:9,20
240:11
**hiring** 42:17 95:23
109:9 114:19
116:11 194:15
200:19
**Hispanic** 68:2,9
83:10 117:16
161:9 163:21
**history** 119:5 162:9
162:12 210:1
221:6,7
**hit** 127:8 162:21
**Hodges** 2:3 3:5,6
101:21 166:6
167:1 211:10
242:4,9 243:25
251:10,11 256:25
257:5 259:10
260:12,16 261:3
**Hodges'** 259:25
**hold** 91:14 118:24
119:3,6 136:19
138:6
**holding** 156:14
237:18
**Holdings** 155:19
254:19
**holds** 142:2
**home** 22:3,7,9,14
24:22 25:6,8,15
25:24 26:5,22,23
27:1,15,19 28:1,2
28:3,6,9,16,18,19
28:21 31:13,21,23
32:14 37:24,25
162:18 210:19
213:19 220:22

231:12
**Homer** 31:7,13,14
**homes** 35:21
**homeschooled**
113:18
**honest** 182:24
183:4 193:2 194:4
**hospital** 21:4
**hospitalized** 19:15
**hours** 35:18 188:18
241:18
**house** 21:16 26:17
30:24 31:1 144:22
**household** 21:5,6
33:23 103:11
**Houston** 1:2,23 2:4
2:10 30:4 39:7
42:15,18,23 43:2
43:5 51:22 55:8
96:24,25 98:14,16
124:6,9 147:17
148:3,6 211:21
245:6 252:4 264:2
265:19
**HR** 9:1,5,6,7,8
11:14,17,19 13:10
16:21,25 17:25
18:2,7,14 75:19
113:11 114:2,7
115:23 123:8,9,11
123:12,15,18
124:23 128:20
161:15,16 163:1,7
167:13,14 168:15
169:2 174:9
181:23,25 182:1,5
182:23 183:4
184:11,25 185:2,7
185:7,11,12,16,20
185:23 186:6,11
192:16 193:3,21
204:13 219:7,14
219:19 241:20
**HR's** 185:17
**human** 13:18
**hundred** 125:7
134:9 224:8,15,18

224:18
**husband** 14:12
239:13
**hypothetical**
165:25
**hypothetically**
129:25

**I**

**ID** 209:17 210:22
**identified** 138:14
139:25 190:21
231:13 237:9
238:10
**identifies** 49:4
**identify** 65:23
80:19 220:16
**identifying** 71:6
138:8
**illness** 213:11
**image** 164:6 236:12
**imagine** 245:17
**immediate** 54:23
257:24 258:8,10
**immediately**
103:23 106:21
167:13 182:11,15
183:13 197:2
198:9
**impact** 158:1,15
**impacting** 174:21
**impair** 7:9
**important** 6:10
23:20
**impossible** 210:20
**impression** 69:15
215:21,23 251:2
**improve** 38:17
78:20 104:9
**improvements**
38:21
**in-person** 93:23
94:3
**inability** 21:2
**inaccurate** 127:22
188:15 242:19
243:15

**inadvertently**
162:20
**inappropriate**
236:10
**incentive** 61:1
212:11,13
**incentives** 60:24
212:12
**incident** 10:14
71:23 73:24 76:8
78:3 119:16
162:15 177:1
189:3 235:22
255:18
**incidents** 16:22
73:24 77:19
119:12 186:11
**include** 10:5,24
11:1,3,5 150:20
165:12 220:23
229:6
**included** 10:3,6
78:14 85:17 89:6
150:17 152:24
160:17 161:18
165:3 167:13
206:23 220:6
**including** 223:10
247:1 252:11
**income** 33:17 36:16
103:11 224:19
**Incorporated** 148:9
155:10
**incorrect** 79:14
81:10 153:2
**incorrectly** 58:11
58:18 66:8
**increase** 61:17 62:2
62:3,4,5,6
**incur** 226:21
**incurred** 227:9
**INDEX** 3:2
**indicated** 42:20
75:19 99:15
119:20 165:1
202:13,19 204:14
**indicating** 39:24

**indication** 99:13
**indications** 119:6
**indicators** 61:15
71:16
**indifferently**
193:16
**individual** 62:7
215:17
**individuals** 215:17
**industries** 158:10
199:3 240:15
**industry** 38:19
68:17 88:15 89:4
89:6 197:4,9
198:16,21 199:3,5
254:24
**Influences** 198:15
**info** 210:13
**inform** 17:15
215:16 217:2
**information** 8:3,5
8:12 12:13 15:3
15:22 18:1,4,15
18:17 20:2 22:17
23:6,11,23,23
24:9 27:3 32:16
72:19 73:4 76:13
78:13 97:21
102:17 103:11,16
106:19 107:11,19
108:4,9,15 118:18
126:13 128:5
146:21 148:18
149:24 158:21
159:11 160:19
163:9 164:16
169:9 173:20,22
174:4 175:5,20
183:20 184:12
185:19 190:20
191:3,24 194:7,14
195:2,16 197:8
199:22 204:18
209:5,11 210:7,11
210:22,24 211:1,6
219:19 221:6,10
221:15 229:23

233:4 238:16
240:18,19 241:19
241:21 242:18,19
245:6 247:6,14,17
247:18 248:24
252:11 253:10,12
254:13 256:11
258:15,21 259:8,9
**informed** 12:7,12
28:23 234:14
**initial** 14:21 124:19
184:12
**initially** 69:4 79:17
95:21 123:1
124:10 125:7
160:22 214:6
**initiated** 91:3
255:20
**inquire** 38:13 103:9
107:9
**inquired** 104:18
**inquiring** 13:11
28:1,17 29:3 74:1
92:22 254:12
**inquiry** 136:11
**inside** 27:19
**Instagram** 40:12
**instance** 1:16 120:9
133:3
**instances** 239:22
241:10
**institution** 34:7
**institutions** 50:3
88:23
**instructed** 29:16
143:7 152:25
169:9
**instructing** 163:13
**instructions** 58:21
79:25 80:2,21
**insurance** 62:13,15
62:16,19,20
198:14,14,15
228:8,25
**insurances** 62:12
**intended** 247:2
**intention** 52:8

**intentions** 109:20
176:19 178:1,1,15
**interaction** 71:5
**interactions** 69:24
217:16
**interest** 85:16,21
89:21,23 90:2,5
96:10 121:15
194:10 206:3
217:11 259:8
265:10
**interested** 90:5
99:22
**interesting** 38:21
64:8
**Interim** 4:4
**interject** 77:11
**internal** 16:18 17:9
17:18 83:20 84:16
90:17 98:11
100:13,16 126:1
184:3 219:2 247:5
259:13
**internally** 83:18,24
**International**
154:20,24 155:5
156:15 254:18
**interrogatories**
4:23 220:5,9
**interrogatory**
220:14,15 222:9
231:22
**interrupt** 141:17
**interview** 68:22,24
89:19 90:18,21
92:3,4,7,9,15,17
92:23 93:5,6,8,12
93:17,19,22,23,25
93:25 94:3,12,17
94:19,21 95:2,4
96:2 103:8,17,19
103:21 105:13
107:10 108:5,10
108:14 109:1,2,10
110:8,9,11,21
111:6,17 117:8
124:25 138:4

139:9,16 146:13
182:22 193:22
195:8,10,11
200:18 211:5
242:24 244:5
**interviewed** 8:25
11:13 16:21 17:21
53:16 69:1 94:8
95:10 184:11
241:6,8
**interviewer's**
254:16
**interviewing** 11:14
92:11 107:14
110:13,15 200:16
**interviews** 11:18
87:1 92:14,20
93:15 94:6 104:3
108:24 109:7
110:19,20 183:5
211:3
**intranet** 84:8,25
85:6,10 91:21
**introduced** 182:18
**inventory** 24:3 25:6
147:13
**invest** 184:17
**investigated** 241:21
**investigating** 8:24
17:20,22,25 184:2
184:5,7
**investigation** 3:19
3:21 16:17,25
17:9,17 18:3,18
81:19 123:17
124:14 126:1
127:1,2,14 128:9
129:23 137:19
149:19 159:6
171:24 184:9,14
184:18 186:23
189:9 190:7 243:2
**Investigation/Int...**
3:23 242:13
**investigator** 123:24
254:16
**investigators**

123:23 130:19
137:20 172:2
190:25
**investment** 35:7
**investments** 34:2
**investor** 22:21
**invitation** 215:22
215:24
**involved** 36:13
40:17,21 74:10
**involving** 235:22
**iPhone** 40:5
**Irving** 32:4
**issue** 73:10 79:21
79:21 100:22
105:5 186:2,2,3
188:16,19 189:9
198:3 255:22
**issued** 171:22
**issues** 81:3 139:6
142:1 172:24
176:10 189:8
190:5
**It'll** 234:25
**itemized** 227:13
**items** 25:2 121:13
149:10 157:16
159:10 192:13
226:23
**IV** 44:22,23 48:25
52:16,19 54:9

―――――――
**J**
**J** 4:6 153:10,12
**Jackie** 5:14
**Jackson** 1:22 2:9
**Jaclyn** 2:8
**January** 14:10,12
14:13 25:1 39:11
50:24 140:7,8
141:5 146:16
149:6,9,21 154:8
154:12 155:19
156:17 159:16
160:7,23 248:1
251:16 253:17
256:13,14

**Jared** 104:15,19
105:14,25 106:3,9
106:12,13,20
109:21 110:5,7,12
110:22,24,24
111:6,12,22 112:4
112:11,17,23
113:7,8 115:6,9
116:3,5,9,11,19
117:5,20,24 118:5
118:8,17 119:4,16
120:1,5,10,18
172:21 173:17
177:22 184:20
186:7,17 193:20
194:15,22 195:23
217:17,20 219:9
241:14
**Jared's** 112:1
116:14 117:1
**Jennefer** 1:19
264:15 265:16
**Jesse** 41:4
**Jesus** 2:13
**job** 3:12 19:5 42:9
43:14,16 51:3,19
65:17 70:16 84:9
85:2,15 86:16
90:10 109:19
120:25 196:18,23
197:14 198:6
199:4 209:5,20
210:13 213:2,25
220:18 247:7
**jobs** 199:2
**John** 211:13,15
**Johnson** 31:7,13,14
37:4,4,12,15,19
37:21 38:2,11
136:1,21 243:5
244:3 245:17
**join** 111:22
**joining** 68:15
**joint** 222:25
**Jones** 41:4
**journals** 26:25
**Journey** 159:19

**Jr** 2:3
jstaple@jw.com
2:11
**July** 51:16
**June** 35:15 43:23
44:2 54:13 179:12
196:15,17,19,22
197:14 198:6
213:6 214:8
225:14 227:8
**jury** 1:5 251:7,9
264:5

―――――――
**K**
**K** 4:7 153:25 154:2
154:12 156:4
160:8 250:7,10
**K-L-I-P-E-K-A**
211:14
**Karen** 10:5 11:3
12:20 64:21 67:15
67:17 81:2
**Katy** 113:10,17,24
114:15 115:14,15
115:16,19,22,24
252:3
**keep** 22:18 23:14
23:19 89:10
105:10 210:2,3
211:1,3 221:7,9
**keeping** 23:17
153:20 236:3
**keeps** 76:20
**Kelsey-Seybold**
231:14,23 232:6
232:12
**Kennard** 2:3 15:1,4
15:6,7,10,11
229:10
**Kennard's** 14:25
**kept** 23:23 80:18
92:22 152:23
162:9,12 199:5
**Kestrel** 34:21,25
35:10,16
**key** 70:6 71:7 74:14
78:12 80:3

**keys** 23:20 79:7
**kids** 228:9
**Kimberly** 248:13
248:14,20 249:2,8
249:10 257:10
258:2,11,19 259:2
**kind** 45:15 66:12
70:13,23 75:24
76:1 78:12 88:9
114:5 120:7 121:2
131:16 136:20
145:10 147:11
155:10,19 160:3
198:2 210:2
242:20 243:5
253:6
**Klipka** 211:13
**Klipka's** 211:15
**knew** 10:10,10,14
10:23 15:20 16:22
59:25 113:17
157:23 176:19
184:7 186:8 202:4
217:14 219:21
**know** 7:4 8:3 9:10
12:14,24 13:6
14:7 20:1,3 22:12
27:5 28:25 32:17
34:3 39:20,20
48:17 52:2,10
53:3,8 57:7,23
63:13 65:17 67:11
67:25 68:7,17
69:18 70:16,18
74:4 76:8,17,24
78:17,21 79:17
82:20 85:1 87:2
87:12 88:6,25,25
90:13,20 95:19
96:12 99:9,18,18
100:5 104:10,11
105:18,22 106:8
109:3,13,20
111:20 113:19
114:16,18 120:1,2
120:3,22 122:3,16
125:9,17 126:6

127:2 128:17,20
128:22 129:2,6,8
133:1 134:1,12,18
137:13 138:15
139:18 145:6
146:10 148:10
150:10 151:2,20
152:13 153:13
154:3 156:1 159:2
159:22 160:24
162:22 163:1,5,5
163:6 164:4,15
165:7,23 166:7,8
167:12,20 168:4
170:12 173:9,23
173:25,25 174:5,5
174:10 176:18,19
177:19,25 178:2,2
178:3,10,14,14
179:4 182:22
183:11,12 187:6
187:15 188:8,24
191:18 197:11,17
197:19 198:12
200:4 201:4
202:22 205:9
206:2,4,14 208:11
209:10 210:10
214:11 217:21
219:22 220:9
222:2 224:2 230:3
230:11,22 231:11
231:18 233:25
234:1,1,11 235:12
236:8,19 237:20
238:8 239:19
240:14 241:8
243:21 245:14
249:13 251:25
255:20 257:11,23
260:17,21,25
261:2
**knowing** 13:5
173:20 184:15
196:1 219:25
240:4 247:2
252:24

**knowledge** 13:4
38:13 44:16 75:6
116:20 117:22
124:7 149:18
151:13 159:7,8
160:25 164:6
184:1 191:6,7
214:8 244:25
249:18,21,23
255:15 259:1,3,5
**known** 230:23
245:22
**knows** 219:23

---

**L**

**L** 4:8 158:24 159:1
**La** 4:4 144:18,21
144:25 152:16,21
153:21 156:6,11
252:5
**label** 150:9 166:24
**labeled** 126:16,18
242:10 250:12
**lack** 72:8 236:8
**lacked** 103:22
104:5 109:3
**lacking** 109:10
**lady** 125:6
**lady's** 98:25
**laid** 206:25
**Lake** 24:20,25 25:8
32:13 102:22
203:24
**Lakesha** 4:9 10:24
12:19 64:20 65:10
68:6,12 78:20
80:25 81:9,9
162:4,14,22 163:2
163:20 164:6
165:10 166:13
167:7
**Lakesha's** 163:9,23
**Land** 18:14 37:3
52:1,5,6,9,13
54:18,19 64:15
87:7 88:17 89:11
90:7 92:19 93:15

110:8 111:24
113:10 115:12
116:1,19 118:9
120:20 170:1
173:15 234:12
235:9 236:18,20
236:23 240:3,20
**Lane** 30:15,18 31:1
31:8,14 34:21
35:1,10,16
**laptop** 26:18,21,24
39:18,19,25
**laptops** 39:16
**large** 88:22,23
142:15
**larger** 148:25
**lasted** 195:11
**late** 162:10 189:22
**lateral** 180:5 181:6
181:8
**laundering** 144:3
**law** 2:3 14:25 15:1
15:4,5,6,7,10,11
229:10
**lawsuit** 5:15 8:2,9
8:22 9:19,22 10:7
10:10,13 13:23
14:16,20 15:14,18
16:9,12 23:7,10
27:4,12 28:11
40:16,20 102:15
102:20 179:6
214:21 229:18
232:23
**lawsuits** 40:17,21
**lead** 74:12 120:13
201:11
**leader** 82:1 104:5
**leaders** 103:24
**leadership** 44:24
52:20 89:11,12
177:3
**leading** 45:13
**leads** 176:22
**learn** 15:1 51:19
241:2
**learned** 83:22

97:17 112:4 235:8
**learning** 40:19
80:21
**leave** 48:2 49:18
58:20
**leaving** 44:6 89:25
121:1 249:11
**led** 70:7 72:19
239:5
**Lee** 97:25
**left** 16:19 88:9
111:2 115:25
204:11 225:6
229:16 249:13
**legal** 9:1,5 14:19
**legally** 14:5 183:20
**legitimate** 237:24
**lending** 45:2 61:20
65:19,21 67:2
71:6 103:13
107:18 155:25
**lengthy** 16:13
195:18
**Leonard** 12:9,11,14
12:25 13:5 18:13
55:1,7 56:17
59:16,18 85:16
87:22,25 89:21,21
90:2,4,12,13 91:1
92:2,8,10,19
93:14,22,24 94:13
94:16,17 97:12
98:23 99:5 100:25
103:8,8,19 104:24
105:24 106:4,18
106:25 109:8,17
109:24 110:1,3,10
110:21,22 111:10
116:18 117:6,17
117:24 121:9
127:15 128:3,10
128:13 129:16
140:12,15 141:18
143:6 152:23
153:18 154:7,16
172:17,18,20
173:18,20 175:21

176:11 177:3,12
177:21,24 178:16
178:20,23 179:2
179:10,17 181:16
181:18 184:4
185:3 187:17
191:16 193:19
194:10 195:8,23
204:7,13,15 215:5
215:9,19,25 217:2
217:10,11,19,25
219:9,21,22
238:13 240:6
241:20 247:11,19
249:4 253:21
257:24 258:3,12
258:20,25 259:17
**Leonard's** 93:19
97:2 107:5 116:15
177:25 216:25
217:8 249:5
258:14,21
**let's** 24:8 51:15
65:10 67:15 76:25
77:2 86:7 111:4
111:21 117:9
216:13
**letter** 29:6,22
**level** 66:13,14,23
66:25 67:10
**levels** 123:15
**Lida** 9:23 13:23
20:19,23 21:17
22:5,15 24:23
30:6,9,21,23
32:21 33:20 35:11
35:22 136:18
137:1 223:17
226:13 228:14
239:7,17
**Lida's** 37:13
228:11,17,23
**lieu** 43:8
**life** 33:7 62:16,19
62:20 231:5
**limit** 199:11,12
247:12 260:18

Robert Anthony Sanders

283

**limited** 103:15
143:2
**line** 174:17 218:18
232:4 243:13
262:2
**lines** 183:3
**lining** 35:1
**link** 150:11 209:15
**LinkedIn** 40:9
197:11 208:19,24
209:1,4
**liquidated** 135:17
**list** 9:25 11:15
12:13,22,25 13:2
13:5,20 25:6,12
26:6 83:6,7 119:8
146:23 157:21
158:1,4,4,11,15
158:21 168:10
169:5,8 175:20
176:10 177:12,13
178:7 220:17,18
222:11,12 253:5
**listed** 85:15 137:22
147:19,25 148:13
148:20 149:22
155:18 156:4
159:12,15 160:8,9
160:17 188:23
191:5 201:19
220:25 222:2,14
258:2,11
**listen** 74:14 108:7
**listing** 161:1
**lists** 74:23 149:9,10
154:14 172:23
**little** 8:6 79:19,20
88:16 118:10
140:19 166:11,19
177:6 193:7,18
259:22
**live** 19:19 22:18
24:20 30:3,11,16
30:18 31:10,20
52:8,10 90:7
203:6
**lived** 29:25 31:7,17

32:3 43:25 52:12
113:17 115:16
**living** 14:14 15:23
20:23 21:11,16
22:2,9 23:2 52:6,7
225:18,23 226:18
227:2
**LLC** 4:4 145:10
147:11 152:18
154:20
**Lloyd** 224:10
**LLP** 1:22 2:9
**loaded** 139:16
**loan** 61:16,17 70:10
131:14 146:19,24
147:3,8 200:13
201:9,16 237:10
237:12,21 238:23
248:14 257:12,17
**loans** 189:20
237:25
**located** 1:22 91:12
124:3 147:17
148:2
**location** 45:14,16
45:20 47:1 48:6
49:6 52:13 85:14
85:18,20 89:16
90:3 92:19 98:17
113:14 115:17
118:12 142:12,14
142:23 143:9,24
144:24 145:19,20
146:6,7,20 150:15
150:25 151:3,6
152:13,15 157:10
173:16 200:18
211:20 216:13,16
252:21
**locations** 42:18
45:23 48:5 55:11
55:12 83:23 86:24
89:7,9 141:12
216:4,9,15,19
252:15 253:25
**log** 210:9 221:3
234:19

**log-in** 209:13 222:4
**log-ins** 210:14
**logging** 128:17
**long** 7:19 30:11,18
39:4 71:22 193:25
195:1 198:5,5
203:10
**long-term** 62:22
**longer** 26:21 66:7
120:14 135:19
188:7
**look** 75:11 100:4,24
119:4 122:15
126:3,5,13 137:6
146:14 149:3
151:19 153:12
154:3 157:6 159:2
160:10,14 164:4
164:10 168:4
187:4 200:4,8
203:14,24 206:14
214:22 220:7
242:23
**looked** 84:21 114:5
135:10 162:8
163:7,9 171:19
196:18 199:12
**looking** 87:4 90:16
91:5 138:7 139:23
148:11 149:8
172:13 188:25
198:13 199:2,3
200:12 209:1
216:21 239:8
260:12
**looks** 39:24 140:6
146:11 152:14,15
159:9,14 161:4
169:11 172:8,12
200:13 201:18
202:11,17 205:3
205:15
**Loop** 211:21
**loss** 161:21 183:11
**lost** 163:16
**lot** 27:8 49:13 85:3
135:10,11 142:17

220:21 221:20
225:12 230:4,4,5
234:1 237:1
**Louis** 32:7
**Louisiana** 206:21
**love** 81:21
**Lube** 146:15
**lumber** 155:10,12
254:18
**lunch** 189:23
**lunch?'** 217:3

_____

**M**

**M** 4:9 164:1,3
166:1
**ma'am** 91:22 145:2
190:16
**machine** 1:21
**mail** 37:1
**main** 85:7
**maintaining** 36:13
201:12
**Maintenance** 36:23
**majority** 14:24
74:9 174:21
216:17 224:3
**making** 65:19
173:21 213:23
219:6,11
**male** 41:2 113:8
114:21 117:16,17
**Man** 147:11
**manage** 50:1
179:25 240:11
250:1
**managed** 67:22
98:17
**management** 50:15
59:25 65:17 88:2
185:1,8 197:10
199:6 240:12,14
**manager** 3:12
13:16 44:22,23,25
45:9,10,11 46:9,9
47:22,23 48:1,1
48:25 49:2,3,5,14
50:16,18,20,22

52:1,16,19 53:12
53:16,20,21,22
54:9 56:16 59:9
59:15,16 73:18,22
79:21 80:11,12,12
80:13,15,16,19,22
81:21 91:18 95:23
95:24 96:10 97:7
98:6,9 101:1
104:21 105:9
106:23 107:15
110:13 112:5
114:19 116:22,23
118:11,12,17
119:2,8,14 120:19
121:4 138:19
142:2 143:23
172:19,25 173:1
174:23 176:2,20
176:23 181:8
184:23 199:10,12
200:17,19,20,23
201:1,5,11,21,24
201:24 202:8,9
211:16,17,19
215:6 217:1
218:24 224:16
234:12,16 235:9
240:3,7,21 256:10
**manager's** 109:19
150:16
**managers** 49:1
103:24 146:6
247:11
**manages** 144:11
**managing** 45:15
49:21
**mandatory** 56:12
**manuals** 74:22
**Maps** 142:20
143:22 252:20,24
**marathon** 6:25
**March** 24:15
137:11 139:9,15
140:24 169:4
170:5 247:24
248:1 253:23

Robert Anthony Sanders

284

**marital** 14:15
24:22 25:13 26:4
26:22 27:1,15
28:9,16 32:14
210:19
**mark** 49:13 103:13
**marked** 52:25 53:2
57:1,4,20,22
63:10,12 100:1,3
100:12 122:12,14
125:22,24 127:12
148:23,25 151:16
151:18 153:10,12
153:25 154:2
158:24 159:1
164:1,3 168:1,3
186:19,21 191:12
191:14 200:1,3
204:22,24 205:6,8
206:11,13 214:17
220:1,3
**markers** 232:3
**market** 42:18 44:24
44:25 45:21,25
46:9 49:1,2,5,5
51:22 52:24 53:20
55:8,9 86:21 87:9
94:2 96:24 98:14
98:15,16 103:10
104:17 105:3
106:22 107:15
108:16 116:19
197:12
**markets** 45:23
**marriage** 222:22
**married** 14:8,22
31:22
**marry** 30:9
**Mart** 147:20,22
**Mary** 53:18,20 54:1
54:2,22 55:7,12
85:14 86:15,24
89:25 90:4,9,20
194:9 215:19,25
217:9
**match** 61:24 62:9
**materials** 206:7

**Matt** 45:8,11
**matter** 16:1,2 77:9
79:23 112:15
223:11 241:22
**matters** 16:11
**Matthew** 95:22
232:11
**max** 62:1
**McDonnell** 53:18
53:20 54:22 55:7
85:14 86:16,24
89:25 90:4,9
194:9 215:19,25
217:9
**McKinney** 1:22 2:9
**MD** 120:25
**me,'** 105:5
**meal** 101:20
**mean** 6:17 12:11
25:9,23 26:6,16
45:19 59:23 64:4
76:8 86:16 103:5
104:18 114:24
132:6,17 135:16
136:5 145:7 146:5
157:11 162:2
178:9,10 196:24
203:11 210:8
215:18 240:23
245:1 257:19
259:25
**meaning** 14:8 17:7
17:15 19:4 25:10
27:5 29:2 39:15
73:23 91:25 121:5
133:21 136:18
138:6 185:25
190:10 194:20
195:23 198:10,24
221:7 248:23
257:16
**means** 141:15
156:22 160:16
251:8,12 252:1
**meant** 131:20
259:23
**measuring** 188:7

**media** 26:14
**medial** 40:7
**median** 103:10
**medical** 27:6 28:8
28:10,14 180:8
181:11 212:22
227:20 228:1
229:9 232:5
**medication** 197:24
229:24 231:17
232:9,19
**medications** 7:8
231:15
**meet** 7:14 110:18
116:19,21 124:15
175:25
**meeting** 7:17 70:2
72:9 120:18
128:19 150:17
181:16 182:6,9,14
191:17,23 193:8
212:12 217:2,10
217:19
**meetings** 217:21
**Meghan** 57:2 59:17
60:1 73:6,12,13
73:20,25 77:14
79:24 141:18
152:23 153:17,20
181:18 182:3,11
241:20 247:20
252:9,10
**Melanie** 191:2
**Melinda** 113:15
236:15
**Melissa** 10:3 11:5
11:25 12:1,4,8,10
12:12,24 13:5,12
13:20 18:1,7,9,13
37:23 38:6 64:21
68:3,20 69:3
74:19,20 76:15
81:1 82:17,20
88:11 89:17 99:16
110:9,18,22,23,23
118:11,16 119:7
119:22,23,25

122:9,24 123:25
125:5 161:13,24
163:21 167:4,16
168:17 169:12,25
172:3,22 173:14
175:6,12 176:9,16
177:8,23,23 178:1
178:5 179:14
184:2,4 191:8
193:20 194:22
195:24 235:19
**Melody** 125:4
127:15 128:2,10
129:19 136:24
137:11 140:23
159:5 161:7 172:4
216:23 250:8,11
**member** 35:25
36:19 69:24 75:4
131:8,20,23 132:1
222:17 227:21
229:11
**members** 9:21
10:23 12:18 64:5
64:7 68:14 80:20
81:24 82:2 116:18
168:11 179:25
**Memorandum** 3:16
**memory** 21:18
**Mendez** 64:21,21
67:15,25 81:2
**mental** 222:12
**mention** 38:5 249:4
249:5 254:17
**mentioned** 13:22
15:13 18:4 21:7
38:1 57:11 58:1
68:3 91:11 93:14
96:8 97:15 99:25
108:3 136:8
138:10 140:11
144:17 145:9
157:16 168:20
169:24 177:11,15
181:6,11,14 184:8
184:15 191:19,25
192:5,11,12,14

194:14 225:19
245:10 248:12
254:4,16 256:20
**mentioning** 151:10
**mentions** 137:23
**menu** 166:3
**merchandising**
199:7
**merger** 42:21
206:22
**merit** 61:13 62:3
195:14
**messages** 206:7,8
**met** 7:23 55:17,25
56:6,7 94:9,14,20
95:3,5,11 181:22
181:25 235:18
**method** 75:8 103:3
103:5,9
**methods** 106:25
107:6
**metrics** 212:12
**middle-of-the-road**
56:1
**midst** 14:3
**mike** 242:7
**mileage** 141:8
144:21,23 149:11
149:12,17 150:19
150:23 151:3,5,7
**miles** 145:6 151:6
252:5
**military** 41:12,17
231:2
**mind** 234:25 255:4
**mine** 25:9,12 50:9
51:23,24 88:24
206:23 248:17
**minute** 91:14 124:8
**minutes** 7:21,21
106:5 111:16
187:3 195:12
214:22
**Miranda** 10:3 11:5
12:8,12,24 13:12
13:20 18:2,9,13
37:23 38:6 64:22

Robert Anthony Sanders

285

68:3,7,10,20 69:3
71:19 72:18 73:20
74:5 75:11,16
76:2 78:16,22
79:12 81:1,7,13
82:20 83:9 122:9
122:24 161:13
167:4 168:7
169:12 172:22
173:14 175:7,12
176:9,16 177:9,23
177:23 179:10
184:4 191:8
193:20 194:22
195:24
**Miranda's** 11:25
12:5 18:8 82:17
123:25 124:14
125:5 169:25
172:3 178:1 184:2
**Mirandez** 12:20
**Miriam** 98:25
**miscellaneous**
138:9,14 139:17
139:22,25
**mishandled** 179:22
**missed** 57:16 65:2
74:15
**missing** 142:8
151:11 171:7,9
**Missouri** 24:18,20
30:15 32:8 87:8
203:7
**misstated** 107:22
**misstatement**
131:17,25
**mistake** 119:21
120:8 162:20
163:3,14,23 164:8
165:11,16 166:9
166:10,18 167:18
179:15 187:8
193:15
**misunderstanding**
130:25 131:21
**misunderstood**
132:18

**mixed** 133:14
**MLO** 224:16
**model** 56:6 222:10
**models** 226:7
**mom** 76:12 77:1
**mom's** 37:25 76:21
**moment** 123:5
149:3 151:19
169:24 180:17,17
180:20 191:18
220:7 234:21
**Monday** 162:19,23
170:18
**money** 14:23 20:25
34:4,8,9 130:23
130:24 131:15,18
131:18,24 132:11
132:12 133:5
134:16 138:8,11
139:16,19 141:12
158:9 223:1
224:14 225:12
227:18 229:11
237:18,23 238:8
**monitor** 143:19
**month** 22:13 33:16
34:20 112:20
116:18 170:15,19
170:19,20,21
171:7,9 223:4
225:9,20,22 226:4
230:10,19 231:7
**monthly** 33:13
34:17 138:17
**months** 21:15
43:25 72:1 113:13
113:16 114:3,11
218:5 225:17,18
225:24 226:19
233:18 240:10
241:5 248:5
**months'** 21:19
**moody** 75:16,20
76:3
**morning** 5:12,13,18
181:19 182:18
**mortgage** 22:21,23

22:25 36:16
189:18 223:4
225:20,21 226:17
227:17 229:8
**mother** 76:12 77:24
**mother's** 165:2,5
**motivation** 176:18
**move** 22:7,11 30:14
42:15 43:1,5,6
52:12
**moved** 18:13 24:25
30:4 32:5,6
248:16
**moving** 22:12
31:11 42:13
101:15 211:10
**MSB** 141:12
**MSB's** 157:22
**Multi** 48:24
**multiple** 48:24 49:7
78:19 82:5 86:22
90:3 94:10,14
155:21,22 168:11
208:18,22 245:20
**Mummert** 125:16
125:19 137:11
140:23 159:5
161:8 169:7
191:16
**MUSA** 159:19
**mutilated** 139:19
**mutual** 42:14,23

———————
**N**
———————
**N** 4:11 5:1 168:1,3
168:7
**name** 5:14 9:8 15:3
19:2,13,22 24:9
27:24 32:19,23
36:7,9 39:20 45:9
51:23 54:7 56:15
56:16 57:2 64:25
73:13 85:21 98:25
113:9 114:19
118:25 119:17,18
124:1 126:17
127:7 141:19

145:21 150:1,10
152:24 172:21
197:7 198:18
209:13,22 224:10
224:22 226:3
228:8 231:23
234:16 236:14,15
248:19,25 249:5
250:4
**named** 123:24
232:11 258:17
**names** 8:25 9:10
123:7 124:18,25
154:13 159:23
185:24 231:19
233:4 253:6,13
**narrative** 189:13
190:9
**native** 43:4
**nature** 11:12 25:16
66:18 77:15 81:12
90:14 118:2 197:2
217:19 235:24
237:7
**near** 43:3
**necessarily** 98:21
157:11 247:10
**necessary** 104:1
146:20
**necessity** 5:3
**need** 7:3 28:2,18
53:7 59:21 60:5,8
91:6 92:23 130:9
130:11 134:8,8,19
134:24 143:9,10
143:10 181:2,3
185:16 186:9,16
210:24 217:2
221:8,9 234:23,24
237:16,16,17
**needed** 36:19,23
59:24 72:25 80:7
80:19 131:10,11
155:25 156:22,22
158:21 173:11
174:2,3 203:4
255:20 256:11

**needing** 37:24
**needs** 65:19
**needs-based** 65:22
65:22 66:17 70:12
**neighborhoods**
116:15
**neither** 265:5
**nephew** 21:3,11
22:9
**nepotism** 116:13
117:1,3
**Nevada** 248:16,17
249:13
**never** 11:11 24:2
33:20 34:3,5,6,6
38:2 79:11 81:10
81:11,23 82:6,8
85:3 89:17 90:13
91:2 103:17
106:16,17,17
107:19 108:10,11
108:11 109:15
116:20 120:1
136:10,10,14
138:5 140:5,12
141:18 152:24
162:7 179:16,21
180:4 184:16
188:17,17,19
189:18,21 198:2
218:1,2,3,7,8,9,13
218:16,20 227:4
253:24 254:2
255:14 258:20
259:8
**new** 45:1,20,21,23
45:23,25 46:4,10
46:11,17 47:6
49:23 50:2 55:11
61:17 65:20 73:2
79:3 80:1,19,23
81:22 83:23 86:24
87:11,14 89:7
103:9 104:20
105:4 106:23
107:16,18,21
110:17,25,25

111:19 113:14
120:24 131:1,2,3
131:9,15 133:21
135:1 138:11,14
141:24 142:10,11
145:15,17,18,20
147:14 174:16
180:1,1 196:18
201:15 215:6
216:3,10,12,14,17
225:19 233:21
234:16
**newer** 45:16 46:4,6
47:2
**news** 162:16
**Nexus** 45:22 55:11
85:13,18,20 86:9
86:12 101:1
107:21 172:18
**Nick** 200:19 201:10
**nicknames** 24:11
**Nicole** 123:24
124:8,18,22 125:1
153:17 193:23
194:1,3,19 195:25
196:5 216:23,24
217:18
**nine** 56:25 140:15
180:6
**ninety-five** 60:18
**Nita** 59:2
**Noble** 34:12,13,17
**nod** 6:11
**non-white** 117:23
**nonresponsive** 17:4
46:13 82:11 90:24
93:2 140:18
180:15 193:6
195:20 259:21
**normal** 70:4 133:14
**normally** 59:12
131:5 139:2
149:22 151:10
165:12
**notated** 243:18
**note** 21:5,6 23:1
134:7 165:13

**noted** 128:1 148:15
149:19 263:3
**notes** 23:8,14,18
26:25 126:2 127:1
127:2,14 128:9
129:23 130:4
132:25 137:10,19
138:1,4 148:5
149:20 177:20
225:25 226:4,18
227:17 229:8
242:24 244:5
254:16
**notice** 160:16
214:14 253:9
**noticed** 52:1 138:2
**noticing** 121:3
152:8
**notification** 196:10
**November** 203:12
212:2 229:2,4
**novo** 45:13,15,17
46:4,11,20,22
47:2 48:11 49:22
49:24 50:2 86:12
86:21 89:7 216:10
216:12,17
**novo/Nexus** 46:10
**novos** 45:22 49:23
**number** 39:1,2,4
100:21 148:7
149:9 157:8,17
172:24 201:20
239:10,20
**numbered** 1:18
135:24
**numbers** 38:23,24
**numerous** 148:17
210:8 221:11
**numismatist** 132:5
132:15,19,20,21
133:2

___

**O**

**O** 4:12 5:1 186:19
186:21 190:12,14
190:15,16,18,19

191:11 242:10
253:14,15 254:15
**o'clock** 254:8
**O-G-B-U-R-N**
173:17
**OAC** 4:12 123:17
123:22,24 124:19
172:2 175:9,16
176:12 178:7,24
196:6 219:7
**OAC's** 124:14
**Oak** 211:24
**oath** 6:5
**objected** 19:9
**Objection** 17:4
46:12 82:10 90:23
93:1 140:17 166:6
167:1 180:15
193:6 195:19
243:20 251:9
256:23 259:20
**objects** 19:8
**observation** 71:13
71:23
**observations** 69:20
69:20 74:13
**observe** 105:1
**observed** 70:2
106:19
**observing** 69:21
**obtain** 28:13
**obvious** 83:4
**obviously** 151:25
167:14 173:10
**occasion** 157:15
253:24 255:10
**occasions** 78:5,7
94:24
**occurred** 174:20
256:20
**occurrence** 56:13
57:25
**occurrences** 186:11
**October** 50:23
171:1 228:25
229:1,2
**offended** 70:5

**offensive** 107:14
180:9
**offensively** 77:3
**offer** 53:23 88:7
95:25 99:17 108:4
212:20 213:25
241:7
**offered** 201:2
**office** 3:23 10:1
16:20 23:19,20,21
23:22 37:22 54:18
59:1,9 60:7 64:22
70:14,24 75:15
88:17 89:11,13
94:16 95:25
105:17 110:22
111:3,3,18 113:23
118:1,6,12,23
119:6 120:11
122:2 123:12,16
124:4 128:14
129:9 141:14
142:16 143:7
146:8 169:2 170:8
181:19 186:4
235:19 240:1,4,11
242:12
**officer** 5:4 50:22
200:13,20 201:3,9
201:17 248:15,16
257:12,17,20
264:18
**offices** 1:22
**official** 156:18
**officially** 156:12
185:20
**Ogburn** 104:15,19
105:14 106:3,20
109:21 110:5,7,12
110:22 111:7,12
111:22 112:4,17
116:3,5,11 117:5
117:25 118:8,17
120:10 173:17
184:20 186:8,17
193:20 194:16,22
195:24 217:2,17

217:20 219:9
241:14
**Ogburn's** 112:23
116:9 117:20
118:6
**oh** 40:8 53:18
114:12,16 120:7
132:16 144:9
152:2 192:13
201:6 244:12
250:23 251:10
**okay** 5:17 6:7,16,23
7:6 8:6 9:11 17:24
19:1,7,10,12
25:22 29:13 40:1
40:3 46:12,16
53:1,10 54:6,22
57:5,10,12,18,25
58:2 60:13 62:11
63:18 64:20 66:20
70:23 71:21 81:17
82:10,13 85:9
86:7 87:17,18
88:8 90:23 91:10
91:15 93:1,3 95:9
96:5 99:4 100:6
100:14 101:8,10
101:21 106:1,11
107:23 109:25
114:18 115:21,25
116:8 122:11,18
124:6,12 125:1
126:11,14,25
127:10 128:8
129:11,22 130:8
130:15 132:16
133:18 134:12
137:5,16,25
139:21 140:2,17
140:21 144:12,16
144:25 146:3,25
147:10 148:21
149:7,16 150:21
151:14 152:5,15
153:9,14,23 154:5
156:11,18 158:3
158:16,23 159:3

161:5 164:5,20
166:11,19 167:25
168:5 169:11
170:4,9,12 171:11
171:25 177:5
182:6 183:24
184:10 187:3,13
187:15 188:3,11
188:16 189:2,6,10
189:14 190:2,4,19
190:20 195:19
200:5 202:17
204:14 205:10,18
205:20 206:15
210:1 211:7
213:25 214:25
215:2,13 219:6,20
220:12 221:19
222:19 225:11
226:17 234:22
238:24 242:5,14
242:16 243:12,25
244:12 245:23
247:9 249:7
250:23,23,25
252:2,7 253:3,16
253:17 254:10,15
255:6 256:18
257:3 259:10,20
260:3 261:1
**old** 79:25 80:22
81:5 132:22
133:22 134:23
135:1 142:20
143:23
**older** 16:4,6 40:5
**omitted** 225:3
**onboard** 142:11
**onboarded** 63:1
**onboarding** 145:19
146:1
**once** 70:22 87:15
87:17 90:15
116:18 185:20
250:15
**oncologist** 232:2
**one-on-one** 69:8

71:13
**One/Hibernia** 50:2
**ones** 134:25,25
139:13 156:7,8
254:22 255:4
**ongoing** 89:24
**online** 150:3 199:20
208:19,22 209:14
221:2,3,21
**Onsite** 4:4
**open** 52:5 72:24
74:11 111:4
113:24 115:2,25
189:19 193:2
217:1
**open-model** 70:4
**opened** 46:10 119:5
224:2 236:19
**opening** 51:19
65:20 66:18 73:2
86:24 216:3
**operation** 157:9
**operational** 52:21
65:19 66:16,25
67:22 143:12,25
**operations** 56:16
59:16 73:18 80:12
80:12,15 218:24
**opportunities**
65:21 69:8 70:1
73:1 74:16 199:10
**opportunity** 48:3
51:2 71:6 76:18
87:6 90:21 104:7
117:25 136:14
180:5 199:13
214:5 217:15
218:13
**opposed** 258:12
**opposing** 28:5 29:6
29:22
**option** 165:8,10,19
166:3
**options** 168:14
**oral** 1:10,15 264:11
264:18
**order** 29:18,20

**orders** 22:18 27:20
**organization** 46:8
50:14 84:16 104:8
113:13 216:20
**Original** 4:21
**originally** 236:20
**out-of-pocket**
222:13
**outage** 139:1
**outline** 254:22
**outlined** 187:24
**outlines** 168:9,25
**outlining** 192:13
**outside** 36:17 37:9
38:7 136:1 143:2
157:18,19 243:6
243:11,13,22,22
244:8,12 245:1,2
245:3,8,11,16
246:2,5 247:12
249:19,24
**overall** 56:3,7
**overlapping** 144:8
**overqualified** 89:15
180:7 200:23
**overseeing** 59:21
**owned** 19:20 20:24
21:17 32:10 33:11
**owner** 22:23
**ownership** 244:23
**owning** 249:20
**owns** 22:25 35:22
137:2

─────────────

**P**

**P** 4:13 5:1 190:9,15
190:16 191:12,14
**p.m** 1:19 101:24,25
101:25 102:2
154:12 169:5
171:14,15,15,17
180:22,23,23,25
234:7,8,8,10
235:3,4,4,6 253:9
254:5 261:10,11
**page** 3:3,7,11 4:2
100:19 126:16,17

126:19,23 127:1,2
127:4,5,5,7,12
132:8,9 135:23,25
137:7,7,8 138:3
140:2,6 144:16
145:13 146:11,14
149:4,5,8 154:11
168:6 172:14
189:1 200:9
204:10 205:16,17
207:7,8 215:2,13
216:2,21 218:15
218:25 220:14,15
222:7,8 242:15
248:20 250:24
254:19 262:2
265:1
**pages** 53:6 126:5
127:8,12,20,25
129:22 130:10,17
130:18 137:13,18
148:13
**paid** 36:17 61:11
246:12
**painting** 35:1,5
**pandemic** 64:25
143:1 146:5 188:5
188:8,10 237:25
247:13,22,23
248:7
**panel** 80:3
**panic** 197:23 230:1
**paper** 149:1 199:20
**paragraph** 132:13
132:15 145:11
215:3,13,20 216:1
216:21 218:15,19
218:25 219:1
**paraphrase** 17:11
**Parent-in-law**
164:12 166:2,16
**parents** 30:22,23
52:12 113:17
**part** 12:21 27:20,20
42:17 82:11 89:11
93:19 99:8,9
123:11 124:18

125:18 129:24
142:8 145:24
149:4 157:5 159:6
163:23 165:17
169:12 175:17
202:7 203:5
227:24 251:13
**parted** 70:23
**Partial** 2:8
**participate** 60:19
111:6 212:7
**particular** 10:19
33:19 69:14 77:21
78:3
**parties** 5:2 265:7
**partner** 78:20
248:22 257:17
**parts** 126:7
**party** 264:23 265:3
**Pasadena** 203:6
**pass** 241:25 257:5
261:4
**passed** 100:25
162:16 172:18
241:16
**passing** 57:21
161:14
**passion** 199:8
**password** 209:17
209:22 221:4
222:4
**pasted** 168:22
**Patel** 229:24
231:23 232:1,8,20
**Patel's** 231:25
**pattern** 171:5
**patterns** 162:12
**Patty** 99:1,4,21
**Paul** 48:1 49:14,15
49:19
**pay** 14:19 21:2,5
43:16 207:9,11
212:11 222:11,12
223:3,4,6,11
227:5
**paying** 21:6 23:2
**payment** 207:9,10

207:12
**payments** 36:17
61:1
**payout** 212:13,14
**payroll** 162:18,18
168:19 169:25
170:7 180:11
**PC** 2:3 26:23 39:22
**Pecan** 148:9
**people** 105:9 112:5
119:14 197:3,11
236:25 237:24
**people's** 195:17
**percent** 62:1,4,5,9
125:7
**percentage** 61:16
**perception** 175:4
**Perez** 45:9,11
**perfect** 52:13
**perform** 255:6
**performance** 55:24
56:4,5 61:14,16
61:16 71:18 72:7
72:9 76:6 77:20
78:19,21 85:17
86:18,19 87:1
103:21 104:4,16
105:21 106:20
107:4 109:3,10
115:1 116:24
118:2,3 175:18,24
176:21,23 186:2
187:11,12,20,23
188:1,7 194:8
247:7 257:18
**period** 213:13
**periodic** 7:2
**periodically** 232:3
**periods** 213:5,11,15
**permission** 206:4,6
**Pers** 25:19
**person** 94:7,9,14,20
95:3,4,6,10,12,20
124:9,15,23 125:2
125:13,20 143:14
235:18 240:2
241:20

**person's** 239:10
259:9
**personal** 23:22,22
25:2,5,16,21 26:1
26:4,25 27:8
38:24 39:12,18,19
52:22 65:16 94:6
106:4 149:12
244:25 247:6
249:18,23 255:15
**personally** 26:18
36:8 38:10 39:10
62:6
**pertaining** 15:17
16:8 23:21 27:12
102:17 103:11
108:16 185:19
252:12
**pertains** 191:3
**petition** 4:21
214:20,24
**Petitioner's** 4:21
**phone** 8:17 38:23
38:24 39:1,4,18
40:3,4 91:5 92:6
93:24 94:7 103:8
105:13 106:4
124:16 125:3,13
125:14,20,21
129:19,24 179:18
182:2,6 195:11
196:8 235:24,25
236:2,11,11,12,13
239:11,14
**phones** 39:16
**photo** 143:22
252:20,23
**photos** 38:3,8,9
136:12 142:4
143:8 155:5
156:21,22,24,25
157:3,12,17 251:5
251:22 252:14,16
252:19,24,25
**physical** 133:6
142:13 146:7
251:2

**physically** 143:25
**picked** 71:7
**picking** 27:25 37:1
**picture** 143:24
**pictures** 142:23
143:9,10,10 153:4
**place** 60:13 63:18
65:8 87:4,22
110:11,20 112:15
118:4 148:21
150:15,25 160:2
217:23 222:21
238:17
**placed** 119:2
139:20 232:9
**placing** 138:11
**Plaintiff** 1:3 2:2
264:3
**Plaintiff's** 4:22
**plan** 61:2,4,10
212:11,13 228:4,6
228:11,11,13,15
228:17,20,23
**planning** 42:15
**Plano** 48:9 49:10
89:12
**plans** 212:7
**Plantation** 85:13
86:10 87:9,11
89:15 90:3 96:17
98:20 99:7 101:5
102:5,12,22
121:15 181:7
215:14 217:12
**Plantation's** 86:20
**Plantations** 110:9
**Playa** 265:18
**please** 6:19 7:4
20:20 57:22 130:9
130:10 151:19
154:2 205:8 220:7
251:3,7
**plus** 39:6 151:7
197:11
**point** 14:1,5 54:25
72:17 92:21
105:21 115:15

165:24 249:11
260:18
**pointed** 132:4,10
**points** 191:16
**policies** 192:7,20
**policy** 63:7 75:2,8
75:12 133:17,19
134:2,14,21
138:16 168:9,25
183:9 192:8,19,23
193:2,10,10,12,13
228:25 244:9,15
244:16,19,20
245:1,24 249:19
249:21,24,25
255:25 256:2,6,6
260:7
**portal** 209:15
**portals** 221:2
**Porte** 4:4 144:18,21
144:25 152:16,21
153:21 156:6,11
252:5
**Porter** 10:8 11:1,17
12:20 64:21 66:4
67:11 163:16
**portfolio** 142:16
201:12,14
**portfolios** 45:1
**portion** 61:24
88:22 126:19
142:15 229:14
**position** 27:21 52:1
52:5 83:20,24
84:5,11,11,15
85:5,22 86:2,6
87:5,16,19 88:2
89:1,15,22 90:6
90:15,18,22 91:18
92:5,10,12,14,16
92:18,23 93:12,16
93:17 94:9,13
95:18,20,24 96:9
96:10,24 97:9,13
97:19,22,23 98:1
98:2,7 101:12
107:15 108:19

109:5,15 111:4,12
113:15,20,24
114:15 115:2,17
115:25 116:3,5
117:7 120:19
121:7 173:2
174:24 180:5
194:21 199:15,15
199:23 200:14,14
200:16,17,21,24
201:1,2,5,7,8,21
201:23,25 202:7
207:2 208:20
209:4,6 210:2,6
210:25 211:2
215:14,16,21
240:8,21 241:4
**position?'** 217:1
**positioned** 138:12
**positions** 66:19
80:10 83:18 84:20
85:10,12 101:1
102:5,8,10,12
103:1 121:23
172:19 173:7
174:14 175:2
181:6 194:7,11
195:3,23 197:10
197:13 199:24
206:22 209:2
218:12
**positive** 72:8
**possibly** 9:6 47:17
**post** 83:24,25 86:5
87:17 113:25
114:6,10,14
211:24 240:21,24
**posted** 52:2,3,3
83:25 84:11,16
85:22 86:16 87:15
88:4 90:10,14,15
105:10 240:21,25
**posting** 84:2,17
85:15 86:1 87:4
91:4 115:20
217:12
**postings** 84:9 85:2

Robert Anthony Sanders

289

**posts** 91:1
**potential** 38:11
**potentially** 38:17
**PPP** 146:19,24,25
  147:8 237:10,11
  237:18,21,25
  238:22
**practice** 59:14
  69:23 90:19
  138:16 158:13,20
  194:15 232:17
**prefer** 72:12
**preferred** 74:6
**prepare** 7:12,23
  9:16 160:8,13
**prepared** 93:22
  103:16 108:9
  203:5 245:25
  246:5
**prescribed** 232:10
  232:19
**present** 2:13 5:2
  99:5 110:23
  129:16,19
**presented** 13:7,9
  18:3,11,17 84:3
  103:19 109:16
  161:12 235:14
  243:22
**preserve** 203:16
**president** 46:10
  47:21 48:25
  197:10 211:19
  257:12
**pressure** 197:21
  230:7 231:3,4,11
  231:12,16 232:6,7
  232:19
**presume** 6:15
**pretty** 135:16
  139:12 198:8
  209:16 213:21
  227:7 245:22
**previous** 68:16
  172:21 177:22
  204:19,21 255:10
**previously** 89:20

230:12
**primarily** 49:23,24
  61:20 65:1 67:2
  72:6,22 216:17
**primary** 155:23
  199:1 205:20,22
  213:21 223:18
**print** 210:14
**prior** 22:12 24:19
  31:11 36:5 39:7
  42:13 43:24 44:12
  47:6 48:13,20
  52:4 56:9,12
  58:13,15,16,20
  64:17 65:3 68:14
  68:17 72:3 93:16
  94:5,10,12,20
  95:1 98:6 116:6
  139:8,15 146:5
  157:25 158:14,21
  177:1 182:4
  184:11 196:19
  203:14 216:14
  230:16 244:6
  248:5 253:17,23
  253:24
**private** 71:9
**privileged** 10:13
  12:19 108:23
  109:6 157:21
  173:19
**pro** 46:7 61:21
**probably** 17:2,2
  36:3 39:5,7 56:3
  62:13 67:8,13
  68:2,9 71:15,25
  96:15 101:6
  105:20 116:6
  118:9 122:8
  123:14,20 124:1
  125:6 127:16
  130:6 131:22
  132:18 135:7
  147:6 148:3 153:7
  155:17 158:5
  176:6 186:4
  201:13 203:12

209:2 216:8
  221:15 222:19
  233:18 240:10
  254:11
**problem** 17:14 81:6
  204:17
**procedure** 1:24
  75:8 170:10
  249:25
**procedures** 75:3
**Proceedings** 261:11
**proceeds** 22:22
  33:21,22 34:1
**process** 6:2 7:15
  14:22 15:21 58:6
  58:22,25 59:22
  60:4 80:5,21
  83:16,19,23 85:14
  86:15,17 93:10
  94:19 102:13
  103:9 114:4 120:4
  130:23 132:10
  136:20 138:15
  141:21 142:8
  179:25 186:8,10
  186:14 194:6
  222:21
**processed** 241:15
**processes** 247:5
**produced** 1:16
  12:24 13:5
**product** 75:5
  147:13
**production** 82:8
  212:14
**profits** 250:2
**program** 50:15
  60:20 62:9 233:20
  233:21
**Progressive** 3:15
**prohibiting** 27:19
**projects** 38:18
**promise** 6:12
**promised** 98:1
**prompted** 173:6,9
  173:10
**pronounce** 56:15

141:19
**proof** 236:4
**properly** 56:19
**properties** 32:13,18
  32:21 33:18 34:11
  36:7,11,12,12,14
  37:13,17,20 38:4
  38:12,17,18 137:2
**properties'** 32:15
**property** 19:19,21
  19:21,22,23,24
  20:18,22 21:4
  22:18,19,19,22,24
  22:25 23:5 25:5,7
  25:9,10,12,14,15
  25:15,16,20 26:7
  26:9 27:18 28:7
  29:4,17,21,23
  31:2,3,4,12,15,25
  32:9,19,25 33:3,8
  33:11,14,16 34:4
  34:13,18,22,23
  35:1,4,4,5,7,10,17
  35:21,24 36:1,3
  36:20 224:22,23
  225:3 244:21,24
  244:24 246:20
  247:1,4 249:20
  250:1,2,3
**proprietary** 247:6
**prospect** 81:22
  150:15 159:25
**prospective** 205:25
**protected** 179:3
**protection** 9:3
  225:1
**protocol** 59:8 73:21
**protocols** 143:2
**proud** 41:2 46:7
  81:21
**Proudly** 89:10
**provide** 11:23
  12:13 20:10 21:10
  21:15 116:24
  185:18 198:17
  209:24 210:17
  236:22 237:2

252:25 258:14,18
**provided** 21:25
  107:19 128:6
  157:7 160:1 169:7
  179:16 197:24
  205:1 220:5,13,17
  220:20 222:8,10
  227:13 231:22
  240:16 252:3
  254:14,14
**provider** 213:21
**providing** 21:20,23
  154:13 159:11
  175:5
**provisions** 1:24
**PTSD** 229:23
  230:15,16,18,24
  230:24
**public** 84:14
**pull** 32:16 51:25
  250:15
**pulled** 21:12
  229:15
**purchase** 226:23
  247:2
**purchased** 31:21
  247:1
**purchasing** 34:1
**purpose** 149:23
**purposes** 38:16
**pursuant** 1:23
  264:21
**put** 32:18 57:18
  80:22 82:2 101:10
  118:18,24,25
  119:6,17 123:4
  133:5 143:9
  149:23,25 151:4,4
  157:20 158:11,14
  158:21 160:16
  166:15,23 191:11
  198:10 221:3
  224:22 229:24
  258:6,21
**putting** 138:14
  165:14 225:9
  236:9 258:20

Robert Anthony Sanders

**Q**

**qualified** 237:21
**qualifies** 169:2
**quality** 78:21
**quarter** 55:19 81:8
**quarterly** 61:5,9
 86:18,25 212:15
 212:16,17
**question** 6:15,16,22
 7:5,6 8:6 17:6,11
 17:13,14,24 25:14
 25:22 29:8,8,13
 39:9 46:17 53:15
 82:12,15,16 90:25
 93:4 94:11 102:19
 103:18 107:23
 108:25 109:4,9,15
 109:18 116:8
 135:25 140:2,19
 165:18 166:1,19
 167:3 173:1
 175:10 176:14
 188:13 190:4,8
 191:10 193:7,8
 204:25 222:2
 243:4,12,19,21
 252:18 253:17
 254:2 258:16,23
 259:10,11,22,25
 261:3
**questioned** 88:3
 118:21 140:15
 242:17,25 243:1
 248:6 255:14,16
**questioning** 139:24
 259:18
**questions** 6:9,13,22
 19:6 53:5,9 57:9
 57:10,24 73:6
 93:20 96:6,7
 100:5 108:8,11,18
 122:17,19 126:4
 126:10 127:3,10
 137:14 151:20
 171:21 187:4
 214:23 216:23
 217:5,6,6 220:8

225:12 242:6
245:24 257:6,9
260:10
**quick** 3:24 51:6
 101:20 146:14
 242:13
**quiet** 77:4
**quite** 26:3 113:16
 114:3

**R**

**R** 4:16 5:1 204:22
 204:24
**race** 8:15,24 41:1
 66:1 67:12 68:1,8
 107:3,7,13,25
 109:10 113:2,5
 116:12 117:4,12
 121:18 172:16
 178:13,21 180:7
 235:13
**racial** 8:11
**Rainier** 32:3,9
**raised** 43:4 179:7
 184:8
**rampant** 237:24
**Ranch** 91:13,14
**Randle** 120:13,21
 245:13
**range** 201:23
**rare** 132:25
**rated** 55:17 61:20
**rating** 55:18 56:1
 175:24
**Raven** 10:7 11:1
 12:20 64:21 66:4
 67:11 163:16
**reach** 59:14,15,25
 60:2 73:5 119:23
 198:10 259:2,5
**reached** 73:25
**reaching** 73:20
 74:3 124:23
 233:19
**read** 122:16 127:21
 129:24 130:10,12
 137:12 183:2

189:11 250:17
251:15 261:5
263:1
**reading** 5:3 127:16
 182:20 251:14
**ready** 53:8 57:9,24
 63:13 100:5
 122:17,19 127:3
 137:13 151:20
 153:13 154:4
 159:2 164:4 168:4
 200:4 205:9
 206:14 220:10
**real** 247:1
**reality** 16:14
**realize** 173:25
 184:9
**realized** 173:23
**really** 6:9 14:7
 15:25 27:5 40:8
 72:21 103:20
 104:4 107:23
 109:12 135:9,15
 136:13 137:4
 148:10,19 156:23
 159:23 163:16
 173:9 177:25
 178:14 185:24
 194:5 202:21
 218:1 231:20
**reapplied** 43:24
**reason** 20:25 59:5
 74:18 83:3 117:15
 118:2 121:6
 156:10 160:22
 164:11,20 165:4,6
 165:9,19 166:1,2
 166:12,15,23,24
 174:12,25 176:24
 177:19 182:14
 202:18 204:19
 221:10 237:7
 239:4,9,9,17
 258:2,11,19 262:2
**reasons** 86:22,22
 156:25 181:15
 182:25 185:19

265:2
**rebuilds** 136:9
**recall** 8:21,25 9:24
 11:22 12:18 13:7
 15:2,25 18:11,12
 18:12,18 20:15
 21:14 24:1,2 33:4
 33:15 34:19 35:23
 36:24 37:4,23
 39:14 42:6,7,12
 43:10 47:4,16
 48:8 51:23 55:10
 55:12,14 56:4
 59:2,3,12 60:6,11
 61:7,19 62:13
 63:3,4,15 65:9
 67:18 68:11,25
 72:2 73:3,23,24
 74:8,8,21 75:13
 75:16,18 76:5,7
 76:10,11 77:13,18
 77:18,24 78:2,4,5
 78:8,17,19 79:6
 82:19 83:22 85:6
 85:20,23 87:20,24
 90:3 92:1,17 93:7
 94:22 95:20,21
 96:19,22 97:6,14
 97:15 98:23 99:14
 101:16,17 112:16
 118:8 120:6 122:4
 122:22 123:1,7,8
 124:20,22 125:15
 125:17 127:14,16
 127:18,18 128:13
 128:16 132:3
 136:24 137:3,21
 137:23 138:7,22
 139:11,13,18,19
 139:20,21,23,25
 140:1,8,10,11,24
 145:5,8,11,17
 146:8,10,22,22
 147:4,5,12,24
 148:2,8,14 152:22
 154:11,13,22,23
 154:24 155:1,7,14

156:9,17 159:10
159:21,22 160:5
160:11 161:7,10
161:11 167:22
171:9,10 174:18
174:19 184:17
187:1,11,22 188:2
188:4,5 193:17
194:25 195:25
196:1,3,4,12
209:3 213:13
214:25 216:15
219:6,10,11,17,18
231:19 236:5,7
237:21 238:5,15
238:17 239:2
242:21,22 243:8
244:14,18 245:11
247:19,20 249:8,9
249:17 256:15,16
256:17 257:11,12
258:19
**recalled** 162:15
**receipt** 264:25
**receive** 61:6,11
 62:3,11,16,22
 63:1 91:23 147:2
 156:5 196:10
 207:11,14,22
 208:6,8 212:3,11
 215:22,24 245:7
 250:2
**received** 16:18
 17:18 56:8,14,25
 57:14 58:3 61:1
 62:4 93:5,17 97:8
 162:15 189:21
 205:12 207:20
 211:5 212:18
 213:25 214:9,13
 218:3,16,20 223:5
 224:9 251:17
**receiving** 196:8,12
**receptive** 71:24
 76:3
**Recess** 51:12
 101:25 171:15

180:23 234:8
235:4
**recognize** 206:16
**recollection** 128:1
128:14 168:12
170:25
**recommendation**
110:5 117:6
185:17
**recommendations**
43:5 109:24
**recommended**
78:18 104:14
**record** 1:25 5:6 9:2
9:3 51:10,13
101:22,23 102:1
104:13 151:1,3
171:13,16 180:17
180:20,21,24
210:2 211:4 234:6
234:9,24 235:2,5
242:24 260:23
261:6,8,9 264:19
265:9
**recorded** 130:19
139:22
**recording** 8:14,16
8:20 9:4,12
**recordings** 8:1,7
**records** 9:9 27:6,7
27:8,10,11,14,16
28:8,10,14,18,22
29:10,12,21
183:19 206:6,10
219:4 220:22
**recruit** 49:15 240:7
**recruited** 49:16,19
50:8
**recruiter** 197:8
198:18 199:21,22
205:16,21,23
**recruiters** 197:3,6
198:11,24,24
**reducing** 20:22
**refer** 136:15 160:23
189:19
**reference** 3:24

124:17 131:7
137:4 161:13
165:13 188:11
204:17 242:10,13
247:10 258:5,15
258:18 259:6
**referenced** 30:20
144:2 162:14
181:12
**references** 215:14
216:22 218:16
219:1
**referred** 15:7,10
68:12 132:2
189:18 232:4
**referring** 74:7,21
118:23 131:8
187:16 205:18
216:5 259:13
**refers** 136:1
**reflected** 13:19
149:20
**reflects** 149:2
**refresh** 168:12
**refused** 79:11
167:15 183:23
**regarding** 7:16,18
8:4,11 14:17 15:5
16:11 18:1,7,14
86:20 90:2 140:13
154:8 174:6
182:23 191:17
194:8
**regardless** 117:7
**regards** 18:17
112:8
**Reginald** 19:13,14
19:19,25 20:7,11
20:14,21,23 21:10
21:16,20,24 22:2
22:15
**regional** 73:16
**Regions** 1:5 3:12,13
3:14,16,17,18,20
3:22,23,24 4:5,6,7
4:8,9,10,11,12,13
4:15,17,18,20

5:15,16,21 8:1,4,7
9:1,5,19,25 10:11
10:17,18 11:7,10
12:1,5 13:23 15:7
15:14 16:9,11,17
17:8,17,18,21
23:7 27:4 28:11
33:5 36:18 37:3,7
38:7 40:17,21
42:4,8 44:14
51:16,17,20,25
52:15,19,25 53:2
53:11,17,24 54:10
54:13,17 55:8,16
55:25 56:9 57:1,4
57:12,20,22 58:2
59:8 60:16 61:2
61:22,24,25 62:8
62:12,25 63:5,10
63:12,20 64:2,11
65:3,15 66:23
67:4 68:10,15,18
71:20 73:21 74:7
74:21 75:15 80:6
80:9 82:16,21,24
83:16,20 84:1,4,9
84:12,18,19,21,24
84:25 85:7,9,11
85:20 91:19 92:16
94:14 96:14 97:22
98:8,18 100:1,3
100:12,12,16,21
101:4,12,17 102:5
102:9,14,20,23,25
112:18 113:12
115:18 121:4
122:2,6,12,14
123:9,11,18,23
125:22,24 126:1
126:16 127:13
129:24 130:17
133:4,17,19
134:13 135:24
138:7,16 141:23
142:1 143:15,19
144:5 146:4,19
148:23,25 149:2

151:16,18 153:10
153:12,25 154:2
156:24 158:24
159:1 164:1,3
168:1,3,9,25
170:10,12 171:19
171:23 172:2
179:7 180:10
184:1 185:9,15,22
186:19,21,24
191:12,14 192:7,8
192:19,23 193:9
193:19,21 196:6
196:15,20 197:23
200:1,3 202:2,10
202:22 204:22,24
205:6,8 206:11,13
207:25 208:4,9
213:6,16 214:9,10
214:17,19 215:4
218:24 220:1,3,4
223:2 224:8 225:7
225:7,8,13 226:19
228:3,7,10,12,14
229:18 230:1
233:24 234:12
235:15,20,25
237:13,14,18,20
238:9,19,20,21,25
239:2,2,23 240:17
240:21,24 241:6
241:14 242:12
244:8 245:3,9,9
245:19 246:10,14
246:17,17,20,24
247:2,4 248:15,18
248:23 249:13,19
250:12,22,24
255:24 256:21
257:10 258:24
259:6,13,14 260:1
260:5,19,22 264:5
**Regions'** 8:23 63:1
63:25 81:18 150:8
150:23 159:6
186:22 190:7
228:11 238:14

246:1,6
**registered** 193:24
**Registration**
265:18
**regular** 35:18
207:11
**reimbursement**
255:24
**relate** 8:1 23:9
126:4 149:9
244:13
**related** 8:15 13:11
13:14 28:10 57:14
58:3 72:6,22 78:6
79:16 93:20 102:8
107:25 108:25
109:21 116:8
121:14,16,23
123:25 130:18,22
131:24 137:20
139:8 142:4,13
145:17 149:5,25
159:25 161:11
172:3 173:7 175:2
175:6,8 177:3
187:16,17,18
189:8 191:16
195:4 196:6 199:9
203:21 205:12
212:12 230:24
233:23 246:1,6
253:12 254:23
258:15 265:6
**relates** 8:8 117:3
**relating** 232:21
**relation** 109:18
110:16 125:5
**relations** 219:9
**relationship** 50:21
61:18 65:13,14,16
65:18 66:7 69:2,5
72:5 82:4 90:6
104:23 109:22
142:11 147:14
158:2 199:10
200:20 201:11,24
202:8 218:9

Robert Anthony Sanders

223:18 239:12
**relationships** 44:25
45:1 52:23 75:7
81:22 82:2,3,5
142:10 146:2
155:14 201:13,16
255:21
**relative** 265:8
**relax** 198:1
**release** 207:14
**relevance** 19:3,9
**relevant** 19:11 27:4
**relocated** 52:9
**reluctantly** 38:5
**remaining** 222:18
**remark** 167:10
**remarked** 169:16
**remarks** 188:22
**remember** 9:10
13:13 18:6 32:6
45:8,8 54:20,21
55:4 59:4 60:18
62:1 64:24 65:7
85:25 87:21 94:23
99:2,3 112:13,19
112:21 113:9
118:11 123:2,3
124:25 128:11,25
129:4,5,11 137:25
145:16 147:9,16
154:21 155:3,7,25
156:2,7 161:12
163:17 170:16
171:7 172:5
182:17 183:1,7
187:19 193:24
194:24 196:8,13
197:16 200:15,17
202:25 203:15
208:12 219:12,13
219:14,16 226:8
230:19 234:15
237:5,13 238:6,10
238:11,21,23
240:18 242:21
249:12
**remind** 216:25

**remodel** 136:19,21
136:22 137:1
**remodeling** 37:16
**remodels** 136:22
**renovations** 136:13
**rent** 20:18,22 21:2
21:15,19 23:3
31:14,25 33:13,15
33:21,25 34:8,9
36:11
**rental** 22:3 31:4
32:25 33:17,22
34:4,11,17,22
35:21 36:1,7,10
36:13,16 37:13,13
244:21 249:20
**rented** 22:15 33:10
33:12 34:15
**renting** 19:23,25
20:18 22:14 23:4
34:14
**repeat** 6:18 17:13
**rephrase** 82:15
**replace** 240:8
**replied** 104:10
183:16
**reply** 106:2,8
**report** 112:10
139:7 140:7,13,14
140:15,25 141:5,7
141:20 144:20
148:11,14,16,20
149:6,10 150:2,7
150:11,17 151:5,9
151:12 154:8
155:17 159:10,12
160:10,14,18,20
160:23 161:2,3
169:17 172:24
174:4,10 175:21
179:20,21 189:7
190:4 192:1,4
193:1,1 214:1
237:16 238:13,18
238:21,25 239:1,2
247:15 248:4,5
251:18 252:2

253:25 254:3,3
256:13,17 259:19
260:6
**reported** 1:21
64:16 172:23
176:24 189:5
190:5 219:10
238:16 256:15
**reporter** 1:20 6:8
190:17 264:15
**Reporter's** 3:7
264:10
**reporting** 55:1,9
188:24 265:17
**reports** 4:3 64:19
64:20 76:2 149:2
157:23 183:8
**repossession**
246:21
**represent** 49:6
100:11 123:22
125:25 128:8
129:22 137:9
149:1 153:15
154:6 159:4
186:22 187:15
188:25 191:15
205:11 214:19
216:22 220:4
221:19
**representative** 9:8
**representatives**
17:21
**represented** 71:19
190:13 246:23
**representing** 5:15
105:6 136:24
190:6,24
**represents** 207:10
**request** 4:9 9:13
142:1 143:15
145:24 156:5
157:13,18,19
164:7 165:10,21
167:6,6 191:21
195:15,16 209:5
209:25

**requested** 83:1
104:15 157:18
161:13 167:23
168:17 173:18
209:20 210:13
237:10 252:12
254:13 255:7
264:23 265:3
**requests** 141:25
156:19
**require** 143:23
157:23 170:13
**required** 5:5 58:8
73:2 141:20 143:3
146:5 156:9
183:21 185:18
254:25 256:9,10
256:11
**requirement** 79:3
113:12 141:11
142:18 158:6
**requirements**
80:18 141:13
157:2 247:21
255:2,20
**requires** 209:16
**research** 15:2,4
20:2 163:15 198:8
**researched** 15:4,5
199:9
**residence** 24:21
**residential** 103:15
**resign** 43:8,10
**resigned** 43:11
112:19 120:23
241:14
**resist** 69:7
**resistent** 69:10,12
69:17 71:17
**resolution** 4:12
157:14 186:23
190:17 252:6
**resolutions** 254:21
254:22
**resolved** 196:11
**resources** 13:18
74:7,22 104:1

**respect** 23:7 27:13
28:8 77:21 102:25
124:12
**respectable** 240:2
**respectful** 76:25
77:2,8
**respond** 167:10
179:4 254:9
**responded** 103:23
167:22 169:12
243:23 251:4,21
253:3,5 255:4
259:11
**respondent's**
240:18
**responding** 252:15
**response** 4:22
91:23,25 97:8
152:11 167:12
179:11 217:18
222:8,9 243:8
**responses** 137:22
138:1,2 182:24
183:4 192:15
193:3
**responsibilities**
52:22 68:6
**responsibility**
103:24 104:5
216:25 217:8
**responsible** 80:14
138:23
**rest** 69:5 188:13
198:1
**restaurant** 245:5
**restroom** 7:2
171:12
**restructuring** 55:8
**result** 44:3 77:18
95:15,17 202:5
**resulted** 256:21
**results** 138:24
139:10
**résumé** 4:16 88:25
89:6,18 111:10
205:1,24 209:6
240:19

Robert Anthony Sanders

293

**résumés** 198:25
221:12
**retail** 103:16 199:6
**retain** 14:25 210:7
210:23,24 211:5
221:6
**retained** 210:11
**retainer** 14:21
**retaining** 72:19
**retaliated** 175:18
178:20,23 188:17
**retaliating** 175:7
175:12,20 176:16
176:23 178:12,18
179:2
**retaliation** 10:12
174:1 175:18
176:1 177:13,14
177:18,24 178:9
178:11 179:7,9
255:19 259:18
260:7
**retaliatory** 176:9
176:12,20 177:10
177:17 178:6,8
**retrieve** 27:15
**returned** 264:24
265:1
**reverse** 115:8,8
**review** 7:22 9:9
53:3,4,6,7 57:6,23
63:8,12 85:18
86:18,19 100:7
126:25 127:8
130:17 138:25
175:24 176:3
188:12 204:25
205:9
**reviewed** 89:17
127:11,20 137:17
139:9,12,12,14
**reviewing** 138:23
244:14
**reviews** 87:1
175:19 176:21
194:9
**Rich** 147:20

**Richman** 147:20,20
**Richmond** 87:8
147:20,22
**right** 14:3 15:16
16:14 24:17 26:23
51:15 56:2 57:15
60:17 64:25 65:20
66:11,23 73:8,19
77:23 80:2,23
84:6 86:13 98:10
99:14 100:2,18
102:3 111:25
119:22 120:9
121:1,13,19
122:13 124:22
125:23 126:18,24
127:11,19 129:13
130:16 135:15,21
135:22 136:2
137:5,17 138:3,18
141:5 142:25
144:4 147:10
149:8 151:17
152:6,24 154:6
156:19 158:25
159:21,24 164:10
165:18 166:21
169:6 171:18
174:17 176:6
186:15,20 189:12
189:14 190:14
200:2,8 202:14
205:4 214:14,18
215:11 222:7
223:15 225:16
226:2 227:16
230:20 231:15
237:10 241:10,23
241:25 242:15,23
248:10 249:3
251:24 255:22
256:17 257:2,3,5
258:22 259:12
260:9
**Rinaldi** 205:18
**Rivadeneyra** 10:5
11:3,17

**Riverstone** 85:19
91:11,15,18 92:4
92:10,16,20 93:6
93:10,16 94:13,19
94:21 95:1,2,10
95:15 96:16,20
98:20 99:25 101:5
102:5,12,22
103:10 105:14
107:1,7,11,25
108:19,22 109:5
121:15 181:7
**roads** 150:20
**Robert** 1:3,11,15
3:4 4:16 5:8 24:10
105:4,17 111:4
114:20 126:18
137:8 163:10
182:14,21 251:17
263:1,7 264:3,11
264:17
**Robert's** 182:11
**robert-sanders@...**
39:12
**role** 50:12,17,20
51:1 53:12,17
56:6 66:5 67:6
68:4 98:12 102:6
102:23 105:6
107:15 110:13,15
113:13 118:9
121:16 241:7
256:10
**roles** 102:9,13,14
102:18 103:24
181:8
**ROM** 73:6,15
79:24
**Ron** 114:20
**room** 26:14,14
106:4 111:3
181:23 182:1,4,10
**Rosenberg** 200:18
201:5
**Rosharon** 30:1
32:20 34:22 35:24
52:12

**Ross** 265:17
**rotate** 170:23
**rotation** 170:17
**Rouge** 206:21
**roughly** 14:13
34:19 48:18 50:7
50:23 54:14 66:21
72:2 101:9 116:7
173:4 208:13
247:25
**round** 145:6,7
252:5
**rows** 149:9,20
**Rule** 5:5 264:21
**rules** 1:24 6:2
**rumors** 86:19
**running** 144:1
221:7
**rush** 254:6

---

**S**

**S** 4:18 5:1 205:6,8
**safe** 56:19,21 58:4
**Sagebrush** 31:17
31:25
**sake** 126:9 253:8
**salary** 60:16,17
201:19 202:2,3,4
202:10 212:3,6
**sale** 65:18
**sales** 52:21 65:22
66:17 67:1 70:12
72:8,22 111:14
**San** 203:23
**Sanders** 1:3,11,16
3:4 4:16 5:8,12
7:8,25 9:24 16:6,9
16:17 17:8,14,16
18:19 19:13,14,19
19:25 20:7,11,14
20:21,23 21:11,16
21:20,24 22:2,15
23:13 24:8,10
27:24 29:25 38:23
40:22,25 44:12
51:15 53:1,11
57:3,21 62:25

63:15 82:14 83:15
91:5 96:3 100:2
100:11,25 101:1,1
102:3 105:4
121:25 122:13
125:23 126:18
127:11 130:16
135:22 137:5,8,17
138:5 148:24
151:17,23 153:11
153:15 154:1
158:25 159:4
164:2 168:2
171:18 172:1,17
172:18,19,20,24
177:21 180:16
181:3 184:1
186:20 191:13
198:17 200:2
204:23 206:12
211:9 214:4,18
220:2 221:20
229:6,7 234:11
235:7 242:5,9
257:9 263:1,7
264:3,11,17
**sat** 111:8,16 119:20
**savings** 82:5
**saw** 33:20 34:3,5
52:5 133:4 251:18
**saying** 56:22 73:8
75:16 99:21
111:10 112:11,12
118:18 134:2,3
187:14,18 194:12
210:18 254:5
260:6
**says** 76:20 92:24
100:21,22,25
105:17,18 111:3
111:20 113:24
114:20,25 115:3
117:9,10 126:17
127:7 131:19
134:21 136:3,17
137:8 138:5
147:10 148:6

161:25 163:10
164:11,12 168:8
171:23 172:15
182:21 183:3,18
207:9,9 215:3,15
216:24 218:20
220:14 242:12
243:4,13,14
248:19,20 250:8,9
250:11,11,17
251:1,17
**schedule** 93:12
151:2 170:13,14
170:20
**scheduled** 110:10
110:17 170:18
**School** 41:5
**schools** 41:16
103:12
**science** 41:19
**score** 61:21
**scored** 111:13
**scratch** 46:23
**screening** 92:15,17
93:5
**screenshot** 235:22
236:6
**script** 191:15
**scrutiny** 259:11
**search** 84:20
142:12 196:23
197:15 198:7
199:4 209:21
210:13 213:2
**searching** 213:10
**second** 31:13 56:14
57:25 100:19
132:12,14 168:6
170:19 172:14
189:17 200:9
204:10 205:16,17
215:2 234:18
235:1 250:6,24
**second-to-the-last**
220:14 222:8
**section** 126:25
127:6 132:4,9

137:6 138:4 149:5
149:21 164:24
187:16,18 202:12
**secured** 189:20
**security** 44:7
241:21 246:10
**see** 13:2 17:10 29:6
29:22 36:15 38:9
38:21 74:15 84:8
84:13,14,17,21
100:20 105:20,22
106:15 111:5,21
114:2,3,13 117:10
127:6,18 128:1
130:6 144:18
145:11 147:1
148:16 160:20
162:12 169:21
176:21,22 182:16
184:16 187:9
191:4 195:14
202:2 216:13
218:6 224:5
225:10 227:1
232:1,16 240:25
243:4 244:5
248:10 250:8,16
250:18 252:6,6
261:1
**seeing** 100:8 122:22
139:21 187:1
233:11 240:18
**seek** 185:17
**seen** 61:19 122:21
139:16 186:24
221:3 222:3
232:21
**sees** 133:9
**select** 168:13
**selected** 98:20 99:7
99:12,14 101:4
102:7,11,22,24
164:14 165:9,20
166:4,5 200:25
218:12
**self** 66:2
**self-identified** 66:1

67:12 68:1 117:12
**self-identify** 40:25
66:2 68:8 235:12
**self-proclaimed**
132:15 133:1
**sell** 22:19 31:23
37:25 131:4,12
**selling** 36:5 147:14
**send** 78:16 142:24
163:12 167:15
253:11
**senior** 41:4 48:1
49:14 97:6 185:8
200:20 201:11
211:16,16 248:16
**sensitive** 230:23
**sent** 106:8 153:2
162:17 168:16
169:1,20,20 236:2
236:10 254:4,11
**sentence** 132:12,12
132:14 136:17
**separate** 14:1,9,23
62:8
**separated** 14:6
225:7
**September** 203:20
225:15 227:8
**series** 153:16
205:11
**served** 214:10
**serves** 21:18
**service** 41:24,25
61:21 65:18 72:22
141:12 157:9
158:10 231:2
**services** 37:22
226:23 236:22
237:3 265:17
**serving** 230:25
**session** 233:17
**sessions** 232:25
**set** 4:22 53:14
104:9 134:18
151:14 153:2,23
161:5 205:4
210:23 233:21

**severance** 207:9,10
207:12,20
**severe** 231:10
**sexually** 235:24
236:2 239:4
**Shah** 59:3
**shake** 6:12
**Shannon** 120:13,21
245:13
**share** 107:12 108:5
108:13
**shared** 18:15 24:22
106:18 108:4,7
**sheet** 165:15
**sheets** 139:23
**Shell** 4:4 144:18,21
144:25 152:16,21
153:21 156:7,12
252:5
**shipments** 67:23
**shoes** 26:8
**shop** 146:15 155:22
**short** 103:22
241:19
**short-term** 62:22
64:23
**Shorthand** 1:20
264:15
**shot** 111:5,21
**show** 75:3,12 78:1
**showed** 38:3,8
128:13 129:3
179:13
**showing** 74:25
161:25 163:22
167:9,11,13
187:10 192:23
202:22 203:17
**shown** 136:12
183:5
**shrug** 6:12
**shut** 70:13 141:15
153:6 253:2
**sic** 12:20 45:4
106:25 107:6
191:3 211:14
232:12

**sick** 162:11
**side** 35:25 57:19
60:14 63:19 67:1
67:1 79:11 101:11
123:4 148:22
151:14 153:24
161:6 191:11
205:5
**Sienna** 24:17,19
85:13,18 86:9,20
87:8,11 88:2
89:15 90:3 91:13
91:14 96:16,17
98:20,24 99:6,7
99:22 101:5 102:5
102:11,22 110:8
110:17,17 117:8
118:12 121:15
181:7 215:14
217:12
**sign** 207:14 261:5
**signature** 3:7
200:10 262:1
263:2 264:22
265:1
**signed** 202:18
**signer** 76:21 79:22
**signers** 79:25 80:1
**signing** 63:15
244:15
**silver** 132:25 133:9
134:24
**similar** 39:24
152:21 187:5
**simple** 29:15
**simplified** 235:23
**simply** 82:16
258:17
**singling** 169:14
**sister** 165:2,5
**sit** 71:13 74:11
86:25
**site** 142:19,22
143:8,11 145:14
145:21,23 156:21
157:3,16 251:6,18
251:22 252:3,7,16

253:4 255:19
**sits** 106:5
**sitting** 130:2
**situation** 10:2
72:14 77:9,22
**six** 216:9 233:18
**SK** 154:20,24 155:5
156:15 254:18
**skill** 104:8
**slashes** 202:24
**small** 39:23,25
197:9
**smart** 188:22
**so-and-so** 129:2
**social** 40:7 44:7
**software** 150:3,6
221:21
**sold** 22:24 31:3,5
31:24 35:13,14
36:2,3 156:1
246:16
**solicit** 37:12
**somebody** 133:21
211:2 241:16
**son** 9:24 16:6 76:12
76:15 77:24 226:9
226:10,11 229:6
**soon** 158:8 234:5
**sorry** 17:13 24:10
28:17 31:12 32:7
39:21 40:8 41:14
45:10 48:17 54:3
54:20 55:22 56:17
58:15 81:15,17
91:7,15,16 94:11
95:8 120:25 127:4
132:7,16 144:9
151:23 175:10
196:19 230:16
232:12 242:11
246:3 250:9,23
260:20
**sort** 25:7 36:21
62:16 141:9
**sorts** 23:9
**sought** 220:17

**sound** 47:18 151:22
152:1
**sounds** 100:18
172:11
**South** 211:21
**Southeast** 245:5
**SOUTHERN** 1:1
264:1
**speak** 9:15 10:7
111:9 112:7
124:16 125:4
174:6
**speaking** 7:20 10:9
79:23 125:15
155:5 175:1
**specialist** 45:2
65:13,15 104:23
110:16
**speciality** 231:25
232:15
**specific** 116:16
126:7 131:9
140:22 161:10
178:5 187:5
192:20 214:23
220:8 245:23
255:17
**specifically** 152:23
192:6 255:7
**specifics** 10:21
100:23 127:19
**specifying** 249:1
**speculation** 166:6
167:1 243:20
244:1
**spend** 7:19 130:5
**spending** 27:23,25
**spent** 85:3 229:11
229:15
**split** 224:14,19
**splits** 224:9
**spoke** 7:16 16:1
18:7 28:25 99:1,5
112:14 119:20
120:22 124:9,13
125:1,6,12,18,19
149:19 161:15

162:25
**spoken** 14:15 15:13
15:17 16:8 219:19
**spouse** 198:3
**spreadsheet** 150:5
**Spring** 30:1,11,24
**Springs** 24:17,19
30:21 42:3
**sprint** 7:1
**St** 32:7
**stack** 171:20
**staff** 11:15 12:7,12
12:18 17:1 38:1
46:23 56:20 58:21
58:24 74:10 75:2
88:17 104:21
230:2
**staffing** 65:1
**stand** 73:15
**standard** 62:14
123:21 134:6,18
142:21
**Staple** 2:8 3:5,6
5:11,14 17:4,5
46:12,14 51:15
53:1 57:3,21
63:11 82:10,14
90:23,25 93:1,4
100:2 101:19,22
102:3 122:13
125:23 140:17,19
148:24 151:17,23
153:11 154:1
158:25 164:2
166:11 167:4
168:2 171:18
180:15,16,19
181:2 186:20
190:16,19 191:13
193:6,7 195:19,21
200:2 204:23
205:7 206:12
211:8,11 214:18
220:2 234:3,11
235:7 241:25
243:20 251:9
256:23 257:8

259:20,22 260:9
261:7
**start** 6:11 51:4 67:6
68:10 111:1
127:10 135:5
152:10 186:9
190:3 197:18
202:13,20 203:3
203:21 219:1
**started** 14:9 42:16
42:16 50:6,14,15
54:23 56:11 62:25
71:20,25 79:3
83:23 85:14 86:15
99:24 118:20
119:12 120:24
121:2 135:6
173:15 174:16
175:19 176:1
180:9 182:19,20
194:25 196:23
197:3,14,16,23
198:8,12 208:10
212:9,19 213:1,7
216:11 217:9
218:5 225:8,14
228:19 231:10,12
233:9 235:20
247:23 252:10
**starting** 82:4 86:17
144:22 198:6
213:16
**starts** 137:7
**state** 1:20 121:8
183:10 192:6
264:16
**stated** 1:25 27:14
130:20 172:15
173:2 184:9 190:6
**statement** 117:24
120:16 130:22
179:21 188:17,23
189:16,17,24
190:24 218:19
251:13
**statements** 5:4
11:23 120:12

190:6,22 191:2,7
193:3 195:17
226:25 227:14
245:25 246:6
**states** 1:1 41:21
189:9 264:1
**stating** 137:25
222:14
**station** 156:2
**stations** 142:18
**status** 97:18
**steal** 81:14
**stealing** 82:18
**stenotype** 1:21
**step** 66:13 70:20
71:12 73:22,22
76:18 80:18
146:16,18 160:6
**step-by-step** 74:22
**Stephens** 248:13,14
248:20 249:2
258:3,11,20 259:2
**Stephens'** 257:10
**stepping** 59:10
**steps** 73:3 87:21
107:16
**stereo** 26:15
**stood** 111:3
**stop** 101:20 127:6
**stopped** 14:11,14
**storage** 39:16
**store** 135:13,13,15
143:21 147:23
254:24
**stores** 142:17
**straight** 126:10
**street** 1:23 32:3,9
48:8 54:21 252:24
**stress** 230:5
**structure** 61:4
**structures** 55:9
**stuff** 23:22 127:17
**Stuttgart** 42:2
**subject** 16:2
**subjected** 15:20
**submit** 91:17
198:25 205:24

Robert Anthony Sanders

206:7 207:21
209:8,23
**submitted** 92:1
98:22 101:7 206:2
206:4 208:18
209:6 220:19
221:14,17 256:13
**submitting** 70:17
83:19 221:11
**subordinates**
245:15
**SUBSCRIBED**
265:11
**substances** 7:9
**Subway** 155:22
**success** 89:5,5
**successes** 69:25
**successful** 81:21
104:2 216:3
**sue** 214:14
**suffer** 230:24
**suffered** 215:4
**sufficient** 53:4
**Sugar** 18:14 37:3
52:1,5,6,8,13
54:18,19 64:15
87:7 88:17 89:11
90:7 92:19 93:15
110:8 111:24
113:9 115:12
116:1,19 118:9
120:20 170:1
173:15 234:12
235:9 236:18,20
236:23 240:3,20
**suitable** 104:8
**Suite** 1:23 2:4,9
**summarize** 158:6
**summary** 56:7
**summer** 18:23 19:2
**Sunlight** 155:19
156:14 254:18
**supervised** 258:12
**supervisor** 45:7
47:24 49:12 54:23
55:3,6 97:3 112:1
143:6 184:21

185:2 204:5
211:12,13 248:20
248:25 249:1
257:25 258:3,6,9
258:10,17,24
**supervisors** 248:21
**supplemental**
152:20 220:6
222:9
**supplementation**
220:13
**support** 59:25 60:8
113:4,21 118:5
120:10 180:13
201:10 222:17
239:23 241:11
254:12
**supported** 43:5
**supposed** 170:23
**sure** 10:16 17:14
36:16 44:17 51:7
57:8 65:11,19
72:21 79:15 86:8
86:11 94:12
100:11 105:19
106:9 109:7 115:5
116:10 122:18,20
125:8,11 127:20
132:9 137:4 139:1
139:12,14 141:22
142:12 143:5,11
145:13 146:7
148:19 155:3
156:23 157:25
164:16 170:6
176:15 177:5
196:20 198:20
202:21 203:7,19
209:18 210:12
213:23 231:2
232:3 238:8
245:21 249:16
254:11 255:1
257:23 259:3,7
**surplus** 224:6
**surprise** 136:18
170:9,13,23 171:1

171:6,8,10 181:20
**surprising** 137:1
**survey** 142:19,22
143:8 145:14,21
145:23 251:24
252:4,7
**surveys** 149:13
157:3,16 251:6,23
252:17,25 255:19
**survivor** 181:13
**suspected** 118:24
**swap** 134:4,16
**sweep** 34:5
**switch** 130:23
132:11
**sworn** 1:17 5:9
264:18 265:11
**symptoms** 229:20
232:22 233:22
**syndrome** 27:24
213:20
**system** 75:6 79:17
79:18,21 80:14,23
81:3,5 84:8 85:21
96:9 150:23
164:14,15 221:24
**systems** 247:5

---

**T**

**T** 4:19 206:11,13
206:17 207:7
**T-A-T-E** 236:16,17
**tab** 84:19 151:4
**Taft** 47:25
**Tahoe** 203:24
226:8,15
**take** 5:18 6:9 7:2
25:1,4 26:7 41:17
51:6 53:7 81:24
87:4 91:8 100:4
101:20 107:17
115:1,4 118:13
122:15 126:3
130:11 133:5
137:6,12 142:23
149:3 151:19
153:5,12 154:3,22

159:2 163:18
164:3 168:4
171:11 180:17
181:3 184:14
187:3 195:1
196:17,22 197:1
197:19 198:3
200:4 203:21
206:14 214:22
220:7 228:4 234:2
234:25,25 252:14
252:25
**taken** 1:17 5:20,23
5:25 24:3 77:3
82:8 86:4 87:21
97:10,11,17
129:23 130:1,4
146:5 156:23,25
157:1 213:23
222:23 223:14
235:25 245:24
265:7
**takes** 29:18 222:20
**talk** 6:20,21 7:14
44:12 45:17 51:16
65:10 67:15 69:24
86:7,25 87:5
99:16 108:10
114:25 120:2
130:12 149:4
193:18 211:9
218:13
**talked** 13:22 16:2
35:20 50:4 68:15
90:15 103:14
111:8 112:10
121:14,16 154:18
155:9 163:6 172:1
172:3 173:2
174:24 178:6
179:8 181:6 187:5
191:18 196:2
198:14 213:4
215:7,9,14 218:12
218:17,21 224:11
239:15,20,21
241:12

**talking** 65:5 76:16
76:20 77:4 88:5
102:4 136:21
152:7 172:5
191:16 215:20
260:4
**talks** 216:2
**Tammy** 205:18
**tasks** 72:10
**Tate** 236:15
**Tatiana** 93:5,8,9
113:11 114:1,9,9
115:23
**Tayte** 2:8
**team** 9:5 10:10,17
10:23 11:7,9,12
11:13 13:19 16:21
38:2,6 52:21
56:20 58:9,11
59:15,25 60:5
64:5,7,9,15,19
68:14 69:6,9,21
69:23,24 70:24
74:9,12,17 75:2,4
76:1 78:11,14
80:20 81:23 82:2
83:13 88:17 93:20
101:16 103:25
107:17 109:19
110:25 111:22
116:18 160:3
179:24 180:13
185:22
**team's** 58:10 138:8
188:21
**technically** 22:24
**technology** 46:4,6
46:18
**telephone** 2:5,10
125:2
**tell** 17:15 85:3 90:9
90:12 91:1 112:12
120:21 127:19
128:6 130:22
132:10 135:3,6
148:11 156:13
159:23 167:4

170:9 182:8
189:14 193:10
203:11 254:21
**teller** 50:25 51:4
66:7,25 79:2,9,10
133:16 135:2
181:21
**teller/personal** 66:9
**telling** 11:7 29:19
104:19 105:8,8
106:22 112:5
119:14 127:14
167:15
**temporary** 22:17
27:20
**ten** 24:6,7 39:6
111:16
**term** 64:3,9 86:12
**terminate** 54:14
182:15 184:22,24
185:5,6,13,16,23
185:25 186:5,7,17
257:21
**terminated** 42:5,8
43:12 54:12 60:15
64:18 65:3 112:17
121:9 179:18
180:3 181:15,17
184:24 185:9
192:17 196:25
197:22 208:9
223:2,5 225:7,13
228:24 229:25
249:14
**terminating** 183:12
**termination** 41:7
42:25 43:9,22
56:9 60:22,23
179:12,16 181:24
182:8 183:22
185:19,21 186:6
186:12 191:18,20
192:12 193:8,13
196:15,20 207:16
207:25 208:4
213:6,16 214:7
222:20 228:3,7,14

228:22 233:24
234:13 235:10
244:6 256:22
**terminology** 64:11
**terms** 15:21 33:17
40:25 41:3 46:7
61:17 62:12 66:1
67:12 68:1,8 76:3
89:3 90:7 112:13
116:23 123:2
155:4,4 156:20
170:11 177:4
190:22 191:5
192:1 194:6
205:14 212:10
235:13 257:14,18
**tested** 111:11
**testified** 5:9 25:1
28:9 47:1 89:20
118:7 134:1
153:20 198:18
205:20 222:16
235:8,22
**testifying** 6:5,5
117:20 134:13
**testimony** 7:10
13:17 107:9
116:25 117:19
223:21 235:23
251:12 264:19
265:7
**Texas** 1:1,21,23 2:4
2:10 4:14,19
24:18 27:6,13
30:15 31:8,18
32:4 48:9 50:22
121:8 199:15,19
200:7 202:1
203:21 205:1,12
205:14 206:20,23
206:25 207:5,16
208:10,15 210:9
211:21 213:7,16
216:13 221:8
225:14 226:19
228:19,20,22
233:9 248:11

258:4,7,16 259:1
259:5 264:1,16
265:16,19
**text** 206:8
**Thank** 6:19 51:9
261:6,8
**therefor** 265:2
**they'd** 159:9
**thick** 125:25
**thing** 7:4 65:20
70:5 85:1 122:9
157:21 177:11
192:14 237:11,16
**things** 13:19 25:24
28:2 36:19,21
46:5 66:18,22
71:7 73:2,7 74:11
74:23 76:4 80:20
81:20 89:7 95:4
107:25 121:3
127:23 131:3
142:4 144:11
158:9,14 173:13
174:17,20 176:25
177:9 184:15
189:4 192:12,16
217:23 218:7
220:7 230:5
239:21 259:15
**think** 20:6 37:25
40:5 43:25 46:25
50:6 51:5 53:19
59:23 60:17,24
61:25 65:2 67:17
72:25 74:18 77:12
79:4 80:11 84:22
87:23 88:20 91:15
91:25 98:16,24
99:21,24 101:19
109:17 112:20
114:19 116:8
120:7 121:19,23
124:8,9,18 125:6
125:8 131:16,21
131:25 134:20
138:21,25 145:18
145:20 147:18

150:24 153:3
155:13,16 156:14
156:15 157:19
160:18 161:15,15
162:25 164:16
165:11 170:11,15
171:3,3,4,11
173:17 174:21
182:3 185:24
190:2 198:8
202:24 203:5,25
208:11 209:15
211:7 212:14
215:11 218:4
219:8 225:5
227:11,11,15
228:8 229:13,22
230:21 232:10
234:3,15 235:16
237:4,12 238:15
239:8,18 241:24
242:19 247:25
249:8,16 250:5,18
250:21 251:4
253:8 255:3
256:16,18 257:2
257:19 260:13
**thinking** 12:20 59:5
254:7
**third** 96:8 132:13
132:14 140:2
170:20
**Thomas** 9:23,24
13:24 14:2,15,19
15:15,23 16:3,16
16:16 17:7,7,16
17:16 19:20 24:23
30:7,9 31:2 32:12
32:21 33:2,7,10
33:20,22,25 35:22
36:6 136:18 137:1
223:17 239:7
**Thomas'** 30:21,23
**thought** 18:24
136:25 174:7
193:23 225:2
238:4

**thousand** 208:13
224:15
**three** 18:21 21:18
36:4 47:17 102:4
102:8,13,18
118:10 121:23
153:4 216:8
225:25 226:5,17
**threw** 183:11
**Thriveworks** 233:2
233:6,8,11,17,18
**Thursday** 162:17
**tie** 150:11,12
**tied** 151:1
**TikTok** 40:14
**till** 162:19
**time** 4:9 7:3 10:1
12:14 14:1,5,9,14
15:24 16:20 18:9
18:25 19:13,20,23
20:20 21:4 22:13
23:5 27:22,23,25
33:11 35:3,8,19
37:23 42:20 45:15
47:25 48:18 49:13
51:5 52:6,7,11
53:4,7 55:10 58:8
59:2,6 60:12,15
60:22,23 61:23
63:5 64:17,18,22
64:25 65:7,9
67:17 68:11,25
69:18 71:4 72:3
75:7,10,19 78:2
80:4,9,24 83:5,7
85:3,25 87:23
92:25 95:5,11,14
96:15 98:17,19,23
99:15 100:7,8
101:2,3,6,19
103:7,7 105:15
109:17 110:7
112:10,20,22
113:19 121:1,6,19
121:24,25 122:8
126:9,13 130:5,8
130:9,11,12,17

131:6,22 132:3
134:8 137:12
142:16,25 143:1
150:14 151:13
154:23 155:24
156:1,2 160:18
162:13,21 165:14
166:14 167:17
168:8,17,19,20
169:2,25 170:6,8
171:11 172:20
173:15,24 181:4
184:3 185:9,15
192:5 195:3
196:17,22,25
197:1,5,13,17,19
198:4,10,11,13,16
201:6 202:24
203:1,5,18 207:19
207:23 208:1,9,10
213:5,7,15 215:12
218:1 222:20
223:1 225:6 230:5
230:19,25 231:4
231:10 233:3,16
234:4 244:6 246:3
246:9 247:5
248:21 249:9
255:22 256:3,21
260:18,19,20,22
**time's** 253:8
**timeline** 32:6 33:4
47:16 55:4 96:12
112:13 113:7
120:22 163:18
174:19 203:25
224:2
**timely** 139:6 254:9
**times** 72:11 73:5
78:4,19 90:4
94:10,14,23,25
112:16 131:1
189:23 194:8
221:11,20 245:20
**title** 44:21 47:20
48:23 52:15 54:8
65:12 66:4,6 97:5

105:7 211:15,18
257:10
**titled** 19:22 226:2
**titles** 48:24
**today** 5:19 6:3,4,12
7:10,12 9:16 19:5
129:25 130:2,8
168:9,24 171:19
182:15 212:24
215:8 218:12,21
239:20 256:20
258:23
**today's** 7:16,20
21:24
**told** 10:17 11:17,19
13:19 16:16 17:6
18:3 29:5 75:11
76:16 77:3 81:7
88:1 106:21 108:9
108:15 120:2
130:19 133:17
167:16 179:12,19
179:22 181:14
185:11,13 190:25
224:24 235:24
237:22
**toll** 150:20
**tolls** 150:20 151:8
**ton** 27:10
**tons** 26:17
**Tool** 3:19,21
171:24
**tools** 104:1
**top** 20:1,3 100:21
126:17,18 127:12
135:23 137:8
145:5 154:21
160:11 171:23
220:15 250:7,10
254:7 260:13
**topics** 94:10 107:13
**total** 150:19 151:7
226:4
**totally** 236:11
**touched** 196:1
**tours** 42:1
**Toyota** 226:9,11

**track** 100:13
**tracking** 84:8
**traditional** 45:5,6
47:1,3,4 48:11,12
49:22,25
**trail** 31:18 32:1
148:5
**train** 58:21
**trained** 235:19
240:1 244:16
**training** 50:15
56:12 57:14 63:24
72:23 75:9 78:18
78:23 79:2,5
88:16 187:24
203:8
**trainings** 63:21
78:16
**transaction** 69:21
238:6
**transactional** 66:16
**transactions** 79:10
237:5
**transcript** 264:18
264:25
**transfer** 83:1
115:14,19,21
**transferred** 82:20
83:8 113:9 170:4
**transferring** 48:4
115:24
**transfers** 42:19
181:9
**transition** 66:6
89:25
**transitioned** 67:18
**transitioning** 51:22
55:13 80:17
**transparent** 97:25
**transpired** 87:24
123:19
**transpiring** 16:22
**travel** 118:14,15
**traveling** 203:2
**treat** 83:9,12
193:16
**treated** 103:4,6

180:14 188:18
**treating** 193:13
232:18
**treatment** 183:6
192:23 194:15
**Treats** 189:24
**trial** 6:6
**tried** 27:17 72:11
160:19 174:1
220:23
**trip** 145:6,7 203:20
252:5
**trips** 203:12,14,25
**trouble** 171:20
**true** 121:12 142:14
170:25 184:16
189:15,17,24
192:24,25 193:2,4
204:25 257:24
258:8 263:3
264:19
**Truist** 44:15
**Trust** 44:15,18
**truthful** 7:10 183:4
193:3,4,5
**try** 6:19,21 28:4
62:19 72:7 75:23
77:11 78:10,12
79:1,8 81:13
150:1 158:13
174:8 195:3 210:3
**trying** 13:9,15 19:3
29:24 55:10 61:18
61:25 65:2 72:25
75:25 76:12 83:5
87:20 91:9 93:12
102:16 116:23
120:11,18 131:1
131:17 145:16
154:21 170:16
176:15 177:8
178:4 192:22
195:14 233:13,21
234:2,19,19 236:8
237:8 253:9,11
254:8 259:23
**Tuesday** 162:23

**tumor** 232:3
**tune** 239:16
**turn** 91:9 126:15
135:23 161:25
168:6 218:15
237:17,23 238:4
**turned** 194:5 195:5
**turning** 146:11
216:21 218:25
222:7
**twenties** 134:8
**Twitter** 40:10,11
**two** 30:13 52:4
56:10,10,24 66:19
71:15 111:13
118:15 199:23
211:3 216:8 223:9
223:14
**type** 16:25 28:5
40:4 60:19 69:10
71:17 75:21,22
148:17 164:24
188:16 221:9
258:14
**type-in** 166:13
**typed** 164:17 165:4
**types** 34:1
**typically** 142:2
**typo** 202:15,16

———————

**U**

U 4:21 214:17,19
**Uh-huh** 152:17
164:22 206:18
226:12
**ultimately** 80:7
88:11
**unable** 213:7
**unavailable** 213:8
213:17
**unaware** 241:6
**uncle** 165:5,8,20,20
166:4
**uncles** 161:18
**underneath** 138:3
164:11
**understand** 5:19

6:4,18 7:17 17:11
17:24 18:9,19,22
19:3 23:13 25:13
37:9 38:19 41:4
41:21 44:14 47:12
48:13 52:11 54:12
72:17 83:15
102:16 119:7
121:8 123:10
141:21 158:3
169:15 176:15
177:8,15 210:18
221:23 249:25
253:12 259:24
**understanding**
11:12 12:21 18:16
19:14 23:4 29:11
32:12 34:16 35:13
37:2,6 42:23
52:15 54:25 55:6
55:15,23 63:20
71:12 75:14 83:6
84:1,15 90:16
94:11 95:7 100:15
102:21 115:23
116:22 123:13,16
123:19 141:23
144:20 161:22
175:22 176:14
184:21 187:9
188:4 189:3
193:17 195:13
199:14 208:14
214:4,13 217:21
223:21 225:12
240:3,6,9 244:14
249:24 254:20
256:5
**understood** 6:16
18:6 51:5 148:12
191:10 193:12
260:8
**undisclosed** 116:21
**unemployed** 35:3
36:18
**unemployment**
43:18,23 44:1

197:18 207:17,22
207:24 208:2,3,8
223:5
**unequivocally**
180:4
**unfavorably**
188:18
**unfortunately**
22:20 51:2 80:1
197:20 210:3
239:13
**unions** 221:1
**unique** 109:13
133:4,6
**United** 1:1 41:21
264:1
**University** 91:13
91:14
**unknown** 172:22
**unmet** 55:22 56:5
**unnecessary** 211:1
**unpaid** 246:12
**unsatisfactory**
187:10,12,19,23
188:1,9
**unscheduled** 129:3
**untrue** 188:17
**untruthful** 192:15
**unwilling** 213:8
**update** 168:8,24
**updates** 252:24
**upper** 59:25
**upset** 175:25
**upsettingly** 114:6
**use** 20:13 25:21
31:4 33:22,25
40:10,11,12,14
64:3 75:7 131:5
173:21 221:21
227:18 255:9
**user** 209:13,17,21
210:22
**utilities** 21:5,7
227:3,4,6,9
**utility** 227:5
**utilization** 75:6
**utilize** 79:9

| **V** |
| --- |

**V** 4:22 220:1,3
**VA** 231:1
**vacation** 16:20
56:18,23 58:7,13
58:14,16,19,20
59:11,18,19,24
60:2,8 118:13,20
162:21,24 163:19
165:16 166:17
203:9,17
**vacations** 203:22
213:4
**vaguely** 194:18
**validate** 137:22
**validated** 231:14
**value** 133:12
**various** 23:14 74:7
94:10 123:23
149:13 161:1
174:13 189:4
190:5 194:20
**vault** 67:20,21,23
181:22
**vehicles** 226:2
**vendors** 35:2
**verbal** 3:16 58:3
187:19,21 188:2
188:11
**verbiage** 122:4
183:7
**verified** 253:20,25
255:13
**verify** 123:10 169:2
**versus** 49:25
133:22 135:1
203:3 258:20
**veterans** 230:24
**vice** 48:25 197:10
211:19 257:12
**video** 7:25 8:7
235:23 236:3,5,7
236:11 239:4,13
**Videographer** 2:13
5:6 51:10,13
101:23 102:1
171:13,16 180:21

180:24 234:6,9
235:2,5 242:7
261:9
**VIDEOTAPED**
1:10,15 264:11
**ViewPoint** 47:13
47:15,17,20,24
48:2,5,6,10,20
49:15,17 216:14
**violate** 193:1
**violated** 192:6,8,19
192:20,22 193:9
193:11,13 244:19
244:20 256:6
260:6
**violation** 183:8
186:1 193:16
248:8 249:20,22
250:1
**virtually** 124:16
**vision** 62:15 212:22
**visit** 4:4 105:4
128:15 129:4
143:11 146:20
147:4 148:17
155:16 156:9
181:20 232:5
**visited** 149:23
150:1 156:2
**visiting** 155:24
**visits** 143:13 251:2
251:18
**vocational** 41:16
**voice** 8:18
**VS** 1:4 264:4

| **W** |
| --- |

**W-2** 224:19
**wait** 6:22 87:3 91:3
91:14 124:8
128:19 197:17
198:6 207:19,20
208:1 234:21
**waiting** 162:19
227:16
**waived** 5:2
**walked** 105:3 106:7

106:7 182:10
**Walker** 1:22 2:9
**walks** 106:3
**wall** 89:10
**want** 6:2 28:25 36:2
42:16 43:1 53:6
62:24 65:4 66:8
66:24 74:14 77:14
81:1 87:21 93:21
99:20 100:9
107:16 111:2
113:24 120:23
126:5,12 130:3
133:13,21 141:17
145:5 157:5
169:22 170:20,21
170:22 173:24
175:3,4,23 177:5
180:11 185:23
190:3 193:18
195:21 197:25
198:4,9 224:24
228:24 240:10
242:23 247:9
248:10 251:25
**wanted** 18:5 37:25
38:19 52:11 70:9
71:6 84:4 106:14
107:11 111:9
115:7,14 117:18
119:1 121:10
159:16 167:24
169:21 174:9
175:3,4 180:13
186:7,16 197:1,18
198:1,2,3 200:22
201:23 202:7
203:7 240:4
250:16
**wants** 114:10
**warehouse** 147:15
**warning** 3:14,16
57:13 58:3 187:19
187:22 188:12
**warnings** 56:9
**wasn't** 10:9 15:24
16:1 18:2,2 35:8

Robert Anthony Sanders

300

35:19 36:24 71:4
74:2 79:20,20
82:22 107:4
117:15 131:9,13
140:13 163:22,22
174:15 195:18
196:25 236:25
238:20 239:1,9
247:14 259:17
**waste** 197:4,12
198:9,13,16
**way** 18:11 22:16
36:10 67:7 74:6
74:18 77:6 80:8
95:9 97:24 102:19
103:3,6 109:16
117:23 118:6
122:3 123:10
126:22 132:23
134:22 135:6
145:7 158:5
161:12 174:8,14
178:10 179:11
219:24 221:5
222:19 223:3
230:25 236:9
238:20 251:5,21
**ways** 46:4 70:23
213:23 214:2
**we'll** 39:7 211:7
226:5
**we're** 29:23 65:19
182:14,25 183:12
190:19 253:14
260:4
**we've** 35:20 50:3
88:5 121:13
154:18 213:4
215:7 239:21
253:6
**website** 51:25
84:19,21 85:7,9
91:21 150:8
168:23 208:24
209:5,8 221:14
240:22 241:1
**week** 11:14 16:24

118:13 162:23
168:19 170:19,20
170:21,21 172:9
195:9
**weekend** 162:19
254:9
**weeks** 52:4 207:11
**Welch** 49:13
**well-prepared**
93:25
**Wells** 68:13
went 41:4,12 50:10
56:23 58:7 59:18
60:2 65:1 66:6
70:24 84:19 85:21
85:22 96:9 99:16
106:12 111:17
123:3 155:15
161:16 162:13
178:3 190:2 196:3
199:24 203:13,13
203:23,23 209:4
222:17 228:2
231:1,14 233:2
240:6 247:21
**weren't** 247:16
**Wernecke** 73:13
153:17 181:18
241:20
**West** 211:21
**When's** 233:16
white 113:7,8
114:21 115:10
117:21
**Wholesale** 147:11
**wife** 9:23 13:23
14:12 21:1 22:20
27:18 32:18 34:23
52:11 118:13
136:18 197:1,18
198:1 213:18
222:23 224:1,6,25
228:8 235:21
239:8,10 250:3
**wife's** 19:22 43:3,6
189:18
**willing** 29:7,23

**Wilson** 155:9
254:18
**wind** 106:21
**wiped** 223:13
**wish** 229:16
**wishes** 180:12
**withdraw** 222:15
**witness** 1:16 130:14
137:15 151:21
242:1 257:6 261:4
264:17,20
**Woodway** 2:4
**word** 132:5 236:4
**words** 58:11,18
91:2 95:4 173:21
214:9 224:15
**work** 34:25 35:4,16
35:17 36:23,25
37:13,16,20,24
38:3,9,11 47:15
48:16 54:16 64:6
64:8,13,13,14
67:7 75:5,5 78:21
83:17 101:17
114:1 134:14
136:9,10,11,12,15
180:12 187:10,12
189:22 198:23
204:11 205:17
213:8,9,10,12,14
213:14,17 214:1,3
216:9 220:16
228:12 237:2
246:13 248:18
**WorkDay** 168:8,24
208:24 221:21
**worked** 9:25 37:2
44:14 45:4 47:12
48:7,10,13 50:4
50:12,19,25 56:17
68:12 113:8
121:11 133:3
170:10 197:10
198:2 201:11,15
216:16,18 228:10
240:1 241:18
257:10 258:5

**Workforce** 27:6,13
210:9 221:8
**working** 28:4 33:5
35:8 36:18 51:24
59:4 60:7 68:16
69:2,4 72:4,4
74:20 83:2 84:18
93:9 115:6 147:2
156:3 170:1,7
173:19 188:20
196:25 213:24
**workmanship**
38:15
**works** 96:4 111:5
111:21 117:10
198:21
**worth** 21:19
**wouldn't** 73:3,23
166:14 243:23
**wraparound** 22:21
22:23
**wrapping** 234:4
**write** 29:5,22
**write-up** 56:13,14
218:23
**write-ups** 56:24
218:17,20
**written** 3:14 57:13
**wrong** 124:20
174:18
**wrongdoing** 248:8
**wrongful** 43:22
179:12 222:20
256:21
**wrongfully** 179:18
180:3 223:2,5
229:25

### X

### Y

**Ybarra** 88:11
**Ybarra's** 89:18
**yeah** 6:17 27:10
29:14 32:5 62:20
62:24 65:6 82:16
91:15 114:16

123:14,21 159:21
175:11 176:6
185:18 188:25
189:24,25 192:4
201:6 203:16
205:22 210:20
214:2 218:22
219:11,17 221:16
230:6 234:25
240:24,25 241:8
248:3 249:16
250:24 251:15
253:23 260:3
**year** 14:10 35:13
42:12,13 44:18
47:5,8 62:2,3,4,7
63:21,24 112:21
131:2 142:20
143:22 163:17
228:25 230:20
252:21
**year's** 42:20
**years** 30:13 36:2,4
36:4,4 38:25 39:1
39:6,6,8,11,17
41:24,25 42:7
47:17 48:16,19
50:8,10 56:25
86:23 89:3,8,14
109:14 135:8
140:15 180:6
222:22 223:14
224:14
**Yep** 145:2
**young** 98:25 159:19
**Yvette** 47:25

### Z

### 0

**000045-000051**
3:13
**000057** 3:18
**000132-000133**
3:16
**000134** 3:14
**000160-000163**

3:22
**000164-000167**
  3:20
**000165** 100:21
**000168-000206**
  3:24
**000185** 126:16
**000207-000223**
  4:12
**000224** 4:13
**001775** 250:12
**001775-001777** 4:7
**001778-001780**
  4:11
**001816-001818** 4:8
**001829-001833** 4:5
**001869** 4:9
**001904** 4:10
**001923-001928** 4:6
**002207-002210**
  4:18
**002227-002228**
  4:15
**002229-002231**
  4:17
**002240-002247**
  4:20

—————————
**1**
**1** 155:19 156:14
  188:16 207:8
**1/25** 145:14
**1:01** 101:24,25
**1:40** 101:25 102:2
**10** 7:21 134:25,25
  195:12 216:3
  218:25
**10-dollar** 134:20,24
**10,000** 20:16 21:8
  21:10,13,23
  222:16 229:12
**10:33** 1:19 5:7
**100** 3:19
**10010** 2:4
**11** 39:6
**11-by-17** 149:1
**11:39** 51:11,12

**11:45** 51:8,12,14
**1100** 61:8
**1123** 24:18
**1126** 34:12
**11706** 265:18
**11th** 126:20 128:11
  129:14 136:25
  172:5
**12** 113:13,16 114:3
  114:11 254:19
**1201** 31:7,13
**122** 3:21
**125** 3:23
**12th** 122:18
**1333** 211:21
**13409** 30:1
**13th** 146:16
**14** 215:13
**1401** 1:22 2:9
**148** 4:3
**15** 7:21 39:8 195:12
  212:15
**15,000** 212:16
**1500** 122:17,18
**151** 4:4
**153** 4:6,7
**158** 4:8
**16** 39:8 215:20
**1600** 34:20
**164** 4:9
**168** 4:11
**169** 265:18
**17** 254:19
**1776** 250:15,24
**17th** 214:8
**18** 16:3,6 126:19
  127:1,5,8,12,20
  127:25 129:22
  130:10,17 174:15
  174:18,19
**184,000** 222:18
**1850** 33:15
**186** 4:12
**18th** 100:16 172:9
  260:1
**19** 135:7 174:15,17
  174:22 188:12

**1900** 1:23 2:9
**191** 4:13 135:24
**194,000** 222:14
  239:16
**1964** 24:15
**1982** 41:10,25
**1986** 41:25
**1990's** 135:8
**1998** 50:6,7

—————————
**2**
**2** 149:4,5,8
**2,000** 61:8 226:5
  241:19
**20** 30:10 174:22
  176:4 188:12
  216:1 222:22
**200** 4:14
**2000** 30:10 31:12
  31:21
**2004** 31:12 48:21
**2008** 47:18 48:21
**2011** 42:17 47:18
**2012** 30:5 31:11
  44:1 51:17 180:10
**2013** 180:10
**2014** 30:20 187:24
**2017** 30:20
**2018** 39:11 96:18
  96:21 173:3
  174:13 226:8
**2019** 55:5 65:4
  96:23 101:2 116:7
  172:20 173:3
  174:13,23 187:11
  187:25
**2020** 71:20,25 81:9
  171:2 176:5,6,7
  188:1,6 202:23
  219:2,7 231:6,9
  247:24 248:1
**2021** 18:24 19:2
  36:3 43:23 50:23
  54:13 55:19
  100:16 126:20
  128:11 129:14
  137:11 139:9,15

140:8,24 141:5
149:6,9,21 154:8
154:12 156:17
160:13,25 169:4
170:5 172:5,9
173:8 174:14,25
175:24 176:3
179:12 196:15,17
196:22 197:14
198:6 202:14,16
203:12,13,17,20
203:25 213:6
214:7,8 225:17
227:8 230:9,13,21
231:6,9 233:5,7
248:1 260:1
**2022** 18:23 22:8
  35:12,15 43:24
  50:24 212:2 225:5
  226:8,9 229:4
  233:7
**2023** 1:12,18 14:12
  25:1 264:12
**204** 4:16
**205** 4:18
**206** 4:19
**20th** 203:3
**21** 65:7
**214** 4:21
**22** 27:23 65:7
  213:20
**220** 4:22
**227** 34:21 35:10,16
**23** 132:9
**24** 127:2,5,9,12,20
  127:25 129:23
  130:10,17 135:23
  242:15
**242** 3:5
**250-million-dollar**
  201:14
**257** 3:6
**26** 1:12 24:20,25
  25:8 32:13 89:12
  137:7,8,13,18
  138:3 148:13
  264:12

**260** 3:6
**262** 3:7
**264** 3:7
**26th** 1:18
**27** 140:2
**27th** 214:6
**28** 140:6 144:16
  145:13
**281)484-0770**
  265:19
**28th** 212:2
**29** 146:11 154:12
**29th** 155:19 159:16
  160:7,23 251:16
**2nd** 51:16 137:11
  139:9,15 140:24

—————————
**3**
**3** 62:4,5 161:23
  189:1 215:13
  220:14
**3:11** 169:5
**3:31** 171:14,15
**3:35** 171:15,17
**3:50** 180:22,23
**3:55** 180:23,25
**30** 137:7,13,18
  148:13 158:19
  264:25
**30(b)(5)** 5:5
**30(e)(1)** 264:22
**300** 131:8 224:9,18
**300,000** 224:7
**31** 151:6 216:21
**37** 145:6
**39** 126:19
**3rd** 54:13 188:12
  196:15,17,22
  198:6 213:6

—————————
**4**
**4** 149:4 216:2
**4:22-cv-01523** 1:4
  264:4
**4:30** 251:16
**40** 225:22
**401(k)** 20:12,13

Robert Anthony Sanders

302

| | | | | |
|---|---|---|---|---|
| 62:2,5,7,14 212:8<br>212:20 222:13,15<br>222:18 223:2,13<br>227:18 229:11,14<br>239:15,16<br>**42278** 3:21<br>**42415** 3:19<br>**4306** 32:3<br>**44** 218:15,19<br>**469)744-0923** 39:2<br>**48** 225:22<br>**4th** 24:15 197:14<br>207:6 219:1,7<br><br>**————— 5 —————**<br>**5** 3:5<br>**5,000** 241:15<br>**5,035** 225:21<br>**5/3** 187:11<br>**5:00** 253:9 254:5,8<br>**5:02** 154:12<br>**5:14** 234:7,8<br>**5:17** 234:8,10<br>**5:18** 235:3,4<br>**5:21** 235:4,6<br>**5:57** 1:19 261:10,11<br>**50** 30:15<br>**500,000** 222:24<br>**5120** 2:4<br>**52** 3:12<br>**57** 3:14,15<br>**5th** 159:15 160:13<br>160:25<br><br>**————— 6 —————**<br>**6** 54:20 62:1,9<br>216:21 222:9<br>**6,250** 207:10<br>**61** 218:25 219:1<br>**610** 211:25<br>**62** 151:6<br>**627** 32:20<br>**63** 3:17<br><br>**————— 7 —————**<br>**70,000** 223:10<br>226:22,24 227:9 | **713)742-0900** 2:5<br>**713)752-4415** 2:10<br>**713)754-6715** 2:11<br>**75,000** 201:19<br>**7500** 14:24<br>**77010** 1:23 2:10<br>**77027** 211:22<br>**77034** 265:19<br>**77056** 2:4<br>**77459** 24:18 30:15<br><br>**————— 8 —————**<br>**8** 218:15<br>**8/31/24** 265:17<br>**832)558-9412** 2:5<br>**8585** 24:17<br>**8th** 169:4 203:4<br><br>**————— 9 —————**<br>**9** 215:3<br>**9/20** 202:20<br>**9/20/20** 202:13<br>**9/8/20** 202:18,19<br>**90** 158:18,19<br>**905** 31:17<br>**91** 252:5<br>**9325** 265:16<br>**95** 212:6<br>**95,000** 212:6 | | | |

# EXHIBIT B

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 460-2021-03447 |

| Texas Workforce Commission Civil Rights Division | and EEOC |
|---|---|

*State or local Agency, if any*

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Robert A. Sanders | (469) –744-0923 | |

| Street Address | City, State and ZIP Code |
|---|---|
| 26 Lake Como Drive | Missouri City, TX 77459 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Regions Bank – South Texas/Louisiana Market | 10+ | |

| Street Address | City, State and ZIP Code |
|---|---|
| 2310 Highway 6 South | Sugarland, Tx 77478 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Dave Leonard | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest 10/1/2018    Latest 08/01/2020

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Since 2013, I have lived in the Missouri City community (Sienna Plantation) and am actively involved within the community. I am providing this statement of disparaging and discriminatory acts I have directly suffered as a result of Dave Leonard, CBM discriminatory or intent. Over the past three years I have been denied the opportunities to be the Branch Manager for any of the Nexus (New Denovo Branches) within the Missouri City or Sugar Land markets. In 2017 when the list of approved Nexus locations was announced, I expressed a high degree of interest to the Consumer Banking Manager (Mary McDonnell) at the time and through 2018. The conversation took place during branch visit / branch observation completed by Mary McDonnell. During the 3rd Quarter 2018, my office (Sugar Land Branch) was realigned to Dave Leonard.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| MAY 27, 2021 _____ Date    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* Gloria Quintanilla My Commission Expires 02/13/2023 ID No. 126033572 |

SANDERS 0070

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| | ☐ FEPA | |
| | ☐ EEOC | **460-2021-03447** |
| **Texas Workforce Commission Civil Rights Division** | | and EEOC |
| *State or local Agency, if any* | | |

THE PARTICULARS ARE *(if additional paper is needed, attach extra sheet(s)):*

December 2018, Again, during branch visits and branch manager meetings, I continued to inquire about the posting of the Sienna Plantation BSM position and applying for the position. I was always told that the position had not been posted, but I would be informed when it did. In December 2018, during a Branch Managers meeting (Greenway Plaza Corporate Building) I inquired about the Sienna Plantation posting to Dave Leonard, and he indicated that he and Earl Connell, CBE had already extended an offer to an outside applicant. I did not understand why, I was never informed or approached about the position at the Sienna Plantation Nexus, again I indicated my intent to apply for the next Nexus location in Sugar Land (Lake Riverstone).

During the months of July and August 2019, Dave Leonard would utilize my branch to conduct interviews for the Branch Manager positions within the market. I was informed by another associate that Dave Leonard was interviewing for the Lake Riverstone, Branch Manager opening. I contacted Dave and reminded him of my interests to interview for the position. Dave instructed me to post for the position and he will schedule an interview. After waiting three weeks for a scheduled interview with Dave, I followed up with an email as a reminder about the interview. Dave suggested that we have a Phone Interview within two weeks. In my career of 20 years of banking experience, I have successfully opened more than 10 New Denovo (Nexus) locations for other financial entities. I was very well prepared and looking forward to our scheduled interview.

On August 20th, Dave contacted me for the phone interview. The interview lasted less than 30 minutes, and I was taken back by the fact that during the interview, questions asked were irrelevant to the developing of New Household / Business Relationships within the market (Lake Riverstone). The last question from Dave Leonard was, "Have you ever hired an employee that did great in the interview, but turned out to be a poor performing employee?" My initial response was "yes" and it's our responsibility as leaders to identify areas of opportunity to develop associates and help them reach their full potential.

On February 11, 2021 (Thursday – 8:30am), just prior to entering the Sugar Land branch for opening procedures, my staff and I noticed that Dave Leonard (Consumer Banking Manager) was waiting in the parking lot. After completing the opening procedures, Dave Leonard entered the branch and stated that "I just wanted to stop by to visit with you and your team." That day we were short staffed with myself and two other bankers. He insisted on spending 2-4 hours of the day at my office. At 8:45am I was in the process of logging into my computer, while Dave Leonard stood in my office watching as if to see if I was emailing or chatting with someone else. Without any prior notification, Dave stated," Hey Robert, I'm not sure what's going on, but Melody Bodine (HR Office of Associate Conduct) just called me this morning and wanted me to be here for a conference call with you." I asked him if he knew the reason or the nature of what the call, and he indicated that he did not know why HR wanted to speak with me."

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| May 27, 2021     *[signature]*<br>Date      Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)*    Gloria Quintanilla<br>My Commission Expires 02/13/2023<br>ID No. 12603341 |

RS 0071

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☐ EEOC | **460-2021-03447** |

| Texas Workforce Commission Civil Rights Division | and EEOC |
|---|---|
| *State or local Agency, if any* | |

THE PARTICULARS ARE *(if additional paper is needed, attach extra sheet(s)):*

Dave Leonard provided me the phone number for Melody Bodine and the call was made from the office line. When Melody answered, she made the following statement, "Good morning Dave and Robert, how are you doing this morning? Robert, the reason for this call is due to some concerns of associate misconduct or behavior that was anonymously reported to us by one of your bankers. Regions has a Zero/No Retaliations Policy against any associate for reporting complaints or issues to HR. She then proceeded with a list of false accusations made by associate Melissa Miranda, Financial Relationship Consultant. Several things I was accused of are as follows, she questioned my communication with associates, I was accused of providing unfair treatment of scheduling the associate on weekends, she questioned the purchase or exchanging of new currency/bills. Ms. Melody even questioned by integrity, she falsely accused me of sending mortgage referrals to my Wife (Owns a Mortgage Branch) instead of Regions Mortgage, COI Referrals to Real Estate agents. Ms. Miranda also made a false statement that I was conducting personal business (Managing Investment properties) during bank time, and that I was falsely submitting entries on my January 2021 Expense Report.

About halfway through the conversation, I made the following statement, "The reason we are having this call is because Melissa Miranda was retaliating against me for having a "Partially Met-Expectation" performance review for 4th Quarter 2021 & Annual performance review for 2021. Melissa told two other associates at the branch weeks after her annual review that she was going to make a list of allegations about me and report the information to our supervisor Dave Leonard." The phone call was nearly 1 hour, and Melody stated at the end that if I had any questions or additional information to contact her if needed. During the interview, Dave Leonard only took notes and made no comments. I was very angry and felt offended at the allegations of an apparent attack on my integrity, character, and of my family.

After this incident, the work atmosphere became hostile, and I was uneasy around Ms. Miranda. I felt she would monitor and try to obtain or relay any information to further sabotage my position.

RECEIVED 28 MAY 2021 Houston District Office US EEOC

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| May 27, 2021　　X _____<br>*Date*　　*Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)*　　Gloria Quintanilla<br>My Commission Expires<br>02/13/2023<br>ID No. 126033572 |

SANDERS 0072

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | **AMENDED**<br>**460-2021-03447** |

| **Texas Workforce Commission Civil Rights Division** | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Mr. Robert A. Sanders** | **(469) –744-0923** | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| **26 Lake Como Drive** | **Missouri City, TX 77459** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **Regions Bank – South Texas/Louisiana Market** | **500+** | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| **2310 Highway 6 South** | **Sugarland, Tx 77478** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **Dave Leonard** | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| | | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN | Earliest: **10/1/2018** Latest: **06/03/2021** |
| ☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION | |
| ☒ OTHER (Specify) **Hostile Work Environment** | ☒ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

Since 2013, I have lived in the Missouri City community (Sienna Plantation) and I am actively involved within the community. I am providing this statement of disparaging and discriminatory acts I have directly suffered as a result of Regions Bank employee, Dave Leonard, discriminatory motives. Over the past three years, I have been repeatedly denied the opportunities to be the Branch Manager for any of the Nexus (New Denovo Branches) within the Missouri City or Sugar Land markets. In 2017, when the list of approved Nexus locations were announced, I expressed a high degree of interest to the Consumer Banking Manager (Mary McDonnell) at the time and through 2018. The conversation took place during branch visit / branch observation completed by Mary McDonnell. During the 3rd Quarter 2018, my office (Sugar Land Branch) was realigned to be supervised by Dave Leonard.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| *June 17, 2021*<br>Date _____ Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |

**SANDERS 0073**

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☐ EEOC | |

| **Texas Workforce Commission Civil Rights Division** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

In December 2018, again, during branch visits and branch manager meetings, I continued to inquire about the posting of the "Sienna Plantation BSM position" and I applied for the position. I was consistently told that the position had not been posted, but I would be informed when it did. In December 2018, during a Branch Managers meeting (Greenway Plaza Corporate Building) I inquired about the Sienna Plantation posting to Dave Leonard, and he indicated that he and Earl Connell, CBE had already extended an offer to an outside applicant (outside of my protected class). I did not understand why, I was never informed or approached about the position at the Sienna Plantation Nexus. However, I again indicated my intent to apply for the next open Nexus location in Sugar Land (Lake Riverstone).

During the months of July and August 2019, Dave Leonard would utilize my branch to conduct interviews for the Branch Manager positions within the market. I was informed by another associate that Dave Leonard was interviewing for the Lake Riverstone, Branch Manager opening. I contacted Dave and reminded him of my interests to interview for the position. Dave instructed me to apply for the position and he would schedule an interview. After waiting three weeks for a scheduled interview with Dave, I followed up with an email as a reminder about the interview. Dave suggested that we have a Phone Interview within two weeks after I followed up with him. In my career of 20 years banking experience, I have successfully opened more than 10 New Denovo (Nexus) locations for other financial entities. I was very well prepared and looking forward to our scheduled interview.

On August 20th 2019, Dave contacted me for the phone interview. The interview lasted less than 30 minutes, and I was taken back by the fact that during the interview, questions asked were irrelevant to the developing of New Household / Business Relationships within the market (Lake Riverstone). The last question from Dave Leonard was, "Have you ever hired an employee that did great in the interview, but turned out to be a poor performing employee?" My initial response was "yes" and it's our responsibility as leaders to identify areas of opportunity to develop associates and help them reach their full potential. Ultimately, I was not hired in the position.

On February 11, 2021, (Thursday – 8:30am), just prior to entering the Sugar Land branch for opening procedures, my staff and I noticed that Dave Leonard (Consumer Banking Manager) was waiting in the parking lot. After completing the opening procedures, Dave Leonard entered the branch and stated that "I just wanted to stop by to visit with you and your team."

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| *June 17, 2021* _____ Date            *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

**SANDERS 0074**

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☐ EEOC | |

| **Texas Workforce Commission Civil Rights Division** | and EEOC |
|---|---|
| State or local Agency, if any | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

That day we were short staffed with myself and two other bankers. He insisted on spending 2-4 hours of the day at my office. At 8:45am I was in the process of logging into my computer, while Dave Leonard stood in my office watching as if to see if I was emailing or chatting with someone else. Without any prior notification, Dave stated," Hey Robert, I'm not sure what's going on, but Melody Bodine (HR Office of Associate Conduct) just called me this morning and wanted me to be here for a conference call with you." I asked him if he knew the reason or the nature of what the call, and he indicated that he did not know why HR wanted to speak with me."

Dave Leonard provided me the phone number for Melody Bodine and the call was made from the office line. When Melody answered, she made the following statement, "Good morning Dave and Robert, how are you doing this morning? Robert, the reason for this call is due to some concerns of associate misconduct or behavior that was anonymously reported to us by one of your bankers. Regions has a Zero/No Retaliations Policy against any associate for reporting complaints or issues to HR. She then proceeded with a list of false accusations made by associate Melissa Miranda, Financial Relationship Consultant. Several things I was accused of are as follows, she questioned my communication with associates, I was accused of providing unfair treatment of scheduling the associate on weekends, she questioned the purchase or exchanging of new currency/bills. Ms. Melody even questioned by integrity, she falsely accused me of sending mortgage referrals to my Wife (Owns a Mortgage Branch) instead of Regions Mortgage, COI Referrals to Real Estate agents. Ms. Miranda also made a false statement that I was conducting personal business (Managing Investment properties) during bank time, and that I was falsely submitting entries on my January 2021 Expense Report.

About halfway through the conversation, I made the following statement, "The reason we are having this call is because Melissa Miranda was retaliating against me for having a "Partially Met-Expectation" performance review for 4th Quarter 2020 & Annual performance review for 2020. Melissa told two other associates at the branch weeks after her annual review that she was going to make a list of allegations about me and report the information to our supervisor Dave Leonard." The phone call was nearly 1 hour, and Melody stated at the end that if I had any questions or additional information to contact her if needed. During the interview, Dave Leonard only took notes and made no comments. I was very angry and felt offended at the allegations of an apparent attack on my integrity, character, and of my family.

After this incident, the work atmosphere became hostile, and I was uneasy around Ms. Miranda. I felt she would monitor and try to obtain or relay any information to further sabotage my position. I have made complaints regarding Regions failure to promote me, and I believe Regions is treating me more unfavorably compared to my peers because of my race and my inquiries for a promotion. The Regions Bank organization has taken the action of "retaliation" against me directly related to the Race Discrimination complaint I filed with Regions HR / OAC on February 17, 2021.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| *June 17 2021* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date        Charging Party Signature | |

**SANDERS 0075**

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☐ EEOC | |

| **Texas Workforce Commission Civil Rights Division** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Since filing the charge with this agency, in May 2021, Respondent received notice of my previous complaints, my EEOC Charge, and since increased its retaliation against me. After 9 years of meeting and exceeding performance expectations year after year (via Regions annual reviews) and never having received any poor or negative performance reviews or disciplinary write-ups; I was wrongfully terminated on June 3, 2021. I am a Certified Elite Team Captain with Regions at Work Program. I was stripped of my position of Branch Manager IV/Vice President, and was replaced by someone outside my protected class. I am a well-established Financial Leader in the Sugar Land & Missouri City communities.

Title VII of the Civil Rights Act of 1964 ("Title VII") makes it unlawful for a covered employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Tanik v. S. Methodist Univ.*, 116 F.3d 775, 776 (5th Cir. 1997). "Failure to promote is clearly an adverse employment action." *Haire v. Bd. of Sup'rs of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 364 (5th Cir. 2013). To establish a prima facie case in the context of failure to promote, an employee must demonstrate that: "(1) he was not promoted, (2) he was qualified for the position she sought, (3) he fell within a protected class at the time of the failure to promote, and (4) the Defendant either gave the promotion to someone outside of that protected class or otherwise failed to promote the employee because of his race." *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir.2002). If the employee meets this obligation, he raises an inference of unlawful discrimination, which shifts the burden of production to the Defendant to proffer a legitimate, nondiscriminatory reason for not promoting the employee.

As an African American, I am a member of a protected class under Title VII of the Civil Rights Act. I am qualified for my position, and because Regions failed to promote me when I was qualified for the position, and gave another employee outside my protected class the position, I have material adverse employment action against Regions. Moreover, Regions ultimately terminated me from my Branch Manager IV/Vice President position because of my race and complaints. There is reason to believe that other non-African American Branch Managers have been treated more favorably and promoted to positions which I was not hired. I have continuously dealt with the discriminatory treatment, and it affected the terms and conditions of my employment. When I was terminated, I was never presented with a reasoning for why I was being terminated. Since Regions terminated me without any cause, it will be used as direct evidence of race discrimination and retaliation under Title VII based on the close proximity of my complaints and the adverse employment action taken against me.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| June 17, 2021 _____ Date              Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

**SANDERS 0076**

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☐ EEOC | |

| **Texas Workforce Commission Civil Rights Division** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

With respect to my Title VII retaliation claim, Title VII permits me to seek judicial relief for adverse employment actions done in retaliation for me asserting my rights under Title VII. 42U.S.C. §2000(e)(3). To state retaliation claim, a plaintiff must allege facts to show (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) there is a causal connection between the protected activity and the adverse employment action. *McDaniel v. Shell Oil Co.*, 350 F. App'x 924, 927 (5th Cir. 2009). Protected activity includes complaining about alleged workplace mistreatment. *See Fanning v. Metro. Transit Auth. of Harris Cty., Tex.*, 141 F. App'x 311, 314 (5th Cir. 2005) (per curiam) (holding that filing a charge of discrimination and reporting discriminatory practices to a supervisor are protected activities under federal law).

I believe I was retaliated against in violation of Title VII of the Civil Rights Act. Based on the facts I can show each element of the Title VII retaliation claim because I made complaints regarding discrimination and unfair treatment with Regions HR in February 2021, which was protected under the statute. Regions failed to investigate my complaints and I was forced to file an EEOC Charge on May 27, 2021, which is protected activity under Title VII. I faced adverse employment when I was terminated seven days later without any reasoning (given the fact that I was never given a write up or had any negative performance reviews), and it can be inferred that a causal connection exists between my subsequent termination, and my multiple complaints based on the close nexus of time between my complaint, EEOC Charge and my termination. Therefore, I believe Regions retaliated against me for engaging in protected activity by terminating me, in violation of Title VII.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| June 17, 2021 _____<br>Date      *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

**SANDERS 0077**

EEOC Form 161-B (11/09)

## U.S. Equal Employment Opportunity Commission

## Notice of Right to Sue *(Issued on Request)*

| | | | |
|---|---|---|---|
| To: | **Robert Sanders**<br>**26 Lake Como Dr**<br>**Missouri City, TX 77459** | From: | **Houston District Office**<br>**1919 Smith Street ,6th Floor** |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **460-2021-03447** | **Patricia Palacios Ware,**<br>**EO Investigator** | **(346) 327-7681** |

*(See also the additional information enclosed with this form.)*

**Notice to the Person Aggrieved:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

<mark>More than 180 days have passed since the filing of this charge.</mark>

The EEOC is terminating its processing of this charge.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Patricia Palacios Ware*

Digitally signed by Patricia Palacios Ware
Date: 2022.01.26 08:05:57 -06'00'

for

Enclosures(s)

**Rayford O. Irvin**
**District Director**

*(Date Mailed)*

cc:  **Michele Walker, COUNSEL**
**REGIONS FINANCIAL CORPORATION - LEGAL**
**1900 Fifth Ave., Ste. 2200**
**Birmingham, AL 35203**

**Jamila M. Brinson**
**JACKSON WALKER LLP**
**1401 McKinney St., Ste. 1900**
**Houston, TX 77010**

**Alfonso Kennard**
**KENNARD LAW**
**5120 Woodway Dr., #10010**
**Houston, TX 77056**

Enclosure with EEOC
Form 161-B (11/09)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**.  Therefore, you should **keep a record of this date**.  Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.  Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**.  (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***

# EXHIBIT C



CODE OF
*Business Conduct*
AND *Ethics*

2020

REGIONS

REGIONS 000551

# CONTENTS

Foreword from the President and Chief Executive Officer ................................................................. 2

Our Culture ................................................................................................................................. 3

Our Commitment to Ethics and Values ........................................................................................... 3

Our Code and Your Responsibilities ............................................................................................... 4

Raising Issues and Reporting Violations ......................................................................................... 5

Work Environment ....................................................................................................................... 6

Commitment to Risk Management .................................................................................................. 7

Compliance with Laws and Regulations .......................................................................................... 7

Fair and Responsible Banking ....................................................................................................... 8

Referring Potentially Suspicious Activity and Compliance with Bank Secrecy Act/
   Anti-Money Laundering and Office of Foreign Assets Control Requirements ................................... 8

Restrictions on Certain Tying Activities ........................................................................................... 8

Protection and Proper Use of Corporate Assets ............................................................................... 9

Protecting Confidential and/or Proprietary Information .................................................................... 11

Internal and External Communications ........................................................................................... 15

Insider Information ....................................................................................................................... 16

Anticompetitive Activities ............................................................................................................. 16

Conflicts of Interest ..................................................................................................................... 17

Anti-Bribery and Anti-Corruption .................................................................................................. 17

Gifts and Other Items of Value ..................................................................................................... 18

Additional Legal Restrictions on Gifts and Other Items of Value ...................................................... 19

Outside Activities ........................................................................................................................ 20

Bequests, Inheritances, and Fiduciary Appointments ...................................................................... 23

Self-Dealing ............................................................................................................................... 24

Political Organizations and Activities ............................................................................................. 25

Sales Practices ........................................................................................................................... 26

Incentive Policies and Procedures ................................................................................................. 27

Integrity of Corporate Records and Public Disclosure ...................................................................... 27

# Foreword from the President and Chief Executive Officer

*Our core value, "Do What is Right", drives how we operate, how we serve our customers and communities, and how we treat each other.*

Living and working according to this value starts with integrity, and in turn, integrity is how you earn trust. And in our business, earning and keeping that trust is the only way Regions will succeed.

Regions values its relationships with associates, customers, vendors, and the communities where we work and live. We understand that a good reputation comes from relationships built on trust, respect, and fair treatment. Our Board of Directors sets the "tone at the top" that Regions maintains a workplace culture that is reflective of our core values — a workplace where all associates are treated with dignity and respect. And our Code of Business Conduct and Ethics ("Code") forms the foundation of our ethical culture. By having a strong Code, we demonstrate that doing what is right is not just a slogan — it's the way we do business.

> *We all have a responsibility to represent our company with integrity, to conduct ourselves ethically, and to treat others with dignity and respect. All of us are the face of Regions, whether we are at work or in the community.*

When one person fails to adhere to our Code, it has the potential to reflect negatively on the entire company, which is why ethical behavior and personal integrity are the core of our culture. It's a must for our associates to understand what our policies prohibit and to feel comfortable reporting violations. Our Code provides guidance on what conduct is allowed and what is prohibited, and while it cannot address every issue or situation that may arise, Human Resources teammates can help should you have a question. Associates have multiple avenues for reporting violations of our Code, including an anonymous option. The Office of Associate Conduct oversees the handling, investigation and resolution of associate issues and allegations of misconduct.

Many companies talk about culture and doing the right thing. At Regions, we mean it. It is essential that we have a company people trust to do the right thing for them and to truly understand their needs. It is the heart of all we do. Our actions have yielded positive results in the form of a culture that reflects our values, but we will continue to review our processes and policies to ensure continued effectiveness. We know that a diverse and inclusive workforce is essential to achieving and maintaining a thriving culture. We know that maintaining a thriving culture creates job satisfaction and associate engagement. And we know that associate engagement promotes collaboration and commitment to excellence.

I am confident that with your help, Regions will continue to do business in a way that reflects our values and our mission to make life better for our associates, our customers, our shareholders and the communities we serve.

*John M Turner Jr*

John M. Turner, Jr.
President and CEO

**EMPLOYMENT RELATIONSHIP**

This Code of Business Conduct and Ethics ("Code") neither constitutes nor should be construed to constitute a contract of employment for a definite term or a guarantee of continued employment. These policies and standards do not alter "at will" employment relationships. This means that we recognize an associate's right to resign at any time for any reason; similarly, Regions, or its affiliates, may terminate an associate at any time, with or without cause. The terms "Regions" and "Company" as used throughout this Code mean Regions Financial Corporation and all of its direct and indirect subsidiaries.



## Our Culture

Regions' strong corporate culture is founded on the idea that creating shared value for our customers, shareholders, associates, and communities is the right way to operate our business. As we strengthen our culture, we simultaneously develop an organization that is more balanced, diverse, inclusive, and thoughtful. We also enhance our customer service quality, increase associate engagement, and create a strong risk management culture.

Honoring and affirming protections for human rights is part of our culture and embodied in our values. Regions' support of fundamental rights is also reflected in our policies and in our daily interactions with associates, vendors, customers, and the communities where we do business. Regions' Human Rights Statement sets forth our commitment to conduct business in a manner that is consistent with key human rights principles, such as those set forth in the United Nations Universal Declaration of Human Rights and the International Labour Organization's Declaration on Fundamental Principles and Rights at Work. We are committed to maintaining a work environment where every associate at every level is treated with dignity and respect, free from discrimination and harassment, and can devote their full attention and best efforts to their job. These same standards apply to our interactions with customers and others with whom we do business, including vendors, contractors, and subcontractors.

## OUR *Commitment* TO *Ethics* AND *Values*

Our corporate values are not simply the values of a legal entity; they are values that encompass the ethics and commitment of all Regions associates. Our values are the statement of how we will do business; they are a promise and a measuring stick upon which to judge our behavior and results:

- **Put people first** — Have respect for every person. Listen. Care. Serve others before yourself. Build the best team. Be inclusive. Work as one team. Balance work in a full life. Lead humanely. Set the good example. And remember to say thank you.

- **Do what is right** — Always. Be honest. Do what you say. Use common sense. Stand for quality and integrity. Take the long view. Earn trust. Be responsible and accountable.

- **Focus on your customer** — Serving the customer as one team, in an exceptional way is our business, our only business. Know your customer. Serve your customer. Be committed. Understand needs. Meet needs. Make your customer's life better by what you do. Create shared value.

- **Reach higher** — Grow. Our company must grow, and we must grow prudently. Raise the bar. Be energetic. Be innovative. Achieve excellence. Improve continuously. Inspire and enable others. Succeed the right way. Improve efficiency and effectiveness.

- **Enjoy life** — Have fun. We are in the business of banking. But more importantly, we are in the business of life. Enjoy it. Laugh. Be creative. Celebrate. Recognize success.

# Our Code and Your Responsibilities



In our Code, we have defined what is appropriate behavior and what is not — in other words, we have defined what we aspire to be collectively as a company and what we expect of ourselves as individuals. Our Code is based on our core values that guide us in our daily activities, and it helps us make ethical business decisions.

While our Code says that we will comply with applicable laws and regulations where we do business, it is not only about compliance. Rather, our Code describes how we, as a company, relate to others as we conduct business. It describes our core values and how we work together as associates. It cannot address every issue that we may encounter, but it does provide guidance and resources for those times when the right choice may not be clear. The Code is a reference guide that will help you locate relevant company policies, and it provides information about how to seek help if you have an ethical concern. The Board of Directors, our Chief Executive Officer, the Executive Leadership Team and all of Regions' other leaders and associates stand behind our Code.

*All associates, officers and Directors of Regions, as well as our subsidiaries and our affiliates are expected to comply with our Code. In addition, certain Regions business partners, such as vendors, outside counsel and consultants, serve as extensions of Regions, and are expected to adhere to the spirit of the Code, and to any applicable provisions, when working on behalf of Regions. Regions has a* Vendor Code of Conduct *that reiterates our expectation that our vendors, and their employees, adhere to the applicable provisions of our Code and sets forth the ethical business practice we expect them to maintain.*

### AMENDMENTS AND ADMINISTRATION OF THE CODE

Our Code is administered by the Human Resources Department in conjunction with the Legal Department. Substantive revisions are approved by the Chief Human Resources Officer in conjunction with oversight by the Compensation and Human Resources Committee of the Board of Directors.  Periodic reports regarding Code revisions and an annual report regarding the overall status of Regions' ethics objectives will be made to the Compensation and Human Resources Committee.

The Human Resources Department maintains operational responsibility for administering the Code. The Chief Human Resources Officer together with the Associate Conduct Officer are responsible for interpreting and applying the Code. Associates may seek guidance regarding the Code from their manager, Human Resources or the Ethics Program Manager.

Any material departure from a provision of the Code on the part of a Director, Senior Financial Officer, or member of the Executive Leadership Team  will be referred to the Compensation and Human Resources Committee and may be waived only by the Board of Directors or a duly authorized committee of the Board. To the extent required by applicable law, rule, or regulation, any such waiver shall be promptly and publicly disclosed.

In addition to this Code, Regions' Chief Executive Officer, Chief Financial Officer, and Principal Accounting Officer and Controller (collectively the "Senior Financial Officers") are also bound by a separate Code of Ethics for Senior Financial Officers ("Code of Ethics"), a copy of which can be found on the Corporate Governance webpage at regions.com. The provisions of the Code of Ethics supplement, but do not replace, this Code.

### BUSINESS UNIT-SPECIFIC POLICIES

Some business units have additional or supplemental codes of conduct and/or other policies which may impose requirements in addition to those specifically discussed in the Code. You are responsible for knowing and abiding by the applicable policies of your business unit.

### ACCESS TO THE CODE

Our Code is maintained electronically and is posted on Regions' internal website, life@regions, and Regions' external website, regions.com. Associates and Directors are notified promptly of any substantive revisions or additions to the Code.

### TRAINING ON CODE CONTENT AND CERTIFICATION OF COMPLIANCE WITH THE CODE

All associates and Directors are required to complete annual training on the Code and to certify that they have read and understand the Code.  Associates who fail to complete this training (or any Mandatory Annual Courses) are subject to discipline as set forth in the *You and Regions Guidelines*.

**REGIONS 000555**

4



# RAISING *Issues* AND REPORTING *Violations*

We are all responsible for living up to the high standards of ethical behavior set forth in our Code, and for being accountable in all we do. When one person fails to adhere to our Code, it has the potential to reflect negatively on the entire Company, and that is why ethical behavior and personal integrity are the core of our culture. Regions investigates all alleged violations of our Code. Following the investigation, if necessary, the Company will take appropriate action to address the findings. Associates who are found to have violated the Code are subject to discipline up to and including termination from employment.

## REPORTING VIOLATIONS

*Associates have a responsibility to promptly report knowledge of or information regarding any violation or suspected violation of the law, any provision of the Code or other Regions policies or procedures.*

There are several ways you can report any potential violations or potentially suspicious behavior by customers, associates or vendors:

- The Report It! Hotline (1-888-270-5934) is a confidential toll-free number which is available seven days a week, 24 hours a day for associates to make anonymous reports in confidence. All calls are answered by trained professionals, and callers are given the option of speaking English or Spanish.

- The Report It! Website at *www.reportlineweb.com/Regions*, is available seven days a week, 24 hours a day for associates to submit reports in confidence.

- The *Raise the Red Flag online referral form* is an internal resource for associates to immediately refer potentially suspicious activity or behavior within the same business day it is identified as potentially suspicious.

- The HR Connect Team (1-877-562-8383 or *HRConnect@regions.com*)

- Directly to the Associate Conduct Officer (1-800-846-6641)

- Directly to the Ethics Program Manager (205-264-7299)

- Anonymously through the mail by addressing a letter to:

  Associate Conduct Officer
  Regions Bank
  Post Office Box 11007
  Birmingham, Alabama 35288
  Internal Mailcode ALBH10703B

Remember that **customer complaints** should be entered in the *Centralized Customer Complaint ("CCC") Database*. ALL associates have access and a responsibility to enter customer complaints into the CCC Database. If you receive a customer complaint, it should be entered into the *CCC Database* within five (5) business days.

## OFFICE OF ASSOCIATE CONDUCT

The Office of Associate Conduct ("OAC") is responsible for investigating and providing effective solutions to all matters related to associate conduct. Investigations involving allegations of associate misconduct will be promptly and effectively investigated by the OAC along with other business groups, as appropriate. Investigations are thorough and protect confidential information to the maximum degree possible. The OAC will administer programs designed to establish and maintain effective associate relations through the uniform and equitable application of policies and procedures.

## PROTECTION FROM RETALIATION

Retaliation is a serious violation of our values and this Code. Regions will not permit retaliation of any kind for good faith reports of alleged ethical violations or misconduct of others. Associates should report any incident of retaliation. If you believe that you or someone you know has been retaliated against for raising an ethics concern, contact Human Resources or the Office of Associate Conduct, or use the Report It! process by calling the Report It! Hotline (1-888-270-5934) or submitting your complaint via the web at *www.reportlineweb.com/Regions*. All reports are investigated with prompt, effective remedial action being taken when appropriate.

# Work Environment

*Regions strives to provide a safe and healthy work environment for all associates. We expect associates to follow all corporate and local policies designed to maintain a safe, effective and healthy work environment. It is every associate's duty to know these policies and to take steps, as necessary, to ensure the policies are applied.*



## EQUAL EMPLOYMENT PRACTICES

Regions is fully committed to equal employment opportunity and compliance with the letter and spirit of the full range of fair employment practices with respect to recruitment, hiring, training, promotion, demotion, transfer, layoff, recall, compensation, benefits, social/recreational programs and other terms and conditions of employment. Regions does not discriminate on the basis of race, color, national origin, sex, religion, age, sexual orientation, gender identity, disability, protected veteran status, genetic information, pregnancy, or any other characteristic protected by law.

You should report any incident of discrimination to Human Resources at 1-877-562-8383 or via email at *HRConnect@regions.com* or contact the Report It! Hotline at 1-888-270-5934 or *www.reportlineweb.com/Regions*. Any associate who is found to have violated the *Regions Equal Employment Opportunity policy* will be subject to disciplinary action, up to and including termination of employment. Retaliation against associates for raising claims or concerns of discrimination is strictly prohibited.

## DIVERSITY AND INCLUSION

At Regions, we recognize that a diverse and inclusive workforce is essential to achieving and maintaining a thriving company. We seek to recruit, develop, and retain the most talented people from a diverse candidate pool and believe that we all benefit from the creativity, varied perspectives, innovation, and energy that arises out of our diverse workforce. We create and deliver learning and performance solutions that drive inclusion and engagement and are aligned with Human Resources' mission to develop diverse talent and Regions' corporate strategy to effectively and efficiently build the best team. To reinforce this, Regions has several talent management and associate development programs. Regions does not want to simply provide jobs: we are one team, focused on investing in the careers, lives, and well-being of our teammates.

## HARASSMENT AND INTIMIDATION

Regions is committed to maintaining a work environment that is free from harassment and in which associates at all levels treat each other with dignity and respect so that our associates can devote their full attention and best efforts to the job. Regions does not authorize and will not tolerate any form of harassment based on race, sex, national origin, age, disability, religion, sexual orientation, protected veteran status, gender identity, genetic information, pregnancy or any other characteristic that is protected by law. Associates should report harassing or intimidating behavior by co-workers, vendors or customers directly to Human Resources at 1-877-562-8383 or via email at *HRConnect@regions.com* or contact the Report It! Hotline at 1-888-270-5934 or *www.reportlineweb.com/Regions*. Additionally, Regions has a No-Retaliation Policy that protects associates who, in good faith, report harassment or who participate in an investigation of harassing conduct.

## PROHIBITION AND PREVENTION OF WORKPLACE VIOLENCE

Regions mandates a "zero tolerance for violence" environment and seeks to prevent violent incidents from occurring. Violence includes, but is not necessarily limited to, physical harm, verbal assault, shoving, pushing, harassment, intimidation, coercion, brandishing a weapon and threats or talk of violence. You must report any incident that may involve a violation of this policy to Human Resources either at 1-877-562-8383 or via email at *HRConnect@regions.com*, or you may contact the Report It! Hotline at 1-888-270-5934 or *www.reportlineweb.com/Regions*.

# Commitment TO Risk Management



**EFFECTIVE RISK MANAGEMENT IS CORE TO REGIONS' SUCCESS.** *At Regions, the risks we face can be classified as one of eight key risk types: market risk, liquidity risk, credit risk, operational risk, legal risk, compliance risk, reputational risk and strategic risk.*

Effective management of these various risks requires a team approach, and all associates have a role in managing risk every day. In order to promote effective risk management across the Company, clearly defined roles and responsibilities have been established across all of Regions' business units. Associates are expected to discuss risk issues in an open, candid and transparent manner, providing all available information so that Regions can make sound decisions for our customers, shareholders and our Company. Associates, officers and Directors are also required to respond promptly, truthfully and candidly when interacting with Regions' examiners, regulators, auditors and/or attorneys.

Additional information regarding the risks faced by Regions and Regions' commitment and approach to risk management can be found in the *Regions Risk Management Framework*, located on life@regions.

## Compliance with Laws and Regulations

*The banking industry is highly regulated, and Regions must comply with numerous laws, rules and regulations in jurisdictions at both the federal and state level. As a financial holding company with multiple operational subsidiaries and affiliates, we are subject to comprehensive, consolidated supervision and regulation by the Board of Governors of the Federal Reserve System.*

We are also regulated by the Alabama State Banking Department and the Consumer Financial Protection Bureau and are a member of the Federal Deposit Insurance Corporation. The U.S. Securities and Exchange Commission ("SEC"), the New York Stock Exchange, the Financial Industry Regulatory Authority, and other federal and state regulators supervise our fiduciary, securities and insurance activities.

All associates must abide by the laws, regulations and policies impacting the financial services industry, as well as federal and state laws and regulations such as employment laws, antitrust laws, privacy laws, insider trading laws and criminal laws governing fraud, theft, anti-corruption, anti-bribery, embezzlement, conversion and conflicts of interest. Improper and/or wrongful actions or inactions by associates which could subject Regions to civil or criminal liability or jeopardize the Company's regulatory compliance efforts are prohibited and may subject the associate to discipline up to and including

termination. In addition, alleged violations of laws applicable to Regions' business may be reported to the appropriate authorities for individual prosecution.

While Regions does not expect you to understand all details of these laws, rules and regulations, you are expected to be knowledgeable about and comply with the letter **and** the spirit of these laws, rules, and regulations as they apply to your job responsibilities and to seek guidance when questions arise. This also requires that you avoid not only actual misconduct but also the appearance of impropriety.

Company policies and procedures involving laws, rules and regulations and additional information are posted on Regions' intranet site, life@regions. However, these policies and procedures do not constitute a complete listing of the laws, rules and regulations that must be adhered to by every individual subject to this Code in the conduct of his or her duties at Regions.

# Fair and Responsible Banking

**COMMITMENT TO PREVENTING UNFAIR, DECEPTIVE OR ABUSIVE ACTS OR PRACTICES**

Regions is committed to treating prospective and existing customers in a manner that is equitable, transparent and consistent with laws and regulations, including consumer protection laws and regulations that prohibit unfair, deceptive or abusive acts or practices. For more information, please see the *Regions Policy on the Prohibition of Unfair, Deceptive or Abusive Acts or Practices* located on life@regions.



## PROHIBITION AGAINST DISCRIMINATION IN BANKING

Regions is strongly committed to making its financial products and services available to prospective and existing customers on a fair and responsible basis. Regions prohibits discrimination in lending on the basis of race, color, religion, national origin, sex, marital status, familial status, military or veteran status, disability, age, the fact that all or part of a customer's income is derived from any public assistance program, the fact that a customer had in good faith exercised any of their rights under the Consumer Credit Protection Act, and any other basis prohibited by law. Regions' commitment to fair and responsible lending is a basic responsibility of all associates. For more information, please see the *Fair and Responsible Lending Policy* and the *Servicemembers and Veterans Affairs Policy*, both of which are located on life@regions.

# Referring Potentially Suspicious Activity and Compliance with Bank Secrecy Act/Anti-Money Laundering and Office of Foreign Assets Control Requirements

As set forth in the *Regions Financial Corporation Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") Program* and the *Regions Financial Corporation Office of Foreign Assets Control ("OFAC") Program*, all associates have an obligation to timely refer potentially suspicious activity via the *Raise the Red Flag form* and are encouraged to also notify their supervisor or manager. Each associate is responsible for compliance with Regions' BSA/AML and OFAC Programs including any applicable business unit-specific BSA/AML and OFAC procedures.

Examples of compliance with Regions' BSA/AML and OFAC Programs include, but are not limited to:

- Adhering to Regions' established "Know Your Customer" requirements pertaining to the use of our products and services

- Immediately referring unusual and/or potentially suspicious activity after becoming aware of the activity

- Immediately referring alleged fraud or theft on a customer's account

- Immediately referring potentially suspicious criminal activity that may be detected through directly dealing with a customer

- Immediately referring potentially suspicious criminal or fraudulent activity by an associate

Associates should *never* disclose to a customer or other party that Regions has filed or is contemplating filing a Suspicious Activity Report.

# Restrictions on Certain Tying Activities

Regions encourages customers to take advantage of the benefits of all Regions products and services, and cross selling can be a valuable tool for accomplishing this. However, the law does prohibit some, but not all, tying arrangements in which Regions requires a customer to buy one product or service as a condition to buying or receiving another. Contact the Legal Department if you are uncertain whether a proposed arrangement involving both "traditional" and "nontraditional" banking products or services is allowable.

# Protection and Proper Use of Corporate Assets

*Our corporate assets are very valuable to our financial success. We are responsible for properly handling those assets that are entrusted to us. All associates are responsible for using good judgment to ensure that corporate assets are not lost, stolen or wasted, and are used to further Regions' legitimate business purposes. Corporate assets should never be used for improper personal gain or benefit.*

All associates and Directors of Regions cannot spend corporate funds in a way that is excessive, extravagant, or otherwise creates a risk of significant damage to Regions' reputation with our customers, shareholders, investors, or regulators, or in the communities where we conduct business.

## REGIONS CORPORATE ASSETS INCLUDE, BUT ARE NOT LIMITED TO:

- Facilities
- Physical property (including office and other supplies)
- Cash
- Securities
- Customer, supplier and distributor information
- Intellectual property and proprietary information (including business plans, Regions' name, logos, service marks, trademarks, patents, processes, domain names, inventions, innovations, computer programs, models and other items)
- Electronic media, such as telephones, computers, e-mail and voice mail systems
- Application systems and network communications
- Relationships with customers, vendors and other centers of influence
- Services (including bank products such as accounts and internet banking)

## ASSOCIATE EXPENSE REIMBURSEMENT

Regions reimburses associates for actual, reasonable and proper expenses incurred while conducting business on behalf of Regions. Associates must abide by the *Regions Associate Expense Reimbursement Policy*, which provides guidance and sets forth procedures regarding the proper expenditure of corporate funds for conducting Regions' business. Associates who have been issued a Regions corporate expense credit card are prohibited from using those cards for personal expenses. Additional information regarding the proper use of Regions corporate expense cards can be found in the *Associate Expense Card Policy*, located in the *You & Regions Guidelines*. Failure to comply with these policies may subject you to disciplinary action.

## USE OF CORPORATE ASSETS FOR CHARITABLE OR PRO BONO PURPOSES

Regions encourages associates to participate in charitable or pro bono causes and officially supports many non-profit organizations. However, your personal decision to provide financial support to a non-profit organization or charitable campaign will not be reimbursed from corporate funds. In addition, Regions' corporate assets, including facilities, equipment, and customer or vendor lists, should not be used to support charitable causes or provide pro bono assistance unless prior approval for such support has been obtained from your Market Leader or Business Unit Executive and only after you have met any other notice requirements required by corporate or local policy.

Unless on behalf of a Regions-approved initiative and/or for a Regions-approved charity, associates should not solicit customers or vendors for donations or other support of charitable causes or campaigns either on Regions property or while working on Regions time, and should not use their Regions email or otherwise imply Regions' support of a charitable or pro bono cause or event. For additional information, see the *Associate Solicitation and Distribution Policy* and the *Use of Stationary, Titles, Etc. in Personal Correspondence Policy*, both located in the *You & Regions Guidelines*.

*You should never offer to make a charitable contribution or provide other forms of support to a charitable cause or campaign for the purpose of influencing a third party to conduct business with Regions, and you should never accept charitable contributions or offers of pro bono assistance from customers or vendors in exchange for taking or refraining from taking any official action in your role at Regions.*



In addition to reputational and litigation risks, the use of Regions' marks by certain vendors and service providers may also increase security concerns because it could inform criminals as to Regions' security products and services. For these reasons, Regions rarely participates in news releases, case studies, promotional or marketing materials, placement on customer lists, business presentations, testimonials, white papers, videos or other announcements made by vendors or service providers about a business relationship with Regions (hereinafter, a "Vendor Communication"), whether in print or on websites or other electronic or social media, and whether such relationship is new or existing. Additional information regarding a Vendor Communication can be found in the *Media Relations Policy* on life@regions.

**USE OF REGIONS' NAME, LOGO AND MARKS BY THIRD PARTIES**

*Maintaining the exclusive association of Regions' name, logos, service marks, domain names and trademarks ("Regions' marks") with Regions and its quality products and services is essential to the success of Regions' business.*

Regions' general practice is not to permit use of Regions' marks by any third party (including but not limited to vendors and service providers with whom Regions has current contracts, and charitable organizations) in any public appearance or in published or posted materials (including, without limitation, charitable event materials, news releases, case studies, associate testimonials or endorsements, customer listings, speeches, webcasts, videos, articles or interviews) *unless there is a clearly identifiable and substantial benefit to Regions*.

The use of Regions' marks by any third party (especially vendors and service providers) can lead to potential compliance, reputational, litigation and security risks, especially when our customers, non-customers or regulators interpret a third party's use of Regions' marks on its website, brochures or other marketing materials as a Regions endorsement. Controlling the use of Regions' marks enables us to reduce some of these risks.

If you work with any third party that requests use of one of Regions' marks (including any Vendor Communication) and that you believe provides a **clearly identifiable and substantial benefit to Regions**, you must first complete the *Request for Use of Regions Trademarks and Logo form* and submit it to *trademarks@regions.com*. This also includes any sponsorship where Regions' marks would be used to support or advertise an event. The Trademark Approval Group, which consists of associates from Legal, Compliance, Community Engagement, Marketing, Risk Management, Technology, and Human Resources, will review the submission to determine potential positive and negative impacts for Regions. Additional information regarding the use of Regions' marks can be found by clicking the following link: *http://lifeatregions.rgbk.com/Legal/NameLogosMarks.rf*.

**IMPORTANT NOTE:** No agreement should be entered into with any third party (specifically including a vendor or service provider) that includes (i) an obligation for Regions to participate in a Vendor Communication or (ii) an authorization for the vendor, service provider or other third party to use Regions' marks, without obtaining the **prior approval** of the Trademark Approval Group. Doing so without obtaining approval is considered a violation of this Code. Approval is required even when an existing agreement with a vendor or service provider includes (i) an obligation for Regions to participate in a Vendor Communication or (ii) an authorization for the vendor or third party to use Regions' marks.



# PROTECTING *Confidential* AND/OR *Proprietary* INFORMATION

As a Regions associate, you have an obligation to protect confidential and/or proprietary information. Associates may not engage in any activity which threatens the confidentiality, integrity, and/or security of Regions' confidential and/or proprietary information. Confidential and/or proprietary information is nonpublic information, which includes, but is not limited to:

- *Confidential Supervisory Information* ("CSI")
- Information about Regions' operations, results, strategies and projections
- Information about mergers, acquisitions, divestitures and other transactions that Regions is considering or pursuing
- Information about Regions' business plans, business processes and client relationships
- Information about Regions' customers, including potential and current customer lists
- Personally Identifiable Information ("PII") about current or potential associates, customers, suppliers, and distributors that could potentially identify or be associated with a specific individual, and other information or data received in the course of your employment about current or potential associates, customers, suppliers and distributors
- Financial information, including budgets or projections, price lists and any other financial, marketing or sales information
- Business and technical information, including information such as a formula, program, model, template, method, technique or compilation of information used in the course of Regions' business operations and which is not publicly available
- Intellectual property, including without limitation, patents, inventions, trade secrets, secret processes and information about present, past, or future products
- Information about Regions' technology and systems

- Any other system, information or process that gives Regions an opportunity to obtain an advantage over our competitors or would be harmful to Regions if disclosed
- Information Regions considers to be confidential or is required by law to treat confidentially

With regard to confidential and/or proprietary information, associates must comply with the following:

- Never disclose CSI to anyone outside of Regions without express written consent from the Office of the General Counsel of the Federal Reserve. The Legal Department must be consulted on all requests to disclose CSI outside of Regions.
- Never remove CSI from Regions premises.
- If an associate must access confidential and/or proprietary information, including CSI, remotely for business purposes, then such access must be solely through a secure Regions-provided platform (for example, via VPN).
- Accessing, using and disclosing CSI or other confidential and/or proprietary information must comply with the *Associate Device Usage for Business Purposes Policy*, the *Electronic Communications and Computer Use Policy*, and all other Regions policies and requirements, particularly with regard to the use of personal email accounts and personal devices.
- Do not attempt to access confidential and/or proprietary information, including customer account information, unless you have a legitimate Regions business reason for doing so. Do not attempt to gain access to information you do not need to perform your job.
- Do not disclose CSI or other confidential and/or proprietary information to Regions colleagues, unless they have a need to know such information in connection with their Regions responsibilities.

**REGIONS 000562**
11

- Never disclose customer information outside Regions to anyone other than the customer unless such disclosure:
  - Has been approved by the Legal Department,
  - Is in response to proper legal process or regulation as required by law and is at the direction of the Legal Department, or
  - Has been permitted by the customer.
- Never use your knowledge of Regions' internal systems or other confidential and/or proprietary information, or any information derived either from your use of Regions' internal systems or your access to confidential and/or proprietary information for personal financial gain or to compete with Regions.
- Take all appropriate steps to ensure the security of confidential and/or proprietary information, including but not limited to the following:
  - Proactively *Raise the Red Flag* to refer potentially suspicious activity and notify your supervisor or manager.
  - Designate emails containing confidential and/or proprietary information as [Confidential] when sending internally or [Secure] when sending externally.
  - Use the appropriate CSI tagline on all written materials, including emails, that contain CSI.

Additional information regarding your obligations to protect confidential and/or proprietary information can be found on life@regions, including, but not limited to, the *Privacy Policy*, the *Information Security Policy*, and the *Electronic Communications and Computer Use Policy*.

All of your obligations regarding the protection of confidential and/or proprietary information continue after your employment or association with Regions ends. Misuse or misappropriation of confidential and/or proprietary information may result in criminal and civil liability. You should avoid discussing confidential and/or proprietary information in places where you may be overheard — this includes public and nonpublic areas, such as restaurants, airplanes, Regions' elevators or hallways.

Under the Defend Trade Secrets Act (18 U.S.C. § 1836, et. seq.), associates are immune from any criminal or civil liability under state and federal trade-secret laws when disclosing a trade secret in confidence to an attorney or governmental official solely for the purpose of reporting or investigating a suspected violation of law or for use in an anti-retaliation lawsuit.

## MERGERS, ACQUISITIONS, DIVESTITURES AND OTHER CONFIDENTIAL TRANSACTIONS

*Some Regions associates ("Transaction Associates") may from time to time have access to certain nonpublic information ("Transaction Information") regarding potential confidential transactions that Regions is considering, evaluating or pursuing ("Potential Transactions").*

Potential Transactions might include, for example, the acquisition of a bank or other financial services company, the sale of a Regions company, the sale or purchase of branch facilities, the sale or purchase of financial assets or liabilities, the issuance or repurchase of stock, or the issuing or retiring of debt. Transaction Information includes any and all nonpublic information and materials pertaining to a Potential Transaction, all analyses, compilations, forecasts, studies or other documents prepared by Regions or its representatives in connection with the Potential Transaction, the identities of any parties to the Potential Transaction, and the fact that Regions is considering or is engaged in discussions with any other party regarding the Potential Transaction.

*In addition to the general obligations of all Regions associates to protect confidential and/or proprietary information, each Transaction Associate has a special duty to hold in confidence, protect and safeguard Transaction Information in accordance with Regions' policies and procedures and not to use or disclose Transaction Information except to perform his or her responsibilities in connection with the Potential Transaction, to comply with applicable law or regulation, or as otherwise directed or permitted by his or her manager.*

Each Transaction Associate also should be aware that any Potential Transaction is likely subject to a confidentiality or nondisclosure agreement between Regions and the other party(ies) to the Potential Transaction ("Potential Transaction NDA"). Managers of Transaction Associates who receive Transaction Information that may be subject to a Potential Transaction NDA are responsible for apprising such Transaction Associates of the terms of the Potential Transaction NDA. Transaction Associates should avoid taking any action or making any omission that would put Regions in breach of the terms of any Potential Transaction NDA.



**INTELLECTUAL PROPERTY OF OTHERS**
*Regions respects the intellectual property rights of others and expects its associates to do the same. Inappropriate use, sale, or distribution of others' intellectual property may expose Regions and individual associates to criminal and civil penalties and is strictly prohibited.*

**DEVELOPMENT, ACQUISITION AND REGISTRATION OF CONFIDENTIAL AND/OR PROPRIETARY INFORMATION BY ASSOCIATES**

Associates should inform Regions, in writing, of any pre-existing rights or interest they have in any intellectual property, inventions or technology which may relate to their employment with Regions by submitting the Pre-Existing Intellectual Property Disclosure and Acknowledgement Form to the Legal Department within 60 days of their start date with the Company.

During your employment with Regions, any discovery, innovation, creation, development, invention, concept, process, idea or work related to the business of Regions, written or otherwise, developed or created by you alone or in combination with others, whether or not registerable, copyrightable or patentable, and whether or not performed during off duty hours and/or using Regions' facilities, equipment or resources (collectively "Regions Work Product") is "work made for hire" and belongs to Regions.

With regard to Regions Work Product, you agree to the following as conditions to your employment with Regions:

- You acknowledge and agree that all Regions Work Product and any other confidential and/or proprietary information is Regions' sole property and you disclaim any rights, title, and interests therein and assign exclusively these rights, title, and interests to Regions.

- You may not agree, in a written contract or otherwise, to the assignment of any Regions Work Product to any vendor or third party who is engaged to assist the Company with a project or initiative.

- You understand and agree that Regions is not required to obtain your permission to modify or make derivative works from the Regions Work Product.

- You agree to assist Regions (during and/or after your employment with Regions) in securing for its own benefit all copyrights, patent rights, trademarks, domain names, trade names, service marks, mask work rights, trade secret rights and any other proprietary and intellectual property rights, in and to the Regions Work Product and will execute such documents and take such actions as Regions believes are necessary to accomplish and effectuate the assignment and to secure, protect and perfect Regions' rights in and to the Regions Work Product.

- You agree never to register or apply to register, either during your employment or after, a trademark or domain name containing a Regions name or mark, or a simulation or variation thereof.

- You agree never to apply to register, either during your employment or after, a copyright for any Regions Work Product.



*If your employment with Regions ends, you must return all Regions Work Product, including all confidential and/or proprietary information, that may have been retained on personal items (for example, electronic devices and personal computers). If it is determined that you have violated any of the above listed obligations, Regions may prosecute or seek other legal action against you.*

**REGIONS 000564**

## PRIVACY OF ASSOCIATE INFORMATION

*Regions respects the confidentiality of associate personal information. This includes associate medical and personnel records.*

Access to personal information is authorized only when there is a legitimate and lawful reason for such access. Access is granted only to appropriate personnel. Requests for confidential associate information from anyone outside of Regions under any circumstances must be approved in accordance with our policies.

It is important to remember that associates should have no expectation of privacy with regard to normal-course workplace communications or any personal property brought onto Regions' premises or used for Regions business.



**PROTECT CUSTOMER PRIVACY AND ACT TO PREVENT IDENTITY THEFT**

*Regions is committed to protecting confidential information about our customers. Regions follows all applicable laws and regulations directed toward privacy and information security. This includes our relationships with our third party vendors and service providers. When other companies provide services for us, we require them to protect the confidential customer information they receive.*

Associates should act diligently to prevent third parties from engaging in identity theft and other forms of fraudulent use or misappropriation of customer information. All associates receiving notice from any source regarding actual or suspected identity theft are expected to adhere to policies and procedures in the *Regions Identity Theft Prevention Program*, the *Regions BSA/AML Policy* and its reporting requirements, as well as any applicable identity theft prevention policies and/or procedures for their business unit.

Any associate who has knowledge or suspects that customer data has been compromised or Regions' data security has been breached is required to immediately refer the matter by submitting the *Raise the Red Flag form*.

## INFORMATION BARRIERS

Certain departments within Regions have information barrier procedures that prevent inappropriate sharing of information between departments. Associates must comply with Regions information barrier procedures and any applicable business procedures when appropriate. Information barriers are designed to separate associates engaged in lending, investment banking or merchant banking activities, who routinely have access to confidential information about customers (private-side activities), from those associates who trade in securities based on publicly available information or who engage in investment management activities (public-side activities). Information barriers are one of the methods used to address potential and actual conflicts of interest among business activities.

*You are responsible for knowing and complying with the information barrier procedures that may apply to you and your business.*



Associates may disclose customer information, including credit information and business plans, to other Regions associates, businesses or affiliates only on a "need to know basis." Associates must observe all restrictions for consumers who have "opted out" of information sharing between Regions' affiliates as allowed under applicable privacy regulations.

**REGIONS 000565**

14



# Internal AND External COMMUNICATIONS



*What we say, write and do should reflect a clear understanding of Regions' ethical values and expectations, should demonstrate sound personal judgments, and should be consistent with all laws and regulations, including laws and regulations that prohibit unfair, deceptive or abusive acts or practices.*

This commitment is an important part of Regions' dedication to promoting the highest standards of behavior in all aspects of its practices. That means being clear, truthful, accurate and respectful. Always avoid exaggeration, colorful language, guesswork and legal speculation. These requirements apply to communications of all kinds, including voice mails, e-mail and informal notes or memos.

## COMMUNICATING WITH THE PUBLIC

Only authorized persons can provide information to investors, analysts or the media. Nonpublic information or materials regarding Regions' trade secrets, intellectual property, or confidential customer or business information must not be distributed outside of Regions. Promptly refer any inquiry from the media to Corporate Communications. Any inquiry concerning Regions' securities or financials should be promptly referred to Investor Relations.

Only authorized Regions associates can engage in the business use of social media (i.e., conduct Regions' business over social media). Associates who engage in the personal use of social media do so at their own risk. Regions expects all associates — whether they are using social media for business or personal purposes — to conduct themselves responsibly, and cautions against inappropriate or illegal conduct that could subject you or Regions to legal liability. Whether or not you identify yourself as a Regions associate on social media, remember that others may do so. Because of this, you also should avoid acts of misrepresentation, and other misleading, unprofessional or rude conduct.

Unless authorized, do not give the impression that you are speaking on behalf of Regions in any communication that may become public. This includes, without limitation, social media, on-line forums, blogs, chat rooms and bulletin boards. This policy also applies to endorsements of products and services, comment letters to regulatory agencies, and comments to journalists, including letters to the editor, about specific matters that relate to our businesses. For more information, refer to the *Social Media Personal Use Guidelines* and the *Media Relations Policy*, both located in the *You and Regions Guidelines*, and the *Fair Disclosure Policy*, which is located on life@regions. Failure to comply with these Guidelines and Policies may subject you to disciplinary action, up to and including termination of employment.

## FAIR DISCLOSURE

Regions is committed to providing timely, transparent, consistent and accurate financial and other information to the investing community on a nonselective basis. All officers, Directors and associates of Regions are subject to Regions' *Fair Disclosure Policy*, which prohibits associates from communicating with securities market participants regarding material, nonpublic information concerning Regions' financial condition, results of operations, strategies, and other similar matters. Associates should inform Investor Relations of any presentations to securities market participants in advance of the presentation and refer all questions from securities market participants to the Investor Relations Department.

A summary of Regions' Fair Disclosure Policy is posted on regions.com to enable securities market participants, Company shareholders and the media to further inform themselves regarding the Policy.

**OUTSIDE SPEAKING ENGAGEMENTS, PRESENTATIONS AND PANEL DISCUSSIONS**

Prior to an associate delivering remarks and/or presenting materials at an outside speaking engagement or other event (other than those hosted by Regions) including, but not limited to, panel discussions, industry conferences, seminars, presentations (other than financial education and other presentations made and/or managed through Investor Relations, Community Affairs, Government Affairs or Sales Service & Performance Management), or news conferences or interviews (including those for publication in print or on websites or other electronic or social media) not arranged through Corporate Communications (i) at which the associate will be identified as a Regions associate (using Regions' name, logo or other mark), or (ii) that is related to Regions' business, such participation in the event must be preapproved both by an Executive Leadership Team member for the associate's business unit (or their specific designee) and by the Ethics Program Manager. Outside speaking engagements that are required by an associate's job responsibilities with Regions are excluded from this requirement. Questions regarding the applicability of this requirement can be directed to Human Resources, to the Associate Conduct Officer and/or to the Ethics Program Manager.

Associates must complete and submit the *Outside Speaking Engagement Approval Request Form* at least thirty (30) days prior to the event (or as soon as possible if less than 30 days' notice is provided to the speaker). Copies of all materials to be presented as well as any release or any assignment, transfer, waiver, or other disclaimer required by the sponsor of the event or for the publication of the materials should be included with the form at the time it is submitted. Presentation materials should *never* contain confidential or proprietary information.

The Ethics Program Manager will coordinate the review of the request with other interested parties and will communicate all approvals in writing. Associates should never agree to any terms or conditions with the sponsor or organizer of the event or regarding the publication of the materials prior to receiving written approval to participate.

> *Failure to receive written approval for an outside speaking engagement may result in reputational and legal risk to the Company as well as discipline to the associate, up to and including termination of employment.*

# Insider Information



*While performing your responsibilities at Regions, you may receive confidential information about Regions, our customers, our vendors and others, or about mergers, acquisitions, divestitures and other transactions that Regions is considering or pursuing.*

It is a violation of federal securities laws to purchase or sell shares or other securities of a company if you are aware of "Material Nonpublic Information" concerning that company at the time of the proposed transaction. Material Nonpublic Information is information that is both "Material" and "Nonpublic."

Information may be considered "Material" if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to buy, hold or sell shares or other securities. Any information that could be expected to affect a company's stock price either positively or negatively should be considered Material.

Information is considered "Nonpublic" if it has not been disclosed broadly to the marketplace (such as by press release or a public filing with the SEC) or if the investing public has not had time to fully absorb the information after it has been publicly disclosed. Release of information to the media or through public filings does not necessarily and automatically mean that the information is considered publicly available. To avoid the appearance of impropriety, as a general rule, information should not be considered fully absorbed by the marketplace until the end of the trading day (generally, any business day on which the New York Stock Exchange is open for trading) following the day on which the information is released. You should refrain from trading in Company securities when in possession of such information until adequate time has passed.

The *Regions Financial Corporation General Policy on Insider Trading* ("Insider Trading Policy") outlines, in detail, the standards of conduct that apply to associates and Directors of Regions whenever they are conducting certain securities transactions as described therein, whether such transactions are conducted for themselves or on behalf of others. Every associate and Director is expected to read and understand the Insider Trading Policy and to adhere to its provisions.

# Anticompetitive Activities

Antitrust laws prohibit agreements among competitors to restrict competition. Associates may not conspire with any of Regions' competitors to fix prices, allocate markets, allocate customers or refuse to deal with particular suppliers or customers. When in contact with Regions' competitors, associates must avoid discussing how Regions conducts its business. Associates must be particularly careful to avoid these discussions at social or business gatherings, such as trade association meetings or seminars.



# Conflicts OF Interest

*A conflict of interest occurs when an associate's or a Director's personal or financial interests interfere or compete with Regions' interests.*

Conflicts of interest may arise when it appears that a person, entity or activity outside of Regions could influence an associate's ability to act objectively with respect to Regions' business. Conflicts of interest may also arise when an associate (or their immediate family member) is offered or receives personal benefits and/or preferential treatment that is intended to influence the associate regarding Regions' business.

> *For purposes of this Code, "immediate family member" means any child, stepchild, parent, step-parent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law, and any person sharing your household.*

Associates are responsible for avoiding situations that give rise to conflicts of interest, including situations where there may only be the appearance of a conflict of interest.

It is difficult to identify every situation in which a conflict of interest could arise but some common situations include the offer/receipt of gifts and other items of value, outside employment and other outside business and investment activities, leadership positions in both for-profit and non-profit entities, accepting inheritances and fiduciary appointments, conducting personal bank transactions, and participating in certain political activities.

**BUSINESS UNIT-SPECIFIC POLICIES**

Some Regions business units have supplemental policies regarding conflicts of interest, including the offer/acceptance of gifts and other items of value and participation in outside activities, which may require additional reports or approvals or are more restrictive than the policies in this Code. You are responsible for knowing and abiding by the applicable policies of your business unit.

**ADDITIONAL RESPONSIBILITIES OF CORPORATE DIRECTORS AND OFFICERS**

Directors are subject to additional laws governing conflicts of interest that might arise in connection with investments. Further, Section 16 of the Securities Exchange Act of 1934 has provisions specific to Directors and designated executive officers regarding certain registered equity securities transactions. Regions' Directors and designated officers who are subject to such requirements receive separate communications which outline these obligations and restrictions in more detail.

# Anti-Bribery and Anti-Corruption

Regions requires all business activity be conducted in an honest and ethical manner, with a zero-tolerance approach to bribery and corruption. Regions expects and requires compliance with the U.S. Foreign Corrupt Practices Act, the Bank Bribery Act and other laws and regulations related to anti-bribery and anti-corruption.

The Bank Bribery Act makes it a federal criminal offense for you to corruptly give or offer, or to corruptly accept or agree to accept, anything of value to/from anyone intending to influence or be influenced or to reward or be rewarded in connection with Regions' business. Violations of the Bank Bribery Act are punishable by up to 30 years of imprisonment and/or a fine of up to $1,000,000 or three (3) times the value of the bribe or gratuity, whichever is greater.

It is critical that all Regions associates conduct business strictly on the value of the products and services we provide or purchase and not on the value of any gifts, entertainment, meals or other items of value we may receive or give. With respect to all offers of gifts, entertainment, travel, meals, refreshments, or other items of value that involve customers, consultants, vendors, suppliers and even other associates, you must always be vigilant in considering the motive behind the offer.

You should not accept gifts, services or other items of value from a customer or vendor who is actively negotiating, re-negotiating or bidding for business with Regions. Certain meals and refreshments provided in conjunction with business presentations or discussions may be acceptable. Regardless, you may **never** offer or accept gifts, entertainment, travel, meals, refreshments, or other items of value or forms of compensation to/from anyone, including other associates, when the motive or intent is to influence a business decision. If you feel any offer is intended to influence a business decision, you should contact the Ethics Program Manager as soon as possible.

## Gifts and Other Items of Value

*We are in a relationship business and building relationships is important to our continued success. Business gifts and entertaining and having meals with customers, consultants, vendors and suppliers (or prospective customers, consultants, vendors and suppliers) are common business practices that can be properly used to build relationships. However, they can also be misinterpreted or give the appearance of something improper even when there is no improper intent.*

You should **never** offer or accept any item of value in exchange for a business decision or if doing so would appear to obligate either the offeror or the recipient with respect to a decision involving Regions' business. Note that an "item of value" may include discounts on products or services that are not available to other members of the general public (or to all Regions associates), stock options, and offers of employment or consulting opportunities for you or an immediate family member.

Questions concerning the appropriateness of any gift, entertainment, meal, or other item of value should be submitted to *CodeOfConduct@Regions.com*. You may also contact the Ethics Program Manager or the Associate Conduct Officer with questions or concerns.

### GIFTS

You may accept a gift from or give a gift to a customer, consultant, vendor or supplier (or prospective customer, consultant, vendor or supplier) **only** if:

(1) the gift's value does not exceed $200, or $25 in the case of gift cards or gift certificates for use at specific establishments;

(2) it was not solicited;

(3) it is an occasion when gifts are customary;

(4) the gift is not in cash or in cash equivalents (stored value cards that are not tied to a specific retailer are prohibited);

(5) other gifts are not frequently offered to or given by the same source;

(6) there was no intent to influence a business decision; and

(7) no state banking department employees, government officials or labor unions are involved.

You may accept gifts of a greater value from family or personal friends with whom you have a non-business relationship provided the offer is clearly based on your personal relationship and there is no intent to influence a business decision.

You may accept non-monetary prizes or promotional gifts that are either provided to all participants at an industry or vendor seminar or conference, or awarded in a random drawing or other contest where all participants have an equal chance of winning at an event sponsored by an industry trade association or by current or prospective consultants, vendors or customers.

Exceptions to this policy (other than as it relates to government officials or labor unions) may be made by the Chief Human Resources Officer to allow or encourage associates and/or Directors to participate in or attend events if Regions and/or a significant customer, consultant, vendor or supplier sponsors an event, and attendance at the event is important to Regions and/or to maintaining Regions' relationship with the customer, consultant, vendor or supplier.

## MEALS, REFRESHMENTS, ENTERTAINMENT, TRAVEL AND ACCOMMODATIONS



*You may accept meals, refreshments, entertainment, travel and/or accommodations from family or personal friends with whom you have a non-business relationship provided the offer is clearly based on your personal relationship and there is no intent to influence a business decision.*

You may accept offers of meals, refreshments, entertainment, travel and/or accommodations from customers, consultants, vendor or suppliers (or prospective customers, consultants, vendors or suppliers) **only** if:

(1) you do not solicit the offer;

(2) the customer, consultant, vendor or supplier, as host, is present at the event;

(3) the level of expense is reasonable and customary in the context of your position with the Company;

(4) the purpose of the event is to foster business relationships or to have bona fide business discussions;

(5) the frequency of invitations from the source is not excessive;

(6) there is no intent to influence a business decision; and

(7) any offers of travel and/or accommodations are **pre-approved** as required below.

An offer of entertainment, meals, travel and/or accommodations where the offeror is **NOT** present is considered to be a gift, and will be subject to the requirements of the policies regarding the offer and acceptance of gifts and other items of value.

You **may not** accept offers of **travel and/or accommodations** unless specifically approved in advance of the event both by the Executive Leadership Team member for your business unit (or their specific designee) and by the Ethics Program Manager. The Chief Executive Officer must obtain such approval from the General Counsel and the Ethics Program Manager. To request approval, complete and submit the *Travel and Accommodations Approval Request Form*. Approval shall only be given when restrictions (1) through (7) above are satisfied **AND** Regions would have otherwise paid for the travel and accommodations as a reasonable business expense.

## DECLINING GIFTS AND OTHER ITEMS OF VALUE

Any associate offered any gifts, meals, refreshments, travel, accommodations, entertainment and/or other items of value prohibited by this policy must decline the same and immediately report the matter to the Ethics Program Manager using the *Gift, Entertainment, Travel or Accommodations Declination Disclosure Form*.

The Ethics Program Manager shall keep a contemporaneous written record of all disclosures regarding gifts, meals, refreshments, travel, accommodations and/or entertainment.

# Additional Legal Restrictions on Gifts and Other Items of Value

## GOVERNMENT OFFICIALS

Federal, state, foreign and many local jurisdictions have established laws restricting the provision of gifts, meals, entertainment, transportation, lodging or other items of value to government officials. Depending on the jurisdiction, the term "government official" can include not only elected and appointed officials, but also employees of the legislative, executive, or judicial branches of federal, state and local governments, and of government agencies and other entities. The specific restrictions set forth in these laws vary from jurisdiction to jurisdiction. Associates are required to fully comply with all applicable laws regarding the provision of gifts and/or other items of value to government officials. Questions regarding the application of this policy should be addressed to Government Affairs.

In addition, the U.S. Foreign Corrupt Practices Act outlines very serious provisions against bribery, including the payment, or promise of payment, of anything of value to a foreign official (including any person employed by or representing a foreign government, a foreign political party, public international organization, as well as candidates for foreign office) with the intent to improperly influence the recipient's behavior or gain an illegitimate advantage. Any such payments made indirectly through a consultant, contractor or other intermediary also are prohibited.

> *Under no circumstances may you offer anything of value to a foreign or domestic government official for the purpose of influencing the recipient to take or refrain from taking any official action with regard to Regions, or to induce the recipient to conduct business with Regions.*

## LABOR ORGANIZATIONS

The *Labor-Management Reporting and Disclosure Act* (LMRDA) requires all U.S. employers, including Regions, to report any gift, meal, entertainment, payment or loan of money (whether direct or indirect), or other thing of value (including but not limited to fee waivers or favorable terms on loans and/or deposit products, and reimbursed expenses) provided to any labor organization or any officer, agent, shop steward, or other representative of a labor organization unless a specific exemption is available. Civil and criminal penalties may be assessed for failure to comply with the LMRDA.

Under no circumstances may you offer anything of value to an official or representative of a labor organization for the purpose of influencing the recipient to take or refrain from taking any official action with regard to Regions, or to induce the recipient to conduct business with Regions.

All gifts, meals, entertainment or other benefits provided to labor organization officials or representatives must be reported to Corporate Accounts Payable Compliance using the *LMRDA form* located on life@regions.

## HIGHER EDUCATION EMPLOYEES

Regions and its associates shall not provide, directly or indirectly, anything of value to any institution of higher education, or its employees, directors or agents, in exchange for any advantage or consideration provided to Regions or Regions' higher education loan activity, including but not limited to placement on any institution of higher education's Preferred Lender List. This prohibition shall also include, but not be limited to, (i) "revenue sharing" with an institution of higher education; (ii) providing an institution of higher education with any product for which the institution pays below market prices; (iii) providing printing costs or services; and (iv) providing benefits to any institution of higher education or any institution's students for a particular type of loan in exchange for placement on any institution's preferred lender list.

## SPONSORSHIPS AND TICKET USAGE

Regions sponsors certain entertainment venues, events and organizations within our markets to entertain customers through the use of event tickets and/or hospitality passes. Associates should become familiar with the specific policies that have been developed by the Regions Marketing Department to address issues that may arise out of the use of such sponsorships.

Associates who entertain customers and vendors (or prospective customers or vendors) at a Regions-sponsored venue or event must fully comply with all sections of this Code and all applicable laws, including all anti-bribery and anti-corruption laws, and Company and/or business-unit policies regarding offering items of value to government officials and other third parties.

Sponsorships of a certain value must have prior written approval from Corporate Marketing, and all ticket/hospitality usage must be reported to Corporate Marketing following the *Corporate Marketing Sponsorship and Entertainment Venue Policy and Procedures*.

# Outside Activities



*Associates must be sensitive to any activities, interests or relationships that might conflict with, or even appear to conflict with, your ability to act in the best interests of Regions or that might create reputational risk. Regions requires associates to receive approval prior to engaging in outside activities.*

When participating in any outside activity, take care that your actions do not imply Regions is sponsoring or supporting any political party, charitable endeavor, civic organization, religious organization or similar outside organization. Further, you should regulate your activities to mitigate reputational risk, to avoid real or perceived conflicts of interest and to avoid activities that interfere with your Regions duties.

Due to the nature of conflicts of interests, it is impossible to list all prohibited activities. As a general rule, associates should not be involved in outside activities that:

- Significantly detract from your time or attention at work

- Adversely affect the quality of your work

- Compete with Regions or use Regions' confidential and/or proprietary information

- Involve any significant use of Regions' equipment, facilities or supplies

- Require or imply Regions' sponsorship or support (unless authorized by an appropriate officer)

- Harm or potentially harm Regions' reputation

**EXAMPLES OF OUTSIDE ACTIVITIES THAT MAY PRESENT CONFLICTS OF INTEREST INCLUDE, BUT ARE NOT LIMITED TO:**

- Outside employment and second jobs, including starting or owning your own business
- Certain business and investment activities and ventures, including the formation of partnerships, LLCs, corporations or other entities for the purpose of performing business or investment activities or transactions
- Business and investment activities involving customers and vendors, including ownership interests in family-owned businesses
- Board memberships and other leadership positions (such as an officer, director or committee chair) with for-profit organizations as well as charitable, civic and non-profit organizations (excluding organizations with which Regions has a contractual or similar right to fill the position)

**OUTSIDE ACTIVITY APPROVAL PROCESS**

You must receive express approval from your manager and the Associate Conduct Officer prior to engaging in any activity that may present a conflict of interest or create reputational or other risk to Regions. To request approval, complete and submit the *Outside Activities Approval Request Form*, which is located on life@regions.

The decision to approve your outside activity request will be made by the Associate Conduct Officer in consultation with management. All decisions will be communicated to you in writing. It is within Regions' sole discretion to approve or disapprove participation in outside activities.

If a previously-approved outside activity is later determined to involve an actual conflict of interest that presents undue risk to Regions, Regions retains the right to revoke the approval and reasonably work with the associate to address actions that must be taken before the associate may continue with the activity.

Approvals for outside activities with unlimited terms of service **expire after two (2) years**, and re-approval via the *Outside Activities Approval Request Form* must be obtained to continue your participation in the activity. For outside activities with established term limitations or other limitations on the dates of service, re-approval is required only if you will serve another term.

It is within Regions' sole discretion to prohibit any activity Regions determines places the Company at risk. Further it is within Regions' sole discretion to discipline associates, up to and including termination, for personal or outside conduct that results in a perceived or real conflict of interest.

**OUTSIDE EMPLOYMENT**



*Because of the potential for conflicts of interest, associates must obtain approval via the* Outside Activities Approval Request Form *before accepting or starting work outside of Regions, including starting your own business.*

Regions has determined that the following types of outside employment/second jobs are generally prohibited because they present a conflict of interest:

- Preparing, auditing or certifying statements or documents relating to Regions' business.
- Being employed at the same time by both Regions and by certain securities firms, financial services firms or public utility holding companies.
- Being employed at the same time by both Regions and as a broker, contractor or agent who engages in real estate transactions (including negotiating or selling real estate or mortgages for others, appraising property or acting as a collection agent).
- Being employed at the same time by both Regions and as an attorney, tax preparer, tax or investment counselor, accountant, financial advisor, insurance agent or broker.
- Being employed or serving as a paid or unpaid consultant or advisor for any entity that could be seen as a competitor to Regions or that could potentially divert business opportunities from Regions.

## OUTSIDE BUSINESS AND INVESTMENT ACTIVITIES

Because of the potential for conflicts of interest, associates should not use their position at Regions to endorse or promote their personal business or investment activities or take any business action that provides personal or financial benefit to the associate at the expense of Regions.

Due to conflicts of interests, associates are generally prohibited from engaging in the following outside business activities:

- Buying assets from, or selling assets to, Regions or any account for which Regions acts as a fiduciary.

- Buying property (either directly or through a family member or other third party) that Regions acquired through foreclosure or repossession. Associates should conduct proper due diligence on properties they intend to purchase to avoid this situation.

- Representing another company in its dealings with Regions.

- Purchasing any property (either directly or through a family member or other third party), including real estate, knowing that Regions intends to purchase it.

- Using Regions property, corporate time, internal systems or processes or other proprietary or confidential information (or your knowledge regarding any of these) for personal gain other than in the performance of your job.

Some, but not all, of the types of outside business and investment activities that require pre-approval because of the potential for conflicts of interest are as follows:

- If you represent Regions in its dealings with an entity that is a vendor or customer, you must obtain approval before investing in the entity, or before continuing to hold an investment in an entity once it begins doing business with Regions.

- Any business relationship or proposed business transaction between Regions and any company in which you or an immediate family member has a direct or indirect interest, from which you or an immediate family member may derive a benefit, or where an immediate family member is employed, if such a relationship or transaction might give rise to the appearance of a conflict of interest.

- Owning a material interest in the securities of any competitor, or of a customer, vendor, service provider or other entity doing business with Regions, including family-owned businesses. "Securities" include stocks, bonds, partnership and other ownership interests.  An associate is considered to have a "material interest" in an entity when the associate directly or beneficially owns five percent or more of the securities of the entity or securities of the entity having a fair market value of $500,000 or more. An associate "directly owns" securities that are registered in their name or in the name of a broker or nominee. An associate "beneficially owns" securities that are held for their benefit in a partnership, trust, profit sharing plan or other entity, or in the name of an immediate family member.

- Investing in a vendor or customer's business or soliciting investments on behalf of a customer or vendor (or potential customer or vendor).

Outside business activities involving a Regions vendor, including but not limited to investments in a vendor and/or service on a board or other leadership position for a vendor, may require additional approval from Third Party Risk Management.

## BOARD MEMBERSHIPS AND OTHER LEADERSHIP POSITIONS



*Regions encourages associates to participate in non-profit and civic organizations as board members and in other leadership positions, such as officer or committee chair. Regions also supports those associates who have the opportunity to serve as board members or in other leadership roles of for-profit businesses and organizations, including family-owned businesses.*

However, because of the potential for conflicts of interest and other risks to Regions, approval of your manager and the Associate Conduct Officer via the *Outside Activities Approval Request Form* is required before you may serve in these roles.

Associates who serve as officers, partners or directors of an outside entity should act with caution to avoid an actual or perceived conflict of interest between the outside entity and Regions. When serving in this capacity, associates should adhere to the following:

- Do not attempt to influence or take part in any vote or decision which may lead to the use of any Regions product or service by the outside entity, or result in the obtaining of some special benefit by Regions.

- Do not attempt to influence or take part in any decision at Regions that may result in the obtaining of a special benefit by the entity. If the entity is a Regions customer or vendor, you should not participate in loan approval decisions or other business decisions regarding the entity.

- Ensure that the outside entity conducts its affairs lawfully, ethically and in accordance with prudent management and financial practices.

- Comply with any additional Regions' policies relating to service to the outside entity.

**SERVING AS AN EXPERT OR CONSULTANT**

The expertise you develop in the course of your employment may provide opportunities to participate in outside activities as a paid or unpaid expert or consultant.

However, serving as an expert witness or consultant in litigation, arbitration or similar proceedings (other than on behalf of Regions) or as a paid or unpaid consultant in a position that is similar in nature to your role at Regions, or that would require you to provide another organization (including an expert network that conducts professional research for the investment industry) with knowledge or information you obtained while working in your current role at Regions, could create the appearance of a conflict of interest.

Because of this, any opportunities to serve as an expert or consultant (whether paid or unpaid) that are not otherwise prohibited by this Code must be approved by your manager and the Associate Conduct Officer via the *Outside Activities Approval Request Form*.

If approved to serve as an expert or consultant, you should not use or distribute materials or products developed as part of your responsibilities with Regions or that otherwise contain Regions' confidential and/or proprietary information. You must ensure that you are in compliance with Regions' Fair Disclosure Policy and/or other Company policies regarding external communications.



# Bequests, Inheritances, AND Fiduciary APPOINTMENTS

Because of the potential for conflicts of interest, you must seek approval from your manager and the Associate Conduct Officer via the *Outside Activities Approval Request Form* before accepting an appointment or continuing to act as a fiduciary or co-fiduciary of any estate, trust agency, guardianship or custodianship account of a Regions customer. You do not need to seek approval if the appointment is part of the regular and proper discharge of your job responsibilities at Regions.

Similarly, you should not agree to be named as a beneficiary in a customer's will or trust instrument, or accept an inheritance or bequest from a

*If you are approved to serve as a fiduciary or co-fiduciary for a customer, you may not service that customer's accounts at Regions.*

customer (other than immediate family members). An exception to this prohibition may be made by the Associate Conduct Officer in certain situations if you have never dealt with the customer as a representative of Regions or it is otherwise clear that the bequest is based on a personal relationship that was established outside of your role at Regions. To request an exception from the Associate Conduct Officer, submit the *Outside Activities Approval Request Form* immediately upon learning of the bequest.

If you are named as a beneficiary in a prohibited situation or your request for an exception is denied, you must decline the bequest and immediately report the matter to the Ethics Program Manager using the *Gift, Entertainment, Travel or Accommodations Declination Disclosure Form*.

# Self-Dealing

Self-dealing occurs when an associate, officer or Director appears to put their own personal or financial interest, or the interest of immediate family members or close personal friends, above the interest of Regions. Associates, officers and Directors should avoid engaging in these activities because they are or give the appearance of a conflict of interest.

Examples of activities that Regions considers to be prohibited self-dealing are as follows:

- Personally extending credit to a Regions customer or any person (other than an immediate family member) who has applied for and was denied credit by Regions.

- Representing Regions in any activity requiring the associate's judgment or discretion that affects a person or entity with which the associate has a material family, financial or other relationship.

- Signing on a customer's account, acting as deputy or co-lessee of a customer's safe deposit box, acting as a customer's power of attorney, or otherwise representing customers. This prohibition does not include immediate family members.

- Accessing customer account information without a valid business need to do so. You should not use Regions' internal systems to access information regarding accounts on which you are a signatory. Never use Regions' internal systems to access information regarding accounts of immediate family members, close personal friends, or other accounts in which you have a personal interest. Associates should use the same methods available to Regions' customers (including online and mobile banking and ATMs) to access information regarding their personal accounts.

- Improperly influencing an associate over whom a supervisor has managerial responsibility to perform any action that would otherwise be prohibited by this Code.

- Processing bank transactions or conducting service or maintenance for your own personal accounts, the accounts of immediate family members or close personal friends, or other accounts in which you have a personal interest or on which you are an authorized signer. Specifically, this includes, but is not limited to, opening accounts, accepting deposits, withdrawal of deposits, refunding, reversing or waiving fees, transferring funds, ordering debit or credit cards, entering loan or credit applications, approving or increasing credit lines or loans, and cashing checks. Associates must conduct transactions for their personal accounts using the same methods available to other Regions customers (including online or mobile banking, ATMs or having the transaction processed by an impartial associate).

- Borrowing from customers, suppliers or other persons or companies that do business with Regions, except those engaged in lending in the usual course of business and then only on terms offered to others under similar circumstances, and under no circumstances in connection with a transaction of Regions.

## DUTY TO REGIONS REGARDING CORPORATE OPPORTUNITIES

You owe a duty to Regions to advance its legitimate interests when the opportunity to do so arises. You shall not take for personal use or gain (or take for the use of gain of others) any information or business opportunity learned of during the course of serving Regions or through use of Regions' property, or otherwise as a result of your position with Regions.

## OFFERING PROFESSIONAL ADVICE AND PROVIDING REFERRALS OR RECOMMENDATIONS

At times, you may be asked by a customer to provide legal, accounting, investment, or tax advice, or recommendations for these and other similar professional services.



*Unless your role and responsibilities at Regions require you to provide these services, you should never offer legal, investment, accounting or other professional advice or opinions to customers.*

You may recommend these professional services if at least three (3) selections are given and you do not attempt to influence the customer's ultimate decision. You should not make recommendations that will provide personal gain or benefit to you or an immediate family member. Attorneys, accountants and other professionals used by Regions may be included among the recommendations, but no preference should be expressed for or against those individuals.

This section does not apply to situations where Regions lawfully requires or recommends another firm for use in connection with a business transaction between Regions and a customer or service provider. You may refer Regions' affiliated companies as a general recommendation without providing several selections.



# Political Organizations and Activities

*Regions recognizes and believes in the importance of all citizens taking an active interest in our political and governmental processes.*

Regions associates are encouraged to participate in political activities, provided that such participation complies with all state and federal election and ethics law and does not unduly interfere with your duties as a Regions employee. Care should be taken that your actions do not imply Regions is sponsoring or supporting any political candidate, ballot initiative, party or other political cause. Further, you should regulate your activities to mitigate reputational risk and to avoid real or perceived conflicts of interest.

**OBTAINING PERMISSION FOR POLITICAL ACTIVITIES**

Associates who wish to seek election or appointment to a political office must obtain approval from their manager, Government Affairs, and the Associate Conduct Officer. To request approval complete and submit the *Outside Activities Approval Request Form*. Associates must also submit the *Outside Activities Approval Request Form* before serving in statewide or national leadership positions with political organizations. All requests are reviewed to assess the potential for conflicts of interest and/or reputational risk. It is within Regions' sole discretion to approve or disapprove an associate's request to seek election or appointment to public office.

This form must be resubmitted every two years to maintain approval of any ongoing political activity or position that does not have an established term of service. For service in political positions or offices with established term limitations, the form should be resubmitted only if you seek to serve another term.

**USE OF CORPORATE RESOURCES TO SUPPORT CANDIDATES OR BALLOT INITIATIVES**

Contributions of Regions' corporate funds to support candidates and ballot initiatives absolutely are prohibited except as set forth below and in the *Policy on Political Contributions*.

Regions is prohibited by law from making contributions or expenditures in connection with any federal and some state elections. Regions may make corporate contributions in states where permissible under law. Regions does not make contributions to other political entities organized under Section 527 of the Internal Revenue Code or to special interest lobbying groups organized under Section 501(c)(4) of the Internal Revenue Code to support political activities, even when legally permissible. Regions will disclose semi-annually its independent expenditures and corporate political giving on the Government Affairs page of regions.com.

The Regions Political Action Committee

**REGIONSPAC**

("Regions PAC"), which is voluntarily funded by eligible Regions associates, makes contributions to certain political campaigns and initiatives in accordance with federal and state laws and regulations. From time to time, Regions may present you the opportunity to make personal contributions through payroll deductions to the Regions PAC. All exempt associates are eligible to be solicited for contributions. All contributions are voluntary, and the decision to contribute, or not to contribute, is entirely at your discretion, and will have no effect on your job. Associates are encouraged to make recommendations to the Regions PAC to support candidates financially.

**REGIONS 000576**

Other than with respect to the activities of the Regions PAC and events sponsored by the Regions PAC, candidate or other political information should not be distributed on Company property or using Company resources. To avoid even the appearance of corporate sponsorship or endorsement, neither Regions' name nor address should be used in mailed material or solicitations, nor should Regions be identified in any advertisement or literature relating to a political campaign or initiative. All materials relating to the Regions PAC and to events sponsored by the Regions PAC should use only the Regions PAC logo, name and address.

## PERSONAL SUPPORT OF POLITICAL CANDIDATES AND CAUSES

*If you are personally involved in political activities, you act solely as an individual and not as a representative of Regions.*



Your individual participation in election campaigns or other political activities must be undertaken in off-duty hours and at your own expense without any use of Regions' facilities, equipment or resources. You should not solicit Regions' customers or vendors for donations or other support of your personal political causes or campaigns.

You are free to make your own choice concerning financial support of any political party, candidate, or cause. However, you are also responsible for ensuring that your provision of financial support complies with applicable state and federal election laws and regulations. Your individual decision to provide financial support to a political candidate, campaign or other political cause will not be reimbursed from corporate funds.

Political contributions for the purpose of influencing the recipient to take or refrain from taking any official action, or to induce the recipient to conduct business with Regions are **strictly prohibited**.

If your job duties involve contacting local, county, state or other government officials regarding business opportunities for Regions, you are responsible for ensuring that any personal contributions to elected officials are in compliance with applicable state and federal election and ethics laws and regulations as well as any additional applicable policies of your business unit.

## SEEKING PUBLIC OFFICE AND SERVING AS A PUBLIC OFFICIAL

Regions supports the desire of associates to serve the public in an elected or appointed office where such service does not create a conflict of interest or unacceptable reputational risk for Regions. Associates who seek and/or serve in elected or appointed office do so as individual citizens and not as representatives of Regions.

If the performance of your official duties or running for public office conflicts with the performance of your normal job duties for Regions during regular business hours, you must comply with all personal time off and leave policies of Regions. You may not use Regions' corporate resources in any way in connection with your campaign for or service as a public official. You must not take phone calls at work regarding your political campaign or position or use Regions' materials, such as Company letterhead, or Company technologies, such as computers, e-mail, copiers and fax machines to support or benefit your political campaign or position.

# Sales Practices

Banking is a relationship business that is built on a foundation of integrity and trust. To build that foundation, we must focus on our customers and do what is right for them 100% of the time. Regions' definition of "doing what is right" is consistently applying the needs-based approach to serving our customers, and our associates work together as a team to understand our customers' needs and help them achieve their financial goals.

> *Regions associates are required to provide clarity and transparency when interacting with our customers to help them make educated decisions about the products and services that best fit their needs.*

Regions has policies in place regarding sales practices and interactions with Regions' customers and prospective customers. Failure to abide by these policies can create misunderstanding and confusion for our customers, and can potentially create reputational, compliance and even legal risk for Regions. Inappropriate sales practices — those that are not in the best interest of our customers, not aligned with our needs-based approach or conducted for personal gain — are strictly prohibited and will result in disciplinary action up to and including termination.

If you are aware of any associate who is engaging in inappropriate sales practices, you should immediately report the conduct to your supervisor, Human Resources at 1-877-562-8383 or via email at *HRConnect@regions.com*, or the Report It! Hotline at 1-888-270-5934 or *www.reportlineweb.com/Regions*. Customer complaints that identify inappropriate sales practices should also be entered into the *Centralized Customer Complaint Database*.

# Incentive Policies and Procedures

Associates are prohibited from using business and sales practices that abuse the intent and spirit of Regions' incentive programs. Any associate who manipulates or attempts to manipulate incentive results for personal gain at the expense of customers, other associates, or Company objectives will be subject to appropriate disciplinary action, up to and

**The intent of Regions' incentive programs is to justly reward high-performing sales, service and support teams.**

including termination of employment. Associates are expressly prohibited from establishing incentive plans or practices, or from otherwise offering incentives of any type whatsoever, other than those specifically allowed by Regions' incentive plans or policies.

Associates aware of unethical incentive program practices are expected to report any such activity to their supervisor, Human Resources, at 1-877-562-8383 or via email at *HRConnect@regions.com*, or the Report It! Hotline at 1-888-270-5934 or *www.reportlineweb.com/ Regions*. Customer complaints that identify unethical incentive program practices should also be entered into the *Centralized Customer Complaint Database*.

# Integrity of Corporate Records and Public Disclosure

*Accurate and reliable business and financial recording and reporting are of the utmost importance in meeting our financial, legal and business obligations and to provide an accurate accounting of Regions' performance to our shareholders, regulators, customers and associates.*



It is Regions' policy to provide accurate and timely disclosures in all reports and documents filed with, or submitted to, the SEC. Regions further requires that its financial and other reporting fairly presents the financial condition, results of operations and cash flow of our company and complies in all material respects with applicable laws, and governmental rules and regulations, including generally accepted accounting principles and applicable rules of the SEC, the New York Stock Exchange, the Financial Industry Regulatory Authority and other regulators.

All associates, executive officers, and Directors who are involved in the disclosure process (including the preparation of such reports and documents and in preparation of information included in such reports and documents) are responsible for acting in furtherance of this policy and must discharge his or her responsibilities diligently.

*In particular, associates are required to maintain familiarity with the disclosure policies, procedures and requirements applicable to the Company and are strictly prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit material facts about the Company to others, whether within or outside the Company, including the Company's independent auditors or investors.*

**life@regions**



© 2012 - 2019 Regions Bank. Member FDIC.
(Rev. 11/19)

REGIONS 000579











# Code of Business Conduct and Ethics

2022

**REGIONS**

REGIONS 000580

# CONTENTS

Foreword from the President and Chief Executive Officer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Our Culture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Our Commitment to Ethics and Values . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Our Code and Your Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Raising Issues and Reporting Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Work Environment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Commitment to Risk Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Compliance with Laws and Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Fair and Responsible Banking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Referring Potentially Suspicious Activity and Compliance with Bank Secrecy Act/
  Anti-Money Laundering and Office of Foreign Assets Control Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Restrictions on Certain Tying Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Protection and Proper Use of Corporate Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Protecting Confidential and/or Proprietary Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Internal and External Communications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Insider Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Anticompetitive Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Conflicts of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Anti-Bribery and Anti-Corruption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Gifts and Other Items of Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Additional Legal Restrictions on Gifts and Other Items of Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Outside Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Bequests, Inheritances, and Fiduciary Appointments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Self-Dealing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Political Organizations and Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Sales Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Incentive Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Integrity of Corporate Records and Public Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# Foreword from the President and Chief Executive Officer

*Our core value, "Do What is Right", drives how we operate, how we serve our customers and communities, and how we treat each other.*

Living and working according to this value starts with integrity, and in turn, integrity is how you earn trust. And in our business, earning and keeping that trust is the only way Regions will succeed.

Regions values its relationships with associates, customers, suppliers, and the communities where we work and live. We understand that a good reputation comes from relationships built on trust, respect, and fair treatment. Our Board of Directors sets the "tone at the top" that Regions maintains a workplace culture that is reflective of our core values — a workplace where all associates are treated with dignity and respect. And our Code of Business Conduct and Ethics ("Code") forms the foundation of our ethical culture. By having a strong Code, we demonstrate that doing what is right is not just a slogan — it's the way we do business.

> *We all have a responsibility to represent our company with integrity, to conduct ourselves ethically, and to treat others with dignity and respect. All of us are the face of Regions, whether we are at work or in the community.*

When one person fails to adhere to our Code, it has the potential to reflect negatively on the entire company, which is why ethical behavior and personal integrity are the core of our culture. It's a must for our associates to understand what our policies prohibit and to feel comfortable reporting violations. Our Code provides guidance on what conduct is allowed and what is prohibited, and while it cannot address every issue or situation that may arise, Human Resources teammates can help should you have a question. Associates have multiple avenues for reporting violations of our Code, including an anonymous option. The Office of Associate Conduct oversees the handling, investigation and resolution of associate issues and allegations of misconduct.

Many companies talk about culture and doing the right thing. At Regions, we mean it. It is essential that we have a company people trust to do the right thing for them and to truly understand their needs. It is the heart of all we do. Our actions have yielded positive results in the form of a culture that reflects our values, but we will continue to review our processes and policies to ensure continued effectiveness. We know that a diverse and inclusive workforce is essential to achieving and maintaining a thriving culture. We know that maintaining a thriving culture creates job satisfaction and associate engagement. And we know that associate engagement promotes collaboration and commitment to excellence.

I am confident that with your help, Regions will continue to do business in a way that reflects our values and our mission to make life better for our associates, our customers, our shareholders and the communities we serve.

*John M Turner Jr*



John M. Turner, Jr.
President and CEO

**EMPLOYMENT RELATIONSHIP**

This Code of Business Conduct and Ethics ("Code") neither constitutes nor should be construed to constitute a contract of employment for a definite term or a guarantee of continued employment and does not alter "at will" employment relationships. This means that we recognize an associate's right to resign at any time for any reason; similarly, Regions, or its affiliates, may terminate an associate at any time, with or without cause. The terms "Regions" and "Company" as used throughout this Code mean Regions Financial Corporation and all of its direct and indirect subsidiaries.



## Our Culture

Regions' strong corporate culture is founded on the idea that creating shared value for our customers, shareholders, associates, and communities is the right way to operate our business. As we strengthen our culture, we simultaneously develop an organization that is more balanced, diverse, inclusive, and thoughtful. We also enhance our customer service quality, increase associate engagement, and create a strong risk management culture.

Honoring and affirming protections for human rights is part of our culture and embodied in our values. Regions' support of fundamental rights is also reflected in our policies and in our daily interactions with associates, vendors or suppliers, customers, and the communities where we do business. Regions' Human Rights Statement, located on the *Corporate Governance webpage* at regions.com, sets forth our commitment to conduct business in a manner that is consistent with key human rights principles, such as those set forth in the United Nations Universal Declaration of Human Rights and the International Labour Organization's Declaration on Fundamental Principles and Rights at Work. We are committed to maintaining a work environment where every associate at every level is treated with dignity and respect, free from discrimination and harassment, and can devote their full attention and best efforts to their job. These same principles apply to our interactions with customers and others with whom we do business, including vendors or suppliers, contractors, and subcontractors.

## Our Commitment to Ethics and Values

Our corporate values are not simply the values of a legal entity; they are values that encompass the ethics and commitment of all Regions associates. Our values are the statement of how we will do business; they are a promise and a measuring stick upon which to judge our behavior and results:

- **Put people first** — Have respect for every person. Listen. Care. Serve others before yourself. Build the best team. Be inclusive. Work as one team. Balance work in a full life. Lead humanely. Set the good example. And remember to say thank you.

- **Do what is right** — Always. Be honest. Do what you say. Use common sense. Stand for quality and integrity. Take the long view. Earn trust. Be responsible and accountable.

- **Focus on your customer** — Serving the customer as one team, in an exceptional way is our business, our only business. Know your customer. Serve your customer. Be committed. Understand needs. Meet needs. Make your customer's life better by what you do. Create shared value.

- **Reach higher** — Grow. Our company must grow, and we must grow prudently. Raise the bar. Be energetic. Be innovative. Achieve excellence. Improve continuously. Inspire and enable others. Succeed the right way. Improve efficiency and effectiveness.

- **Enjoy life** — Have fun. We are in the business of banking. But more importantly, we are in the business of life. Enjoy it. Laugh. Be creative. Celebrate. Recognize success.

# Our Code and Your Responsibilities



In our Code, we have defined what is appropriate behavior and what is not — in other words, we have defined what we aspire to be collectively as a company and what we expect of ourselves as individuals. Our Code is based on our core values that guide us in our daily activities, and it helps us make ethical business decisions.

While our Code says that we will comply with applicable laws and regulations where we do business, it is not only about compliance. Rather, our Code describes how we, as a company, relate to others as we conduct business. It describes our core values and how we work together as associates. It cannot address every issue that we may encounter, but it does provide guidance and resources for those times when the right choice may not be clear. The Code is a reference guide that will help you locate relevant company policies, and it provides information about how to seek help if you have an ethical concern. The Board of Directors, our Chief Executive Officer, the Executive Leadership Team and all of Regions' other leaders and associates stand behind our Code. All associates and officers (collectively referred to as "associates") and Directors of Regions, as well as all of our subsidiaries and our affiliates are expected to comply with our Code.

*Certain Regions business partners, such as vendors or suppliers, outside counsel and consultants, serve as extensions of Regions, and are expected to adhere to the spirit of the Code, and to any applicable provisions, when working on behalf of Regions. Regions has a Supplier Code of Conduct, located on the* **Supply Partners webpage** *at regions.com, that reiterates our expectation that our vendors or suppliers, and their employees, adhere to the applicable provisions of our Code and sets forth the ethical business practice we expect them to maintain.*

## AMENDMENTS AND ADMINISTRATION OF THE CODE

Our Code is administered by the Human Resources Department in conjunction with the Legal Department. Substantive revisions are approved by the Compensation and Human Resources Committee of the Board of Directors. Periodic reports regarding Code revisions and an annual report regarding the overall status of Regions' ethics objectives will be made to the Compensation and Human Resources Committee.

The Human Resources Department maintains operational responsibility for administering the Code. The Chief Administrative and Human Resources Officer, together with the Associate Conduct Officer, are responsible for interpreting and applying the Code. Associates may seek guidance regarding the Code from their manager, Human Resources or the Ethics Program Manager.

Any material departure from a provision of the Code on the part of a Director, Senior Financial Officer (as defined below), or member of the Executive Leadership Team  will be referred to the Compensation and Human Resources Committee and may be waived only by the Board of Directors or a duly authorized committee of the Board. To the extent required by applicable law, rule, or regulation, any such waiver shall be promptly and publicly disclosed.

In addition to this Code, Regions' Chief Executive Officer, Chief Financial Officer, and Principal Accounting Officer and Controller (collectively the "Senior Financial Officers") are also bound by a separate Code of Ethics for Senior Financial Officers ("Code of Ethics"), a copy of which can be found on the *Corporate Governance webpage* at regions.com. The provisions of the Code of Ethics supplement, but do not replace, this Code.

## BUSINESS UNIT-SPECIFIC REQUIREMENTS

Some business units have additional or supplemental guidelines, procedures or other requirements in addition to those specifically discussed in the Code. You are responsible for knowing and abiding by any additional requirements of your business unit.

## ACCESS TO THE CODE

Our Code is maintained electronically and is posted on Regions' internal website, life@regions, and Regions' external website, regions.com. Associates and Directors are notified promptly of any substantive revisions or additions to the Code.

## TRAINING ON CODE CONTENT AND CERTIFICATION OF COMPLIANCE WITH THE CODE

All associates and Directors are required to complete annual training on the Code and to certify that they have read and understand the Code.  Associates who fail to complete this training (or any Mandatory Annual Courses) are subject to discipline as set forth in the *You and Regions Guidelines*.

4

# Raising Issues and Reporting Violations

We are all responsible for living up to the high standards of ethical behavior set forth in our Code, and for being accountable in all we do. When one person fails to adhere to our Code, it has the potential to reflect negatively on the entire Company, and that is why ethical behavior and personal integrity are the core of our culture. Regions investigates all alleged violations of our Code. Following the investigation, if necessary, the Company will take appropriate action to address the findings. Associates who are found to have violated the Code are subject to discipline up to and including termination from employment.

### REPORTING VIOLATIONS



*Associates have a responsibility to promptly report knowledge of or information regarding any violation or suspected violation of the law, any provision of the Code or other Regions policies or procedures.*

There are several ways you can report any potential violations or potentially suspicious behavior by customers, associates and vendors or suppliers:

- The Report It! Hotline (1-888-270-5934) is a confidential toll-free number which is available seven days a week, 24 hours a day for associates to make anonymous reports in confidence. All calls are answered by trained professionals, and callers are given the option of speaking English or Spanish.

- The *Report It! Website* is available seven days a week, 24 hours a day for associates to submit reports in confidence.

- The *Raise the Red Flag* online referral form is an internal resource for associates to immediately refer potentially suspicious activity or behavior within the same business day it is identified as potentially suspicious.

- Contact the HR Connect Team via *HR Connect Messaging* or at 1-877-562-8383.

- Directly to the Associate Conduct Officer (1-800-846-6641)

- Directly to the Ethics Program Manager (205-264-7299)

- Anonymously through the mail by addressing a letter to:
  Associate Conduct Officer
  Regions Bank
  Post Office Box 11007
  Birmingham, Alabama 35288
  Internal Mailcode ALBH30308B

> Remember that **customer complaints** should be entered in the *Centralized Customer Complaint ("CCC") Database*. ALL associates have access and a responsibility to enter customer complaints into the *CCC Database*. If you receive a customer complaint, it should be entered into the *CCC Database* within five (5) business days.

### OFFICE OF ASSOCIATE CONDUCT

The Office of Associate Conduct ("OAC") is responsible for investigating and providing effective solutions to all matters related to associate conduct. Investigations involving allegations of associate misconduct will be promptly and effectively investigated by the OAC along with other business groups, as appropriate. Investigations are thorough and protect confidential information to the maximum degree possible. The OAC will administer programs designed to establish and maintain effective associate relations through the uniform and equitable application of policies, procedures and guidelines.

### PROTECTION FROM RETALIATION

Retaliation is a serious violation of our values and this Code. Regions' *No Retaliation Policy* prohibits retaliation of any kind for good faith reports of alleged ethical violations or misconduct of others. Associates should report any incident of retaliation. If you believe that you or someone you know has been retaliated against for raising an ethics concern, contact Human Resources or the Office of Associate Conduct, or use the Report It! process by calling the Report It! Hotline (1-888-270-5934) or submitting your complaint via the *Report It! Website*. All reports are investigated with prompt, effective remedial action being taken when appropriate.

# Work Environment

*Regions strives to provide a safe and healthy work environment for all associates. We expect associates to follow all Regions' policies, procedures and guidelines designed to maintain a safe, effective and healthy work environment. It is every associate's duty to know these requirements and to take steps, as necessary, to ensure they are applied.*

**EQUAL EMPLOYMENT PRACTICES**

Regions is fully committed to equal employment opportunity and compliance with the letter and spirit of the full range of fair employment practices with respect to recruitment, hiring, training, promotion, demotion, transfer, layoff, recall, compensation, benefits, social/recreational programs and other terms and conditions of employment. Regions does not discriminate on the basis of race, color, national origin, sex, religion, age, sexual orientation, gender identity, disability, protected veteran status, genetic information, pregnancy, or any other characteristic protected by law.

You should report any incident of discrimination to Human Resources at 1-877-562-8383 or via *HR Connect Messaging*. You may also contact the Report It! Hotline at 1-888-270-5934 or the *Report It! Website* to submit a report in confidence. Any associate who is found to have violated Regions' *Equal Employment Opportunity and Affirmative Action Policy* will be subject to disciplinary action, up to and including termination of employment. Retaliation against associates for raising claims or concerns of discrimination is strictly prohibited.

**DIVERSITY, EQUITY AND INCLUSION**

At Regions, we recognize that a diverse, equitable and inclusive workforce is essential to achieving and maintaining a thriving company. We seek to recruit, develop, and retain the most talented people from a diverse candidate pool and believe that we all benefit from the creativity, varied perspectives, innovation, and energy that arises out of our diverse workforce. We create and deliver learning and performance solutions that drive inclusion and engagement and are aligned with Human Resources' mission to develop diverse talent and Regions' corporate strategy to effectively and efficiently build the best team. To reinforce this, Regions has several talent management and associate development programs. Regions does not want to simply provide jobs: we are one team, focused on investing in the careers, lives, and well-being of our fellow associates.

**HARASSMENT AND INTIMIDATION**

Regions is committed to maintaining a work environment that is free from harassment and in which associates at all levels treat each other with dignity and respect so that our associates can devote their full attention and best efforts to the job. Regions' *No Harassment Policy* prohibits any form of harassment based on race, sex, national origin, age, disability, religion, sexual orientation, protected veteran status, gender identity, genetic information, pregnancy or any other characteristic that is protected by law. Associates should report harassing or intimidating behavior by co-workers, suppliers or customers directly to Human Resources at 1-877-562-8383 or via *HR Connect Messaging* or contact the Report It! Hotline at 1-888-270-5934 or the *Report It! Website* to submit a report in confidence. Regions' *No Retaliation Policy* protects associates who, in good faith, report harassment or who participate in an investigation of harassing conduct.

## PROHIBITION AND PREVENTION OF WORKPLACE VIOLENCE

Regions mandates a "zero tolerance for violence" environment and seeks to prevent violent incidents and abusive conduct from occurring. Violence includes, but is not necessarily limited to, physical harm, verbal assault, shoving, pushing, harassment, intimidation, coercion, brandishing a weapon and threats or talk of violence. You must report any incident that may involve workplace violence to Human Resources either at 1-877-562-8383 or via *HR Connect Messaging* or you may contact the Report It! Hotline at 1-888-270-5934 or the *Report It! Website*. Additional information regarding Regions' commitment to preventing workplace violence and abusive conduct can be found in the *Threatening Conduct, Workplace Violence and Prohibition of Weapons Guideline* and the *Workplace Abusive Conduct Prevention Guideline*. Violations of these guidelines are subject to disciplinary action, including termination of employment.

**DRUG-FREE WORKPLACE**

Regions is committed to maintaining a workplace environment that is free from the influence of illegal drugs and substance abuse. All associates are required to comply with Regions' *Drug-Free Workplace Guidelines*. Violations of these guidelines will not be tolerated and may result in disciplinary action, including termination of employment.

# Commitment to Risk Management

**EFFECTIVE RISK MANAGEMENT IS CORE TO REGIONS' SUCCESS.** *At Regions, the risks we face can be classified as one of eight key risk types: market risk, liquidity risk, credit risk, operational risk, legal risk, compliance risk, reputational risk and strategic risk.*



Effective management of these various risks requires a team approach, and all associates have a role in managing risk every day. In order to promote effective risk management across the Company, clearly defined roles and responsibilities have been established across all of Regions' business units. Associates are expected to discuss risk issues in an open, candid and transparent manner, providing all available information so that Regions can make sound decisions for our customers, shareholders and our Company. All Regions associates and Directors are also required to respond promptly, truthfully and candidly when interacting with Regions' examiners, regulators, auditors and/or attorneys.

Additional information regarding the risks faced by Regions and Regions' commitment and approach to risk management can be found in the *Regions Risk Management Framework*, located on life@regions.

## Compliance with Laws and Regulations

*The banking industry is highly regulated, and Regions must comply with numerous laws, rules and regulations in jurisdictions at both the federal and state level. As a financial holding company with multiple operational subsidiaries and affiliates, we are subject to comprehensive, consolidated supervision and regulation by the Board of Governors of the Federal Reserve System.*

We are also regulated by the Alabama State Banking Department and the Consumer Financial Protection Bureau and are a member of the Federal Deposit Insurance Corporation. The U.S. Securities and Exchange Commission ("SEC"), the New York Stock Exchange, the Financial Industry Regulatory Authority, and other federal and state regulators supervise our fiduciary, securities and insurance activities.

All associates must abide by the laws and regulations impacting the financial services industry, as well as federal and state laws and regulations such as employment laws, antitrust laws, privacy laws, insider trading laws and criminal laws governing fraud, theft, money laundering, anti-corruption, anti-bribery, embezzlement, conversion and conflicts of interest. Improper and/or wrongful actions or inactions by associates which could subject Regions to civil or criminal liability or jeopardize the Company's regulatory compliance efforts are prohibited and may sub-ject the associate to discipline up to and including

termination. In addition, alleged violations of laws applicable to Regions' business may be reported to the appropriate authorities for individual prosecution.

While Regions does not expect you to understand all details of these laws, rules and regulations, you are expected to be knowledgeable about and comply with the letter *and* the spirit of these laws, rules, and regulations as they apply to your job responsibilities and to seek guidance when questions arise. This also requires that you avoid not only actual misconduct but also the appearance of impropriety.

Company policies, procedures and guidelines involving laws, rules and regulations and additional information are posted on Regions' intranet site, life@regions. However, these do not constitute a complete listing of the laws, rules and regulations that must be adhered to by every individual subject to this Code in the conduct of his or her duties at Regions.

# Fair and Responsible Banking

**COMMITMENT TO PREVENTING UNFAIR, DECEPTIVE OR ABUSIVE ACTS OR PRACTICES**

Regions is committed to treating prospective and existing customers in a manner that is equitable, transparent and consistent with laws and regulations, including consumer protection laws and regulations that prohibit unfair, deceptive or abusive acts or practices. For more information, please see the *Policy on the Prohibition of Unfair, Deceptive or Abusive Acts or Practices*.



## PROHIBITION AGAINST DISCRIMINATION IN BANKING

Regions is strongly committed to making its financial products and services available to prospective and existing customers on a fair and responsible basis. Regions prohibits discrimination in lending on the basis of race, color, religion, national origin, sex, marital status, familial status, military or veteran status, disability, age, the fact that all or part of a customer's income is derived from any public assistance program, the fact that a customer had in good faith exercised any of their rights under the Consumer Credit Protection Act, and any other basis prohibited by law. Regions' commitment to fair and responsible lending is a basic responsibility of all associates. For more information, please see the *Fair and Responsible Lending Policy* and the *Servicemembers and Veterans Affairs Policy*.

# Referring Potentially Suspicious Activity and Compliance with Bank Secrecy Act/Anti-Money Laundering and Office of Foreign Assets Control Requirements

As set forth in the *Regions Financial Corporation Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") Program* and the *Regions Financial Corporation Office of Foreign Assets Control ("OFAC") Program*, all associates have an obligation to timely refer potentially suspicious activity via the *Raise the Red Flag form* and are encouraged to also notify their supervisor or manager. Each associate is responsible for compliance with Regions' BSA/AML and OFAC Programs, the components of which include the *BSA/AML Policy*, the *OFAC Policy*, the *BSA/AML/OFAC Program Standards*, and any applicable *business unit-specific BSA/AML and OFAC procedures*.

Examples of compliance with Regions' BSA/AML and OFAC Programs include, but are not limited to:

- Adhering to Regions' established "Know Your Customer" and customer due diligence requirements pertaining to the use of our products and services

- Immediately referring unusual and/or potentially suspicious activity after becoming aware of the activity

- Immediately referring alleged fraud or theft on a customer's account

- Immediately referring potentially suspicious criminal activity that may be detected through directly dealing with a customer

- Immediately referring potentially suspicious criminal or fraudulent activity by an associate

Associates should ***never*** disclose to a customer or other party that Regions has filed or is contemplating filing a Suspicious Activity Report.

# Restrictions on Certain Tying Activities

Regions encourages customers to take advantage of the benefits of all Regions products and services, and cross selling can be a valuable tool for accomplishing this. However, the law does prohibit some, but not all, tying arrangements in which Regions requires a customer to buy one product or service as a condition to buying or receiving another. Contact the Legal Department if you are uncertain whether a proposed arrangement involving both "traditional" and "nontraditional" banking products or services is allowable.

# Protection and Proper Use of Corporate Assets

*Our corporate assets are very valuable to our financial success. We are responsible for properly handling those assets that are entrusted to us. All associates are responsible for using good judgment to ensure that corporate assets are not lost, stolen or wasted, and are used to further Regions' legitimate business purposes. Corporate assets should never be used for improper personal gain or benefit.*

All associates and Directors of Regions cannot spend corporate funds in a way that is excessive, extravagant, or otherwise creates a risk of significant damage to Regions' reputation with our customers, shareholders, investors, or regulators, or in the communities where we conduct business.

## REGIONS CORPORATE ASSETS INCLUDE, BUT ARE NOT LIMITED TO:

- Facilities
- Physical property (including office and other supplies)
- Cash
- Securities
- Customer, supplier and distributor information
- Intellectual property and proprietary information (including business plans, Regions' name, logos, service marks, trademarks, patents, processes, domain names, inventions, innovations, computer programs, models and other items)
- Electronic media, such as telephones, computers, e-mail and voice mail systems
- Application systems and network communications
- Relationships with customers, vendors or suppliers and other centers of influence
- Services (including bank products such as accounts and internet banking)

## ASSOCIATE EXPENSE REIMBURSEMENT

Regions reimburses associates for actual, reasonable and proper expenses incurred while conducting business on behalf of Regions. Associates must abide by Regions' *Associate Expense Reimbursement Policy*, which provides guidance and sets forth procedures regarding the proper expenditure of corporate funds for conducting Regions' business. Associates who have been issued a Regions corporate expense credit card are required to pay off the balance in full by the due date of each monthly statement cycle and are prohibited from using those cards for personal expenses. Additional information regarding the proper use of Regions corporate expense cards can be found in the *Regions Associate Expense Card Guideline*, located in the *You & Regions Guidelines*. Failure to comply with these requirements may subject you to disciplinary action.

## USE OF CORPORATE ASSETS FOR CHARITABLE OR PRO BONO PURPOSES

Regions encourages associates to participate in charitable or pro bono causes and officially supports many non-profit organizations. However, your personal decision to provide financial support to a non-profit organization or charitable campaign will not be reimbursed from corporate funds. In addition, Regions' corporate assets, including facilities, equipment, and customer or vendor or supplier lists, should not be used to support charitable causes or provide pro bono assistance unless prior approval for such support has been obtained from your Market Leader or Business Unit Executive and only after you have met any other applicable notice requirements.

Unless on behalf of a Regions-approved initiative and/or for a Regions-approved charity, associates should not solicit customers or vendors or suppliers for donations or other support of charitable causes or campaigns either on Regions property or while working on Regions time, and should not use their Regions email or otherwise imply Regions' support of a charitable or pro bono cause or event. For additional information, see the *Solicitation and Distribution by Regions Associates Guideline* and the *Use of Stationary, Titles, Etc. in Personal Correspondence Guideline*, both located in the *You & Regions Guidelines*.

*You should never offer to make a charitable contribution or provide other forms of support to a charitable cause or campaign for the purpose of influencing a third party to conduct business with Regions, and you should never accept charitable contributions or offers of pro bono assistance from customers or vendors or suppliers in exchange for taking or refraining from taking any official action in your role at Regions.*

REGIONS 000589

9



**USE OF REGIONS' NAME, LOGO AND MARKS BY THIRD PARTIES**

*Maintaining the exclusive association of Regions' name, logos, service marks, domain names and trademarks ("Regions' Mark(s)") with Regions and its quality products and services is essential to the success of Regions' business.*

***Regions' general practice is not to permit use of Regions' marks by any third party*** (including but not limited to vendors, suppliers or service providers with whom Regions has current contracts, charitable organizations, and/or trade or industry organizations) either with respect to any public appearance or in published or posted materials including charitable event materials, news releases, case studies, associate testimonials or endorsements, promotional or marketing materials, placement on customer lists, business presentations, white papers, speeches, webcasts, videos, articles, interviews or other announcements made by third parties ("Third Party Communication(s)").

The use of Regions' Marks by any third party (especially vendors, suppliers or service providers) can lead to potential compliance, reputational and litigation risks for Regions, especially when our customers, non-customers or regulators interpret a third party's use of Regions' Marks as a Regions endorsement. The use of

Regions' Marks by third parties may also increase security risks because it could inform criminals as to Regions' security products and services. Controlling the use of Regions' Marks enables us to reduce these risks.

For these reasons, Regions rarely participates in Third Party Communications about a business relationship with Regions, whether in print or on websites or other electronic or social media, and whether such relationship is new or existing.

If you work with ***any third party*** that requests use of a Regions' Mark and you and your management team believe that allowing the use of Regions' Mark will provide a ***clearly identifiable and substantial benefit to Regions***, you must first complete the *Request for Use of Regions Trademarks and Logo form* and submit it for approval to *trademarks@regions.com* at least thirty (30) days prior to the proposed date of the intended use. The Trademark Approval Group, which consists of associates from Legal, Compliance, Community Engagement, Marketing, Risk Management, Technology, and Human Resources, will review the request to assess the potential positive and negative impacts for Regions and determine whether the proposed use will be allowed.

Additional information regarding the use of Regions' Marks can be found on the *Use of Regions' Name Logos & Marks page* on life@regions.



**IMPORTANT NOTE:** No agreement should be entered into with ***any third party*** (specifically including a vendor, supplier or service provider) that includes either (i) an obligation for Regions to participate in a Third Party Communication or (ii) an authorization for the third party to use Regions' Marks, without first obtaining the ***prior approval*** of the Trademark Approval Group. Doing so without obtaining approval is considered a violation of this Code.

Approval from the Trademark Approval Group is required each time any third party requests to use Regions' Marks, even when an existing agreement with the third party includes either (i) an obligation for Regions to participate in a Third Party Communication or (ii) an authorization for the third party to use Regions' Marks.

**REGIONS 000590**

# Protecting Confidential and/or Proprietary Information

As a Regions associate, you have an obligation to protect confidential and/or proprietary information. Associates may not engage in any activity which threatens the confidentiality, integrity, and/or security of Regions' confidential and/or proprietary information. Confidential and/or proprietary information is nonpublic information, which includes, but is not limited to:

- *Confidential Supervisory Information* ("CSI")

- Information about Regions' operations, results, strategies and projections

- Information about mergers, acquisitions, divestitures and other transactions that Regions is considering or pursuing

- Information about Regions' business plans, business processes and client relationships

- Information about Regions' customers, including potential and current customer lists

- Personally Identifiable Information ("PII") about current or potential associates, customers, suppliers, and distributors that could potentially identify or be associated with a specific individual, and other information or data received in the course of your employment about current or potential associates, customers, suppliers and distributors

- Financial information, including budgets or projections, price lists and any other financial, marketing or sales information

- Business and technical information, including information such as a formula, program, model, template, method, technique or compilation of information used in the course of Regions' business operations and which is not publicly available

- Intellectual property, including without limitation, patents, inventions, trade secrets, secret processes and information about present, past, or future products

- Information about Regions' technology and systems

- Any other system, information or process that gives Regions an opportunity to obtain an advantage over our competitors or would be harmful to Regions if disclosed

- Information Regions considers to be confidential or is required by law to treat confidentially

## WITH REGARD TO CONFIDENTIAL AND/OR PROPRIETARY INFORMATION, ASSOCIATES MUST COMPLY WITH THE FOLLOWING:

- Never disclose CSI to anyone outside of Regions without express written consent from the regulator to whom the CSI belongs (typically, the Office of the General Counsel of the Federal Reserve or the Alabama State Banking Department). The Legal Department must be consulted on all requests to disclose CSI outside of Regions.

- Never remove CSI from Regions premises.

- If an associate must access confidential and/or proprietary information, including CSI, remotely for business purposes, then such access must be solely through a secure Regions-provided platform (for example, via VPN).

- Accessing, using and disclosing CSI or other confidential and/or proprietary information must comply with the *Associate Device Usage for Business Purposes Guideline*, the *Electronic Communications and Computer Use Guideline*, and all other Regions requirements, particularly with regard to the use of personal email accounts and personal devices.

- Do not attempt to access confidential and/or proprietary information, including customer account information, unless you have a legitimate Regions business reason for doing so. Do not attempt to gain access to information you do not need to perform your job.

- Do not disclose CSI or other confidential and/or proprietary information to Regions colleagues unless they have a need to know such information in connection with their Regions responsibilities.

- Never disclose customer information outside Regions to anyone other than the customer unless such disclosure:

  — Has been approved by the Legal Department,

  — Is in response to proper legal process or regulation as required by law and is at the direction of the Legal Department, or

  — Has been permitted by the customer.

- Never use your knowledge of Regions' internal systems or other confidential and/or proprietary information, or any information derived either from your use of Regions' internal systems or your access to confidential and/or proprietary information for personal financial gain or to compete with Regions.

- Take all appropriate steps to ensure the security of confidential and/or proprietary information, including but not limited to the following:

  — Proactively *Raise the Red Flag* to refer potentially suspicious activity and notify your supervisor or manager.

  — Designate emails containing confidential and/or proprietary information as [Confidential] when sending internally or [Secure] when sending externally.

  — Use the appropriate CSI tagline on all written materials, including emails, that contain CSI.

Additional information regarding your obligations to protect confidential and/or proprietary information can be found in the *Policy Library*, including, but not limited to, the *Privacy Policy* and the *Information Security Policy*, and in the *Electronic Communications and Computer Use Guideline*.

All of your obligations regarding the protection of confidential and/or proprietary information continue after your employment or association with Regions ends. Misuse or misappropriation of confidential and/or proprietary information may result in criminal and civil liability. You should avoid discussing confidential and/or proprietary information in places where you may be overheard — this includes public and nonpublic areas, such as restaurants, airplanes, Regions' elevators or hallways.

Under the Defend Trade Secrets Act (18 U.S.C. § 1836, et. seq.), associates are immune from any criminal or civil liability under state and federal trade-secret laws when disclosing a trade secret in confidence to an attorney or governmental official solely for the purpose of reporting or investigating a suspected violation of law or for use in an anti-retaliation lawsuit.

## MERGERS, ACQUISITIONS, DIVESTITURES AND OTHER CONFIDENTIAL TRANSACTIONS

*Some Regions associates ("Transaction Associates") may from time to time have access to certain nonpublic information ("Transaction Information") regarding potential confidential transactions that Regions is considering, evaluating or pursuing ("Potential Transactions").*



Potential Transactions might include, for example, the acquisition of a bank or other financial services company, the sale of a Regions company, the sale or purchase of branch facilities, the sale or purchase of financial assets or liabilities, the issuance or repurchase of stock, or the issuing or retiring of debt. Transaction Information includes any and all nonpublic information and materials pertaining to a Potential Transaction, all analyses, compilations, forecasts, studies or other documents prepared by Regions or its representatives in connection with the Potential Transaction, the identities of any parties to the Potential Transaction, and the fact that Regions is considering or is engaged in discussions with any other party regarding the Potential Transaction.

*In addition to the general obligations of all Regions associates to protect confidential and/or proprietary information, each Transaction Associate has a special duty to hold in confidence, protect and safeguard Transaction Information and not to use or disclose Transaction Information except to perform his or her responsibilities in connection with the Potential Transaction, to comply with applicable law or regulation, or as otherwise directed or permitted by his or her manager.*

Each Transaction Associate also should be aware that any Potential Transaction is likely subject to a confidentiality or nondisclosure agreement between Regions and the other party(ies) to the Potential Transaction ("Potential Transaction NDA"). Managers of Transaction Associates who receive Transaction Information that may be subject to a Potential Transaction NDA are responsible for apprising such Transaction Associates of the terms of the Potential Transaction NDA. Transaction Associates should avoid taking any action or making any omission that would put Regions in breach of the terms of any Potential Transaction NDA.

**REGIONS 000592**

12



**INTELLECTUAL PROPERTY OF OTHERS**

*Regions respects the intellectual property rights of others and expects its associates to do the same. Inappropriate use, sale, or distribution of others' intellectual property may expose Regions and individual associates to criminal and civil penalties and is strictly prohibited.*

**DEVELOPMENT, ACQUISITION AND REGISTRATION OF CONFIDENTIAL AND/OR PROPRIETARY INFORMATION BY ASSOCIATES**

Associates should inform Regions, in writing, of any pre-existing rights or interest they have in any intellectual property, inventions or technology which may relate to their employment with Regions by submitting the Pre-Existing Intellectual Property Disclosure and Acknowledgement Form to the Legal Department within 60 days of their start date with the Company.

During your employment with Regions, any discovery, innovation, creation, development, invention, concept, process, idea or work related to the business of Regions, written or otherwise, developed or created by you alone or in combination with others, whether or not registerable, copyrightable or patentable, and whether or not performed during off duty hours and/or using Regions' facilities, equipment or resources (collectively "Regions' Work Product") is "work made for hire" and belongs to Regions.

With regard to Regions' Work Product, you agree to the following as conditions to your employment with Regions:

- You acknowledge and agree that all Regions' Work Product and any other confidential and/or proprietary information is Regions' sole property and you disclaim any rights, title, and interests therein and assign exclusively these rights, title, and interests to Regions.

- You may not agree, in a written contract or otherwise, to the assignment of any Regions' Work Product to any vendor or supplier or other third party who is engaged to assist the Company with a project or initiative.

- You understand and agree that Regions is not required to obtain your permission to modify or make derivative works from the Regions' Work Product.

- You agree to assist Regions (during and/or after your employment with Regions) in securing for its own benefit all copyrights, patent rights, trademarks, domain names, trade names, service marks, mask work rights, trade secret rights and any other proprietary and intellectual property rights, in and to the Regions' Work Product and will execute such documents and take such actions as Regions believes are necessary to accomplish and effectuate the assignment and to secure, protect and perfect Regions' rights in and to the Regions' Work Product.

- You agree never to register or apply to register, either during your employment or after, a trademark or domain name containing a Regions' Mark, or a simulation or variation thereof.

- You agree never to apply to register, either during your employment or after, a copyright for any Regions' Work Product.

*If your employment with Regions ends, you must return all Regions' Work Product, including all confidential and/or proprietary information, that may have been retained on personal items (for example, electronic devices and personal computers). If it is determined that you have violated any of the above listed obligations, Regions may prosecute or seek other legal action against you.*



**REGIONS 000593**

13

**PRIVACY OF ASSOCIATE INFORMATION**

*Regions respects the confidentiality of associate personal information. This includes associate medical and personnel records. The* **Information Security Policy***, the* **Privacy & Directed Security Inspections Guidelines** *and the* **Associate Files Guidelines** *address the protection of associate information.*

Access to personal information is authorized only when there is a legitimate and lawful reason for such access. Access is granted only to appropriate personnel. Requests for confidential associate information from anyone outside of Regions under any circumstances must be handled in compliance with applicable Regions procedures and guidelines and in accordance with applicable laws.

It is important to remember that associates should have no expectation of privacy with regard to normal-course workplace communications or any personal property brought onto Regions' premises or used for Regions' business.



**PROTECT CUSTOMER PRIVACY AND ACT TO PREVENT IDENTITY THEFT**

*Regions is committed to protecting confidential information about our customers and to following all applicable laws and regulations directed toward privacy and information security. This includes in our relationships with our third-party vendors, suppliers or service providers. When other companies provide services for us, we require them to protect the confidential customer information they receive.*

Associates should act diligently to prevent third parties from engaging in identity theft and other forms of fraudulent use or misappropriation of customer information. All associates receiving notice from any source regarding actual or suspected identity theft are expected to adhere to policies and procedures in the *Regions Identity Theft Prevention Program*, the *Bank Secrecy Act/Anti-Money Laundering Policy* and its reporting requirements, as well as any applicable identity theft prevention procedures for their business unit.

Any associate who has knowledge or suspects that customer data has been compromised or Regions' data security has been breached is required to immediately refer the matter by submitting the *Raise the Red Flag* form.

**INFORMATION BARRIERS**

Certain departments within Regions have information barrier procedures that prevent unauthorized sharing of information between departments. Associates must comply with the *Information Barriers Policy* and any other applicable business-specific procedures to prevent the unauthorized disclosure of confidential information. Information barriers are designed to separate associates engaged in lending, investment banking or merchant banking activities, who routinely have access to confidential information about customers (private-side activities), from those associates who trade in securities based on publicly available information or who engage in investment management activities (public-side activities). Information barriers are one of the methods used to address potential and actual conflicts of interest among business activities.

*You are responsible for knowing and complying with the information barrier procedures that may apply to you and your business.*



Associates may disclose customer information, including credit information and business plans, to other Regions associates, businesses or affiliates only on a "need to know basis." Associates must observe all restrictions for consumers who have "opted out" of information sharing between Regions' affiliates as allowed under applicable privacy regulations.

# *Internal and External Communications*

*What we say, write and do should reflect a clear understanding of Regions' ethical values and expectations, should demonstrate sound personal judgments, and should be consistent with all laws and regulations, including laws and regulations that prohibit unfair, deceptive or abusive acts or practices.*



This commitment is an important part of Regions' dedication to promoting the highest standards of behavior in all aspects of its practices. That means being clear, truthful, accurate and respectful. Always avoid exaggeration, colorful language, guesswork and legal speculation. These requirements apply to communications of all kinds, including voice mails, e-mail and informal notes or memos.

### COMMUNICATING WITH THE PUBLIC

Only authorized persons can provide information to investors, analysts or the media. Nonpublic information or materials regarding Regions' trade secrets, intellectual property, or confidential customer or business information must not be distributed outside of Regions. Promptly refer any inquiry from the media to Corporate Communications. Any inquiry concerning Regions' securities or financials should be promptly referred to Investor Relations.

Only authorized Regions associates can engage in the business use of social media (i.e., conduct Regions' business over social media). Associates who engage in the personal use of social media do so at their own risk. Regions expects all associates — whether they are using social media for business or personal purposes — to conduct themselves responsibly and cautions against inappropriate or illegal conduct that could subject you or Regions to legal liability or reputational risk. Whether or

not you identify yourself as a Regions associate on social media, remember that others may do so. Because of this, you also should avoid acts of misrepresentation, and other misleading, unprofessional or rude conduct.

Unless authorized, do not give the impression that you are speaking on behalf of Regions in any communication that may become public. This includes, without limitation, social media, on-line forums, blogs, chat rooms and bulletin boards. This requirement also applies to endorsements of products and services, comment letters to regulatory agencies, and comments to journalists, including letters to the editor, about specific matters that relate to our businesses.

For more information, refer to the *Social Media Personal Use Guidelines*, the *Social Media Business Use Policy*, the *Media Relations Guidelines* and the *Fair Disclosure Policy*. Failure to comply with these guidelines and policies may subject you to disciplinary action, up to and including termination of employment.

### FAIR DISCLOSURE

Regions is committed to providing timely, transparent, consistent and accurate financial and other information to the investing community on a nonselective basis. All Regions associates and Directors are subject to Regions' *Fair Disclosure Policy*, which prohibits associates from communicating with securities market participants regarding material, nonpublic information concerning Regions' financial condition, results of operations, strategies, and other similar matters.

Associates should inform Investor Relations of any presentations to securities market participants in advance of the presentation and refer all questions from securities market participants to the Investor Relations Department.

Regions' Fair Disclosure Policy is also posted on the *Corporate Governance webpage* at regions.com to enable securities market participants, Company shareholders and the media to further inform themselves regarding the Policy.

**REGIONS 000595**

15



## OUTSIDE SPEAKING ENGAGEMENTS, PRESENTATIONS AND PANEL DISCUSSIONS

Prior to an associate delivering remarks and/or presenting materials at an outside speaking engagement or other event (other than those hosted by Regions) including, but not limited to, panel discussions, industry conferences, seminars, presentations (other than financial education and other presentations made and/or managed through Investor Relations, Community Affairs, Government Affairs or Sales Service & Performance Management), or news conferences or interviews (including those for publication in print or on websites or other electronic or social media) not arranged through Corporate Communications (i) at which the associate will be identified as a Regions associate (using Regions' name, logo or other mark), or (ii) that is related to Regions' business, such participation in the event must be preapproved both by an Executive Leadership Team member for the associate's business unit (or their specific designee) and by the Ethics Program Manager. Outside speaking engagements that are required by an associate's job responsibilities with Regions are excluded from this requirement. Questions regarding the applicability of this requirement can be directed to Human Resources, to the Associate Conduct Officer and/or to the Ethics Program Manager.

Associates must complete and submit the *Outside Speaking Engagement Approval Request Form* at least thirty (30) days prior to the event (or as soon as possible if less than 30 days' notice is provided to the speaker). Copies of all materials to be presented, as well as any release or any assignment, transfer, waiver, or other disclaimer required by the sponsor of the event or for the publication of the materials should be attached to the form at the time it is submitted. Presentation materials should never contain confidential or proprietary information.

The Ethics Program Manager will coordinate the review of the request with other interested parties and will communicate all approvals in writing.

*Associates should never agree to any terms or conditions with the sponsor or organizer of the event or regarding the publication of the materials prior to receiving written approval to participate.*

Failure to receive written approval for an outside speaking engagement may result in reputational and legal risk to the Company as well as discipline to the associate, up to and including termination of employment.

> **NOTE:** If an event sponsor or other third party requests either (1) to use Regions' name or logo in connection with an outside speaking event (such as for advertising or promotional purposes), or (2) to publish presentation materials containing the Regions' name or logo on a website or other electronic or social media, you **must** receive approval from the Trademark Approval Group before completing the *Outside Speaking Engagement Approval Request Form*. To request trademark approval, complete the *Request for Use of Regions' Trademarks & Logo Form* and submit it to *trademarks@regions.com*.

**REGIONS 000596**

16

# Insider Information

While performing your responsibilities at Regions, you may receive confidential information about Regions, our customers, vendors or suppliers and others, or about mergers, acquisitions, divestitures and other transactions that Regions is considering or pursuing.

It is a violation of federal securities laws to purchase or sell shares or other securities of a company if you are aware of "Material Nonpublic Information" concerning that company at the time of the proposed transaction. Material Nonpublic Information is information that is both "Material" and "Nonpublic."



*Information may be considered "Material" if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to buy, hold or sell shares or other securities. Any information that could be expected to affect a company's stock price either positively or negatively should be considered Material.*

Information is considered "Nonpublic" if it has not been disclosed broadly to the marketplace (such as by press release or a public filing with the SEC) or if the investing public has not had time to fully absorb the information after it has been publicly disclosed. Release of information to the media or through public filings does not necessarily and automatically mean that the information is considered publicly available. To avoid the appearance of impropriety, as a general rule, information should not be considered fully absorbed by the marketplace until the end of the trading day (generally, any business day on which the New York Stock Exchange is open for trading) following the day on which the information is released. You should refrain from trading in Company securities when in possession of such information until adequate time has passed.

The *Regions Financial Corporation General Policy on Insider Trading* ("Insider Trading Policy") outlines, in detail, the standards of conduct that apply to associates and Directors of Regions whenever they are conducting certain securities transactions as described therein, whether such transactions are conducted for themselves or on behalf of others. Every associate and Director is expected to read and understand the Insider Trading Policy and to adhere to its provisions.

**BUSINESS UNIT-SPECIFIC REQUIREMENTS**

Some business units have additional or supplemental guidelines, procedures or other requirements in addition to those in the *Inside Trading Policy*. For example, certain associates who have regular access to Material Nonpublic Information of customers and other third parties in the course of their daily job duties are required to comply with additional requirements and restrictions regarding personal trading as set forth in the *Associate Investment Policy*. Associates are responsible for knowing and abiding by any additional requirements of their business unit.

## Anticompetitive Activities

Antitrust laws prohibit agreements among competitors to restrict competition. Associates may not conspire with any of Regions' competitors to fix prices, allocate markets, allocate customers or refuse to deal with particular suppliers or customers. When in contact with Regions' competitors, associates must avoid discussing how Regions conducts its business. Associates must be particularly careful to avoid these discussions at social or business gatherings, such as trade association meetings or seminars.

# Conflicts of Interest



*A conflict of interest occurs when an associate's or a Director's personal or financial interests interfere or compete with Regions' interests.*

Conflicts of interest may arise when it appears that a person, entity or activity outside of Regions could influence an associate's or a Director's ability to act objectively with respect to Regions' business. Conflicts of interest may also arise when an associate or Director (or their immediate family member) is offered or receives personal benefits and/or preferential treatment that is intended to influence them regarding Regions' business.

> *For purposes of this Code, "immediate family member" means any child, stepchild, parent, step-parent, spouse or domestic partner, siblings (including step and/or half siblings), mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law, and any person sharing your household.*

Associates and Directors are responsible for avoiding situations that give rise to conflicts of interest, including situations where there may only be the appearance of a conflict of interest. It is difficult to identify every situation in which a conflict of interest could arise but some common situations include the offer/receipt of gifts and other items of value, outside employment and other outside business and investment activities, leadership positions in both for-profit and non-profit entities, accepting inheritances and fiduciary appointments, conducting personal bank transactions, and participating in certain political activities.

### BUSINESS UNIT-SPECIFIC REQUIREMENTS

Some Regions business units have supplemental requirements regarding conflicts of interest, including the offer/acceptance of gifts and other items of value and participation in outside activities, which may require additional reports or approvals or are more restrictive than the requirements in this Code. You are responsible for knowing and abiding by the applicable requirements of your business unit.

### ADDITIONAL RESPONSIBILITIES OF CORPORATE DIRECTORS AND OFFICERS

Directors are subject to additional laws governing conflicts of interest that might arise in connection with investments. Further, Section 16 of the Securities Exchange Act of 1934 has provisions specific to Directors and designated executive officers regarding certain registered equity securities transactions. Regions' Directors and designated executive officers who are subject to such requirements receive separate communications which outline these obligations and restrictions in more detail.

## Anti-Bribery and Anti-Corruption

As stated in the *Anti-Bribery and Anti-Corruption Policy*, Regions requires all business activity be conducted in an honest and ethical manner, with a zero-tolerance approach to bribery and corruption. Regions further expects and requires compliance with the U.S. Foreign Corrupt Practices Act, the Bank Bribery Act and other laws and regulations related to anti-bribery and anti-corruption.

The Bank Bribery Act makes it a federal criminal offense for you to corruptly give or offer, or to corruptly accept or agree to accept, anything of value to/from anyone intending to influence or be influenced or to reward or be rewarded in connection with Regions' business. Violations of the Bank Bribery Act are punishable by imprisonment and/or significant fines.

It is critical that all Regions associates conduct business strictly on the value of the products and services we provide or purchase and not on the value of any gifts, entertainment, meals or other items of value we may receive or give. With respect to all offers of gifts, entertainment, travel, meals, refreshments, or other items of value that involve customers, consultants, vendors or suppliers and even other associates, you must always be vigilant in considering the motive behind the offer.

You should not accept gifts, services or other items of value from a customer or vendor or supplier who is actively negotiating, re-negotiating or bidding for business with Regions. Certain meals and refreshments provided in conjunction with business presentations or discussions may be acceptable. Regardless, you may **never** offer or accept gifts, entertainment, travel, meals, refreshments, or other items of value or forms of compensation to/from anyone, including other associates, when the motive or intent is to influence a business decision. If you feel any offer is intended to influence a business decision, you must contact the Ethics Program Manager as soon as possible.

## Gifts and Other Items of Value



*We are in a relationship business and building relationships is important to our continued success. Business gifts and entertaining and having meals with customers, consultants, vendors or suppliers (or prospective customers, consultants, vendors or suppliers) are common business practices that can be properly used to build relationships. However, they can also be misinterpreted or give the appearance of something improper even when there is no improper intent.*

You should **never** offer or accept any item of value in exchange for a business decision or if doing so would appear to obligate either the offeror or the recipient with respect to a decision involving Regions' business. Note that an "item of value" may include discounts on products or services that are not available to other members of the general public (or to all Regions associates), stock options, and offers of employment or consulting opportunities for you or an immediate family member.

Questions concerning the appropriateness of any gift, entertainment, meal, or other item of value should be submitted to *CodeOfConduct@Regions.com*. You may also contact the Ethics Program Manager or the Associate Conduct Officer with questions or concerns.

### GIFTS

You may accept a gift from or give a gift to a customer, consultant, vendor or supplier (or prospective customer, consultant, vendor or supplier) **only** if:

(1) the gift's value does not exceed $200, or $25 in the case of gift cards or gift certificates for use at specific establishments;

(2) it was not solicited;

(3) it is an occasion when gifts are customary;

(4) the gift is not in cash or in cash equivalents (stored value cards that are not tied to a specific retailer are prohibited);

(5) other gifts are not frequently offered to or given by the same source;

(6) there was no intent to influence a business decision; and

(7) no state banking department employees, government officials or labor organizations are involved, except as specifically allowed below.

You may accept gifts of a greater value from family or personal friends with whom you have a non-business relationship provided the offer is clearly based on your personal relationship and there is no intent to influence a business decision.

You may accept non-monetary prizes or promotional gifts that are either provided to all participants at an industry or vendor or supplier seminar or conference, or awarded in a random drawing or other contest where all participants have an equal chance of winning at an event sponsored by an industry trade association or by current or prospective consultants, vendors or suppliers or customers.

You may provide promotional items of nominal value to a government official or employee **unless** prohibited by applicable federal, state or local law. Note that this exception does NOT apply to state banking department employees.

Exceptions to these requirements (other than as to state banking department employees, government officials or labor organizations) may be made by the Chief Administrative and Human Resources Officer to allow or encourage associates and/or Directors to participate in or attend events if Regions and/or a significant customer, consultant, vendor or supplier sponsors an event, and attendance at the event is important to Regions and/or to maintaining Regions' relationship with the customer, consultant, vendor or supplier.

## MEALS, REFRESHMENTS, ENTERTAINMENT, TRAVEL AND ACCOMMODATIONS



*You may accept meals, refreshments, entertainment, travel and/or accommodations from family or personal friends with whom you have a non-business relationship provided the offer is clearly based on your personal relationship and there is no intent to influence a business decision.*

You may accept offers of meals, refreshments, entertainment, travel and/or accommodations from customers, consultants, vendors or suppliers (or prospective customers, consultants, vendors or suppliers) **only** if:

(1) you do not solicit the offer;

(2) the customer, consultant, vendor or supplier, as host, is present at the event;

(3) the level of expense is reasonable and customary in the context of your position with the Company;

(4) the purpose of the event is to foster business relationships or to have bona fide business discussions;

(5) the frequency of invitations from the source is not excessive;

(6) there is no intent to influence a business decision; and

(7) any offers of travel and/or accommodations are **pre-approved** as required below.

An offer of entertainment, meals, travel and/or accommodations where the offeror is **NOT** present is considered to be a gift and will be subject to the requirements regarding the offer and acceptance of gifts and other items of value.

You **may not** accept offers of **travel and/or accommodations** unless specifically approved in advance of the event both by the Executive Leadership Team member for your business unit (or their specific designee) and by the Ethics Program Manager. The Chief Executive Officer must obtain such approval from the Chief Legal Officer and the Ethics Program Manager. To request approval, complete and submit the *Travel and Accommodations Approval Request Form*. Approval shall only be given when restrictions (1) through (7) above are satisfied **AND** Regions would have otherwise paid for the travel and accommodations as a reasonable business expense.

### DECLINING GIFTS AND OTHER ITEMS OF VALUE

Any associate offered any gifts, meals, refreshments, travel, accommodations, entertainment and/or other items of value prohibited by this policy must decline the same and immediately report the matter to the Ethics

Program Manager using the *Gift, Entertainment, Travel or Accommodations Declination Disclosure Form*.

The Ethics Program Manager shall keep a contemporaneous written record of all disclosures regarding gifts, meals, refreshments, travel, accommodations and/or entertainment.

# Additional Legal Restrictions on Gifts and Other Items of Value

### GOVERNMENT OFFICIALS

Federal, state, foreign and many local jurisdictions have established laws restricting the provision of gifts, meals, entertainment, transportation, lodging or other items of value to government officials. Depending on the jurisdiction, the term "government official" can include not only elected and appointed officials, but also employees of the legislative, executive, or judicial branches of federal, state and local governments, and employees of government agencies and other entities.

As a general rule, approved promotional items of a nominal value, such as pens, caps or keychains, may be provided to a government official if reasonable and customary for the occasion **unless** prohibited by applicable federal, state or local laws. The specific restrictions regarding the provision of gifts and other items of value to government officials vary from jurisdiction to jurisdiction. All Regions associates and Directors are required to fully comply with all applicable laws regarding the provision of gifts and/or other items of value to government officials. Questions regarding these restrictions should be addressed to Government Affairs and/or the Ethics Program Manager.

In addition, the U.S. Foreign Corrupt Practices Act outlines very serious provisions against bribery, including the payment, or promise of payment, of anything of value to a foreign official (including any person employed by or representing a foreign government, a foreign political party, public international organization, as well as candidates for foreign office) with the intent to improperly influence the recipient's behavior or gain an illegitimate advantage. Any such payments made indirectly through a consultant, contractor or other intermediary also are prohibited.

> *Under no circumstances may you offer anything of value to a foreign or domestic government official for the purpose of influencing the recipient to take or refrain from taking any official action with regard to Regions, or to induce the recipient to conduct business with Regions.*

### LABOR ORGANIZATIONS

The *Labor-Management Reporting and Disclosure Act* (LMRDA) requires all U.S. employers, including Regions, to report any gift, meal, entertainment, payment or loan of money (whether direct or indirect), or other thing of value (including but not limited to fee waivers or favorable terms on loans and/or deposit products, and reimbursed expenses) provided to any labor organization or any officer, agent, shop steward, or other representative of a labor organization unless a specific exemption is available. Civil and criminal penalties may be assessed for failure to comply with the LMRDA.

Under no circumstances may you offer anything of value to an official or representative of a labor organization for the purpose of influencing the recipient to take or refrain from taking any official action with regard to Regions, or to induce the recipient to conduct business with Regions.

All gifts, meals, entertainment or other benefits provided to labor organization officials or representatives must be reported to Corporate Accounts Payable Compliance using the *LMRDA form* located on life@regions.

### HIGHER EDUCATION EMPLOYEES

Regions and its associates shall not provide, directly or indirectly, anything of value to any institution of higher education, or its employees, directors or agents, in exchange for any advantage or consideration provided to Regions or Regions' higher education loan activity, including but not limited to placement on any institution of higher education's Preferred Lender List. This prohibition shall also include, but not be limited to, (i) "revenue sharing" with an institution of higher education; (ii) providing an institution of higher education with any product for which the institution pays below market prices; (iii) providing printing costs or services; and (iv) providing benefits to any institution of higher education or any institution's students for a particular type of loan in exchange for placement on any institution's *Preferred Lender List*.

### SPONSORSHIPS AND TICKET USAGE

Regions sponsors certain entertainment venues, events and organizations within our markets to entertain customers through the use of event tickets and/or hospitality passes. Associates should become familiar with the specific requirements that have been developed by the Regions Marketing Department to address issues that may arise out of the use of such sponsorships.

Associates who entertain customers and vendors or suppliers (or prospective customers or vendors or suppliers) at a Regions-sponsored venue or event must fully comply with all sections of this Code and all applicable laws, including all anti-bribery and anti-corruption laws, and Company and/or business-unit restrictions regarding offering items of value to government officials and other third parties.

## Outside Activities



*Associates must be sensitive to any activities, interests or relationships that might conflict with, or even appear to conflict with, their ability to act in the best interests of Regions or that might create reputational risk. Regions requires associates to receive approval prior to engaging in outside activities.*

When participating in any outside activity, take care that your actions do not imply Regions is sponsoring or supporting any political party, charitable endeavor, civic organization, religious organization or similar outside organization. Further, associates should regulate their activities to mitigate reputational risk, to avoid real or perceived conflicts of interest and to avoid activities that interfere with their Regions duties.

> **DUE TO THE NATURE OF CONFLICTS OF INTEREST, IT IS IMPOSSIBLE TO LIST ALL PROHIBITED ACTIVITIES. AS A GENERAL RULE, ASSOCIATES SHOULD NOT BE INVOLVED IN OUTSIDE ACTIVITIES THAT:**
>
> • Significantly detract from their time or attention at work
>
> • Adversely affect the quality of their work
>
> • Compete with Regions or use Regions' confidential and/or proprietary information
>
> • Involve any significant use of Regions' equipment, facilities or supplies
>
> • Require or imply Regions' sponsorship or support (unless authorized by an appropriate officer)
>
> • Harm or potentially harm Regions' reputation

Examples of outside activities that may present conflicts of interest include, but are not limited to:

- Outside employment and second jobs, including starting or owning your own business

- Certain business and investment activities and ventures, including the formation of partnerships, LLCs, corporations or other entities for the purpose of performing business or investment activities or transactions

- Business and investment activities involving customers and vendors or suppliers, including ownership interests in family-owned businesses

- Board memberships and other leadership positions (such as an officer, director or committee chair) with for-profit organizations as well as charitable, civic and non-profit organizations (excluding organizations with which Regions has a contractual or similar right to fill the position)

**OUTSIDE ACTIVITY APPROVAL PROCESS**

Associates must receive express approval from their manager and the Associate Conduct Officer prior to engaging in any activity that may present a conflict of interest or create reputational or other risk to Regions. To request approval, complete and submit the *Outside Activities Approval Request Form*, which is located on life@regions.

The decision to approve an outside activity request will be made by the Associate Conduct Officer in consultation with management. All decisions will be communicated in writing. It is within Regions' sole discretion to approve or disapprove participation in outside activities.

If a previously-approved outside activity is later determined to involve an actual conflict of interest that presents undue risk to Regions, Regions retains the right to revoke the approval and reasonably work with the associate to address actions that must be taken before the associate may continue with the activity, if at all.

Approvals for outside activities with unlimited terms of service **expire after two (2) years**, and re-approval via the *Outside Activities Approval Request Form* must be obtained to continue participation in the activity. For outside activities with established term limitations or other limitations on the dates of service, re-approval is required only if you will serve another term.

It is within Regions' sole discretion to prohibit any activity Regions determines places the Company at risk.

Further it is within Regions' sole discretion to discipline associates, up to and including termination, for personal or outside conduct that results in a perceived or real conflict of interest.

**OUTSIDE EMPLOYMENT**



*Because of the potential for conflicts of interest, associates must obtain approval via the* Outside Activities Approval Request Form *before accepting or starting work outside of Regions, including starting your own business.*

Regions has determined that the following types of outside employment/second jobs are generally prohibited because they present a conflict of interest:

- Employment, including self-employment, that involves preparing, auditing or certifying statements or documents relating to Regions' business, including but not limited to, serving as a paid notary.

- Employment by certain securities firms, financial services firms or public utility holding companies.

- Employment, including self-employment, as a broker, contractor or agent who engages in real estate transactions (including negotiating or selling real estate or mortgages for others, appraising property or acting as a collection agent).

- Employment, including self-employment, that involves providing tax advice or counseling or tax return preparation.

- Employment, including self-employment, as an attorney, accountant, financial advisor or investment counselor, or as an insurance agent or broker.

- Employment, including self-employment, or otherwise serving as a paid or unpaid consultant or advisor for any entity that could be seen as a competitor to Regions or that could potentially divert business opportunities from Regions.

## OUTSIDE BUSINESS AND INVESTMENT ACTIVITIES

Because of the potential for conflicts of interest, associates and Directors should not use their position at Regions to endorse or promote their personal business or investment activities or take any business action that provides personal or financial benefit to them or an immediate family member at the expense of Regions.

Due to conflicts of interests, associates are generally prohibited from engaging in the following outside business activities:

- Buying assets from, or selling assets to, Regions or any account for which Regions acts as a fiduciary.

- Buying property (either directly or through a family member or other third party) that Regions acquired through foreclosure or repossession. Associates should conduct proper due diligence on properties they intend to purchase to avoid this situation.

- Representing another company in its dealings with Regions, which may include being a signatory on an account for a company that conducts business with Regions' customers.

- Purchasing any property (either directly or through a family member or other third party), including real estate, knowing that Regions intends to purchase it.

- Using Regions property, corporate time, internal systems or processes or other proprietary or confidential information (or your knowledge regarding any of these) for personal gain other than in the performance of your job.

Some, but not all, of the types of outside business and investment activities that require pre-approval because of the potential for conflicts of interest are as follows:

- If you represent Regions in its dealings with an entity that is a Regions vendor or supplier or a customer, you must obtain approval before investing in the entity, or before continuing to hold an investment in an entity once it begins doing business with Regions.

- Any business relationship or proposed business transaction between Regions and any company in which you or an immediate family member has a direct or indirect interest, from which you or an immediate family member may derive a benefit, or where an immediate family member is employed, if such a relationship or transaction might give rise to the appearance of a conflict of interest.

- Owning a material interest in the securities of any competitor, or of a customer, vendor or supplier, service provider or other entity doing business with Regions, including family-owned businesses. "Securities" include stocks, bonds, partnership and other ownership interests. An associate is considered to have a "material interest" in an entity when the associate directly or beneficially owns five percent or more of the securities of the entity or securities of the entity having a fair market value of $500,000 or more. An associate "directly owns" securities that are registered in their name or in the name of a broker or nominee. An associate "beneficially owns" securities that are held for their benefit in a partnership, trust, profit sharing plan or other entity, or in the name of an immediate family member.

- Investing in a vendor or supplier or a customer's business or soliciting investments on behalf of a customer or a vendor or supplier (or potential customer or vendor or supplier).

Outside business activities involving a Regions vendor or supplier, including but not limited to investments in a vendor or supplier and/or service on a board or other leadership position for a vendor or supplier, may require additional approval from Third Party Risk Management.

## BOARD MEMBERSHIPS AND OTHER LEADERSHIP POSITIONS



*Regions encourages associates to participate in non-profit and civic organizations as board members and in other leadership positions, such as officer or committee chair. Regions also supports those associates who have the opportunity to serve as board members or in other leadership roles of for-profit businesses and organizations, including family-owned businesses.*

However, because of the potential for conflicts of interest and other risks to Regions, approval of your manager and the Associate Conduct Officer via the *Outside Activities Approval Request Form* is required before you may serve in these roles.

Associates who serve as officers, partners or directors of an outside entity should act with caution to avoid an actual or perceived conflict of interest between the outside entity and Regions. When serving in this capacity, associates should adhere to the following:

- Do not attempt to influence or take part in any vote or decision which may lead to the use of any Regions product or service by the outside entity or result in the obtaining of some special benefit by Regions.

- Do not attempt to influence or take part in any decision at Regions that may result in the obtaining of a special benefit by the entity. If the entity is a Regions customer or a vendor or supplier, you should not participate in loan approval decisions or other business decisions regarding the entity.

- Ensure that the outside entity conducts its affairs lawfully, ethically and in accordance with prudent management and financial practices.

- Comply with any additional Regions' requirements relating to service to the outside entity.

**SERVING AS AN EXPERT OR CONSULTANT**

The expertise you develop in the course of your employment may provide opportunities to participate in outside activities as a paid or unpaid expert or consultant.

However, serving as an expert witness or consultant in litigation, arbitration or similar proceedings (other than on behalf of Regions) or as a paid or unpaid consultant in a position that is similar in nature to your role at Regions, or that would require you to provide another organization (including an expert network that conducts professional research for the investment industry) with knowledge or information you obtained while working in your current role at Regions, could create the appearance of a conflict of interest.

Because of this, any opportunities to serve as an expert or consultant (whether paid or unpaid) that are not otherwise prohibited by this Code must be approved by your manager and the Associate Conduct Officer via the *Outside Activities Approval Request Form*.

If approved to serve as an expert or consultant, you should not use or distribute materials or products developed as part of your responsibilities with Regions or that otherwise contain Regions' confidential and/or proprietary information. You must ensure that you are in compliance with Regions' *Fair Disclosure Policy* and/or other Company requirements regarding external communications.

# *Bequests, Inheritances, and Fiduciary Appointments*

Because of the potential for conflicts of interest, you must seek approval from your manager and the Associate Conduct Officer via the *Outside Activities Approval Request Form* before accepting an appointment or continuing to act as a fiduciary or co-fiduciary of any estate, trust agency, guardianship or custodianship account of a Regions customer. You do not need to seek approval if the appointment is part of the regular and proper discharge of your job responsibilities at Regions.

Similarly, you should not agree to be named as a beneficiary in a customer's will or trust instrument or accept an inheritance or bequest from a customer (other than immediate family members). An exception to this prohibition may be made by the Associate Conduct Officer in certain

> If you are approved to serve as a fiduciary or co-fiduciary for a customer, you may not service that customer's accounts at Regions.

situations if you have never dealt with the customer as a representative of Regions or it is otherwise clear that the bequest is based on a personal relationship that was established outside of your role at Regions. To request an exception from the Associate Conduct Officer, submit the *Outside Activities Approval Request Form* immediately upon learning of the bequest.



If you are named as a beneficiary in a prohibited situation or your request for an exception is denied, you must decline the bequest and immediately report the matter to the Ethics Program Manager using the *Gift, Entertainment, Travel or Accommodations Declination Disclosure Form*.

**REGIONS 000604**

24

# Self-Dealing

Self-dealing occurs when an associate or Director appears to put their own personal or financial interest, or the interest of immediate family members or others with whom they have a close personal or familial relationship, above the interest of Regions. All Regions associates and Directors should avoid engaging in these activities because they are or give the appearance of a conflict of interest.

Examples of activities that Regions considers to be prohibited self-dealing are as follows:

- Personally extending credit to a Regions customer or any person (other than an immediate family member) who has applied for and was denied credit by Regions.

- Representing Regions in any activity requiring the associate's judgment or discretion that affects a person or entity with which the associate has a material family, financial or other close personal relationship.

- Signing on a customer's account, acting as deputy or co-lessee of a customer's safe deposit box, acting as a customer's power of attorney, or otherwise representing customers. This prohibition does not include immediate family members.

- Accessing customer account information without a valid business need to do so. You should not use Regions' internal systems to access information regarding accounts on which you are a signatory or accounts for entities in which you have a material management, ownership or personal financial interest. Never use Regions' internal systems to access information regarding accounts of immediate family members and other persons with whom you have a close personal or familial relationship, or other accounts in which you have a personal interest. Associates should use the same methods available to Regions' customers (including online and mobile banking and ATMs) to access information regarding their personal accounts.

- Improperly influencing an associate over whom a supervisor has managerial responsibility to perform any action that would otherwise be prohibited by this Code.

- Processing bank transactions or conducting service or maintenance for your own personal accounts, the accounts of immediate family members and other persons with whom you have a close personal or familial relationship, or other accounts in which you have a personal interest or on which you are an authorized signer or have a material management, ownership or personal financial interest. Specifically, this includes, but is not limited to, opening accounts, accepting deposits, withdrawal of deposits, refunding, reversing or waiving fees, transferring funds, ordering debit or credit cards, entering loan or credit applications, approving or increasing credit lines or loans, and cashing checks. Associates must conduct transactions for their personal accounts using the same methods available to other Regions customers (including online or mobile banking, ATMs or having the transaction processed by an impartial associate).

- Borrowing from customers, suppliers or other persons or companies that do business with Regions, except those engaged in lending in the usual course of business and then only on terms offered to others under similar circumstances, and under no circumstances in connection with a transaction of Regions.

**DUTY TO REGIONS REGARDING CORPORATE OPPORTUNITIES**

You owe a duty to Regions to advance its legitimate interests when the opportunity to do so arises. You shall not take for personal use or gain (or take for the use of gain of others) any information or business opportunity learned of during the course of serving Regions or through use of Regions' property, or otherwise as a result of your position with Regions.

**OFFERING PROFESSIONAL ADVICE AND PROVIDING REFERRALS OR RECOMMENDATIONS**

At times, you may be asked by a customer to provide legal, accounting, investment, or tax advice, or recommendations for these and other similar professional services.



*Unless your role and responsibilities at Regions require you to provide these services, you should never offer legal, investment, accounting or other professional advice or opinions to customers.*

You may recommend these professional services if at least three (3) selections are given and you do not attempt to influence the customer's ultimate decision. You should not make recommendations that will provide personal gain or benefit to you or an immediate family member. Attorneys, accountants and other professionals used by Regions may be included among the recommendations, but no preference should be expressed for or against those individuals.

This section does not apply to situations where Regions lawfully requires or recommends another firm for use in connection with a business transaction between Regions and a customer or service provider. You may refer Regions' affiliated companies as a general recommendation without providing several selections.



# Political Organizations and Activities

*Regions recognizes and believes in the importance of all citizens taking an active interest in our political and governmental processes.*

Regions associates are encouraged to participate in political activities, provided that such participation complies with all state and federal election and ethics law and does not unduly interfere with your duties as a Regions associate. Care should be taken that your actions do not imply Regions is sponsoring or supporting any political candidate, ballot initiative, party or other political cause. Further, you should regulate your activities to mitigate reputational risk and to avoid real or perceived conflicts of interest.

**OBTAINING PERMISSION FOR POLITICAL ACTIVITIES**

Associates who wish to seek election or appointment to a political office must obtain approval from their manager, Government Affairs, and the Associate Conduct Officer. To request approval complete and submit the *Outside Activities Approval Request Form*. Associates must also submit the *Outside Activities Approval Request Form* before serving in statewide or national leadership positions, as well as certain local leadership positions, with political organizations. All requests are reviewed to assess the potential for conflicts of interest and/or reputational risk. It is within Regions' sole discretion to approve or disapprove an associate's request to seek election or appointment to public office.

This form must be resubmitted every two years to maintain approval of any ongoing political activity or position that does not have an established term of service. For service in political positions or offices with established term limitations, the form should be resubmitted only if you seek to serve another term.

**USE OF CORPORATE RESOURCES TO SUPPORT CANDIDATES OR BALLOT INITIATIVES**

Contributions of Regions' corporate funds to support candidates and ballot initiatives absolutely are prohibited except as set forth below and in the *Statement on Political Contributions*.

Regions is prohibited by law from making contributions or expenditures in connection with any federal and some state elections. Regions may make corporate contributions in states where permissible under law. Regions does not make contributions to single issue political entities organized under Section 527 of the Internal Revenue Code or to special interest lobbying groups organized under Section 501(c)(4) of the Internal Revenue Code to support political activities, even when legally permissible. Regions will disclose semi-annually its independent expenditures and corporate political giving on the Government Affairs page of regions.com.

The Regions Political Action Committee ("Regions PAC"), which is voluntarily funded by eligible Regions associates, makes contributions to certain political campaigns and initiatives in accordance with federal and state laws and regulations. From time to time, Regions may present you the opportunity to make personal contributions through payroll deductions to the Regions PAC. All exempt associates are eligible to be solicited for contributions. All contributions are voluntary, and the decision to contribute, or not to contribute, is entirely at your discretion, and will have no effect on your job.

Other than with respect to the activities of the Regions PAC and events sponsored by the Regions PAC, candidate or other political information should not be distributed on Company property or using Company resources. To avoid even the appearance of corporate sponsorship or endorsement, neither Regions' name nor address should be used in mailed material or solicitations, nor should Regions be identified in any advertisement or literature relating to a political campaign or initiative. All materials relating to the Regions PAC and to events sponsored by the Regions PAC should use only the Regions PAC logo, name and address.

**PERSONAL SUPPORT OF POLITICAL CANDIDATES AND CAUSES**

*If you are personally involved in political activities, you act solely as an individual and not as a representative of Regions.*



Your individual participation in election campaigns or other political activities must be undertaken in off-duty hours and at your own expense without any use of Regions' facilities, equipment or resources. You should not solicit Regions' customers or vendors or suppliers for donations or other support of your personal political causes or campaigns.

You are free to make your own choice concerning financial support of any political party, candidate, or cause. However, you are also responsible for ensuring that your provision of financial support complies with applicable state and federal election laws and regulations. Your individual decision to provide financial support to a political candidate, campaign or other political cause will not be reimbursed from corporate funds.

Political contributions for the purpose of influencing the recipient to take or refrain from taking any official action, or to induce the recipient to conduct business with Regions are **strictly prohibited**.

If your job duties involve contacting local, county, state or other government officials regarding business opportunities for Regions, you are responsible for ensuring that any personal contributions to elected officials are in compliance with applicable state and federal election and ethics laws and regulations as well as any additional applicable requirements of your business unit.

**SEEKING PUBLIC OFFICE AND SERVING AS A PUBLIC OFFICIAL**

Regions supports the desire of associates to serve the public in an elected or appointed office where such service does not create a conflict of interest or unacceptable reputational risk for Regions. Associates who seek and/or serve in elected or appointed office do so as individual citizens and not as representatives of Regions.

If the performance of your official duties or running for public office conflicts with the performance of your normal job duties for Regions during regular business hours, you must comply with all personal time off and leave requirements of Regions. You may not use Regions' corporate resources in any way in connection with your campaign for or service as a public official. You must not take phone calls at work regarding your political campaign or position or use Regions' materials, such as Company letterhead, or Company technologies, such as computers, e-mail, copiers and fax machines to support or benefit your political campaign or position.

# Sales Practices

Banking is a relationship business that is built on a foundation of integrity and trust. To build that foundation, we must focus on our customers and do what is right for them 100% of the time. Regions' definition of "doing what is right" is consistently applying the needs-based approach to serving our customers, and our associates working together as a team to understand our customers' needs and help them achieve their financial goals.

> *Regions associates are required to provide clarity and transparency when interacting with our customers to help them make educated decisions about the products and services that best fit their needs.*

Regions has requirements in place regarding sales practices and interactions with Regions' customers and prospective customers. Failure to abide by these requirements can create misunderstanding and confusion for our customers, and can potentially create reputational, compliance and even legal risk for Regions.

Inappropriate sales practices — those that are not in the best interest of our customers, not aligned with our needs-based approach or conducted for personal gain — are strictly prohibited and will result in disciplinary action up to and including termination.

If you are aware of any associate who is engaging in inappropriate sales practices, you should immediately report the conduct to your supervisor, Human Resources at 1-877-562-8383 or via *HR Connect Messaging*, or by using the Report It! Hotline at 1-888-270-5934 or the *Report It! Website*. Customer complaints that identify inappropriate sales practices should also be entered into the *CCC Database*.

**REGIONS 000607**

## Incentive Programs

Associates are prohibited from using business and sales practices that abuse the intent and spirit of Regions' incentive programs. Any associate who manipulates or attempts to manipulate incentive results for personal gain at the expense of customers, other associates, or Company objectives will be subject to appropriate disciplinary action, up to and including termination of employment. Associates are expressly prohibited from establishing incentive plans or practices, or from otherwise offering incentives of any type whatsoever, other than those specifically allowed by Regions' incentive programs.

*The intent of Regions' incentive programs is to justly reward high-performing sales, service and support teams.*

Associates aware of unethical incentive program practices are expected to report any such activity to their supervisor, Human Resources, at 1-877-562-8383 or via *HR Connect Messaging*, or by using the Report It! Hotline at 1-888-270-5934 or the *Report It! Website*. Customer complaints that identify unethical incentive program practices should also be entered into the *CCC Database*.

## Integrity of Corporate Records and Public Disclosure

*Accurate and reliable business and financial recording and reporting are of the utmost importance in meeting our financial, legal and business obligations and to provide an accurate accounting of Regions' performance to our shareholders, regulators, customers and associates.*



It is Regions' practice to provide accurate and timely disclosures in all reports and documents filed with, or submitted to, the SEC. Regions further requires that its financial and other reporting fairly presents the financial condition, results of operations and cash flow of our company and complies in all material respects with applicable laws, and governmental rules and regulations, including generally accepted accounting principles and applicable rules of the SEC, the New York Stock Exchange, the Financial Industry Regulatory Authority and other regulators.

All associates, executive officers, and Directors who are involved in the disclosure process (including the preparation of such reports and documents and in preparation of information included in such reports and documents) are responsible for acting in furtherance of all Company disclosure requirements and must discharge his or her responsibilities diligently.

*In particular, associates are required to maintain familiarity with the disclosure requirements applicable to the Company and are strictly prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit material facts about the Company to others, whether within or outside the Company, including the Company's independent auditors or investors.*

**life@regions**



© 2012 - 2021 Regions Bank. Member FDIC.
(Approval Date 12/21)

# Raising Issues and Reporting Violations

**Effective Date:** January 1, 2013
**Revision Date:** October 1, 2018
**Review Date:** July 12, 2018

Associates have a responsibility to promptly report knowledge of or information regarding any violation or suspected violation of the law or any other suspicious activity, any provision of the Code of Conduct, or other Regions guidelines or procedures. There are several ways you can report any potential violations or potentially suspicious behavior by customers, Associates, or vendors:

- The Suspicious Activity Referral (SAR) Hotline (205-261-0700)
- The Report It! Hotline (1-888-270-5934) is a confidential toll-free number which is available seven days a week, 24 hours a day for Associates to make anonymous reports in confidence
- Associates may also submit a Report It! confidentially via the web, at www.reportlineweb.com\Regions
- Directly to the Ethics Program Manager (205-264-7299)
- Directly to the Associate Conduct Officer (800-846-6641)
- Anonymously through the mail by addressing a letter to:
  Associate Conduct Officer
  Regions Bank
  Post Office Box 11007
  Birmingham, AL 35288
  Internal Mail code: ALBH10703B

### The Report It! Hotline

Associates may use the Report It! Hotline (1-888-270-5934) to report violations. The Report It! Hotline is available 24 hours a day, every day of the year. All calls are answered by a trained professional, and callers are given the option of speaking Spanish. Callers may provide their identity or remain anonymous – it is their choice. When appropriate, callers are given a call-back date so additional information can be obtained if needed. Associates may also submit a Report It! confidentially via the web, at www.reportlineweb.com\Regions.  Investigations are thorough and protect confidential information to the maximum degree possible.

### Protection from Retaliation

Retaliation is a serious violation of our Values and Code of Conduct. Regions will not permit retaliation of any kind for good faith reports of alleged ethical violations or misconduct of others. Associates should report any incident of retaliation. If you believe that you or someone you know has been retaliated against for raising an ethics concern, contact Human Resources at 877-562-8383 or HRConnect@regions.com or call the Report It! Hotline. All reports are investigated with prompt, effective remedial action being taken when appropriate.

### Violations of the Code of Conduct

We are all responsible for living up to the high standards of ethical behavior set out in our Code of

# EXHIBIT D

I am providing this statement of disparaging and discriminatory acts I have directly suffered as a result of Dave Leonard, CBM discriminatory or intent.  Over the past three years I have been denied the opportunities to be the Branch Manager for any of the Nexus (New Denovo Branches) within the Missouri City or Sugar Land markets.  Since 2013, I have lived in the Missouri City community (Sienna Plantation) and actively involved within the community.  In 2017 when the list of approved Nexus locations were announced, I expressed a high degree of interest to the Consumer Banking Manager (Mary McDonnell) at the time and through 2018.  The conversation were during branch visit / branch observation completed by Mary McDonnell.  During the 3rd Quarter 2018, my office (Sugar Land Branch) was realigned to Dave Leonard.  Again, during branch visits and branch manager meetings, I continued to inquiry about the posting of the Sienna Plantation BSM position and applying for the position.  I was always told that the position has not been posted, but I would be informed when it does.  In December 2018, during a Branch Managers meeting (Greenway Plaza Corporate Building) I inquiry about the Sienna Plantation posting to Dave Leonard, and he indicated that he and Earl Connell, CBE had already extended an offer to an outside applicant.  Not understanding why I was never informed or approached about the position at the Sienna Plantation Nexus, again indicated my intent to apply for the next Nexus location in Sugar Land (Lake Riverstone).

During the months of July and August 2019, Dave Leonard would utilize my branch to conduct interviews for the Branch Manager positions within the market.  I was informed by another associate that Dave Leonard was interviewing for the Lake Riverstone, Branch Manager opening.  I contacted Dave, and reminded him of my interest to interview for the position.  Dave instructed me to post for the position and he will schedule an interview.  After waiting three weeks for a scheduled interview with Dave, I followed up with an email as a reminder about the interview.  Dave suggested that we have a Phone Interview within two weeks.  In my career of 20 years of banking experience, I have successful opened more than 10 New Denovo (Nexus) locations for other financial entities.  I was well prepared and looking forward to the interview.  On August 20th, Dave contacted me for the phone interview.  The interview last less than 30 minutes, and I was taken back by the fact that no interview questions were related to developing New Household / Business Relationships within the market (Lake Riverstone).  The last question from Dave Leonard was "Have you ever hired an employee that did great in the interview, but turned out to be a poor performing employee?"  My initial response was "yes" and it's our responsibility as leaders to identify areas of opportunity to develop associates and help them reach their full potential.

SANDERS 0001

## Robert A. Sanders

**From:** Robert A. Sanders
**Sent:** Friday, February 19, 2021 3:58 PM
**To:** Melody Bodine
**Subject:** RE: Melissa Miranda

*Thank you Melody for your understanding and support.*

*Thank you,*

*Robert A. Sanders*
*Vice President, Branch Manager IV*
*Regions Bank – Sugar Land Branch*

*2310 Highway 6 South*
*Sugar Land, TX 77478*
*Office: (346) 309-3261*
*Branch: (346) 309-3260*
*Fax: (281) 242-0969*

*Email: Robert.sanders@regions.com*

**From:** Melody Bodine
**Sent:** Friday, February 19, 2021 3:54 PM
**To:** Robert A. Sanders <robert.sanders@regions.com>
**Subject:** RE: Melissa Miranda

Thanks Robert.

Not a problem - I know that everyone in Texas is dealing with so many challenges this week.  I wanted to let you know that Nicole Cooper and I will be working on your concerns together.  After we receive your written concerns and have a chance to review them, we will follow up with you.

Have a good weekend.

Melody Bodine
Regions Bank
Human Resources - Office of Associate Conduct
Assistant Vice President, Associate Relations Business Partner
melody.bodine@regions.com
Phone: (217) 619-0958
HR Connect: 1-877-562-8383

Do what is right  ᪥ᚖ  Put people first  ᪥ᚖ  Reach higher  ᪥ᚖ  Focus on your customer  ᪥ᚖ  Enjoy life

**From:** Robert A. Sanders <robert.sanders@regions.com>
**Sent:** Friday, February 19, 2021 3:03 PM

1

**SANDERS 0002**

**To:** Melody Bodine <Melody.Bodine@Regions.com>
**Subject:** RE: Melissa Miranda

*Hello Melody,*

*The statement grievance/discrimination details are still being completed.  I will be sending the information as soon as possible.  Since we are just starting to reopen the branches since yesterday, my staff and I have been extremely busy.  Thank you for your patience.*

*Thank you,*

*Robert A. Sanders*
*Vice President, Branch Manager IV*
*Regions Bank – Sugar Land Branch*

*2310 Highway 6 South*
*Sugar Land, TX 77478*
*Office:  (346) 309-3261*
*Branch:  (346) 309-3260*
*Fax:  (281) 242-0969*

*Email:  Robert.sanders@regions.com*

---

**From:** Melody Bodine
**Sent:** Wednesday, February 17, 2021 3:30 PM
**To:** Robert A. Sanders <robert.sanders@regions.com>
**Subject:** Melissa Miranda

Hi Robert,

Melissa Miranda has notified HR that she is without power and water and could not make it in to work due to those circumstances.  Melissa said that she has attempted to contact you to notify you but unsure that you have received her voice mails and texts.  She is going to try to make it in tomorrow if she can find a place to stay with power and water.

Thank you.


Melody Bodine
Regions Bank
Human Resources - Office of Associate Conduct
Assistant Vice President, Associate Relations Business Partner
melody.bodine@regions.com
Phone:  (217) 619-0958
HR Connect:  1-877-562-8383

Do what is right    Put people first    Reach higher    Focus on your customer    Enjoy life

**SANDERS 0003**

## Robert A. Sanders

**From:** Melody Bodine
**Sent:** Friday, February 19, 2021 3:54 PM
**To:** Robert A. Sanders
**Subject:** RE: Melissa Miranda

**SecureMailType:** 0

Thanks Robert.

Not a problem - I know that everyone in Texas is dealing with so many challenges this week.  I wanted to let you know that Nicole Cooper and I will be working on your concerns together.  After we receive your written concerns and have a chance to review them, we will follow up with you.

Have a good weekend.

Melody Bodine
Regions Bank
Human Resources - Office of Associate Conduct
Assistant Vice President, Associate Relations Business Partner
melody.bodine@regions.com
Phone:  (217) 619-0958
HR Connect:  1-877-562-8383

Do what is right    Put people first    Reach higher    Focus on your customer    Enjoy life

**From:** Robert A. Sanders <robert.sanders@regions.com>
**Sent:** Friday, February 19, 2021 3:03 PM
**To:** Melody Bodine <Melody.Bodine@Regions.com>
**Subject:** RE: Melissa Miranda

*Hello Melody,*

*The statement grievance/discrimination details are still being completed.  I will be sending the information as soon as possible.  Since we are just starting to reopen the branches since yesterday, my staff and I have been extremely busy.  Thank you for your patience.*

*Thank you,*

*Robert A. Sanders*
*Vice President, Branch Manager IV*
*Regions Bank – Sugar Land Branch*

*2310 Highway 6 South*
*Sugar Land, TX 77478*
*Office:  (346) 309-3261*
*Branch:  (346) 309-3260*

**SANDERS 0004**

Enterprise Associate Investigation Tool (EAIT)

Print this page

## Enterprise Associate Investigation Tool (EAIT)

**Tracking Number** 42,415

### Issue Origin Information

| | | | |
|---|---|---|---|
| Issue Intake Point | Human Resources | Date Received | 2/18/2021 |
| | | Created By | Melody Bodine; |

### Issue Initiator

| | | | |
|---|---|---|---|
| Issue Type | Current Associate | Branch/Location | Sugar Land |
| Associate Name | Robert A. Sanders; | | |
| Associate User ID | c4bn6 | | |
| Associate Position | Branch Manager | | |
| Associate Title | VP | | |
| Hire Date | 7/2/2012 | | |
| Associate Manager | Dave Leonard; | | |
| City | Sugar Land | Region/LOB | South |
| State | TX | District/Department | South Texas / South Louisiana |

### Person(s) Reported

| | | | |
|---|---|---|---|
| Person Reported Type | Current Associate | | |
| Associate Name | Dave Leonard; | | |
| Associate User ID | t021058 | | |
| Associate Position | Consumer Banking Manager | | |
| Associate Title | SVP | | |
| Associate Manager | Earl C. Connell; | Branch/Location | Regions Houston Headquarters |
| City | Houston | Region/LOB | South |
| State | TX | District/Department | South Texas / South Louisiana |
| Repeat Suspect | ☐ No | | |
| Comments | EAIT: #5312 - Improper Referral Credit - No wrongdoing<br>Past Suspect database: HR Legal 2017-479 - Inappropriate Sales Practices - No wrongdoing<br>No additional findings using initial search only - CM 2.18.2021 | | |

| | | | |
|---|---|---|---|
| Associate Name 2 | Melissa Miranda; | | |
| Associate User ID | c8wg0 | | |
| Associate Position | Financial Relationship Consultant | | |
| Associate Title | Associate | | |
| Associate Manager | Robert A. Sanders; | Branch/Location | Sugar Land |
| City | Sugar Land | Region/LOB | South |
| State | TX | District/Department | South Texas / South Louisiana |
| Repeat Suspect | ☐ No | | |
| Comments | EAIT: #35081 - Discrimination/Poor Customer Service - Coaching issued<br>No additional findings using initial search only - CM 2.18.2021 | | |

| | |
|---|---|
| Associate Name 3 | |
| Associate User ID | |

**CONFIDENTIAL**

Enterprise Associate Investigation Join -1.xls

| | |
|---|---|
| **Associate Position** | |
| **Associate Title** | |
| **Associate Manager** | |
| **City** | |
| **State** | |
| **Repeat Suspect** | ☐ |

| | |
|---|---|
| **Branch/Location** | |
| **Region/LOB** | |
| **District/Department** | |

| | |
|---|---|
| **Comments** | |

## Issue Specifics

| | | | |
|---|---|---|---|
| **Type of Issue** | Associate Relations | **Entered in CCC?** | N/A |
| **Subcategory** | Discrimination | **CCC ID** | |

**Description of Issue:** If necessary, attach any description documents in the Attachments section below.

In response to investigations of EAIT #39102, 40392, 42275 and 42278, Robert Sanders stated that he is being discriminated based on his race, age, and health conditions by CBM Dave Leonard.  Sanders alleges that Leonard has passed over Sanders for Nexus Branch Manager positions that Sanders has applied for in 2019 and since that time. Sanders alleges that Leonard has conspired with a previous associate Jared (last name unknown)  and current associate Melissa Miranda, who reported the concerns in 40392. 42275, and 42278 to report issues to attack Sanders as a manger.

| | |
|---|---|
| **Secondary Issue** | ☑ |

| | | | |
|---|---|---|---|
| **Type of Issue 2** | Associate Relations | **Entered in CCC?** | N/A |
| **Subcategory** | Retaliation (Not Audit Related) | **CCC ID** | |

**Description of Issue:** If necessary, attach any description documents in the Attachments section below.

Sanders alleges that CBM Dave Leonard is retaliating against Sanders - see above.

Sanders alleges that Melissa Miranda is retaliating against Sanders for her poor performance by keeping a list of issues and reporting Sanders to the OAC in the above mentioned cases.

| | |
|---|---|
| **Tertiary Issue?** | ☐ |

## Customer Remediation

| | |
|---|---|
| **Evaluation Needed?** | No |
| **Action Taken?** | |
| **Action Description** | |

## Triage Comments

***NOTE: This case is being assigned to both ARBPs due to issue types, please consult each other***
***NOTE: Assigning to Melody Bodine as several of the cases listed in the Issue Description are also assigned to Melody. To help with consistency, you have also been assigned this case.***

This case is being assigned to you by the Office of Associate Conduct Triage Team for investigation.  If during your investigation you discover any type of Questionable Conduct and/or potential customer harm, please notify the OAC Triage Team so that the new information can be added to the case. If wrongdoing is found, and your proposed action would vary from the established risk framework, you should submit a completed Case Resolution Form

## Risk Level

| | |
|---|---|
| **Risk Rating** | Very High |
| **Is this a Complaint?** | Yes |

## CONFIDENTIAL

## REGIONS 000165

## Lead Investigator

| Investigator Name | Nicole A. Cooper; Laura Jensen; | | Case # | EAIT 42415 |
|---|---|---|---|---|
| Investigator Department | Human Resources | | | |

## Secondary Investigator

| Investigator Name | |
|---|---|
| Investigator Department | |

## Alerted Parties

| Name | Stephen D. Smith; Melanie Dunagan; Michelle C. Spencer; Jon M. Sills; |
|---|---|
| Department | Human Resources |
| Name | Stacey M. Turner; Turner Benoist; |
| Department | HR Legal |
| Name | |
| Department | |
| Name | |
| Department | |
| Name | |
| Department | |

## Investigation Results

| Investigation Results | No Wrongdoing Found |
|---|---|
| Refer to BSA Ops? | No |
| Investigator Comments | |

| Nicole A. Cooper | 4/14/2021 7:25:44 AM |
|---|---|
| A/C Privilege approved by Michelle Spencer, via email from Steve Smith on 4/13/2021 to close the case per Stacey Turner's request. This case will be investigated under legal. | |

| Nicole A. Cooper | 4/1/2021 8:25:13 AM |
|---|---|
| A/C Privilege Per the guidance of Stacey Turner, Assistant General Counsel, this case will be closed in EAIT and will be investigated under legal. ARM Steve smith is aware, and approves | |

| Nicole A. Cooper | 3/25/2021 5:18:18 PM |
|---|---|
| A/C Privilege Stacey Turner has not received any information regarding Sanders concerns from his legal rep | |

| Nicole A. Cooper | 2/26/2021 10:06:04 AM |
|---|---|
| Interview conducted with Sanders and Bodine | |

| Nicole A. Cooper | 2/22/2021 10:00:30 AM |
|---|---|
| Conversation with Bodine regarding case concerns. Email sent to Sanders to set up call | |

| Melody Bodine | 2/18/2021 3:24:12 PM |
|---|---|
| Bodine received information from Sanders - no additional case acknowledgment needed. | |

## Compliance Review Information

| Reviewer Name | | Privacy Team Reviewed | ☐ |
|---|---|---|---|
| Review Date | | | |
| Consumer Protection Findings? | | Privacy Compliance Findings? | |
| Finding Details | | | |

**CONFIDENTIAL**

**REGIONS 000166**

Save

## Retail Integrity Information

| | |
|---|---|
| **Reviewer Name** | |
| **Review Date** | |
| **Product** | |
| **RI Findings?** | |
| **Finding Details** | |

## Quality Review

| | |
|---|---|
| **QC Response** | Approved |
| **OAC Reviewer** | Stephen D. Smith; |
| **Validation Date** | 4/26/2021 |
| **Days to Complete** | 54.59 |
| **Root Cause Category** | Other    **If Other:** N/a |
| **Root Cause Comments** | No wrongdoing found. No past suspects info to review. NO CRF ATTACHED - Privileged, per notes above. SDSmith 4/26/2021 |
| **Additional Comments** | Reviewed by SDSmith 4/26/2021<br><br>Approved<br>M Spencer<br>4/27/2021 |

## Attachments

<span style="color:red">Do Not Use Special Characters in File Name (!@#$%^&*()+=,:;)</span>

Attach Investigation Reports or any other relevant documents

Click here to attach a file

| Cancel | Mark Case as Private | Save |
|---|---|---|

## Regions Office of Associate Conduct
## Investigation/Interview Quick Reference Guide

| Investigator Name(s) | Role (OAC, Corp. Sec., etc.) | EAIT Case Number |
|---|---|---|
| Melody Bodine | OAC | 40392, 42275, 42278, 42211, 39102 (related) |

**General Interview Guidelines:**
- Prior to the interview:
  - o Prepare this guide with key questions/issues
  - o Begin with an understanding of what you hope to learn
  - o Be flexible – you can add questions as you learn new information
- Conducting the interview:
  - o State the purpose for the meeting
  - o State Regions' expectations of investigation cooperation and providing full, honest answers
  - o Reinforce Regions' anti-retaliation policy
  - o Begin with broad questions. Ask more specific information as new information is learned
  - o ALWAYS treat interviewee with respect and dignity, regardless of the circumstances
- Concluding the interview:
  - o Ask the interviewee if they know of anyone else you should speak with
  - o Re-cap what the interviewee has told you
  - o Ask if there's anything else they would like to share
  - o Ask the interviewee to follow up with you if s/he remembers important information later
  - o Provide your contact information

**Investigation Guidelines:**
- Always reach out to complainant/manager by the end of the second business day after receipt of complaint.
- Remain objective – recuse yourself if there is a real or perceived conflict of interest
- Reach out for support when needed (i.e. your ARM, other ARBPs, Leave of Absence, Security, etc.)
- Keep appropriate case stakeholders informed
- Regardless of the evidence, ensure the accused party is interviewed for their perspective
- Never speculate or draw conclusions that cannot be supported by facts and data
- Document concisely, directly and plainly
- Listen for secondary issues, such as potential retaliatory claims, ADA issues, etc.
- Plan your follow-up with the complainant and/or other applicable stakeholders
- Be flexible – this is a working document and can be amended to reflect a new direction based on what is learned

*THIS REPORT IS PRIVILEGED AND CONFIDENTIAL AND NOT INTENDED FOR EXTERNAL DISTRIBUTION.*

*Developed – June 2018*

Internal Use

**CONFIDENTIAL**                                                                 **REGIONS 000168**
**PRODUCED UNDER LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE**

**Investigation Notes/Research** *(including interviews required/completed, internal research/documents reviewed, next steps, etc.)***:**

**EAIT# 39102 –**assigned to ARBP Nicole Cooper – transferred to ARBP Melody Bodine on 12/18/21 to balance workload.  Issue type: Code of Conduct – Conflict of Interest – Self Dealing

**Case reported by Nicole Bullock on 12/4/21–** reporting Branch Manager Robert Sander for suspected Code of Conduct for referring to one specific realtor.  Bullock saw a stack of Realtor Peter Wokoun's business cards in Sanders's office.  During interview, Bullock stated that another associate had made Bullock aware that Sanders refers Regions customers to Sander's wife's mortgage business.

**1/6/21 – ARBP Bodine interviewed Nicole Bullock.**

**EAIT #40392 –** Anonymous Report It #201901007 – reported 1/7/2021- Assigned to ARBP Melody Bodine.  Issue types:  Associate Relations – Retaliation (Not Audit Related); Code of Conduct – Conflicts of Interest – Self Dealing; Performance – Poor Management.  Assigned to ARBP Melody Bodine

Caller reported that if you question what Sanders is doing or take one of his customers, then Sanders will retaliate by making you work unfavorable hours and days.  The caller had reached out to CBM Dave Leonard.  Caller stated that Sanders makes smart remarks; Sanders does personal business with Eric Johnson, another Regions associate while working at the branch.  The caller alleges that Sanders sends customers to Sanders' wife's mortgage loan business.  Caller alleged that Sanders steals company time, coming into work late, long lunches, and leaving early.

**1/11/21 – ARBP Bodine interviewed CBM Leonard.**  Leonard reviewed conversation that Anonymous caller had reported directly to Leonard.  Bodine asked Leonard to request anonymous caller contact Bodine to discuss issues if anonymous caller was comfortable.

**1/11/21 – Leonard contacted Melissa Miranda.**  Miranda stated that Miranda would contact Bodine directly.

**1/20/21 – Miranda emailed Bodine.**  Miranda stated that Miranda had been out sick and would follow up soon.

**1/21/21 – Bodine interviewed Melissa Miranada.**

**1/26/21 – Bodine interviewed Karen Mendez (Rivadenayra)**

**1/29/21 – Miranda contacted Bodine with additional concerns.  Miranda stated that there is a gas smell in the branch that is making her and other associates feel ill.**

**EAIT #41477 –** Opened on 1/29/21**.**  Issue type – Safety Issues & Sanitation – assigned to ARBP Missy O'Maley – This issue was investigation and was not substantiated.  Gas company responded on the 1st initial complaint at the site and found no issues and zero finding on their meters.  Miranda's Worker's Compensation Claim was denied by AIG.

**2/11/21 – Bodine & Leonard interviewed Robert Sanders**

**EAIT#42211 –** Opened on 2/12/21.  Issue type – Performance – Poor Management – assigned to ARBP Melody Bodine.  Miranda called HRConnect.  Miranda was out due to health issues.  Miranda stated that Miranda had been calling Sanders to make him aware of the situation.  Miranda alleged that she reached Sanders on 2/12/21 and that Sanders was very rude and made a comment about how he will let his manager (CBM Leonard) know.  Miranda

*THIS REPORT IS PRIVILEGED AND CONFIDENTIAL AND NOT INTENDED FOR EXTERNAL DISTRIBUTION.*

*Developed – June 2018*

Internal Use
**CONFIDENTIAL**                                          **REGIONS 000169**
**PRODUCED UNDER LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE**

stated she did not understand why Sanders had an issue with her being out when she had the sick time and the doctors note.

**EAIT #42275 –** Opened on 2/12/21 as extension of allegations raised during investigation interview of #40292. Assigned to Corporate Security and ARBP Melody Bodine & Erin Mummert. Issue types:  Associate Relations – Discrimination; Questionable Conduct – Fraud; Policy/Procedural Violation – Corporate Expense Card Abuse

Discrimination - Associate Melissa Miranda alleges that Sanders treats Miranda who is Hispanic and the other Hispanic associate differently.  Miranda states that Sanders and all other associates are African American.

Fraud - Miranda alleges that Sanders brings in currency, and asks cash line assoicates to hold in their drawer.  He exchanges currency for bills that he can spend.  On payday, he buys back the currency that he asked the associate to hold in the drawer.

Corporate Expense Card Abuse – CBM Leonard was reviewing Sanders' expense report and noticed mileage was reported for EDD site visits and Next Step Business Calls.  Leonard questions legitimacy of those trips.

**EAIT #42278 –** Opened on 2/12/21 as extension of allegations raised during investigation interview of #40292. Assigned to ARBP Melody Bodine.   Issue Type – Code of Conduct – Conflicts of Interest – Outside Activity.

Sanders owns rental property and has not reported it.

**2/12/21 – Bodine consulted with ROM Ashley Gonzales about annual SCC conducted 12/16/2020**

**2/12/21 – 8:45 am – Miranda contacted Bodine via phone.**
Miranda expressed concern – she has been out due to a bone spur in her left foot – plantar fasciatis – tendon issue.  It acted up Sunday.  Monday she went to work and left early – went to the doctor.  She got a shot.  Dr put her in a boot yesterday.  She has to get an MRI.  Tried to catch up with Sanders.  Miranda called Sanders evening of 2/11 and left a message.  She called Sanders again this morning.  He confirmed he got the message and stated that he forwarded it to CBM Dave Leonard.  Told Miranda to have a good day.  Miranda was concerned that Sanders was contacting Leonard so Miranda called HRConnect to make sure she was doing everything right.  Miranda wanted to know if there was going to be an issue with wearing a boot.

Bodine assured Miranda that wearing a boot for medical issues would not be a problem.  Bodine also assured Miranda that it is not uncommon for a Branch Manager to let a CBM know if an associate was out multiple days.

**EAIT #42211**  Opened on 2/12/21 – Assigned to ARBP Melody Bodine.  Miranda also contacted HR Connect with the concern that Sanders responded rudely to her about this situation and she did not understand why Sanders had an issue with Miranda being out when she had the sick time and the doctor's note.

**2/12/2021 @ 10:00 am** - Bodine contacted CBM Leonard.  Sanders had not notified Leonard that Miranda was out.


**2/17/21 – Miranda  contacted Bodine – attempting to reach Sanders to let him know that she was without power and water due to storm.  Afraid that it would appear that she abandonded job.**

2/16 - Miranda stated Sanders sent a text to team saying branch would not be open due to power outage.
2/17 - Miranda said she has called Sanders and left a voice mail to let Sanders know she was without power and water due to storm and requested confirmation of receipt but received no response.

*THIS REPORT IS PRIVILEGED AND CONFIDENTIAL AND NOT INTENDED FOR EXTERNAL DISTRIBUTION.*

*Developed – June 2018*

Internal Use
**CONFIDENTIAL**                                                                                      **REGIONS 000170**
**PRODUCED UNDER LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE**

2/17 @ 7:43 am – Sanders sent a group text asking team's status.  Miranda stated she replied.
2:17 @ 1:00pm – Miranda sent a group text stating her power was out.
2/17 @ 3:11 pm – Sanders sent group text stating that he heard from everyone but Miranda.

Bodine asked Miranda to forward screen shots of texts – never forwarded.
Bodine emailed Sanders and Leonard notifying them of Mirnda's status.  Bodine requested that Sanders respond to Miranda.

**2/17/20@ 4:20 pm –** Sanders went in to check the branch and called Bodine to respond to email Bodine had sent alerting Sanders that Miranda was trying to reach Sanders.  Sanders stated that he had responded to group text about staffing and while he did not specifically mention Miranda – his response included Miranda.  Bodine asked Sanders to respond to Miranda specifically.  Sanders stated that he did not receive a voice message from Miranda.  Sanders was reading through texts to Bodine.  Bodine requested Sanders to forward text and Sanders stated that he would but never did.  Sanders stated that he wanted to follow up with Bodine after the 2/11 interview with Leonard and Bodine.  Sanders stated that he did not feel comfortable expressing concerns with Leonard present.

**2/17/21 – Sanders reported allegation of Discrimiation and Retaliation by Leonard and Retaliation by Miranda to ARBP Bodine.**  Bodine opened case.  Sanders alleged that Leonard had discriminated agains Sanders either for race, age, or health status in 2019 when Leonard did not promote Sander to Branch Manager of a Nexus De Novo Branch.

Sanders alleged that Miranda retaliated against Sanders for Sanders coaching Miranda's poor performance.  Sanders stated that he would follow up with concerns in writing.

**EAIT #42415** – Opened on 2/18 reporting Leonard and Miranda.  Assigned to ARBP Nicole Cooper and Melody Bodine

**2/20/21 – Bodine and Cooper interviewed Sanders**
Sanders planned to submit concerns in writing and then schedule a follow-up interview with Bodine and Cooper.

**2/25/21** – CBM Dave Leonard and ROM Meghan Wernecke met with Sanders about issues with Branch SCC.

**2/26/21 @ 8:55 am** – ARBP Nicole Cooper and Melody Bodine interviewed Sanders about his concerns of retaliation and discrimination reported in EAIT #42415  Sanders stated that he would follow up with concerns in writing.

**3/2/21 – Bodine and Mummert conducted interview with Sanders for issues in EAIT #42275**

**3/3/21 – EAIT #42415 - Bodine was removed from case due to conflict with cases reporting Sanders and Laura Jensen replaced Bodine on EAIT #42415**

**3/9/21 – Email received from Megan Bundy @ Kennard Law – Letter of Representation & Cease & Desist –** addressed to ARBP Trewolla, Cooper & Bodine

**3/19/21 – Bodine & Mummert interviewed Raven Porter**

**3/19/21 – Bodine & Mummert interviewed Karen Mendez (Rivadenayra)**

*THIS REPORT IS PRIVILEGED AND CONFIDENTIAL AND NOT INTENDED FOR EXTERNAL DISTRIBUTION.*

*Developed – June 2018*

**3/24/21 – Bodine & Mummert conducted follow-up interview with Robert Sanders –** RE:  Allegation that Sanders discriminated against Miranda and Mendez (Hispanic Associates)

**3/25/21 – Bodine & Mummert conducted follow-up conversation with Leonard**

*THIS REPORT IS PRIVILEGED AND CONFIDENTIAL AND NOT INTENDED FOR EXTERNAL DISTRIBUTION.*

*Developed – June 2018*

**CONFIDENTIAL**

**PRODUCED UNDER LIMITED WAIVER OF ATTORNEY-CLIENT PRIVILEGE**

# EXHIBIT E

**Robert A. Sanders**

| | |
|---|---|
| **From:** | RegionsExpenseManagement@regions.com |
| **Sent:** | Friday, February 5, 2021 5:04 PM |
| **To:** | Robert A. Sanders |
| **Subject:** | Employee Reimbursement --Expense Rpt Approved |

The following expense report was approved for payment:: Owner: C4BN6 ER#: ER01989472 ER Title: 2021 JANUARY EXPENSE REPORT *Note: Expenses imported with Expense Card Payment type will be paid directly to your expense card. Check card balance to ensure proper payment. Payment for out of pocket expenses - i.e., Regions Debit Card, Regions Personal Card, Other Credit Card - may take 2-3 business days to post to your checking or savings account depending on your bank. Please direct any questions to AEMHelp@Regions.com. PLEASE DO NOT REPLY TO THIS MESSAGE!

SANDERS 0036

## Expense Report   ER01989472   2021 JANUARY EXPENSE REPORT

| | | | | |
|---|---|---|---|---|
| **Employee Name** | Robert A Sanders | | **Employee Title** | Branch Manager |
| **Employee ID** | C4BN6 | | **Cost Center** | HOUSTON TX: SUGAR LAND BRANCH 0006-B |
| **Submit Date** | Jan 29, 2021 | | **Purpose** | Other |
| **From Date** | Jan 4, 2021 | | **To Date** | Jan 27, 2021 |
| **Cost Center** | HOUSTON TX: SUGAR LAND BRANCH 0006-B | | | |
| **Department** | Regions Department-0101 | | | |
| **Division** | Regions Division-0101 | | | |
| **Company** | 0101 - REGIONS BANK | | | |

### Linked Documents
No documents to display

### ER TP Comparison
No data to display

### Financial Overview

| | |
|---|---|
| Total Reported Expenses | $318.15 |
| Less Personal Expenses | $0.00 |
| Authorized Expenses | $318.15 |
| Less Company Paid Expenses | $0.00 |
| Less Cash Advances | $0.00 |

### Expense Summary

| Expense Category | Amount | Approved Amount |
|---|---|---|
| Mileage | $318.15 | |

### Account Distribution

| Account | Amount |
|---|---|
| 575440-HOUSTON TX: SUGAR LAND BRANCH 0006-B | $318.15 |

### Expense Details

| Type | Date of Expense | | | Transaction Amount | Amount | Exchange Rate | Approved Amount | Purpose | Payment Method | Vendor | VAT Reclaim Amount | VAT Non-Reclaim Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Mileage : Personal Car** | **Jan 4, 2021** | | | $17.55 | $17.55 | 1 | | | Out Of Pocket | | | |

Destination: Katy/Texas
Description: EDD SITE SURVEY
Customer or Non Customer: C for customer
Distance: 39   Rate: 0.45

Allocations: | 100.00%, $17.55, HOUSTON TX: SUGAR LAND BRANCH 0006-B 0101004994 |

| Type | Date of Expense | | | Transaction Amount | Amount | Exchange Rate | Approved Amount | Purpose | Payment Method | Vendor | VAT Reclaim Amount | VAT Non-Reclaim Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Mileage : Personal Car** | **Jan 5, 2021** | | | $28.35 | $28.35 | 1 | | | Out Of Pocket | | | |

Destination: Houston/Texas
Description: BUSINESS OUTSIDE APPOINTMENTS
Customer or Non Customer: C for customer
Distance: 63   Rate: 0.45

Allocations: | 100.00%, $28.35, HOUSTON TX: SUGAR LAND BRANCH 0006-B 0101004994 |

| | $40.95 | $40.95 | 1 |
|---|---|---|---|

**SANDERS 0037**

| | | | Out Of Pocket |
|---|---|---|---|
| **Jan 12, 2021** Mileage : Personal Car | | | |

Destination: Houston/Texas
Description: EDD SITE SURVEYS
Customer or Non Customer: C for customer
Distance: 91    Rate: 0.45

Allocations: 100.00%,  $40.95,  HOUSTON TX: SUGAR LAND BRANCH 0006-B 0101004994

| | | | Out Of Pocket |
|---|---|---|---|
| **Jan 13, 2021** Mileage : Personal Car | $14.85 | $14.85    1 | |

Destination: Sugar Land/Texas
Description: NEXT STEP CALLS
Customer or Non Customer: C for customer
Distance: 33    Rate: 0.45

Allocations: 100.00%,  $14.85,  HOUSTON TX: SUGAR LAND BRANCH 0006-B 0101004994

| | | | Out Of Pocket |
|---|---|---|---|
| **Jan 14, 2021** Mileage : Personal Car | $24.75 | $24.75    1 | |

Destination: Katy/Texas
Description: BUSINESS NEXT STEP APPOINTMENTS
Customer or Non Customer: C for customer
Distance: 55    Rate: 0.45

Allocations: 100.00%,  $24.75,  HOUSTON TX: SUGAR LAND BRANCH 0006-B 0101004994

| | | | Out Of Pocket |
|---|---|---|---|
| **Jan 19, 2021** Mileage : Personal Car | $13.05 | $13.05    1 | |

Destination: Sugar Land/Texas
Description: OUTSIDE BUSINESS CALLS
Customer or Non Customer: C for customer
Distance: 29    Rate: 0.45

Allocations: 100.00%,  $13.05,  HOUSTON TX: SUGAR LAND BRANCH 0006-B 0101004994

| | | | Out Of Pocket |
|---|---|---|---|
| **Jan 20, 2021** Mileage : Personal Car | $39.15 | $39.15    1 | |

Destination: Houston/Texas
Description: EDD RESOLUTION
Customer or Non Customer: C for customer
Distance: 87    Rate: 0.45

Allocations: 100.00%,  $39.15,  HOUSTON TX: SUGAR LAND BRANCH 0006-B 0101004994

| | | | Out Of Pocket |
|---|---|---|---|
| **Jan 21, 2021** Mileage : Personal Car | $19.35 | $19.35    1 | |

Destination: Katy/Texas
Description: NEXT STEP BUSINESS CALLS
Customer or Non Customer: C for customer
Distance: 43    Rate: 0.45

Allocations: 100.00%,  $19.35,  HOUSTON TX: SUGAR LAND BRANCH 0006-B 0101004994

| | | | Out Of Pocket |
|---|---|---|---|
| **Jan 22, 2021** Mileage : Personal Car | $15.75 | $15.75    1 | |

Destination: MISSOURI CITY/Texas
Description: BUSINESS CALLS
Customer or Non Customer: C for customer
Distance: 35    Rate: 0.45

**SANDERS 0038**

Expense Report 2021 JANUARY EXPENSE REPORT                                    Page 5 of 3

| | | | | |
|---|---|---|---|---|
| | Allocations: | 100.00%,  $15.75,  HOUSTON TX: SUGAR LAND BRANCH 0006-B 0101004994 | | |

**Jan 25, 2021**
**Mileage :**
**Personal**
**Car**

| | | | |
|---|---|---|---|
| $40.95 | $40.95 | 1 | Out Of Pocket |

Destination: Houston/Texas
Description: EDD SITE SURVEY
Customer or Non Customer: C for customer
Distance: 91    Rate: 0.45
Allocations: 100.00%,  $40.95,  HOUSTON TX: SUGAR LAND BRANCH 0006-B 0101004994

**Jan 26, 2021**
**Mileage :**
**Personal**
**Car**

| | | | |
|---|---|---|---|
| $24.30 | $24.30 | 1 | Out Of Pocket |

Destination: Katy/Texas
Description: BUSINESS PROSPECT CALLS
Customer or Non Customer: C for customer
Distance: 54    Rate: 0.45
Allocations: 100.00%,  $24.30,  HOUSTON TX: SUGAR LAND BRANCH 0006-B 0101004994

**Jan 27, 2021**
**Mileage :**
**Personal**
**Car**

| | | | |
|---|---|---|---|
| $39.15 | $39.15 | 1 | Out Of Pocket |

Destination: Houston/Texas
Description: EDD RESOLUTION / SITE SURVEY
Customer or Non Customer: C for customer
Distance: 87    Rate: 0.45
Allocations: 100.00%,  $39.15,  HOUSTON TX: SUGAR LAND BRANCH 0006-B 0101004994

**Overage**
No data to display

**Document Exceptions**
No data to display

**Item Exceptions**
No data to display

**Document Notes**
No data to display

**Item Notes**
No data to display

**Audit Log**
No data to display

**SANDERS 0039**



# Search My Receipts

Receipts For All Expenses          Close

Filter Receipts ⌃

To search for your receipts, enter the required filter criteria and click Search

◯  Search with tracking Number:

◯  Search with Date range:    From  1/1/20          To  2/27/21

Search        Clear

| Number of Receipts | Tracking Number ↓ | Description | Total |
|---|---|---|---|
| 0 | ER01989472 | 2021 JANUARY EXPENSE REPORT | $318.15 |
| 1 | ER01977817 | SEPTEMBER 2020 - MONTHLY EXPENSE REPORT | $237.72 |
| 0 | ER01969218 | JULY 2020 EXPENSE REPORT | $234.90 |
| 3 | ER01960470 | REVISED - MARCH & APRIL 2020 - EXPENSE REPORT | $177.75 |
| 0 | ER01950426 | FEBRUARY 2020 - EXPENSE REPORT | $225.00 |

**SANDERS 0040**

SANDERS 0041

3/6/2021

# Search My Receipts

Receipts For All Expenses          Close

Filter Receipts ∧

To search for your receipts, enter the required filter criteria and click Search

○ Search with tracking Number: [                    ]

○ Search with Date range:     From [1/1/19]     To [12/31/19]

Search     Clear

| | Number of Receipts | Tracking Number ↓ | Description | Total |
|---|---|---|---|---|
| | 0 | ER01927035 | EXPENSE REPORT - NOVEMBER & DECEMBER 2019 | $240.30 |
| | 0 | ER01921129 | EXPENSE REPORT - OCTOBER 2019 | $209.70 |
| | 1 | ER01903137 | EXPENSE REPORT - SEPTEMBER 2019 | $278.59 |
| | 0 | ER01893390 | EXPENSE REPORT - JULY & AUGUST 2019 | $284.85 |
| | 6 | ER01873332 | MAY & JUNE EXPENSE REPROT 2019 | $306.82 |
| | 0 | ER01847382 | 2019 MARCH - EXPENSE REPORT | $115.20 |
| | 1 | ER01842562 | 2019 FEBRUARY - EXPENSE REPORT | $356.72 |

**SANDERS 0042**

Case 4:22-cv-01523   Document 39-1   Filed on 08/21/23 in TXSD   Page 200 of 267

SANDERS 0043

3/6/2021

## Search My Receipts

Receipts For All Expenses          Close

Filter Receipts ⌃

To search for your receipts, enter the required filter criteria and click Search

○ Search with tracking Number: [          ]

○ Search with Date range:    From [1/2/18] 📅    To [12/29/18] 📅

Search    Clear

| | Number of Receipts | Tracking Number ↓ | Description | Total |
|---|---|---|---|---|
| | 0 | ER01815137 | EXPENSE REPORT - OCT, NOV, DEC 2018 | $204.32 |
| | 1 | ER01785075 | EXPENSE REPORT - EVERGREEN WEEK 2018 | $96.24 |
| | 0 | ER01780503 | EXPENSE REPORT - AUGUST 2018 | $111.42 |
| | 0 | ER01767626 | EXPENSE REPORT - JUNE & JULY 2018 | $204.54 |
| | 0 | ER01744079 | March & April 2018 Expense Reports | $147.06 |
| | 0 | ER01730112 | February 2018 - Expense Report | $151.26 |
| | 0 | ER01711170 | January 2018 - Expense Report | $144.04 |

**SANDERS 0044**

Case 4:22-cv-01523   Document 39-1   Filed on 08/21/23 in TXSD   Page 202 of 267

SANDERS 0045

3/6/2021



# Search My Receipts

Receipts For All Expenses          Close

Filter Receipts ⌃

To search for your receipts, enter the required filter criteria and click Search

○ Search with tracking Number: [                    ]

○ Search with Date range:     From [1/3/17]  📅  To [12/30/17]  📅

Search     Clear

| Number of Receipts | Tracking Number ↓ | Description | Total |
|---|---|---|---|
| 1 | ER01694052 | Expense Report - December 2017 - First Week | $185.67 |
| 0 | ER01690135 | Expense Report - November 2017 - Last Week | $51.96 |
| 0 | ER01687612 | Expense Report - October 2017 | $177.30 |
| 2 | ER01674391 | Expense Report - September 2017 | $169.74 |
| 1 | ER01658277 | EXPENSE REPORT - AUGUST 2017 | $64.64 |
| 0 | ER01640112 | Expense Report - July 2017 | $138.80 |
| 0 | ER01637062 | Expense Report - June 2017 | $121.80 |
| 0 | ER01628873 | EXPENSE REPORT - MAY 2017 | $184.38 |
| 0 | ER01611967 | Expense Report - April 2017 | $151.62 |
| 0 | ER01604829 | Expense Report - March 2017 | $127.46 |

**SANDERS 0046**

| | Number of Receipts | Tracking Number ↓ | Description | Total |
|---|---|---|---|---|
| | 0 | ER01586817 | Expense Report - February 2017 | $117.86 |
| | 0 | ER01577775 | Expense Report - January 2017 | $128.92 |

# Search My Receipts

Receipts For All Expenses           Close

Filter Receipts ⌃

To search for your receipts, enter the required filter criteria and click Search

○ Search with tracking Number: [ ]

○ Search with Date range:   From 1/2/16  📅  To 12/30/16  📅

Search     Clear

| Number of Receipts | Tracking Number ↓ | Description | Total |
|---|---|---|---|
| 0 | ER01544725 | Expense Report - October 2016 | $121.64 |
| 0 | ER01504447 | Expense Report - May 2016 | $126.08 |
| 0 | ER01462164 | Expense Report - January - February 2016 | $171.40 |

**SANDERS 0048**

SANDERS 0049

# Search My Receipts

Receipts For All Expenses                    Close

Filter Receipts ⌃

To search for your receipts, enter the required filter criteria and click Search

○ Search with tracking Number: [            ]

○ Search with Date range:    From  1/1/15        To  12/31/15

Search    Clear

| | Number of Receipts | Tracking Number ↓ | Description | Total |
|---|---|---|---|---|
| | 1 | ER01417063 | Expense Report Evergreen Week - September 2015 | $60.00 |
| | 1 | ER01416066 | Expense Report - September 2015 | $138.15 |
| | 1 | ER01369229 | Expense Report - August 2015 | $114.95 |
| | 1 | ER01378897 | Expense Report - July 2015 | $318.71 |
| | 1 | ER01362155 | Expense Report - June 2015 | $235.79 |
| | 0 | ER01360579 | Expense Report - May 2015 | $154.05 |
| | 1 | ER01356565 | Expense Report - April 2015 | $121.95 |
| | 1 | ER01338118 | Expense Report - March 2015 | $229.40 |
| | 2 | ER01296703 | Expense Report - January 2015 | $142.90 |
| | 2 | ER01295230 | Expense Report - December 2014 | $777.16 |

**SANDERS 0050**

Case 4:22-cv-01523   Document 39-1   Filed on 08/21/23 in TXSD   Page 208 of 267

SANDERS 0051

3/6/2021



# Search My Receipts

Receipts For All Expenses      Close

Filter Receipts ⌃

To search for your receipts, enter the required filter criteria and click Search

○ Search with tracking Number: [　　　　]

◉ Search with Date range:   From [ 1/1/14 ] 📅 To [ 12/31/14 ] 📅

Search    Clear

| | Number of Receipts | Tracking Number ↓ | Description | Total |
|---|---|---|---|---|
| 🖨 | 2 | ER01285037 | Expense Report - 2014 November 2014 | $73.80 |
| 🖨 | 2 | ER01273311 | Expense Report - 2014 September | $104.35 |
| 🖨 | 2 | ER01269503 | Expense Report - September 2014 | $196.65 |
| 🖨 | 2 | ER01238393 | Expense Report - August 2014 | $204.70 |
| 🖨 | 3 | ER01235121 | Expense Report - July 2014 | $330.00 |
| 🖨 | 2 | ER01216081 | Expense Report - June 2014 | $164.45 |
| 🖨 | 2 | ER01214635 | Expense Report - May 2014 | $198.00 |
| 🖨 | 2 | ER01204604 | Expense Report - April 2014 | $228.12 |
| 🖨 | 2 | ER01203849 | Expense Report - March 2014 | $128.65 |
| 🖨 | 2 | ER01180485 | February 2014 | $156.40 |

SANDERS 0052

| Number of Receipts | Tracking Number ↓ | Description | Total |
|---|---|---|---|
| 2 | ER01180462 | Expense Report - January 2014 | $135.20 |

SANDERS 0053
3/6/2021

# Search My Receipts

Receipts For All Expenses                    Close

Filter Receipts ∧

To search for your receipts, enter the required filter criteria and click Search

○ Search with tracking Number: [          ]

○ Search with Date range:    From 1/1/13    📅    To 12/31/13    📅

Search    Clear

| | Number of Receipts | Tracking Number ↓ | Description | Total |
|---|---|---|---|---|
| | 2 | ER01158136 | Expense Report November & December 2013 | $148.60 |
| | 2 | ER01133563 | Expense Report - September 2013 | $117.20 |
| | 2 | ER01110796 | JULY 2013 EXPENSE REPORT | $170.00 |
| | 2 | ER01108835 | AUGUST 2013 - EXPENSE REPORT | $134.00 |
| | 2 | ER01048825 | February Expense Reort 2013 | $485.05 |
| | 4 | ER01033380 | January Expense Report 2013 | $203.40 |

**SANDERS 0054**

Case 4:22-cv-01523   Document 39-1   Filed on 08/21/23 in TXSD   Page 212 of 267

SANDERS 0055

3/6/2021



# Search My Receipts

Receipts For All Expenses                    Close

Filter Receipts ︿

To search for your receipts, enter the required filter criteria and click Search

○  Search with tracking Number:  [          ]

○  Search with Date range:    From  7/3/12    To  12/29/12

Search    Clear

| | Number of Receipts | Tracking Number ↓ | Description | Total |
|---|---|---|---|---|
| | 3 | ER01015497 | October & November | $136.50 |
| | 2 | ER00993713 | September 2012 Expense Report | $581.66 |
| | 2 | ER00982279 | August Mileage Report | $348.24 |
| | 2 | ER00966877 | July Mileage Report | $273.35 |

**SANDERS 0056**

3/6/2021

# EXHIBIT F

Competencies



| Competency | Description | Manager Evaluation |
|---|---|---|
| Drive For Success | Setting and exceeding challenging work goals, willingly tackling demanding tasks, proactively addressing opportunities, taking initiative on work tasks and responsibilities, and demonstrating resilience by staying positive when setbacks occur. | **Manager**<br><br>**Proficiency Rating**  Ineffective<br>Typical behaviors that may be associated with the selected proficiency level:<br>- Does not complete daily success planner<br>- Completes additional tasks only when asked<br>- Does not display a sense of urgency to improve performance<br>- When encountering challenges, depends on management for solutions<br><br>**Comment** |
| Interpersonal Communication | Interacting with customers in a pleasant and professional manner, building rapport, demonstrating an interest in customers, conveying information confidently, enthusiastically, and clearly, avoiding the use of jargon, providing negative information in a tactful manner, and communicating in an ethical and trustworthy manner. | **Manager**<br><br>**Proficiency Rating**  Ineffective<br>Ineffective:<br><br>Typical behaviors that may be associated with the selected proficiency level:<br>- Adapts communication style to some (not all ) audiences<br>- Struggles through difficult conversations<br>- Allows distractions to negatively affect engagement with the custome<br><br>**Comment** |

REGIONS 001329

Competencies



| Competency | Description | Manager Evaluation |
|---|---|---|
| Recommending Products & Services | Analyzing and interpreting information to relate to products/services to customer needs.  Matching the implied or expressed needs of customers with appropriate products/services designed to meet those needs, understanding and confidently communicating the details, benefits, and requirements of various product/service options, adjusting recommendations based on the individual circumstances of each customer, and successfully responding to customer objections. | **Manager**<br><br>**Proficiency Rating**  Ineffective<br><br>Ineffective:<br>Typical behaviors that may be associated with the selected proficiency level:<br>- Has limited knowledge of product features and benefits<br>- Does not educate customer on digital banking channels<br>- Handles customer immediate needs, but asks no or limited questions regarding future needs<br><br>**Comment** |
| Teamwork & Adherence to Tools and Processes | Developing effective and supportive relationships with colleagues, showing a sense of team spirit, working with others to generate effective solutions to problems, managing work priorities and following up in a timely manner, learning and applying policies and procedures, providing quality service without errors, remaining detail-oriented and focused during less than ideal conditions, and understanding the role of policies and procedures in risk management. | **Manager**<br><br>**Proficiency Rating**  Proficient<br><br>Typical behaviors that may be associated with the selected proficiency level:<br>- Partners effectively across business lines<br>- Displays a willingness to do what is best for the team (vs. self)<br>- Regularly shares Best Practices with others<br>- Reminds others of changes in policies<br>- Effective use of Guided Discovery<br>- Effective use of Choreography<br>- Effective use of Tele connecting script<br>- Effective use of calculators<br>- Effective use of Pipeline tool<br>- Effectively converts MBE intercepts to conversations<br><br>**Comment** |

**Manager Summary**

    **Calculated Proficiency Rating**    Ineffective
    **Proficiency Rating Description**

REGIONS 001330

Competencies



| Competency | Description | Manager Evaluation |
|---|---|---|
| Drive For Success | Setting and exceeding challenging work goals, willingly tackling demanding tasks, proactively addressing opportunities, taking initiative on work tasks and responsibilities, and demonstrating resilience by staying positive when setbacks occur. | **Manager** **Proficiency Rating** Developing Typical behaviors that may be associated with the selected proficiency level indicate that the associate's performance falls between the descriptions below OR that the associate does not consistently perform the higher level behaviors: Ineffective: - Does not complete daily success planner - Completes additional tasks only when asked - Does not display a sense of urgency to improve performance - When encountering challenges, depends on management for solutions Proficient: - Consistently implements coaching plan in stated time frame and moves to a new objective - Demonstrates a clear desire to learn, grow and progress in the company - Makes outbound calls to generate his/her own success - Possesses drive to create own success every day **Comment** Melissa was in the transition from one branch to the other mostly in Q2. She tried to achieve her goals in June but her May and April didn't have much of production. She needs to work on setting goals and have a plan to achieve her daily, weekly and monthly goals. |

Competencies

 REGIONS

| Competency | Description | Manager Evaluation |
|---|---|---|
| Interpersonal Communication | Interacting with customers in a pleasant and professional manner, building rapport, demonstrating an interest in customers, conveying information confidently, enthusiastically, and clearly, avoiding the use of jargon, providing negative information in a tactful manner, and communicating in an ethical and trustworthy manner. | Manager<br><br>**Proficiency Rating** Advanced<br>Typical behaviors that may be associated with the selected proficiency level indicate that the associate's performance falls between the descriptions below OR that the associate does not consistently perform the higher level behaviors:<br><br>Proficient:<br>- Checks to determine if the message he/she has been delivering is understood<br>- Develops ongoing relationships with customers<br>- Provides negative information to the customer in a tactful manner<br>- Able to conduct complex conversations on the phone<br><br>Role Model:<br>- Responds quickly to the needs of the audience during public speaking engagement<br>- Intervenes to defuse conflict situations within the Branch<br>- Uses information from prior interactions to build on the customer relationship<br><br>**Comment**<br>She was able to conduct complex conversations on the phone with client to explain client's concerns.<br>Built on going relationship with client, remember their names and stories. |

CONFIDENTIAL



| Competency | Description | Manager Evaluation |
|---|---|---|
| Recommending Products & Services | Analyzing and interpreting information to relate to products/services to customer needs.  Matching the implied or expressed needs of customers with appropriate products/services designed to meet those needs, understanding and confidently communicating the details, benefits, and requirements of various product/service options, adjusting recommendations based on the individual circumstances of each customer, and successfully responding to customer objections. | Manager<br><br>**Proficiency Rating** Developing<br>Typical behaviors that may be associated with the selected proficiency level indicate that the associate's performance falls between the descriptions below OR that the associate does not consistently perform the higher level behaviors:<br><br>Ineffective:<br>- Has limited knowledge of product features and benefits<br>- Does not educate customer on digital banking channels<br>- Handles customer immediate needs, but asks no or limited questions regarding future needs<br><br>Proficient:<br>- Demonstrates effective follow-up through pipeline management or customer appointments<br>- Able to analyze and interpret Guided Discovery/NBA recommendations<br>- Able to understand, diagnose and recommend the right solution for the customer<br>- Able to engage the customer in conversation regarding lending and long-term investments<br>- Takes the full financial picture into account and makes educated recommendations<br><br>**Comment**<br><br>Melissa didn't have any production for borrowing during Q2, but she will work on it on Q3 to be more familiar to lending product knowledge, have more lending conversation with client and identify lending opportunity through conversation with client |

Competencies



| Competency | Description | Manager Evaluation |
|---|---|---|
|  |  |  |

CONFIDENTIAL



| Competency | Description | Manager Evaluation |
|---|---|---|
| Teamwork & Adherence to Tools and Processes | Developing effective and supportive relationships with colleagues, showing a sense of team spirit, working with others to generate effective solutions to problems, managing work priorities and following up in a timely manner, learning and applying policies and procedures, providing quality service without errors, remaining detail-oriented and focused during less than ideal conditions, and understanding the role of policies and procedures in risk management. | Manager<br><br>**Proficiency Rating**  Advanced<br>Typical behaviors that may be associated with the selected proficiency level indicate that the associate's performance falls between the descriptions below OR that the associate does not consistently perform the higher level behaviors:<br><br>Proficient:<br>- Partners effectively across business lines<br>- Displays a willingness to do what is best for the team (vs. self)<br>- Regularly shares Best Practices with others<br>- Reminds others of changes in policies<br>- Effective use of Guided Discovery<br>- Effective use of Choreography<br>- Effective use of Tele connecting script<br>- Effective use of calculators<br>- Effective use of Pipeline tool<br>- Effectively converts MBE intercepts to conversations<br><br>Role Model:<br>- Sought out by other lines of business for partnership<br>- Rallies team during difficult times<br>- Successfully develops associates<br>- Assumes leadership with Branch projects such as community service projects or Branch outings<br>- Takes a proactive 360 approach to developing customer relationships<br>- Serves as an agent of change for new tools and processes<br>- Is a leader to the team in risk matters<br>- Is a leader to the team in operational matters<br>- Serves as a subject matter expert for new tools and processes<br>- Stays updated on operational or risk policy changes |

**REGIONS 001335**



| Competency | Description | Manager Evaluation |
|---|---|---|
| | | **Comment** - Trains others on policies and procedures<br>- Proactive use of tools and processes outside of the individual's job family<br>- Supports Branch Manager through the delegation and inspection of risk activities<br>- Recommends new processes to enhance efficiency<br><br>She helped her team when needed, work with partners to refer client to them. She needs work more on being a leader to the team in risk matters, operations, and using tools and resources, where she can help them where to find the answers and provide solutions when needed. |

Manager Summary

    **Calculated Proficiency Rating**    Proficient

    **Proficiency Rating Description**

CONFIDENTIAL



| Competency | Description | Manager Evaluation |
|---|---|---|
| Drive For Success | Setting and exceeding challenging work goals, willingly tackling demanding tasks, proactively addressing opportunities, taking initiative on work tasks and responsibilities, and demonstrating resilience by staying positive when setbacks occur. | Manager<br><br>**Proficiency Rating** Developing<br>Typical behaviors that may be associated with the selected proficiency level indicate that the associate's performance falls between the descriptions below OR that the associate does not consistently perform the higher level behaviors:<br><br>Ineffective:<br>- Does not complete daily success planner<br>- Completes additional tasks only when asked<br>- Does not display a sense of urgency to improve performance<br>- When encountering challenges, depends on management for solutions<br><br>Proficient:<br>- Consistently implements coaching plan in stated time frame and moves to a new objective<br>- Demonstrates a clear desire to learn, grow and progress in the company<br>- Makes outbound calls to generate his/her own success<br>- Possesses drive to create own success every day<br><br>**Comment**<br><br>Melissa makes outbound calls from call block to generate her own success. Melissa utilized her 360 partners for referral for mortgage and investment. Opportunity: Melissa needs to display sense of urgency to improve performance, have her plan of the day and follow it, know her goals and create pipeline to track on it.<br>BM and Melissa will work on how to plan |

REGIONS 001337

Competencies



| Competency | Description | Manager Evaluation |
|---|---|---|
| | | Melissa's day better where she can focus on accomplish her tasks and achieve her goals. |
| Interpersonal Communication | Interacting with customers in a pleasant and professional manner, building rapport, demonstrating an interest in customers, conveying information confidently, enthusiastically, and clearly, avoiding the use of jargon, providing negative information in a tactful manner, and communicating in an ethical and trustworthy manner. | Manager<br><br>**Proficiency Rating**  Proficient<br>Typical behaviors that may be associated with the selected proficiency level:<br>- Checks to determine if the message he/she has been delivering is understood<br>- Develops ongoing relationships with customers<br>- Provides negative information to the customer in a tactful manner<br>- Able to conduct complex conversations on the phone<br><br>**Comment**<br><br>Melissa is confident when she communicate and deliver product and policy to clients.<br>She is natural when she speaks on the phone or making out bounce call.<br>She can develop the relationship with client through communication in person and over the phone.<br>Opportunity: Melissa can improve her skill on overcoming client's objections, utilized needs based conversation to uncover more opportunity to help client. |

REGIONS 001338



| Competency | Description | Manager Evaluation |
|---|---|---|
| Recommending Products & Services | Analyzing and interpreting information to relate to products/services to customer needs.  Matching the implied or expressed needs of customers with appropriate products/services designed to meet those needs, understanding and confidently communicating the details, benefits, and requirements of various product/service options, adjusting recommendations based on the individual circumstances of each customer, and successfully responding to customer objections. | Manager |

Manager

**Proficiency Rating**

Developing
Typical behaviors that may be associated with the selected proficiency level indicate that the associate's performance falls between the descriptions below OR that the associate does not consistently perform the higher level behaviors:

Ineffective:
- Has limited knowledge of product features and benefits
- Does not educate customer on digital banking channels
- Handles customer immediate needs, but asks no or limited questions regarding future needs

Proficient:
- Demonstrates effective follow-up through pipeline management or customer appointments
- Able to analyze and interpret Guided Discovery/NBA recommendations
- Able to understand, diagnose and recommend the right solution for the customer
- Able to engage the customer in conversation regarding lending and long-term investments
- Takes the full financial picture into account and makes educated recommendations

**Comment**

Melissa is comfortable presenting recommendation to client. She provide good recommendation on everyday banking and deposit account. Melissa needs to work more on the recommendation on lending. Melissa needs to work on how to include

REGIONS 001339

Competencies



| Competency | Description | Manager Evaluation |
|---|---|---|
| | | Green Print on her interaction with client when opening new accounts or helping client with their transaction.<br>BM and Melissa will work on to build her skill on identify opportunities through clues from conversation with clients. |

REGIONS 001340

Competencies



| Competency | Description | Manager Evaluation |
|---|---|---|
| Teamwork & Adherence to Tools and Processes | Developing effective and supportive relationships with colleagues, showing a sense of team spirit, working with others to generate effective solutions to problems, managing work priorities and following up in a timely manner, learning and applying policies and procedures, providing quality service without errors, remaining detail-oriented and focused during less than ideal conditions, and understanding the role of policies and procedures in risk management. | Manager<br><br>**Proficiency Rating**  Proficient<br>Typical behaviors that may be associated with the selected proficiency level:<br>- Partners effectively across business lines<br>- Displays a willingness to do what is best for the team (vs. self)<br>- Regularly shares Best Practices with others<br>- Reminds others of changes in policies<br>- Effective use of Guided Discovery<br>- Effective use of Choreography<br>- Effective use of Tele connecting script<br>- Effective use of calculators<br>- Effective use of Pipeline tool<br>- Effectively converts MBE intercepts to conversations<br><br>**Comment**<br><br>She partners effectively with 360 partners like mortgage and investment or Private Wealth.<br>She shares Best Practices with others Melissa support the Manager and team by hosting huddle for Refer a Friend and Omni channel.<br>Opportunity: Melissa will work on effective use of calculators, Pipeline tool, Choreography and Green Print to help her achieve her goals.<br>Plan her time for MAC or any other required trainings.<br>Enhance her knowledge with policy and procedure where she can avoid error and prepared for BRCA audit, but also help her team to be operational sounded. |

REGIONS 001341



Manager Summary

| | |
|---|---|
| **Overall Rating Weight** | 100 |
| **Calculated Proficiency Rating** | Developing |
| **Proficiency Rating Description** | |

Competencies



| Competency | Description | Manager Evaluation | Associate Evaluation |
|---|---|---|---|
| Adherence to Tools & Processes (Banker) | Banker utilizes Operational Risk, Banker Integrity, and adheres to tools and processes | Manager<br><br>**Proficiency Rating** Proficient<br>Banker adequately and consistently utilizes and adheres to Operational Risk, Banker Integrity, and tools and processes<br><br>**Comment** | Associate<br><br>**Proficiency Rating**<br><br>**Comment** |
| Building Relationships and Discovering Customer Needs (Banker) | Banker utilizes Consumer and Small Business needs-based conversations (Greenprint®) – resulting in balanced performance while helping customers make better financial decisions | Manager<br><br>**Proficiency Rating** Developing<br>Banker partially and inconsistently utilizes Greenprint® to conduct needs-based conversations<br><br>**Comment** | Associate<br><br>**Proficiency Rating**<br><br>**Comment** |
| Drive for Success (Banker) | Banker utilizes proactive activities to conduct more needs-based conversations to grow households and strengthen relationships with existing customers. | Manager<br><br>**Proficiency Rating** Developing<br>Banker uses time to partially and inconsistently utilize proactive activities to grow households and strengthen existing relationships (Regions360)<br><br>**Comment** | Associate<br><br>**Proficiency Rating**<br><br>**Comment** |

CONFIDENTIAL



| Competency | Description | Manager Evaluation | Associate Evaluation |
|---|---|---|---|
| Interpersonal Communication & Teamwork (Banker) | Banker utilizes interactions with customers to create an optimal customer experience (demonstrates KDS360 Brand Behaviors) and collaborates with bank associates and Regions360 partners in an effective and professional manner | Manager<br><br>**Proficiency Rating** Proficient<br>Banker adequately and often exemplifies Regions Values and is somewhat committed to providing first-class customer service (KDS360) and collaborating with bank associates and Regions360 partners to create shared value<br><br>**Comment** | Associate<br><br>**Proficiency Rating**<br><br>**Comment** |

**Manager Summary**
- **Overall Rating Weight** 100
- **Calculated Proficiency Rating** Developing
- **Proficiency Rating Description**

**Associate Summary**
- **Calculated Proficiency Rating**
- **Proficiency Rating Description**

**REGIONS 001344**

Competencies



| Competency | Description | Manager Evaluation |
|---|---|---|
| Drive For Success | Setting and exceeding challenging work goals, willingly tackling demanding tasks, proactively addressing opportunities, taking initiative on work tasks and responsibilities, and demonstrating resilience by staying positive when setbacks occur. | **Manager**<br>**Proficiency Rating**  Ineffective<br>Typical behaviors that may be associated with the selected proficiency level:<br>- Does not complete daily success planner<br>- Completes additional tasks only when asked<br>- Does not display a sense of urgency to improve performance<br>- When encountering challenges, depends on management for solutions<br>**Comment** |
| Interpersonal Communication | Interacting with customers in a pleasant and professional manner, building rapport, demonstrating an interest in customers, conveying information confidently, enthusiastically, and clearly, avoiding the use of jargon, providing negative information in a tactful manner, and communicating in an ethical and trustworthy manner. | **Manager**<br>**Proficiency Rating**  Ineffective<br>Ineffective:<br>Typical behaviors that may be associated with the selected proficiency level:<br>- Adapts communication style to some (not all ) audiences<br>- Struggles through difficult conversations<br>- Allows distractions to negatively affect engagement with the custome<br>**Comment** |

CONFIDENTIAL

Competencies

 REGIONS

| Competency | Description | Manager Evaluation |
|---|---|---|
| Recommending Products & Services | Analyzing and interpreting information to relate to products/services to customer needs.  Matching the implied or expressed needs of customers with appropriate products/services designed to meet those needs, understanding and confidently communicating the details, benefits, and requirements of various product/service options, adjusting recommendations based on the individual circumstances of each customer, and successfully responding to customer objections. | **Manager**<br><br>**Proficiency Rating**  Ineffective<br><br>Ineffective:<br>Typical behaviors that may be associated with the selected proficiency level:<br>- Has limited knowledge of product features and benefits<br>- Does not educate customer on digital banking channels<br>- Handles customer immediate needs, but asks no or limited questions regarding future needs<br><br>**Comment** |
| Teamwork & Adherence to Tools and Processes | Developing effective and supportive relationships with colleagues, showing a sense of team spirit, working with others to generate effective solutions to problems, managing work priorities and following up in a timely manner, learning and applying policies and procedures, providing quality service without errors, remaining detail-oriented and focused during less than ideal conditions, and understanding the role of policies and procedures in risk management. | **Manager**<br><br>**Proficiency Rating**  Proficient<br><br>Typical behaviors that may be associated with the selected proficiency level:<br>- Partners effectively across business lines<br>- Displays a willingness to do what is best for the team (vs. self)<br>- Regularly shares Best Practices with others<br>- Reminds others of changes in policies<br>- Effective use of Guided Discovery<br>- Effective use of Choreography<br>- Effective use of Tele connecting script<br>- Effective use of calculators<br>- Effective use of Pipeline tool<br>- Effectively converts MBE intercepts to conversations<br><br>**Comment** |

Manager Summary
    **Calculated Proficiency Rating**    Ineffective
    **Proficiency Rating Description**

CONFIDENTIAL



# Miranda, Melissa

**Quarterly Financial Relationship Consultant/Senior Consultant Review**

Financial Relationship Consultant

Manager: Robert A. Sanders (Terminated)

Evaluated By: Robert A. Sanders (Terminated)

Organization: Sugar Land Branch (Beverly Ero)

Location: Sugar Land

10/01/2019 - 12/31/2019

## Overall

### Manager Overall Evaluation

**Rating:**            Partially Met Expectations

**Comment:**

## Acknowledgement

### Associate

**Entered by:**     Melissa Miranda (On Leave)          **Date:**     02/10/2020

**Status:**          Acknowledge with comments

**Comment:**        As A new FRC starting in December, I have completed all of my required MAC training. I am scheduled for training classes in February and March to complete my required training. My goal is to learn as much as I can, I can then use my knowledge to service my customer giving them the best solutions.

## Competencies

### Recommending Products & Services (FRC/FRSC)

Analyzing and interpreting information to relate to products/services to customer needs.  Matching the implied or expressed needs of customers with appropriate products/services designed to meet those needs, understanding and confidently communicating the details, benefits, and requirements of various product/service options, adjusting recommendations based on the individual circumstances of each customer, and successfully responding to customer objections.

#### Manager Evaluation

Proficiency Rating:      **Too New To Rate**

Comment:

### Drive for Success (FRC/FRSC)

Setting and exceeding challenging work goals, willingly tackling demanding tasks, proactively addressing opportunities, taking initiative on work tasks and responsibilities, and demonstrating resilience by staying positive when setbacks occur.

#### Manager Evaluation

Proficiency Rating:      **Too New To Rate**

Comment:

### Interpersonal Communication (FRC/FRSC)

Interacting with customers in a pleasant and professional manner, building rapport, demonstrating an interest in customers, conveying information confidently, enthusiastically, and clearly, avoiding the use of jargon, providing negative information in a tactful manner, and communicating in an ethical and trustworthy manner.

#### Manager Evaluation

CONFIDENTIAL                                                                                          **REGIONS 001347**

Proficiency Rating:      **Too New To Rate**

Comment:

## Adherence to Tools and Processes (FRC/FRSC)

Learning and applying policies and procedures, providing quality service without errors, maintaining high standards, remaining detail-oriented and focused during in less than ideal conditions, and understanding the role of policies and procedures in risk management.

Manager Evaluation

Proficiency Rating:      **Too New To Rate**

Comment:

## Teamwork (FRC/FRSC)

Developing effective and supportive relationships with colleagues, showing a sense of team spirit, working with others to generate effective solutions to problems, considering unique aspects of situations, balancing customer needs with customer requests, remaining calm during challenging situations, managing work priorities and following up in a timely manner.

Manager Evaluation

Proficiency Rating:      **Too New To Rate**

Comment:

Section Summary

## Manager Evaluation

Proficiency Rating:      **Developing**



## Miranda, Melissa
Financial Relationship Consultant
Manager: Robert A. Sanders (Terminated)
Evaluated By: Robert A. Sanders (Terminated)

## 2020 Mid-Year (Q1 & Q2) Review
Organization: Sugar Land Branch (Beverly Ero)
Location: Sugar Land
01/01/2020 - 06/30/2020

## Overall

### Manager Overall Evaluation

Rating:          Partially Met Expectations

Comment:

## Competencies

### Drive For Success

Setting and exceeding challenging work goals, willingly tackling demanding tasks, proactively addressing opportunities, taking initiative on work tasks and responsibilities, and demonstrating resilience by staying positive when setbacks occur.

Manager Evaluation

Proficiency Rating:     **Proficient**

Comment:     Associate will focus on opportunities around Staying Positive when setbacks occur.

### Interpersonal Communication

Interacting with customers in a pleasant and professional manner, building rapport, demonstrating an interest in customers, conveying information confidently, enthusiastically, and clearly, avoiding the use of jargon, providing negative information in a tactful manner, and communicating in an ethical and trustworthy manner.

Manager Evaluation

Proficiency Rating:     **Developing**

Comment:     Associate has two recent Customer Complaints that require updates from BSM.

### Recommending Products & Services

Analyzing and interpreting information to relate to products/services to customer needs.  Matching the implied or expressed needs of customers with appropriate products/services designed to meet those needs, understanding and confidently communicating the details, benefits, and requirements of various product/service options, adjusting recommendations based on the individual circumstances of each customer, and successfully responding to customer objections.

Manager Evaluation

Proficiency Rating:     **Developing**

Comment:     Associate will focus on developing Product Knowledge with Business Deposit Relationships, and Borrowing Smarter Solutions.

### Teamwork & Adherence to Tools and Processes

Developing effective and supportive relationships with colleagues, showing a sense of team spirit, working with others to generate effective solutions to problems, managing work priorities and following up in a timely manner, learning and applying policies and procedures, providing quality service without errors, remaining detail-oriented and focused during less than ideal conditions, and understanding the role of policies and procedures in risk management.

Manager Evaluation

Proficiency Rating:     **Proficient**

Comment:     Associate works well with others and a sense of team spirit.

CONFIDENTIAL                                    **REGIONS 001349**

Section Summary

## Manager Evaluation

Proficiency Rating:     **Developing**

## Questions

Associate has demonstrated an understanding of how he/she and his/her team contributes to the current direction of Regions and has demonstrated personal commitment to the current vision of Regions.

Manager Evaluation

Rating:        **2. Agree**

Response:

Associate has shown an accurate understanding of customer needs and has proactively worked to meet the needs of Bank Customers for which he/she is responsible.

Manager Evaluation

Rating:        **2. Agree**

Response:

CONFIDENTIAL

**REGIONS 001350**



**Miranda, Melissa**

Financial Relationship Consultant

Manager: Robert A. Sanders (Terminated)

Evaluated By: Robert A. Sanders (Terminated)

**Quarterly_Performance_Review**

Organization: Sugar Land Branch (Beverly Ero)

Location: Sugar Land

07/01/2020 - 09/30/2020

## Overall

### Manager Overall Evaluation

Rating:              Did Not Meet Expectations

Comment:

## Competencies

### Drive For Success

Setting and exceeding challenging work goals, willingly tackling demanding tasks, proactively addressing opportunities, taking initiative on work tasks and responsibilities, and demonstrating resilience by staying positive when setbacks occur.

Manager Evaluation

Proficiency Rating:    **Ineffective**

Comment:

### Interpersonal Communication

Interacting with customers in a pleasant and professional manner, building rapport, demonstrating an interest in customers, conveying information confidently, enthusiastically, and clearly, avoiding the use of jargon, providing negative information in a tactful manner, and communicating in an ethical and trustworthy manner.

Manager Evaluation

Proficiency Rating:    **Ineffective**

Comment:

### Recommending Products & Services

Analyzing and interpreting information to relate to products/services to customer needs.  Matching the implied or expressed needs of customers with appropriate products/services designed to meet those needs, understanding and confidently communicating the details, benefits, and requirements of various product/service options, adjusting recommendations based on the individual circumstances of each customer, and successfully responding to customer objections.

Manager Evaluation

Proficiency Rating:    **Ineffective**

Comment:

### Teamwork & Adherence to Tools and Processes

Developing effective and supportive relationships with colleagues, showing a sense of team spirit, working with others to generate effective solutions to problems, managing work priorities and following up in a timely manner, learning and applying policies and procedures, providing quality service without errors, remaining detail-oriented and focused during less than ideal conditions, and understanding the role of policies and procedures in risk management.

Manager Evaluation

Proficiency Rating:    **Proficient**

Comment:

**REGIONS 001351**

Section Summary

## Manager Evaluation

**Proficiency Rating:**     **Ineffective**

REGIONS 001352



**Miranda, Melissa**

Financial Relationship Consultant

Manager: Robert A. Sanders (Terminated)

Evaluated By: Robert A. Sanders (Terminated)

**Quarterly__Performance__Review**

Organization: Sugar Land Branch (Beverly Ero)

Location: Sugar Land

10/01/2020 - 12/31/2020

## Overall

### Manager Overall Evaluation

Rating:          Partially Met Expectations

Comment:

## Competencies

### Drive For Success

Setting and exceeding challenging work goals, willingly tackling demanding tasks, proactively addressing opportunities, taking initiative on work tasks and responsibilities, and demonstrating resilience by staying positive when setbacks occur.

Manager Evaluation

Proficiency Rating:   **Ineffective**

Comment:

### Interpersonal Communication

Interacting with customers in a pleasant and professional manner, building rapport, demonstrating an interest in customers, conveying information confidently, enthusiastically, and clearly, avoiding the use of jargon, providing negative information in a tactful manner, and communicating in an ethical and trustworthy manner.

Manager Evaluation

Proficiency Rating:   **Ineffective**

Comment:

### Recommending Products & Services

Analyzing and interpreting information to relate to products/services to customer needs.  Matching the implied or expressed needs of customers with appropriate products/services designed to meet those needs, understanding and confidently communicating the details, benefits, and requirements of various product/service options, adjusting recommendations based on the individual circumstances of each customer, and successfully responding to customer objections.

Manager Evaluation

Proficiency Rating:   **Proficient**

Comment:

### Teamwork & Adherence to Tools and Processes

Developing effective and supportive relationships with colleagues, showing a sense of team spirit, working with others to generate effective solutions to problems, managing work priorities and following up in a timely manner, learning and applying policies and procedures, providing quality service without errors, remaining detail-oriented and focused during less than ideal conditions, and understanding the role of policies and procedures in risk management.

Manager Evaluation

Proficiency Rating:   **Developing**

Comment:

REGIONS 001353

Section Summary

## Manager Evaluation

Proficiency Rating:     **Developing**

REGIONS 001354



# Miranda, Melissa

Financial Relationship Consultant
Manager: Robert A. Sanders (Terminated)
Evaluated By: Automated Processes

# MBE Annual Reference Point

Organization: Sugar Land Branch (Beverly Ero)
Location: Sugar Land
12/31/2020 - 12/31/2020

## Overall

### Manager Overall Evaluation

**Rating:**          1.01 - 2.49

**Comment:**

**REGIONS 001355**



# Miranda, Melissa

Financial Relationship Consultant- Nexus

Manager: Quynh Vu (Terminated)
Evaluated By: Christopher Freeman

# Verbal_Warning

Organization: Katy Westpark Tollway (Maria Euceda-Cruz)

Location: Katy Westpark Tollway

08/19/2021 - 08/19/2022

## Disciplinary Action

**Reason:**                           Attendance/ Tardiness (United States of America)

**Related Disciplinary Actions:**

**REGIONS 001356**



# Miranda, Melissa

Financial Relationship Consultant- Nexus

# Written_Warning

Organization: Katy Westpark Tollway (Maria Euceda-Cruz)

Manager: Quynh Vu (Terminated)

Location: Katy Westpark Tollway

Evaluated By: Jo McCormick

*02/04/2022 - 02/04/2023*

## Disciplinary Action

| | |
|---|---|
| **Reason:** | Attendance/ Tardiness (United States of America) |
| **Related Disciplinary Actions:** | Verbal_Warning |

**REGIONS 001357**


View Worker History by Category: Melissa
Miranda



| Business Process | Initiated On | Leave of Absence Date | Status |
|---|---|---|---|
| Leave Request: Melissa Miranda | 06/12/2020 02:21:10 PM | 06/13/2020 | Successfully Completed |
| Leave Return for Melissa Miranda last day of leave on 05/07/2020, first day back at work on 05/08/2020 | 05/07/2020 12:43:34 PM | 05/07/2020 | Successfully Completed |
| Leave Request: Melissa Miranda | 05/04/2020 09:21:42 AM | 05/01/2020 | Successfully Completed |

Goals and Reviews

Performance Processes

| Performance Process | Status | Initiated On |
|---|---|---|
| Retail Year End Performance Review: Melissa Miranda | Successfully Completed | 12/01/2022 04:51:30 AM |
| 2021 Half-Year (Q3 & Q4) Review: Melissa Miranda | Successfully Completed | 12/13/2021 09:08:51 AM |
| 2021 Quarterly Performance Review: Melissa Miranda | Successfully Completed | 07/27/2021 06:25:46 AM |
| Quarterly Performance Review: Melissa Miranda | Successfully Completed | 04/26/2021 08:09:55 AM |
| Quarterly__Performance__Review: Melissa Miranda | Successfully Completed | 01/21/2021 09:19:28 AM |
| Quarterly Recommended Rating: Melissa Miranda | Rescinded | 04/26/2021 07:44:57 AM |
| MBE Annual Reference Point: Melissa Miranda | Successfully Completed | 02/05/2021 12:33:38 PM |
| Quarterly_Performance_Review: Melissa Miranda | Successfully Completed | 10/20/2020 08:59:56 AM |
| Quarterly Recommended Rating: Melissa Miranda | Rescinded | 01/21/2021 08:15:46 AM |
| Quarterly Recommended Rating: Melissa Miranda | Rescinded | 10/20/2020 08:21:25 AM |
| 2020 Mid-Year (Q1 & Q2) Review: Melissa Miranda | Successfully Completed | 07/20/2020 08:48:15 AM |
| Quarterly Recommended Rating: Melissa Miranda | Rescinded | 05/05/2020 02:00:00 AM |
| Quarterly Financial Relationship Consultant/Senior Consultant Review: Melissa Miranda | Successfully Completed | 01/21/2020 08:54:23 AM |
| MBE Recommended Rating  (FRC/FRSC): Melissa Miranda | Rescinded | 01/16/2020 02:00:00 AM |

Disciplinary Actions

| Disciplinary Action | Reasons | Status | Initiated On |
|---|---|---|---|
| Written_Warning: Melissa Miranda | Attendance/ Tardiness (United States of America) | Successfully Completed | 02/04/2022 07:02:23 PM |
| Verbal_Warning: Melissa Miranda | Attendance/ Tardiness (United States of America) | Successfully Completed | 08/19/2021 12:18:04 PM |

Career and Talent

Talent Reviews

| Business Process | Status | Initiated On |
|---|---|---|
| Update Profile: Role and Relationship Orientation: Melissa Miranda | Successfully Completed | 06/08/2021 12:41:49 AM |

Skills & Experience

| Business Process | Achievement | Status | Initiated On |
|---|---|---|---|
| Manage Job History: Melissa Miranda | House /Wife | Successfully Completed | 01/03/2020 02:30:52 PM |

CONFIDENTIAL

# EXHIBIT G

**Erin P. Mummert**

| | |
|---|---|
| **From:** | Stacey Rowland |
| **Sent:** | Wednesday, June 2, 2021 9:06 PM |
| **To:** | Erin P. Mummert; Melody Bodine |
| **Cc:** | Melanie Dunagan |
| **Subject:** | Fwd: Pre-approval request:  EAIT 40392/42275/42278 |

Termination approved.


Stacey B. Rowland, SPHR
Associate Relations Manager
Regions Bank | Office of Associate Conduct
Office: 205.264.4164
E-mail: ████████@regions.com

**From:** Michelle C. Spencer ████████@regions.com>
**Sent:** Wednesday, June 2, 2021 7:44:11 PM
**To:** Stacey Rowland ████████@regions.com>
**Cc:** Melanie Dunagan ████████@Regions.com>
**Subject:** Re: Pre-approval request: EAIT 40392/42275/42278

Thank you. I agree.
MCS

**From:** Stacey Rowland ████████@regions.com>
**Sent:** Wednesday, June 2, 2021 6:52:38 PM
**To:** Michelle C. Spencer ████████@regions.com>
**Cc:** Melanie Dunagan ████████@Regions.com>
**Subject:** Fwd: Pre-approval request: EAIT 40392/42275/42278

Michelle,

Melanie and I support the recommendation to terminate the associate. He was dishonest during the investigation. While other violations were substantiated as outlined below, the term recommendation is based on the associate's dishonesty.

Please let me know if you have any questions or concerns. Thank you.


Stacey B. Rowland, SPHR
Associate Relations Manager
Regions Bank | Office of Associate Conduct
Office: 205.264.4164
E-mail: ████████@regions.com

**From:** Erin P. Mummert ████████@regions.com>
**Sent:** Wednesday, June 2, 2021 11:22:19 AM

1

REGIONS 001766

**To:** Stacey Rowland ▮▮▮▮▮▮▮▮▮▮ @regions.com>
**Cc:** Melody Bodine ▮▮▮▮▮▮▮▮▮▮ @Regions.com>; Melanie Dunagan <▮▮▮▮▮▮▮▮▮▮ @Regions.com>
**Subject:** Pre-approval request: EAIT 40392/42275/42278

Hi Stacey,

This case is marked "very high" risk rating.

**Associate**:     Robert Sanders
**Position**:       Branch Manager
**Location**:       Sugar Land Branch

**Allegation**:

| 40392 | Associate Relations | Retaliation (Not Audit Related) |
|-------|---------------------|--------------------------------|
| 40392 | Code of Conduct | Conflicts of Interest – Self Dealing |
| 40392 | Performance | Poor Management |
| 42275 | Associate Relations | Discrimination |
| 42275 | Questionable Conduct | Fraud |
| 42275 | Policy/Procedural Violation | Violation of Policy/Guideline/Procedure |
| 42278 | Code of Conduct | Conflicts of Interest – Outside Activity |
| 42278 | Code of Conduct | Code of Conduct - Other |

*See CRF for specifics

**Investigative results**:  See CRF.

**Resolution**: The code of conduct violation in not being truthful coupled with the other violations led to the termination recommendation.

- The allegation of Code of Conduct – Code of Conduct – Other was substantiated.
  - SANDERS violated the Code of Business Conduct and Ethics – Raising Issues and Reporting Violations.
- The allegation of Performance – Poor Management was substantiated.
  - SANDERS violated the You and Regions Management Guidelines in applying Regions' policies consistently for all associates.
- The allegation of Policy/Procedural Violation – Policy/Guideline/Procedure was substantiated.
  - SANDERS violated the Transaction Processing Manual - Chapter 5 - Branch Currency & Coin - Coin and Currency Collection policy.
  - SANDERS violated the Associate Expense Reimbursement Policy.
- The allegation of Conflicts of Interest – Outside Activity was substantiated.
  - SANDERS violated the Outside Activities and Employment Policy and the Code of Conduct by failure to complete the Outside Activities Request Form.
  - SANDERS violated the Code of Conduct – Conflict of Interest – Outside Activity by failure to report the outside activity of owning and operating rental property.
- The allegation of Associate Relations – Retaliation (Not Audit Related) was unsubstantiated.
- The allegation of Code of Conduct – Conflicts of Interest – Self Dealing was unsubstantiated.
- The allegation of Associate Relations – Discrimination was unsubstantiated.
- The allegation of Questionable Conduct – Fraud was unsubstantiated.

2

CONFIDENTIAL

**REGIONS 001767**

SANDERS is noted as a repeat suspect. Prior conduct history including all investigations and subsequent disciplinary action(s) were reviewed to determine relevance to this matter.

Thanks,

Erin Mummert, VP
Associate Relations Business Partner
Office of Associate Conduct
P (407) 556-6175

STRATEGIC | RELATOR | ANALYTICAL | RESPONSIBILITY | COMMAND

Bring Your Whole Self to Work

We have a passion for creating an inclusive environment that promotes and values diversity of race, color, national origin, religion, age, sexual orientation, gender identity, disability, veteran status, genetic information, sex, pregnancy, and many other primary and secondary dimensions that make each of us unique as individuals and provide valuable perspective that makes us a better company and employer. More importantly, we recognize that creating a workplace where everyone, regardless of background, can do their best work is the right thing to do.

OFCCP Disclosure: Equal Opportunity Employer/Disabled/Veterans

NOTICE: The information contained in this electronic mail message is confidential and intended only for certain recipients. If you are not an intended recipient, you are hereby notified that any disclosure, reproduction, distribution or other use of this communication and any attachments is strictly prohibited. If you have received this communication in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.

Internal Use

Internal Use

Internal Use

Internal Use

CONFIDENTIAL

REGIONS 001768

# EXHIBIT H

**Robert A. Sanders**

---

| | |
|---|---|
| **From:** | Robert A. Sanders |
| **Sent:** | Tuesday, February 2, 2021 2:02 PM |
| **To:** | Meghan Wernecke; Alex Ott; Amanda Riel; Andrew Hale; Angel Beltran; Angelina Hall; Ann E. Lury; Beverly Ero; Carlos Carlin; Celeste Vanduren; Chelsea Lindell; Chris M. Peralta; Christopher J. Gallegos; Clarabella Diaz-Dominguez; Cody Huggins; Cristi Ramirez; Eustaquio Martinez; Fred Kelley; Homa Scott; Ivan Borjas; James Fox; Jennifer Parrish; Jose Ortiz; Kendrick Robinson; Kerri Gonzalez; Leslie Alimi; Luis Jaramillo; Madaline Ward; Mary Locklear; Matthew Batuuka; Melissa Ybarra; Mitchell Schwartz; Myke Roeschlein; Myra L. Sanchez; Nadia S. Khan; Patricia E. Velasquez; PoYan Ng; Richard Mireles; Roberto Cruz; Robin Thomas; Sabrina Williams; Salvador Gutierrez; Samantha Sanchez; Sandra Rivera; Stacy Barnes; Tierney Kane; Tina Morales |
| **Cc:** | Dave Leonard; Lee Harris; Katy Donovan |
| **Subject:** | RE: Virtual EDD and CDD's |

*Hello Meghan,*

*Thank for providing clarification around Site Surveys for EDD's & CDD's. The one challenge that we are facing when completing the Virtual Visits is that if the images on GoogleMaps or Company Websites are more than a year old, our EDD department requires that recent images be provided to clear the EDD requirements. Just within the past two weeks, if we had not provided the recent images of the business locations, the EDD Resolution would remain incomplete or outstanding. Given the large number of clients with business relationships here at Sugar Land that fall into EDD category, a great deal of time is invested to clear our EDD exceptions.*

*I have informed my team that Outside Surveys will be discontinued until further notice.*

*Thank you,*

*Robert A. Sanders*
*Vice President, Branch Manager IV*
*Regions Bank – Sugar Land Branch*

*2310 Highway 6 South*
*Sugar Land, TX 77478*
*Office: (346) 309-3261*
*Branch: (346) 309-3260*
*Fax: (281) 242-0969*

*Email:  Robert.sanders@regions.com*

**From:** Meghan Wernecke
**Sent:** Tuesday, February 2, 2021 1:09 PM
**To:** Alex Ott <alex.ott@regions.com>; Amanda Riel <amanda.riel@regions.com>; Andrew Hale <andrew.hale@regions.com>; Angel Beltran <angel.beltran@regions.com>; Angelina Hall <angelina.hall@regions.com>; Ann E. Lury <ann.lury@regions.com>; Beverly Ero <beverly.ero@regions.com>; Carlos Carlin <carlos.carlin@regions.com>; Celeste Vanduren <celeste.vanduren@regions.com>; Chelsea Lindell

SANDERS 0018

<chelsea.lindell@regions.com>; Chris M. Peralta <chris.peralta@regions.com>; Christopher J. Gallegos <christopher.gallegos@regions.com>; Clarabella Diaz-Dominguez <clarabella.diaz-dominguez@regions.com>; Cody Huggins <cody.huggins@regions.com>; Cristi Ramirez <cristi.ramirez@regions.com>; Eustaquio Martinez <eustaquio.martinez@regions.com>; Fred Kelley <fred.kelley@regions.com>; Homa Scott <homa.scott@regions.com>; Ivan Borjas <ivan.borjas@regions.com>; James Fox <james.fox@regions.com>; Jennifer Parrish <jennifer.parrish@regions.com>; Jose Ortiz <jose.ortiz@regions.com>; Kendrick Robinson <kendrick.robinson@regions.com>; Kerri Gonzalez <kerri.gonzalez@regions.com>; Leslie Alimi <leslie.alimi@regions.com>; Luis Jaramillo <luis.jaramillo@regions.com>; Madaline Ward <madaline.ward@regions.com>; Mary Locklear <mary.locklear@regions.com>; Matthew Batuuka <matthew.batuuka@regions.com>; Melissa Ybarra <melissa.ybarra@regions.com>; Mitchell Schwartz <mitchell.schwartz@regions.com>; Myke Roeschlein <myke.roeschlein@regions.com>; Myra L. Sanchez <myra.sanchez@regions.com>; Nadia S. Khan <nadia.khan@regions.com>; Patricia E. Velasquez <Patricia.Velasquez@regions.com>; PoYan Ng <poyan.ng@regions.com>; Richard Mireles <richard.mireles@regions.com>; Robert A. Sanders <robert.sanders@regions.com>; Roberto Cruz <roberto.cruz@regions.com>; Robin Thomas <robin.thomas@regions.com>; Sabrina Williams <sabrina.williams2@regions.com>; Salvador Gutierrez <salvador.gutierrez@regions.com>; Samantha Sanchez <samantha.sanchez@regions.com>; Sandra Rivera <sandra.rivera@regions.com>; Stacy Barnes <stacy.barnes2@regions.com>; Tierney Kane <tierney.kane@regions.com>; Tina Morales <tina.morales@regions.com>
**Cc:** Dave Leonard <dave.leonard@regions.com>; Lee Harris <lee.harris@regions.com>; Katy Donovan <Katy.Donovan@Regions.com>
**Subject:** Virtual EDD and CDD's

**BM's Please make sure that you are following this process belwo for on site visits for EDD and CDD.**

Click links below

## Virtual Site Visits

**Information For:**     All Branch Associates
Page Content

**As previously communicated, the requirement for Onsite Visits for customers related to EDD and CDD, has been suspended until further notice.**

Beginning August 1, we will begin Virtual Site visits for the category of customers that fall into the Onsite visit categories.

Virtual site visits are required **within 60 calendar days of account opening** for all newly onboarded:

- Money Service Businesses
- Casinos/Bingo
- Privately-owned ATMs/ISOs
- Cash Intensive Businesses with revenue of $1MM or more
- Third-Party Payment Processors.

Virtual site visits requested by EDD Operations for CDD reviews or EDD reviews must be completed **within 60 calendar days of the request.**

The number of locations for Virtual visits remain the same as was required for onsite visits. When a customer has more than one location, the Virtual site should be conducted for the customer's primary location (or where the Bank's primary contact is located. For customers whose primary businesses are privately owned ATMs, in addition to the primary location, you must perform a virtual on 20% of other locations, not to exceed five visits in total. For TPPPs, the virtual visit should be conducted on the processor's business operations center if it is located separately. For any customer with multiple locations, EDD Operations may also require additional virtual visits to other locations as requested at their discretion.

SANDERS 0019

When a business falls into multiple risk categories (e.g., cash intensive business that has ATMs), associates conducting virtual visits should complete all sections of the form that are applicable to the business (e.g., cash intensive business that has ATMs would require completion of cash intensive business and ATM sections).

Attached are the detailed procedures and a copy of the virtual onsite visit form.  A link to both of these will be posted by August 1 on the ConsumerConnects **CDD / EDD Resources Tile**.

**Attachment:** Temporary Onsite Visit Procedures_FINAL_6_25_2020.pdf Interim Onsite Visit Form_FINAL_(6-2020).pdf

**Thank you**
**Meghan Wernecke**
**Austin and Central Houston Retail Operations Manager**
**Cell# 713-254-6217**

Consistency – Achiever- Responsibility – Arranger - Learner

*This message is for the named individuals' use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any accidental transmission. If you receive this message in error, please immediately destroy it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient.*

**SANDERS 0020**

SANDERS 0021

**Robert A. Sanders**

| | |
|---|---|
| **From:** | Meghan Wernecke |
| **Sent:** | Tuesday, February 2, 2021 1:09 PM |
| **To:** | Alex Ott; Amanda Riel; Andrew Hale; Angel Beltran; Angelina Hall; Ann E. Lury; Beverly Ero; Carlos Carlin; Celeste Vanduren; Chelsea Lindell; Chris M. Peralta; Christopher J. Gallegos; Clarabella Diaz-Dominguez; Cody Huggins; Cristi Ramirez; Eustaquio Martinez; Fred Kelley; Homa Scott; Ivan Borjas; James Fox; Jennifer Parrish; Jose Ortiz; Kendrick Robinson; Kerri Gonzalez; Leslie Alimi; Luis Jaramillo; Madaline Ward; Mary Locklear; Matthew Batuuka; Melissa Ybarra; Mitchell Schwartz; Myke Roeschlein; Myra L. Sanchez; Nadia S. Khan; Patricia E. Velasquez; PoYan Ng; Richard Mireles; Robert A. Sanders; Roberto Cruz; Robin Thomas; Sabrina Williams; Salvador Gutierrez; Samantha Sanchez; Sandra Rivera; Stacy Barnes; Tierney Kane; Tina Morales |
| **Cc:** | Dave Leonard; Lee Harris; Katy Donovan |
| **Subject:** | Virtual EDD and CDD's |
| | |
| **SecureMailType:** | 0 |

BM's Please make sure that you are following this process belwo for on site visits for EDD and CDD.

Click links below

## Virtual Site Visits

**Information For:**     All Branch Associates

Page Content

**As previously communicated, the requirement for Onsite Visits for customers related to EDD and CDD, has been suspended until further notice.**

Beginning August 1, we will begin Virtual Site visits for the category of customers that fall into the Onsite visit categories.

Virtual site visits are required **within 60 calendar days of account opening** for all newly onboarded:

- Money Service Businesses
- Casinos/Bingo
- Privately-owned ATMs/ISOs
- Cash Intensive Businesses with revenue of $1MM or more
- Third-Party Payment Processors.

Virtual site visits requested by EDD Operations for CDD reviews or EDD reviews must be completed **within 60 calendar days of the request.**

The number of locations for Virtual visits remain the same as was required for onsite visits. When a customer has more than one location, the Virtual site should be conducted for the customer's primary location (or where the Bank's primary contact is located. For customers whose primary businesses are privately owned ATMs, in addition to the primary location, you must perform a virtual on 20% of other locations, not to exceed five visits in total. For TPPPs, the virtual visit should be conducted on the processor's business operations center if it is located separately. For any customer with multiple locations, EDD Operations may also require additional virtual visits to other locations as requested at their discretion.

**SANDERS 0022**

When a business falls into multiple risk categories (e.g., cash intensive business that has ATMs), associates conducting virtual visits should complete all sections of the form that are applicable to the business (e.g., cash intensive business that has ATMs would require completion of cash intensive business and ATM sections).

Attached are the detailed procedures and a copy of the virtual onsite visit form. A link to both of these will be posted by August 1 on the ConsumerConnects **CDD / EDD Resources Tile**.

**Attachment:** 📄Temporary Onsite Visit Procedures_FINAL_6_25_2020.pdf 📄Interim Onsite Visit Form_FINAL_(6-2020).pdf

**Thank you**
**Meghan Wernecke**
**Austin and Central Houston Retail Operations Manager**
**Cell#** 713-254-6217

Consistency – Achiever- Responsibility – Arranger - Learner

*This message is for the named individuals' use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any accidental transmission. If you receive this message in error, please immediately destroy it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient.*

**SANDERS 0023**

# Temporary Onsite Visit Modifications

Onsite visit procedures will be modified based on the COVID-19 pandemic until further notice.  The modifications, which will remain in place until further notice, are being implemented with the primary purpose of protecting our employees and customers.

**Procedural Modifications**

The changes to the existing procedures are as follows:

1.  You will not have to schedule an onsite visit meeting with the customer, but you must still complete the ***Onsite Visit Form – Interim COVID-19***, which has been updated to align with the changes described below.

2.  To complete the form, schedule a phone call with your customer at a convenient time to collect required information, in addition to the Google Maps photo, drive-by photo and/or other web searches described below.

3.  Collect a photo of the premises from Google Maps, <u>if within 12 months old</u>, by saving the image and inserting it into Exhibit A of the *Onsite Visit Form – Interim COVID-19* –
    a.  Click on "Street View" image whenever available (See Appendix A for example); or
    b.  If "Street View" image is not available, please use "Satellite view" image; and
    c.  Save the image to later insert into the *Onsite Visit Form – Interim COVID-19*.

4.  <u>If the Google Maps photo is older than 12 months</u>, then you must conduct a drive-by of the premises.  If a drive-by is conducted, please take a photo of the premises on your phone and insert image into Exhibit A of the *Onsite Visit Form – Interim COVID-19*.

5.  Collect a photo, as described above, for each location if customer has multiple privately owned ATM locations, up to 20% of their locations but not to exceed five (5).

    EDD Operations may also contact the relationship manager and require additional locations at their discretion.

6.  To complete the *Onsite Visit Form – Interim COVID-19*, you should conduct the following steps –
    a.  Complete the relevant sections of the *Onsite Visit Form – Interim COVID-19*;
    b.  You may complete only one form if multiple locations are required (but include photo of each location, as applicable); and
    c.  You may complete the form sections by collecting information from the Google Maps photo, drive-by photo, the customer's website, general internet searches and/or a phone call or conversation with the customer (if a new customer, we recommend collecting as much of this information during initial contact).

**SANDERS 0024**

7. If information is collected from the customer's website or a general internet search, please save the screenshot of the webpage and insert it into the relevant exhibit section within the *Onsite Visit Form – Interim COVID-19*.

   If the customer's website is blocked by Regions Information Security, complete Exhibit B of the *Onsite Visit Form – Interim COVID-19* by checking the box that indicates that the website is blocked.  Then, complete Exhibit C if general searches are successful in collecting additional relevant information.

8. Obviously, some of the guidance contained within the current published procedures for competing the *Onsite Visit Form – Interim COVID-19* may not be applicable, such as documenting if the customer did not disclose that they had an ATM on the premises, or if there were other banks nearby the customer and why they are banking with Regions.  However, please follow as much of the existing guidance, as relevant.

9. When saving the *Onsite Visit Form – Interim COVID-19* in iView, please include all supporting photos and web searches by inserting the saved images into the relevant sections of the form.

**Company Website and Internet Searches**

As stated in the procedural section above, specific sections within the updated *Onsite Visit Form – Interim COVID-19* could be completed with internet searches of the subject customer's website or other general searches for information, such as: (a) Operations and services (b) signs and brochures, and (c) inventory/merchandise, in addition to other information.

Please retain documentation of relevant information (e.g., website or general web search with listing of the merchandise offered by the customer) by saving a screenshot of web page(s) and inserting it into the applicable exhibit section of the *Onsite Visit Form – Interim COVID-19*.  Please document customer website in the form, if applicable.  See Appendix B for an example of a website search and a general search.

SANDERS 0025

## Appendix A: Example of Google Maps photo



Photo Image Date

SANDERS 0026

## Appendix B: Examples of website and general searches

The below screenshot is an example of a customer website search, which provides a listing of the customer's hardware store merchandise offered. Please also include the website in Exhibit B of the *Onsite Visit Form – Interim COVID-19* (e.g., TrueValue.com). If the customer's website is blocked by Regions Information Security, check the box that indicates that the website is blocked on Exhibit B.



The below screenshot is an example of a general search through Google, which provides a photo of the customer's convenience store and listing of merchandise offered. Complete Exhibit C of the *Onsite Visit Form – Interim COVID-19*, if this search is applicable.



## Robert A. Sanders

| | |
|---|---|
| **From:** | Meghan Wernecke |
| **Sent:** | Tuesday, February 2, 2021 3:31 PM |
| **To:** | Robert A. Sanders |
| **Cc:** | Dave Leonard; Katy Donovan |
| **Subject:** | RE: Virtual EDD and CDD's |

**SecureMailType:** 0

Robert ,

We are not to discontinue off site visits.  Please see attachment below in the link.  If it is over 1 year then you have to do a drive by and take a pic.  But if it is far for you then you can always as a BM that has a branch close to that branch to take a pic for you.

You are still responsible for clearing edd.  But you can teamwork it

Thank you
Meghan Wernecke
Austin and Central Houston Retail Operations Manager
Cell# 713-254-6217

Consistency – Achiever- Responsibility – Arranger - Learner

> *This message is for the named individuals' use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any accidental transmission. If you receive this message in error, please immediately destroy it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient.*

**From:** Robert A. Sanders <robert.sanders@regions.com>
**Sent:** Tuesday, February 2, 2021 2:02 PM
**To:** Meghan Wernecke <Meghan.Wernecke@regions.com>; Alex Ott <alex.ott@regions.com>; Amanda Riel <amanda.riel@regions.com>; Andrew Hale <andrew.hale@regions.com>; Angel Beltran <angel.beltran@regions.com>; Angelina Hall <angelina.hall@regions.com>; Ann E. Lury <ann.lury@regions.com>; Beverly Ero <beverly.ero@regions.com>; Carlos Carlin <carlos.carlin@regions.com>; Celeste Vanduren <celeste.vanduren@regions.com>; Chelsea Lindell <chelsea.lindell@regions.com>; Chris M. Peralta <chris.peralta@regions.com>; Christopher J. Gallegos <christopher.gallegos@regions.com>; Clarabella Diaz-Dominguez <clarabella.diaz-dominguez@regions.com>; Cody Huggins <cody.huggins@regions.com>; Cristi Ramirez <cristi.ramirez@regions.com>; Eustaquio Martinez <eustaquio.martinez@regions.com>; Fred Kelley <fred.kelley@regions.com>; Homa Scott <homa.scott@regions.com>; Ivan Borjas <ivan.borjas@regions.com>; James Fox <james.fox@regions.com>; Jennifer Parrish <jennifer.parrish@regions.com>; Jose Ortiz <jose.ortiz@regions.com>; Kendrick Robinson <kendrick.robinson@regions.com>; Kerri Gonzalez <kerri.gonzalez@regions.com>; Leslie Alimi <leslie.alimi@regions.com>; Luis Jaramillo <luis.jaramillo@regions.com>; Madaline Ward <madaline.ward@regions.com>; Mary Locklear <mary.locklear@regions.com>; Matthew Batuuka <matthew.batuuka@regions.com>; Melissa Ybarra <melissa.ybarra@regions.com>; Mitchell Schwartz <mitchell.schwartz@regions.com>; Myke Roeschlein <myke.roeschlein@regions.com>; Myra L. Sanchez <myra.sanchez@regions.com>; Nadia S. Khan <nadia.khan@regions.com>; Patricia E. Velasquez <Patricia.Velasquez@regions.com>; PoYan Ng <poyan.ng@regions.com>; Richard Mireles

1

**SANDERS 0028**

<richard.mireles@regions.com>; Roberto Cruz <roberto.cruz@regions.com>; Robin Thomas
<robin.thomas@regions.com>; Sabrina Williams <sabrina.williams2@regions.com>; Salvador Gutierrez
<salvador.gutierrez@regions.com>; Samantha Sanchez <samantha.sanchez@regions.com>; Sandra Rivera
<sandra.rivera@regions.com>; Stacy Barnes <stacy.barnes2@regions.com>; Tierney Kane <tierney.kane@regions.com>;
Tina Morales <tina.morales@regions.com>
Cc: Dave Leonard <dave.leonard@regions.com>; Lee Harris <lee.harris@regions.com>; Katy Donovan
<Katy.Donovan@Regions.com>
Subject: RE: Virtual EDD and CDD's

*Hello Meghan,*

*Thank for providing clarification around Site Surveys for EDD's & CDD's.  The one challenge that we are
facing when completing the Virtual Visits is that if the images on GoogleMaps or Company Websites are more
than a year old, our EDD department requires that recent images be provided to clear the EDD
requirements.  Just within the past two weeks, if we had not provided the recent images of the business
locations, the EDD Resolution would remain incomplete or outstanding.  Given the large number of clients with
business relationships here at Sugar Land that fall into EDD category, a great deal of time is invested to clear
our EDD exceptions.*

*I have informed my team that Outside Surveys will be discontinued until further notice.*


**Thank you,**

**Robert A. Sanders**
**Vice President, Branch Manager IV**
**Regions Bank – Sugar Land Branch**

**2310 Highway 6 South**
**Sugar Land, TX 77478**
**Office:  (346) 309-3261**
**Branch:  (346) 309-3260**
**Fax:  (281) 242-0969**


**Email:  Robert.sanders@regions.com**

From: Meghan Wernecke
Sent: Tuesday, February 2, 2021 1:09 PM
To: Alex Ott <alex.ott@regions.com>; Amanda Riel <amanda.riel@regions.com>; Andrew Hale
<andrew.hale@regions.com>; Angel Beltran <angel.beltran@regions.com>; Angelina Hall <angelina.hall@regions.com>;
Ann E. Lury <ann.lury@regions.com>; Beverly Ero <beverly.ero@regions.com>; Carlos Carlin
<carlos.carlin@regions.com>; Celeste Vanduren <celeste.vanduren@regions.com>; Chelsea Lindell
<chelsea.lindell@regions.com>; Chris M. Peralta <chris.peralta@regions.com>; Christopher J. Gallegos
<christopher.gallegos@regions.com>; Clarabella Diaz-Dominguez <clarabella.diaz-dominguez@regions.com>; Cody
Huggins <cody.huggins@regions.com>; Cristi Ramirez <cristi.ramirez@regions.com>; Eustaquio Martinez
<eustaquio.martinez@regions.com>; Fred Kelley <fred.kelley@regions.com>; Homa Scott <homa.scott@regions.com>;
Ivan Borjas <ivan.borjas@regions.com>; James Fox <james.fox@regions.com>; Jennifer Parrish
<jennifer.parrish@regions.com>; Jose Ortiz <jose.ortiz@regions.com>; Kendrick Robinson
<kendrick.robinson@regions.com>; Kerri Gonzalez <kerri.gonzalez@regions.com>; Leslie Alimi
<leslie.alimi@regions.com>; Luis Jaramillo <luis.jaramillo@regions.com>; Madaline Ward
<madaline.ward@regions.com>; Mary Locklear <mary.locklear@regions.com>; Matthew Batuuka

SANDERS 0029

<matthew.batuuka@regions.com>; Melissa Ybarra <melissa.ybarra@regions.com>; Mitchell Schwartz
<mitchell.schwartz@regions.com>; Myke Roeschlein <myke.roeschlein@regions.com>; Myra L. Sanchez
<myra.sanchez@regions.com>; Nadia S. Khan <nadia.khan@regions.com>; Patricia E. Velasquez
<Patricia.Velasquez@regions.com>; PoYan Ng <poyan.ng@regions.com>; Richard Mireles
<richard.mireles@regions.com>; Robert A. Sanders <robert.sanders@regions.com>; Roberto Cruz
<roberto.cruz@regions.com>; Robin Thomas <robin.thomas@regions.com>; Sabrina Williams
<sabrina.williams2@regions.com>; Salvador Gutierrez <salvador.gutierrez@regions.com>; Samantha Sanchez
<samantha.sanchez@regions.com>; Sandra Rivera <sandra.rivera@regions.com>; Stacy Barnes
<stacy.barnes2@regions.com>; Tierney Kane <tierney.kane@regions.com>; Tina Morales <tina.morales@regions.com>
**Cc:** Dave Leonard <dave.leonard@regions.com>; Lee Harris <lee.harris@regions.com>; Katy Donovan
<Katy.Donovan@Regions.com>
**Subject:** Virtual EDD and CDD's

**BM's Please make sure that you are following this process belwo for on site visits for EDD and CDD.**

**Click links below**

## Virtual Site Visits

**Information For:**      All Branch Associates

Page Content

**As previously communicated, the requirement for Onsite Visits for customers related to EDD and CDD, has been suspended until further notice.**

Beginning August 1, we will begin Virtual Site visits for the category of customers that fall into the Onsite visit categories.

Virtual site visits are required **within 60 calendar days of account opening** for all newly onboarded:

- Money Service Businesses
- Casinos/Bingo
- Privately-owned ATMs/ISOs
- Cash Intensive Businesses with revenue of $1MM or more
- Third-Party Payment Processors.

Virtual site visits requested by EDD Operations for CDD reviews or EDD reviews must be completed **within 60 calendar days of the request.**

The number of locations for Virtual visits remain the same as was required for onsite visits. When a customer has more than one location, the Virtual site should be conducted for the customer's primary location (or where the Bank's primary contact is located. For customers whose primary businesses are privately owned ATMs, in addition to the primary location, you must perform a virtual on 20% of other locations, not to exceed five visits in total. For TPPPs, the virtual visit should be conducted on the processor's business operations center if it is located separately. For any customer with multiple locations, EDD Operations may also require additional virtual visits to other locations as requested at their discretion.

When a business falls into multiple risk categories (e.g., cash intensive business that has ATMs), associates conducting virtual visits should complete all sections of the form that are applicable to the business (e.g., cash intensive business that has ATMs would require completion of cash intensive business and ATM sections).

Attached are the detailed procedures and a copy of the virtual onsite visit form.  A link to both of these will be posted by August 1 on the ConsumerConnects **CDD / EDD Resources Tile.**

**Attachment:** [pdf] Temporary Onsite Visit Procedures_FINAL_6_25_2020.pdf  [pdf] Interim Onsite Visit Form_FINAL_(6-2020).pdf

SANDERS 0030

Thank you
**Meghan Wernecke**
**Austin and Central Houston Retail Operations Manager**
**Cell#** 713-254-6217

Consistency – Achiever- Responsibility – Arranger - Learner

*This message is for the named individuals' use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any accidental transmission. If you receive this message in error, please immediately destroy it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient.*

SANDERS 0031

## Robert A. Sanders

| | |
|---|---|
| **From:** | Meghan Wernecke |
| **Sent:** | Friday, February 5, 2021 4:54 PM |
| **To:** | Robert A. Sanders |
| **Cc:** | Dave Leonard; Katy Donovan |
| **Subject:** | RE: LA PORTE SHELL LLC |
| | |
| **SecureMailType:** | 0 |

*Yes they have to be within the last 12 months but you can ask a branch closer to that place to run by and take a pic for you to save you time and money*

*Thank you*
*Meghan Wernecke*
*Austin and Central Houston Retail Operations Manager Cell# 713-254-6217*


*Consistency – Achiever- Responsibility – Arranger - Learner*

*This message is for the named individuals' use only. It may contain confidential, proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any accidental transmission. If you receive this message in error, please immediately destroy it and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print, or copy any part of this message if you are not the intended recipient.*

*-----Original Message-----*
*From: Robert A. Sanders <robert.sanders@regions.com>*
*Sent: Tuesday, February 2, 2021 2:52 PM*
*To: Meghan Wernecke <Meghan.Wernecke@regions.com>*
*Cc: Dave Leonard <dave.leonard@regions.com>; Katy Donovan <Katy.Donovan@Regions.com>*
*Subject: FW: LA PORTE SHELL LLC*

*Meghan,*

*Here is one example of what I was communicating about regarding Site Surveys.  You and Dave were copied on this last week.*

*Thank you,*

*Robert A. Sanders*
*Vice President, Branch Manager IV*
*Regions Bank – Sugar Land Branch*

*2310 Highway 6 South*
*Sugar Land, TX 77478*
*Office:  (346) 309-3261*
*Branch:  (346) 309-3260*
*Fax:  (281) 242-0969*

*Email:  Robert.sanders@regions.com*

1

**SANDERS 0032**

-----Original Message-----
From: Nicole Garner
Sent: Friday, January 22, 2021 5:16 PM
To: Robert A. Sanders <robert.sanders@regions.com>
Cc: Meghan Wernecke <Meghan.Wernecke@regions.com>; Dave Leonard <dave.leonard@regions.com>
Subject: RE: LA PORTE SHELL LLC

Robert,

We won't be able to use those photos as they were taken in 2019. The photos must be within the last 12 months.
>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>
>>>>>>>>>>
Nicole Garner
Officer, BSA/AML EDD Support
EDD Operations and Compliance
Phone: (205) 766-5936


Every associate should be familiar with Regions corporate and individual obligations to comply with applicable federal requirements relating to anti-money laundering and terrorist financing. Every associate must take these obligations very seriously. The consequences for failure to comply with BSA/AML/OFAC laws and regulations can be significant and can result in criminal and civil penalties being imposed on Regions as well as on individual associates – Regions BSA/AML/OFAC Policy

Confidentiality Notice: The information contained in this email message is confidential and intended only for the use of the individual(s) named as addressed. If you are not the intended recipient, you are requested to please notify the sender and delete this information immediately; retaining no copies of any of this information, nor to take any action in reliance on the information it contains.


Internal Use

-----Original Message-----
From: Robert A. Sanders <robert.sanders@regions.com>
Sent: Friday, January 22, 2021 3:32 PM
To: Nicole Garner <Nicole.Garner@regions.com>
Cc: Meghan Wernecke <Meghan.Wernecke@regions.com>; Dave Leonard <dave.leonard@regions.com>
Subject: RE: LA PORTE SHELL LLC

Thank you Nicole...Please let me know if additional photos are needed.

Thank you,

Robert A. Sanders
Vice President, Branch Manager IV
Regions Bank – Sugar Land Branch

2310 Highway 6 South
Sugar Land, TX 77478
Office: (346) 309-3261
Branch: (346) 309-3260

**SANDERS 0033**

Fax:  (281) 242-0969

Email:  Robert.sanders@regions.com

-----Original Message-----
From: Nicole Garner
Sent: Friday, January 22, 2021 10:15 AM
To: Robert A. Sanders <robert.sanders@regions.com>
Cc: Meghan Wernecke <Meghan.Wernecke@regions.com>; Dave Leonard <dave.leonard@regions.com>
Subject: RE: LA PORTE SHELL LLC

Please forward me the photos so that I may attach them for you.

Thanks,

Nicole Garner
Officer, BSA/AML EDD Support
EDD Operations and Compliance
Phone: (205) 766-5936


Every associate should be familiar with Regions corporate and individual obligations to comply with applicable federal requirements relating to anti-money laundering and terrorist financing. Every associate must take these obligations very seriously. The consequences for failure to comply with BSA/AML/OFAC laws and regulations can be significant and can result in criminal and civil penalties being imposed on Regions as well as on individual associates – Regions BSA/AML/OFAC Policy

Confidentiality Notice: The information contained in this email message is confidential and intended only for the use of the individual(s) named as addressed. If you are not the intended recipient, you are requested to please notify the sender and delete this information immediately; retaining no copies of any of this information, nor to take any action in reliance on the information it contains.


Internal Use

-----Original Message-----
From: Robert A. Sanders <robert.sanders@regions.com>
Sent: Friday, January 22, 2021 10:01 AM
To: Nicole Garner <Nicole.Garner@regions.com>
Cc: Meghan Wernecke <Meghan.Wernecke@regions.com>; Dave Leonard <dave.leonard@regions.com>
Subject: RE: LA PORTE SHELL LLC

Hello Nicole,

I could use your assistance to how to link the photos to the form.  When I click the link to add/attach/copy it would not post the information.  Please let me know if you can help.

Thank you,

Robert A. Sanders
Vice President, Branch Manager IV
Regions Bank – Sugar Land Branch

SANDERS 0034

2310 Highway 6 South
Sugar Land, TX 77478
Office: (346) 309-3261
Branch: (346) 309-3260
Fax: (281) 242-0969

Email: Robert.sanders@regions.com

-----Original Message-----
From: Nicole Garner
Sent: Friday, January 22, 2021 8:17 AM
To: Robert A. Sanders <robert.sanders@regions.com>
Cc: Meghan Wernecke <Meghan.Wernecke@regions.com>; Dave Leonard <dave.leonard@regions.com>
Subject: LA PORTE SHELL LLC

Robert,

Thank you for the onsite form you provided. However, the form is missing the pictures for the customer that must be added on page 4.

Nicole Garner
Officer, BSA/AML EDD Support
EDD Operations and Compliance
Phone: (205) 766-5936


Every associate should be familiar with Regions corporate and individual obligations to comply with applicable federal requirements relating to anti-money laundering and terrorist financing. Every associate must take these obligations very seriously. The consequences for failure to comply with BSA/AML/OFAC laws and regulations can be significant and can result in criminal and civil penalties being imposed on Regions as well as on individual associates – Regions BSA/AML/OFAC Policy

Confidentiality Notice: The information contained in this email message is confidential and intended only for the use of the individual(s) named as addressed. If you are not the intended recipient, you are requested to please notify the sender and delete this information immediately; retaining no copies of any of this information, nor to take any action in reliance on the information it contains.


Internal Use

-----Original Message-----
From: Robert A. Sanders <robert.sanders@regions.com>
Sent: Wednesday, January 20, 2021 2:16 PM
To: Nicole Garner <Nicole.Garner@regions.com>
Cc: Meghan Wernecke <Meghan.Wernecke@regions.com>; Dave Leonard <dave.leonard@regions.com>
Subject: Form Returned: Interim Onsite Visit_FINAL_ - LA PORTE SHELL LLC 01-20-2021.pdf

Form Returned: Interim Onsite Visit_FINAL_ - LA PORTE SHELL LLC 01-20-2021.pdf

The attached file is the filled-out form. Please open it to review the data.

SANDERS 0035