Case 4:22-cv-01523   Document 49   Filed on 05/14/24 in TXSD   Page 1 of 18

United States District Court
Southern District of Texas
**ENTERED**
May 14, 2024
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ROBERT SANDERS, § | |
| § | |
| *Plaintiff,* § | |
| VS. § | CIVIL ACTION NO. 4:22-CV-1523 |
| § | |
| REGIONS BANK, § | |
| § | |
| *Defendant.* § | |

# ORDER

Pending before the Court is Defendant Regions Bank's ("Regions") Motion for Summary Judgment. (Doc. No. 35). Plaintiff Robert Sanders ("Sanders") filed a Response. (Doc. No. 39). Defendant replied. (Doc. No. 40). For the reasons outlined below, the Court hereby **GRANTS** Regions' Motion for Summary Judgment. (Doc. No. 35).

## BACKGROUND

This is an employment discrimination case. Sanders was employed by Regions as a Branch Manager in Sugar Land, Texas beginning in 2012 until his termination in 2021.

Sanders alleges that his former supervisor Dave Leonard ("Leonard"), a Consumer Banking Manager, was "disparaging and discriminatory" towards him during his employment at Regions. (Doc. No. 1-3 at 3). Sanders claims that he expressed interest in open Branch Manager positions at other Regions branches between 2018-2019 and was repeatedly denied the opportunity to transfer. Sanders applied and participated in a short interview with Leonard for a Branch Manager position in Lake Riverstone, Texas, in 2019. Sanders alleges that Leonard's interview questions were "irrelevant" to Sanders' experience and that he felt discriminated against during the interview.

1

In early January 2021, when Sanders was employed by Regions as a Branch Manager in Sugar Land, an employee in Sanders' branch, Melissa Miranda ("Miranda"), filed an internal complaint against Sanders. Sanders alleges that this internal complaint was made in retaliation for Sanders' 2020 performance review of Miranda, in which he rated her as "partially" meeting expectations. Regions alleges that Miranda's complaint raised numerous issues, including that Sanders made certain associates work unfavorable times, referred Regions' customers to his wife's mortgage business, came into work late, left early, and took long lunches, and did personal business with a Regions IT support associate, Eric Johnson ("Johnson"), who had a side construction business. (Doc. No. 35 at 11). On January 26, 2021, after Miranda's internal complaint was filed, Regions alleges that it interviewed Karen Mendez Rivadenayra ("Rivadenayra"), one of Sanders' direct reports, who stated that "once a month for about a year, Sanders…brought his personal money into the branch, exchanged it for new bills, asked his associates to keep his bills in their cashboxes, and brought back the original bills on payday." (Doc. No. 35 at 12). Associates were allegedly instructed by Sanders to "record his bills on their cashbox balance sheets as 'miscellaneous.'" (*Id.*). Regions alleges that Sanders was, in effect, "treating Regions' cashboxes like a pawn shop." (*Id.*).

Meanwhile, Sanders submitted his January 2021 expense report, which Leonard reviewed and found charges he thought were "odd," including mileage reimbursements for performing due diligence on five businesses apparently without formal requests from Regions. Leonard asked Sanders for the names of the business visited, and Sanders allegedly "provided five business names, most located at significant distances from Sanders' Sugar Land branch." (Doc. No. 35 at 13).

On February 11, 2021, Leonard arrived unannounced at Sanders' branch. Sanders alleges that Leonard "stood in close proximity" to Sanders while he logged into his computer, acting "as if [Sanders] was violating bank policies or tending to personal duties while on the clock." (Doc. No. 1-3 at 6).

Leonard then informed Sanders that they were scheduled to participate in a phone conference with Human Resources. Shortly thereafter, Sanders, Leonard, and Human Resources representative Melody Bodine ("Bodine") joined a telephone conference in which Bodine explained that an anonymous complaint had been made against Sanders. According to Regions, Sanders "described Miranda negatively on the call," admitted his wife had a mortgage business but denied referring Regions customers to her business, and, in response to the cashbox allegations, described himself as a "numismatist," or someone who collects and studies rare currency. (Doc. No. 35 at 13). Regions further alleges that Sanders "mentioned his family member was financially struggling, so he brought in $300 from his personal money collection and exchanged it for $100 bills; asked an associate to hold his original bills; then exchanged other bills he had for his original bills on payday." (Doc. No. 35 at 14). When asked why he did not help his family member with the money he had, Regions alleges that Sanders "did not answer and deflected, stating he was not experiencing personal gain and, to him, it was no different than when a bank's vault retains new bills." (Doc. No. 35 at 14).

Sanders claims that he relayed his concerns about retaliation to Human Resources at that time. On February 19, 2021, Bodine emailed Sanders to inform him that she forwarded his discrimination concerns to another Human Resources representative, Nicole Cooper ("Cooper") for investigation. On February 26, 2021, Cooper called Sanders. Sanders alleges that the call "transitioned from inquiry to interrogation[]." (Doc. No. 1-3 at 7). Sanders claims that "it was

3

obvious that their 'inquiry' was bias and in place to protect Regions and not research the incidents and occurrences reported by [Sanders]." (Doc. No. 1-3 at 7). Sanders further alleges that in the weeks following the phone call with Cooper, he experienced continued "investigation and retaliation" by Regions. (*Id.*).

While the investigation was ongoing, Miranda filed a second discrimination claim against Sanders with Regions' Human Resources Department. Miranda claimed that Sanders had approved bereavement leave for another employee's aunt but denied bereavement leave for the death of her aunt. Regions claims that it does not include aunts in its bereavement leave policy; when asked about this (given that he coded the other employee's leave as a "parent in law"), Regions claims that Sanders "said he made a mistake…and did not realize he could not correct it after the fact." (Doc. No. 35 at 17) .

On May 28, 2021, Sanders filed an EEOC charge alleging race discrimination and retaliation against Regions.[1] After a surprise visit to his branch for an "audit" conducted by Leonard and Meghan Wernecke ("Wernecke"), Regions' Regional Operation Manager, Regions terminated Sanders' employment on June 3, 2021. Regions cited several reasons for Sanders' termination, including: "(1) poor performance/management for inconsistently applying Regions' bereavement policy; (2) violating Regions' Transaction Processing Manual – Branch Current & Coin – Coin and Currency Collection related to pawning bills in cashboxes; (3) misapplying the Associate Expense Reimbursement Policy related to EDD; and (4) violating Regions' Code by failing to disclose an outside activity, his rental properties." (Doc. No. 35 at 17-18). Finally, Regions notes that "most significantly, Sanders also violated Regions' Code by presenting shifting explanations and untruthful communications to Regions during the investigation[.]" (*Id.*). Sanders

---

[1] Sanders later amended his EEOC charge to include a hostile work environment claim. (Doc. No. 39-1 at 110).

4

argues that race was a motivating factor in Regions' decision to terminate him, and that he was terminated in retaliation for engaging in protected activity.

Sanders first states causes of action for race discrimination and retaliation under the Texas Human Rights Commission Act ("TCHRA")[2] stemming from his termination and Regions' failure to promote or hire him to another Branch Manager Position. Additionally, Sanders alleges that severe discrimination and harassment while at Regions "unreasonably interfered with his work performance" and that he was subjected to a hostile work environment under the TCHRA.

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in

---

[2] The provisions of the TCHRA are outlined in Chapter 21 of the Texas Labor Code. *See* TEX. LABOR CODE ANN. § 21.001.

favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

## ANALYSIS

### I. Exhaustion of Administrative Remedies

Regions first argues that Sanders' claims should be dismissed because he never received a right-to-sue letter from the Texas Workforce Commission ("TWC"). Regions argues that presenting a TWC letter is a condition precedent to sue under the TCHRA, and that Sanders' Equal Employment Opportunity Commission ("EEOC") notice is not interchangeable with a TWC letter. In response, Sanders argues that he is not required to present a TWC letter to bring claims under the TCHRA; instead, he argues that "for jurisdictional purposes, a plaintiff need not request a right to sue letter because it is the mere *entitlement* to the letter that exhausts the administrative process and ends the [TWC]'s exclusive jurisdiction." (Doc. No. 39 at 19). Sanders contends that he timely filed his EEOC charge, which was "dual filed with the TWC," and that he let 180 days lapse from the date of his EEOC charge before filing suit. (Doc. No. 39 at 19).

The TCHRA is modeled on Title VII. "Like Title VII, the TCHRA provides that certain administrative steps are required before pursuing judicial remedies." *Gorman*, 753 F.3d at 169. The TCHRA provides that a complainant is "entitled to request from the commission a written notice of the complainant's right to file a civil action." *City of Pasadena v. Poulos*, No. 01-22-00676-CV, 2023 WL 7134974 (Tex. App.—Hous. [1st Dist.] Oct. 31, 2023) (citing TEX. LABOR CODE ANN. § 21.252(a)). The Commission's "failure to issue the notice of a complainant's right to file a civil action" does not affect the complainant's right to bring a lawsuit against his employer.

6

*Id.*; *see* TEX. LABOR CODE ANN. § 21.252(d). Indeed, the Fifth Circuit has held that "the failure to receive a Texas right to sue letter is not a jurisdictional defect" in the TCHRA context and can be excused where a plaintiff does not receive the letter until after the lawsuit is filed. *Gorman v. Verizon Wireless Texas, L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014). Texas courts have found that it is the *entitlement* to the right to sue letter that exhausts the complainant's administrative remedies rather than the receipt of the letter—in other words, the right to sue letter is not part of the exhaustion requirement; it represents merely *notice* of exhaustion. *Rice v. Russell-Stanley, L.P.*, 131 S.W.3d 510, 513 (Tex. App.—Waco 2004, pet. denied) (emphasis added).

Plaintiff has attached evidence of his EEOC charge and the EEOC right to sue letter. (Doc. No. 39-1 at 107). Plaintiff notes in his briefing that his EEOC Charge was "dual filed" with the TWC. The TWC is listed as an additional agency on the paperwork. (Doc. No. 39-1 at 107). The case law is clear that an EEOC right to sue letter cannot be substituted for a TWC right to sue letter. *Gorman*, 753 F.3d 169. The receipt of a TWC right to sue letter is still a mandatory statutory requirement even if it is not jurisdictional one. *Id.* Although it is troubling that Plaintiff has yet to receive a TWC right to sue letter or notify the Court of its receipt given that this lawsuit was filed nearly two years ago, the Court finds that the evidence of dual filing with the EEOC and TWC is enough to establish exhaustion at this juncture and to excuse the mandatory statutory requirement (especially given that Regions did not challenge Sanders' proffered evidence in its reply). Accordingly, the Court proceeds to the merits of Regions' motion for summary judgment.

## II.  Race Discrimination under the TCHRA

Under the TCHRA, "an employer commits an unlawful employment practice if because of race…the employer…fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the

7

terms, conditions, or privileges of employment[.]" TEX. LABOR CODE ANN. § 21.051. Section 21.051 is "effectively identical" to Title VII. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 633-34 (Tex. 2012). The Supreme Court of Texas has "consistently held" that cases interpreting Title VII should guide courts' interpretation of the TCHRA. *Id.* Texas courts follow the United States Supreme Court in recognizing two alternative methods of proof in discriminatory treatment cases. *Id.* "The first method, rather straightforward, involves proving discriminatory intent via direct evidence of what the defendant did and said." *Id.* When a claim involves circumstantial evidence, however, Texas courts utilize the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In *McDonnell Douglas*, the Supreme Court outlined a three-part framework to analyze a discrimination claim. First, the plaintiff must establish a prima facie case of discrimination. *Id.* If the plaintiff does so, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* If the employer provides a legitimate, nondiscriminatory reason for the employee's rejection, the burden shifts back to the plaintiff to prove that the employer's reason was pretext for discrimination. *Id.* at 804–05.

**A. Prima facie case of race discrimination**

The parties appear to agree that the *McDonnell-Douglas* burden shifting framework applies to Sanders' claim of race discrimination.[3] Regions argues that Sanders has failed to establish a prima facie case under TCHRA. To establish a prima facie case of discrimination under the TCHRA, "the plaintiff must establish that [he] (1) was a member of the protected class ..., (2) was qualified for the position at issue, (3) suffered a final, adverse employment action, and (4) was

---

[3] Regions' reply frames Sanders' response as arguing for a direct-evidence analysis, but Sanders explicitly states in his briefing that "Plaintiff asserts that he can establish a prima facie case of race discrimination based on circumstantial evidence." (Doc. No. 39 at 21).

8

either (a) replaced by someone [outside the protected class] or (b) otherwise treated less favorably than others who were similarly situated but outside the protected class." *Ross v. Judson Indep. Sch. Dist.*, 993 F.3d 315 (5th Cir. 2021) (citing *Tex. Tech. Univ. Health Sci. Ctr.-El Paso v. Flores*, 612 S.W.3d 299, 305 (Tex. 2020)). The "similarly situated" prong requires a plaintiff to show that she "was treated less favorably than others 'under nearly identical circumstances.'" *Morris v. Town of Indep.*, 827 F.3d 396, 401 (5th Cir. 2016). As a result, the practical effect is that "comparators must share the same job or responsibilities, the same supervisor, the same conduct leading to the adverse decisions, and essentially comparable violation histories." *Ray v. United Parcel Serv.*, 587 Fed. App'x 182, 194 (5th Cir. 2014). If a plaintiff cannot meet their burden in establishing a prima facie case of discrimination, the Court need not reach the subsequent burden-shifting analysis under *McDonnell Douglas*.

Defendants move for summary judgment on Sanders' race discrimination claims for "failure to promote" him to another branch and his termination. The Court will address each theory in turn.

### i. Failure to "promote"

Sanders' first theory of discrimination is based on Regions' failure to "promote" him to other open Branch Manager positions in which he had expressed interest. "Failure to promote is a discrete discriminatory act that starts a new clock for filing charges alleging that act." *Grice v. FMC Techs. Inc.*, 216 Fed. Appx. 401 (5th Cir. 2007) (unpublished) (citations omitted); *see also Pegram v. Honeywell, Inc.*, 361 F.3d 272, 280 (5th Cir. 2004). Regions argues that Sanders' failure to promote claim is time-barred. Under the TCHRA, Sanders was required to file his charge with the TWC within 180 days after Regions declined to select him for the other Branch Manager positions. Regions presented a sworn affidavit from Erin Mummert ("Mummert"), Associate

9

Relations Business Partner, Vice President at Regions, stating that Sanders applied for the Lake Riverstone branch position on April 4, 2019, was interviewed by Leonard, and was ultimately rejected in favor of another internal candidate. (Doc. No. 35-3 at 9). Mummert's affidavit further indicates that Leonard's last application (for the Lake Riverstone branch) was officially closed in Regions' internal database on May 22, 2019.[4] (Doc. No. 35-3 at 9). In Sanders' deposition, he noted that the Lake Riverstone application process occurred in 2019. (Doc. No. 39-1 at 25, 96:20-25).[5] Sanders filed his EEOC charge on May 28, 2021. (Doc. No. 39-1 at 107). Sanders does not cite to any rebuttal evidence in his response, nor did Sanders substantively respond to Regions' arguments as to the failure to promote claim. As a result, the Court finds that Sanders' failure to promote claim is time-barred. The Court grants summary judgment in favor of Regions on that claim.

### ii. Sanders' termination

Regions next argues that Sanders cannot demonstrate a prima facie case of race discrimination based on his termination because he cannot show that he was either 1) replaced by someone outside the protected class, or 2) treated less favorably than other similarly-situated employees outside the protected class. *See Ross,* 993 F.3d at 322. Regions does not appear to dispute that Sanders has met the first three prongs of the prima facie case: namely, that he is African-American, that he was qualified for his position, and that he suffered an adverse employment action (termination). Thus, the main issue is whether he was replaced by someone outside the protected class, or whether he has presented sufficient comparator evidence at the prima

---

[4] There was another opening at the Lake Riverstone branch in 2020, but Mummert's sworn affidavit states that Regions has no record of Sanders applying for the 2020 opening. There is no evidence to controvert this assertion.
[5] When asked at his deposition when he applied to the Sienna Plantation branch (another position that he indicated he was "passed over" for) he stated that he "didn't recall." (Doc. No. 39-1 at 25, 96:17-19). Mummert's affidavit states that the application process closed for the Sienna Plantation branch in 2018. (Doc. No. 35-3 at 9).

facie case stage. First, it is undisputed that Sanders was replaced by an African American associate, Beverly Ero. (Doc. No. 35-3 at 10, Doc. No. 35-1 at 95, 235:7-17). As a result, the Court finds that Sanders was not replaced by someone outside the protected class.

Next, the "similarly situated" prong requires a plaintiff to show that she "was treated less favorably than others 'under nearly identical circumstances.'" *Morris*, 827 F.3d at 401. To satisfy this requirement, Sanders must show that the proffered comparator(s) and he: "held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, had essentially comparable violation histories, and had engaged in nearly identical conduct to the conduct that resulted in Sanders' termination." *Ross*, 993 F.3d at 322.

Sanders argues that "it is clear that [Sanders'] internal complaints and complaints about his subordinates…were not taken into consideration by Mr. Leonard or Regions HR/OAC in the same manner as the claims/allegations being lodged against [Sanders]." (Doc. No. 39 at 22). As a result, Sanders contends that "Mr. Leonard treated non-African American[s] more favorably because, under identical circumstances, Regions failed to investigate Plaintiff's internal complaints of race discrimination and disparate treatment in comparison to complaints filed by African American employees." (*Id.* at 23). Sanders has failed to offer even a single comparator to support his prima facie case. HR's handling of the internal complaints filed by Sanders' subordinates do not qualify as "similarly situated" comparator evidence, even if they arose from the same investigation— Sanders has offered no evidence to show, for example, that the complainants held the same job or responsibilities as Sanders or had essentially comparable violation histories. *See Ross*, 993 F.3d at 322. Sanders has therefore failed to meet his burden to establish a prima facie case of race discrimination under the TCHRA. The Court grants summary judgment for Regions as to that issue.

### III. Retaliation under the TCHRA

Regions next argues that Sanders cannot establish a prima facie case of retaliation stemming from his termination under the TCHRA.[6] "A retaliation claim is related to, but distinct from, a discrimination claim, and one may be viable even when the other is not." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 764 (Tex. 2018). The Supreme Court of Texas has defined a retaliation claim accordingly:

> Unlike a discrimination claim, a retaliation claim focuses on the employer's response to an employee's protected activity, such as making a discrimination complaint. The TCHRA's prohibition against retaliation does not protect employees from all ostracism, discipline, or even termination following a discrimination complaint. Rather, a remedy exists only when the evidence establishes that a materially adverse employment action resulted from the employee's protected activities.

*Id.* at 764.

#### A. Prima facie case of retaliation

Establishing a prima facie case for retaliation requires the plaintiff to demonstrate that "(1) she engaged in protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action. *Gorman*, F.3d at 170. Under [the TCHRA], an employee has engaged in protected activity if [he] has opposed any practice made an unlawful employment practice under [the TCHRA]." *Id.* If the plaintiff establishes his prima facie case, the *McDonnell Douglas* burden-shifting framework applies. *Id.*

As to the first prong, Sanders argues that he engaged in two discrete protected activities: first, he points to the internal complaint of race discrimination that he filed with Regions in

---

[6] Regions also argues, out of an abundance of caution, that other actions that Sanders claims were retaliatory in his deposition (including Miranda's internal complaint against Sanders, and Leonard "accusing Sanders of things Sanders claims he did not do") are not actionable under the statute. (Doc. No. 35 at 26). Given that Sanders did not raise these as retaliatory actions in his response, the Court need not consider them.

February 2021, and second, he offers his EEOC charge filed in May 2021. The Court finds that both actions constitute protected activity under the TCHRA.[7]

Sanders points to his termination as the sole adverse employment action relevant to his retaliation claim. (Doc. No. 39 at 26-27). As a result, the issue for this Court to determine is whether Sanders has proffered enough evidence to establish that a causal link exists between the protected activity and his termination.

"A causal link required for a prima facie showing of retaliation does not rise to the level of a 'but for' standard." *Cooper v. Wal-Mart Transp., LLC*, 662 F. Supp. 2d 757, 777 (S.D. Tex. 2009) (citations omitted). "A 'causal link' for a prima facie showing is established if evidence shows that 'the employer's decision to terminate was based in part on knowledge of the employee's protected activity.'" *Id.* (citing *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir. 2001)). Temporal proximity between an employee's protected activity and an adverse action may provide the causal connection required for a prima facie case; however, in cases where mere temporal proximity has been held to be sufficient evidence, the proximity must be "very close." *Id.* (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

Sanders argues that the "close nexus" in time between the filing of his internal complaint in February 2021 and EEOC charge in May 2021, and his termination on June 3, 2021, creates an inference of a causal connection sufficient to establish a prima facie case. (Doc. No. 39 at 27). Additionally, Sanders argues that the ultimate decisionmakers (Leonard, Bodine, and Erin Mummert) were aware of Sanders' protected activity at the time they recommended his

---

[7] Protected activities under the TCHRA include "(1) opposing a discriminatory practice; (2) making or filing a charge; (3) filing a complaint; or (4) testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing." *Rodriquez v. Wal-Mart Stores, Inc.*, 540 Fed. Appx. 322 (5th Cir. 2013) (unpublished) (internal quotation marks omitted) (citing *Dias v. Goodman Mfg. Co.*, 214 S.W.3d 672, 676 (Tex. App.—Houston [14th dist.] 2007, pet. denied)). An employee who files an internal complaint of discrimination engaged in protected activity. *Id.*

termination. Sanders ultimately contends that "fact issues exist" due to "inconsistences between the determination and recommendation and what was used to make that recommendation to terminate [Sanders]." (Doc. No. 39 at 27). Regions argues that the independent nature of the investigation and its timing (the investigation began in January 2021, after Miranda filed the internal complaint against Sanders and before Sanders's first protected action in February 2021) undermine Sanders' claim that temporal proximity is enough to establish causation. (Doc. No. 35 at 27). "If ever an employee could pursue a retaliation claim to trial simply by issuing their own report after learning their employer was investigating them," Regions argues, "every workplace investigation resulting in a termination would result in a jury trial." (Doc. No. 35 at 27).

Undisputed evidence shows that the investigation and resulting termination occurred on the following timeline:

- **January 7, 2021**: Regions received an anonymous complaint about Sanders, which included allegations related to violations of Regions' outside activity policy and complaints about Sanders' treatment of associates. It also included allegations related to Sanders coming into work late, leaving early, and taking long lunches. (Doc. No. 39-1 at 188).
- **January 21, 2021**: The anonymous complainant disclosed herself to HR as Miranda and spoke with Leonard and Bodine. (Doc. No. 39-1 at 188; Doc. No. 35-3 at 58).
- **January 26, 2021**: Bodine interviewed Rivadenayra, who made the allegations related to Sanders' use of the cashboxes (detailed in Background section, above). (Doc. No. 39-1 at 188).
- **February 11, 2021**: Bodine and Leonard interviewed Sanders in connection with the investigation into Miranda's complaint. (Doc. No. 39-1 at 188).
- **February 18-19, 2021**: Sanders filed an internal complaint of discrimination against Leonard and retaliation by Miranda. (Doc. No. 39-1 at 178).
- **February 26, 2021**: Sanders was interviewed by HR regarding his complaint. (Doc. No. 39-1 at 190).
- **March 2, 2021**: Bodine and Mummert interviewed Sanders to follow up on Rivadenayra's cashbox allegations and issues with Sanders' January 2021 expense report. (Doc. No. 39-1 at 190).
- **March 9, 2021**: Regions receives "cease and desist" letter from Sanders' counsel. (Doc. No. 39-1 at 190).
- **March 24, 2021**: Bodine and Mummert interviewed Sanders related to new discrimination complaints filed by Miranda related to Sanders' handling of her bereavement leave claim. (Doc. No. 39-1 at 191).

- **March 25, 2021**: Mummert and Bodine discussed the investigation with Leonard, who decided to terminate Sanders' employment. (Doc. No. 35-3 at 8).
- **April 8, 2021**: Mummert submitted a recommendation for Sanders' termination to Jon Mark Sills, HR Business Partner at Regions ("Sills"). Sills supported the termination recommendation. (Doc. No. 35-3 at 253).
- **June 2, 2021**: HR received final approvals to terminate Sanders' employment. (Doc. No. 39-1 at 246).
- **June 3, 2021**: Sanders received notice that his employment had been terminated.

A "causal link" is established when the evidence demonstrates that "the employer's decision to terminate was based in part on knowledge of the employee's protected activity." Medina, 238 F.3d at 684. The "causal link" element is satisfied when the plaintiff shows that the employment decision and his protected activity were not "wholly unrelated." *Id.* (citing *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.1985). The Court finds that Sanders has sufficiently established a fact question concerning the "causal link" at the prima facie case stage: the temporal proximity between Sanders' internal complaint, his EEOC charge, and his eventual termination was short (the entire chain of events occurred within a five-month span). Additionally, although Regions argues that Leonard "decided to terminate Sanders' employment on or [about] March 25, 2021," the evidence (including relevant email chains and Bodine's internal investigation notes) show that the final termination decision was not made until June 2, 2021. Moreover, it is not clear to the Court based on the evidence presented that Leonard was entirely unaware of Sanders' internal complaint of discrimination at the same time that he was participating in the internal investigation. Viewed in the light most favorable to the plaintiff and given the close temporal proximity of Sanders' termination and his internal complaint/EEOC charge, the Court finds that Sanders has met his burden to raise an issue of material fact with respect to a prima facie case of retaliation under the TCHRA.

## B. *McDonnell-Douglas* framework

The burden of production "now shifts to [Regions] to articulate a legitimate, nondiscriminatory reason" for its termination of Sanders. *Medina*, 238 F.3d at 684-5. "This burden is satisfied by introducing evidence, which, if true, would permit the trier-of-fact to conclude that the termination was nondiscriminatory." *Id.* Regions avers that it "honestly believed the results of its investigation that found Sanders violated the Code and other Regions policies." (Doc. No. 35 at 29). Regions attached evidence supporting this claim, including an email between Stacey Rowland, Associate Relations Manager at Regions, Mummert, and Bodine, which indicates that Sanders' termination resulted from his "dishonesty" during the investigation. (Doc. No. 35-3 at 255). The email also included a list of Code of Conduct violations that had been "substantiated" during the investigation, including the "cashbox" allegations. (Doc. No. 35-3 at 256). This evidence is supported by a sworn affidavit by Mummert. (Doc. No. 35-3 at 8). The Court finds that this is enough to meet Regions' burden to articulate a legitimate, nondiscriminatory reason for its termination of Sanders.

Therefore, Sanders has the burden to "adduce evidence that [Regions'] proffered reason for his termination was merely a pretext" for race discrimination. *Medina*, 238 F.3d at 685. To meet this burden, Sanders must raise a fact issue showing that he would not have been terminated "but for" engaging in protected activity. *Id.* The burden at this stage is "more stringent" than the burden of establishing a "causal link" at the prima facie stage. *Id.* The plaintiff must reveal "a conflict in substantial evidence on the ultimate issue of retaliation in order to withstand a motion for summary judgment." *Id.* (citing *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998)). In response to Regions' proffer of a legitimate, nondiscriminatory reason for Sanders' termination, Sanders argues the following:

> Plaintiff asserts that Defendant's reason for termination was pretext to cover up a discriminatory and retaliatory intent to end Plaintiff's employment because there are genuine factual issues exist that provide inconsistencies in the way Defendant follows its policies as it relates to investigating internal complaints and the treatment of Plaintiff. Defendant's failure to follow their own policy creates inconsistencies and doubts as to Defendant's investigation.

(Doc. No. 39 at 28).

Sanders points out that the allegations of violations of the self-dealing policy were unsubstantiated. (Doc. No. 39 at 25). This is undisputed. It does not, however, undermine Regions' evidence that the investigation uncovered other violations of the Code of Conduct, and that the ultimate reason for Sanders' termination was his dishonesty. Sanders argues that "Miranda was known to brag around the office that she was fabricating a list against Plaintiff in collusion with Mr. Leonard," but cites to no supporting evidence for this proposition other than Sanders' own deposition testimony. (Doc. No. 39 at 25).[8] Finally, Sanders claims that "it is clear that [his] internal complaints about his subordinates…were not taken into consideration by [Leonard] or Regions HR/OAC in the same manner as the claims/allegations being lodged against [Sanders]" but does not offer any evidence in support of this conclusory statement. (Doc. No. 39 at 16).

Ultimately, Sanders has failed to meet his burden to raise a genuine issue of material fact that his termination would not have occurred "but for" his protected conduct. In fact, Regions has proffered overwhelming evidence to support its argument that Sanders' termination would have resulted regardless of his internal report or EEOC charge. (Doc. No. 35 at 29). As a result, the Court hereby grants Regions' motion on Sanders' retaliation claim.

---

[8] Defendant objects generally to Sanders' attached exhibits on authentication grounds but does not raise any evidence objections to Sanders' deposition testimony.

For the reasons articulated above, the Court **GRANTS** Regions' Motion for Summary Judgment in its entirety. (Doc. No. 35). Regions failed to move for summary judgment on Plaintiff's hostile work environment cause of action. (Doc. No. 1-3 at 12-13). Therefore, this claim remains.

Signed at Houston, Texas, on this the 14th day of May 2024.

Andrew S. Hanen
United States District Judge